UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DAVID BERGERON ET AL.,                  )
        Plaintiffs                      )
                                        )
        v.                              )
                                        )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY             )
And SHERIFF OF SUFFOLK COUNTY,          )
        Defendant.                      )
_____)

### DEFENDANT SHERIFF ANDREA CABRAL'S MEMORANDUM IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

## I.      INTRODUCTION

This is an action brought pursuant to 42 U.S.C. § 1983 alleging retaliation based upon political affiliation and union activity. The Plaintiffs[1] are ten (10) of the thirty-six (36) custody and non-custody staff at both the Nashua Street Jail ("NSJ") and the Suffolk County House of Correction ("HOC") who were decommissioned as Deputy Sheriffs on April 21, 2005 by Defendant Sheriff Cabral pursuant to M.G. L. c. 37, § 3. The Plaintiffs are all officers at the NSJ.

Sheriff Cabral was sworn in as the Sheriff of Suffolk County on November 29, 2002. She was appointed by then Governor Jane Swift to complete the term of retiring Sheriff Richard J. Rouse. Sheriff Cabral's appointment came in the aftermath of the publication of the Stern

---

[1] During the relevant time period of the Complaint, Plaintiffs John Barnes, John Ellis, Paul Giglio, John Grennon, and William Peneau held the rank of JO-1 and were members of the Jail Officers & Employees Association of Suffolk County ("JOASC"). Plaintiff Tim Turley was a Corporal (JO-2) and Plaintiff David Bergeron was a Sergeant (JO-3); both were members of JOEASC. Plaintiff Erik Dilibero was a permanent Sergeant (JO-3), serving as a temporary Lieutenant pursuant to the terms of the Collective Bargaining Agreement ("CBA"). At various points he was a member of JOEASC and Local 3643, the superior officers union. Plaintiff Lorne Lynch was a Lieutenant (JO-4) and Plaintiff Al Moscone was a Captain (JO-5). Both Lynch and Moscone belonged to Local 3643.

Commission Report, which detailed mismanagement at the Suffolk County Sheriff's Department under the prior administration and recommended numerous reforms, particularly in the area of training, hiring and promotions.  In particular, the Stern Commission urged the new Sheriff to adopt an objective promotional system based on merit and performance.

Utilizing the Stern Commission Report as a blueprint, Sheriff Cabral implemented a number of significant reforms upon taking office.  She completely reformed Department hiring and promotional practices and restructured the investigative and training divisions.  All candidates for employment must complete a comprehensive review that includes a lengthy written application, a panel interview, physical and academic testing, a criminal records check, and a personal interview with Sheriff Cabral.  During these individual interviews Sheriff Cabral candidly discusses with each candidate her expectations about their own conduct as officers and their obligation to report the misconduct of others. Sheriff Cabral has also expanded the length of the training academy that all new hires must attend to ten weeks and revamped the curriculum to include components on personal responsibility and accountability.  The Training Academy now serves to reinforce the message of professionalism and integrity that Sheriff Cabral communicates to new hires and is a means to deliver that same message to veteran officers through ongoing in-service training.  Finally, Sheriff Cabral has implemented a promotional testing process that is fair and comprehensive.  It is emphasized to all staff that promotions and advancements within the Department are based on job performance and merit.

M.G.L. c. 37 § 3 provides the Sheriff with the complete authority and discretion to appoint deputy sheriffs[2]. See Sheriff of Middlesex County v. International Brotherhood of Correctional Officers, Local RI-193, 62 Mass.App.Ct. 830, 834 821 N.E. 2d 512, 515 (2005) (Sheriff may not surrender her statutory authority to make deputy appointments).  The Sheriff

---

[2] "A sheriff may appoint deputies, who shall be sworn before performing any official act." M.G.L. c. 37, § 3.

appoints deputies from time to time pursuant to this statute and also pursuant to Suffolk County Sheriff's Department ("SCSD"/"Department") Policy S516.  Pursuant to this policy, "the Sheriff may appoint as many deputies as she believes are needed to execute the duties of her office." Any officer so appointed by the Sheriff "holds this status at the will of the Sheriff, who may revoke such appointment at any time and for any reason." (See SCSD Policy S-516, attached hereto as Exhibit 9).

The decommissioning was part of a comprehensive process that commenced in 2004 to make the Deputy Sheriff position more meaningful and reflective of the merit and performance based reforms that Sheriff Cabral was implementing at the Department.  An *ad hoc* committee reviewed the list of 472 current Deputy Sheriffs and, based upon consideration of a number of factors, recommended to Sheriff Cabral that certain employees be decommissioned.  Sheriff Cabral simply received the committee's recommendations; she did not participate in the review that was conducted. After inquiring about a few of the names on the list, none of which were the Plaintiffs, and adding one name, Plaintiff Erik Dilibero, Sheriff Cabral adopted the recommendation of the committee and decommissioned the thirty-six (36) employees.

The Plaintiffs allege that Sheriff Cabral decommissioned them as Deputy Sheriffs and took other adverse employment action against them in retaliation for their union activity and their support for her political opponent in the 2004 election for Suffolk County Sheriff. The summary judgment record belies the Plaintiffs' assertion in their Complaint that they were **active** union members and **avid** supporters and/or contributors to the campaign of Stephen J. Murphy, Sheriff Cabral's opponent in the 2004 Sheriffs race.  (Plaintiffs' Complaint)  In fact there is little evidence of political activity and very limited evidence of union activity.  Although Plaintiffs contend that the decommissioning has caused them to lose a significant source of **potential**

income, only two of the Plaintiffs have worked paid details with any regularity since 2000. They further allege that they have been subjected to a myriad of adverse employment actions (transfers, shift changes, imposition of discipline, changes in days off) and have been denied promotional opportunities. The summary judgment record does not support any of these allegations.

Sheriff Cabral maintains that the decommissioning was a lawful exercise of her authority and discretion pursuant to M.G.L. c. 37, § 3 and consistent with Policy S516. Further, any employment action taken with respect to any of the Plaintiffs was lawful and consistent with Department policy, and was not retaliatory.

The Plaintiffs have brought suit against Andrea Cabral in her individual and official capacity as Sheriff of Suffolk County.

The Complaint contains two counts: Count I- Political Retaliation and Count II- Protected Union Activity, both of which allege that the actions of the Defendant are in violation of the First and Fourteenth Amendment to the United States Constitution[3].

Sheriff Cabral contends that no genuine issues of material fact exist as to both Counts and that she is entitled to judgment as a matter of law.

## II.    FACTS

Defendants rely on the *Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1*, as well as documents that are filed therewith.

## III.    THE PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO COMPLY WITH THE COURT'S ORDER OF DISCOVERY.

---

[3] Although Plaintiffs allege a violation of the Fourteenth Amendment, the summary judgment record establishes that the Plaintiffs did not have a property interest in their appointment as Deputy Sheriffs. See M.G.L. c. 37, § 3; See Hatfield-Bermudez v. Aldanondo-Rivera et al., 2007 WL 2231623 (1st Cir. P.R.) The record further establishes that the Plaintiffs did not have a property interest in any particular assignment at the NSJ and none of the Plaintiffs were terminated from their employment with the Suffolk County Sheriffs Department. Accordingly, no due process violation occurred.

As a preliminary matter, this Court should dismiss the Plaintiffs' Complaint for failure to comply with the Court's Order dated May 9, 2007 requiring that all outstanding discovery (signed Interrogatories, relevant tax records, medical records, non-privileged union records and responses to Request for Admissions) be provided no later than May 18, 2007.  The Court's Order was in response to the Defendant's Second Motion To Compel (Document No. 11) filed on April 25, 2007.  The Defendant incorporates by reference the factual documentation and arguments made in that motion. The Court denied the Defendant's Motion without prejudice based upon the Plaintiffs' representation that the responsive discovery would be produced by May 18, 2007.  The discovery has not been produced, accordingly this Court should dismiss the Plaintiffs' claims.[4]

Plaintiffs have failed to provide tax returns for Plaintiffs Ellis, Barnes, Giglio and Dilibero.  Plaintiffs have failed to produce medical records for Plaintiff Giglio and counseling records for Plaintiffs Dilibero and Grennon.  Plaintiffs have supplied some counseling records for Plaintiff Bergeron.  However, despite the fact that Mr. Bergeron testified that he regularly received such treatment, the initial production of records from October 2006 has not been supplemented.

Plaintiffs have failed to produce notes, files, documents, and correspondence pertaining to the allegations in the instant lawsuit that Plaintiffs Turley and Barnes testified that they had in their possession. (Defendants' Second Motion to Compel, pgs. 6, 8-9, Document No. 11).  There has been no assertion of privilege, nor have Plaintiffs produced a privilege log.

Plaintiff John Ellis was the recording secretary for JOEASC from approximately April

---

[4] Plaintiffs did produce Responses to Requests for Admissions and Answers to Interrogatories.  Instead of answers however, Plaintiffs simply referred to pages of their depositions.

2003 to October 2004.  He testified at deposition that a box of JOEASC documents, including

drafts of the two letters and a press release issued to voters in March and April 2004 and minutes

of meetings, were provided to counsel for the Plaintiffs sometime in the fall of 2004 after new

union leadership was elected.  (Defendant's Second Motion to Compel, pgs. 7-8, Document No.

11). Included in that box were minutes of a March 2004 meeting attended by Sheriff Cabral,

Superintendent Harris, John Barnes, and Mark Turley.  According to Ellis the issue of dental and

vision benefits was discussed and Sheriff Cabral allegedly said that she was using the issue of

dental and vision benefits as a bargaining chip in contract negotiations.[5]  Ellis' account is

consistent with the deposition testimony of Plaintiff Barnes, testifying as the 30(b)(6)

representative of JOEASC. Mr. Barnes testified that locker #220 in the employee locker room at

the NSJ was utilized by the JOEASC Executive Board to store and maintain union documents,

including official minutes of union meetings (general membership, Executive Board, Board of

Directors), correspondence sent and received, records concerning contract negotiations, financial

records, information requests, and records concerning the terms and conditions of employment.

Mr. Barnes stated definitively that, at some point during a change in the leadership of JOEASC,

perhaps in 2006, union documents stored in locker #220 were turned over to the law firm of

Merrick, Louison and Costello, LLP. (Defendant's Second Motion to Compel, pgs. 9-10,

Document No. 11).  Despite the fact that two plaintiffs and former union officials have testified

that their attorneys stored union documents on their behalf, none of the requested documents

have been turned over nor has any explanation been provided as to their whereabouts.  No

privilege has been asserted, nor has a privilege log been produced.  Additionally, a subpoena

duces tecum was served on JOEASC with the return date extended to March 12, 2007, to

---

[5] See Deposition of John Ellis, dated January 18, 2006, pgs. 169:20-24; 170:24; 171:1-6, 19-20; 173:9-24; 174:1-6, attached to Exhibit 1, Affidavit of Ellen M. Caulo

accommodate Plaintiffs' counsel. To date no documents have been produced, nor has there been a response to the subpoena.[6]

Finally, Plaintiff Grennon testified at deposition that he had prepared handwritten notes of a meeting that he and Plaintiff John Barnes had with Defendant Sheriff Cabral in April 2004 concerning two letters and a press release authored and disseminated by Plaintiffs Grennon, Barnes and Ellis. Mr. Grennon testified that he gave the notes to Attorney David Condon of Merrick, Louison & Costello, LLP (Defendant's Second Motion to Compel, pg. 8, Document No. 11). These three plaintiffs (Grennon, Barnes and Ellis) contend that Defendant Sheriff Cabral decommissioned them in part, because of their involvement in preparing and issuing the letters and press release. They also allege that they were threatened during this meeting. Clearly, notes prepared by Plaintiff Grennon concerning a meeting he had with the Defendant regarding allegations in the instant complaint are discoverable. A request for the notes was made during the deposition and later in correspondence dated March 1 and March 15, 2007. To date the notes have not been produced. Nor has there been an assertion that these notes are privileged.

This Court has "broad authority to impose sanctions in discovery matters." In Re Eddy, 339 B.R. 8, 14 (D. Mass. 2006) quoting In re Bushay, 327 B.R. 695, 701 (1st Cir. BAP 2005). Federal Rule of Civil Procedure 37(b)(2)(C) provides:

> If a party… fails to obey an order to provide or permit discovery…the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:
> (C) An order…staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

---

[6] See Exhibit 1, Affidavit of Ellen M. Caulo, with attachment: Deposition of John Ellis.

It is well settled in the First Circuit that a party who fails to comply with a court order does so at his peril. In Re Eddy, supra. Where a party is on notice that continued noncompliance with an unambiguous order will result in "drastic consequences, the court is not required to exhaust less severe sanctions before either dismissing or entering a default judgment." Id; In re Bushay, supra at 704 ("It is well settled in the First Circuit that a trial judge does not need to exhaust milder sanctions before resorting to dismissal when a noncompliant litigant has disregarded court orders and have been suitably forewarned.").

In In re Bushay, the First Circuit articulated three factors that the trial court should consider in determining whether a party's conduct warrants dismissal:

(1)    the existence of a pattern of dilatory and willful misconduct;
(2)    prejudice suffered by the other party as a result of the misconduct; and
(3)    the potential for effectiveness of alternative sanctions.  In re Bushay, 327

B.R. at 704-705.

The conduct of the Plaintiffs in this matter clearly meets those criteria.  The Defendant served a Request for the Production of Documents in May 2006.  Through deposition of the individual Plaintiffs it became apparent that the initial response to that document production request was deficient and that there were numerous responsive and relevant documents in the possession of the Plaintiffs.  Indeed, testimony of some of the Plaintiffs has suggested that the documents are in the possession of counsel.  Since October 2006, Defendant's counsel has attempted to obtain the responsive discovery via correspondence, telephone calls and formal requests on the record during deposition.  The response from the Plaintiffs has been noteworthy for its silence.  The correspondence attached to the Defendant's Second Motion to Compel unequivocally establish that the Plaintiffs' conduct in this matter has been dilatory and willful. See In Re Eddy, supra at 15; In Re Bushay, supra at 704-705.

There is no question that the Defendant has been prejudiced by the Plaintiffs' refusal to produce relevant and responsive discovery. Plaintiff Turley testified that he had notes and an e-mail file regarding the incidents that form the basis for this lawsuit. Plaintiff Barnes testified that he regularly used his home computer to conduct union business and may have copies of e-mails, documents and correspondence relevant to the instant lawsuit. Plaintiff Grennon compiled handwritten notes of his meeting with Sheriff Cabral, which he turned over to Attorney Condon. None of these documents have been produced. Additionally, there has been no explanation for Plaintiffs Barnes and Ellis' testimony that a box of documents from their tenure as Union officials, the very period for which they allege they have been retaliated against, was given to their counsel. The Plaintiffs refusal to produce these documents has severely compromised the Defendant's ability to effectively refute the very serious allegations made by the Plaintiffs. In Re Bushay, supra at 705. Finally, tax records and medical and mental health records have not been produced for a number of the Plaintiffs. It is impossible to fully evaluate the Plaintiffs' claims for damages without these records.

There is no sanction short of dismissal that would be effective in this instance. The Plaintiffs' conduct in this matter has been egregious, as demonstrated by Defendant's numerous attempts to resolve this impasse informally and the two previously filed Motions to Compel, and has necessitated two extensions to complete discovery. Although this Court has not expressly warned the Plaintiffs that noncompliance would result in dismissal, any lesser sanction at this juncture would be superfluous. Indeed, the Court's Order denying **without prejudice** the Defendant's Second Motion to Compel based upon the Plaintiffs' representation that responsive discovery would be forthcoming by May 18, 2006[7], was an implicit acknowledgment that failure to comply would result in sanctions. In circumstances that "reflect[] a persistent pattern of

---

[7] Docket No. 12, filed May 8, 2007.

disregarding or disobeying the requirements of the Federal Rules of Civil Procedure, the Local Rules of the…District Court and explicit court orders," dismissal may be employed in the Court's discretion. <u>Big Top USA, Inc. v. The Wittern Group</u>, 183 F.R.D. 331 (D. Mass. 1998), quoting <u>Morgan v. Massachusetts General Hospital</u>, 901 F.2d 186, 195 (1st Cir. 1990). "Although resolution of cases on the merits is obviously preferable, a litigant who 'willfully violated procedural rules and orders of the district court' is not 'entitled to have his case heard on the merits.'" <u>Id</u>.  This is such a case.  The Plaintiffs claims should be dismissed with prejudice for failure to comply with discovery.

## IV.    <u>ARGUMENT</u>

A party is entitled to summary judgment when, after reviewing all the facts and reasonable inferences therefrom in the light most favorable to the non-moving party, the court determines that no genuine issues of material fact remain and that the moving party is entitled to judgment as a matter of law. See Fed. R.Civ. P. 56(c); <u>Putnam v. Town of Saugus</u>, 365 F.Supp.2d 151, 166 (D.Mass. 2005).  A "genuine issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party."  "A fact is material when it 'might affect the outcome of the suit under governing law.'" <u>Putnam v. Saugus</u>, 365 at 166.  As the moving party in this case, the Defendant can meet her burden by demonstrating the absence of evidence to support the Plaintiffs' case or by producing evidence to disprove an element of the Plaintiffs' case.  <u>Id</u>. Thereafter, as the non-moving party, the Plaintiff must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file designate specific facts showing there is a material issue for trial." <u>Id.</u>

"Brash conjecture, coupled with earnest hope that something concrete will eventually materialize, is insufficient to block summary judgment." <u>Maldonado-Denis</u>, 23 F.3d 576, 581,

(1st Cir. 1994), quoting <u>Dow v. United Brotherhood of Carpenters</u>, 1 F.3d 56, 58 (1st Cir. 1993).

Moreover, merely discrediting the moving party's testimony is not normally sufficient to defeat

the mover's motion for summary judgment; instead, the non-mover must submit affirmative

evidence. <u>First National Bank of Arizona v. Cities Service Co.</u>, 391 U.S. 253 (1968).

### A.    **THE PLAINTIFFS ARE UNABLE TO DEMONSTRATE THE NECESSARY CAUSAL LINK  BETWEEN THEIR PURPORTED POLITICAL AFFILIATION AND ANY ADVERSE EMPLOYMENT ACTION.  SUMMARY JUDGMENT MUST THEREFORE BE GRANTED TO SHERIFF CABRAL ON COUNT ONE OF THE COMPLAINT – THE POLITICAL RETALIATION CLAIM.**

Defendant Andrea Cabral was sworn in as Suffolk County Sheriff on November

29, 2002, taking over responsibility for the operation of the Suffolk County Sheriff's

Department, its two facilities (NSJ and HOC), 1100 employees and approximately 2200

detainees and inmates.  At the time that Sheriff Cabral took office approximately 400 employees

held the title of Deputy Sheriff, having been previously sworn in by her predecessor, Richard J.

Rouse.  Since the term of a Deputy Sheriff is coterminous with that of the sitting Sheriff, those

employees were no longer authorized to act as Deputy Sheriffs until sworn in by Sheriff Cabral.

Accordingly, the Department notified all Deputy Sheriffs that they were decommissioned.

Employees who subsequently applied to be appointed as Deputy Sheriffs by Sheriff Cabral were

commissioned without a thorough evaluation of their fitness for the appointment.  In 2002 and

2003 the Department[8] swore in hundreds of employees as Deputy Sheriffs en masse, without

scrutinizing their qualifications or fitness for the position.  The ten Plaintiffs were sworn in

during this time period.

---

[8] Sheriff Cabral, Chief of Staff Keeley and Superintendent Horgan were all qualified to commission employees as Deputy Sheriffs.  On those occasions when Sheriff Cabral was unavailable, Keeley and/or Horgan did the swearing in. See Exhibit 8, pg. 181.

Commencing in early 2004, Sheriff Cabral tasked Chief of Staff Elizabeth Keeley and Superintendent of Human Resources Michael Harris with the responsibility to evaluate the Deputy Sheriff appointment process and Policy S516 (Deputy Sheriff Appointments) with the purpose of making it a more meaningful title and consonant with the other merit and performance based reforms that she was implementing. After Sheriff Cabral was elected to a full six-year term in November 2004, it was determined that it was not necessary to redeputize all Deputy Sheriffs who were appointed after she first took office in 2002, because her term as Sheriff was continuous.  Instead, a decision was made to review the current list of Deputy Sheriffs and make a determination whether anyone should be removed. Superintendent Harris coordinated an *ad hoc* committee comprised of NSJ Superintendent Eugene Sumpter, HOC Superintendent Gerard Horgan, Deputy Superintendent Viktor Theiss, Chief Keeley and himself to review the list of current Deputy Sheriffs and make recommendations regarding which employees, if any, should be decommissioned.[9]

In early 2005 the list of individuals recommended for decommissioning was presented to Sheriff Cabral for her review and consideration.  Sheriff Cabral reviewed the list, added Plaintiff Dilibero's name to it and then, in the exercise of her statutory discretion, authorized the decommissioning.  It was this process that resulted in the decommissioning of thirty-six (employees) including the ten (10) Plaintiffs.  In reviewing the list, Sheriff Cabral relied on her own knowledge of, and interaction with, each of the Plaintiffs.[10]

In Count I of their Complaint, Plaintiffs contend that they were decommissioned and subjected to other adverse employment actions by Sheriff Cabral because they supported Sheriff

---

[9] See Defendant's Statement of Undisputed Facts ¶¶ 38-49.
[10] The only one of the Plaintiffs that Sheriff Cabral did not recognize was Paul Giglio.  In authorizing Giglio's decommissioning and any other employees whom she did not recognize, Sheriff Cabral simply relied on the committee's recommendation without inquiring about the reasons.

Cabral's opponent, Stephen Murphy, in the 2004 campaign for Suffolk County Sheriff, thereby violating their First Amendment rights.

To establish a prima facie case of political discrimination the Plaintiffs must show that their political affiliation was a substantial and motivating factor in an adverse employment action. Gonzalez-Pina v. Rodruquez, 407 F.3d 425, 431 (1st Cir. 2005); Rivera Torres, et al. v. Ortiz Velez, et al., 306 F.Supp. 2d 76 (1st Cir. 2002) (citing Padilla-Garcia v. Guillermo Rodriquez, 202 F.3d 69, 74 (1st Cir. 2000)); Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977); *see also* Mercado-Alicea v. P.R. Tourism Company, 396 F.3d 46, 51 (2005).  "Employment actions short of outright dismissal or demotion are redressable if improperly motivated, Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 (1990), **but** only if the employment action resulted in conditions 'unreasonably inferior' to the norm for that position.  Rosario-Urdaz v. Velazco, 433 F.3d 174, 178 (2006) (emphasis added) citing Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218-1219 (1st Cir. 1989) (en banc). The First Circuit requires plaintiffs to prove by **clear and convincing** evidence that their "job had been rendered '**unreasonably inferior**' to the norm for that position and that the change was of a magnitude that would cause 'reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.'" Bisbal-Ramos v. City of Mayaguez, 467 F.3d 16, 22 (1st Cir. 2006) quoting Agosto-de-Feliciano, supra at 1217-1220 (emphasis added); Torres-Martinez v. Puerto Rico Department of Corrections, 485 F.3d 19, (1st Cir. 2007); Gonzalez-Pina, supra.

The severity of harm that a plaintiff must establish to make out a cognizable claim of political retaliation is tantamount to that required for a constructive discharge. Agusto-de-Feliciano, 889 at 1218; Mercado-Alicea, supra at 52 (proof of constructive discharge requires

working conditions imposed by the employer so onerous, abusive or unpleasant that a reasonable person in the employee's position would have felt compelled to resign); Wilson v. Moreau, 2007 WL 1866758 * 7.  Requiring that proof of changed working conditions be established by **clear and convincing** evidence is "consistent with the First Amendment interest of the governmental employer." Agosto-de-Feliciano, supra at 1220, (emphasis added), citing Addington v. Texas, 441 U.S. 418, 424 (1979) ("clear and convincing" standard has been used to protect notably important interests in civil cases).

Should the Plaintiffs meet their burden of establishing unreasonably inferior working conditions they must further persuade, by a preponderance of the evidence, that their political affiliation was a motivating factor in the alleged adverse employment decision. Torres-Martinez, supra; Gonzalez-Pina, supra.  The burden then shifts to the employer to establish, by a preponderance of the evidence, that it would have taken the same action regardless of the plaintiffs' political affiliation. Mt. Healthy, 429 U.S. at 287.

1.      **The Plaintiffs Are Unable To Demonstrate That Decommissioning  Rendered Their Job Unreasonably Inferior To The Norm For That Position.**

The Plaintiffs will not be able to meet their burden of proving by **clear and convincing** evidence that either the decommissioning[11] or any of the other alleged adverse employment actions set forth in their Complaint resulted in conditions "unreasonably inferior" to the norm for that position. Pursuant to G.L. c. 37, § 3, Sheriff Cabral is vested with the statutory authority and discretion to appoint deputies who have general law enforcement powers, and are thus "able to perform certain functions beyond those that can be exercised by correction officers or other

---

[11] Sheriff Cabral reappointed Plaintiffs Ellis and Barnes as Deputy Sheriffs in May 2007.   Neither Ellis nor Barnes worked any paid details prior to their decommissioning in April 2005.  Additionally, since their reappointment in May 2007, neither Ellis nor Barnes have purchased a pager, a prerequisite to working paid details pursuant to Department Policy S520. (See Defendant's Statement of Undisputed Facts ¶¶ 269, 271-272).  Accordingly, all claims made by Ellis and Barnes pertaining to their decommissioning should be dismissed as moot.

employees of the sheriff". Sheriff of Middlesex County v. International Brotherhood of Correctional Officers, Local R1-193, 62 Mass. App.Ct. 830, 831-832 (2005), citing Tedeschi v. Reardon, 5 F.Supp.2d 40, 42 n.3 (D. Mass. 1998) (noting that appointment as a deputy sheriff confers "general law enforcement powers" and that correction officers in Essex County must be sworn as deputy sheriffs to be eligible for street detail); Commonwealth v. Baez, 42 Mass.App.Ct. 565, 567, 569 n. 6, 678 N.E. 2d 1335, 1338 (1997)(providing examples of statutes authorizing deputy sheriffs to serve criminal process and to make arrests in certain circumstances). The Deputy Sheriff designation carries no remuneration, Tedeschi, supra, and the general law enforcement powers conferred by that designation are not necessary to perform the duties and responsibilities of a correction officer. See Sheriff of Middlesex County, supra at 832.

The primary function of officers at the NSJ or HOC is the care and custody of inmates and detainees. There is no correlation between a Deputy Sheriff appointment and the duties and responsibilities inherent in that function. It is a designation above and beyond that of a jail or correction officer and, in the context of this case, simply provides an opportunity for officers to "enhance their income by performing duties outside the scope of their duties as [jail] officers." Sheriff of Middlesex County, Id. The designation of Deputy Sheriff has no impact on an employee's hours of work, days off, or assignment within the institution. The salary of officers at the Nashua Street Jail is determined by a collective bargaining agreement ("CBA"), and an employee's status as a Deputy Sheriff has no affect whatsoever on the salaries set forth in the CBA.

The decommissioning of the Plaintiffs in this case has had no material effect on their working conditions or their ability to perform the duties and responsibilities incumbent upon

15

them as jail officers.  The decommissioning did not alter the Plaintiffs' respective ranks, shifts, salary, or job duties. See <u>Tedeschi</u>, 5 F.Supp.2d at 43, n.10.  Subsequent to their decommissioning, the Plaintiffs Dilibero, Bergeron, Lynch and Moscone continued to supervise subordinate officers and handle job responsibilities commensurate with their rank. The remaining Plaintiffs continue to come to work and have the same responsibilities that they had prior to their decommissioning.   The record is completely barren of any evidence that as a result of being decommissioned, the Plaintiffs' duties were "substantially narrowed", <u>Agosto-de-Felicano</u>, supra at 1219, or effectively eliminated.  See <u>Rodriguez-Pinto v. Tirado-Delgado</u>, 982 F.2d 34, 40 (1st Cir 1993) (Plaintiff made out a prima facie case of political discrimination where, "since his reassignment, plaintiff only has been assigned clerical tasks which take ten minutes a day to perform"). The Plaintiffs do not allege that "<u>all</u> [their] work duties had been assigned to others" for a considerable period of time, <u>Diaz-Gandia v. Dapena-Thompson</u>, 90 F.3d 609, 615 (1st Cir. 1996) (holding that such a claim might constitute an adverse employment decision for the purposes of the Veterans Reemployment Rights Act of 1968), nor is there any evidence in the record to support such a claim.

To the extent the Plaintiffs claim of an adverse employment decision is premised on the fact that a Deputy Sheriff appointment is a prerequisite to performing private paid security details, it too must fail.  It is undisputed that the performance of private paid security details is not part of the job duties and responsibilities of an officer at the NSJ and the HOC.  It is an opportunity to earn extra income by providing security for outside agencies in exchange for compensation paid by those agencies[12].  See <u>Sheriff of Middlesex County</u>, 62 Mass.App.Ct. at 832.  Indeed, employees are not permitted to perform a private paid detail if it conflicts with their regular assignment for the Department.  There are no exceptions to this policy for Department

---

[12] See Defendant's Statement of Undisputed Facts ¶ 267

personnel.  Furthermore, the ability to perform private paid security details is a privilege

bestowed only upon those Deputy Sheriffs who meet all the requisite qualifications set forth in

Department Policy S520, of which a Deputy Sheriff appointment is only one.[13] Being denied an

opportunity to take advantage of a privilege is insufficient to make out a constitutional injury.

See Agosto-de-Felicano, supra at 1219 (An employee who has lost merely the "perks" of his

position e.g. the best office, or secretary, unlimited telephone access or minimal oversight, would

not meet the "unreasonably inferior" standard).

  Additionally, the summary judgment record establishes that in recent years only two of

the Plaintiffs (Lynch and Moscone) have taken advantage of the privilege to perform private paid

security details[14].  Since 2003 notification of available details has been made via a pager, which

must be purchased by the employee at the employee's own expense. Plaintiffs Peneau, Dilibero,

Giglio, Turley and Barnes never purchased a pager prior to their decommissioning in April

2005[15].  Plaintiff Grennon did not purchase a pager until one week before he was

decommissioned in April 2005, choosing to work as an EMT and enroll in a paramedic-training

program instead of working details[16].  None of those individuals therefore were contacted to

perform a private paid detail pursuant to Policy S520. Although Plaintiffs Bergeron and Ellis

purchased pagers neither worked a private paid detail during this time period.  Notably, only

Plaintiffs Lynch and Moscone have performed private paid details in accordance with Policy

S520 with any regularity since approximately 2002.  Indeed, even though Ellis and Barnes were

reappointed as Deputy Sheriffs in May 2007 they have not purchased a pager and have not

---

[13] See Defendant's Statement of Undisputed Facts ¶ 268; Exhibit 43, Policy S520.
[14] See Defendant's Statement of Undisputed Facts ¶¶ 270, 275-290.
[15]  Dilibero had a beeper in 2003 but did not purchase one in 2004 and 2005.  Dilibero did not work any paid details
in 2003.  See Exhibit 44, Coppi Aff. ¶ 6.
[16] See Defendant's Statement of Undisputed Facts ¶¶ 285-286

worked a paid detail[17]. Accordingly, since the decommissioning only impacts the Plaintiffs'

opportunity to perform outside employment (an opportunity that only two of the Plaintiffs have

taken advantage of), and not the job for which they were hired, the Plaintiffs cannot establish an

adverse employment action.

> **2.    The Plaintiffs Are Unable To Demonstrate That Any Employment
> Action Taken By The Department Rendered Their Jobs Unreasonably
> Inferior To The Norm For That Position.**

The Plaintiffs will not be able to meet their burden of proving by clear and convincing

evidence that any of the other alleged adverse employment actions set forth in their Complaint

resulted in conditions "unreasonably inferior" to the norm for that position.   The alleged adverse

employment actions complained of include transfers, reassignments, shift changes[18], discipline[19],

demotion and failure to promote.  As will be demonstrated below, none of these employment

actions reach the threshold of a constitutional injury.

> **a.    John Barnes[20]**

Plaintiff Barnes contends that his reassignment from his role as the Property Officer to

work as a line officer in a housing unit in January 2005 was an adverse employment action.

Barnes makes this contention even though he acknowledged at deposition that no position at the

---

[17] See Defendant's Statement of Undisputed Facts ¶ 272.

[18] Plaintiff Lynch has alleged that his days off were changed from every other weekend, Friday/Monday to every other weekend, Thursday/Tuesday.  This trivial act hardly constitutes that kind of "unreasonably inferior" working conditions that gives rise to a constitutional injury.  See Bisbal-Ramos v. City of Mayaguez, supra at 22.  Further, at Lynch's request, his days off were changed back to every other weekend, Friday/Monday effective January 31, 2007.

[19] Plaintiff Turley alleges in the Complaint that the twenty-day suspension he received in January 2004 constituted an adverse employment action that was taken against him by Sheriff Cabral in retaliation for his political affiliation and union activity.  (Complaint ¶ ¶ 45-46).  At deposition, Turley testified that he believed the discipline was imposed in retaliation for his union activities but the decommissioning was done in retaliation for his political affiliation. (Turley Dep. pg. 146-147, Ex. 15).  Regardless of the motives that Turley ascribes for the imposition of discipline, it does not constitute an unreasonably inferior work environment sufficient to establish a claim for political retaliation.

[20] See Defendant's Statement of Undisputed Facts ¶¶ 223-229.

NSJ is exclusively delegated to one person.[21] Barnes was one of a number of officers at the NSJ who received new quarterly assignments in January 2005.  Superintendent Sumpter authorized the new assignments without any involvement by or knowledge of Sheriff Cabral.[22]

Subsequent to his reassignment, Barnes maintained the same rank (JO-1), salary, and shift (7-to-3) that he had prior to his reassignment.  Subsequent to his reassignment Barnes still reported to the Nashua Street Jail to work.  Although, his job duties as housing unit officer were different than they were as the Property Officer, those changes were not "unreasonably inferior" to the norm for the position of jail officer. As stated above, the primary function of jail officers is to maintain care, custody and control of inmates in accordance with departmental policies and procedures[23]. Officers with the rank of JO-1 regularly and routinely work in housing units where they are responsible for supervising the inmates in those units.  Indeed, as Barnes himself conceded at deposition, the vast majority of jail officers work in housing units on all three shifts.[24] Barnes was hired as a jail officer 1993 and, prior to working in Property, he was assigned to a variety of posts within the institution including: transportation, classification, booking, kitchen, records, **and line officer in a housing unit**.[25] All of these assignments are consistent with the norm for the position of JO-1.  In fact, these are the very assignments that his fellow plaintiffs and JOEASC members (Turley, Peneau, Giglio, and Ellis) have worked and **continue** to work over the course of their careers as jail officers at the NSJ.

---

[21] See Exhibit 34, pg. 96:3-7
[22] Barnes acknowledged at deposition that he had no factual basis or evidence that Sheriff Cabral made the decision to reassign him from property to line officer. (See Exhibit 34, pg. 99:10-16, 18-21.
[23] See Exhibit 37, Position description JO-1.
[24] See Exhibit 34, pg. 93:2-13
[25] See Defendant's Statement of Undisputed Facts ¶ 223.

Although the reassignment resulted in Barnes' days off being changed from every weekend to every other weekend that hardly reaches the threshold of a constitutional injury.[26] The NSJ operates twenty-four hours a day, seven days a week.  The realities of working as an officer in a correctional facility is that you do not always have weekends off.  Indeed, it is the exception and not the norm for custody staff to have every weekend off. Further, after his reassignment, Barnes was able to pick his days off by seniority, which resulted in him having the same days off that he had before he was the Property officer.[27]  In fact, Barnes conceded at deposition that the assignment to line officer was not punitive, merely less desirable to him only because he did not have every weekend off.[28]  The summary judgment record does not support Plaintiff Barnes' contention that his reassignment from property to unit officer subjected him to conditions that were "unreasonably inferior" to the position for which he was hired.

### b.    Al Moscone[29]

In January 2005 Plaintiff Al Moscone was reassigned from Transportation Supervisor on the 7-to-3 shift to a Floor Supervisor on the 3-to-11 shift.  The reassignment of Moscone occurred in the aftermath of an audit of the Transportation Division that led to a reorganization of that Division.  The audit concluded that trip assignments (transportation of inmates to and from other correctional facilities, court and hospital appointments) could be handled more effectively if they originated out of Communications as opposed to Transportation, because the Communications officer was in charge of all radio communications, had knowledge of where all transportation vans and vehicles were, and could therefore more efficiently assign manpower.

---

[26] Property is only staffed Monday to Friday.  Officer Getchel was the property officer for approximately 10-12 years before he was replaced by Barnes.  Officer Getchel is currently a Corporal on the 11 to 7 shift. After Getchel was transferred from property he no longer had weekends off.  See Exhibit 21, pg. 16: 11-21, pg. 17:1-11.

[27] See Defendant's Statement of Undisputed Facts ¶ 267.

[28] Exhibit 34, pg. 93:14-16. 18-21

[29] See Defendant's Statement of Undisputed Facts ¶¶ 247-261.

There no longer is a Transportation Supervisor at the NSJ and trip assignments continue to be coordinated out of Communications.

Moscone was also one of a number of superior officers who were reassigned and had their shifts changed at that time. Subsequent to the reassignment Moscone retained the same rank (Captain), however his salary **increased** because he was now entitled to shift differentials for nights and weekends. Subsequent to the reassignment Moscone still reported to the NSJ for work everyday.  Although, his job duties as a Floor Supervisor were different than they were as the Transportation Supervisor, those changes were not "unreasonably inferior" to the norm for the position of Captain. The duties and responsibilities of a Captain include "issu[ing] orders and directly supervise[ing] other officers and staff to assure furtherance of Suffolk County Sheriff's Department goals, objectives and policies."[30]  That is precisely what a Floor Supervisor does.  As a Floor Supervisor, Moscone reports directly to the Shift Commander and has ultimate responsibility for the smooth and efficient operation of the housing units on his floor including the direct supervision of the subordinate officers assigned to those units and the inmates housed there.  The Floor Supervisor is second only to the Shift Commander in terms of importance to the operation of the NSJ.[31] Moreover, the primary function of any jail officer, regardless of rank is the care and custody of inmates committed to the institution.  Indeed, the Position Description for the rank of Captain expressly states that he "must be able to perform all duties and responsibilities and functions of any custodial officer within the Suffolk County Sheriff's Department."[32]  While Moscone's new responsibilities were different, they were no less important to the furtherance of the Department's goals and objectives.

---

[30] See Exhibit 47, Position description JO-5.
[31] See Defendant's Statement of Undisputed Facts ¶¶ 263-264.
[32] See Exhibit 47.

Moscone contends that he was given "a less desirable assignment… and a less desirable workload."[33]  However, other than his personal opinion that the assignment and workload was less desirable, there is nothing in the summary judgment record to establish that it was "unreasonably inferior".  The only evidence he offers in support of this contention is that he was the "only captain in charge of a floor" and that in his opinion the Department was "wasting a good guy on a floor."[34] This falls far short of the quantum of evidence necessary to establish changed working conditions unreasonably inferior to the norm. Although Moscone may have felt personally disrespected because he was the only "senior captain" assigned as a Floor Supervisor,[35] that is insufficient to reach the threshold of a constitutional injury. Agosto-de-Feliciano, 889 F.2d at 1218, citing Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 119 (1st Cir. 1977) (Where duties of transferred plaintiff remained appropriate for rank, no constructive discharge found even though plaintiff suffered a blow to his pride and incurred additional unreimbursed commuting costs.  A more severe reduction in the quality of working conditions is necessary to constitute a constructive discharge).  Moreover, Moscone frequently worked as a Floor Supervisor when he worked overtime shifts.[36]  In fact, on occasions when there are two Captains assigned to a shift, one often assumes the responsibilities of Floor Supervisor.  Indeed, Moscone was **not** deprived of work duties and responsibilities as he was **"in charge"** of a floor. See Rosario-Urdaz, 433 F.3d at 179 (completely depriving an employee of work indefinitely might make out a claim of an unreasonably inferior work environment).

Moscone was also relieved of some responsibility he had for the oversight of several contracts at the NSJ, including elevators, fire alarm system, and communications.  The reduction

---

[33] See Exhibit 19, Moscone Dep. pg. 62:1-2.
[34] See Exhibit 19, pg. 62:16-18
[35] See Exhibit 19, pg. 63:7-9.
[36] See Defendant's Statement of Undisputed Facts ¶ 263.

in his responsibilities did not result in a reduction of his salary.  This occurred during the same time period that Moscone was reassigned from Transportation to Floor Supervisor on the 3 to 11 shift. The responsibility for oversight of these contracts was reassigned to the Maintenance Supervisor, Lieutenant Morelli[37], because Maintenance was already responsible for the elevators and Lieutenant Morelli was effectively managing other contracts. Although Moscone was relieved of these responsibilities, he was given a new assignment with duties and responsibilities commensurate with his rank and experience.  This is not the kind of mistreatment that is cognizable in a political discrimination case. See  Agosto-de-Feliciano, 889 F.2d at 1219, ("an employee whose job has been substantially narrowed-perhaps reduced from manager of five departments to two-but who retains supervisory authority over matters of comparable significance to those taken away would not meet the 'unreasonably inferior' standard").  Here, Captain Moscone was given an assignment that required him to exercise supervisory authority over multiple staff members and the inmates in their care and custody, to ensure the smooth and efficient operation of housing units. These were not trifling responsibilities.[38]

The summary judgment record does not support Plaintiff Moscone's contention that his reassignment[39] from Transportation constituted an adverse employment action, actionable under a political discrimination theory.

    c.    **John Grennon[40]**

In October 2004 Plaintiff Grennon was reassigned from the Training Division

---

[37] Lieutenant Morelli and Moscone both belonged to Local 3643.  Sheriff Cabral later promoted Morelli to Captain.

[38] On January 31, 2007 Plaintiff Moscone was reassigned, at his request, back to the 7 to 3 shift.  See Defendant's Statement of Undisputed Facts ¶ 265.  Since his return to the 7-to-3 shift his responsibilities have included Central Control, Back Gate and Floor Supervisor.

[39] Moscone also alleges that the Department retaliated against him by imposing discipline without just cause. Moscone received a written warning which, other than an oral warning, is the least severe form of discipline under the CBA.  The written warning did not result in any loss of salary or rank.  An arbitrator overturned the discipline on July 24, 2006.

[40] See Defendant's Statement of Undisputed Facts ¶¶ 230-243

back to his original assignment as a jail officer (JO-1) at the NSJ where he had worked for approximately five years before being assigned to Training on a full time basis[41].  From that time until January 2007 when Sheriff Cabral promoted him to the rank of Lieutenant, Grennon duties and responsibilities have been commensurate with his rank as a JO-1 and his position as a Jail Officer.  Grennon contends that the reassignment constituted an adverse employment action.  However, the summary judgment record does not establish that his working conditions and duties, after the reassignment, were unreasonably inferior to the norm for his position.

Grennon was hired as a jail officer in 1993.  As a jail officer, Grennon knew that he could be assigned anywhere within the NSJ that the Shift Commander, Deputy Superintendent or Superintendent assigned him.  During the fourteen years that he has been working as a jail officer at the NSJ, Grennon has had a number of different assignments including: unit officer, escort officer, relief officer and housing control officer.  He has been assigned to work in Central Control, the back gate area and Transportation.  Additionally he has worked as a member of the Sheriff's Escort and Response Team ("SERT")[42].  All of these positions are consistent with the norm for the position of a JO-1.  Indeed, these are the very assignments that his fellow plaintiffs and JOEASC members (Giglio, Dilibero, Peneau, Ellis, Turley, Barnes, and Bergeron) have worked and **continue** to work over the course of their careers as jail officers at the NSJ.

In approximately 1998 Grennon was assigned to the Training Division on a part-time basis as a staff instructor.  He worked part-time in Training and part-time at the NSJ performing his responsibilities as a JO-1.  When Sheriff Cabral was first appointed in 2002, Grennon was working full-time as an instructor in the Training Division, primarily at the HOC, and occasionally at the NSJ.  In 2004 the Training Division moved to a facility in Chelsea, which is

---

[41] See Defendant's Statement of Undisputed Facts ¶ 231.
[42] SERT is comprised of offices trained to be immediately deployed throughout the facility in response to any and all emergencies and/or provide necessary back-up response in an emergency.

where Grennon was assigned until October 2004 when he was reassigned back to the NSJ. Significantly, during the entire time that Grennon was assigned to Training, either part-time or full-time, he was a first and foremost a jail officer (JO-1) whose current assignment happened to be Training. Indeed, while assigned to Training as an instructor on a full-time basis, Grennon continued to work overtime shifts as an officer (JO-1) at the NSJ, where his assignments included transportation, unit officer, medical unit officer, clinic lobby officer and SERT.[43] All of these assignments and their attendant duties and responsibilities are consistent with the norm for the position of Jail Officer (JO-1).[44]

The reassignment of Grennon had no effect on his shift (7-to-3) or days off (Saturday and Sunday) through the end of 2004. In January 2005, by virtue of his seniority, Grennon was able to select his shift (3 to 11) and days off (Friday and Saturday). Grennon maintained that same shift and days off by choice until January 2007, when Sheriff Cabral promoted him to the rank of Lieutenant. The summary judgment record does not support Plaintiff Grennon's contention that his reassignment from Training constituted an adverse employment action, actionable under a political discrimination theory.

### d.    Denial Of Promotions[45]

To the extent that the Plaintiffs allege that they were denied promotional opportunities because of their political affiliation, their claims must fail. The promotional process is governed by the terms and conditions of the Collective Bargaining Agreements ("CBA") and includes a formula for the selection of applicants from a list of qualified candidates.[46] For promotions to the ranks of Corporal, Sergeant and Lieutenant, an employee

---

[43] See Defendant's Statement of Undisputed Facts ¶ 232.
[44] See Exhibit 37.
[45] See Defendant's Statement of Undisputed Facts ¶¶ 305-337.
[46] See Defendant's Statement of Undisputed Facts ¶ 305.

must pass a promotional exam and meet all the other relevant criteria in order to be eligible for promotion pursuant to the process set forth in the CBA.  Sheriff Cabral's involvement with the promotional process occurs when she is presented with a list of candidates who have met all the requisite criteria.

Since Sheriff Cabral took office in November 2002, the Department has only offered two promotional examinations: a Lieutenants Promotional exam in February 2006 and a Corporal/Sergeant promotional examination that was administered in April 2007.  Plaintiffs Turley, Peneau and Dilibero took the Lieutenants Promotional exam but did not receive a passing score and therefore were not eligible to be promoted to the permanent rank of Lieutenant.   Plaintiffs Barnes, Ellis and Giglio chose not take the Lieutenants Promotional exam and therefore were not eligible for promotion pursuant to the terms of the CBA.  Accordingly, Sheriff Cabral did not deny Plaintiffs Giglio, Dilibero, Peneau, Turley, Ellis and Barnes an opportunity to be permanently promoted to the rank of Lieutenant.[47]

Plaintiffs Giglio, Ellis and Barnes chose not to take the Corporal/Sergeant promotional examination that was offered in April 2007, and therefore they are not eligible for promotion to either of those ranks.  Plaintiffs Peneau and Turley did take the examination, which is the first step in the promotional process, however the examinations have not yet been scored and the process is ongoing.   Accordingly, Sheriff Cabral has not denied Plaintiffs Ellis, Giglio, Peneau, Turley, and Barnes the opportunity for a permanent promotion to the rank of Corporal or Sergeant.[48]

Plaintiff Grennon passed the Lieutenant's Promotional exam and was promoted to the rank of Lieutenant in January 2007.  Based upon the promotional formula set forth in the CBA,

---

[47] See Defendant's Statement of Undisputed Facts ¶¶ 307, 316, 319, 321, 324 & 326.
[48] See Defendant's Statement of Undisputed Facts ¶¶ 307, 319, 321, 324 & 326.

Sheriff Cabral could have passed over Grennon without violating the terms of the CBA. However, unlike her predecessors Sheriffs Rufo and Rouse, Sheriff Cabral exercised her discretion and promoted Grennon from the rank of Jail Officer 1 (JO-1) to the rank of Lieutenant (JO-4). That promotion has provided Grennon with an increase in his salary and the opportunity to be a supervisor for the first time in his fourteen years with the Department.  At the time that he was promoted Grennon was the President of JOEASC.[49]

Plaintiff Bergeron received a passing score on the Lieutenant's Promotional exam but he but did not rate as highly in the other categories and has not yet been promoted from that list.[50] The other categories include a panel interview and recommendations from Shift Commanders. Sheriff Cabral has not denied Bergeron a permanent promotion to the rank of Lieutenant

### e.    Demotion of Plaintiff Dilibero[51]

Plaintiff Dilibero claims Sheriff Cabral demoted him from his position as a temporary Lieutenant in retaliation for his political affiliation. The summary judgment record simply does not support Dilibero's claim.  First, since April 2003 Mr. Dilibero's permanent rank has been Sergeant (JO-3).  Second, as will be demonstrated more fully below, there is no connection between Mr. Dilibero's political affiliation and the restoration of his permanent rank.

Mr. Dilibero was hired as a Jail Officer (JO-1) in 1987 and was promoted, along with several other jail officers, to the rank of Lieutenant in 2000 by former Sheriff Richard Rouse. Sheriff Rouse promoted Dilibero and the others without administering an examination.  Local 1134 (the precursor to JOEASC) filed a charge of prohibited practices with the Labor Relations Commission (LRC) to protest the promotion of Mr. Dilibero and others to the rank of Lieutenant

---

[49] See Defendant's Statement of Undisputed Facts ¶¶ 327-329.
[50] See Defendant's Statement of Undisputed Facts ¶ 322.
[51] See Defendant's Statement of Undisputed Facts ¶¶ 309-315.

in contravention of the parties' oral agreement that an examination would be prerequisite to any promotion.

In April 2003 the Labor Relations Commission ("LRC") ruled in favor of Local 1134 and directed the Department to rescind the permanent promotions of Plaintiff Dilibero and others to the rank of Lieutenant. Thereafter, Mr. Dilibero's permanent promotion to the rank of Lieutenant was rescinded and he reverted to his prior permanent rank of Sergeant. Sheriff Cabral appointed Dilibero a **temporary** Lieutenant pursuant to the temporary service language of the parties CBA in March 2004.[52]

Since his appointment as a temporary Lieutenant in March 2004, Plaintiff Dilibero had been on restricted duty as a result of a work related injury. The Department provided all reasonable accommodations to facilitate Mr. Dilibero's return to work after his injury, including shortening his workday to four (4) hours, and assigning him to a post that was consistent with his physical limitations. While he was on restricted duty, Plaintiff Dilibero was not performing the supervisory responsibilities of a Lieutenant. Moreover, Sheriff Cabral was aware that Dilibero was not an effective supervisor.

On January 26, 2005 Sheriff Cabral restored Dilibero to his permanent rank of Sergeant. Restoring an employee who has been acting in temporary service at a higher rank pursuant to the terms of the CBA, to their permanent rank does not constitute a demotion. Plaintiff Dilibero will be unable to persuade the Court otherwise.

### 3. The Plaintiff's Political Affiliation Was Not A Substantial Motivating Factor In Any Employment Action.

---

[52] Article XI of the CBA between JOEASC and Suffolk County provides that employees who perform, pursuant to assignment, temporary service in a position higher than the position in which he performs regular service, shall be compensated at the rate to which he had been entitled had he been promoted to that position.

Should this Court determine that the Plaintiffs have met their burden of demonstrating by clear and convincing evidence that they were subjected to an unreasonably inferior work environment, their claims must still fail because they are unable to demonstrate that their political affiliation was a substantial factor in rendering their environment inferior.

To sustain their burden, Plaintiffs must demonstrate that they "**engaged** in constitutionally protected conduct **and** that this conduct [political affiliation or opinions] was a substantial or motivating factor for the adverse employment decision." Carrasquillo v. Pereira-Castillo, 441 F.Supp. 2d 363, 368 (D. P.R. 2006), quoting Padilla-Garcia v. Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000). Plaintiffs contend that they engaged in the protected conduct of supporting Sheriff Cabral's opponent in the 2004 election for Suffolk County Sheriff, and that their support was the motivating factor behind all the alleged adverse employment actions set forth above. In order to establish this element of their claim, the Plaintiffs must "produce sufficient evidence to show that [Sheriff Cabral] knew of [their] political persuasion." Carrasquillo, Id., quoting from Goodman v. Penn. Turnpike Com'n, 293 F.3d 655, 663 (3rd Cir. 2002); Nieves-Hernandez v. Puerto-Rico Elec. Power Authority, 2006 WL 1704572 * 3 (D.P.R. June 16, 2006) ("For political affiliation to be a motivating factor behind an adverse employment action, those responsible for the deprivation of constitutional rights must have had knowledge of the Plaintiff's political affiliation.").

Direct evidence that an employee was terminated for his political affiliation is not necessary. Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 (1st Cir. 1998) (highly-charged political atmosphere, conspicuous target and reassignment of tasks to members of opponent party may be sufficient to draw inference that politically motivated). However, the evidence must do more that merely juxtapose an individual's political affiliation with the fact that he was arguably

treated unfairly. <u>Colon-Rodriguez v. Lopez Bonilla, et al.</u>, 344 F. Supp. 2d 333 (1st Cir. 2004)

(holding that without evidence establishing the employer knew of the employee's political

affiliation, a prima facie case was not established).  It is not enough for the Plaintiffs to introduce

evidence that they were politically active and that Sheriff Cabral was aware of their opposing

political affiliation. <u>Carrasquillo,</u> 441 F. Supp at 369.  Rather, in order to prevail, Plaintiffs **must**

point to evidence in the record that would "permit a rational fact finder to conclude that the

challenged personnel action occurred and stemmed from a politically based discriminatory

animus." <u>Id.</u>, quoting <u>Rivera-Cotto v. Rivera</u>, 38 F.3d 611, 614 (1st Cir. 1994).

  The summary judgment record is devoid of any evidence to support the Plaintiffs'

contention that Sheriff Cabral knew that they supported her political opponent, Stephen Murphy,

**and** that she intentionally decommissioned them and authorized the other alleged employment

actions in retaliation for that support.  While the 2004 primary campaign for Suffolk County

Sheriff was well publicized, there is no evidence that a "highly charged" political atmosphere

permeated the Department or its two facilities, the NSJ and the HOC.  See <u>Rodriguez-Rios</u> ,

supra.  Sheriff Cabral did not solicit nor accept campaign contributions from any employee of the

Department.  Moreover, she took significant steps to remove political considerations from the

workplace by completely reforming the Department's hiring and promotional practices to

emphasize merit and job performance.[53]

  None of the Plaintiffs were prominent in their support for Sheriff Cabral's opponent nor

did they hold prominent positions in Murphy's campaign.  None of the Plaintiffs were outspoken

in their support for Sheriff Cabral's opponent at the Department.  Indeed, almost all of the

Plaintiffs acknowledged being very discreet about their political beliefs and affiliations while at

---

[53] See Exhibit 2, Cabral Aff. ¶ 6-7.

work.[54] This is consistent with the fact that many of the Plaintiffs were unaware of any other employees, including fellow Plaintiffs, who supported Stephen Murphy.  Although Plaintiff Moscone hosted a fundraiser for Stephen Murphy two weeks before the primary election, some of the Plaintiffs learned about it for the first time upon reading deposition transcripts in this case. In fact Sheriff Cabral and Superintendent Sumpter were only aware, after the fact, that Moscone had attended a fundraiser, not that he hosted one. They did not learn that he had organized the fundraiser until depositions were taken in this lawsuit.  *Contrast* Peguero-Moronta v. Santiago, 464 F.3d 29 (1st Cir.2006) (Plaintiff's evidence portrayed a relatively small workplace where employees all knew one another and political affiliations were common knowledge).  Most importantly, none of the Plaintiffs had specific conversations with Sheriff Cabral or any member of the *ad hoc* committee that reviewed the Deputy Sheriff appointment process, in which they identified themselves as being aligned with and supportive of Sheriff Cabral's opponent.  While Sheriff Cabral may have **assumed** that some of the Plaintiffs (Ellis, Barnes, Grennon, Bergeron and Moscone)[55] supported Stephen Murphy that is insufficient to establish liability for political retaliation.  See Carrasquillo, 441 F. Supp at 369; Roman v. Delgado Altierei, 390 F.Supp.2d 94, 102-103 (D.P.R. 2005).  Notably, the **only** conversation that any of the Plaintiffs had with Sheriff Cabral concerning the 2004 campaign was when Plaintiff Moscone informed Sheriff Cabral that he was **not** supporting her opponent.

---

[54] See Exhibit 30, pg. 94: 5-14, pg. 95: 2-4; Exhibit 29, pg. 61: 22-24, pg. 62: 1-7; Exhibit 20, pg. 69: 14-24, pg. 70: 1-4; Exhibit31, pg. 140: 21-24, pg. 141: 1-7; Exhibit 19, pg. 109:23-24, pg. 110:1, 11-13; Exhibit 18, pg. 179:20-24, pg. 180: 1-4.

[55] Sheriff Cabral assumed that Ellis, Barnes, and Grennon supported Stephen Murphy because the two letters and a press release that they authored in March/April 2004 contained information and allegations similar to literature issued by the Murphy campaign. The letters and press release never mentioned Stephen Murphy or the campaign for Suffolk County Sheriff.   Sheriff Cabral assumed that Bergeron supported Murphy because she saw him holding a Murphy sign in West Roxbury on primary day in September 2004.  Finally, she assumed that Moscone and perhaps Lynch supported Murphy because they attended a fundraiser for him.  However, Sheriff Cabral had no knowledge of the political affiliations of Plaintiffs Giglio, Dilibero, Peneau and Turley. See Exhibit 2, Cabral Aff. ¶ 22-26.

At most the summary judgment record establishes that the Plaintiffs' support for Stephen Murphy ranged from tepid to modest.[56] Further, the manifestation of that support (attendance at routine campaign events, fundraising, rallies, bumper stickers) is insufficient to establish that Sheriff Cabral knew of this support and took retaliatory action **because** of it. Roman, supra at 102-103 (D.P.R. 2005) (Knowledge of political affiliation cannot be merely established through testimony of having been seen or met during participation in routine campaign activity, having political propaganda attached to one's car or house or through the knowledge of third parties); Carrasquillo, 441 F.Supp.2d at 369 (Evidence of plaintiff's membership in political party, service as an electoral officer, attendance at political rallies, fundraising and other activity in support of political campaigns, not sufficient to survive summary judgment). Even if the Court considers the letters and press release written by Plaintiffs Ellis, Barnes and Grennon as evidence of their political support for Stephen Murphy, the conclusion is the same.

The mailings did not mention Stephen Murphy or the campaign for Suffolk County Sheriff, nor did they solicit support for his candidacy. Ellis, Barnes and Grennon did not identify themselves in the letters as close political allies of Stephen Murphy. There is no evidence that Ellis, Barnes and Grennon, or any of the Plaintiffs occupied a policymaking or trust position in the Murphy campaign. Nor is there any evidence that they were prominent in their political activity on his behalf that would make them conspicuous targets for political discrimination. See, Rodriguez-Rios v. Cordero, 138 F.3d 22, 24 (1998). Indeed, there is no evidence in the summary judgment record that their allegiance to his campaign distinguished them from any of the over one hundred JOEASC members who voted to endorse Murphy's candidacy, many of whom remain Deputy Sheriffs. See Gonzalez-De-Blasini v. Family Dept., 377 F.3d 81, 85-86 (1st Cir.2004) (Evidence that plaintiff was a well-known supporter of political party, had held a trust

---

[56]See Defendant's Statement of Undisputed Facts ¶¶ 179-210.

position under prior administration of that political party and was allegedly demoted after opposing political party came to power was not adequate to show that political affiliation was a substantial factor in the challenged action.); Wilson v. Moreau, 2007 WL 1866758; Day v. City of Providence, 338 F.Supp.2d 310 (1st Cir. 2004); Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990) (Juxtaposing someone else's politics with the fact that the employee was treated unfairly is not enough to state a constitutional claim.).  There is simply nothing in the summary judgment record to support the Plaintiffs' contention that their political support for Stephen Murphy was a **substantial** factor in any of the alleged adverse employment actions about which they complain.

In Day v. City of Providence, 338 F. Supp. 2d 310 (1st Cir. 2004) the Court held that a city employee's support for a prior mayor, and his expression of his political views on three or four radio programs did not establish a prima facie case of political discrimination.  Critical to the Court's ruling was that there was no evidence that the mayor or his staff were even aware of the radio broadcasts, nor that the plaintiff's support of a previous mayor motivated the current mayor's decision to terminate him.  Similarly in Wilson v. Moreau, 2007 WL 1866758, __F.3d__(1st Cir. 2007) the Court determined that the fact that a contractor erected some campaign signs for a former mayor and donated a modest amount to his campaign, was not sufficient to establish that the current mayor's implementation of general requirements for contractors engaged in work with the City were political revenge against him.

Here the evidence is even more tenuous.  At most the Plaintiffs can establish that they engaged in rather routine, low profile campaign activity on behalf of Stephen Murphy in the weeks before the primary election in September 2004, and that for some of the Plaintiffs (Moscone, Ellis, Barnes, Grennon, Bergeron, and perhaps Lynch), Sheriff Cabral assumed they

supported her opponent.  The reassignment of Plaintiffs Moscone and Barnes did not occur until

January 2005, almost four (4) months after the primary election,[57] see <u>Acevedo-Diaz</u>, 1 F.3d at

69 ("Mere temporal proximity between a change in administration and a public employee's

dismissal is insufficient to establish discriminatory animus."), and the record is clear that Sheriff

Cabral was not involved in those reassignments.  Although the reassignment of Grennon was

done at the direction of Sheriff Cabral approximately one month after the primary, that too is

insufficient to establish a discriminatory animus. <u>Id.</u>  Similarly, the decommissioning of all

Plaintiffs occurred in April 2005, almost eight (8) months after the primary election and after an

*ad hoc* committee completed the review it began months before in 2004.  *Contrast* <u>Peguero-</u>

<u>Moronta</u>, supra at 53 (Plaintiffs, who all shared a different political party than the party currently

in power, were dismissed within one month of the change in political administrations **and** after a

hurried evaluation process that did not conform to regulations.)  Sheriff Cabral had no

involvement in that review or the process that resulted in the identification of the individuals

who were recommended for decommissioning.  Sheriff Cabral did not provide any instructions

or directives to the committee.  She did not provide the committee with the names of any

employees that she wanted decommissioned, other than adding Plaintiff Dilibero's name to the

list, after the review was completed.

There was no political litmus test, nor will the Plaintiffs be able to prove otherwise. In

essence, the Plaintiffs claim that Sheriff Cabral must have known their political affiliation

because she **could** have investigated it and found out, and she must have retaliated against them

because they were decommissioned and some were reassigned.  These assertions are inadequate

to state a prima facie case of political retaliation because "merely juxtaposing the decision-

---

[57] Sheriff Cabral had no opponent in the November general election and therefore, the 2004 campaign for Sheriff
was essentially over after she won the primary in September.

maker's politics against an adverse employment decision is insufficient to support a claim of political discrimination." <u>Beleaguer-Santiago</u>, et al. v. <u>Echegoyen</u>, et al. 2007 WL 439109 *9, 219 Fed.Appx. 13 (1st Cir. 2007), citing <u>Mercado-Alicea</u>, 396 F.3d at 52.

Any inference of political motivation is completely destroyed by Sheriff Cabral's **failure** to decommission individuals who were known to her or her Command Staff as supporters of Stephen Murphy, i.e. Officer Pat O'Brien, Captain Richard Coleman, Officer Angelo Rossi, Sergeant Richard Rossetti, Officer Dennis Guilfoyle, Officer William McLaughlin, Captain Kevin Janielis, Sergeant Miguel Bueno, John O'Connor, Benny Fiasconaro, Mel Reed, Nick Adams and Jeff Fiorentino.[58]  Moreover Sheriff Cabral promoted individuals who were known to her or her Command Staff[59] as supporters of Stephen Murphy, i.e. Mel Reed, Tom Donohue, Nick Adams, Al Mancini and John Farragher.  The Plaintiffs are unable to establish any showing that a causal connection exists between any alleged adverse employment and their political affiliation; accordingly their claims must be dismissed. See <u>Correa-Marinez</u>, supra.

**4.  <u>All Employment Action Taken Against The Plaintiffs Was Done For
   Legitimate Non-Discriminatory Reasons</u>**

Even if this Court determines that the Plaintiffs have met their initial burden to demonstrate that the decommissioning and reassignments constituted adverse employment actions that were substantially motivated by political affiliation, their claims must still fail. Sheriff Cabral would have taken the same action, regardless of the Plaintiffs' political beliefs. <u>Mercado-Alicea</u>, 396 F.3d at 51; <u>Vasquez-Valentin v. Santiago-Diaz</u>, 385 F.3d 23, 30 (1st Cir.2004); <u>Mount</u> <u>Healthy</u>, 429 U.S. at 286.  "A view of causation that focuses solely on whether protected conduct played a part in an employment decision…would put an 'employee in a better

---

[58] See Exhibit 2, Cabral Aff. ¶ 27; Exhibit 4, Horgan Aff. ¶ 12.
[59] See Exhibit 2 Cabral Aff. ¶ 27; Exhibit 4 Horgan Aff. ¶ 13.

position as a result of the exercise of constitutionally protected conduct that he would have occupied [otherwise].'" <u>Vasquez-Valentin</u>, supra (quoting <u>Mt. Healthy</u>, supra at 285).

**<u>Decommissioning</u>**

The summary judgment record establishes that the Plaintiffs were decommissioned for legitimate and non-discriminatory reasons. It is undisputed that pursuant to M.G.L. c. 37, § 3 Sheriff Cabral possesses the statutory authority and discretion to appoint Deputy Sheriffs. It is also undisputed that since she took office in November 2002, Sheriff Cabral has implemented significant reforms designed to enhance professionalism and create a merit and performance based workplace. To that end she completely reformed the hiring process to eliminate political patronage and implemented a promotional process that rewards job performance and merit. Consistent with those reforms, Sheriff Cabral tasked her Chief of Staff and Superintendent of Human Resources to review the Deputy Sheriff appointment process and make it more consonant with the other changes that she was implementing. It was this process, which involved looking at disciplinary history, comportment and demeanor, professionalism, and job performance, that resulted in the decommissioning of thirty-six individuals, including the ten (10) Plaintiffs.[60]

The summary judgment record clearly establishes that Sheriff Cabral would have authorized the decommissioning of all ten plaintiffs regardless of their political affiliation or

---

[60] To the extent the Plaintiffs' claim that Sheriff Cabral's decision to decommission them, made some time after she was presented with the list of recommendations, is an extension of discriminatory conduct or improper considerations by the committee, it must fail. First, the record does not establish any discriminatory animus on behalf of the committee. Second, there is no nexus between the actions of the committee in conducting the review and Sheriff Cabral's personal decision authorizing the decommissioning. The record is clear that Sheriff Cabral had absolutely no involvement in the review conducted by the *ad hoc* committee. She provided no instructions, no directives, no specific criteria and no list of names. Even if there was evidence of discrimination on behalf of certain members of the committee, there is no evidence that Sheriff Cabral acquiesced in or condoned any alleged discriminatory conduct on behalf of the committee amounting to deliberate indifference. See <u>Barreto-Rivera v. Medina-Vargas</u>, 168 F.3d 42, 48 (1st Cir. 1999) (no supervisory liability pursuant to § 1983, absent evidence of deliberate indifference).

activity.  Since the Deputy Sheriff designation authorizes employees to act in an official capacity

outside the institution and with the public at large, Sheriff Cabral wanted the position of Deputy

Sheriff to reflect the best the Department had to offer.  From Sheriff Cabral's perspective, in

addition to the officers involved in community outreach programs, Deputy Sheriffs represent the

public face of the Department.  Because of their interaction with the general public, Deputy

Sheriffs are at times emissaries of the Department. It was important to Sheriff Cabral that

employees selected for that privilege be professional in the performance of their duties and their

interaction with staff and inmates. Indeed, even the Plaintiffs concede that professionalism,

integrity, good judgment and respect are important qualities that all Deputy Sheriffs must possess

and that a Deputy Sheriff appointment is an acknowledgement by the Sheriff that you are

"considered professional and of some integrity."[61]

The record is replete with evidence that, in the opinion of Sheriff Cabral and the

Committee, these individuals either by attitude, comportment, discipline, job performance, and

lack of respect were not fit to be Deputy Sheriffs, thereby justifying the recision of their

discretionary appointments.  Plaintiffs Giglio, Dilibero, Lynch and Bergeron were openly hostile

and negative toward the Sheriff and Command Staff.[62]  Plaintiffs Peneau and Turley were

disciplined for conduct that was disrespectful and unprofessional (Peneau) and that called into

question their judgment and veracity (Turley).  Additionally, Turley was observed to be openly

disrespectful to Chief Keeley after he was disciplined[63].  Plaintiff Moscone's job performance as

Transportation Supervisor was not satisfactory and he was unwilling to implement the changes

and improvements recommended by the Transportation audit[64]. Finally Plaintiffs Ellis, Barnes

---

[61] See Exhibit 20,Ellis Dep. pg. 33:15-19
[62] See Defendant's Statement of Undisputed Facts ¶¶ 50, 57, 61-62, 97, 99-100 & 111.
[63] See Defendant's Statement of Undisputed Facts ¶¶ 51-52, 54-55 & 98.
[64] See Defendant's Statement of Undisputed Facts ¶¶ 112, 255-258.

and Grennon authored and disseminated two letters and a press release that disparaged the

Department and contained intentionally false and misleading information about Sheriff Cabral

and her conduct[65].  Further, Sheriff Cabral found Grennon to be duplicitous[66]. The litany of

unprofessional and disrespectful conduct, discipline and unsatisfactory job performance set forth

in the Defendant's Statement of Undisputed Facts and known to Sheriff Cabral and the members

of the *ad hoc* committee, was sufficient to disqualify all of the Plaintiffs from the privilege of a

Deputy Sheriff appointment.  None of it was in any way related to their political affiliation or

activity.

## Reassignment of Barnes[67]

The summary judgment record clearly establishes that Barnes was reassigned for

legitimate and nondiscriminatory reasons.  In January 2005, three months **after** the primary

election, Barnes and other support services officers at the NSJ were reassigned to various posts

within the institution.  January marks the beginning of the first quarterly assignment of the year.

All assignments within the institution are made on a quarterly basis, with the exception of

support services, which are reviewed annually.  Superintendent Sumpter reassigned Barnes from

Property, a support services position, to line officer in a housing unit.   That is also an

assignment that Barnes had worked previously and one that the vast majority of custody officers,

including some of the Plaintiffs, work regularly.

Superintendent Sumpter is authorized to make staffing changes and assignments based

upon the operational needs of the NSJ.  In making staffing decisions, he has endeavored to

provide opportunities for officers who have been assigned to custody units for sustained periods

to work in support services positions, including transportation, visits, booking and property.

---

[65] See Defendant's Statement of Undisputed Facts ¶¶ 64-92 & 109-110.
[66] See Defendant's Statement of Undisputed Facts ¶¶ 110, 233-239.
[67] See Defendant's Statement of Undisputed Facts ¶¶ 223-229.

Officers selected for these positions get some relief from working in housing units and an opportunity to learn new skills.[68]  Indeed, Barnes acknowledged at deposition that it was fair for other officers to be given the same opportunity that he had to learn new skills and to enjoy weekends off.[69]  Superintendent Sumpter relies on the Shift Commanders at the NSJ, members of Local 3643, to identify appropriate officers for these positions.  Sumpter's ability to provide work environment variety for custody staff in ways that increase the pool of officers available to meet the Department's operational needs is of great benefit.

The reassignment of Barnes in January 2005 was just one example of Sumpter's efforts to provide other custody officers the opportunity to work in support services and learn new skills. Barnes' political affiliation was not a factor in his reassignment and he will not be able to prove otherwise.

**Reassignment of Al Moscone[70]**

The reassignment of Captain Moscone from Transportation Supervisor on the 7-to-3 shift to Floor Supervisor on the 3-to-11 shift  in January 2005 was for legitimate and nondiscriminatory reasons.  It is undisputed that the Department's April 2004 report[71] on the audit of the NSJ Transportation Division identified two primary areas of concern: trip assignments and property both of which were under Moscone's supervision and control. The purpose of the audit was to determine a more efficient and cost effective way to manage all the different transportation runs that occur during the course of a day.   Moscone participated in the audit by organizing data concerning daily court and hospital trips for the preceding thirty days, sharing his concerns about way transportation was managed and proposing a solution.  The **only**

---

[68] See Defendant's Statement of Undisputed Facts ¶¶ 224, 228; Cabral Aff. ¶ 29; Sumpter Aff. ¶ 15.
[69] Exhibit 34 Barnes Dep.  pg. 95:4-24, 96:2
[70] See Defendant's Statement of Undisputed Facts ¶¶ 247-265.
[71] Deputy Superintendents Cliff Carney and Gerry Walsh and Captain Moscone authored the report.

solution that Moscone proposed was to increase staffing levels and assign more manpower to Transportation. This was a particularly ill-advised proposal given the significant budgetary and operational concerns of the Department.

It is also undisputed that the audit concluded that trip assignments could be handled more efficiently and effectively if they originated from Communications as opposed to Transportation, because the communications officer[72] was in charge of all radio communications, had knowledge of where all transportation vans and vehicles were, and could therefore more efficiently assign manpower. Moscone remained as the Transportation Supervisor for approximately eight (8) months after the audit was concluded. During that time the **only** thing that Mr. Moscone did to support the recommendations of the audit and implement the proposed changes was to address the staff at roll call and tell them "do the best you can, double up on trips" because additional staff would not be forthcoming.[73] Moscone was given the opportunity to contribute and operate as Transportation Supervisor under this new system. After keeping him in the post for eight months it became apparent to Superintendent Sumpter and Deputy Superintendent Carney that Moscone was not supportive of or interested in implementing the changes that were recommended.[74] Moscone's lack of cooperation made it necessary for Deputy Superintendent Carney to issue an order in October 2004, which referred to the Transportation Audit, reiterating that the new transportation system was mandatory and that the Shift Commander would coordinate hospital

---

[72] Lieutenant Mark Charles is the communications officer and a member of Local 3643. He continues to oversee and manage the transportation runs and trip assignments.

[73] Exhibit 19, Moscone Dep. pg. 40:11-16, 41:10-18.

[74] In addition to his role as Transportation Supervisor, Moscone was also responsible for the oversight of some contracts at the NSJ (elevators, fire alarms and radios) and ensuring that detainees were searched before going to court and that property belonging to detainees in the Department's custody was sent to the appropriate location. In Superintendent Sumpter's opinion, Moscone did a poor job of managing these responsibilities. In fact, the Transportation Audit cited Moscone's oversight of detainee property as a concern.

trips and Communications (radio dispatch) would handle daily trips to and from the NSJ and the HOC.[75]

Once the reorganization of Transportation was completed with Communications absorbing Moscone's primary responsibilities for coordinating trip assignments, the position of Transportation Supervisor was eliminated and there was no longer an operational need for a Captain to be assigned to Transportation.[76]  The 3-to-11 shift was short a supervisor however and there was an operational need to balance that shift with an additional supervisor. Accordingly, Superintendent Sumpter made the decision to reassign Moscone from Transportation to Floor Supervisor on the 3-to-11 shift.  Neither Sheriff Cabral nor Chief Keeley was involved in that decision.  Moscone was reassigned because the Transportation Division was reorganized and there was a need for an additional supervisor on the 3-to-11 shift, his political affiliation notwithstanding.[77] See Beleaquer-Santiago, et al. v. Echegoyen, et al. 2007 WL 1765550 (1st Cir. P.R.) (Summary judgment record supported Defendants' nondiscriminatory explanation that satellite office closed and plaintiffs transferred because of budgetary constraints, not political retaliation).

**Reassignment of John Grennon[78]**

Grennon contends that Sheriff Cabral removed him from Training in retaliation for his political support of Stephen Murphy and his union activity as Vice President of JOEASC. The summary judgment record however, establishes that Sheriff Cabral removed Grennon for legitimate non-discriminatory reasons and that she would have removed him regardless of his

---

[75] See Defendant's Statement of Undisputed Facts ¶ 256; Exhibit 42, Carney Transportation Memo; Exhibit 41, Transportation Audit.
[76] See Defendant's Statement of Undisputed Facts ¶¶ 260-261.
[77] On January 31, 2007 Plaintiff Moscone was reassigned, at his request, back to the 7 to 3 shift.  See Defendant's Statement of Undisputed Facts ¶ 265.
[78] See Defendant's Statement of Undisputed Facts ¶¶ 88-92, 109-110, 120-121 & 230-243.

political affiliation or his union activity. Furthermore, given the unique position that the Training Division serves in the implementation of Department policies and philosophy, and Grennon's prominent role in that Division, his claim of political discrimination fails as a matter of law.

It is undisputed that the Training Division is a critical component of the reforms that Sheriff Cabral has sought to implement at the Department. The Training Division administers the ten-week academy for new officer candidates and the in-service training for veteran officers. The Training Academy and its curriculum serve to reinforce the message that Sheriff Cabral communicates to all new hires concerning the level of professionalism, accountability and integrity expected of all officers. Additionally, Training is a means for Sheriff Cabral to deliver that same message to veteran officers through in-service training. Moreover, changes in Department policy and directives are communicated to employees through the Training Division.

Officers assigned to the Training Division are essential in molding and developing the new officers that join the Department. The trainers are responsible for instilling in the new recruits the work ethic and commitment to the mission of the Department necessary to become successful productive officers. The mission of the Department is conveyed to the new recruits during the Training Academy. Officers assigned to teach the officer candidates must embrace the Sheriff's mission to effectively relay it to the recruits. In light of Sheriff Cabral's personal interactions with Grennon, she did not believe he was an appropriate candidate to train new officers. She questioned Grennon's ability to imbue young officers with **her** sense of the mission and goals of the Department and be a role model for them when he did not embrace her mission or share her views. Additionally, while assigned to the Training Division, Grennon would

represent the Sheriff if called to attend monthly meeting of the Massachusetts Sheriffs' Association Education and Training Committee (MSAETC) on behalf of Suffolk County.

Sheriff Cabral was also aware that Martin Michelman, the individual whom she selected to be her Director of Training, was having difficulty controlling Grennon. Michelman informed Sheriff Cabral that Grennon was causing problems in Training and that on once occasion he caught Grennon conducting union business while on duty.[79] Sheriff Cabral advised Michelmen that he was the manager in charge of Training and if he was having difficulty with one of his subordinates or if he believed someone was inappropriate for training, he needed to document the reasons why, and take the necessary action.  Finally, Grennon's reckless behavior in authoring and disseminating the letters and press release that intentionally misrepresented Sheriff Cabral's conduct and position on important issues only served to confirm Sheriff Cabral's determination that he was inappropriate for Training.  Indeed, when she met with Grennon to discuss his conduct he did nothing to indicate that he had any respect for her position as Sheriff.

Sheriff Cabral's decision to remove Grennon from his unique position in Training was for legitimate and non-discriminatory reasons.  However, should the Court determine that Grennon's political affiliation was a substantial factor in his reassignment, his claim still fails because political affiliation is a reasonable requirement for Training. See Hadfield v. McDonough, 407 F.3d 11, 18-19 (1st Cir. 2005).

**Political Affiliation Is An Appropriate Prerequisite For An Assignment To Training**

The Court has recognized the significance of  policy-making positions in Training and determined that it is one of the few positions within a Sheriff's Department for which political affiliation was a pre-requisite. Hadfield, supra (Political affiliation was an appropriate

---

[79] Michelman also informed Chief Keeley and Deputy Superintendent Thiess that he observed Grennon conducting union business while he should have been working. See Exhibit 16, Michelman Dep  pg. 97.

requirement of Assistant Deputy Superintendent for Training where Training program critical to

Sheriff's ability to implement agenda and reasonable for Sheriff to fill position with an

individual whom Sheriff believes is committed to his program).

   Grennon held a managerial and policymaking position in the Training Division.   Once

he was assigned to Training on a full-time basis his responsibilities included assisting Assistant

Deputy Superintendent John O'Leary[80] with policy development, specifically research and

writing new Department policies.  Grennon's managerial responsibilities also included

scheduling (approving days off and vacation), payroll[81] (approving credit and comp days) and

project creation.  Grennon was specifically given the authority to perform these managerial

functions by all the Training Directors that he worked for, including Assistant Deputy

Superintendent O'Leary, Captain John Scaduto and finally Assistant Deputy Superintendent

Martin Michelmen.

   Grennon also conducted trainings outside the Department for other law enforcement

agencies and attended meetings of MSAETC as Sheriff Cabral's representative. He also taught

numerous classes for recruits, veteran officers and non-custody personnel on issues including

sexual harassment, discrimination in the workplace, ethics and professionalism, constitutional

law for corrections, report writing, and forced cell moves.  Grennon wrote the curriculum and

materials for many of these classes. These duties and responsibilities are consistent with other

mid to upper-level positions for which the Court has held that political affiliation is an

appropriate requirement. Hadfield, supra at 17-18; Rosenberg v. City of Everett, 328 F.3d 12, 18-

19 (1st Cir. 2003) (political dismissal upheld where Plaintiff's position as Director of Community

---

[80] Assistant Deputy Superintendent John O'Leary was in charge of Training when Grennon was assigned there on a full-time basis.

[81] According to Grennon, even though he held the rank of JO-1 he had a manager's identification number and therefore had access to the payroll data records of everyone in the Department including Sheriff Cabral.  See Defendant's Statement of Undisputed Facts ¶ 243.

TV station who reported directly to the Mayor determined to encompass policy-related duties); Duriex-Gauthier v. Lopez-Nieves, 274 F.3d 4, 10 (1st Cir. 2001) (political dismissal upheld where employee was responsible for the planning and supervision of personnel activities, analyzing organization problems and acting as liaison with higher office); see also Flynn v. City of Boston, 140 F.3d 42, 45 (1st Cir. 1998) (Court noted that political dismissal has been upheld in First Circuit where plaintiff merely represented the agency's positions to other entities or to the public.).

To maintain Grennon in Training would have meant compromising the critical reforms that Sheriff Cabral was determined to implement. It is entirely reasonable and legitimate for Sheriff Cabral to only assign individuals to Training whom she believes are committed to her programs. See Hadfield v. McDonough, supra at 18. Id. As the First Circuit stated in Hadfield,

> The Sheriff runs a prison and therefore must make numerous
> politically-influenced decisions about prison operations
> and the treatment of inmates—some or many of which
> decisions could be the subject of partisan political contention.
> These decisions are embodied in Department policies and
> directives which are put into effect by Department employees
> working directly within the prison. These employees, in turn,
> learn about the new policies and directives primarily through
> training. The Sheriff's efforts to implement his agenda could
> therefore be frustrated by a training program which does not
> accurately reflect his views. Hadfield, supra at 16-17.

Political affiliation is a legitimate requirement for a public position if (1) "the discharging agency's functions entail decision making on issues where there is room for political disagreement on goals or their implementation," and (2) "the particular responsibilities of the plaintiff's position resemble those of a policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement for continued tenure." Rosenberg v. City of Everett, 328 F.3d

45

12, 18 (1st Cir. 2003) quoting from <u>Roldan-Plumey v. Cerezo-Sudrez</u>, 115 F.3d 58, 61-62 (1st Cir. 1997) (internal quotations eliminated).  Utilizing this analytical framework, Sheriff Cabral was warranted in removing Grennon from Training and the decision to do so did not constitute political retaliation.

The record clearly establishes that Plaintiffs Barnes, Moscone and Grennon were reassigned for legitimate reasons, and not because of their political affiliation.  The record further establishes that the Sheriff would have taken the same action (i.e. to reassign them) regardless of any alleged protected activity.  Consequently, Sheriff Cabral is entitled to Judgment as a Matter of Law on Count I of the complaint.

**5.    Sheriff Andrea Cabral Is Immune From Personal Liability Pursuant To The Doctrine Of Qualified Immunity.**

Qualified immunity is an entitlement not to stand trial or face the other burdens of litigation. <u>Mitchell v. Forsyth</u> 472 U.S. 511, 526  (1985).  The privilege is an immunity from suit, not merely a defense to liability. <u>Id</u>. The immunity may only be overcome by a showing that an official participated personally in depriving the plaintiff of a clearly established constitutional right.  See, <u>Febus-Rodriguez v. Betancourt-Lebron</u>, 14 F.3d 87, 91 (1st Cir.1994).

The threshold inquiry in determining a qualified immunity defense is whether or not a constitutional violation occurred. <u>Santana v Calderon</u>, 342 F. 3d 18, 29 (1st Cir. 2003) *citing* <u>Saucier v Katz</u>, 533 U.S.194, (2001). Sheriff Cabral contends in the instant case that the decommissioning and reassignments of the Plaintiffs did not constitute a constitutional violation. Sheriff Cabral is entitled to qualified immunity however, even if the Court were to find a constitutional violation.

An official cannot be stripped of protection when the actions taken were reasonable, even if mistaken.  *"[L]aw enforcement officials will in some cases reasonably but mistakenly*

46

*conclude* that [their conduct] is [constitutional] and … that … *those officials* –like other officials who act in ways they reasonably believe to be lawful – *should not be held personally liable*." Hegarty v. Somerset County, 53 F.3d 1367, 1373 (1st. Cir. 1995), citing, Anderson v. Creighton, 483 U.S.635, 641 (1987); Burns v. Loranger, 907 F.2d 233, 237(1st Cir.1990).  In determining whether there is a qualified immunity defense, "the court should ask whether the agents acted reasonably under settled law in the circumstances." St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st. Cir. 1995) *cert denied*, 518 U.S. 1017 (1996), *citing*, Hunter v. Bryant 502 U.S. 224, 228 (1991). The Court in St. Hilaire went on to identify two prongs of the basic qualified immunity analysis; first whether the constitutional right was "clearly established" at the time of the alleged violation; second the court must ask whether "a reasonable official situated in the same circumstances should have understood that the challenged conduct violated that established right" Id. Here, Sheriff Cabral, acting within her statutory authority pursuant to M.G.L. c. 37, § 3 and on the recommendation of her senior managers, made a determination regarding which employees should represent her Department as Deputy Sheriffs.

Actions are to be measured by a standard of objective legal reasonableness in light of the legal rules that were established at the time [they] were taken.  St. Hilaire, at 24 *citing*, Anderson v. Creighton, 483 U.S. 635, 639 (1987). Additionally, qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." See, Joyce v. Town of Tewksbury 112 F.3d 19, 22 (1st Cir. 1997), citing Malley v. Briggs, 475 U.S. 335, 341 (1986).

A fundamental justification for the qualified immunity defense is that public employees are free to perform discretionary functions without fear of punitive litigation except when they fairly can anticipate that their conduct will give rise to liability for damages. Savard v. Rhode

Island, 338 F. 3d 23, 28 (1st Cir. 2003). Additionally, qualified immunity exists not only to protect public officials from money damages, but also to also prevent the distraction from their official duties, prevent the cost of litigation and the deterrence of able-bodied people from public service. Guzman-Rivera v. Rivera Cruz, 98 F. 3d 664, 665 (1st Cir. 1996) *citing* Harlow v. Fitzgerald ,457 U.S. 800, 816 (1982). Here Sheriff Cabral's decision to authorize the decommissioning of the Plaintiffs was a reasonable exercise of her authority as Sheriff. Similarly, it was reasonable for Sheriff Cabral to delegate the authority to make staffing decisions at the NSJ to Superintendent Sumpter; it was also reasonable and appropriate for Sheriff Cabral to rely on those staffing decisions. Finally, Sheriff Cabral had no basis to believe that her actions in removing John Grennon from Training because, in her view, he did not support the reforms she was implementing at the Department, were anything but appropriate.

Sheriff Cabral should be granted Judgment as a Matter of Law as she is immune from personal liability due to the doctrine of qualified immunity.

B.    **THE PLAINTIFFS CANNOT DEMONSTRATE THE NECESSARY CAUSAL LINK  BETWEEN THEIR PURPORTED UNION ACTIVITY AND ANY ADVERSE EMPLOYMENT ACTION.  SUMMARY JUDGMENT MUST THEREFORE BE GRANTED TO SHERIFF CABRAL ON COUNT TWO OF THE COMPLAINT – THE PROTECTED ACTIVITY CLAIM.**

In Count II of their Complaint, Plaintiffs contend that they were decommissioned and subjected to other adverse employment actions because they engaged in protected union activity, in violation of their First Amendment rights.

To establish a prima facie claim of retaliation for protected union activity, the Plaintiffs must establish that their protected conduct was a substantial or motivating factor in the adverse employment action.  Holsum de Puerto Rico, Inc. v. N.L.R.B., 456 F.3d 265 (1st Cir. 2006).  In

Holsum, the Court held that this burden was satisfied by showing that (1) the employee engaged in protected activity, (2) the employer was aware of the protected activity, (3) the employer had an animus against such activity, and (4) there was a causal connection between the animus and the adverse employment action.  Hoslum, supra at 269, citing N.L.R.B. v. Transportation Management Corp., 462 U.S. 393, 401-403 (1983), *abrogated in part and clarified by* Director, Office of Workers' Compensation Programs v. Maher Terminals, Inc., 512 U.S. 267, 276-78 (1994). In this case there is a dearth of evidence in the record of protected union activity and any employment action was taken for legitimate and non-discriminatory reasons.

1. **Plaintiffs Giglio, Dilibero, Bergeron, Peneau, Turley, Lynch and Moscone Can Not Demonstrate That Their Negligible Union Activity Was The Cause Of Any Employment Action.**

Significantly, the Plaintiffs do not identify with any specificity the union activity they engaged in that resulted in their decommissioning or other alleged adverse employment action. Indeed, the summary judgment record establishes that, with the exception of Plaintiffs Ellis, Barnes and Grennon, union activity by the remaining Plaintiffs was negligible.  It is undisputed that other than their membership in JOEASC and attendance at union meetings, Plaintiffs Giglio, Dilibero and Bergeron engaged in **no** activity on behalf of JOEASC.[82]Although Plaintiff Peneau and Turley held official positions in JOEASC (Grievance Administrator and Chief Steward respectively) their union activity was relatively benign and routine:  processing grievances and appearances as union representation at disciplinary hearings and arbitrations. Neither Peneau nor Turley engaged in policymaking or contract negotiations on behalf of the Union.  Further, with the exception of Turley's limited interaction with Sheriff Cabral in April 2004 when he

---

[82] See Defendant's Statement of Undisputed Facts ¶¶ 132-138, 139-145 & 156-157.

accompanied Plaintiff Ellis to Ellis' meeting with the Sheriff, neither had any interaction with Sheriff Cabral in their official roles.[83]

By his own admission, Dilibero's role as Vice President of Local 3643 was **"largely ceremonial"** with little or no duties or responsibilities. According to Dilibero, the President of Local 3643 did all the work on behalf of the union.[84] Lynch was the Grievance Administrator for Local 3643 and between 2003 and 2005 he filed **one** grievance and attended **two to three** contract bargaining sessions. Similarly, Moscone was Secretary of Local 3643 from 2002 to 2005, before becoming President in 2005. During that entire three-year period when Moscone was either Secretary or President of Local 3643, the union filed perhaps fewer than five grievances.[85] Moreover, Sheriff Cabral did not know what position Moscone held in the union and was completely unaware that Dilibero and Lynch held any official positions in the union.[86] None of these Plaintiffs, with the limited exception of Turley, had **any** interaction as union officials with Sheriff Cabral concerning union business.[87]

In essence, the quantum of proof provided by Plaintiffs Giglio, Dilibero, Bergeron, Peneau, Turley, Lynch and Moscone to support their claim that the decommissioning and other employment actions were in retaliation for their protected union activity boils down to their membership in the union and some unidentified low level, routine activity on behalf of the union. There is no evidence in this summary judgment record that any of these particular Plaintiffs were

---

[83] See Defendant's Statement of Undisputed Facts ¶¶ 146-155.

[84] See Defendant's Statement of Undisputed Facts ¶¶ 139-144.

[85] See Defendant's Statement of Undisputed Facts ¶¶ 171-172 & 176.

[86] See Defendant's Statement of Undisputed Facts ¶¶ 145, 173 & 177.

[87] To the extent that Plaintiffs Lynch and Moscone contend that their advocacy on behalf of Local 3643's efforts to preserve the 7:1 overtime ratio was the protected activity they engaged in their claim must fail. First, the Department discussed the issue of the overtime ration with the union over a period of several months before discontinuing the practice in 2005. Second, the discontinuation of the practice provided more overtime opportunities for JOEASC, the union that voted overwhelmingly to endorse Sheriff Cabral's opponent. Third, the Department decided to implement an overtime ratio of 10:1 in the Fall 2006 on a trial basis, which is still in effect. See Defendant's Statement of Facts ¶¶ 295-298.

engaged in any protracted acrimonious struggles with the Department on behalf of their members or regularly took positions adverse to the Department.  *Contrast* Holsum, 456 F.3d supra.  In Holsum, the Court found that the employee engaged in substantial efforts to organize fellow employees to form a union and that his union organizing activity was conducted publicly in plain view of the employer. Holsum, supra at 270.  Further, the Court found that the employee was a "visible and vocal leader in a unionization effort that the company was **monitoring and stridently opposing."** Id. (emphasis added); see also N.L.R.B. v. Hospital San Pablo, Inc., 207 F.3d 67, 71 (1st Cir. 2000) (Plaintiff was committed union activist who actively engaged in union recruitment on and in the employer's property). Here, there is nothing to establish that Sheriff Cabral took any particular note of the Plaintiffs' union membership or their minimal union activity.  There is nothing in this summary judgment record that distinguishes their conduct as union members from any other member of JOEASC or Local 3643.

Even if the Plaintiffs demonstrate that Sheriff Cabral was aware of their protected activity, their claim still fails because they cannot establish a causal connection between the union activity, whatever it is, and the decommissioning and reassignments. A causal connection can be shown through direct evidence of discriminatory animus, evidence of similar treatment of employees engaging in similar conduct; or circumstantial evidence demonstrating that the protected conduct was followed by discriminatory action. Donaldson v. Akibia Inc., 20 Mass. L. Rept. 318 (2005).  Here Plaintiffs are unable to show any causal connection. There is no evidence in the record to suggest that Sheriff Cabral harbored a discriminatory animus against any of these Plaintiffs. Further, since the Plaintiffs do not identity specifically what their protected activity was and when it occurred relative to the alleged adverse employment action, there is no temporal proximity to establish causation.  The Plaintiffs were all decommissioned in

April 2005. Lynch had his days off changed and Moscone was reassigned in January 2005. The Plaintiffs have failed to identify any particular protected conduct that they engaged in relative to those events. The mere fact that one event followed another is not sufficient to make out a causal link. <u>MacCormack v. Boston Edison</u> Co. 423, Mass. 652,662, 672 N.E. 2d 1 (1996). In fact, unless the adverse employment action is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation. <u>Mole v. Univ. of Mass</u>. 442 Mass. 582, 595, 814 N.E. 2d 329 (2004).

There is nothing in the record that establishes Sheriff Cabral has discriminated against union officials or sought to transfer them or decommission them because of union activity. Indeed, the evidence is directly to the contrary. Sheriff Cabral has promoted and upgraded current and former union officials consistently since she took office, including: Plaintiff John Grennon (former Vice President and President of JOEASC), Michael Walsh (President of JOEASC 2004-2005), Christopher McCray (former President of Local 419), Robert Tullos (JOEASC Executive Board member), William Dowd (former President of Local 419), Bryan Kaiser, Jack Sullivan (former President of 419), Sean Ross (former Vice-President Local 419) and Michael Powers (former President of 419). Many of these union officials actively took positions adverse to the Department and were vigorous in their opposition.

Here Plaintiffs Giglio, Dilibero, Bergeron, Peneau, Turley, Lynch and Moscone cannot establish that a causal connection exists between their unidentified union activity and any employment action; accordingly Sheriff Cabral is entitled to Judgment as a Matter of Law on their claims.

Even if this Court determines that the Plaintiffs have met their burden to establish that a causal connection exists between their union activity and an employment action, their claims still

fail because the summary judgment record establishes unequivocally that the Department would have taken the same action in the absence of any protected activity. Courts have recognized that an employment decision involving an employee who has engaged in some form of protected activity, will not subject the employer to a retaliation claim if it can establish that it would have taken the same action in the absence of the protected activity. See Mount Healthy, supra at 287.

The record clearly establishes that the above Plaintiffs were all decommissioned and Moscone was reassigned for legitimate Department/operational reasons, and not because of their protected union activity. The record further establishes that the Sheriff would have taken the same action regardless of any protected activity. Therefore Sheriff Cabral is entitled to Judgment as a Matter of Law on the "Union Activity" claims of Plaintiffs Giglio, Dilibero, Bergeron, Peneau, Turley, Lynch and Moscone. (See Section A. 4. supra, pg. 35-48).

> **2.** **Plaintiffs Ellis, Barnes And Grennon Can Not Demonstrate That Their Union Activity Was The Cause Of Any Employment Action.**

Plaintiffs Ellis, Barnes and Grennon do not specifically identify the protected union activity they engaged in that they contend resulted in their decommissioning and reassignment.[88] Although they held official elected positions in JOEASC from April 2003 to October 2004 (Secretary, President and Vice-President respectively), with the exception of the two letters and a press release authored and disseminated by them in March/April 2004, there is nothing in the summary judgment record that distinguishes their advocacy on behalf of their members from any previous or subsequent local union leadership. For purposes of this motion, the only conduct that Ellis, Barnes and Grennon engaged in under the guise of union activity that concerned Sheriff Cabral was the dissemination of the intentionally false and misleading information contained in

---

[88] Ellis was not reassigned. Thus his only complaint is that he was decommissioned. Further, as set forth above, the decommissioning of all Plaintiffs and the reassignment of Barnes and Grennon were done for legitimate and non-discriminatory reasons and would have been effectuated regardless of any protected activity.

the two letters and press release, which disparaged the Department and misrepresented her

conduct and actions.

Since this conduct implicates the Plaintiffs rights as public employees to speak out

against their public employer, the Court must strike a balance between the employees' interest,

as citizens, in commenting on issues and the employer's interest in the efficient discharge of its

public responsibilities.[89]  Curran v. Cousins, 482 F.Supp.2d 36, 42 (D.Mass. 2007), citing

Connick v. Myers, 461 U.S. 138, 142 (1983).  The Supreme Court recently articulated the

reasons why this balance must be struck:

> When a citizen enters government service, the citizen by
> necessity must accept certain limitations on his or her freedom.
> Government employers, like private employers, need a significant
> degree of control over their employees' words and actions; without
> it, there would be little chance for the efficient provision of public
> services.  Public employees, moreover, often occupy trusted
> positions in society.  When they speak out, they can express views
> that contravene governmental policies or impair the proper
> performance of governmental functions.
>
> At the same time, the Court has recognized that a citizen
> who works for the government is nonetheless a citizen.  The First
> Amendment limits the ability of a public employer or to leverage the
> employment relationship to restrict, incidentally or intentionally, the
> liberties employees enjoy in their capacities as private citizens.  So long
> as employees are speaking as citizens about matters of public concern,
> they must face only those speech restrictions that are necessary for
> their employers to operate efficiently and effectively.

Curran, supra, quoting Garcetti v. Ceballos, 547 U.S. 1038, 126 S.Ct. 1951, 1958 (2006)

(citations and quotations omitted).  "The government as employer indeed has far broader powers

---

[89] In order to prevail on their First Amendment claim, Plaintiffs Ellis, Barnes and Grennon must show: "(1) that their expression involved matters of public concern; (2) that their interest [and the public's interest] in commenting on these matters outweighed the Department's interest in promoting workplace efficiency; and (3) that their "protected speech" was a substantial or motivating factor in the Department's [employment] decision." Jordan v. Carter, 2007WL 1957127 *2, ___F.Supp.2d___(D.Mass. 2007) citing Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2007).  The first two prongs are questions of law and thus appropriate for the Court to determine. Connick v. Myers, 461 U.S. 138, 148 n. 7 (1983).

than does the government as sovereign." <u>Garcetti</u>, <u>Id</u>., quoting <u>Waters v. Churchill</u>, 511 U.S. 661, 671, 114 S.Ct. 1878 (1994).

Assuming for purposes of this argument only that the Plaintiffs conduct in disseminating the letters and press release involved a matter of public concern and was a substantial motivating factor in their decommissioning and reassignment, summary judgment should be granted to Sheriff Cabral because the Plaintiffs cannot satisfy the second prong of the First Amendment protected speech analysis. This Court must balance the Plaintiffs' right to engage in such activity with the Sheriff's interest in "promoting the efficiency of the public services [the Department] performs through its members." <u>Jordan</u>, supra at 5, quoting <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568 (1968). In making this determination, the Court should consider whether the statements undermine harmony among co-workers, negatively impact on close-working relationships for which personal loyalty and confidence are essential or interferes with the regular operation of the employer. <u>Jordan</u>, Id.

The summary judgment record establishes that the Plaintiffs' reckless conduct in spreading misinformation that disparaged the Department and misrepresented the Sheriff's actions and conduct on a number of important issues had a deleterious affect on the harmonious and efficient operation of the Department and its public safety mission. It is undisputed that the Sheriff's Department performs an important public safety function in providing for the care and custody of pre-trial detainees and sentenced inmates twenty-four hours a day, seven days a week. The content of the letters and press release accused Sheriff Cabral of stealing pension money, mismanaging the Department's finances to the point of creating a fiscal crises and denying benefits to employees. The false allegations concerning the Department's contributions to the employees' pension fund and the provision of dental and vision coverage to JOEASC members

as well as vacation benefits for military employees caused needless apprehension and anxiety among superior and line officers, particularly at the NSJ. [90] Clearly, this had the potential to subvert Sheriff Cabral's authority and jeopardize the Department's management of the NSJ. See Curren, 482 F.Supp. 2d at 46-47. (Sheriff's interest in efficient discharge of public responsibilities, outweighed correction officer's right to criticize operation of the Department where employee posted statements comparing Department to Nazi Germany and encouraging corrections personnel to disobey Department orders.)   In this context, where close working relationships are imperative to fulfilling that public safety mission, significant deference to the employer's judgment is appropriate.  Jordan, supra at 5; Connick, 461 U.S. at 151-152.

It is axiomatic that discipline and harmony are accorded greater importance in the context of law enforcement agencies than in other governmental entities.  Jordan, 2007 WL 1957127 * 5, __FSupp.2d___(D.Mass. 2007.  "[L]aw enforcement employees are subject to greater First Amendment restraints than most other citizens." Curren 482 F.Supp.2d at 47, quoting Wagner v. City of Holyoke, 241 F.Supp.2d 78, 91 (D.Mass.2003).  The publication of this false information in several media outlets and dissemination to thousands of voters in Suffolk County portrayed the Department, a law enforcement agency, in an exceedingly negative light, thereby undermining public confidence in operation. See Shands v. City of Kennett, 993 F.2d 1337, 1344 (8th Cir. 1993) (Police departments need to "promote efficiency, foster loyalty and obedience to superior officers, maintain morale, and instill public confidence.")   There is no question that the false and disparaging content of the letters and press release authored by Ellis, Barnes and Grennon had a "palpable tendency to impact negatively on workers, supervisors, and the efficient functioning of the Department." Jordan, supra. In order to correct the demonstrably false information spread by the Plaintiffs and alleviate the tension and anxiety among

---

[90] See Exhibit 7, Harris Aff. ¶ 48.

Department employees that resulted, it was necessary for Sheriff Cabral to address roll call for all three shifts at the both the HOC and the NSJ and distribute a memorandum setting forth the true facts.[91]

"The First Amendment does not 'require a public office to be run as a roundtable for employee complaints over internal office affairs.'" Jordan, supra, quoting Connick, 461 U.S. at 149. Nor must an employer wait for "events to unfold to the extent that the disruption of the office and the destruction of the working relationships is manifest before taking action." Connick, supra at 152; see Waters 511 U.S. at 680-681 (Court found as matter of law that "potential disruptiveness" was sufficient to outweigh First Amendment value in a nurse's statement critical of her supervisor and the hospital's obstetrics department because it could discourage individuals from working in that department and undermine management's authority.) Finally, and of particular importance here given the personal nature of the attack on Sheriff Cabral's integrity evinced in the letters and press release, "[t]he First Amendment notwithstanding, a supervisor is entitled to a modicum of respect and decorum in work-related situations." Hennessy v. City of Melrose, 194 F.3d 237, 248 (1st Cir. 1999). Sheriff Cabral need not tolerate the speech by Ellis, Barnes and Grennon that publicly and falsely accused her of official misconduct, thereby undermining her authority. Id.

Where the summary judgment record establishes that the speech engaged in by Ellis, Barnes and Grennon engendered disharmony in the workplace, damaged morale among Department employees, undermined Sheriff Cabral's authority and disrupted the operations of the Department, such speech is not entitled to First Amendment protection. Accordingly, Sheriff

---

[91] Notably, this was the second time that Sheriff Cabral felt it necessary to issue a memorandum regarding the Department's contribution to the employees' pension fund. In December 2003 Sheriff Cabral issued a memorandum to alleviate the "needless anxiety" that was created from misinformation being spread about this issue. See Exhibit 32.

Cabral is entitled to Judgment as a Matter of Law with respect to the "union activity" claims of Plaintiffs Ellis, Barnes and Grennon in Count II of the complaint.

## IV.    CONCLUSION

For all the foregoing reasons, the Defendants Sheriff Andrea Cabral respectfully requests that this Honorable Court grant her Motion for Summary Judgment.

Respectfully submitted
For Sheriff Andrea Cabral
By her attorney

/s/ Ellen M. Caulo
Ellen M. Caulo, BBO #545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA 02114
(617) 961-6681

Date:   August 13, 2007

## Local Rule 7.1 Certification

I hereby certify that I conferred with counsel for the Plaintiff in an attempt to narrow the issues raised by Defendant's Motion for Summary Judgment.

/s/ Ellen M. Caulo
Ellen M. Caulo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DAVID BERGERON ET AL.,                  )
        Plaintiffs                      )
                                        )
        v.                              )
                                        )          C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY             )
And SHERIFF OF SUFFOLK COUNTY,          )
        Defendant                       )
_____)

## AFFIDAVIT OF ELLEN M. CAULO

I, Ellen M. Caulo, being duly sworn, do hereby depose and state:

1.      I am Deputy General Counsel for the Suffolk County Sheriff's Department.

2.      I am the attorney of record in the matter of Bergeron et al., v. Andrea Cabral, C.A.
        No. 05-11661-RGS currently pending in the Federal District Court.

3.      I am an attorney in good standing in the Commonwealth of Massachusetts and the
        District of Massachusetts.  I have been practicing law for over twenty years.

4.      On May 18, 2006 I served a Request for Production of Documents on counsel
        for the Plaintiffs, Stephen C. Pfaff, Esq.  The documents marked as Exhibit 1 to
        Defendant's Second Motion to Compel are an accurate copy of the Defendant's
        Request for Production of Documents and the Plaintiffs' response.

5.      Although Plaintiffs' counsel represented that he would supplement his discovery
        response with the Plaintiffs' tax returns, to date the tax returns for only six
        Plaintiffs have been produced.

6.      During the process of deposing the individual Plaintiffs it became clear that there
        were other responsive documents in the care, custody or control of the Plaintiffs
        that had not been produced or even requested by Plaintiffs' counsel.

7.      With respect to counseling records of Plaintiff Grennon, the only document that
        has been produced is a copy of a release authorizing an unidentified provider to
        furnish medical/psychiatric records to Plaintiffs' counsel.

8.     With respect to Plaintiff Dilibero, treatment records pertaining to counseling have not been produced.

9.     With respect to Plaintiff Giglio, treatment records pertaining to physical symptoms of stress have not been produced.

10.    With respect to Plaintiff Bergeron, treatment records pertaining to mental health counseling have not been supplemented.

11.    A subpoena was served on JOEASC, seeking documents relevant to this litigation.  Although the return date was extended to March 12, 2007, no responsive documents have been produced.

12.    To date the documents referenced by Plaintiffs Ellis, Turley, Barnes and Grennon in their depositions and which are directly relevant to the issues in the instant litigation have not been produced.  Plaintiffs have not asserted any privilege nor has any privilege log been produced.

12.    I have attempted to resolve this impasse informally by communicating with Plaintiffs' counsel through letters and phone calls in an effort to obtain the discovery.  The documents marked as Exhibit 3 to the Defendant's Second Motion to Compel are accurate copies of eleven letters sent to Attorney Pfaff (October 5 & 20; December 5, 8 & 14, 2006; January 8, 2007; March 1, 8 & 15, 2007; April 2 & 25, 2007)) seeking the production of outstanding discovery.

13.    In addition to the letters marked as Exhibit 3 I have also spoken directly with Attorney Pfaff on numerous occasions and left a number of messages in an effort to obtain the outstanding discovery.

14.    Attached to this affidavit is a true and accurate copy of portions of the deposition of John Ellis, dated January 8, 2007

### SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY

/s/ Ellen M. Caulo
Ellen M. Caulo

Date: August 13, 2007

169

1      Q.   Okay.

2      A.   Michael Harris' secretary was recording

3   from their end, I was recording from our end, and

4   usually at the next meeting we'd exchange minutes.

5      Q.   Okay.  Other than the recording of what

6   transpired during those contract negotiation

7   meetings, did you actually actively participate at

8   the table in the contract negotiations?

9      A.   We tried to keep the number of voices

10  down to a minimum in the actual meeting itself,

11  so, there were times I made comments, but

12  oftentimes I was more busy writing down quotes and

13  trying to keep them accurate.

14     Q.   What specific interactions did you have

15  with Sheriff Cabral as secretary of JOEASC, and

16  I'm not referring to the meeting you had in April

17  of '04, holding that aside for the moment, what

18  specific interactions did you have with Sheriff

19  Cabral as secretary of JOEASC?

20     A.   I remember her, I believe it was the

21  month before where she came to address the

22  meeting, and that was, what I recall from that

23  meeting was her saying that the, the dental and

24  vision issue she had to hold that for leverage for

COPLEY COURT REPORTING, INC.
(617) 423-5841

170

1    the collective bargaining agreement.

2        I don't recall saying a lot to her at

3    that meeting.

4        Q.    Who was present at that meeting?

5        A.    I know John Barnes was, I'm not sure John

6    Grennon was.  There was a period of time where

7    John Grennon was trying to make meetings, but he

8    was having difficulty because he was also at that

9    time in training.

10        So, there were, you know, academies and

11    training sessions going on, and we were getting

12    oftentimes relieved for a few hours to attend

13    these meetings while on our shift, but it was more

14    difficult for John to do so, so, I can't say with

15    certainty, I think Mark Turley was here.

16        Q.    So, you're not sure John Grennon was

17    there or John Barnes?

18        A.    John Barnes I believe was definitely

19    there.  I know John Grennon missed some meetings,

20    that may have been one of them, and we try not to

21    have everyone on the executive board at every

22    meeting because there are seven of us, and we try

23    to limit it to three or four guys here, so.

24        Q.    You believe you were there, Mr. Barnes,

COPLEY COURT REPORTING, INC.
(617) 423-5841

171

1    and who else?

2         A.    I want to say Mark Turley was there.

3         Q.    How about the Sheriff Department,

4    anybody?

5         A.    Michael Harris and Steve Tomkins briefly

6    at the beginning but left shortly thereafter.

7         Q.    The meeting was in this room here?

8         A.    It was.

9         Q.    How long was the meeting?

10        A.    Rough guess, ninety minutes.

11        Q.    The purpose of it was what?

12        A.    Contract negotiations and other issues

13   coming up, and it was the Sheriff's opportunity to

14   at least get a snapshot of what was going on, but

15   coming away from the meeting it polarized things

16   more than anything else.

17        Q.    March of '03 or '04?

18        A.    '04 I believe.

19        Q.    Okay, March of '04?

20        A.    Yeah.

21        Q.    All right.

22        A.    Definitely not '03, we weren't in yet.

23        Q.    Other than dental and vision, what other

24   issues do you recall being discussed during this

173

1   pension fund was not a contract issue, right?

2       A.   Not directly.

3       Q.   And the issue of the 15F letters was not

4   a contract issue?

5       A.   Correct.

6       Q.   And the veterans benefits was not a

7   contract issue?

8       A.   Correct.

9       Q.   I'm trying to get a sense of what the

10  contractual issues that were on the table that you

11  were trying to hammer out some understanding

12  about, and that was dental and vision?

13      A.   That's what I remember, it was three

14  years ago, I forget exactly what went on.  I'd

15  have to go back and see what the minutes were.

16      Q.   So, the minutes would reflect that you

17  believe?

18      A.   I believe so.

19      Q.   Would the minutes reflect Sheriff Cabral

20  saying she was holding that as a bargaining chip,

21  that meaning dental and vision?

22      A.   Yes.

23      Q.   Those were minutes you took?

24      A.   Yes.

174

1      Q.   And those minutes were given to the law

2   firm?

3      A.   Yes.

4      Q.   And the law firm we're talking about is

5   Merrick, Louison & Costello?

6      A.   That's correct.

7      Q.   Did you testify at any arbitrations on

8   behalf of union members in 2003 and 2004?

9      A.   I didn't testify, I went to one, not an

10   arbitration, it was an informal session, Tim

11   Turley was running it, and he was meeting with Jim

12   Davin I believe over I think it was a precursor to

13   some arbitration going on, and I was there to

14   observe because I was trying to learn the process

15   a little bit, but I've never testified at

16   arbitration.

17      Q.   Did you participate in any disciplinary

18   hearings?

19      A.   No.

20      Q.   Did you file any complaints against the

21   Department or Sheriff Cabral?

22      A.   I did not.

23      Q.   Were any grievances filed on your behalf?

24      A.   No.