UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                                )
DAVID BERGERON ET. AL.,         )
        Plaintiffs              )
                                )
        v.                      )
                                )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY     )
And SHERIFF OF SUFFOLK COUNTY,  )
        Defendant               )
_____)
```

## DEFENDANT ANDREA CABRAL'S, INDIVIDUALLY AND AS SHERIFF OF SUFFOLK COUNTY, STATEMENT OF UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1

Pursuant to Local Rule 56.1, Defendant Andrea Cabral hereby submits the following statements of material facts, each of which they contend is undisputed:

## I.    THE PEOPLE

1.    Defendant Andrea J. Cabral was appointed Suffolk County Sheriff on November 29, 2002 to complete the term of Sheriff Rouse. She was thereafter elected to the position in November 2004. Sheriff Cabral's opponent in the 2004 Democratic primary race for Sheriff was Boston City Councilor Stephen J. Murphy. Sheriff Cabral ran unopposed in the general election. As Sheriff she is responsible for the operation and management of the Suffolk County Sheriff's Department. (See Exhibit 2, Affidavit of Andrea J. Cabral, ¶¶ 1, 2, 20 - hereinafter cited as Cabral Aff.).

2.    At all times relevant to the Complaint, Elizabeth Keeley was the Chief of Staff of the Suffolk County Sheriff's Department. During the relevant time period of the Complaint, Chief Keeley[1] reported directly to Sheriff Cabral and was the second in command of the entire Department. Her duties and responsibilities included but were not limited to: knowing what was happening in the Department every day and advising Sheriff Cabral of significant events; implementing changes to increase professionalism within the Department; to improving communication within the Department; increasing programming for inmates; dealing with overcrowding; and fiscal management. (See Exhibit 3, Deposition of Elizabeth Keeley, dated February 28, 2006, in the matter of *Michelman v. Cabral, C.A.05-1157-RGS* pg. 13-19 –hereinafter cited as Keeley Michelman Dep.).

---

[1] Chief Keeley resigned from the Department in 2006.

3.    Gerard Horgan is the Superintendent of the Suffolk County House of Correction.
      As Superintendent he is responsible for the daily operations of the HOC.  (See
      Exhibit 4, Affidavit of Gerard Horgan, ¶ 2 - hereinafter cited as Horgan Aff.).

4.    Eugene Sumpter is the Superintendent of the Nashua Street Jail.  He has held that
      position since November 2003.  As Superintendent he is responsible
      for the daily operation of the Nashua Street Jail. (See Exhibit 5, Affidavit of
      Eugene S. Sumpter, Jr. ¶ 1 - hereinafter cited as Sumpter Aff.).

5.    Cliff Carney is the Deputy Superintendent of the Nashua Street Jail.  He has held
      that Position since December 2003.  Deputy Superintendent Carney reports
      directly to Superintendent Sumpter and assists him in the daily operation of the
      NSJ. (Sumpter Aff. ¶ 1).

6.    In February 2003, Sheriff Cabral hired Viktor Theiss as Chief of the Sheriff's
      Investigation Division (SID).  In January 2004 Deputy Superintendent Thiess
      responsibilities expanded to include oversight of the Training Division and the
      Director of Training at that time, Martin Michelman. (See Exhibit 6, Deposition
      of Viktor Theiss, dated May 8, 2006, 7:10-9:22 - hereinafter cited as Theiss Dep.).

7.    Deputy Superintendent Theiss[2] was promoted to Superintendent in January 2005
      and was responsible for overseeing the Training and Intelligence Division.
      (Theiss Dep. pp. 8:17-9:22).

8.    Michael J. Harris, the Director of Employee (Labor) Relations was promoted to
      Superintendent of Human Resources in March 2004.  Mr. Harris' duties and
      responsibilities included all labor matters including collective bargaining. (See
      Exhibit 7, Affidavit of Michael J. Harris ¶ 1 - hereinafter cited as Harris Aff.).

9.    Patrick Bradley was the Superintendent of the HOC from November 2002 to
      November 2003 when he left the Department.  He was replaced as Superintendent
      by Gerard Horgan.  (Horgan Aff. ¶ 2).

10.   The Plaintiffs: David Bergeron, John Grennon, Lorne Lynch, John Barnes, John
      Ellis, Timothy Turley, Al Moscone, William Peneau, Eric Dilibero and Paul
      Giglio, are all jail officers employed by Suffolk County at the Nashua Street Jail
      ("NSJ") of the Suffolk County Sheriff's Department ("Department"/"SCSD").
      (Plaintiffs' Complaint ¶¶ 4- 13).

11.   During the relevant time period of the Complaint, Plaintiffs Grennon, Ellis,
      Barnes, Peneau, and Giglio held the rank of Jail Officer 1 (JO-1) and were
      members of the Jail Officers and Employees Association of Suffolk County
      ("JOEASC").  Plaintiffs Dilibero and Bergeron held the rank of Sergeant (JO-3)
      and were members of JOEASC.  Plaintiffs Moscone and Lynch were members of

---

[2] Superintendent Theiss resigned from the Department in 2006.

Local 3643 and held the rank of Captain and Lieutenant respectively. (Sumpter Aff. ¶ 26).

## II.    THE DEPARTMENT

12.    The Suffolk County Sheriff's Department ("Department"/ "SCSD") is a division of Suffolk County. The Sheriff's Department operates two correctional facilities, the Nashua Street Jail ("NSJ") which houses pre-trial detainees and the Suffolk County House of Correction ("HOC") which houses sentenced individuals. Each facility has a distinct Superintendent who is responsible for its daily operation, including supervision of staff.  (Horgan Aff. ¶ 1).

13.    Suffolk County employs approximately 1100 individuals at the Department, approximately 800 of which are jail/corrections (custody) officers working at the NSJ   or the HOC.  (Harris Aff. ¶ 3).

14.    There are four separate and distinct bargaining units representing custody staff for purposes of M.G.L. c. 150E within the Department.  Approximately 1000 employees are covered by Collective Bargaining Agreements negotiated by their bargaining representatives with the Department. (Harris Aff. ¶ 3).

15.    JOEASC represents jail officers with the rank of JO-1 through JO-3.  Prior to the formation of JOEASC, these jail officers were represented by AFSCME Council 93, Local 1134.  AFSCME Council 93, Local 3643 represents the superior officers (Lieutenants, JO-4 and Captains, JO-5) at the NSJ. (Harris Aff. ¶ 4).

16.    Sheriff Richard J. Rouse retired as Suffolk County Sheriff effective November 2002.  Prior to his leaving, a special commission was appointed to investigate and report on operations of the Sheriff's Department. The Stern Commission report was critical of several aspects of department management, including training. (Cabral Aff. ¶¶ 4, 6).

## III.    CHANGES IMPLEMENTED BY SHERIFF CABRAL

17.    In response to the concerns raised in the Stern Commission, Sheriff Cabral implemented significant reforms in the areas of hiring, promotions, training and discipline.  She has completely reformed Department hiring and promotional practices and has completely restructured the training and investigation divisions. All officer candidates must successfully complete a comprehensive review that includes a lengthy written application, a panel interview, physical and academic testing, a criminal records check, a drug (hair) test and verification of all previous employment, personal references and residence(s).  (Cabral Aff. ¶ 6).

18.    Sheriff Cabral has made it a practice to personally interview all finalists for jail or correction officer positions and she makes the final hiring decision.  A successful

interview is the final requirement for all officer candidates.  During the interview, which lasts anywhere from 60-90 minutes, Sheriff Cabral candidly discusses with each candidate her expectations, including her expectations about their own conduct and also about their obligation to report the misconduct of others. (Cabral Aff. ¶ 7).

19.    Sheriff Cabral created the Department's first off-site Training Academy, which is staffed by certified trainers.  (Cabral Aff. ¶ 7).  All recruits who successfully complete the hiring process must also successfully complete a 10-week training academy before starting work in either the NSJ or the HOC.  The training curriculum includes components dealing with professional responsibility and accountability, use of force continuum and the obligation to report and properly document incidents of staff misconduct.  New officers are probationary employees for the first 18 months and can be terminated for any reason during that time.  All veteran officers are required to undergo 40-hours per year of in-service training that includes training in these same areas.  (Cabral Aff. ¶ 8).

20.    The Training Academy and its curriculum serve to reinforce the message that Sheriff Cabral communicates to all new hires concerning the level of professionalism, accountability and integrity expected of all officers.  Additionally, the Training Academy is a means for Sheriff Cabral to deliver that same message to veteran officers through in-service training.  (Cabral Aff. ¶ 9).

21.    Sheriff Cabral has implemented a promotional testing process that is fair and comprehensive.  It is emphasized to all staff that promotions and advancements within the Department are based on job performance and merit.  (Cabral Aff. ¶ 10).

22.    Since assuming office in November of 2002, Sheriff Cabral has very consistently imposed appropriate discipline, including termination, where allegations of misconduct on behalf of jail or corrections officers have been sustained.  (Cabral Aff. ¶ 11).  Since 2003, Sheriff Cabral has terminated a number of employees, custody and non-custody, for filing false reports.  (Harris Aff. ¶ 47).

## IV. DEPUTY SHERIFF APPOINTMENTS

23.    The Plaintiffs were all sworn in as Deputy Sheriffs shortly after Sheriff Cabral took office. (Plaintiffs Complaint ¶ 26).

24.    A Deputy Sheriff appointment is coterminous with the term of a sitting sheriff.  Upon the appointment of Sheriff Cabral as Suffolk County Sheriff in 2002, all persons who were appointed Deputy Sheriffs by former Sheriff Rouse were decommissioned.  (Harris Aff. ¶ 5).

25.    After she took office in 2002, Sheriff Cabral was advised by then HOC

Superintendent Patrick Bradley that there was an operational need and necessity for certain employees who were Deputy Sheriffs to be sworn in under her Administration.  As a result several large groups of employees were sworn in en masse shortly after Defendant Cabral was sworn in as Sheriff. (See Exhibit 8, Deposition testimony of Sheriff Cabral dated January 22, 2007 pp.78:14-79:22 – hereinafter Cabral Dep.). The qualifications of these individuals who were sworn and their fitness for the title of Deputy Sheriff were not scrutinized at that time. (Keeley Dep. p. 57-59).

26.  The decommissioning the Plaintiffs occurred in April 2005, almost eight months after the primary election and six months after the general election and after the Department had conducted a review of the qualifications of current Deputy Sheriffs. (Harris Aff. ¶18).

27.  SCSD Policy S516 establishes policies and procedures for appointment of Deputy Sheriffs. (See exhibit 9, SCSD Policy S-516 – Deputy Sheriffs).

28.  Sheriff Cabral has the statutory authority and discretion to appoint as many Deputy Sheriffs as she believes are needed to execute the duties of her office. (M.G.L. c. 37, § 3.)

29.  As Sheriff, Defendant Cabral has total discretion in making Deputy Sheriff appointments.  Deputy Sheriffs hold that status at the will of the Sheriff, who may revoke such appointment at any time and for any reason. (Exhibit 9, Policy S-516)

30.  There is no requirement that just cause be established before a Deputy Sheriff appointment may be revoked. There is no provision of the plaintiffs' Collective Bargaining Agreements ("CBA") that pertain to the appointment or removal of Deputy Sheriffs. (Barnes Dep. I, p. 42, Bergeron Dep. p. 28)

31.  An appointment as Deputy Sheriff is a privilege and not an entitlement of employment with Suffolk County at the Suffolk County Sheriff's Department. Department employees who wish to be considered for the privilege of appointment as Deputy Sheriff must submit an application for approval. The Sheriff is responsible for the official acts of her deputies to the amount of her bond. (Exhibit 9)

32.  A Deputy Sheriff appointment results in no additional salary for persons performing their regular work assignment for the SCSD.(Harris Aff. ¶ 35)

## V.    2004 ANNUAL REVIEW OF DEPUTY SHERIFF

### A.  The Process

33.  Commencing in early 2004 the Department began to evaluate the Deputy Sheriff appointment process and Policy S516 (Deputy Sheriff Appointments) with the

purpose of making it a more meaningful title. (Cabral Dep. 82:4-9).  The evaluation encompassed the role and responsibilities of Deputy Sheriffs, the requirements, qualifications, and training necessary for appointment as Deputy Sheriff, as well as the individuals who currently had the privilege of that appointment. (Harris Aff. ¶ 6).

34.    Sheriff Cabral tasked Chief of Staff Keeley and Superintendent Harris with making the Deputy Sheriff appointment more meaningful and more consonant with the other merit based and performance based reforms and changes she was making to the Department.  (Cabral Dep. 82:11-22; 83:16-18).

35.    Defendant Sheriff Cabral conveyed to Chief of Staff Keeley that she wanted the title of Deputy Sheriff to reflect the best that the Department had to offer.  To that end, the way officers approached their job, their attitude towards the job, the manner in which they interacted with inmates, fellow employees and command staff were to be considered.  (Cabral Dep. 112:18-113:14).

36.    Defendant Sheriff Cabral did not provide any specific guidelines and criteria by which Deputy Sheriffs were to be evaluated.  Defendant Cabral was confident that Keeley, Harris and the Superintendents understood her emphasis on professionalism and accountability and her desire to identify the best and the brightest as the public face of the Department. (Cabral Dep. 124:1-20).

37.    After Sheriff Cabral was elected to a full six-year term in November 2004, the Department determined that it did not have to redeputize all Deputy Sheriffs who were appointed after she first took office in 2002, because her term as Sheriff was continuous.  Instead, a decision was made to review everyone who was currently a Deputy Sheriff and make a determination whether anyone should be removed. (Harris Aff. ¶ 7).

38.    Superintendent Michael Harris coordinated an *ad hoc* committee comprised of himself, Chief of Staff Keeley, Superintendent Gerard Horgan ("Horgan"), Superintendent Eugene Sumpter ("Sumpter"), and Superintendent Viktor Theiss ("Theiss"), hereinafter "Committee", to review the list of current Deputy Sheriffs and make recommendations regarding which employees, if any, should be decommissioned.  (Harris Aff. ¶ 8; Horgan Aff. ¶ 3; Sumpter Aff. ¶ 4).

39.    Defendant Sheriff Cabral was not a member of the Committee nor was she involved in the review that they undertook.  (Harris Aff. ¶ 10)

40.    Sheriff Cabral did not attend any meetings of the Committee.  Sheriff Cabral did not provide any instructions or directions to the Committee concerning how to conduct the review.  (Harris Aff. ¶ 10; Sumpter Aff. ¶ 7; Horgan Aff. ¶ 7).

41.    Sheriff Cabral had no discussions with the members of the Committee concerning the review while it was ongoing, nor did she provide the Committee with a list of

names of individuals whom she wanted to be decommissioned.  (Harris Aff. ¶ 10; Sumpter Aff. ¶ 7; Horgan Aff. ¶ 7).

42.     Parallel with the review being conducted by the Committee, Superintendent Harris was also working on revamping the process by which Deputy Sheriff appointments were made. (Harris Aff. ¶ 11).

43.     The Committee was provided with a list of all employees who were commissioned as  Deputy Sheriffs.  Over 400 hundred employees were on the list, including both  custody and non-custody staff. (Harris Aff. ¶ 9).

44.     The Committee met approximately two (2) to three (3) times between November 2004 and January 2005 to discuss their recommendations for decommissioning. The Committee considered a number of factors including, disciplinary history, attendance, whether a Deputy Sheriff appointment was necessary to perform certain assignments, demeanor and comportment, professionalism, and job performance.  (Harris Aff. ¶ 12; Sumpter Aff. ¶ 5; Horgan Aff. ¶ 6, 8).

45.     This was the first time that the Department had undertaken such a review of Deputy Sheriffs and there was no formal protocol that was followed.  It was an informal process in which members of the Committee weighed in with their thoughts and comments on individuals who were being recommended for decommissioning.  Members of the Committee who were unfamiliar with particular individuals deferred to those who had knowledge.  There were no notes maintained of the meetings. (Harris Aff. ¶ 13; Sumpter Aff.¶ 6; Horgan Aff.¶ 7).

46.     Superintendent Horgan focused his review on those Deputy Sheriffs working at the HOC.  (Horgan Aff. ¶ 7).  Superintendent Sumpter focused his review on those Deputy Sheriffs working at NSJ.  (Sumpter Aff. ¶ 6).  Deputy Superintendent Theiss advised the Committee concerning whether any of Deputy Sheriffs were currently or previously the subject of an investigation by SID. Theiss also provided any insight concerning specific individuals derived from his experience with the Training Division. (Theiss Depo. 68:10-17)

47.     Chief of Staff Keeley contributed her own personal observations and interactions with individuals whom she knew, but deferred in significant part to Superintendents Horgan and Sumpter concerning custody staff working at their respective facilities. (See Exhibit 10, Deposition testimony of Elizabeth Keeley dated April 6, 2006, p. 85:14-20; p.89: 5-12 – hereinafter Keeley Dep.).

48.     The committee did not recommend any individual for decommissioning because of their political affiliation. (Keeley Dep. p. 94-95; Harris Aff. ¶ ¶16-17; Sumpter Aff. ¶¶ 8-9; Horgan Aff. ¶¶ 10-11).

49.    The committee did not recommend any individual for decommissioning because of their union activity.  (Keeley Dep. p. 94-95; Harris Aff. ¶ ¶16-17; Sumpter Aff. ¶¶ 8-9; Horgan Aff. ¶¶ 10-11).

## B.  Plaintiffs' Discipline And Unprofessional Conduct

### Plaintiffs Giglio and Dilibero

50.    Prior to their decommissioning, Plaintiffs Giglio and Dilibero were observed by Superintendent Sumpter to have poor attitudes and to have acted disrespectfully toward Defendant Sheriff Cabral and other Command Staff. (See Exhibit 11, Deposition testimony of Eugene Sumpter, Jr., dated April 5, 2006, p. 67:8-11; 68:7-13 – hereinafter Sumpter Dep.).

### Plaintiff Peneau

51.    Plaintiff William Peneau was disciplined for violation of SCSD Policy S220 pertaining to his conduct and interaction with NSJ Superintendent Sumpter on January 31, 2005.  (See Exhibit 12, Deposition testimony of William Peneau, dated December 8, 2006 p. 11:16-12:17, - hereinafter Peneau Dep.) (Sumpter Dep. p. 69:2-23).  That discipline was in effect at the time he was decommissioned in April 2005.  Sheriff Cabral was aware of the incident when she made the decision to decommission Peneau. (Cabral Aff.¶ 40).

52.    Superintendent Sumpter issued the written warning to Mr. Peneau for his actions on January 31, 2005. (See Exhibit 13, Written Warning dated February 4, 2005).  The written warning accurately reflects Peneau's conduct and interaction with Superintendent Sumpter on that date. (Peneau Dep. p. 14:10-14).

53.    Superintendent Sumpter had another interaction with Plaintiff Peneau in approximately 2004 pertaining to Peneau's performance of his duties at the back gate control room of the NSJ.  Sumpter admonished Peneau twice in the same day for his failure to secure the back gates and allowing other persons to be in the control room.  Sumpter found Mr. Peneau to be defensive about his actions. (Sumpter Dep. pp.70:4-72:2).

### Plaintiff Turley

54.    Plaintiff Turley received a twenty-day suspension in January 2004 for an incident in which it was determined that he had falsely accused a detainee of kicking another detainee in the head[3].  (See Exhibit 14, Notice of Twenty-Day Suspension issued to Corporal Timothy Turley dated January 22, 2004) The discipline had not

---

[3] In October 2005, after settlement discussions with the JOEASC over a number of pending grievances, the Department agreed to rescind Turley's discipline and make him whole for the time he was suspended.  There was no

been rescinded prior to his decommissioning in April 2005.  (See Exhibit 15, Deposition testimony of Timothy Turley dated January 9, 2007, p. 24: 2-24 - hereinafter cited as Turley Dep.). Sheriff Cabral was aware of the discipline and the reasons why it was imposed. (Cabral Dep. pp. 140:24-141:6). However, Sheriff Cabral was not involved in the decision to impose discipline. (Cabral Aff. ¶41).

55.    It was reported to Chief Keeley that Plaintiff Turley was very angry and upset with his being disciplined.  After he was disciplined, Chief Keeley encountered Mr. Turley when she was touring the NSJ and he was on duty in a control booth. On that occasion, Mr. Turley turned his back on Chief Keeley and did not acknowledge her presence. (Keeley Dep. p. 49: 4-17). Superintendent Sumpter also observed Plaintiff Turley to be disrespectful to members of the Command Staff, including Chief Keeley and Sheriff Cabral. (Sumpter Dep. p. 72:12-16).

**Plaintiff Grennon**

56.    Deputy Superintendent and Director of Training Martin Michelman testified that he counseled Plaintiff Grennon in 2004 about conducting union business while on duty in the Training Division. (See Exhibit 16, Deposition of Martin Michelman, dated October 3, 2006 in the matter of *Michelman v. Cabral, CA 05-11577-RGS*, p. 54:13-55:3 -hereinafter Michelman Dep.).

**Plaintiff Lynch**

57.    Plaintiff Lorne Lynch was disciplined in April 2002 for saying to an African-American co-worker (Arla Sutherland) that she liked her coffee, "Like you like your men, hot and black." (See Exhibit 17, Deposition testimony of Lorne Lynch dated May 4, 2001, in the matter of *Arla Sutherland v. Suffolk County Sheriff's Department, MCAD No. 00133417*, p. 13:7-10).

58.    Ms. Sutherland filed a lawsuit against Mr. Lynch and the Suffolk County Sheriff's Department based in part upon the statement made by Mr. Lynch. (See Exhibit 18, Deposition testimony of Lorne Lynch dated October 6, 2006 p. 71:11-73:3 – hereinafter Lynch Dep. I).

59.    The Suffolk County Sheriff's Department under the administration of Defendant Sheriff Cabral paid for Mr. Lynch's legal representation in the lawsuit brought by Ms. Sutherland.  (Cabral Aff. ¶ 32). (Lynch Dep. I pp. 74:23-75:1)

60.    In 2005, the Suffolk County Sheriff's Department under the administration of Defendant Sheriff Cabral authorized the payment of a settlement on behalf of Mr. Lynch and the Department in the lawsuit brought by Ms. Sutherland.  (Cabral Aff. ¶ 32; Lynch Dep I.  pg. 74:3-12)

---

admission of wrongdoing by the Department or concession that the discipline was not supported by just cause. (Harris Affidavit)

61. Chief of Staff Keeley considered Plaintiff Lynch to be openly hostile and disdainful to her and Sheriff Cabral. On numerous occasions when Plaintiff Lynch was working in Central Control at the NSJ, Chief Keeley observed that he kept her waiting in the sallyport before opening the door, failed to acknowledge her or stared her down. (Keeley Dep. pp. 38:17-39:24) Chief Keeley informed Superintendent Sumpter about the way that Plaintiff Lynch was behaving. Superintendent Sumpter told Chief Keeley that Lynch treats everyone that way. (Keeley Dep. pp. 40:15-41:13).

62. Sheriff Cabral is aware that Lorne Lynch has displayed an incessantly negative and disparaging attitude toward the Sheriff's Department in the years preceding her tenure as Sheriff and throughout her tenure. Sheriff Cabral considers Lynch to be a smart, capable man who has squandered his enormous potential in the Department, because of his negativity. (Cabral Aff. ¶ 32; Cabral Dep. pp. 151:20-152:4).

**Plaintiff Moscone**

63. Plaintiff Moscone received a written warning in November 2004 that was still in effect and had not been rescinded in April 2005[4]. (See Exhibit 19, Deposition of Albert Moscone dated September 27, 2006, pp.74:17-77:8 – hereinafter Moscone Dep.).

**C. The Mailings and Press Release Written By Plaintiffs Ellis, Barnes and Grennon**

64. Plaintiffs Ellis, Barnes and Grennon authored and disseminated two letters and a press release in March/April 2004, one year before they were decommissioned, that disparaged the Department and misrepresented Sheriff Cabral's actions. The content of the letters and the press release concerned dental and vision insurance coverage for JOEASC members, a delay in the payment of the Department's obligation to the City of Boston Retirement Fund, vacation benefits provided to returning veterans, alleged pay raises to management employees and an alleged overdue Department utility bill. (See Exhibit 48, Admissions of John Ellis, #6, hereinafter cited as Ellis Admissions); (See Exhibit 21, Deposition testimony of John Barnes dated October 31, 2006, pp.139:4-142:16 - hereinafter cited as Barnes Dep. I). (See Exhibit 22, Deposition testimony of John Grennon dated January 19, 2006, pp.124:1-20, 136:9-12 - hereinafter cited as Grennon Dep. I).

65. The letters and press release were sent to voters and members of external unions in Suffolk County and were reprinted in a number of newspapers including the West Roxbury Transcript and Boston City Paper. (See Exhibit 23, West Roxbury Transcript, dated April 1, 2004 and Exhibit 24, Boston City Paper, dated April 23, 2004.

---

[4] An Arbitrator ruled that written warning was issued to Moscone without just cause

66.     On April 2, 2004 a letter written on JOEASC letterhead, entitled *What a Mess! Promises Not Kept* was sent to citizens in Suffolk County.  The letter was endorsed with the printed signature of Plaintiff John Barnes. (See Exhibit 25)

67.     On March 25, 2004 a letter alleging the same "facts", with the title *What a Mess! Sheriff takes employees' Benefits* was sent to union members in Suffolk County. That letter accused Sheriff Cabral of "taking employee benefits away from the hardworking men and women of the Suffolk County Sheriff's Department." This letter went out under the printed and handwritten name of Plaintiff John Grennon. (See Exhibit 26)

68.     On March 25, 2004 a Press Release on JOEASC letterhead, with Plaintiff John Ellis identified as the contact person for JOEASC was issued. The Press Release refers to the above referenced letters, stating "the letter sights a misuse of money owed to pension benefits, a lack of dental and vision health coverage, delinquent payment of water bills, and a dishonoring of agreements with veteran employees who have been called away to duty." (See Exhibit 27)

69.     Mr. Ellis acknowledged at deposition that the issues of alleged pay raises to management employees, vacation benefits to returning veterans and pension benefits were not union contract issues. (See Exhibit 20, Deposition testimony of John Ellis dated January 8, 2007, pp. 172:24-173:8 - hereinafter cited as Ellis Dep.)

70.     JOEASC members and Plaintiffs Bergeron, Peneau, Turley, Giglio and Dilibero had no involvement in the creation or dissemination of the mailings dated March 25 and April 2, 2004. (See Exhibit 28, Deposition testimony of David Bergeron, dated October 4, 2006 p. 106:16-20 - hereinafter cited as Bergeron Dep.; Exhibit 29, Deposition testimony of Paul Giglio dated December 13, 2006, p.71: 2-4 - hereinafter Giglio Dep.;  Exhibit 30, Deposition testimony of Erik Dilibero dated December 13, 2006, p. 100: 4-9 - hereinafter cited as Dilibero Dep.; Peneau Dep. p. 45:16-21 ; Turley Dep. p. 85:22-24).

71.     Plaintiff Grennon maintains that Plaintiffs Ellis, Barnes and Attorney Condon of Merrick, Louison and Costello were responsible for the content of the mailings dated March 25 and April 2, 2004. (See Exhibit 31, Deposition of John Grennon dated February 19, 2007, pp 179:1-4; 189:6-8 – hereinafter cited as Grennon Dep. II).

72.     On December 12, 2003 Sheriff Cabral issued a Memorandum to all Department employees concerning the April 2003—June 2003 Pension Payments.  The Memorandum sets forth in detail the facts regarding why the Department's contribution to the City of Boston pension fund was delayed for the last three months of Fiscal Year 2003 and that no retired or current employees' pension were at risk.  Further, the memo confirmed that all payments for fiscal year 2004

July through November 2003 had been made.  (See Exhibit 32 Cabral Memorandum, dated December 12, 2003).

73.    On April 28, 2004 Sheriff Cabral issued a Memorandum to all Department employees concerning the letters and press release authored and disseminated by Ellis, Barnes and Grennon.  The Memorandum sets forth in detail the accurate facts concerning the issues of dental and vision coverage, payment to the Retirement Board, vacation benefits for veterans, alleged pay raises, and payment of water bill.  (See Exhibit 33, Cabral Memorandum, dated April 28, 2004). Sheriff Cabral also addressed roll call on all three shifts at the NSJ and the HOC to correct the misinformation that Ellis, Barnes and Grennon had spread. (Harris Aff. ¶ 49).

### D.  Ellis, Barnes And Grennon's Knowledge Of The Real Facts

#### Pay Raises

74.    Superintendent Harris had a number of conversations with Plaintiffs Barnes, Grennon and Ellis in which he explained in great detail the City of Boston, Central Payroll Office process that requires the Department to utilize 15Fletters when hiring an employee into a grade beyond Step 1.  Harris explained that the 15F letters did not constitute pay raises but instead only a procedural adjustment that placed their compensation at the level initially established and agreed upon at the date of their hire. These conversations took place prior to May 2004. (Harris Aff. ¶ 21).

#### Pension Issue

75.    Ellis and Barnes received Sheriff Cabral's memo dated December 12, 2003, concerning the late pension payments. (see ¶ 71, supra). (Ellis Dep. pp. 121:13-122:22) (Barnes Dep. I, pp.179:19-180:4).

76.    Superintendent Harris explained the budgetary reasons for the delay in the Department's pension contribution to Plaintiffs Ellis, Barnes and Grennon prior to April 2004. Harris informed them that the pension money was not missing or misappropriated and that at most it was a late payment scenario not a default. (Harris Aff. ¶ 22).

77.    On another occasion prior to April 2004 Superintendent Harris explained to Plaintiffs Barnes and Ellis and their counsel, Attorney Condon, that no retired or current employees' retirement benefits were ever jeopardized, that payment would be made in full shortly, and that the SCSD was not the only Department to ever make a late payment to the Retirement account. (Harris Aff. ¶ 23).

#### Dental and Vision Benefits

78.   Defendant Sheriff Cabral was not responsible for JOEASC's removal from the Massachusetts Public Employee's (MPE) Plan and the loss of dental and vision coverage that resulted from their removal. (Peneau Dep. pp. 56:22-57:1) (Cabral Memorandum dated April 28, 2004, Ex. 33 )

79.   Superintendent Michael Harris had two conversations with Plaintiff John Barnes prior to JOEASC being recognized as the official bargaining unit, in which Harris expressed his concern about JOEASC's continuing status in the existing MPE plan.  Harris' concern was due to comments made by AFSCME Staff Representative, Jim Breslin, to both Barnes and Harris, indicating that JOEASC members would potentially forfeit their enrollment in the AFSCME sponsored Mass Public Employees Fund. (Harris Aff. ¶ 24).

80.   After MPE discontinued benefits to JOEASC members, Plaintiff Barnes personally informed Superintendent Harris about the MPE decision and asked him to intercede with MPE. Harris did so but was unsuccessful in restoring benefits. Thereafter, JOEASC asked the Department to join them in a potential lawsuit against MPE, which the Department declined. (Harris Aff. ¶ 25).

81.   Subsequently, Superintendent Harris had a number of conversations with Plaintiffs Barnes and Grennon, and occasionally Ellis concerning optional coverage plans.  One of these conversations occurred when Sheriff Cabral voluntarily elected to assume the COBRA coverage expenses for each of the affected members.  Harris had another conversation with Barnes and Grennon after it was learned that JOEASC had failed to notify all its members of the COBRA enrollment option thereby rendering some members ineligible for this option.  (Harris Aff. ¶ 26).

82.   Shortly after the Department began to make the COBRA payments for eligible JOEASC members, Harris met with Plaintiffs Barnes, Grennon and Ellis.  During this meeting Barnes, Grennon and Ellis insisted that it was the Department's obligation under the parameters of the CBA to ensure continuing coverage. Harris reminded them, on more than one occasion, that (A) their CBA expired, (B) JOEASC had never technically negotiated a CBA with the Department, (C) the "existing benefit" stipulated to in the AFSCME Local 1134 contract was no longer available due to their conscious decision to decertify from AFSCME. (Harris Aff. ¶ 27).

83.   Harris also explained to Barnes, Grennon and Ellis that Dental Benefits were a CBA matter and all changes, modifications and even the continuation of existing benefits or the creation of a new benefit needed to be collectively bargained and jointly agreed to.  (Harris Aff.¶ 28).

84.   The Department attempted to collectively bargain the subject of Dental Benefits with JOEASC for a prolonged period of time and did in fact reach a tentative agreement that included an alternative dental benefits plan, which was rejected.

13

All during this period Sheriff Cabral voluntarily continued to pay COBRA coverage costs for members of this bargaining unit until this option expired after a period of approximately eighteen (18) months.  The Department paid out over $200,000 in COBRA coverage costs. (Harris Aff. ¶ 29; Exhibit 33).

85.    On several occasions prior to the COBRA expiration date, Superintendent Harris personally advised Plaintiffs Barnes, Grennon and Ellis of the impending expiration of benefits and requested, to no avail, that we again try to resolve alternative coverage options via the collective bargaining process. All of these discussions transpired between January 2003 and July of 2004.  (Harris Aff.¶ 30)

### Veterans' Vacation Benefits

86.    Superintendent Harris had several conversations with John Ellis, John Barnes and John Grennon beginning in late January/early February 2003 regarding vacation benefits for returning military personnel.  On each of these occasions he explained to them that employees returning from military duty were required to have thirty (30) weeks of service at the Department in the prior year for vacation eligibility. (Harris Aff. ¶ 31).

87.    Superintendent Harris also explained to Ellis, Barnes, and Grennon that the provisions of M.G.L., c. 137 do not apply to the Department because it is not a state agency and, in any case, the statue does not provide for accrual of vacation time while on leave.  During these conversations, Superintendent Harris also reminded them of the vacation and other benefits that the Department voluntarily provides to employees in the military.  (Harris Aff. ¶ 32).

### E.  Meetings Between Sheriff Cabral and Plaintiffs Ellis, Barnes and Grennon

88.    In April 2004 Sheriff Cabral met with John Barnes, John Grennon, and John Ellis concerning the disparaging comments about the Sheriff's Department and the intentionally false and misleading information concerning her actions as Sheriff, contained in letters and a press release that they authored and disseminated in March and April 2004. She met first with Grennon and Barnes and then with Ellis at a later date.  (Cabral Aff. ¶ 33).

89.    During these two meetings, Sheriff Cabral addressed each of the issues raised in the letters and press release in turn: dental and vision insurance coverage for JOEASC members, a delay in the payment of the Department's obligation to the City of Boston Retirement Fund, vacation benefits provided to returning veterans, alleged pay raises to management employees and an alleged overdue Department utility bill.  She reminded them what the true facts were in contrast to the "facts" alleged in the mailings. (Cabral Dep. p. 50:7-20; Exhibit 33).

90.    She confronted them with the falsehoods in the letters and told them that she

considered their conduct libelous and actionable. Sheriff Cabral told them that they had disparaged the Department and her and specifically asked each one how they could create this information and intentionally distribute it to Department employees and the public when they knew that the information was false.  They did not provide any satisfactory explanation for their actions.  (Cabral Aff. ¶ 34).

91.    Barnes, Grennon and Ellis never told Sheriff Cabral that these letters and press release were created and written by anyone else but them.  (Cabral Aff. ¶ 35).

92.    During the meeting Sheriff Cabral had with Barnes and Grennon, and thereafter with Ellis, she never discussed the 2004 campaign for Suffolk County Sheriff. She did not ask whether they were supporting Stephen Murphy.  The sole focus of the conversation was their disparaging comments about the Department and the intentionally false and misleading information about her actions as Sheriff contained in the letters and press release.  (Cabral Aff. ¶ 36).

**F. Sheriff Cabral's Review Of The List Of Individuals Recommended For Decommissioning**

93.    Ultimately the Committee agreed on a list of individuals whom they recommended for decommissioning.  The Committee did not vote on which names to include. The list included custody and non-custody staff at the NSJ and the HOC. (Harris Aff. ¶ 14; Sumpter Aff. ¶ 8; Horgan Aff. ¶ 10).

94.    In early 2005 a list of individuals recommended for decommissioning was presented to Sheriff Cabral for her review and consideration. The list contained only the names of the individuals, without any reasons provided. Sheriff Cabral did not have any prior input into the names that appeared on that list.  Sheriff Cabral did not know how the Committee arrived at the names that were recommended.  (Cabral Aff. ¶ 37).

**Plaintiff Paul Giglio**

95.    Sheriff Cabral did not recognize all of the employees on the list, including Plaintiff Paul Giglio.  She only inquired about the reasons for some of the names that she did recognize, none of which were the Plaintiffs in this lawsuit.  (Cabral Aff. ¶ 37).

96.    Sheriff Cabral accepted the recommendation to decommission Paul Giglio without inquiring why his name was on the list.  (Cabral Aff. ¶ 39).

**Plaintiff Erik Dilibero**

97.    The only name that Sheriff Cabral added to the list was Plaintiff Erik Dilibero. Sheriff Cabral added his name to the list based upon her own personal observations of his demeanor and attitude and her understanding that he had

displayed poor performance and judgment as a line officer and was an equally poor supervisor.  (Cabral Aff. ¶ 38).

### Plaintiffs William Peneau and Tim Turley

98.    Sheriff Cabral did not ask for the reasons why William Peneau and Tim Turley were on the list.  However, she was aware that Superintendent Sumpter had previously disciplined Peneau for unprofessional conduct.  Additionally, she was aware that Tim Turley had been disciplined for an incident in which the Department believed he had falsely accused a detainee of kicking another detainee in the head and had sought to have the detainee punished based upon the false allegation.  (Cabral Aff. ¶ 40).

### Plaintff  David Bergeron

99.    Sheriff Cabral did not ask for the reasons why David Bergeron was recommended for decommissioning.  However, based upon her own observations of Mr. Bergeron's unprofessional and inappropriate conduct towards her, Sheriff Cabral agreed that he should be decommissioned.  (Cabral Aff. ¶ 41).

100.    Sheriff Cabral had a conversation with Plaintiff Bergeron at Holy Name School in West Roxbury on March 2, 2004, in which, he addressed her in a tone that was argumentative and disrespectful to her personally and her position as Sheriff.  During this conversation, Mr. Bergeron confronted Sheriff Cabral concerning her administration and specific actions she had taken regarding dental and vision benefits, veterans benefits and the compensation paid to management employees.  Sheriff Cabral attempted to provide Mr. Bergeron with the facts because it was apparent to her that he was misinformed, however he would not listen.  (Cabral Aff. ¶ 16; ¶ 17).

101.    At the time that Bergeron had this conversation with Sheriff Cabral on March 2, 2004 he was not an elected official of JOEASC or a member of the JOEASC Executive Board. Bergeron engaged in this conversation with Sheriff Cabral as an employee of the Department, not as a representative of JOEASC.  (Bergeron Dep. p. 127:4-129:4, 131:17-24).

102.    The conversation that took place between Bergeron and Sheriff Cabral on March 2, 2004 was not in the context of a labor/management meeting.  During this conversation Plaintiff Bergeron told Sheriff Cabral that he was "disappointed in her and angry at her administration" and proceeded to tell her why he was.  (Bergeron Dep. pp. 81-87).

103.    Bergeron told Sheriff Cabral that Officer Angelo Rossi had attempted to speak with her about his intent to run for Sheriff and was told that the Sheriff did not want to see him.  (Bergeron Dep. p. 84: 3-17).

16

104.  Bergeron told Sheriff Cabral "You know, it just doesn't look good.
      You're giving out raises to your people up top and there are other people doing
      without." (Bergeron Dep. p. 85:3-5).  When Sheriff Cabral explained that these
      were not raises but rather the mechanism employed by the City of Boston to place
      employees in the salary slot that they were hired for, he continued to dispute her.
      (Bergeron Dep. p. 85: 5-16).

105.  Plaintiff Bergeron told Sheriff Cabral that she did not spend enough time at the
      NSJ.  Bergeron stated, "That's unacceptable from my point of view.  You should
      be spending more time at the jail, some more hands-on stuff."  (Bergeron Dep. p.
      85:22-24; p. 86:1-2).

106.  Viktor Theiss observed the interaction between Bergeron and Sheriff Cabral at the
      Holy Name Rotary and described it as very heated and further described Bergeron
      as being aggressive and very upset. (Thiess Dep. pp.11:10-15; 84:7-13).

107.  Sheriff Cabral told Superintendent Sumpter that Bergeron was very disrespectful
      to her in public and she was upset about the interaction. (Sumpter Dep. p.60:1-2,
      p. 61: 4-7).  This conversation took place before the annual review of Deputy
      Sheriffs. (Sumpter Dep. p.61:13-14).

108.  On other occasions Sheriff Cabral observed Bergeron to be intentionally
      disrespectful to her when she encountered him at the NSJ.  (Cabral Aff. ¶ 18).

### Plaintiffs John Ellis, John Barnes and John Grennon

109.  Sheriff Cabral did not ask for the reasons why John Ellis, John Barnes and John
      Grennon were recommended for decommissioning.  In her opinion, their reckless
      behavior in authoring and disseminating two letters and a press release in
      March/April 2004 that disparaged the Department and intentionally
      misrepresented her individual conduct and the Department's positions and
      policies on important issues was sufficiently egregious to disqualify them from
      the privilege of being appointed a Deputy Sheriff.  (Cabral Aff. ¶ 42).

110.  Sheriff Cabral had also had interactions with John Grennon in which she found
      him to be duplicitous.  (Cabral Aff. ¶ 33).

### Plaintiff Lorne Lynch

111.  Sheriff Cabral did not ask for the reasons why Lorne Lynch was recommended
      for decommissioning.  However, based upon her observations of Mr. Lynch's
      incessantly negative and disrespectful attitude, she agreed that he should
      be decommissioned.  (Cabral Aff. ¶ 41).

### Plaintiff Al Moscone

112.    Sheriff Cabral was aware that Al Moscone had been given an opportunity to implement changes when he was assigned to Transportation and he had not been willing to do so.  Accordingly, she agreed with the recommendation that he be decommissioned.  (Cabral Aff. ¶ 41). (See ¶ 255 -257 infra )

## G.  Decommissioning

113.    On April 21, 2005, with the approval of Sheriff Cabral, thirty-six (36) out of a total of four hundred seventy-two (472) Deputy Sheriffs working at the Department were decommissioned.  Some of the decommissioned employees worked at the NSJ while others worked at the HOC. (Harris Aff. ¶18).

114.    The Deputy Sheriffs who were decommissioned were invited to submit an application for reappointment after May 2006. (Harris Aff. ¶19).

115.    The plaintiffs in the instant case comprise ten (10) of the thirty-six (36) employees who were decommissioned on April 27, 2005. (Harris Aff. ¶18).

### Plaintiffs Giglio and Dilibero

116.    Paul Giglio and Erik Dilibero were both decommissioned because of their negative attitudes and their lack of respect for Sheriff Cabral and Chief Keeley. Superintendent Sumpter believed that since neither Giglio nor Dilibero had any respect for the Sheriff, then they should not be entitled to represent her and the Department in public as a Deputy Sheriff. (Sumpter Dep. p. 68: 2-13; Cabral Dep. pp. 139:20-140:12; Keeley Dep. p. 69:1-5).

### Plaintiff Peneau

117.    William Peneau was decommissioned because of his disrespectful and inappropriate conduct while on duty, some of which resulted in discipline. (Sumpter Dep. p. 69:2-22; p.70:11-24,  p.71:1-19, p. 72: 1-6; Exhibit 13).

### Plaintiff Turley

118.    Tim Turley was decommissioned because he received a twenty-day suspension for an incident in which the Department believed that he had falsely accused an inmate of kicking another inmate in the head.  Additionally, after he was disciplined, Turley was disrespectful to members of the Command Staff, including the Chief Keeley and Sheriff Cabral. (Sumpter Dep. p. 72:11-17; Keeley Dep. p. 49: 4-17; Theiss Dep. p. 98:4-16).

### Plaintiff Bergeron

119.    David Bergeron was decommissioned because of his disrespectful and inappropriate interaction with Sheriff Cabral at the Holy Name Rotary in March

2004 and on other occasions at the NSJ. (Cabral Aff. ¶42; Cabral Dep. p. 159 - 160; Theiss Dep. p.86:18-24; Sumpter Dep. p.63:12-18).

**Plaintiffs Ellis, Barnes and Grennon**

120.    John Ellis, John Barnes and John Grennon were decommissioned because of their reckless behavior in authoring and disseminating the letters and press release disparaging the Department and intentionally misrepresenting Sheriff Cabral's individual conduct and the Department's positions and policies on important issues. (Cabral Dep. p. 168: 4-24-170:18; pp. 146:14-148:12; pp. 154:12-157:20; Cabral Aff. ¶ 43; Sumpter Dep. p. 75: 2-6; p. 77: 5-7, 18-20).

121.    Sheriff Cabral also found John Grennon to be duplicitous based upon her own observations and interactions with him as well as what others reported to her. Specifically, Sheriff Cabral was aware that Grennon would make laudatory remarks about her actions as Sheriff at Academy graduations but then harshly criticize her and her administration to Department employees. (Cabral Dep. pp. 168:16-170:18).

**Plaintiff Lynch**

122.    Lorne Lynch was decommissioned because of his incessantly negative attitude towards Sheriff Cabral and the changes she has implemented at the Department. (Cabral Dep. pp. 151:20-154; Cabral Aff. ¶42; Theiss Dep. p. 93:24; p. 94:1-14)

**Plaintiff Moscone**

123.    Al Moscone was decommissioned because of his sub par job performance while assigned to Transportation and his inability to implement recommended changes. (Sumpter Dep. p. 52:16-21: p. 53:1-14; p. 54:13-24: p. 55:1-7, 24; p.56: 2-3; Cabral Aff. ¶42) (See ¶¶ 255-157 infra )

**Effect Of The Decommissioning On The Plaintiffs**

124.    The loss of their Deputy Sheriff status has had no effect on the Plaintiffs' shift, days off, vacation, assignments, seniority, rank, salary, and duties and responsibilities as Jail Officers. (Peneau Dep. p. 80:1-9; Turley Dep. p. 57:12-19,p. 159:7-14: Giglio Dep. p. 104:10-18, p. 111:1-9).

125.    The decommissioned employees were notified of their change in status by a form letter that was individually addressed to each employee.  The letter was poorly worded and was not meant to impugn any employee's status as a member of the Department in good standing. (Harris Aff. ¶ 48)

**Union Officials Who Were Not Decommissioned**

126.   Of the four hundred thirty-five (435) Deputy Sheriffs who were not decommissioned, some were current or former union officials, including: Michael Walsh (JOEASC President 2004-2005), Robert Tullos (JOEASC Executive Board member 2003-2004), Stan Andruszkiewicz (current JOEASC President), Mark Turley (JOEASC Treasurer 2003-2004), Michael Cinelli (JOEASC Executive Board), Kevin O'Riordan (JOEASC Executive Board member 2003-2004), Michelle Fitzpatrick(JOEASC Executive Board member 2003-2004), Richard Rosetti (JOEASC Trustee), Miguel Bueno (JOEASC Executive Board member), Angelo Rossi (current JOESC Vice President) Todd Flynn (Local 419 Executive Board member), Bryan Kaiser (Local 419 Trustee), Brian McPherson (Local 419 Executive Board member), William Noonan (Secretary Local 3643), Troy Salvetti (Vice President Local 419), Dennis Guilfoyle (Recording Secretary Local 419),Christopher McCray (Former President Local 419), Mike Powers (Former President Local 419), and Jack Sullivan (Former President Local 419). (Harris Aff. ¶44)

**Supporters of Stephen Murphy Who Were Not Decommissioned**

127.   Of the four hundred thirty-five (435) Deputy Sheriffs who were not decommissioned, some were supporters of Sheriff Cabral's political opponent, including: Patrick O'Brien, Angelo Rossi, Kevin Janellis, Richard Coleman, Jeremy Washburn, and Dennis Harrison. (Cabral Aff. ¶ 27; Horgan Aff. ¶ 10; Moscone Dep. p. 115-117, Lynch Dep. I, p.178-179, 188).

128.   Angelo Rossi is an officer at the NSJ and member of JOEASC.  Angelo Rossi publicly announced his intention to run as an independent candidate for Suffolk County Sheriff in 2004 against Sheriff Cabral.  Sheriff Cabral was aware of Rossi's intent to run against her for Sheriff.  (Cabral Aff. ¶ 21; Bergeron Dep. p. 47-49).

129.   Angelo Rossi was not decommissioned as a result of the review of Deputy Sheriffs that concluded in April 2005.  (Horgan Aff. ¶ 10).

## VI.   UNION ACTIVITIES

130.   Although she could have, Sheriff Cabral did not challenge the decision by the membership of JOEASC to self-organize and separate from AFSCME. (Turley Dep. p. 109).

131.   Since 2003 Sheriff Cabral promoted or upgraded numerous staff members, both custody and non-custody, with strong union affiliation including office holders, stewards, bargaining unit members. (Harris Aff. ¶ 47)

**Plaintiff Paul Giglio**

132.    Mr. Giglio has never held an elected or official position with JOEASC at anytime under the Cabral administration. (Giglio Dep. p. 85:18-23).

133.    Other than being a member of JOEASC and occasionally attending union meetings, Giglio has never engaged in or conducted any union business on behalf of JOEASC.  (Giglio Dep. p. 86: 6-22).

134.    Mr. Giglio never engaged in contract negotiations on behalf of JOEASC nor testified on behalf of any union members in disciplinary hearings or arbitrations during the relevant time period of this Complaint.  (Giglio Dep. pp. 86-88).

135.    Mr. Giglio has never had any interactions with Defendant Sheriff Cabral pertaining to union business.  (Giglio Dep. pp. 86-87).

136.    Mr. Giglio has never had any interactions with Chief of Staff Elizabeth Keeley pertaining to union business.  (Giglio Dep. p. 87:3-8).

137.    Mr. Giglio has never had any interactions with Superintendent Michael Harris pertaining to union business.  (Giglio Dep. p. 87:3-8).

138.    Sheriff Cabral had no interactions with Paul Giglio. (Cabral Dep. p. 140: 9-15).

**Plaintiff Erik Dilibero**

139.    Mr. Dilibero was the Vice President of Local 3643 (the superior officers union at the NSJ) from approximately 2003 through 2004.  (Dilibero Dep. p.102: 6-22).  Mr. Dilibero described his role as Vice President of Local 3643 as largely ceremonial, with minimal duties and responsibilities.  (Dilibero Dep. p. 107:2-8).

140.    According to Mr. Dilibero, whomever was the President of Local 3643 conducted all the significant work on behalf of Local 3643.  (Dilibero Dep.  p. 107: 9-16).

141.    When he was Vice President of Local 3643 Mr. Dilibero did not file any Grievances on behalf of the union, testify at any disciplinary hearings or arbitrations on behalf of the union, file any complaints on behalf of the union, or participate in contract negotiations on behalf of the union.  (Dilibero Dep. pp.105-107, lines 12-1).

142.    Mr. Dilibero had no specific interactions with Defendant Sheriff Cabral or Chief of Staff Elizabeth Keeley in his capacity as a member of Local 3643 or Vice President of Local 3643.  (Dilibero Dep. p.106: 6-22).  Sheriff Cabral was unaware that Dilibero held an official position with the union or that he engaged in activity on behalf of the union. (Cabral Aff. ¶ 12).

143.    Mr. Dilibero had minimal interactions with Superintendent Michael Harris as

a member of Local 3643 or Vice President of Local 3643.  (Dilibero Dep. p. 106: 10-17).

144.    Once Mr. Dilibero was restored to his permanent rank of Sergeant on January 26, 2005 he became a member of JOEASC.  Other than being a member and occasionally attending union meetings, Mr. Dilibero was not active in JOEAC. (Dilibero Dep. pp. 108-109).

145.    During deposition Dilibero was unable to identify what union activity he engaged in that he alleges was the reason for his decommissioning.   Dilibero admitted that he had no evidence that Sheriff Cabral was even aware that he was a member of Local 3643. (Dilibero Dep. p. 110: 2-12).

**Plaintiff William Peneau**

146.    Mr. Peneau was the grievance administrator for JOEASC between April 2003 and approximately October 2004. (Peneau Dep., p. 50:10-19).  As grievance coordinator, Peneau kept track of grievances and assisted the Chief Steward, Plaintiff Turley. (Peneau Dep. p. 59:12-16).

147.    Mr. Peneau did not testify at any arbitrations on behalf of JOEASC members, participate in any contract negotiations on behalf of JOEASC or file any complaints against the Department between April 2003 and April 2005.  (Peneau Dep. pp. 60-61).

148.    Other than acting as the grievance administrator, participating in some Step 2 hearings on behalf of JOEASC members and occasionally accompanying a JOEASC member to an investigatory interview, Mr. Peneau engaged in no other activity on behalf of JOEASC.  (Peneau Dep. p. 66: 3-18).

149.    After he left the grievance administrator position, Peneau did not perform any work on behalf of JOEASC between the Fall 2004 and April 2005.  (Peneau Dep. pp. 59-60).

150.    Peneau had no interactions with Defendant Sheriff Cabral in his capacity as a union official or a grievance administrator for JOEASC. (Peneau Dep. p. 54: 21-23).  Sheriff Cabral was unaware that Mr. Peneau was the grievance administrator for JOEASC.  (Cabral Aff. ¶ 12).

**Plaintiff Timothy Turley**

151.    Turley was the Chief Steward of JOEASC from approximately April 2003 through October 2004 when the members voted in new leadership.  (Turley Dep. p. 79:14-18).

152.    Turley was not involved in contract negotiations on behalf of JOEASC.  (Turley Dep. p. 119:15-18).

153.    Turley maintains that he was not decommissioned because of his union activity or union membership.  (Turley Dep. pp. 146-147).

154.    The only interaction that Plaintiff Turley had with Defendant Sheriff Cabral in his capacity as Chief Steward was to accompany Plaintiff John Ellis to the meeting that Ellis had with Sheriff Cabral in April 2004.  Mr. Turley did not attend the meeting or participate in it once it commenced. (Cabral Aff. ¶ 14; Turley Dep. pp. 80:10-81:2).

155.    As Chief Steward, Plaintiff Turley had a friendly and professional relationship with Superintendent Harris. (Turley Dep. p. 117: 3-6).

**Plaintiff David Bergeron**

156.    David Bergeron was a member of the interim union government prior to the official recognition of JOEASC as the designated bargaining agent representing jail officers (JO-1 to JO-3) and nurses.  During the period of time that he was part of the interim union government Mr. Bergeron did not engage in any activity on behalf of the union membership with Defendant Sheriff Cabral or the Cabral administration.  (Bergeron Dep. pp. 126-127).

157.    David Bergeron was not a member of the JOEASC Executive Board or an elected JOEASC official between April 2003 and April 2005.  Mr. Bergeron did not engage in any activity on behalf of the JOEASC membership with Defendant Sheriff Cabral or the Cabral administration between April 2003 and April 2005. (Bergeron Dep. pp. 128-129).

**Plaintiff John Ellis**

158.    Plaintiff John Ellis was the recording secretary for JOEASC from April 2003 until approximately October 2004 when the members of JOEASC voted in new leadership.  (Ellis Dep., pp. 167-168, 177).

159.    Mr. Ellis' primary responsibilities as recording secretary were to record minutes of meetings, typically general membership meetings and maintain and provide those minutes.  Ellis also kept minutes of collective bargaining sessions. (Ellis Dep., p. 168:7-9, 17-20).

160.    Mr. Ellis did not testify at any arbitrations, participate in any disciplinary hearings, or file any complaints or grievances against the Department or Sheriff Cabral in 2003 or 2004. (Ellis Dep. p. 174:7-24).

161.    Mr. Ellis did not hold an elected position in JOEASC at the time that he was

decommissioned in April 2005. (Ellis Dep. 167-168, 177).

162.    Mr. Ellis did not engage in or conduct any union business on behalf of JOEASC from approximately October 2004 until April 2005. (Ellis Dep. 167-168)

163.    Ellis' primary contact in the Department concerning labor/management issues was Superintendent Mike Harris. (Cabral Aff. ¶ 15).

**Plaintiff John Barnes**

164.    Plaintiff John Barnes was President of JOEASC from April 2003 until approximately October 2004 when the members of JOEASC voted in new leadership. (See Exhibit 34, Deposition testimony of John Barnes, dated December 7, 2006 p. 16 – hereinafter Barnes Dep. II).

165.    Mr. Barnes did not hold an elected position in JOEASC at the time that he was decommissioned in April 2005. (Barnes Dep. I pp. 73:24—74:10).

166.    Barnes' primary contact in the Department concerning labor/management issues was Superintendent Mike Harris. (Cabral Aff. ¶ 15).

**Plaintiff John Grennon**

167.    Plaintiff John Grennon was the Vice President of JOEASC from April 2003 until approximately October 2004 when the members of JOEASC voted in new leadership. (Grennon Dep. I pp. 90-91).

168.    Mr. Grennon did not hold an elected position in JOEASC at the time that he was decommissioned in April 2005. (Grennon Dep. II, p.115:23-24, p.116:1-3, p. 127:4-9)

169.    Grennon's primary contact in the Department concerning labor/management issues was Superintendent Mike Harris. (Cabral Aff. ¶ 15).

170.    The new leadership of JOEASC elected in October 2004 consisted of Michael Walsh (President), Robert Tullos (Vice President), Stan Andruszkiewcz (Recording Secretary) and Chris Mills (Treasurer). These JOEASC officials engaged in union activity advocating positions on behalf of the membership. These JOEASC officials engaged in contract negotiations and were successful in securing a contract on behalf of their membership. (Ellis Dep. p. 177:15-24, p. 178:5-14).

**Plaintiff Lorne Lynch**

171.    Mr. Lynch was the grievance officer and a member of the Executive Board of

Local 3643 at the time of his decommissioning.  (See Exhibit 35, Deposition testimony of Lorne Lynch dated November 2, 2006 pp. 53-54 - hereinafter Lynch Dep. II).

172.  As a union official for Local 3643, Mr. Lynch filed one grievance and attended two to three contract negotiating sessions on behalf of Local 3643 between 2003 and 2005.  (Lynch Dep. II pp. 61-62).

173.  Sheriff Cabral was unaware that Lynch held an official position in the union or that he filed any grievances on behalf of the union.  (Cabral Aff. ¶ 12).

**Plaintiff Al Moscone**

174.  Plaintiff Al Moscone was secretary of Local 3643 from approximately 2002-2005 and became President in 2005.  (Moscone Dep. 136:14-19).

175.  As President of Local 3643, Mr. Moscone filed grievances on behalf of union members and represented the interests of the Local in most of the business with the Department.  (Moscone Dep. pp. 136:20-137:8).

176.  Local 3643 filed fewer than ten and perhaps fewer than five grievances on behalf of union members between 2002 and 2005.  (Moscone Dep. p. 143:11-16).

177.  Sheriff Cabral was unaware of what official position that Moscone held in the union.  Sheriff Cabral never had any dealings with Moscone concerning union issues and was unaware of any grievance that he filed on behalf of the union. (Cabral Aff. ¶ 13).

## VII.  POLITICAL AFFILIATION

**Plaintiff Paul Giglio**

178.  Paul Giglio made one or two contribution of $50 to $100 to the Stephen Murphy campaign, attended two fundraisers (one of which was organized by Plaintiff Moscone), held signs and participated in phone banks. (Giglio Dep. pp. 52:18-53:8; pp. 69:24-70:13).

179.  Mr. Giglio has no information that Sheriff Cabral ever saw him engage in any political or campaign activity on behalf of Stephen Murphy.  (Giglio Dep. p .93:20-24).

180.  Mr. Giglio is unaware whether Defendant Sheriff Cabral knew he supported Stephen Murphy.  (Gilgio Dep. p .94:1-9).

**Plaintiff Erik Dilibero**

181.    Dilibero kept his political beliefs to himself and did not express his support for Stephen Murphy while on the job.  Dilibero never discussed the election for Sheriff or his support for Stephen Murphy with Sheriff Cabral or Chief Keeley. (Dilibero Dep. p. 100:24, p. 101:1-7)

182.    Mr. Dilibero never discussed the 2004 campaign for Suffolk County Sheriff or his support for Stephen Murphy with Defendant Sheriff Cabral, Chief of Staff Elizabeth Keeley, Superintendent Sumpter, or Superintendent Michael Harris. (Dilibero Dep. p. 84:3-21; p.100:24-101:7).

183.    Dilibero's support for Stephen Murphy consisted solely of attending a couple of Fundraisers, making a one-time contribution of $300, hanging a few campaign signs, and working the polls in East Boston on primary day. (Dilibero Dep. p. 88-89; p. 92: 3-10).

184.    Dilibero admitted at deposition that he has no evidence that Sheriff Cabral knew that he supported Stephen Murphy or that he attended fundraisers on behalf of Murphy. (Dilibero Dep. p. 99:3-9)

**Plaintiff William Peneau**

185.    Mr. Peneau did not engage in any work on behalf of Stephen Murphy's campaign for Suffolk County Sheriff in 2004.  Mr. Peneau did not contribute any money, volunteer on any committees, participate in any phone banks, attend any fundraising events, hold any signs, or attend any meetings to support Stephen Murphy's campaign for Suffolk County Sheriff.  (Peneau Dep. pp.36:11-37:1, p. 38:5-9).

186.    The only action Mr. Peneau took to support Stephen Murphy's campaign for Suffolk County Sheriff was to cast a vote in favor of the endorsement of his candidacy by  JOEASC.  (Peneau Dep. p. 38-39).

187.    Mr. Peneau did not have any conversations with Defendant Sheriff Cabral, Superintendent Sumpter, Deputy Superintendent Cliff Carney, Chief of Staff Elizabeth Keeley, or Superintendent Michael Harris regarding the 2004 election for Suffolk County Sheriff.  (Peneau Dep. p. 43-44:11; pp. 54:21-55:2). Mr. Peneau was never advised that there would be consequences if he did not support Defendant Sheriff Cabral's campaign for Suffolk County Sheriff. (Peneau Dep. pp. 43:11-44:11).

**Plaintiff Timothy Turley**

188.    Mr. Turley did not discuss his support for Stephen Murphy with Superintendent Eugene Sumpter or Deputy Superintendent Cliff Carney.  (Turley Dep. p. 140:11-14).

189.   Mr. Turley did not discuss his support for Stephen Murphy with Superintendent
       Michael Harris, Chief of Staff Elizabeth Keeley, Superintendent Viktor Theiss or
       Defendant Sheriff Cabral.  (Turley Dep. p. 140-141).

190.   Mr. Turley does not know if Sheriff Cabral was aware of his support for Stephen
       Murphy.  (Turley Dep. p. 148:11-14).

191.   The only involvement Mr. Turley had in the Stephen Murphy campaign was to
       attend three fundraisers and participate in one phone bank.  Mr. Turley
       contributed no money to the campaign nor did he engage in any public
       campaigning on Mr. Murphy's behalf.  (Turley Dep. pp. 133:17-137:22).

**Plaintiff David Bergeron**

192.   The only work that Plaintiff Bergeron did on behalf of Stephen Murphy in the
       2004 campaign for Suffolk County Sheriff was to hold a Stephen Murphy sign on
       primary day, September 14, 2004 at Holy Name School. Mr. Bergeron did not
       participate in any phone banks, serve on any committees, place a bumper sticker
       on his car or place a sign at his home on behalf of candidate Stephen Murphy.
       (Bergeron Dep. pp. 50:1-51:14; 61-62).

193.   Mr. Bergeron decided to support Stephen Murphy after the JOEASC union
       voted to endorse him.  Mr. Bergeron does not recall participating in that
       endorsement by casting a vote.  (Bergeron Dep. pp. 74:20-75:12).

194.   Mr. Bergeron was not vocal about his support for Stephen Murphy at work and
       does not recall telling anyone at the Department that he was supporting Stephen
       Murphy.  Mr. Bergeron had no conversations with Deputy Superintendent
       Carney, Superintendent Sumpter, Deputy Superintendent Theiss, Chief of Staff
       Keeley or Defendant Sheriff Cabral regarding his support for Stephen Murphy.
       (Bergeron Dep. pp. 63:5-64:24).

195.   Mr. Bergeron had no communication with Sheriff Cabral on September 14, 2004
       at Holy Name School, and never had any conversation with Defendant Sheriff
       Cabral regarding his support of Stephen Murphy.  (Bergeron Dep. p. 66: 2-5,
       p.70: 6-16).

**Plaintiff John Ellis**

196.   Mr. Ellis did not decide to support Stephen Murphy until approximately August
       2004, around the time that JOEASC voted to endorse Murphy for Suffolk County
       Sheriff.  (Ellis Dep., p. 47: 3-8, p. 49:18-24, p.50:1-11).

197.   After he decided to support Murphy, Mr. Ellis attended a few campaign events,
       made one financial contribution of $500, held a sign and marched in a parade with
       Murphy in September 2004, and worked the polls on primary day.  Ellis had not

intended to march in the parade but he had just finished a road race in the area and encountered Murphy who asked him to join him in the parade. Since JOEASC had already voted to endorse Murphy, Ellis agreed to march. (Ellis Dep. p. 47:9-11, p. 153:13-24, p. 154:1-3, 9-19, p. 155: 2-5).

198. Mr. Ellis was not very vocal about his support for Stephen Murphy in the Department. (Ellis Dep., p. 69-70).

199. No one in the Department or Sheriff Cabral's senior management ever displayed hostility to Ellis because of his support for Stephen Murphy. No one in the Department or Sheriff Cabral's senior management ever communicated to him that he would suffer adverse consequences because of his support for Stephen Murphy. (Ellis Dep., p. 156:1-15).

**Plaintiff John Barnes**

200. The only work that John Barnes did for Stephen Murphy was to hold signs on one or two occasions, participate in phone banks on approximately three occasions, make one financial contribution of $125.00 and attend two campaign events. (Barnes Dep. I, p. 89:5-90:1 p. 93:13-17, p. 96:3-7).

**Plaintiff John Grennon**

201. After JOEASC endorsed Stephen Murphy in August 2004, Mr. Grennon introduced Murphy at a JOEASC sponsored Veteran's Appreciation Night in Hyde Park. (Grennon Dep. II p.135: 3-21).

202. Mr. Grennon donated approximately $150.00 to the Murphy campaign after the JOEASC endorsement, attended two campaign events, participated in phone banks and held signs on a number of occasions. On the occasions when he held signs and participated in phone banks, there were no other Department employees working for Murphy. (Grennon Dep. II, p. 136:1-15, 20-24, p.137:1-8, 17-22, p. 138: 2-5, p. 142: 7-24).

203. Mr. Grennon had no conversations with Sheriff Cabral, Chief Keely, Deputy Superintendent Carney, or Superintendent Sumpter concerning the election for Suffolk County Sheriff in 2004. (Grennon Dep. II p. 140:10-20)

204. Grennon did not make his personal support of Stephen Murphy known in the Department. (Grennon Dep. II  p. 140:21-24, p. 141:5-7).

**Plaintiff Lorne Lynch**

205. Mr. Lynch made one financial contribution to Stephen Murphy's 2004 campaign for Suffolk County Sheriff and attended the fundraiser organized by Plaintiff Moscone. (Lynch Dep. I p. 179:10-19, 172:4-17).

206.    Mr. Lynch did not do any work for the Murphy campaign such as, volunteer on committees, participate in phone banks, hold signs, or attend any meetings to support Stephen Murphy's campaign for Suffolk County Sheriff. (Lynch Depo. I pp. 177:13-178:17).

**Plaintiff Al Moscone**

207.    The only direct communication that Plaintiff Moscone had with Defendant Sheriff Cabral regarding the 2004 election for Suffolk County Sheriff occurred when he phoned her and told her that he was not supporting Stephen Murphy for Suffolk County Sheriff. (Moscone Dep. p. 126:1-11, p. 129:1-9).

208.    Mr. Moscone had no conversations with Superintendent Sumpter, Superintendent Harris, Deputy Superintendent Theiss or Chief of Staff Keeley regarding supporting Stephen Murphy for Suffolk County Sheriff in the 2004 election. (Moscone Dep. pp. 122:16-125:24).

209.    Moscone organized a fundraiser for Stephen Murphy approximately two weeks Before the primary election in September 2004. (Moscone Dep. pp. 103:17-104:2). Moscone contacted fellow employees and invited them to the fundraiser. Department employees who attended the fundraiser included Lorne Lynch, Kevin Janellis, Richard Coleman, David McCarthy, Paul Giglio, Patrick O'Brien, Erik Dilibero, Michael Donovan, Michael Cinelli and Matthew Mullen. (Moscone Dep. p. 106: 2-24, Lynch Dep. I, p. 178)

210.    Lieutenant Kevin Janielis, Captain Richard Coleman, Lieutenant David McCarthy, Lieutenant Michael Donovan, Officer Michael Cinelli, Lieutenant Matthew Mullen and Officer Patrick O'Brien are all Deputy Sheriffs and were not decommissioned.(Moscone Dep. p. 115-117; Lynch Dep. I, p. 188; Horgan Aff. ¶ 12)

**Local 3643**

211.    Local 3643, the Union to which Plaintiffs Lynch and Moscone belong, did not endorse a candidate in the 2004 election for Suffolk County Sheriff, nor was it involved in that political process. (Moscone Dep. p. 130: 9-13).

**JOEASC**

212.    In August 2004, JOEASC voted by a tally of 122 to 1, to endorse Stephen Murphy in the 2004 election for Suffolk County Sheriff. The vote was conducted by secret ballot. (Ellis Dep. p. 49-50:1).

**VIII.  STAFFING**

213.    Plaintiffs Barnes, Grennon, Lynch and Moscone claim that they were reassigned from certain posts and had their days off and shifts changed in retaliation for their support for Stephen Murphy and their union activity. Plaintiffs Giglio, Dilibero, Peneau, Turley, Bergeron and Ellis make no such claims. (Complaint)

**Department's Authority**

214.    The Department retains the power and authority, to assign and re-assign staff based upon the needs of the jail on that particular day and shift.  These assignments are made at the discretion of the Superintendent, the Deputy Superintendent and/or shift commander. (Sumpter Aff. ¶ 10; See Exhibit 36, SCSD Policy S201 - Staffing)

215.    The authority of the Department to assign and re-assign custody staff is not limited by any provision of any Collective Bargaining Agreement. (Sumpter Aff. ¶ 10)

216.    All custody staff, regardless of seniority and rank, are aware that their shift may be changed, subject to the limitations of the CBA, at any time based upon Department needs and concerns for safety and security of the institution, its inmates and staff. (Sumpter Aff. ¶ 11).

217.    Jail officers with the rank of JO-1 through JO-3 have the right, consistent with the operational needs of the Department, through their collective bargaining agreement, to pick their shifts.  Superior officers, Captains and Lieutenants do not have the right to pick their shift. (Sumpter Aff. ¶12).

218.    Once shift selection is completed, officers are assigned quarterly to specific posts depending on their rank, seniority and operational and security needs of the institution.  Posts are also assigned daily and quarterly.  Custody staff assignments are based on the needs of the Department.  Officer assignments change on a regular basis. (Sumpter Aff. ¶ 13).

219.    Although an officer is eligible to participate, and does participate in shift selection, this does not exclude the potential for reassignment to a different shift while on regular duty. (Sumpter Aff. ¶ 14).

220.    The Superintendent of the NSJ has the authority to assign staff to support services positions. Support service positions are yearly assignments. (Sumpter Aff. ¶ 15).

221.    Property and Transportation are support services assignments. (Sumpter Aff. ¶ 15).

222.    Captains and Lieutenants regularly perform the work of Floor Supervisors at the NSJ. (Sumpter Aff. ¶ 16).

### Reassignment of Plaintiff John Barnes

223.  Plaintiff Barnes was first assigned as property officer in approximately 2000 under the administration of then Sheriff Rouse. Prior to that time Mr. Barnes was assigned to a variety of posts, including line officer in housing units, transportation, classification, booking, kitchen and records. (Barnes Dep. I p. 11:5-24, pp. 14:10-15:20).

224.  The property support services position is staffed from Monday to Friday with weekends off. Barnes' duties as Property Officer included storage of all detainee property, documenting the storage of their property and searching detainees. (Barnes Dep. I, pp. 18:10-20:19).

225.  Mr. Barnes was reassigned from property officer to line officer in January 2005 by Superintendent Sumpter. Mr. Barnes was one of approximately ten officers at the NSJ who were given new quarterly assignments commencing in January 2005. (Sumpter Aff. ¶ 19). Sheriff Cabral was not involved in nor consulted about the decision to reassign Barnes.(Cabral Aff. ¶ 28)

226.  The reassignment of Plaintiff Barnes did not alter his salary, rank, seniority or shift. After Mr. Barnes was reassigned he was able to choose his days off by seniority. (Barnes Dep. II pp. 96:18-97:6). The reassignment of Barnes resulted in his days off being changed from every weekend to every other weekend. (Barnes Dep. II p. 96: 8-17)

227.  Since his reassignment, Barnes has been performing duties and responsibilities commensurate with his rank of JO-1 and his role as a Jail Officer.(See Exhibit 37, SCSD Position Description for JO –1)

228.  Mr. Barnes was reassigned from property to give other officers, who had been working in the housing units, an opportunity to work in support services. (Sumpter Dep. p. 75:12-22).

229.  Since January 2005, two (2) officers have been given the opportunity to work in support services as the property officer. (Sumpter Aff. ¶ 21).

### Reassignment of Plaintiff John Grennon

230.  Plaintiff John Grennon was reassigned from Training to line officer at the NSJ in October 2004. Grennon retained the same shift (7 to 3) and days off (Saturday and Sunday) through the end of the year. In January 2005 Grennon selected his shift (3 to 11) and days off (Friday and Saturday) by seniority. Grennon selected that same shift and days off in 2006 and 2007, until Sheriff Cabral promoted him to the rank of Lieutenant in January 2007.(Sumpter Aff. ¶ 26)

231.    Prior to his full-time assignment in Training, Grennon was assigned to a variety of posts within the NSJ, including: housing unit officer, escort and relief Officer, housing control, transportation, back gate, and central control. Since his reassignment back to the NSJ, Grennon's duties and responsibilities have been commensurate with his rank as a JO-1 and role as a Jail Officer. (Grennon Dep. I, p. 18:20-24, p.19:1-6; Sumpter Aff. ¶ 20).

232.    While Grennon was assigned to Training on a full-time basis he continued to work overtime shifts as an officer (JO-1) at the NSJ, where his assignments included transportation, unit officer, medical unit officer, clinic lobby officer and SERT.  All of these assignments and their attendant duties and responsibilities are consistent with the norm for the position of JO-1. (Sumpter Aff. ¶ 20).

233.    Sheriff Cabral made the decision to transfer Grennon from Training because *inter alia*, she did not believe John Grennon was an appropriate person to be training officer candidates given what she observed of him, and his interactions at the training academy graduations versus how he really felt about the Sheriff's Department.  Sheriff Cabral questioned Grennon's ability to imbue young officers with her sense of the mission and goals of the Department and be a role model for them, when he did not share her views. (Cabral Dep. p. 180: 5-17;Theiss Dep. p. 39:11-18).

234.    Grennon was a speaker at a Training Academy Graduation at MIT in which he was effusive in his praise for the Sheriff and her administration.  In subsequent comments and writings, Grennon was openly critical of Sheriff Cabral.  This duplicity caused Sheriff Cabral to question Grennon's veracity and his trustworthiness.  (Cabral Dep. pp. 168:13-172; Theiss Dep. p. 43:21- 44:1-12).

235.    Sheriff Cabral told Superintendent Theiss that she wanted Grennon transferred out of Training because she had issues with his veracity and character and did not want him working in her Training Division because, in her opinion, he was not an appropriate representative of what she wanted to impart to new officers. (Theiss Dep. pg. 39:18-21, p. 45:20-23).

236.    Sheriff Cabral told Superintendent Theiss that based upon her interactions with Grennon, she felt that he was not truthful in his dealings with her, that he would say one thing and do another.  One example Sheriff Cabral provided to Superintendent Theiss was a lawsuit filed by Grennon and JOEASC concerning delayed payments to the pension fund.  Prior to filing the lawsuit Grennon had advised Sheriff Cabral that he was satisfied with the Department's explanation for the delay in payment and that no action would be taken.[5]  (See Exhibit 38, Deposition testimony of Viktor Theiss dated April 19, 2006 in the matter of *Michelman v. Cabral, C.A. 06-2296*, p. 105-106: 3-13; p.107:6-12 – hereinafter Thiess Michelman Dep.).

---

[5] The lawsuit, *JOEASC and John Grennon v. Andrea Cabral*, C.A. No. 03-5854, was dismissed by Suffolk Superior Court Judge Janet Sanders on April 15, 2004.

237.    When Sheriff Cabral directed Mr. Theiss to remove John Grennon from Training she never told Theiss that Grennon's union activity was a concern to her. (Theiss Michelman Dep. p. 107:12-23; Theiss Dep. 47-50).

238.    Sheriff Cabral was informed by Director of Training Martin Michelman that Grennon was a problem in the Training Division and that he was having difficulty controlling him.  Sheriff Cabral advised Michelman that he was the manager in charge of Training and if he was having difficulty with one of his subordinates he needed to document it and deal with the situation. Sheriff Cabral advised Michelman that he needed to document deficiencies with staff. Michelman failed to make a record of issues he was having with staff. Sheriff Cabral advised him that if he believed someone was inappropriate for training, he needed to document the reasons why, and impose disciplinary action if necessary. Michelman was obligated as a manager to address issues with staff. (Cabral Dep. p. 180-181, See also Exhibit 39, Deposition of Andrea J. Cabral dated January 19, 2007, in the matter of *Michelman v. Cabral, C.A. 06-2296,* p.58-61 – hereinafter Cabral Michelman Dep.).

239.    Sheriff Cabral was advised that Grennon was conducting union business while on Duty in the Training Division (Cabral Dep. p. 181).

240.    Michelman counseled John Grennon on at least one occasion for inappropriate behavior, i.e. conducting union business while on duty during training time.  This occurred before the Training Division moved to the new facility in Chelsea. (Michelman Dep. p. 54:2-55:3)

241.    Sheriff Cabral recalled specifically that Michelman raised issues about John Grennon and his behavior within the Training Division. Sheriff Cabral advised him that she put him in place as the Training Director and it was up to him to document the issues when they come up and deal with them right then. (Cabral Michelman Dep. pp. 58-60)

242.    Michelman informed Elizabeth Keeley and Viktor Thiess that he observed Grennon conducting union business while he should have been working (Michelman Dep. p. 97:4-7)

243.    John Grennon held a managerial and policymaking role in Training.  His duties And responsibilities included: policy development, project creation, development of course materials and curriculum scheduling, payroll, internal and external trainings, and attendance at MSAETC as Sheriff Cabral's representative. (Grennon Dep. 1, pg. 26:2-17, 20-24; 27:1; 28:8-18; 34:10-18; 36:8:18, 22-24; 37:1-4)

**Reassignment of Plaintiff Lorne Lynch**

244.   On or about January 2005, Mr. Lynch's days off were changed from
       Friday/Monday every other weekend, to Tuesday/Thursday every other weekend.
       This change was necessary because there was an operational need to balance the
       shift. (See Exhibit 40, Deposition testimony of Cliff Carney dated April 4, 2006,
       p.77 – hereinafter cited as Carney Dep.; Sumpter Dep. p. 116-117)

245.   On or about January 2006, Superintendent Sumpter changed Lynch's assignment
       From Central Control to the Back Gate.  Superintendent Sumpter made the
       change because he believed that he needed someone with Lynch's experience to
       be accountable at the Back Gate for the volume of activity that occurs there.
       (Sumpter Dep. p. 87; Carney Dep. p. 77-78)

246.   At Mr. Lynch's request his days off were changed back to Friday/Monday every
       other weekend on January 31, 2007.  The Superintendent was able to
       accommodate Mr. Lynch's request because the Department had promoted a
       number of new Lieutenants. (Sumpter Aff. ¶ 23).

**Reassignment of Plaintiff Al Moscone**

247.   Plaintiff Moscone was the supervisor of Transportation at the NSJ from
       approximately 1999 until January 2005 when he was reassigned from the 7-to-3
       shift to the 3-to-11 shift as a Floor Supervisor. (Moscone Dep., p. 16: 21-23;
       19:22-20:1, p.50:18-52:4).

248.   Moscone's primary responsibilities as Transportation Supervisor were
       coordinating the transportation of detainees to and from court, other correctional
       facilities and hospital appointments. (Moscone Dep. p.20:11-21:10).  Beginning
       in approximately 2001, Moscone's responsibilities as Transportation Supervisor
       expanded to include ensuring that detainees were searched before going to court
       and that property belonging to detainees no longer in the Department's custody
       was sent to the appropriate location.  (Moscone Dep. pp. 22:13-23:21).  In
       Superintendent Sumpter's opinion,  Moscone did not manage his responsibility
       for property effectively. (Sumpter Dep. p. 93: 8-11).

249.   Mr. Moscone was assisted in performing his responsibilities in Transportation by
       a Lieutenant at the HOC and Lieutenant Mark Charles at the NSJ. (Moscone
       Dep. pp. 21:24-22:12).

250.   In April 2004, the Department issued a report concerning an audit of the
       Transportation Division at the NSJ.  The audit was conducted by Deputy
       Superintendent Carney, Deputy Superintendent Gerry Walsh, and Plaintiff Al
       Moscone. (See Exhibit 41, Transportation Audit dated April 16, 2004)

251.   The purpose of the audit was to make the transportation process more efficient
       and cost effective.  Plaintiff Moscone was involved in the audit because he was in
       charge of Transportation at that time  (Moscone Dep. p. 28:3-31:8).

252.    Mr. Moscone participated in the audit by organizing some data concerning daily court and hospital trips for the preceding thirty days, relating his concerns about transportation and proposing a solution. The only solution that Mr. Moscone proposed was to increase staffing levels and assign more manpower to Transportation. (Moscone Dep. p. 29:17-30:24).

253.    The Transportation audit identified two primary areas of concern: trip assignments and property both of which were under Mr. Moscone's supervision and control. The audit concluded that trip assignments could be handled more efficiently and effectively and proposed several recommendations to achieve that. (Moscone Dep. p. 44-45). Specifically, the audit recommended that trip assignments should originate from Communications as opposed to Transportation, because the communications officer was in charge of all radio communications, had knowledge of where all transportation vans and vehicles were, and could therefore more efficiently assign manpower. (Sumpter Dep. p. 91:19-24).

254.    After the Transportation audit the only thing that Mr. Moscone did to support the recommendations of the audit and implement the proposed changes was to address the staff at roll call and tell them "do the best you can, double up on trips" because additional staff would not be forthcoming. (Moscone Dep. p. 40:11- 16, p. 41:10-18).

255.    Chief Keeley learned from Superintendent Sumpter and Deputy Superintendent Carney that Moscone was not supportive of or interested in implanting the changes that were recommended. (Keeley Dep. p. 46:5-7).

256.    On October 22, 2004, Deputy Superintendent Carney issued an order regarding court transportation at the NSJ. (See Exhibit 42 Carney memorandum dated October 22, 2004). The order referenced the Transportation audit that was issued on April 16, 2004 and stated that from now on, the Shift Commander would coordinate hospital trips and Communications (radio dispatch) would handle daily trips to and from the NSJ and the HOC. (Exhibit 42. Moscone Dep. p.43:1-4, 9-18)

257.    In addition to his responsibilities for transportation and property, Mr. Moscone also was responsible for the oversight of several contracts at the NSJ, including elevators, fire alarm system and communications. (Moscone Dep. p. 18:11-16).

258.    Superintendent Sumpter relieved Mr. Moscone of those responsibilities because he believed that Moscone was doing a poor job of maintaining those contracts and ensuring that services were actually rendered. (Sumpter Dep. p. 94:9-21). Mr. Moscone's salary was not reduced even though he was relieved of these responsibilities. (Moscone Dep. p. 68:9-69:13).

259.    The responsibility for oversight of these contracts was reassigned to the

Maintenance Supervisor, Lieutenant Morelli, because Maintenance was already responsible for the elevators and Lieutenant Morelli was effectively managing other contracts.( Moscone Dep. p. 26-27)

260.   Once Mr. Moscone's primary responsibilities in Transportation (trip assignments) were reassigned to Communications (radio dispatch) there was no longer an operational need for a Captain to be assigned to Transportation.  No other Captain has replaced Moscone in Transportation once Communications became responsible for coordinating trip assignments. (Sumpter Dep. p. 93: 4-12).

261.   Superintendent Sumpter made the decision to reassign Moscone from Transportation to Floor Supervisor.  Neither Sheriff Cabral nor Chief Keeley were involved in that decision.  (Keeley Dep.48:3-12; Cabral Aff. ¶ 30 ) Mr. Moscone was moved to the 3-to-11 shift as a Floor Supervisor because that shift was short a supervisor and there was an operational need to balance the shift with an additional supervisor. (Sumpter Dep. p 93:13-19; Exhibit 36).

262.   As Floor Supervisor, Moscone reported directly to the Shift Commander and was responsible for the smooth and efficient operation of the housing units on his floor.  His duties included supervising multiple staff members and the inmates in their care and custody, problem solving , gathering reports and responding to emergencies as needed. All of these duties and responsibilities are commensurate with Moscone's rank. (Sumpter Aff. ¶ 27)

263.   Captains routinely and regularly work as Floor Supervisors.  When there are two Captains assigned to a shift, one Captain is assigned as the Shift Commander and the other Captain will be assigned by the Shift Commander to work another post, including Floor Supervisor, Central Control, Back Gate or wherever the Shift Commander needs help. Prior to his reassignment from Transportation, Captain Moscone worked overtime shifts as a Floor Supervisor. (Sumpter Aff. ¶17)

264.   At the NSJ, the Shift Commander and Floor Supervisor positions are the only positions that are exclusively assigned to a Captain or a Lieutenant.  The Floor Supervisor reports directly to the Shift Commander and it is second only to the Shift Commander in terms of importance to the overall operation of the NSJ. (Sumpter Aff. ¶ 16).

265.   At Mr. Moscone's request he was moved from the 3-to-11 shift back to the 7-to-3 shift on January 31, 2007.  Superintendent Sumpter was able to accommodate Mr. Moscone's request because the Department had promoted a number of new Lieutenants and assigned some of them to the 3-to-11 shift.  Since his transfer back to the 7-3 shift, Moscone' assignments have included Central Control, the Back Gate and Floor Supervisor. (Sumpter Aff. ¶ 22).

## IX.   **Private Paid Details**

266.    The Plaintiffs all claim that decommissioning has resulted in a significant source of potential income because without a Deputy Sheriff appointment they are not able to work private details. (Plaintiffs' Complaint ¶ 30).

267.    Private paid details are paid compensation from an outside agency for services rendered (frequently traffic details at a construction site) by a Deputy Sheriff. Private paid details are not part of the duties and responsibilities of an officer at the NSJ or the HOC. (Turley Dep. p. 60-61; Admissions of John Grennon, dated May 18, 2007, Admission #6, Hereinafter cited as Grennon Admissions, Exhibit No. 49).

268.    A Deputy Sheriff appointment is a requirement to perform a paid detail. SCSD Policy S520 sets forth the policies and procedures regarding the privilege of working private paid security details. Pursuant to S520, private paid details are only available to those employees who meet the requisite qualifications and are not scheduled for work on their regular assignment with the SCSD. There is no provision of the plaintiffs' CBA that pertains to private paid details. (See Exhibit 43, SCSD Policy S-520 Private Paid Details)

269.    Plaintiffs Giglio, Dilibero, Peneau, Turley, Bergeron, Ellis, Barnes, and Grennon have worked few if any details since 2002. (Giglio Dep. pp. 33:19-35:10; Dilibero Dep. p. 63:9-11; Peneau Dep. pp. 25:9-27:1, Turley Dep. pp. 65:8-66:7, Bergeron Dep. p. 43-45; Ellis Dep. pp. 34:23-35:7, Barnes Dep I p. 57:1-19, Grennon Dep. II  pp. 89:14-90:4).

270.    Only Plaintiffs Lynch and Moscone have worked private details with any frequency. (Lynch Dep. p. 162:17-24, Moscone Dep. pp. 94:1-95:23).

271.    Eligible employees are notified of available details via a pager, which must be purchased by the employee at the employee's expense. Plaintiffs Giglio, Dilibero, Peneau, Turley, and Barnes did not purchase pagers in 2003, 2004, and 2005 and therefore were not contacted and did not perform private paid security details pursuant to Policy S520 during this period. (See Exhibit 44, Affidavit of James Coppi ¶ 5 – hereinafter Coppi Aff.).

272.    Sheriff Cabral reappointed plaintiffs Ellis and Barnes as Deputy Sheriffs in May 2007. (Cabral Aff. ¶ 44). Ellis and Barnes have not purchased a pager nor have they worked any private details since they were reappointed. (Coppi Aff. ¶ 8).

273.    Deputy Sheriffs working a private paid security detail are an emissary of the Department and must be professional in demeanor and appearance at all times. (Exhibit  43).

274.    Private paid details are performed outside the four walls of the Nashua Street Jail and the Suffolk County House of Correction. Deputy Sheriffs performing private paid details wear Department uniforms and badges and interact with members of

the public and outside law enforcement as representatives of the Suffolk County Sheriff's Department.  (Bergeron Dep. pp. 45:22-46:20).

**Plaintiff Giglio**

275.    Plaintiff Giglio is currently physically incapable of performing private paid security details because of a work related injury.  Mr. Giglio has not performed any private paid security details since his work related injury on or about 2002/2003.  (Giglio Dep. p. 20: 4-9; p. 36: 7-9).

276.    Prior to his work related injury, Plaintiff Giglio infrequently worked private paid security details.  (Giglio Dep. pp. 33:19-35:10).

**Plaintiff Dilibero**

277.    Plaintiff Dilibero stopped working private paid security details as a Deputy Sheriff in the 1990's.  (Dilibero Dep. p. 63: 9-11).

278.    Mr. Dilibero was physically incapable of performing private paid security details as a Deputy Sheriff from on or about November 2003 to August 2005, as a result of a work related injury.  (Dilibero Dep. p. 63:12-22).

**Plaintiff Peneau**

279.    Mr. Peneau has worked fewer than ten (10) private paid security details in the sixteen years that he has worked at the NSJ.  (Peneau Dep. pp. 26:22-27:1).

**Plaintiff Turley**

280.    Plaintiff Turley voluntarily stopped working private paid details as a Deputy Sheriff in approximately 1998.  Mr. Turley does not like to work paid details and testified in deposition that he currently has no interest in working paid details.  (Turley Dep. pp. 65:8-67).

**Plaintiff Bergeron**

281.    Plaintiff Bergeron has not worked a private paid detail since approximately 2000.  (Bergeron Dep. p. 44).

**Plaintiff Ellis**

282.    Plaintiff Ellis was appointed as a Deputy Sheriff in approximately January 2003.  Mr. Ellis has never worked a private paid detail as a Deputy Sheriff, nor has he requested to work a private paid detail.  (Ellis Dep. pp. 34:23-35:7).

### Plaintiff Barnes

283.   Plaintiff Barnes has never worked a private paid detail or requested to work a private in the 14 years that he has worked at the NSJ.  (Barnes Dep. I p. 57:1-19).

### Plaintiff Grennon

284.   Plaintiff Grennon did not purchase a pager in 2003 and 2004, a prerequisite to performing private paid details pursuant to Policy S520, and was not contacted and did not perform any private paid details pursuant to Policy S520.  (Grennon Dep. II  pp. 89:14-90:4).

285.   Mr. Grennon did not purchase a pager in 2005 until approximately one week before he was decommissioned in April 2005.  (Grennon Dep. II, p. 90:5-7).

286.   Instead of performing private paid details pursuant to Policy S520 from 2003 to 2005, Grennon chose to engage in outside employment with various ambulance companies.  (Grennon Dep. II pp. 95:4-96:5).

### Plaintiff Lynch

287.   Plaintiff Lynch began working private paid security details in approximately 1986 and continued to work them consistently until he was decommissioned in April 2005.  (Lynch Dep. p. 162:17-24; See Exhibit 45, Lynch detail earnings 2003-2005).

288.   In 2003, Lynch worked 102 details and earned $24,346.00.  In 2004, Lynch worked 105 details and earned $24,696.00.  Lynch worked 15 details between January 2005 and April 2005 and earned $3,360.00. (See Exhibit 45).

### Plaintiff Moscone

289.   Plaintiff Moscone began working private paid security details in approximately 1985 and continued to work them consistently until he was decommissioned in April 2005.  (Moscone Dep. pp. 94:1-95:23).

290.   In 2003, Moscone worked 56 details and earned $13,314.00.  In 2004 Moscone worked 63 details and earned $15,008.00. Moscone worked 11 details between January 2005 and April 2005 and earned $2,436.00.(See Exhibit 46, Moscone detail earnings 2003-2005)

291.   The number of details associated with the Central Artery Tunnel project began to decrease beginning in 2005. (Moscone Dep. p. 98:5-14; Exhibit 44; Coppi Aff. ¶ 10).

## X.    **OVERTIME**

292.    Plaintiffs Lynch and Moscone allege that Sheriff Cabral has eliminated an overtime distribution practice at the NSJ, which they allege has resulted in less overtime for members of Local 3643 (the superior offices union).  (Moscone Dep. pg. 160:14-21).

293.    The remaining Plaintiffs  (BergeronGiglio, Dilibero, Peneau, Turley, Ellis, Barnes, and Grennon) make no claim, as part of this lawsuit, that Sheriff Cabral has denied them overtime.  (Giglio Dep. p. 105:10-16; Dilibero Dep. p. 122:17-20; Peneau Dep. p. 78:16-18; Turley Dep. pp. 66:14-68:4; Ellis Dep. p. 35:4-20; Barnes Dep. II p. 83:1-7; Grennon Dep.II. p. 209, lines 17-20; Bergeron p. 141:17-21).

294.    A Deputy Sheriff appointment is not required to work overtime.  At all relevant times, Union officials controlled the process by which overtime slots are filled. (Harris Aff. ¶ 34).

295.    Overtime is compensated at time and one-half. (Harris Aff. ¶ 35).

296.    There existed an overtime distribution practice at the NSJ called the 7:1 ratio. That practice required the hiring of one (1) supervisory Jail officer ("white shirts/Local 3643") for every seven (7) subordinate Jail officers ("blue shirts/JOEASC") on overtime. The 7:1 ratio was not part of the parties' collective bargaining agreement. (Harris Aff. ¶ 36).

297.    The 7:1 overtime ratio resulted in the Department paying a higher rate of overtime for a superior officer even if the overtime slot being filled did not require a supervisor.  (Harris Aff. ¶ 37).  After discussions with Local 3643, the Department decided to discontinue this practice in 2005.  In Fall 2006, the Department implemented an overtime ratio of 10:1 on a trial basis, which is still in effect. (Harris Aff. ¶ 38).

298.    The repeal of the 7:1 ratio created more overtime opportunities for JOEASC members (who voted 121-1 to endorse Stephen Murphy over Sheriff Cabral). (Peneau Dep. p.. 78-79; Grennon Admissions #7).

299.    Plaintiff Peneau has worked approximately the same number of overtime shifts since he was decommissioned as he did before he was decommissioned.  (Peneau Dep. p. 78:6-18).

300.    Plaintiff Dilibero works slightly more overtime shifts since his decommissioning in April 2005.  (Dilibero Dep. pp. 121:24-122:20).

301.    Mr. Dilibero's ability to work overtime is limited only by his availability and his physical condition.  (Dilibero Dep. pp. 121:13-123:20).

302.    Plaintiffs Turley and Barnes rarely work overtime by choice.  (Turley Dep. pp. 67:20-68:4, Barnes Dep. I pp. 64:1-65:14).

303.    Plaintiff Lynch has worked more overtime shifts since his decommissioning in April 2005.  (Lynch Dep. pp. 36:23-37:1).

304.    Plaintiff Moscone has worked less overtime since his decommissioning in April 2005.  (Moscone Dep. p. 160:9-11).

## XI.    PROMOTIONS

305.    The requirements for promotions are set forth in the parties' Collective Bargaining Agreement ("CBA").  The promotional process includes a formula for the selection of applicants  from a list of qualified candidates. A passing score on a promotional examination is a prerequisite to permanent promotion pursuant to the CBA.  (Harris Aff. ¶ 39).

### Plaintiff Giglio

306.    Plaintiff Paul Giglio was hired as a Jail Officer (JO-1) in September1989 and has not been promoted by any of the three Sheriffs (Rufo, Rouse and Cabral) that he has served under.  (Giglio Dep. p. 12:16-18, p.14:15-17).

307.    Plaintiff Giglio chose not to take the Lieutenant's Promotional exam that was offered in February 2006 and the Corporal/Sergeant exam that was offered in April 2007 (Giglio Dep. pp. 95:19-96:15; Sumpter Affidavit ¶ 24)

308.    Mr. Giglio has not been denied any permanent promotional opportunities by Defendant Sheriff Cabral. (Giglio Dep., p. 96:5-15).

### Plaintiff Dilibero

309.    Plaintiff Erik Dilibero was hired as a JO-1 in 1987 and was promoted to the rank of Sergeant without taking an examination by former Sheriff Robert Rufo.  (Dilibero Dep. p. 18:7-14).

310.    Sheriff Richard Rouse promoted Mr. Dilibero, to the rank of Lieutenant in 2000 without an examination.  (Dilibero Dep. p. 19: 4-13).  Local 1134 (the precursor to JOEASC) filed a charge of prohibited practices with the Labor Relations Commission (LRC) to protest the promotion of Mr. Dilibero and others to the rank of Lieutenant in contravention of the parties' oral agreement that an examination would be prerequisite to any promotion.  (Dilibero Dep. p. 23:5-15).

311.    In April 2003 the LRC ruled in favor of Local 1134 and directed the Department to rescind the permanent promotions of Plaintiff Dilibero and others to the rank of

Lieutenant upon the request of Local 1134. Thereafter, Mr. Dilibero's permanent promotion to the rank of Lieutenant was rescinded. (Dilibero Dep. p. 23:5-20).

312.    Plaintiff Dilibero was appointed a temporary Lieutenant pursuant to the temporary service language of the parties' CBA in March 2004 by Defendant Sheriff Cabral. (Dilibero Dep. pp. 23:21-24:4).

313.    Plaintiff Dilibero was restored to his permanent rank of Sergeant on January 19, 2005. (Dilibero Dep. p. 28-29, p. 38:9-20).

314.    Since his appointment as a temporary Lieutenant in March 2004, Plaintiff Dilibero had been on restricted duty as a result of a work related injury. The Department provided all reasonable accommodations to facilitate Mr. Dilibero's return to work after his injury, including shortening his work day to four (4) hours, and assigning him to a post that was consistent with his physical limitations. (Dilibero Dep. pp. 33-35:16, 37).

315.    While he was on restricted duty, Plaintiff Dilibero was not performing the supervisory responsibilities of a Lieutenant. (Sumpter Dep. p. 102)

316.    Plaintiff Dilibero took the Lieutenant's promotional examination in February 2006 but did not score high enough to be eligible for promotion pursuant to the terms of the CBA.(Harris Aff. ¶ 50).

317.    Plaintiff Dilibero has not been denied any permanent promotional opportunities by Defendant Sheriff Cabral. (Dilbero Dep., p. 112:22-24).

**Plaintiff Peneau**

318.    Plaintiff William Peneau was hired as a JO-1 in January 1991 and has retained that rank for the sixteen years that he has been employed at the NSJ. (Peneau Dep, p. 8:9-19, 74:1-6).

319.    Plaintiff Peneau took the Lieutenant's promotional exam in February 2006 and did not score high enough to be eligible for promotion pursuant to the terms of the CBA. Peneau took the Corporal/Sergeant exam that was offered in April 2007. That exam has not been scored yet and the promotional process is ongoing. (Sumpter Aff. ¶ 24).

**Plaintiff Turley**

320.    Plaintiff Timothy Turley was hired as a JO-1 in 1989 and held that rank until 1999 when Sheriff Rouse promoted him to the rank of corporal without an examination. (Turley Dep. pp. 15:21-17:16).

321.    Plaintiff Turley did not receive a passing score on the Lieutenant's Promotional

Examination that was administered in February 2006 and therefore he was not eligible for promotion pursuant to the negotiated terms of the CBA. Turley took the Corporal/Sergeant exam in April 2007. The exam has not been scored yet and the promotional process is still ongoing. (Sumpter Aff. ¶ 24).

### Plaintiff Bergeron

322.    Plaintiff Bergeron is a Sergeant. He received a passing score on the Lieutenant's Promotional Exam that was offered in February 2006, but did not rate as highly in the other categories and has not yet been promoted from that list. (Harris Aff. ¶ 50).

### Plaintiff Ellis

323.    Plaintiff John Ellis was hired as a JO-1 in 2000 and has retained that rank to the present date. (Ellis Dep. p. 14: 21-24). He has not been promoted by either of the two Sheriffs (Rouse and Cabral) that he has served under. (Ellis Dep. p. 19:8-12).

324.    Plaintiff Ellis chose not to take the Lieutenant's Promotional Examination that was offered in February 2006 and the Corporal/Sergeant exam that was offered in April 2007. (Sumpter Aff. ¶ 24; Admissions of John Ellis, dated May 17, 2007, Admission #7, Hereinafter cited as "Ellis Admissions", Exhibit 48).

### Plaintiff Barnes

325.    Plaintiff John Barnes was hired as a JO-1 in 1993 and has retained that rank to the present date. Mr. Barnes has not been promoted by any of the Sheriffs (Rufo, Rouse, and Cabral) that he has served under. (Barnes Dep. I., pp. 10:24-11:4).

326.    Plaintiff Barnes chose not to take the Lieutenant's Promotional Examination that was offered in February 2006 (Barnes Dep. II, p. 80: 20-23 ). Barnes did not take the Corporal/Sergeant exam that was offered in April 2007. (Sumpter Aff. ¶ 24).

### Plaintiff Grennon

327.    Plaintiff John Grennon was hired as a JO-1 in May 1993 and retained that rank until January 2007 when he was promoted to the rank of Lieutenant by Defendant Sheriff Cabral. (Grennon Dep. I. p. 5:16-22). Based on the promotional formula set forth in the CBA, Sheriff Cabral could have passed over Grennon without violating the terms of the CBA. (Harris Aff. ¶39)

328.    Until his promotion by Defendant Sheriff Cabral, Plaintiff Grennon had not been promoted by either of the two sheriffs (Rufo and Rouse) that he had served under. (Grennon Dep. I p. 14:2-8; Grennon Admissions #3, Exhibit 49).

329.    At the time that he was promoted to the rank of Lieutenant, Mr. Grennon was
        President of JOEASC.  (Grennon Dep. I. p. 119:13-17; Grennon Admission #3,
        Exhibit 49).

### Plaintiff Lynch

330.    Plaintiff Lynch is a Lieutenant and has retained that rank under the administration
        of Sheriff Cabral.  (Lynch Dep. p. 18:15-17).

331.    In 2004 the Department posted a promotional opportunity for the position of
        Captain at the NSJ and the HOC.  Interested candidates were advised to apply for
        the position.  Mr. Lynch did not apply for the position of Captain.  (Harris Aff. ¶
        33).

### Plaintiff Moscone

332.    Mr. Moscone was promoted to the ranks of Corporal, Sergeant, Lieutenant and
        Captain by then Sheriff Rufo.  Mr. Moscone did not take any examination in order
        to be promoted to those ranks.  (Moscone Dep. pp. 10:7-12:9).

333.    Plaintiff Moscone has not asked to be considered for any promotional
        opportunities under the administration of Sheriff Cabral.  (Moscone Dep. p.
        149:11-13).

### No Denials of Promotions

334.    Sheriff Cabral has not denied any of the Plaintiffs any permanent   promotional
        opportunities. ((Dilibero Dep. p. 112: 22-24; Turley Dep. pp. 151:16-152:4;
        Moscone Dep. p. 150:13-16; Grennon Depo. I. p. 5:16-22;  Ellis Admissions,
        Admission #7; Harris Aff.¶ 39, 50; Sumpter Aff. ¶ 24; Bergeron, pg. 148:9-11).

### Union Officials Promoted By Sheriff Cabral

335.    Since December 1, 2003 Defendant Sheriff Cabral has promoted #x of former
        and current union officials, including: Plaintiff John Grennon, Michael Walsh
        (President of JOEASC 2004-2005), Christopher McCray (former President of
        Local 419), Robert Tullos (JOEASC Executive Board member), William Dowd,
        Bryan Kaiser, Jack Sullivan (former President of 419), and Michael Powers
        (former President of 419). (Harris Aff. ¶ 47).

336.    During her tenure, Sheriff Cabral has promoted or upgraded approximately 15
        staff members, both custody and non-custody, with strong union affiliation
        including office holders, stewards, and bargaining unit members. (Harris Aff. ¶
        18)

337.    Corporal Daniel Hickey is a current member of the training staff and has been an

active member of Local 419 for many years. Hickey joined the Training Division in July 2004. He has been involved in all aspects of union representation for correction officers at the Suffolk County House of Correction. (Harris Aff.¶ 45)

## VI. Annual Review of Deputy Sheriffs April 2007

338.    In April 2007 sixteen (16) Deputy Sheriffs out of a total of four hundred thirty (430) Deputy Sheriffs working at the Department were decommissioned after an annual review. (Harris Aff. ¶ 40).

339.    The review was conducted by a committee comprised of the following individuals: Superintendent Eugene Sumpter, Superintendent Gerard Horgan, Superintendent Michael Harris, and Chief of Staff Anne Powers. (Harris Aff. ¶41).

340.    Of the four hundred fourteen (414) of Deputy Sheriffs who were not decommissioned some were current or former union officials, including: Angelo Rossi (current Vice President of JOEASC), Stan Andrueskicz (current President of JOEASC). (Harris Aff. ¶ 42).

341.    A review was also conducted of employees who submitted applications for appointment as Deputy Sheriffs. The committee recommended 43 employees of the 66 who submitted applications for appointment as Deputy Sheriffs. (Harris Aff. ¶43).

342.    In 2007 Sheriff Cabral was presented with a list of employees who had applied to be appointed to be Deputy Sheriff and met the criteria set forth in Policy S516. Included in that list were Plaintiffs John Grennon, David Bergeron, Al Moscone, Lorne Lynch, John Barnes, and John Ellis. Plaintiffs Dilibero, Giglio, Peneau, and Turley did not submit applications for reappointment as Deputy Sheriffs. (Cabral Aff. ¶ 43).

343.    In her discretion, Sheriff Cabral 44 employees to the title of Deputy Sheriff of 44 employees who were recommended by the committee. Plaintiffs Barnes and Ellis were among those deputized by Sheriff Cabral on or about May 2, 2007. (Cabral Aff. ¶ 44).

344.    In her discretion, Sheriff Cabral declined to appoint Grennon, Bergeron, Moscone, and Lynch as Deputy Sheriffs because she had seen no evidence of any improvement or change in their attitude toward the merit and performance-based reforms that she was seeking to implement or her role as Sheriff. Sheriff Cabral did appoint Barnes and Ellis as Deputy Sheriffs because Superintendent Sumpter had reported that they were demonstrating a positive attitude and were making a positive contribution to the Department. (Cabral Aff. ¶ 44).

345.    At the time that he was sworn in as a Deputy Sheriff on or about May 2, 2007,

Mr. Barnes was the Grievance Administrator and Chief Steward for JOEASC. (Harris Aff. ¶49)

Respectfully submitted,
For the Defendant,
By her Attorney

/s/ Ellen M. Caulo
Ellen M. Caulo, B.B.O. #545250
Deputy General Counsel
Suffolk County Sheriff's Department
200 Nashua Street
Boston, MA  02114
(617) 961-6681

Date: August 13, 2007

## LIST OF EXHIBITS

1.      Affidavit of Ellen M. Caulo, re: Discovery with attachment;

2.      Affidavit of Sheriff Andrea J. Cabral;

3.      Deposition of Elizabeth Keeley, dated February 28, 2006, in the matter of *Michelman v. Cabral, C.A.05-11577-RGS*;

4.      Affidavit of Superintendent Gerard J. Horgan;

5.      Affidavit of Superintendent Eugene S. Sumpter, Jr.;

6.      Deposition of Viktor Theiss dated May 8, 2006;

7.      Affidavit of Superintendent Michael J. Harris;

8.      Deposition testimony of Sheriff Cabral dated January 22, 2007;

9.      Suffolk County Sheriff's Department Policy S-516 – Deputy Sheriffs;

10.     Deposition testimony of Elizabeth Keeley dated April 6, 2006;

11.     Deposition testimony of Eugene Sumpter, Jr. April 5, 2006;

12.     Deposition testimony William Peneau, dated December 8, 2006;

13.     Written Warning issued to Officer William Peneau dated February 4, 2005;

14.     Notice of Twenty-Day Suspension issued to Corporal Timothy Turley dated January 22, 2004;

15.     Deposition testimony of Timothy Turley dated January 9, 2007;

16.     Deposition of Martin Michelman, dated October 3, 2006 in the matter of *Michelman v. Cabral, CA 05-11577-RGS*,;

17.     Deposition testimony of Lorne Lynch dated May 4, 2001, in the matter of *Arla Sutherland v. Suffolk County Sheriff's Department, MCAD No. 00133417*;

18.     Deposition testimony of Lorne Lynch dated October 6, 2006;

19.     Deposition of Albert Moscone dated September 27, 2006;

20.     Deposition testimony of John Ellis dated January 8, 2007;

21.    Deposition testimony of John Barnes dated October 31, 2006;

22.    Deposition testimony of John Grennon dated January 19, 2007;

23.    West Roxbury Transcript, dated April 1, 2004;

24.    Boston City Paper, dated April 23, 2004;

25.    Letter entitled *What a Mess! Promises Not Kept* dated April 2, 2004 under John Barnes signature;

26.    Letter dated March 25, 2004 *What a Mess! Sheriff takes employees' Benefits* under John Grennon signature;

27.     Press release issued by John Ellis dated March 25, 2004;

28.    Deposition testimony of David Bergeron dated October 4, 2006;

29.    Deposition testimony of Paul Giglio dated December 13, 2006;

30.    Deposition testimony of Erik Dilibero dated December 13, 2006;

31.    Deposition of John Grennon dated February 26, 2007;

32.    Memorandum to Employees from Sheriff Cabral dated December 12, 2003;

33.    Memorandum to Employees from Sheriff Cabral dated April 28, 2004;

34.    Deposition testimony of John Barnes, dated December 7, 2006;

35.    Deposition testimony of Lorne Lynch dated November 2, 2006;

36.    Suffolk County Sheriff's Department Policy S201-Staffing;

37.    SCSD Position Description for JO –1;

38.    Deposition testimony of Viktor Theiss dated April 19, 2006 in the matter of *Michelman v. Cabral*.

39.    Deposition of Sheriff Andrea J. Cabral dated January 19, 2007, in the matter of *Michelman v. Cabral. ,*

40.    Deposition testimony of Superintendent Cliff Carney dated April 4, 2006;

41.    Transportation Audit dated April 16, 2004;

42.     Carney Transportation memorandum dated October 22, 2004;

43.     SCSD Policy S-520 Private Paid Details;

44.     Affidavit of Lieutenant James Coppi;

45.     Lynch detail earnings 2003-2005;

46.     Moscone detail earnings 2003-2005;

47.     SCSD Position Description for JO –5;

48.     Admissions of John Ellis, dated May 17, 2007;

49.     Admissions of John Grennon, dated May 18, 2007; and

50.     Affidavit of Ellen M. Caulo

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                    )
DAVID BERGERON ET AL.,                 )
         Plaintiffs                              )
                                                    )
         v.                                       )
                                                    )          C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY      )
And SHERIFF OF SUFFOLK COUNTY,    )
         Defendant                           )
_____)


**<u>AFFIDAVIT OF SHERFF ANDREA J. CABRAL</u>**


I, Andrea J. Cabral, being duly sworn do hereby depose and state:

1.       My name is Andrea J. Cabral and I am the Sheriff of Suffolk County.

2.       I was initially appointed Sheriff by Governor Jane Swift to serve the remainder of Sheriff Richard J. Rouse's term.  I was sworn into office on November 29, 2002. I was elected to a full six-year term in November of 2004.

3.       I had previously worked as a prosecutor in the Middlesex County District Attorney's Office, the Suffolk County District Attorney's Office and the Commonwealth of Massachusetts Office of the Attorney General for approximately sixteen years.

4.       Prior to assuming office in 2002, I read a document entitled Report of the Special Commission – the so-called Stern Commission Report.  It was my understanding that this Commission had reviewed certain areas of the Suffolk County Sheriff's Department's operations and had made a number of recommendations for improvements.

5.       Mindful of the need to be flexible, practical and work within the parameters of the Department's budget, I chose to use the Stern Commission as a blueprint for change as I began my first term as Sheriff.

6.       Since assuming office in 2002, I have implemented a number of significant reforms to address some of the concerns raised in the Stern Commission Report.  I have completely reformed Department hiring and promotional practices and have

1

completely restructured the training and investigation divisions. Political patronage has been eliminated from the hiring process; all candidates must successfully complete a comprehensive review that includes a lengthy written application, a panel interview, physical and academic testing, a criminal records check, a drug (hair) test and verification of all previous employment, personal references and residence(s.)

7.    I personally interview all finalists for jail or correction officer positions and make the final hiring decision. A successful interview is the final requirement for all officer candidates. I spend anywhere from 60 – 90 minutes speaking with candidates who have made it past the initial screening mechanisms. I candidly discuss with each of them my expectations, including my expectations about their own conduct and also about their obligation to report the misconduct of others.

8.    I created the Department's first off-site Training Academy, which is staffed by certified trainers. All recruits who successfully complete the hiring process must also successfully complete a 10-week training academy before starting work in the Department's units. The training curriculum includes components dealing with professional responsibility and accountability, use of force continuum and the obligation to report and properly document incidents of staff misconduct. New officers are probationary employees for the first 18 months and can be terminated for any reason during that time. All veteran officers are required to undergo 40-hours per year of in-service training that includes training in these same areas.

9.    The Training Academy and its curriculum serve to reinforce the message that I communicate to all new hires concerning the level of professionalism, accountability and integrity expected of all officers. Additionally, the Training Academy is a means to deliver that same message to veteran officers through in-service training.

10.   I have implemented a promotional testing process that is fair and comprehensive. It is emphasized to all staff that promotions and advancements within the Department are based on job performance and merit.

11.   Since assuming office in November of 2002, I have very consistently imposed appropriate discipline where allegations of misconduct by a jail or corrections officer were sustained.

12.   I was unaware that Erik Dilibero and Lorne Lynch held an official position with the superior officers union (Local 3643). I never had any dealings with either Dilibero or Lynch concerning union issues and was unaware of any activity that they conducted on behalf of the union. I was unaware that William Peneau held an official position with JOEASC and never had any dealings with him concerning union issues.

2

13.     I was unaware of what position Al Moscone held in the superior officer union (Local 3643). I never had any dealings with Al Moscone concerning union issues and was unaware of any grievances that he filed on behalf of the union.

14.     I knew that Tim Turley was the Chief Steward for JOEASC. The only interaction that I had with Tim Turley as Chief Steward was when he accompanied John Ellis to a meeting I had with Ellis in April 2004. On that occasion I had a brief conversation with Mr. Turley concerning whether Mr. Ellis was facing any discipline with respect to the falsehoods and disparaging comments about me and the Department contained in letters and a press release that were authored and issued by Mr. Ellis, John Barnes and John Grennon. I assured Mr. Turley that Mr. Ellis would not be disciplined for his involvement in the dissemination of letters and a press release in March and April 2004.

15.     I was aware that John Barnes, John Ellis and John Grennon held official positions with JOEASC in 2003 and 2004. Superintendent Michael Harris was their primary contact in the Department concerning labor/management issues.

16.     The only communication that I had with David Bergeron occurred on March 2, 2004 at the Holy Name Rotary in West Roxbury. I did not immediately recognize Mr. Bergeron as an employee of the Department until he identified himself as such. I did not know what union he belonged to nor did Mr. Bergeron identify himself as a union member.

17.     During this conversation, Mr. Bergeron confronted me concerning my administration and specific actions I had taken regarding dental and vision benefits, veterans benefits and the compensation paid to management employees. Mr. Bergeron addressed me in a tone that was argumentative and disrespectful to me personally and my position as Sheriff. I attempted to provide Mr. Bergeron with the facts because it was apparent to me that he was misinformed, however he would not listen. I found Mr. Bergeron's conduct to be entirely inappropriate and unprofessional.

18.     Mr. Bergeron continues to be disrespectful to me whenever I encounter him at the Nashua Street Jail. Mr. Bergeron has done nothing to indicate to me that he respects my role as Sheriff of Suffolk County.

19.     When I announced my intent to run for a full six-year term as Sheriff in 2004, I made it clear that I would not take any campaign contributions from any employee in the Suffolk County Sheriff's Department. This is consistent with the efforts I have taken to eliminate political patronage from the Department and to implement merit and performance based reforms.

20.     My opponent in the September primary election for Suffolk County Sheriff in 2004 was Stephen Murphy. I had no opponent in the November general election.

21.    Angelo Rossi, an officer at the Nashua Street Jail and member of JOEASC publicly announced his intention to run against me for Suffolk County Sheriff. Mr. Rossi ultimately disqualified himself from running in the Democratic primary.

22.    I was unaware of the political affiliation of Paul Giglio, Erik Dilibero, William Peneau, and Tim Turley and did not know that they supported Stephen Murphy in the 2004 campaign for Suffolk County Sheriff.

23.    I assumed that John Ellis, John Barnes and John Grennon supported Stephen Murphy in the 2004 campaign for Suffolk County Sheriff because the letters and press release that they issued in March and April 2004 contained information and allegation, as literature issued by Stephen Murphy's campaign.

24.    I assumed David Bergeron supported Stephen Murphy in the 2004 campaign for Suffolk County Sheriff because I saw him holding a Murphy campaign sign on primary day at the Holy Name Rotary in West Roxbury.  Prior to that date I was unaware of his support for Stephen Murphy.

25.    I assumed that Al Moscone supported Stephen Murphy in the 2004 campaign for Suffolk County Sheriff when I learned that he had attended a fundraiser for Murphy just prior to the election and had arranged for other Department employees to go.  I did not know that Mr. Moscone organized the fundraiser until after depositions were taken in this lawsuit.  Sometime before then, Mr. Moscone had telephoned me to inform me that he was supporting me for Suffolk County Sheriff.  In that telephone call I advised Mr. Moscone that he did not need to tell me that because his status in the Department was not dependent upon whom he supported politically.

26.    I learned that the following employees had attended the Stephen Murphy fundraiser with Al Moscone: Kevin Janielis, Matthew Mullin, and Lorne Lynch.

27.    Throughout 2004 and into 2005, it came to my attention that the following Sheriff's Department officers supported Mr. Murphy in his bid to become Sheriff: Officer Dennis Guilfoyle, Lieutenant Alex Basile, Deputy Thomas Angers, Officer Pat O'Brien, Captain Richard Coleman, Deputy William McLaughlin, Sergeant Richard Rossetti, Deputy David Cataldo and Officer Angelo Rossi.

28.    I was not involved in nor consulted about the decision to reassign John Barnes from Property to another assignment within the Nashua Street Jail. Superintendent Sumpter has the authority and discretion to make staffing changes and assignments based upon the operational needs of the facility.

29.    I am aware that Superintendent Sumpter has endeavored to provide opportunities for officers who have been assigned to custody units for sustained periods to work in  support services positions, including transportation, visits, booking, and

property. Officers who are selected for these positions get some relief from working in housing units and an opportunity to learn new skills. Superintendent Sumpter's ability to provide work environment variety in ways that increase the pool of officers available to meet the Department's operational needs is of great benefit. Superintendent Sumpter relies on the Shift Commanders to identify appropriate officers for these positions.

30.     I was not involved in nor consulted about the decision to reassign Al Moscone from Transportation on the 7-3 shift to Floor Supervisor on the 3-11 shift. This reassignment was done by Superintendent Sumpter consistent with his responsibility for the daily operation of the Nashua Street Jail.

31.     I am aware that an audit of the Transportation Department at the Nashua Street Jail was done in 2004 and that Al Moscone participated in that audit. Through that audit it was brought to my attention that there were performance issues with Mr. Moscone and that he was unwilling to implement the changes that were recommended. Additionally, the audit determined that trip assignments for the transportation of inmates and detainees could be handled more efficiently through the Communications Division.

32.     I am aware that Lorne Lynch has displayed an incessantly negative and disparaging attitude toward the Sheriff's Department in the years preceeding my tenure as Sheriff and throughout my tenure. I am aware that, despite his history, Lorne Lynch has had many opportunities since I became Sheriff, to show leadership and make a positive contribution to the Department and that he has declined those opportunities. I am also aware that Lorne Lynch made a sexually inappropriate comment to a co-worker that led to a lawsuit against the Department. The Department, under my administration, paid for Lynch's legal representation and ultimately authorized the payment of a settlement to resolve the lawsuit.

33.     In April 2004 I met with John Barnes, John Grennon, and John Ellis concerning disparaging comments about the Sheriff's Department and intentionally false and misleading information concerning my actions as Sheriff, contained in letters and a press release that they authored and disseminated in March and April 2004. The content of the letters and the press release concerned dental and vision insurance coverage for JOEASC members, a delay in the payment of the Department's obligation to the City of Boston Retirement Fund, vacation benefits provided to returning veterans, alleged pay raises to management employees and an alleged overdue Department utility bill. I met first with Grennon and Barnes and then with Ellis at a later date.

34.     I confronted them with the falsehoods in the letters and told them that I considered their conduct libelous and actionable. I told them that they had disparaged the Department and specifically asked each one how they could create this information and intentionally distribute it to Department employees and the

public when they knew that the information was false. They did not provide any satisfactory explanation for their actions.

35. Barnes, Grennon and Ellis never told me that these letters and press release were created and written by anyone else but them.

36. During the meeting I had with Barnes and Grennon, and thereafter with Ellis, I never discussed the 2004 campaign for Suffolk County Sheriff. I did not ask whether they were supporting Stephen Murphy. The sole focus of my conversation with them was the disparaging comments about the Department and the intentionally false and misleading information about my actions as Sheriff contained in the letters and press release.

37. In the 4 ½ years that I have been Sheriff I have had numerous conversations with employees regarding issues of importance to them and about which we disagree. During these conversations the employees have conducted themselves in a manner that demonstrated respect for me personally and the office that I hold. I have never taken nor authorized any adverse action against any employee simply because they have disagreed with me, either publicly or privately.

38. I was provided with the list of employees recommended for decommissioning in early 2005. I was not provided with the reasons that these employees were being recommended for decommissioning. I did not recognize all of the employees on the list, including Plaintiff Paul Giglio. I inquired about the reasons for some of the names that I did recognize, none of which were the Plaintiffs in this lawsuit.

39. I added Erik Dilibero's name to the list based upon my own personal observations of his demeanor and attitude and my understanding that he had displayed poor performance and judgment as a line officer and was an equally poor supervisor.

40. I accepted the recommendation to decommission Paul Giglio without inquiring why his name was on the list.

41. I did not ask for the reasons why William Peneau and Tim Turley were on the list. However, I was aware that Superintendent Sumpter had previously disciplined Peneau for unprofessional conduct. Additionally, I was aware that Tim Turley had been disciplined for an incident in which the Department believed he had falsely accused a detainee of kicking another detainee in the head and had sought to have the detainee punished based upon the false allegation. I was not involved in the decision to impose discipline on Mr. Turley.

42. I did not ask for the reasons why Lorne Lynch, Al Moscone, and David Bergeron recommended for decommissioning. However, based upon my own observations of Mr. Lynch's incessantly negative and disrespectful attitude and Mr. Bergeron's

unprofessional and inappropriate conduct towards me, I agreed that they should be decommissioned. Additionally, I was aware that Al Moscone had been given an opportunity to implement changes when he was assigned to Transportation and he had not been willing to do so.  Accordingly, I agreed with the recommendation that he be decommissioned.

43.     I did not ask for the reasons why John Barnes, John Ellis and John Grennon were recommended for decommissioning.  In my opinion, their reckless behavior in authoring and disseminating the letters and press release disparaging the Department, intentionally misrepresenting my individual conduct and the Department's positions and policies on important issues was sufficiently egregious to disqualify them from the privilege of being appointed a Deputy Sheriff. When I met with them to discuss their conduct, they did nothing to indicate that they had any respect for my position as Sheriff.

44.     The political affiliation or union activity of the ten plaintiffs in this lawsuit was not a factor in my decision to decommission them.

45.     In 2007 I was presented with a list of employees who had applied to be appointed to be Deputy Sheriff and met the criteria set forth in Policy S516.  Included in that list were Plaintiffs John Grennon, David Bergeron, Al Moscone, Lorne Lynch, John Barnes, and John Ellis.

46.     In my discretion, I declined to appoint Grennon, Bergeron, Moscone, and Lynch as Deputy Sheriffs because I had seen no evidence of any improvement or change in their attitude toward the merit and performance-based reforms that I was seeking to implement or my role as Sheriff.  I did appoint Barnes and Ellis as Deputy Sheriffs because it had been reported to me by Superintendent Sumpter that they were demonstrating a positive attitude and were making a positive contribution to the Department.

**Signed Under The Pains And Penalties Of Perjury This 26th Day Of July 2007.**

/s/Andrea J. Cabral
Andrea J. Cabral

## In The Matter Of:

*Martin E. Michelman   v.*
*Suffolk County, et al.*

---

*Elizabeth A. Keeley*
*Vol. 1, February 28, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File KEELEY.V1, 151 Pages*
*Min-U-Script® File ID: 1862469558*

**Word Index included with this Min-U-Script®**

Elizabeth A. Keeley
Vol. 1, February 28, 2006

Martin E. Michelman   v.
Suffolk County, et al.

Page 13

[1] chief, and more so when I became chief trial
[2] counsel, and certainly it was an important part of
[3] what I did as first assistant.
[4]     Q: During this whole time since November 1983,
[5] you've worked for public employers; is that true?
[6]     A: Yes.
[7]     Q: At what point did you join the Suffolk
[8] County Sheriff's Department?
[9]     A: I started on November 29, 2002.
[10]     Q: In what capacity?
[11]     A: Chief of staff.
[12]     Q: What were your job functions as chief of
[13] staff?
[14]     A: Beginning at that moment or that time?
[15]     Q: Sure. Yes.
[16]     A: Well, they evolved.
[17]     Q: Start at the beginning.
[18]     A: I'll try. Well, I was new to the
[19] department. Sheriff Cabral had some familiarity
[20] with the jail aspect of the Suffolk County
[21] Sheriff's Department operation, as she had worked
[22] there back in the mid-1980s, but I was not very
[23] familiar with the Jail and House operations. So I
[24] saw it as my responsibility, and it was my

Page 14

[1] understanding that the sheriff wanted me to learn as
[2] quickly as possible the operations within the
[3] department.
[4]     So my primary responsibility was to learn
[5] and identify who would be staff that would continue
[6] to work in various positions and understand the role
[7] and responsibilities of those positions. So for
[8] the first several months, that was fairly consuming.
[9]     At the same time there was a transition
[10] ongoing. The sheriff had appointed members inside
[11] and outside the department to participate in a
[12] transition reviewing all major aspects of the
[13] department's operations. So I was also going to
[14] benefit from that, but at the same time I was
[15] responsible for knowing what was going on in the
[16] department every day and determining what was
[17] significant and what the sheriff should and would
[18] want to know about. So that's really from the
[19] beginning how the operation evolved.
[20]     Q: Well, then what changed?
[21]     A: What changed was we within the first year
[22] identified who was going to be the senior managers,
[23] the superintendents, the deputy superintendents, the
[24] directors, the general counsel, individuals both

Page 15

[1] within the department and brought in from other
[2] agencies to assist me and the sheriff in running the
[3] department.
[4]     So what changed was that we built an
[5] executive management team of people who we felt had
[6] the competencies and the sheriff and myself could
[7] trust and could rely on to make the decisions that
[8] need to be made every day in assuring that the
[9] department runs smoothly and safely and efficiently.
[10]     Q: Did your job duties change after that?
[11]     A: In a sense, yes, because I came to rely on
[12] the senior managers and did not have to be involved
[13] necessarily in every decision that was being made.
[14] And with time I determined, and the sheriff as well,
[15] when I needed to know and what I needed to know and
[16] how that would be relayed to the sheriff. So I was,
[17] to a certain extent, freed up to be able to focus on
[18] some of the priorities that the sheriff had for her
[19] administration.
[20]     Q: What were those priorities?
[21]     A: To increase the professionalism within the
[22] department. And that began with the recruitment of
[23] qualified candidates for custody officers, as well
[24] as qualified individuals for civilian positions. To

Page 16

[1] have a professional academy for custody officers
[2] that would appropriately train them for the
[3] position. To identify individuals who should be
[4] promoted as a result of their training and
[5] experience. To establish promotional exams for the
[6] collective bargaining units, custody officers. To
[7] enhance the department's image within the law
[8] enforcement community.
[9]     To work on many of the issues set forth in
[10] the Stern Commission report. To improve the
[11] communication within the department. To build on
[12] the community corrections initiatives that existed
[13] when we got there but to enhance those relationships
[14] with outside agencies. To increase programming for
[15] inmates, male and female, at the House of
[16] Correction.
[17]     To work on — at that time in 2003, there
[18] was a significant overcrowding at the Jail, we had
[19] over close to 1200 people committed to the Jail with
[20] only beds for between 680 and 690. So the remainder
[21] of those individuals had to be housed somewhere
[22] else, whether at DOC facilities, or eventually we
[23] moved a certain number of them over to the House of
[24] Correction. But to address the overcrowding

Martin E. Michelman   v.
Suffolk County, et al.

Elizabeth A. Keeley
Vol. 1, February 28, 2006

Page 17

[1] situation with the trial court.
[2]     Early on we were — very early on dealing
[3] with a five-plus million dollar deficit as a result
[4] of the sheriff paying a settlement owed in the Mack
[5] versus Rouse case that had been settled before we
[6] arrived at the department and required us to pay
[7] over $5.3 million which had not been appropriated in
[8] the budget. So I was also addressing significant
[9] deficits at the end of FY '03.
[10]     So those were some of the issues we were
[11] dealing with or I was dealing with.
[12]     Q: Well, those continued through today, or
[13] have your duties changed after that?
[14]     A: I'm not sure, I think my responsibilities
[15] have basically remained the same. But we were able
[16] to eliminate the deficit by the end of FY '04 and
[17] have been in the black ever since. We have also
[18] reduced overtime spending for custody officers,
[19] which was a significant part of our reducing the
[20] deficit in fiscal year '04.
[21]     We continue to struggle to recruit
[22] qualified candidates, so that's an ongoing
[23] challenge. We do have, I think, a very good
[24] training staff, and so we're training recruits well.

Page 18

[1] I think three years into the administration we have
[2] a solid team of managers who are working together to
[3] address some of the ongoing issues that face
[4] professionals in corrections.
[5]     Q: What are the technical duties of a chief of
[6] staff? I mean, you've told me what you've been
[7] working on and things like that, but I'd like you to
[8] describe, using language like a position
[9] description, what you do.
[10]     A: Well, my job description requires that I
[11] oversee the day-to-day operations of the Suffolk
[12] County Sheriff's Department. And that entails the
[13] operation of the Jail, the House of Correction, the
[14] halfway houses, the Brooke House and the McGrath
[15] House, our day reporting centers for men and women.
[16] The Men's Center is at 33 Bradston Street, which is
[17] adjacent to the House of Correction; the Women's
[18] Center is at Pemberton Square Courthouse.
[19]     I'm responsible for the financial
[20] management of the department. I'm responsible for
[21] overseeing the human resource department. And what
[22] this entails is, and has for a number of years,
[23] regular meetings with the individuals tasked to run
[24] these areas of the department.

Page 19

[1]     So weekly meetings with the
[2] superintendents of the Jail and the House. Weekly
[3] meetings with the superintendent of human resources.
[4] Weekly meetings with the director of planning and
[5] development. Biweekly meetings with the director of
[6] our Information Technology Division. Biweekly
[7] meetings with the person who was formerly the
[8] superintendent of our Training and Intelligence
[9] Division. Weekly meetings with general counsel.
[10] Weekly meetings with the sheriff. Biweekly meetings
[11] with all of the superintendents and the chief of
[12] external affairs.
[13]     And even with those planned meetings, the
[14] day can be derailed by a particular series of events
[15] that could occur, whether it's an incident
[16] involving an inmate or a jail detainee death, a
[17] significant investigation going on involving an
[18] officer and misconduct or criminal conduct. A
[19] personnel matter.
[20]     Q: How would you get involved with personnel
[21] matters?
[22]     A: They would come to my attention usually
[23] through the superintendent of HR, Mike Harris, or
[24] they might come directly from a supervisor, the

Page 20

[1] individual who is responsible.
[2]     Q: What would you do?
[3]     A: I would gather information from these
[4] individuals. If they had questions or were seeking
[5] advice, I would respond to that and, when
[6] appropriate, bring the matter to the sheriff's
[7] attention.
[8]     Q: What role, if any, did you have in
[9] disciplining or evaluating people under you?
[10]     A: You'd have to be more specific about a time
[11] frame.
[12]     Q: Well, at some point Marty Michelman was
[13] your subordinate; is that correct?
[14]     A: Yes.
[15]     Q: And he reported directly to you?
[16]     A: Yes.
[17]     Q: What role would it have been — if you had
[18] disciplined Mr. Michelman at that time — if you had
[19] back up. During the time that you directly
[20] supervised Mr. Michelman, if he was to be
[21] disciplined, what role, if any, would you have in
[22] that?
[23]     A: Well, since he was my immediate supervisor,
[24] I would impose that discipline.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
                              )
DAVID BERGERON ET AL.,        )
        Plaintiffs            )
                              )
        v.                    )
                              )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY   )
And SHERIFF OF SUFFOLK COUNTY,)
        Defendant             )
_____)
```

## AFFIDAVIT OF SUPERINTENDENT GERARD J. HORGAN

I, Gerard J. Horgan, being duly sworn hereby depose and state:

1.  The Suffolk County Sheriff's Department ("Department"/ "SCSD") is a division of Suffolk County. The Sheriff's Department operates two correctional facilities, the Nashua Street Jail ("NSJ") which houses pre-trial detainees and the Suffolk County House of Correction ("HOC") which houses sentenced individuals. Each facility has a distinct Superintendent who is responsible for its daily operation, including supervision of staff.

2.  I am the Superintendent of the Suffolk County House of Correction ("HOC"). I have held that position since November 2003. I replaced Patrick Bradley who was Superintendent from November 2002 to November 2003. As Superintendent I am responsible for the daily operation of the HOC.

3.  Prior to becoming Superintendent of the HOC, I was Superintendent of the Nashua Street Jail ("NSJ"). Eugene Sumpter was the Deputy Superintendent of the NSJ at that time.

4.  The Suffolk County Sheriff's Department ("Department"/ "SCSD") is a division of Suffolk County. The Sheriff's Department operates two correctional facilities, the Nashua Street Jail ("NSJ") which houses pre-trial detainees and the Suffolk County House of Correction ("HOC") which houses sentenced individuals. Each facility has a distinct Superintendent who is responsible for its daily operation, including supervision of staff.

5.      I was part of the *ad hoc* committee that conducted the review of Deputy
        Sheriffs in 2004. Superintendent Michael Harris coordinated the
        committee, which was comprised of Superintendent Harris, Chief of Staff
        Elizabeth Keeley, Superintendent Eugene Sumpter, Deputy
        Superintendent Theiss and myself.  The review was part of a larger effort
        to make the Deputy Sheriff appointment more merit based.

6.      The committee was provided with a current list of all individuals who
        were commissioned as Deputy Sheriffs.  The committee was tasked with
        reviewing the list and making recommendations as to whom, if anyone,
        should be decommissioned.  A number of factors were considered in
        making that determination, including: disciplinary history, firearms
        training, job performance, professionalism, demeanor and comportment
        and experience.

7.      I generated my own list of custody officers at the HOC who were
        commissioned as Deputy Sheriffs and focused my review on those
        individuals.  I also weighed in on custody officers at the NSJ with whom I
        was familiar.

8.      The committee met approximately two times between approximately
        November 2004 and January 2005 to discuss their recommendations.

9.      Sheriff Cabral did not attend any of the meetings nor did she provide any
        instructions or directions for conducting the review.  Sheriff Cabral did not
        provide the committee with names of individuals whom she wanted to
        decommission.

10.     The committee ultimately agreed upon a list of individuals who were
        recommended for decommissioning.  The political affiliation or union
        activity of any of those individuals were not the reason that they were
        recommended for decommissioning.

11.     I am familiar with the Plaintiffs in this action from my previous position
        as Superintendent of the NSJ.  The Plaintiffs were not recommended for
        decommissioning because of their support for Stephen Murphy or their
        union activity.

12.     I am aware that the following Department employees and Deputy Sheriffs
        supported Stephen Murphy in his campaign to become Sheriff and were
        not decommissioned: Pat O'Brien, Richard Coleman, Kevin Janielis,
        Miguel Bueno, Benny Fiasconaro, Dennis Guilfoyle, Mel Reed, Nick
        Adams, John O'Connor, Jeff Fiorantino.

13.     I am aware of the following Department employees who supported
        Stephen Murphy in his campaign to become Sheriff and who were

promoted by Sheriff Cabral: Mel Reed, Tom Donahue, Nick Adams, Al Mancini and John Farragher.

**Signed Under The Pains And Penalties Of Perjury This 13th Day Of August 2007.**

/s/Gerard J. Horgan
Gerard J. Horgan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DAVID BERGERON ET AL.,                  )
          Plaintiffs                    )
                                        )
          v.                            )
                                        )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY             )
And SHERIFF OF SUFFOLK COUNTY,          )
          Defendant                     )
_____)


**AFFIDAVIT OF SUPERINTENDENT EUGENE S. SUMPTER,JR.**

I, Eugene S. Sumpter, Jr. being duly sworn, do hereby depose and state:

1.     Since November 2003 I have been the Superintendent of the Nashua Street Jail ]
       ("NSJ") for the Suffolk County Sheriff's Department ("Department").  Prior to
       that I was the Deputy Superintendent of the NSJ.  As Superintendent I am
       responsible for the daily operation of the NSJ.  Cliff Carney is the Deputy
       Superintendent of the NSJ.  Deputy Superintendent Carney reports directly to me
       and assists me in the daily operation of the NSJ.

2.     There are approximately 300 uniformed jail officers working at the NSJ.

3.     The NSJ has three working shifts for custody staff: 7 a.m. – 3 p.m. shift ("day
       shift"), 3 p.m. – 11 p.m. shift ("evening shift"), and 11 p.m. – 7 a.m. shift ("night
       shift").

4.     I was part of the *ad hoc* committee that conducted the review of Deputy Sheriffs
       in 2004. Superintendent Michael Harris coordinated the committee, which was
       comprised of Superintendent Harris, Chief of Staff Elizabeth Keeley,
       Superintendent Gerard Horgan, Deputy Superintendent Theiss and myself.  The
       review was part of a larger effort to make the Deputy Sheriff appointment more
       merit based.

5.     The committee was provided with a current list of all individuals who were
       commissioned as Deputy Sheriffs.  The committee was tasked with reviewing the
       list and making recommendations as to whom, if anyone, should be
       decommissioned.  A number of factors were considered in making that
       determination, including: disciplinary history, firearms training, job performance,
       attitude, professionalism, demeanor and comportment and experience.

6.    I focused my review on custody officers at the NSJ who were commissioned as Deputy Sheriffs.  I also weighed in on custody officers at the HOC with whom I was familiar.

7.    Sheriff Cabral did not attend any of the meetings nor did she provide any instructions or directions for conducting the review.  Sheriff Cabral did not provide the committee with names of individuals whom she wanted to decommission.

8.    The committee ultimately agreed upon a list of individuals who were recommended for decommissioning.  The political affiliation and/or union activity of any of those individuals were not the reason that they were recommended for decommissioning.

9.    I am familiar with the Plaintiffs in this action because they are all custody officers at the NSJ.  The Plaintiffs were not recommended for decommissioning because of their support for Stephen Murphy and/or their union activity.

10.   The Department retains the power and authority, to assign and re-assign staff based upon the needs of the jail on that particular day and shift subject to the terms of the CBA. These assignments are made at the discretion of the Superintendent, the Deputy Superintendent and/or shift commander.

11.   All custody staff, regardless of seniority and rank, are aware that their shift or assignment may be changed at any time based upon Department needs and concerns for safety and security of the institution, its inmates and staff.

12.    Jail officers with the rank of JO-1 through JO-3 have the right, through their collective bargaining agreement, to pick their shifts.  Superior officers, Captains and Lieutenants do not have the right to pick their shift.

13.   Once shift selection is completed, officers are assigned quarterly to specific posts depending on their rank, seniority and operational and security needs of the institution.  Posts are also assigned daily and quarterly. Custody staff assignments are made based on the needs of the Department. Officer assignments change on a regular basis.

14.   Although an officer is eligible to participate, and does participate in shift selection, this does not exclude the potential for reassignment to a different shift while on regular duty.

15.   As Superintendent of the NSJ I have the authority to assign staff to support services positions. Since 2003 I have reviewed support service assignments on a yearly basis in an effort to provide custody officers with an opportunity to get some relief from working in housing units and learn some new skills.  This also

serves to develop a larger pool of officers to serve the operational needs of the Department. I consult with the Shift Commanders to identify appropriate officers for these assignments. Transportation and property are support services assignments.

16.   The Shift Commander and Floor Supervisor positions are the only positions that are exclusively assigned to a Captain or a Lieutenant.  The Floor Supervisor reports directly to the Shift Commander and it is second only to the Shift Commander in terms of importance to the overall operation of the NSJ.

17.   Captains routinely and regularly work as Floor Supervisors.  When there are two Captains assigned to a shift, one Captain is assigned as the Shift Commander and the other Captain will be assigned by the Shift Commander to work another post, including Floor Supervisor, Central Control, Back Gate or wherever the Shift Commander needs help. Prior to his   reassignment from Transportation, Captain Moscone worked overtime shifts as a Floor Supervisor.

18.   Once the reorganization of Transportation was completed and Communications assumed the responsibility for coordinating trip assignments, there was no longer an operational need for a Captain to be assigned to Transportation.  There was a need for an additional supervisor on the 3-to-11 shift so I reassigned Captain Moscone to that shift.

18.   Since his reassignment from Transportation, Moscone has been assigned to work a number of posts including Floor Supervisor, Central Control, Back Gate  These are all positions that Captains and Lieutenants are routinely assigned to on a daily basis on all three shifts.

19.   In January 2005 approximately 10 individuals working in support services positions were given new assignments.  Barnes and Moscone were two of the ten officers given new assignments. Additionally, a number of superior officers had their shift changed.

20.   John Grennon worked overtime shifts at the NSJ when he was assigned to Training.  His overtime assignments at the NSJ included transportation, unit officer, medical unit officer, clinic lobby officer and SERT.  All of these assignments and responsibilities are consistent with the norm for the position of Jail Officer (JO-1).

21.   Since January 2005, two (2) officers have been given the opportunity to work in Property on the 7-to-3 shift.

22.   Effective January 31, 2007, Captain Moscone was reassigned, at his request, back to the 7-to-3 shift.  I was able to accommodate Captain Moscone's request because Sheriff Cabral had promoted a number of new Lieutenants, some of

which were assigned to the 3-to11 shift and there was no longer an operational need to have Captain Moscone assigned there to balance the shift.

23.    Effective January 31, 2007 and at his request, Lieutenant Lynch's days off were changed back to Friday/Monday, every other weekend. I was able to accommodate Lieutenant Lynch's request because the influx of new Lieutenants promoted by Sheriff Cabral made it possible to balance the shift.

24.    In April 2007 the Department administered a promotional examination for the ranks of Corporal and Sergeant. Plaintiff Ellis did not register to take the examination and did not take the exam. Plaintiffs Giglio and Barnes registered to take the examination but did not show up and take it. Plaintiffs Turley and Peneau took the exam. The exam has not been graded yet.

25.    The Communications Officer continues to manage and coordinate trip assignments at the NSJ.

26.    After John Grennon was reassigned back to the NSJ in October 2004 he retained the same shift (7-to-3) and days off (Saturday and Sunday) through the end of the year. In January 2005 Grennon selected his shift (3-to-11) and days off (Friday and Saturday) by seniority. Grennon selected that same shift and days off in 2006 and 2007 until Sheriff Cabral promoted him to Lieutenant in January 2007.

27.    Moscone's duties and responsibilities as Floor Supervisor included supervising multiple staff members and inmates, problem solving, gathering reports and responding to emergencies as needed. All of the duties and responsibilities are commensurate with Moscone's rank.

**Signed under the pains and penalties of perjury this 13th day of August 2007.**

/s/ Eugene S. Sumpter, Jr.
Eugene S. Sumpter, Jr.

1

Volume: 1
Pages:  1 to 111
Exhibits:  See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. No. 05-11661-RGS


DAVID BERGERON, et al,        )
                Plaintiffs    )
                              )
                              )
     vs.                      )
                              )
                              )
ANDREA CABRAL, Individually   )
And SHERIFF of SUFFOLK COUNTY, )
                Defendant     )


          DEPOSITION of VIKTOR A. THEISS,
a witness called on behalf of the
Plaintiffs, pursuant to the applicable
provisions of the Federal Rules of Civil
Procedure, before Judith R. Sidel,
Professional Court Reporter and Notary
Public, in and for the Commonwealth of
Massachusetts, at the Office of Merrick,
Louison & Costello, LLP, 67 Batterymarch
Street, Boston, Massachusetts 02110, on
Monday, May 8, 2006, commencing at 11:30
a.m.

APPEARANCES: (Continued on page 2)


              *  *  *  *


          DUNN & GOUDREAU
          (617) 742-6900

7

```
 1    A.   It was everything from budget to politics
 2         involving other agencies, trying to
 3         implement large scale plans, not
 4         having all the resources that you wanted,
 5         staff conflicts, attention to general
 6         environment.  It's not an easy job.
 7    Q.   In your first position with the sheriff,
 8         it was deputy superintendent in charge of
 9         what?
10    A.   The sheriff's investigation division.
11    Q.   What were your duties and
12         responsibilities there?
13    A.   To oversee the daily operations of the
14         investigators, primarily focusing on
15         internal affairs investigations and
16         internal crime committed within the
17         facilities.
18    Q.   Were you hired by Sheriff Cabral for that
19         position?
20    A.   Yes, I was.
21    Q.   You served in that position from February
22         of 2003 until when?
23    A.   Through February 2006.
24    Q.   In the investigative division?
```

8

```
1    A.   I was in charge of that division
2         throughout the entire time.
3    Q.   And when did you assume additional
4         responsibilities?
5    A.   Officially or unofficially?
6    Q.   Whenever you assume -- well, you got an
7         additional title.
8    A.   Correct.
9    Q.   At some point during your career with the
10        sheriff's department?
11   A.   Yes.
12   Q.   And that additional title was what?
13   A.   Superintendent.
14   Q.   Did your duties and responsibilities
15        change?
16   A.   Yes, they did.
17   Q.   You got the superintendent's position at
18        what time during your career with the
19        sheriff's department?
20   A.   January 2005.
21   Q.   And have you told me your duties and
22        responsibilities prior to assuming that
23        position?  As I understand it, it was
24        head of the sheriff's investigative
```

9

```
 1      division?
 2   A.   Correct.
 3   Q.   And when you became superintendent in
 4        January of 2005, you did not loose those
 5        responsibilities as head of the SID
 6        division?
 7   A.   Correct.
 8   Q.   But you assumed additional duties and
 9        responsibilities.
10   A.   Yes, I did.
11   Q.   What were those?
12   A.   I was subsequently in charge of the
13        training division; so supervising the
14        day-to-day operations of training,
15        and there was a newly created gang
16        intelligence unit that had been started
17        at the house of correction, and the
18        canine unit as well.
19   Q.   So as superintendent, in addition to
20        SID, you were head of training, gang
21        intelligence, and a canine unit?
22   A.   Correct.
23   Q.   Anything else?
24   A.   No.
```

11

```
 1    Q.   This would have been the fall of 2004?
 2    A.   I don't remember whether it was the fall
 3         or the spring.  It was part of a -- we
 4         were out just trying to get publicity
 5         for the sheriff's upcoming election.  I
 6         believe it was during the primary for
 7         city counselor race.  I think it was the
 8         spring, but I'm not sure.
 9    Q.   Would you tell me about that experience?
10    A.   We had gone to Holy Name Rotary where she
11         was going to meet and greet potential
12         voters.  At that spot the plaintiff,
13         Dave Bergeron, approached the sheriff,
14         and they had, what I would call, a very
15         heated discussion.
16    Q.   Was there anybody else with the sheriff?
17    A.   Russell Roberts and Matt O'Maley.
18    Q.   Were you with the sheriff as well?
19    A.   Yes.
20    Q.   So it was three individuals, the sheriff
21         and David Bergeron?
22    A.   And his wife was also present.
23    Q.   Whose wife?
24    A.   Dave Bergeron's wife.
```

39

```
 1   A.  Yes.
 2   Q.  Would you please tell me about that
 3       conversation?  First of all, when did it
 4       take place?
 5   A.  I don't recall.
 6   Q.  Was there anybody else in the room while
 7       the two of you were discussing it?
 8   A.  I don't recall.
 9   Q.  And can you tell me about the
10       conversation the two of you had?
11   A.  The sheriff wanted John transferred out
12       of training, because she didn't feel that
13       he was an appropriate representative of
14       what she wanted to be imparted to new
15       officers, and imparted in service
16       training.  She felt that her interactions
17       with him had been of questionable
18       nature.  She didn't -- she had issues
19       with his voracity, with his character.
20       She didn't want him working in her
21       training division.
22            MR. PFAFF:  Could you read the
23       beginning of that answer back.
24            (The preceding answer was read
```

43

```
 1        Steve Jacobs, and was told that the
 2        matter had been resolved to their
 3        satisfaction.  The explanations received
 4        were satisfactory, and then shortly
 5        thereafter, I want to say the next day,
 6        but I could be wrong with that, a suit
 7        was filed that indicated that everything
 8        was not acceptable and put to rest.
 9   Q.   This is with respect to the pension
10        benefits?
11   A.   Again, that's what I want to say, but I
12        am not entirely sure what the subject
13        matter of the suit was.
14   Q.   Do you recall any other conversations
15        that you had with the sheriff with
16        respect to the pension benefits issue?
17   A.   No.
18   Q.   What was the next incident that you
19        recall that led you to believe that the
20        sheriff had this impression about John?
21   A.   There was a training graduation held at
22        the MIT campus.  And during that training
23        John was one of the speakers.  And his
24        remarks about the sheriff were very
```

44

```
 1        effusive, incredibly positive.  If you

 2        had been in the audience, you would have

 3        felt that the two of them were bosom

 4        buddies in total sync.  Subsequent

 5        writings by John and comments by John

 6        were diametrically opposed to what he had

 7        stated at the MIT graduation.

 8   Q.   What were the subsequent writings and

 9        sayings that were diametrically opposed?

10   A.   At that time there was an ongoing series

11        of postings on the JOEASC web site.  John

12        had submitted one or two of them.

13   Q.   Do you know what those web site

14        statements that were attributed to John,

15        do you know what they were?

16   A.   No, not at this point.

17   Q.   Did you discuss them with the sheriff?

18   A.   Not at any length.  It was just commented

19        on.

20   Q.   Were there any other instances prior

21        to this conversation with you and the

22        sheriff that left you with the impression

23        that the sheriff believed that John was

24        not appropriate to be in the training
```

MAY 8, 2006                    CondenseIt™                    VIKTOR A. THEISS

Page 45

1  division?
2  A. Those are the specific examples.
3  Q. And just so I have it then, there are
4    three. There's the training application
5    process in which John said he would back
6    Michaelman, but then submitted his own
7    application.
8  A. Correct.
9  Q. There were the pension benefits'
10   lawsuit.
11 A. Correct.
12 Q. And then there was the training
13   graduation speech.
14 A. Correct.
15 Q. What did she say to you with respect to
16   her impression about John's voracity
17   during this conversation in which she
18   said she didn't believe John belonged
19   in training and should be transferred?
20 A. That didn't come up. It was just a
21   generic statement. She wanted him out
22   of training, because she didn't think
23   he was a fair representative of hers.
24 Q. Prior to that statement or after that

Page 46

1    statement did she give you any specific
2    examples as to why she questioned his
3    truth or voracity?
4       MS. CAULO: Objection. Asked
5    and answered. You may answer.
6  A. I don't recall those specific
7    conversations. I stated the general
8    impression I had was from those examples,
9    and her interaction with John on some
10   other issues. She just had this
11   impression that she had not -- she formed
12   an opinion.
13 Q. Prior to this conversation and after this
14   conversation, did she ever give you any
15   examples as to John's character as not
16   being fit for the job?
17 A. Those are the ones that stick out to me
18   now.
19 Q. So those three examples cover the issue
20   of him not being appropriate, the issue
21   of her questioning his truth or voracity
22   and his character?
23       MS. CAULO: Objection.
24 A. Yes.

Page 47

1       MS. CAULO: The witness said
2    those are ones that come to mind.
3  Q. You were then at this meeting with the
4    sheriff. You had given an order by her
5    to transfer John Grennon.
6       MS. CAULO: Objection.
7  A. I was asked to transfer John.
8  Q. To where?
9  A. Back on line.
10 Q. Prior to this -- by the way, did you give
11   that order to him at some point?
12       MS. CAULO: Objection.
13 A. Yes.
14 Q. How long after you received this
15   instruction from the sheriff did you give
16   the order to John?
17 A. I don't remember.
18 Q. And did the sheriff mention to you that
19   one of her concerns was John's union
20   activity?
21 A. I don't remember.
22 Q. Let me be more specific. At this
23   conversation in which you said John is
24   going to be transferred out of training,

Page 48

1    did she mention at any point in time that
2    his union activity was a concern for her?
3  A. No.
4  Q. Did you ever have a meeting with her in
5    which she said John's union activity is
6    a concern for her?
7  A. At one point, prior to my transferring
8    John, she indicated that she had concern
9    that he may have engaged in union
10   activity during regular business hours,
11   and she asked me to take his computer,
12   and have it looked at.
13 Q. This was prior to the conversation that
14   she had with you in which she instructed
15   you to transfer him, or was it the same
16   conversation?
17       MS. CAULO: Objection.
18 A. I think I said it was after that
19   conversation. Before I had transferred
20   John, it was mentioned to me to get his
21   computer.
22 Q. So, you had a conversation with the
23   sheriff. At some point you then told
24   John he was going to be transferred?

49

```
 1   A.   Yes.
 2   Q.   Was it between those two conversations
 3        that you had his computer checked,
 4        or after you told him that he was
 5        transferred that you had his computer
 6        checked?
 7                  MS. CAULO:   Objection.
 8   A.   After I told him he was transferred and
 9        he was transferred, I took his hard drive
10        and brought it to Brian O-n-e-s-s-i-m-o.
11   Q.   Prior to this conversation with the
12        sheriff in which she said that she wanted
13        you to transfer Grennon, had you ever
14        had a conversation with the sheriff
15        recommending that Grennon be transferred
16        out of training?
17   A.   I don't remember.
18   Q.   Had you ever had a conversation with
19        Grennon, prior to actually transferring
20        him, indicating to him that the sheriff
21        had some concerns about his union
22        activity?
23   A.   About his union activity?
24   Q.   Yes.
```

50

```
 1   A.  Not that I recall.

 2   Q.  Did you ever have a conversation with

 3       John Grennon, prior to transferring

 4       him, that the sheriff had some concerns

 5       about his job duties as an instructor in

 6       training?

 7   A.  I recall we sat down at one point to talk

 8       about his role as a trainer, but I don't

 9       remember what I said at this point.

10   Q.  Why did you do that?

11   A.  I thought John was a good instructor.

12   Q.  And you had no issues with him then,

13       prior to his being transferred, about

14       how he conducted himself as a training

15       instructor; is it fair to say?

16               MS. CAULO:  Objection.

17   A.  The only issue that had come up, and it

18       wasn't one that I had witnessed, was

19       there was a training conducted for

20       in-service training for command staff,

21       and some of the people that attended that

22       felt that John was a little too over the

23       top jovial, and some of his examples used

24       weren't as appropriate as they would have
```

68

1       the disciplinary history, what were the

2       actual duties performed, could that list

3       be pared down, should it be pared down.

4       That became the topic.

5  Q.  Did you look at names on the list?

6  A.  Yes.

7  Q.  And tell me how the process for examining

8       the list began once the list was

9       generated?

10  A.  It was disseminated.  I was instructed to

11       look at the list from the SID perspective

12       to see if anybody, who was currently

13       deputy sheriff, had been the subject of

14       SID investigations, or we had information

15       regarding them that would be of concern,

16       and that might indicate that they weren't

17       suited to be a deputy sheriff.

18  Q.  Do you know how someone becomes a deputy

19       sheriff?

20  A.  The sheriff appoints the deputy sheriff.

21  Q.  Had the list of those names that you

22       looked at, had all those individuals been

23       appointed by Sheriff Cabral?

24  A.  Yes.

84

```
 1    Q.   Did you recommend that the investigation

 2         not even be done on Turley?

 3    A.   I don't remember.

 4    Q.   Were you asked to be part of the

 5         investigation?

 6    A.   I don't remember.

 7    Q.   At the Holy Name Church Rotary, where the

 8         incident with Mr. Bergeron took place,

 9         you were a witness to that?

10    A.   Yes.

11    Q.   How would you describe the conversation

12         between the two of them?

13    A.   Mr. Bergeron was very upset.

14    Q.   How did that conversation end?

15    A.   They walked off.

16    Q.   And did they shake hands before they

17         left?

18    A.   I don't remember.

19    Q.   Do you have any knowledge of a picture

20         of the handshake being posted on the

21         sheriff's web site the day after?

22    A.   No.

23    Q.   The background check that you did on the

24         deputy sheriff candidates, did you make
```

86

1    at SID.  We have a spread sheet that we
2    kept.  I asked Steve Jacobs or Neville
3    Arthur if they recalled anything that
4    I might not be aware of.  That was it.
5    Most of the people that we were involved
6    with would have already fired,
7    terminated.  We didn't have, at that
8    point when I was there, a lot of minor
9    cases that we would have dealt with.  So
10    it would have already been well-known to
11    the superintendents all the disciplinary
12    problems.  Does that make sense?  It's
13    not like there's a secret SID file that
14    command staff wouldn't be aware of.  If
15    we found sufficient evidence, we would
16    have taken serious action that would have
17    been well-known.
18  Q.  Do you know how Dave Bergeron lost his
19    status as deputy sheriff?
20  A.  He was on the list.  He was put out
21    there, because of his interaction with
22    the sheriff at the Holy Name Rotary, and
23    subsequent general demeanor inside the
24    department.

93

```
1        officers, that he would get some pretty
2        hard looks and stares from Officer
3        Bergeron.  He would kind of give me a
4        little wave, and he'd look very hard at
5        you and stare you down.
6    Q.  And you recall this specifically?
7    A.  Yes.
8    Q.  Do you recall any dates of this incident?
9    A.  It was the one time the sheriff
10       addressed -- she offered herself up
11       for available roll calls at the jail.
12   Q.  Was Dave Bergeron ever disciplined for
13       that demeanor?
14   A.  No.
15   Q.  Do you know if he was ever called in
16       by a superior officer to discuss his
17       demeanor?
18   A.  No, not that I'm aware of.
19   Q.  Was there any evaluation done of
20       Dave Bergeron during your tenure that
21       would indicate that his demeanor was
22       unacceptable?
23   A.  Not that I'm aware of.
24   Q.  Lorne Lynch, what's the reason he was
```

94

```
 1        stripped of his status as deputy sheriff?
 2   A.   His general demeanor and personality
 3        towards command staff and others at the
 4        jail.
 5   Q.   Did you ever witness this?
 6   A.   Yes.
 7   Q.   Can you tell me an example?
 8   A.   The same thing, Lorne is not a happy
 9        person.  When you walk by him and try to
10        say good morning, there was virtually no
11        response, and he would just give you a
12        hard look.  It was not the most pleasant
13        experience to walk by Lorne.  He seemed
14        perpetually upset about something.
15   Q.   What about his disciplinary history?
16   A.   I'm not aware of that.
17   Q.   How about general issues of character?
18   A.   I'm not aware of that.
19   Q.   So, in your opinion, then, it was his
20        demeanor on a day-to-day basis, which you
21        would interact with him, that led to him
22        not being a deputy sheriff any longer?
23             MS. CAULO:  Objection.
24   A.   That's my objection.  Others may have had
```

98

```
 1        Elizabeth Keeley had deputy sheriff
 2        status, a few other command staff
 3        members.
 4    Q.  And Tim Turley, do you know why he was
 5        recommended not to be deputy sheriff?
 6    A.  His issues of voracity that came up
 7        involving Scanlon, and then the other
 8        incident involving the affair in the
 9        unit.
10    Q.  The affair in the unit and the Scanlon
11        unit are two separate instances?
12    A.  Yes.  The Scanlon incident I discussed
13        earlier.  That was reported directly to
14        me.  The other incident that occurred
15        in one of the jail units was a separate
16        incident.
17    Q.  But the investigation you did with
18        respect to Turley, no discipline was
19        metered out?
20    A.  No.
21    Q.  And then the ten-day suspension that
22        he ultimately got, which was for the
23        incident in the unit that you're
24        referring to, you weren't part of that?
```

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                                       )
DAVID BERGERON ET AL.,                )
      Plaintiffs                                )
                                                       )
        v.                                          )
                                                       )          C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY     )
And SHERIFF OF SUFFOLK COUNTY,  )
      Defendant                                )
_____)


**AFFIDAVIT OF SUPERINTENDENT MICHAEL J. HARRIS**


I, Michael J. Harris, being duly sworn, do hereby depose and state as follows:

1.      My name is Michael J. Harris. During 2003 I was the Director of Employee/Labor Relations for the Suffolk County Sheriff's Department. Sheriff Cabral promoted me to Superintendent of Human Resources in March 2004.  I am responsible for all labor matters including collective bargaining.

2.      During the relevant time period addressed in the Complaint, the Sheriff's Command Staff consisted of: Michael Harris, Director of Employee Relations; Gerard Horgan, Superintendent House of Correction; Elizabeth Keeley, Chief of Staff; Eugene Sumpter, Superintendent Suffolk County Jail; Steven Tompkins, Public Affairs; and Viktor Theiss, Deputy Superintendent Sheriff's Investigative Division (SID).  Theiss was promoted to Superintendent of the Training and Intelligence Division (TID) in January 2005.

3.      Suffolk County employees approximately 1100 individuals at the Department, approximately 800 of which are jail/corrections (custody) officers working at the NSJ or the HOC.  There are four separate and distinct bargaining units representing custody staff for purposes of M.G.L. c. 150E within the Department.  Approximately 1000 employees are covered by Collective Bargaining Agreements negotiated by their bargaining units with the Department.

4.      JOEASC represents jail officers with the rank of JO-1 through JO-3.  Prior to the formation of JOEASC, these jail officers were represented by AFSCME Council 93, Local 1134.  AFSCME Council 93, Local 3643 represents the superior officers (Lieutenants, JO-4 and Captains, JO-5) at the NSJ.

5.      A Deputy Sheriff appointment is coterminous with the term of a sitting sheriff.  Upon the appointment of Sheriff Cabral as Suffolk County Sheriff in 2002, all

1

persons who were appointed Deputy Sheriffs by former Sheriff Rouse were decommissioned. Many were subsequently reappointed by Sheriff Cabral in December 2002 and January 2003 without a thorough review of their qualifications and fitness for the appointment.

6.     Commencing in early 2004 the Department began to evaluate the Deputy Sheriff appointment process and Policy S516 (Deputy Sheriff Appointments) with the purpose of making it a more meaningful title. The evaluation encompassed the role and responsibilities of Deputy Sheriffs, the requirements, qualifications, and training necessary for appointment as Deputy Sheriff, as well as the individuals who currently had the privilege of that appointment

7.     After Sheriff Cabral was elected to a full six-year term in November 2004, the Department determined that it did not have to redeputize all Deputy Sheriffs who were appointed after she first took office in 2002, because her term as Sheriff was coterminous. Instead, a decision was made to review everyone who was currently a Deputy Sheriff and make a determination whether anyone should be removed. This was the first time that the Cabral administration had undertaken an annual review of individuals holding the title of Deputy Sheriff.

8.     I coordinated an *ad hoc* committee comprised of myself, Chief of Staff Keeley, Superintendent Gerard Horgan, Superintendent Eugene Sumpter, and Superintendent ViktorTheiss to review the list of current Deput Sheriffs and make recommendations regarding which employees, if any, should be decommissioned.

9.     The Committee was provided with a list of all employees who were commissioned as Deputy Sheriffs. Over 400 hundred employees were on the list, including both custody and non-custody staff.

10.     Defendant Sheriff Cabral was not a member of the Committee nor was she involved in the review that we undertook. Sheriff Cabral did not attend any meetings of the Committee. Sheriff Cabral did not provide the committee with a list of employees whom she wanted decommissioned nor did she provide any instructions or directions to the Committee concerning how to conduct the review.

11.     Parallel with the review being conducted by the Committee, I was also working on revamping the process by which Deputy Sheriff appointments were made.

12.     The Committee met approximately two (2) to three (3) times between November 2004 and January 2005 to discuss their recommendations for decommissioning. The Committee considered a number of factors including, disciplinary history, attendance, whether a Deputy Sheriff appointment was necessary to perform certain assignments, demeanor and comportment, professionalism, and job performance.

13.     To my knowledge, this was the first time that the Department had undertaken such a review of Deputy Sheriffs and there was no formal protocol that was followed. It was an informal process in which members of the Committee weighed in with their thoughts and comments on individuals who were being recommended for

decommissioning. Members of the Committee who were unfamiliar with particular individuals deferred to those who had knowledge.  There were no notes maintained of the meetings.

14.    Ultimately the Committee agreed on a list of individuals whom they recommended for decommissioning.  The Committee did not vote on which names to include. The list included custody and non-custody staff at the NSJ and the HOC.

15.    In early 2005 a list of individuals recommended for decommissioning was presented to Sheriff Cabral for her review and consideration. The list contained only the names of the individuals, without any reasons provided. Sheriff Cabral did not have any prior input into the names that appeared on that list.

16.    The committee did not recommend any individual for decommissioning because of their political affiliation or union activity.

17.    None of the Plaintiffs were recommended for decommissioning by the committee because of their political affiliation or union activity.

18.    On April 21, 2005, with the approval of Sheriff Cabral, thirty-six (36) out of a total of four hundred seventy-two (472) Deputy Sheriffs working at the Department were decommissioned.  Some of the decommissioned employees worked at the NSJ while others worked at the HOC. The plaintiffs in the instant case comprise ten (10) of the thirty-six (36) employees who were decommissioned on April 27, 2005

19.    All employees who were decommissioned were invited to submit an application for reappointment after May 2006.

20.    As Superintendent of Human Resources I was the primary Department contact with the four separate and distinct bargaining units representing custody staff at the NSJ and the HOC. During the relevant time period of the allegations in the Plaintiffs' complaint John Barnes was the President of JOEASC.

21.    I had a number of conversations with Plaintiffs Barnes, Grennon and Ellis in which I explained in great detail the City of Boston, Central Payroll Office process that requires the Department to utilize 15F letters when hiring an employee into a grade beyond Step 1.  I explained that the15F letters did not constitute pay raises but instead represented only a procedural adjustment that placed their compensation at the level initially established and agreed upon at the date of their hire.  These conversations took place prior to May 2004.

22.    I explained the budgetary reasons for the delay in the Department's pension contribution to Plaintiffs Ellis, Barnes and Grennon prior to April 2004. I informed them that the Department was late in its payment due to the budget shortfall created by the payment in the strip search class action settlement and that pension money was not missing or misappropriated.

23.    On another occasion prior to April 2004 I explained to Plaintiffs Barnes and Ellis and their counsel, Attorney Condon, that no retired or current employees' retirement benefits were ever jeopardized, that payment would be made in full shortly, and that the SCSD was not the only Department to ever make a late payment to the Retirement account.

24.    I had two conversations with Plaintiff John Barnes prior to JOEASC being recognized as the official bargaining unit for officers with the ranks of JO-1 through JO-3 at the NSJ, in which I communicated my concern about JOEASC's continuing status in the existing Mass Public Employees Fund ("MPE"). The reason for my concern were comments made by AFSCME Staff Representative, Jim Breslin, to both Barnes and me indicating that JOEASC members would potentially forfeit their enrollment in the AFSCME sponsored MPE fund, should they follow through on the decertification effort.

25.    John Barnes personally informed me that MPE had discontinued benefits to JOEASC members and asked me to intercede with MPE. Harris did so but was unsuccessful in restoring benefits. Thereafter, JOEASC asked the Department to join them in a potential lawsuit against MPE, which the Department declined.

26.    After MPE discontinued benefits to JOEASC members, I had a number of conversations with Barnes and Grennon, and occasionally Ellis concerning optional coverage plans. One of these conversations occurred when Sheriff Cabral voluntarily elected to assume the COBRA coverage expenses for each of the affected members. I had another conversation with Barnes and Grennon after it was learned that JOEASC had failed to notify all its members of the COBRA enrollment option thereby rendering some members ineligible for this option.

27.    Shortly after the Department began to make the COBRA payments for eligible JOEASC members, I met with Barnes, Grennon and Ellis. During this meeting Barnes, Grennon and Ellis insisted that it was the Department's obligation under the parameters of the CBA to ensure continuing coverage. I reminded them, on more than one occasion, that (A) their CBA expired, (B) JOEASC had never technically negotiated a CBA with the Department, (C) the "existing benefit" stipulated to in the AFSCME Local 1134 contract was no longer available due to their voluntary decision to decertify from AFSCME.

28.    I also explained to Barnes, Grennon and Ellis that Dental Benefits were a CBA matter and all changes, modifications and even the continuation of existing benefits or the creation of a new benefit needed to be collectively bargained and jointly agreed to.

29.    The Department attempted to collectively bargain the subject of Dental Benefits with JOEASC for a prolonged period of time and did in fact reach a tentative agreement that included an alternative dental benefits plan, which was rejected. All during this period Sheriff Cabral voluntarily continued to pay COBRA coverage costs for members of this bargaining unit until this option expired after a period of approximately eighteen (18) months. The Department paid out over $200,000.00 in COBRA coverage costs during this period.

4

30.     On several occasions prior to the COBRA expiration date, I personally advised
        Plaintiffs Barnes, Grennon and Ellis of the impending expiration of benefits and
        requested, to no avail, that we again try to resolve alternative coverage options via the
        collective bargaining process. All of these discussions transpired between January
        2003 and July of 2004.

31.     I had several conversations with John Ellis and John Barnes beginning in late
        January/early February 2003 regarding vacation benefits for returning military
        personnel.  On each of these occasions I explained to them that employees returning
        from military duty were required to have thirty (30) weeks of service at the
        Department in the prior year for vacation eligibility.

32.     I also explained to Ellis and Barnes that the provisions of M.G.L., c. 137
        do not apply to the Department because it is not a state agency and, in any case, the
        statue does not provide for accrual of vacation time while on leave.  During
        these conversations, I also reminded them of the vacation and other benefits, such as
        additional pay, which the Department voluntarily provides to employees in the
        military.

33.     In 2004 the Department posted a promotional opportunity for the position of Captain
        at the NSJ and the HOC.  Interested employees were advised to apply for the position
        and their qualifications would be reviewed.  Lieutenant Lorne Lynch did not apply to
        be promoted to Captain.

34.     A Deputy Sheriff appointment is not required to work overtime.  At all relevant
        times, Union officials controlled the process by which overtime slots are filled.
        Overtime is generally compensated at time and one-half.

35.     The designation of Deputy Sheriff has no impact on an employee's hours of work,
        days off, or assignment within the institution.  The salary of officers at the SCSD is
        determined by Collective Bargaining Agreement ("CBA"), and an employee's status
        as a Deputy Sheriff has no affect whatsoever on the salaries set forth in the CBA.

36.     There existed an overtime distribution practice at the NSJ called the 7:1 ratio.
        That practice required the hiring of one (1) supervisory Jail officer ("white
        shirts/Local 3643") for every seven (7) subordinate Jail officers ("blue
        shirts/JOEASC") on overtime. The 7:1 ratio was not part of the parties' collective
        bargaining agreement.

37.     The 7:1 overtime ratio resulted in the Department paying a higher rate of overtime
        for a superior officer even if the overtime slot being filled did not require a
        supervisor.  I engaged in discussions concerning the overtime ratio with Local 3643
        representatives Captain Moscone, Lieutenant Lynch and Lieutenant Noonan and
        AFSCME Staff Representative James Breslin.  The position of Local 3643 was that
        the Department did not have a right to unilaterally change the overtime ratio and that
        it had to be collectively bargained.  At no time did Moscone or Lynch allege that the

Department was discontinuing the practice in retaliation for their political support of Stephen Murphy or their union activity.

38.   After providing the union with notice and an opportunity to discuss, the Department made a decision to discontinue this practice in 2004.  In the Fall of 2006, the Department agreed to implement an overtime ratio of 10:1 on a trial basis.  The 10:1 overtime ratio is still in effect on a trial basis.

39.   The requirements for promotions are set forth in the parties' CBA.  The promotional process includes a formula for the selection of candidates from a list of qualified candidates.  With regard to JOEASC members a passing score on a promotional examination is one of the prerequisites to permanent promotion pursuant to the CBA.

40.   In April 2007 sixteen (16) Deputy Sheriffs out of a total of four hundred thirty (430) Deputy Sheriffs working at the Department were decommissioned after an annual review.

41.   The review was conducted by a committee comprised of the following individuals Superintendent Eugene Sumpter, Superintendent Gerard Horgan, Superintendent Michael Harris, and Chief of Staff Anne Powers.

42.   Of the four hundred fourteen (414) of Deputy Sheriffs who were not decommissioned some were current or former union officials, including: Angelo Rossi (current Vice President of JOEASC), Stan Andruskiewicz (current President of JOEASC)

43.   A review was also conducted of employees who submitted applications for appointment as Deputy Sheriffs.  The committee recommended 44 employees of the 66 who submitted applications for appointment as Deputy Sheriffs.

44.   Of the four hundred thirty-five (435) Deputy Sheriffs who were not decommissioned in April 2005, some were current or former union officials, including: Michael Walsh (JOEASC President 2004-2005), Robert Tullos (JOEASC Executive Board member 2003-2004), Stan Andruszkiewicz (current JOEASC President), Mark Turley (JOEASC Treasurer 2003-2004), Michael Cinelli (JOEASC Executive Board), Kevin O'Riordan (JOEASC Executive Board member 2003-2004), Michelle Fitzpatrick(JOEASC Executive Board member 2003-2004), Richard Rosetti (JOEASC Trustee), Miguel Bueno (JOEASC  Executive Board member),Todd Flynn (Local 419 Executive Board member), Bryan Kaiser (Local 419 Trustee), Brian McPherson (Local 419 Executive Board member), William Noonan (Secretary Local 3643), Troy Salvetti (Vice President Local 419), Dennis Guilfoyle (Recording Secretary Local 419),Christopher McCray (Former President Local 419), Mike Powers (Former President Local 419), and Jack Sullivan (Former President Local 419).

45.   Corporal Daniel Hickey is a current member of the training staff and has been an active member of Local 419, for many years. He has filed grievances on behalf of union members. Hickey joined the Training Division in July 2004 and has been

assigned to the Training Division since then, with a six-month hiatus where he was assigned to ICE[1] transportation. He has been involved in all aspects of union representation for correction officers at the Suffolk County House of Correction.

46.     Since 2003, Sheriff Cabral has terminated a number of employees, custody and non-custody, for filing false reports, including: Derren Brown, George Flaherty, Glenn Brewington and Bob O'Rourke.

47.     During her tenure, Sheriff Cabral has promoted or upgraded numerous staff members, both custody and non-custody, with strong union affiliation including office holders, stewards, bargaining unit members. Below is a partial list:

| | | | |
|---|---|---|---|
| a. | Michael Powers | Local 419, President | Captain - 6/17/04 |
| b. | John Sullivan | Local 419, President | Captain – 6/17/04 |
| c. | Chris McCray | Local 419, President | Sergeant – 4/22/05 |
| d. | Chris McCray | Local 419, President | Lieutenant – 5/7/07 |
| e. | Sean Ross | Local 419, Vice Pres. | Sergeant - 8/19/04 |
| f. | Sean Ross | Local 419, Vice – Pres. | Lieutenant – 1/21/05 |
| g. | Jason McGrane | Bargaining Committee, 419 | Lieutenant – 12/24/03 |
| h. | William Dowd | Local 419, President | Lieutenant - 1/21/05 |
| i. | John Grennon | JOEASC, President | Lieutenant – 1/3/07 |
| j. | Robert Tullos | JOEASC, Vice Pres. | Lieutenant – 1/3/07 |
| k. | Michael Walsh | JOEASC, President | Lieutenant 1/3/07 |
| l. | Daniel Griffin | Bargaining Committee 419 | Corporal – 10/8/05 |
| m. | Charles Gillen | President, Local 298 | Upgraded – 4/1/06 |
| n. | William Sweeney | President, Local 285 | Dir. Pers. Admin.- 1/8/05 |
| o. | Kevin Boderick | Bargaining Comm. 298 | upgraded – 4/1/06 |
| p. | Matthew O'Toole | Bargaining Comm., 298 | upgraded – 4/1/06 |
| q. | Thomas Donahue | Local 419 | Lieutenant -4/27/05 |
| r. | Chris Paige | Local 419 | Lieutenant - 12/24/03 |

48.     I am familiar with the two letters and a press release authored and disseminated by John Ellis, John Barnes and John Grennon in March/April 2004.  Subsequent to the publication and mailing of those documents there was a noticeable increase in the level of anxiety and tension in the Department among officers and staff, particularly at the NSJ.  That anxiety was alleviated somewhat after Sheriff Cabral addressed Roll Call for all three shifts and distributed a memorandum correcting the misinformation.

49.     John Barnes was sworn in as a Deputy Sheriff on or about May 2, 2007.  At the time that Mr. Barnes was sworn in he was the Grievance Administrator and Chief Steward for JOEASC.

50.     Erik Dilibero did not receive a passing score on the Lieutenant's exam that was given in February 2006 and therefore was not eligible for permanent promotion to Lieutenant.  David Bergeron received a passing score on the Lieutenant's exam but

---

[1] ICE refers to Immigration Custom Enforcement. The Sheriff's Department holds ICE detainees at the House of Correction.

did not score high enough in the other categories to be promoted within the parameters of the established promotional formula.

Signed under the pains and penalties of perjury this 13th day of August, 2007

/s/Michael J. Harris
Michael J. Harris, Superintendent,
Human Resources

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


------------------------------          *

JOHN GRENNON, LOREN LYNCH,              *
JOHN BARNES, DAVID BERGERON,            *
JOHN ELLIS, TIMOTHY TURLEY,             *
AL MASCONE, WILLIAM PENEAU,             *
ERIC DILIBERO AND PAUL GIGLIO
    Plaintiffs                          *CA No. 05-11661-RGS
vs.                                     *
                                        *
ANDREA CABRAL, IND. AND AS              *
SHERIFF OF SUFFOLK COUNTY               *
    Defendant                           *
------------------------------


DEPOSITION OF:  SHERIFF ANDREA CABRAL

MERRICK LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

January 22, 2007

Commenced at 10:00 a.m.




LESLIE A. D'EMILIA
Court Reporter

COPY

DUNN & GOUDREAU

Page 50

1    tell what the conversation was regarding the issue?

2  A.  I think I was greatly concerned by the allegation

3    that I had taken pension money because it implies

4    fraud or theft, and I asked specifically and

5    directly about that.  I did not, to my recollection,

6    receive any sort of justification for that

7    allegation, and I then recall going point by point

8    through the entire mailing, almost

9    sentence by sentence and saying, "You know that this

10   is inaccurate.  You know that this is false.  You

11   know that this is the issue.  This is what we

12   actually did in this case."  As I say, if I can see

13   it I can be more exacting with regard to the

14   conversation on it, but I can't remember what--all

15   of what was contained in it, but I do recall going

16   through almost literally sentence by sentence asking

17   what the evidentiary basis or factual basis for the

18   allegation was, and saying to them, "That is not

19   what happened, and you know that is not what

20   happened," and I believe the mailing--no, I'm wrong,

21   that happened afterwards so.

22  Q.  Other than Barnes, and Ellis, and Grennon, and

23   yourself being present who was there?

24          MS. CAULO:  I believe--

DUNN & GOUDREAU

Page 82

1    operational need and necessity, and that there was

2    very little scrutiny of the application, at least

3    not to the extent that we currently do it.

4  Q.  When did--when was the decision made to make the

5    position more meaningful?

6  A.  Oh, goodness.  Probably sometime in 2004 and going

7    into 2005, sort of reviewing the process and really

8    trying to figure out how we wanted it to look and

9    what we wanted it to represented.

10  Q.  And who was responsible for reviewing the process?

11  A.  I essentially said to Elizabeth Keeley, and I may

12    have actually said it to Mike Harris, everything

13    that we're doing is supposed to be performance based

14    and merit based.  Not all corrections officers are

15    deputy sheriffs.  That is a designation beyond that

16    of correction officer.  It should be--it should have

17    some meaning, and to the extent that we can make it

18    more performanced based, more reflective of the good

19    work or good character or whatever you want to call

20    it, good comportment of the officer, we should do

21    that, and they went off and I think began to try to

22    figure out ways to do it.

23  Q.  Who was they?

24  A.  At the time I didn't know who the group was.  I

DUNN & GOUDREAU

1    think I subsequently learned that it was the

2    superintendents and Mike Harris, I think, and

3    Elizabeth Keeley.

4  Q.  When did you learn that?

5  A.  Oh, I don't know when during the process.  It was

6       just--I know that they were trying to come up with

7       some consensus around those things, and I knew that

8       those were the people that were trying to do it.

9  Q.  Did either Keeley or Harris tell you that they were

10      going to form a group to review the deputy sheriff

11      process?

12  A.  No.

13  Q.  Did you ever tell Keeley or Harris to form a group

14      to review the deputy process, deputy sheriff

15      process?

16  A.  My recollection is that I tasked Elizabeth Keeley

17      with wanting to change how we did handle the deputy

18      sheriff situation.

19  Q.  Okay.  Did you give her any criteria that she was to

20      use in changing the deputy sheriff process?

21  A.  No.  Beyond my view that it was another mechanism

22      for us to reflect the best face of the department;

23      that these were the people who were out in public,

24      and that our choice--our choice to put them in that

Page 112

1    them, "How are you defining comportment?  How do you

2    see comportment?"  But I trust that they understand

3    how an officer should behave and conduct themselves,

4    and how that should be done in a professional manner

5    and one that's not deleterious or detracts from

6    either the mission of the department or the morale

7    of its employees, and I trust that they understand

8    that without it having to be--without being

9    cross examined by me on it.

10  Q.  So you had no role, then, in telling your

11      superintendents that, "This was the type of

12      comportment I'm looking for in the position of

13      deputy sheriff"?  You just left it to them to

14      determine whether or not an individual had the

15      appropriate characteristics to become deputy

16      sheriff; is that right?

17              MS. CAULO:  Objection.

18  A.  What I said in my earlier response was I made it

19      clear that I wanted the position of deputy sheriff

20      to reflect the best that the department had to

21      offer.  That I wanted it to be as reflective of a

22      merit based and performance based system as we had

23      made many other things in the department, and that

24      part of that was deputy sheriffs are the most public

DUNN & GOUDREAU

Page 113

1     face of the department aside from some of our

2     other--the officers involved in our outreach

3     program; that the way that they approach their job,

4     their attitude toward their job, the way that they

5     behave both to their fellow officers and all of

6     that, to inmates, the way they behave towards

7     command staff, those things I made it clear I

8     thought were part of what I thought should be

9     considered for deputy sheriffship.  I couldn't tell

10    you now exactly the words that I used.  I have

11    absolutely no idea.  I feel comfortable that I

12    conveyed that to Elizabeth Keeley initially and said

13    that that was one of the things I wanted to

14    consider.

15  Q.  Did Elizabeth Keeley convey to you the fact that the

16    deputy sheriffs had told her that, "We think this is

17    the definition of comportment"?

18            MS. CAULO:  Objection.

19  A.  What deputy sheriffs?

20  Q.  Any of the--okay.  Did Elizabeth Keeley ever come to

21    you and say, "I've had a discussion with the deputy

22    sheriffs"--I'm sorry, with the superintendents?

23    "I've had a discussion with them, and I've conveyed

24    to them what you've told me about the imagine of

DUNN & GOUDREAU

Page 124

1    I'm the Sheriff of the institution.  I simply say to

2    my Chief of Staff, "Let's make this position more

3    meaningful and more consonant with the other merit

4    based and performance based reforms and changes

5    we've made in the department."  These are people who

6    had been working with me since I came in 2002.  In

7    my view they understand what that means to me

8    because of the number of other areas in which I've

9    implemented certain kinds of standards.  Talk of

10   standards is pretty much constant in various areas

11   in everything that we do.  I don't--I didn't have

12   these kinds of conversations with them where I'm

13   quoting chapter and verse, nor am I putting out to

14   them a list of criteria.  I trust that they

15   understand that I'm trying to get at a larger goal

16   here of changing an environment and a culture, and

17   that part of that is bringing good people forward,

18   and part of that is identifying good people and

19   putting them in places such as the public face of

20   the department.  That's what I'm trying to get at.

21   So I have--while I have a macro view, you're asking

22   me a series of micro questions that just aren't

23   relevant to my level of involvement with this.

24  Q.  When you decided to make the deputy sheriff's

DUNN & GOUDREAU

Page 125

1    position more meaningful, did it mean making more

2    appointments to the position of deputy sheriff, or

3    did you also mean potentially decommissioning

4    individuals from the position of deputy sheriff?

5        MS. CAULO:  Objection.

6  A.  I don't--those two things don't have anything to do

7    with one another.  Making the position more

8    meaningful is making the position more meaningful in

9    and of itself.  The impact of that is whatever it

10    is.  Whether there were more people who are properly

11    eligible to be commissioned, or people as a result

12    of whatever reason are decommissioned.  They're two

13    completely separate things.

14  Q.  So when you talked about this with Keeley then, then

15    the criteria being used was not simply for the

16    appointment process of deputy sheriff, but it could

17    also be used for the decommissioning of deputy

18    sheriffs?

19  A.  Any time you're looking at eligibility criteria,

20    there can be at any point in time people who meet

21    that general criteria, and people who don't.  People

22    who at one point met it, but then fall below

23    the--anything is possible in that.  This was not--I

24    just answered.  I didn't look at those things as

DUNN & GOUDREAU

Page 139

1    know that it was before--I assume some of it was

2    before I was Sheriff because he clearly by the time

3    I was there was a temporary lieutenant and some of

4    it was during my term as Sheriff; that as a rank and

5    file officer he was not a particular good officer.

6    When he became sergeant it was very difficult for

7    him to comply with the duties and responsibilities

8    of a sergeant.  When he was made a temporary

9    lieutenant there was some resentment because of the

10   way he had moved up in the ranks versus people who

11   had been there much longer and who exhibited a

12   better work ethic, and he was ineffective as a

13   lieutenant because he had been such a poor rank and

14   file officer and such a poor sergeant that as a

15   lieutenant on the occasions when he would exert some

16   supervisory control, the response to him was, "Why

17   should we"--basically, "Why should we do anything

18   you ask us to do?  You didn't do anything when you

19   were a sergeant, and you didn't do anything when you

20   were a blue shirt."  On the occasions when I saw

21   him, I can't recall a time when Lieutenant Dilibero

22   actually addressed me in any sort of a greeting.  He

23   always seemed to me to be somewhat disheveled in

24   appearance as opposed to the other lieutenants who

DUNN & GOUDREAU

Page 140

```
 1      seemed pretty well put together.  His shirt would
 2      always sort of be hanging out a little bit.  It
 3      just--you know, just a little bit off with regard to
 4      appearance, and I didn't believe that he was someone
 5      that I wanted to be the public face of the
 6      department, so I believe I added his name.
 7   Q.  Did you add any other names besides Dilibero?
 8   A.  I don't think I did.
 9   Q.  What information did you get with respect to
10      Paul Giglio?
11   A.  It was just a recommendation that he be
12      decommissioned.
13   Q.  Any interaction with him on a personal basis that
14      you can recall?
15   A.  Not that I can recall.
16   Q.  William Peneau?
17   A.  I do recall a disciplinary issue with Peneau not
18      told to me in the context of the decommissioning,
19      but I was aware of it at the time that it happened.
20      All I know is that it was--it was something that
21      Superintendent Sumpter was involved in, but beyond
22      that no.
23   Q.  Timothy Turley?
24   A.  I recall a disciplinary incident with Timothy Turley
```

DUNN & GOUDREAU

Page 141

1    that to the best of memory involved him alleging

2    that an inmate had kicked or had done something

3    violent when, in fact, that hadn't happened.  There

4    was some issue between him and this inmate, and he

5    was to the best of my recollection attempting to

6    implicate this inmate in some bad behavior.

7  Q.  Who told you this?

8  A.  I may have had a conversation with

9    Superintendent Sumpter.  I may have had a

10    conversation with Viktor Theiss about it.

11  Q.  The names on the list, did any of the

12    superintendents or Chief of Staff Keeley tell you

13    why the names were on the list?

14  A.  I don't believe so.  You mean aside from the people

15    that for one reason or another I may have made an

16    inquiry about?

17  Q.  Right.

18  A.  Yeah.

19  Q.  Did you make an inquiry about Turley?

20  A.  I don't believe so, no.

21  Q.  Peneau?

22  A.  I don't think so.

23  Q.  Dilibero?

24  A.  No.  I put him on.  I knew why that.

DUNN & GOUDREAU

37 (Pages 145 to 148)

Page 145

1  he spoke to Captain Mascone. He may have. I
2  actually didn't ask him whether or not he spoke to
3  Captain Mascone, but if he didn't, I would likely
4  chalk that up to him making some decisions about
5  what he was going to confront and what he wasn't
6  going to confront given the overall changes to the
7  transportation department and his other
8  responsibilities.
9  Q. Did you ever order an investigation into the alleged
10  comments?
11  A. No.
12  Q. Do you know if any other superintendents ever
13  ordered an investigation into this?
14  A. I don't know.
15  Q. And this was information you were given with respect
16  to the list as opposed to inquiring about it; is
17  that right?
18  A. No, no. This--I had heard about this well before
19  this list, and I think that beyond--I mean, the
20  comment, it was told me to as it was a comment that
21  was inappropriate, but I think actually given what,
22  you know, you go through depending on who you are in
23  that department on a daily basis, the thing that was
24  of far more concern to Superintendent Sumpter

Page 146

1  was--were the problems with the transportation
2  division, and how it wasn't running as efficiently
3  as it could have, and Captain Mascone's failure to
4  kind of embrace the idea of better changes to the
5  department that he just--he just wasn't--it wasn't
6  something that he wanted to really be a part of
7  that was apparent.
8  Q. John Ellis? Did you make any inquires as to why he
9  was on the list?
10  A. No. I--if John Ellis hadn't been on the list, I'm
11  sure that I would have suggested that he be on the
12  list.
13  Q. Why is that?
14  A. For the reasons that I stated to you earlier. I
15  don't believe that any of his behavior, particularly
16  around the issue of the mailing, and I will say that
17  I did not consider that to be protected union speech
18  because it was false, and it was sort of almost a
19  level of cowardness shown by him I think in when it
20  was time to have a meeting, if you believed that
21  what you sent out to the public is true, and you
22  believe that you can defend it, come to a meeting
23  and have a discussion about it. He avoided that
24  first meeting, and then would only have the

Page 147

1  third--the special meeting I had to have with him if
2  I assured him that there would be no discipline.
3  That indicates to me that you're worried that you
4  may have done something wrong, and you may have
5  broken a rule, something that you could be
6  disciplined for.
7  Q. Did you have that meeting with him?
8  A. I did. I subsequently had--I had to have a separate
9  meeting with Ellis from the one I had with Barnes
10  and Grennon because Ellis refused to come to the
11  first meeting.
12  Q. How long after the meeting with Grennon and Barnes
13  did you have it with Ellis?
14  A. Oh, I don't remember. It wasn't a very long time.
15  Q. What was discussed there at that meeting?
16  A. The same things that I discussed with Barnes and
17  Grennon about the mailing.
18  Q. And what did Ellis tell you about the mailing?
19  A. There wasn't much distinction between what he said
20  and what the other two had said. He at one point
21  kept sort of trying to defend what was in letter,
22  but we kept reaching the point where I would say to
23  him, "What is the basis, what is the factual basis
24  for this allegation?" And there wasn't a whole lot

Page 148

1  that he could say. Sometimes he would say, "You
2  know, well we just disagree." And I said, "It's
3  fine to disagree, but there should be a basis for
4  your opinion, one that's defensible." Towards the
5  end of the conversation I think kind of shifted to
6  other things, but that was essentially the
7  conversation with him, and I just think that apart
8  from the recommendation of the superintendents,
9  which I would have followed in any event, my
10  personal interaction with Ellis indicated to me that
11  he was not a person that I wanted to be a deputy
12  sheriff.
13  Q. Other than that one-on-one meeting--was it a
14  one-on-one meeting that you had with Ellis, by the
15  way?
16  A. Yes.
17  Q. Other than that one-on-one meeting, what was your
18  personal interaction with him?
19  A. I believe that it was John Ellis around the separate
20  issue of the veteran's benefits, and this came as a
21  result of a press conference that was held at the
22  Statehouse. There were officers at the press
23  conference. I believe that the press conference was
24  actually put together by John Ellis, at least that

DUNN & GOUDREAU

Page 151

1   A.  No, I don't believe anybody mentioned.  The name was

2       just on the list.  I don't think anybody talked

3       about why.

4   Q.  What about with respect to Lorne Lynch, anybody make

5       a recommendation to you orally other than presenting

6       the list to you?

7   A.  No.

8   Q.  Did you have an opinion about Lorne Lynch, whether

9       or not he should be a deputy sheriff?

10  A.  I was aware that at some point, and I think it

11      preceded my coming on board, and I think--I'm not

12      sure if it was when he was a lieutenant or before he

13      was a lieutenant, that Lorne Lynch had wanted to

14      be--or perhaps at some point was in SID, but had

15      wanted a different position in SID, and it

16      ultimately turned out to be a position that another

17      investigator named Steve Scanlon had assigned to

18      the--to a Boston PD task force; that he was not

19      happy from that point on that he had not been given

20      that particular position or assignment.  My own

21      observations of Lieutenant Lynch were that he seemed

22      eternally disgruntled; that he was always unhappy,

23      and I regretted that because I thought he was very

24      smart, and I thought that there was enormous

DUNN & GOUDREAU

Page 152

1    potential for him in the department, but that all I

2    ever heard about Lorne Lynch was that he was

3    constantly sort of spreading this sort of

4    negativity, and it's not--I'm not talking about

5    being sensitive to criticism.  I--we have officers

6    that send things to me, to the Chief of Staff that

7    are constructive, constructively critical about the

8    way that we're doing certain things, and we listen

9    to those things.  In the last promotional process

10   lieutenants came up with a number of things that are

11   great ideas for the improvement of the department,

12   and we accept those.  This is different.  This is

13   isn't constructive criticism.  It's not criticism in

14   the context of an overall positive contribution to

15   the department.  It is incessantly negative.  It is

16   incessantly disgruntled, and it contributes to a

17   feeling that has an impact on all of the officers.

18   I cannot tell you how many times I walked through

19   the jail or on my way to where ever or the house,

20   and I am approached--well let's talk about the jail

21   because these are jail officers.  On the elevator

22   and stairwells on my way outside, standing outside I

23   am approached by officers who say to me whatever the

24   latest thing is that's being--that people are

DUNN & GOUDREAU

39 (Pages 153 to 156)

Page 153

1 disgruntled about, whatever the latest complaint is,
2 and sometimes it will specifically involve an
3 officer, they will say, "We're not--I just want you
4 to know that that's not--that doesn't represent me.
5 That's not how I feel about it. I don't know what
6 these guys are doing," and I respond the same way
7 all the time. "If you're paying union dues, and
8 you're not being representatives, it's incumbent
9 upon you to step up. I can't keep fighting for
10 people who aren't going to fight for themselves." I
11 think that they are afraid to. I think that what
12 you get in retaliation when you do speak out is
13 tremendous in this environment. I think it's
14 diminished, but I think it's still considerable for
15 people, and what I hear from them is it's not worth
16 it to go to the union meetings. It is not worth it
17 to try to fight back because they just shoot you
18 down even when you know you're right, even when you
19 know that things are going well, and Lorne Lynch was
20 part of that.
21 Q. Who told you that?
22 A. From my own personal observation, and from what I
23 heard from Superintendent Sumpter. Certainly that
24 was the Chief of Staff's interaction with him. It's

Page 154

1 well--it's not even something that's not well-known.
2 I mean, if you were to ask other officers, other
3 rank and file officers they would tell you the same
4 thing. I think other supervisors would tell you the
5 same thing, and it does bother me because I think
6 this is a smart, capable man, who for some reason,
7 whether it's me or Rouse or whoever, it doesn't make
8 a difference who the Sheriff is, there's always
9 going to be a problem, and that's just an enormous
10 waste. I don't understand why someone like that
11 would stay in the department.
12 Q. John Barnes, his name was on the list.
13 A. Yep.
14 Q. Did anybody offer any of their oral input with
15 respect to his name being on the list?
16 A. No.
17 Q. Did you have an opinion as to whether or not his
18 name should be on the list?
19 A. Oh, I believe that John Barnes' name should be on
20 the list. I actually think that John Barnes is a
21 far better person than he has strength to be most of
22 the time. I've had some interactions with
23 John Barnes that have been positive, or I've seen
24 things in him that indicate to me that he has much

Page 155

1 more potential than he allows himself to realize. I
2 think that he is influenced easily, and I certainly
3 saw that in the meeting with Grennon and Barnes.
4 Q. But yet you decommissioned him?
5 A. Absolutely.
6 Q. Why?
7 A. Because the bottom line is that it doesn't make a
8 difference whether or not you failed yourself and
9 your department because of a weakness in character
10 or because you did it proactively. You did it, and
11 you're as responsible for that as if you had been
12 one of drivers of it, and I say what I say about
13 John Barnes because at some point in the meeting
14 with him and John Grennon, John Barnes became, at
15 least to my observations, visibly upset, and at one
16 point as I was saying to him, "I don't understand
17 how you could do something like this," and sort of
18 going through chapter and verse and pointing it out,
19 I observed a visceral reaction from John Barnes that
20 indicated to me that on some level I think he
21 regretted that he had done it. It didn't change the
22 fact that he continued to kind of do this kind of
23 stuff and buy into it, but I at least saw something
24 in him that indicated that he wasn't completely

Page 156

1 unaware of the impact that his behavior had had, but
2 I still think that it spoke volumes about his
3 character and that of Grennon and Barnes, that they
4 ever would have engaged in something like this.
5 Q. Something like this being the mailings; is that what
6 you're talking about?
7 A. What the--not the mailings. The mailing itself is a
8 problem. The fact that they decided to mail it to
9 voters in advance of an election is just--just
10 strikes me as wrong. If it were true, they'd have
11 completely within their rights to do it. Everyone
12 is entitled to their opinion. They're entitled to
13 support whoever they want to support. I don't care
14 about that. This was a lie, and it wasn't just a
15 lie that hurt the Sheriff. It was a lie that hurt
16 the department, and that was done on the heels of
17 one of most traumatic periods in the department's
18 history. They didn't care about that. They didn't
19 care about how it affected the individual members of
20 the body. They cared about whatever it was in their
21 agenda to get accomplished, and I have a problem
22 with that.
23 Q. What else besides the mailing would attribute to
24 what you described as weakness in character?

DUNN & GOUDREAU

40 (Pages 157 to 160)

Page 157

1  A. It wasn't just the mailing itself. The mailing was
2  sort of a written culmination of all it.
3  Q. What was--
4  A. It was also what was being communicated to the body
5  of JOEASC with regard to all of these issues. That
6  there was this insistence on not giving the body the
7  truth around these issues so that they could
8  maintain a certain level of discontent, and that was
9  wrong as well. That doesn't serve the body any more
10  than it serves me as the Sheriff of the department,
11  and I think what I'm trying--was bothered by most
12  was that all things were secondary to whatever it is
13  that they were trying to accomplish at that time,
14  what these three individuals were trying to
15  accomplish at that time. So this isn't about
16  weakness of character. It's about lack of
17  character. I'm saying my impression of John Barnes
18  is that he could be better; that he actually has it
19  in him to be better than he actually is, but he
20  chooses, for whatever reason, not to do that.
21  Q. Is there anything else about John Barnes you wish to
22  add with respect to why he should not be a deputy
23  sheriff?
24  A. No.

Page 158

1  Q. Dave Bergeron? Was there any oral recommendation
2  given to you at the time the list was presented to
3  you as to why Bergeron should be decommissioned?
4  A. I don't believe so, no.
5  Q. Did you have an opinion about Bergeron prior to the
6  list being presented to you?
7  A. I did.
8  Q. That opinion was based on what?
9  A. That opinion was based on my personal interaction
10  with Dave Bergeron.
11  Q. Are you talking about one particular incident?
12  A. I'm talking about there--one particular
13  conversation, but any time that I were to see
14  Sergeant Bergeron in the jail, there is just an
15  utter lack of respect. There's no acknowledgment.
16  There's no--there's nothing, and it's obvious, and
17  it's meant to be obvious.
18  Q. How do you mean by that? I'm talking about in the
19  jail now, not any incident that took place outside
20  of the jail.
21  A. Well, ordinarily when the Sheriff is walking
22  through--in fact, when any command staff person is
23  walking through, one would expect in a paramilitary
24  organization that there would be some acknowledgment

Page 159

1  of the presence of a supervisor or a superior,
2  whether you like them or not. I'm sure there were
3  tons of rank and file officers that are not overly
4  thrilled with sergeants, but that you make an
5  acknowledgment, "Hello Sheriff. Hello Officer
6  Bergeron," whatever it might be. That never
7  happened.
8  Q. Are you saying that he never acknowledged you by
9  greeting you, or that you never acknowledged him by
10  greeting him?
11  A. No, no. I'm saying that Officer Bergeron to my
12  observation in what I perceive to be an intentional
13  show of disrespect did not acknowledge me. This was
14  not inadvertent, and it wasn't just me that he
15  didn't acknowledge. I think that that also happened
16  to the Chief of Staff.
17  Q. How do you know that?
18  A. I believe that that's what also happened with the
19  Chief of Staff. Obviously from a conversation I may
20  have had with her about it, but that's my memory of
21  it.
22  Q. I don't know how you would learn that information,
23  so you'll have to forgive me for asking you the
24  question as to how you would because I'm not clear

Page 160

1  how you would. You're telling me you had a
2  conversation with Chief of Staff Keeley that
3  Bergeron was disrespectful to her?
4      MS. CAULO: Objection.
5  A. My memory is that it wasn't--that it was also the
6  Chief of Staff that would get sort of the same
7  reaction, and I can only assume that I had
8  information from the person themselves. That's my
9  memory of it, but notwithstanding that, that was
10  certainly the case with me, and I had an interaction
11  with Mr. Bergeron that was probably one of the most
12  public displays of disrespect to the Office of
13  Sheriff that I think I've experienced since I've
14  been Sheriff.
15  Q. Being disrespect--or getting back to incidents
16  inside the jail, being disrespectful is a violation
17  of policy, isn't it?
18  A. Certainly. I think it's being insubordinate is a
19  violation of policy.
20  Q. Being disrespectful would be--are you saying that
21  being disrespectful is being insubordinate?
22  A. I certainly think that it can be in the context of
23  this discussion primarily because it was done in the
24  context of a political election I didn't discipline

DUNN & GOUDREAU

Page 168

1  Q.  (Mr. Pfaff) Have you exhausted your recollection

2      regarding--

3  A.  Right now, yes.

4  Q.  Thank you.  John Grennon?  John Grennon's name was

5      on the list?

6  A.  Yes.

7  Q.  Was there a recommendation, oral recommendation from

8      anybody?

9  A.  Not to my recollection, no.

10 Q.  And it was your opinion that he should be on it?

11 A.  Right.

12 Q.  Why?

13 A.  For all of the reasons that I've stated previously

14     with regard to Officers Ellis and Barnes, but also

15     there was John Grennon's reaction from being removed

16     from the training department, that troubled me.  It

17     also troubled me that in particular with regard to

18     him we would do the CO graduations, and he

19     would--the period in which he was the training

20     officer.  He would MC the CO graduations, and he

21     would stand in front of this audience of the officer

22     candidates and family and friends of officer

23     candidates and extol the virtues of the department

24     in the most glowing terms.  There is no way that a

DUNN & GOUDREAU

43 (Pages 169 to 172)

Page 169

1  person who actually believed what they were saying
2  to those people about this administration and its
3  progress and how wonderful it was could do and
4  engage in some of the behavior that John Grennon was
5  engaging in. John Grennon is an extremely bright
6  man. Even if somehow the facts were confusing to
7  other people, I refuse to believe that they were
8  ever confusing to John Grennon. I think he
9  absolutely knew what--
10 Q. Why--I'm sorry, go ahead.
11 A. And that is part and parcel of my impression of
12 John Grennon along with the things that I spoke to
13 you about on my answer with regard to Ellis and
14 Barnes.
15 Q. You testified that there's no reason, or you don't
16 know what the reason is why somebody could extol
17 your virtues during an academy presentation, but
18 then do other actions that you found offensive?
19 A. No, that's not what I said.
20 Q. Okay.
21 A. It is--it would have to be hypocrisy almost beyond
22 description to be able to stand and say the things
23 that he was saying about the Sheriff and the
24 administration, but to believe simultaneously that

Page 170

1  that same Sheriff could steal pension money; that
2  she could deny veterans, where her own father is an
3  Army veteran and her own brother is a career
4  Air Force person, could deny veteran's benefits to
5  people who worked, employees who worked in the
6  department; that she could create a fiscal mess of
7  the department after promising--and this is
8  something I also never said, but apparently was in
9  that mailing, promise to clean the mess up, but it
10 would, you know, create a fiscal mess; that she
11 would deny benefits, dental and vision benefits to
12 employees. The two things are antithetical to one
13 another, and they go beyond a simple difference of
14 opinion. They have to do with the person themselves
15 and what they're capable, the two sides of
16 themselves that they're capable of showing, and I
17 took that into consideration with regard to
18 John Grennon as well.
19 Q. Doesn't the praise that John would give to you
20 during academy training or graduation and then how
21 he would, my term, fight you with respect to issues
22 germane to the union, you can't separate those?
23       MS. CAULO: Objection.
24 A. I certainly can separate those if that's actually

Page 171

1  what's going on. That's not what was going on. I
2  was a prosecutor for 16 years. I know exactly when
3  a legitimate and credible fight is, a difference
4  of--I mean that's all you do when you're a lawyer.
5  I know what a legitimate difference of opinion and
6  legitimate fight is. That is not what this was.
7  Q. What was it?
8  A. These were essentially the two possible sides of
9  John Grennon. There was--what you see of
10 John Grennon is what John Grennon wants you to see
11 at that time depending upon the circumstances, and
12 you know what, if you genuinely believe that your
13 Sheriff is capable of political retaliation or theft
14 of pension money or whatever it might be, and that's
15 what you actually believe based on credible
16 evidence, and you stick with that position, and you
17 fight with that, that's fine, but you can't believe
18 both things. You cannot believe--and these were not
19 legitimate union fights because to this day I don't
20 think that John Grennon could point to where I was
21 denying veterans their benefits or where my delay of
22 the pension payments was theft of that money or
23 appropriation of that money. He can't point to
24 those things. My issue is if what you're saying,

Page 172

1  what you're fighting for on the one hand is based on
2  a lie, but you then turn to a different group of
3  people and say things that are directly opposite of
4  that, that's not a legitimate fight. That's not my
5  inability to draw a distinction between the two
6  things. That's something very different with regard
7  to John Grennon. In fact, if he truly believed the
8  things, I would think, he would have allowed
9  somebody else to MC. That actually to me would be
10 the honorable thing to do is to say, "You know what,
11 I like what's going on in training, that we're
12 getting some things done, but there are a number of
13 other issues, and I have other people that I have to
14 look out for here, and I don't want to be the person
15 who's in the position to do this." You have
16 to--it's one of those situations where you had to
17 actually be there because I wasn't the only one that
18 noticed it. I think most of the command staff would
19 listen to him and then come back and we'd see all of
20 this other stuff. You'd have a conversation where
21 it's very clear that you're laying out facts that
22 either the person can defend or they can't, and it
23 would sort of be, "Well it doesn't really matter. I
24 have another goal in mind here, and I'm going to do

DUNN & GOUDREAU

Page 180

1   Q.  You wouldn't--typically--strike that.  Should one's

2       political affiliation or union activity be a reason

3       for a change in the shift?

4   A.  No.

5   Q.  Was John Grennon transferred out of training because

6       of his political affiliation or union activity?

7   A.  No.

8   Q.  Why was John Grennon transferred out of training?

9   A.  I didn't believe that John Grennon was appropriate

10      to be training our officer candidates given what I

11      observed of him, his interaction at the graduations

12      versus how he apparently really felt about the

13      sheriff's department, and I don't know how you can

14      imbue young officers with a sense of the mission and

15      goals of the department and train them to be good

16      officers when, in fact, you don't actually see it

17      that way.

18   Q.  But you do know if, in fact, he was telling officers

19      or making disparaging comments about you or your

20      policies?

21   A.  I don't know whether or not he was doing that with

22      recruit candidates.  I heard frequently from

23      Marty Michelman that he was a problem.

24   Q.  What did you hear?

DUNN & GOUDREAU

Page 181

1   A.   In fact, the first negative thing I ever heard about

2        John Grennon was from Marty Michelman.

3   Q.   What was it?

4   A.   Right now all I can remember is that whenever I

5        would have a conversation with Marty Michelman he

6        would complain about John Grennon.

7   Q.   About what?

8   A.   John Grennon was doing union business on company

9        time.  John Grennon was--he didn't know how to deal

10       with him.  He didn't know how to manage him.  John

11       has a very strong personality.  And so what--all I

12       can remember consistently, and I know I wasn't the

13       only person that said this, I was consistently

14       saying to Marty on the rare occasions when I saw him

15       and Grennon's name would come up on pretty much

16       every occasion I saw him was, "You are a manager,

17       and you have a conversation with the person if

18       you've got a problem with him.  If the problem

19       persist you document it, and you take some remedial

20       action.  If you can't do that, then you can't

21       manage," and it was a major challenge to create--to

22       turn Marty into some sort of a manager, but he

23       complained most consistently about John Grennon, and

24       his behavior in the training, among training staff.

DUNN & GOUDREAU

| Chapter III | Policy #: | References: | |
|---|---|---|---|
| **Institutional Operations** | S516 | MGL c. 37 § 1-25 | Page 1 of 2 |
| Security and Control | Date of Issue: | Approved: | |
| **Deputy Sheriff Appointments** | May 2003 | | |
| | Date: May 1, 2004 | Andrea J. Cabral, Sheriff | |

## Purpose

To establish Suffolk County Sheriff's Department (SCSD) policy and procedures for the privilege of appointment as Deputy Sheriffs and the power and duties vested by operation of law.

## Cancellation

This policy cancels all previous Sheriff's Department policy statements, bulletins, directives, orders, notices, rules or regulations regarding Deputy Sheriff appointments and related duties, which are inconsistent with this policy.

## Definitions

*Sheriff* – The chief law enforcement and administrative officer of the Suffolk County Sheriff's Department elected by the citizens of Suffolk County.

*Office of Employee Relations* – Responsible for the management and approval process for Deputy Sheriff appointments.

*Deputy Sheriff* – A person duly appointed by the Sheriff pursuant to M.G.L. Chapter 37, Section 3.

**EXHIBIT**
Lynch
Ce
10-6-06   cw

## Policy Statements

I.   The Sheriff may appoint as many deputies as she believes are needed to execute the duties of her office.

II.  The Sheriff shall be responsible for the official acts of her deputies to the amount of his/her bond.

III. A Deputy Sheriff holds this status at the will of the Sheriff, who may revoke such appointment at any time and for any reason.

IV.  Any power and duty being exercised, not within the scope of employment, or any misrepresentation of the powers and duties of a Deputy Sheriff shall be grounds for disciplinary action up to and including termination and possible prosecution.

V.   The Sheriff, Chief of Staff and Director of Employee Relations shall be responsible for implementing and monitoring this policy.

S516 Deputy Sheriff Appointments

## Procedures

### A. Suffolk County Sheriff's Department Deputy Sheriff

1. An employee of the Suffolk County Sheriff's Department who may be required to perform the duties of a Deputy Sheriff may submit an application for the privilege of appointment to the Director of Employee Relations.
2. The employee shall be notified by the Director of Employee Relations when their application has been approved.
3. The Sheriff's Department employee shall be officially appointed and sworn in as a Deputy Sheriff.
4. The Director of Employee Relations will establish and maintain an active list of those employees who are sworn deputy sheriffs.

### B. Deputy Sheriffs – University/Law Enforcement Agency

1. The Sheriff may consider the appointment of University/Law Enforcement Agency personnel as Suffolk County Deputy Sheriffs providing the following:
   a. The applicant is employed by a Law Enforcement or investigatory agency located within the Commonwealth of Massachusetts and is a bonafide law enforcement agent.
   b. The Agency Head will submit a request for each candidate for such an appointment.
   c. The Agency Head will submit to the Director of Employee Relations an Application for University/Law Enforcement Agency Deputy Sheriff.
   d. Upon the Sheriff's review and acceptance of the application, the candidate will be officially appointed and sworn-in as a Deputy Sheriff.

## Severability Clause

If any article, section, subsection, sentence, clause or phrase of these regulations is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Sheriff, or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of these regulations.



Volume: I
Pages: 1-122

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

     Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

     Defendant

DEPOSITION OF:  ELIZABETH KEELEY

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 6, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

David Bergeron, et al. vs. Andrea Cabral, Individually and as Sheriff of Suffolk County
Elizabeth Keeley                                                                April 6, 2006

| Page 38 |
|---|
| 1  Ms. Keeley, can you identify any other names that were |
| 2  part of the -- and I'm just using a general phrase -- of |
| 3  the undercurrent at the jail that you've identified? |
| 4  A.  Any other names that -- |
| 5  Q.  Let's start with the list of ten in front of you. |
| 6  Any other names that you can identify? |
| 7  A.  On this list? |
| 8  Q.  On that.  Correct. |
| 9  A.  That were what? |
| 10  Q.  That were part of this undercurrent that caused you |
| 11  to spend an extraordinary amount of time and effort and |
| 12  that were part of this undercurrent that did not forward |
| 13  the mission of the sheriff. |
| 14  A.  Well, Mr. Lynch. |
| 15  Q.  Lynch.  Okay.  What about Lynch made him part of |
| 16  this undercurrent? |
| 17  A.  Mr. Lynch very candidly made it known that he really |
| 18  had no -- didn't care for me, didn't care for the sheriff. |
| 19  Q.  How do you know that? |
| 20  A.  Well, body language, the lack of acknowledgement |
| 21  when I would pass through the sally -- |
| 22  Q.  So this is -- |
| 23        MS. CAULO:  Objection.  Let Ms. Keeley |
| 24        finish her answer. |

| Page 39 |
|---|
| 1        MR. PFAFF:  No, she can't -- |
| 2        MS. CAULO:  No, objection. |
| 3        THE WITNESS:  I can't answer? |
| 4        MS. CAULO:  Steve, you asked a question, |
| 5        and she's tried to respond to it. |
| 6  Q.  (By Mr. Pfaff)  Sure.  Go ahead. |
| 7  A.  Oftentimes, I would pass through the sally port, and |
| 8  Mr. Lynch was in the central control.  And more often than |
| 9  not, he would either not look at me or if he would look at |
| 10  me, he would give me a look of, like, you know, disdain. |
| 11  There were -- |
| 12  Q.  So this is based on your personal observation, what |
| 13  you're telling me now? |
| 14  A.  What I'm telling you now. |
| 15  Q.  That's all I wanted to clarify before.  I apologize. |
| 16  A.  Yeah.  My own personal experience. |
| 17        And there was a great deal of, in my opinion, |
| 18  negativity.  And I didn't understand why someone who was |
| 19  so -- I mean, that's a very visible position.  And I |
| 20  didn't understand why he was in it and why I had to be |
| 21  subjected to standing there and having him either ignore |
| 22  me or stare me down or whatever it was he was doing.  And |
| 23  on occasion, I felt he kept me waiting to go through the |
| 24  sally port. |

| Page 40 |
|---|
| 1        And I learned that he had been moved there because |
| 2  he didn't get along with people up on the floors.  And I |
| 3  said, "Well, why are we rewarding somebody who doesn't get |
| 4  along or is disgruntled or unhappy or whatever his issues |
| 5  were, and put him in a high profile -- what is a pretty |
| 6  good position?" |
| 7  Q.  What was that position, by the way?  You said the |
| 8  sally port.  Is that -- |
| 9  A.  He's in the central control, the first floor of the |
| 10  jail.  He interacts with staff.  He sort of is in the hub |
| 11  of people coming and going. |
| 12        Just my own experience -- and he's correct in saying |
| 13  we didn't have much one-on-one interaction, but I would |
| 14  always sense the hostility, so to speak. |
| 15  Q.  Did you ever report this to anyone? |
| 16  A.  I discussed it with the superintendent and -- |
| 17  Q.  That would be Sumpter? |
| 18  A.  Sumpter, yes. |
| 19  Q.  And where did that discussion lead to, if you know? |
| 20        MS. CAULO:  Objection. |
| 21        You may answer. |
| 22  Q.  (By Mr. Pfaff)  Poor question. |
| 23        Did Sumpter conduct an investigation into your |
| 24  complaints, if you know? |

| Page 41 |
|---|
| 1  A.  No.  He said, "That's Lonny Lynch." |
| 2  Q.  That's Lonny Lynch? |
| 3  A.  Yes. |
| 4  Q.  Did Sumpter -- do you know if he ever talked with |
| 5  Lynch about -- |
| 6  A.  I don't think so. |
| 7  Q.  -- your concerns? |
| 8  A.  I don't think so. |
| 9  Q.  You don't have any memory of Sumpter coming back and |
| 10  saying, "Ms. Keeley, I spoke with Lynch about your |
| 11  concerns, and this is what's going to happen"? |
| 12  A.  No.  My recollection is he says he treats him the |
| 13  same way. |
| 14  Q.  Any other personal observations about Mr. Lynch, |
| 15  before I ask you about what people might have said to you |
| 16  about Lynch? |
| 17  A.  No. |
| 18  Q.  Okay.  What did people say to you about Lynch? |
| 19        MS. CAULO:  Clarification as to time, |
| 20        Steve, please. |
| 21  Q.  (By Mr. Pfaff)  Sure.  The time frame is when you're |
| 22  chief of staff till the time -- |
| 23  A.  Well, that's over three years. |
| 24  Q.  Right.  By the way, that's your only employment at |

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

45

```
 1   systems.  And we started with the external -- the radios
 2   used by transportation officers.  And that was the impetus
 3   to us looking to see how transportation worked.
 4   Q.    (By Mr. Pfaff)  Well, was it the review of Moscone's
 5   position or duties and responsibilities that, for lack of
 6   a better phrase, sort of diminished the positive reaction
 7   that you initially had with him?
 8         MS. CAULO:  Objection.
 9         You may answer.
10   Q.    (By Mr. Pfaff)  Or was it something else that you
11   observed or heard about him that, again for lack of a
12   better term, soured your opinion of him?
13   A.    Those are your words, not mine.
14   Q.    I just said that.  I think I qualified that.  Yep.
15   A.    Taking the review of transportation or the -- I was
16   not directly involved in it, but I was interested in it
17   because I was working with the whole radio upgrade, which
18   was a significant investment of money, over a million
19   dollars.  And I was learning through Lieutenant Charles,
20   through his role in communications, the transportation
21   teams and how they were utilized and so on.
22         And there was a review that determined that we could
23   still meet our transportation needs with fewer
24   transportation teams, which was going to help staffing at
```

David Bergeron, et al. vs. Andrea Cabral, Individually and as Sheriff of Suffolk County
Elizabeth Keeley                                                                    April 6, 2006

| Page 46 | Page 48 |
|---|---|
| 1 the jail. And that the teams also could be deployed once | 1 specifically. |
| 2 they returned from their runs in different ways than they | 2 Q. That's fine. |
| 3 had been in the past. And that also would help with | 3 Did you play a role in Moscone's transfer? |
| 4 staffing. | 4 A. No. |
| 5 And I learned that Captain Moscone was not | 5 Q. Did you have any input in it? |
| 6 supportive and/or interested in changing the way things | 6 A. No. |
| 7 were being done. And I think that my recollection was | 7 Q. Who made the decision to transfer Moscone? Was it |
| 8 that around the same time, I heard that he was being more | 8 Superintendent Sumpter? |
| 9 critical of some of the decisions that were being made by | 9 A. That would have been his responsibility. |
| 10 the superintendent and others. | 10 Q. Do you know if the sheriff had any involvement in |
| 11 Q. Do you know what union Moscone was a member of or | 11 that decision? |
| 12 a member of? | 12 A. I don't know. |
| 13 A. I don't know. Well, it's called the white shirts, | 13 Q. Anybody else on that list, ma'am? |
| 14 but I don't remember the number. It was the captains and | 14 A. On that list what? |
| 15 lieutenants at the jail and the captains at the house. | 15 Q. On the list in front of you that you can identify |
| 16 Q. Do you know if he held a rank in that union or a | 16 either through personal observation or third-party |
| 17 title? | 17 communication that were part of this undercurrent? |
| 18 A. I do know that he was involved because I actually | 18 A. Well, I do know that after -- Timothy Turley, after |
| 19 participated in one of their meetings, and he was at that | 19 a disciplinary situation -- |
| 20 meeting. I don't recall the rank that he had. | 20 Q. Were you the hearing officer for Turley's -- |
| 21 Q. When did you learn that he was being more critical | 21 A. I don't think so. |
| 22 of decisions being made by the sheriff or the department? | 22 Q. -- sheriff's level hearing? |
| 23 A. My recollection, it was in the time frame of this | 23 You weren't? No? Okay. |
| 24 review that we were making of transportation and the | 24 A. I don't think so. I don't recall, but I don't think |

| Page 47 | Page 49 |
|---|---|
| 1 staffing. And then some of the decisions that were made | 1 so. |
| 2 and were going to be implemented. And exactly that time | 2 Q. Okay. After this hearing on Turley, you became -- |
| 3 frame, I can't recall. | 3 or you observed or heard something about Turley? |
| 4 Q. How did you become aware of the criticisms? Through | 4 A. Well, I do recall that he was very unhappy. He was |
| 5 personal observation of what Moscone said or from what a | 5 grieving the discipline. And -- |
| 6 third party told you? | 6 Q. Did you -- I'm sorry, but I'm just trying to find |
| 7 A. I don't recall any direct communications from | 7 out if you observed this or you heard from a third party. |
| 8 Mr. Moscone. I recall hearing it from others. | 8 A. Well, I heard that he was grieving. And my |
| 9 Q. Who were the others? | 9 recollection is that I didn't have much contact with him, |
| 10 A. My recollection, it was Superintendent Sumpter | 10 but my memory was that he worked a control booth as a |
| 11 and/or Deputy Superintendent Carney. | 11 corporal. |
| 12 Q. What did Sumpter tell you? | 12 On one of my tours, I had the occasion to come into |
| 13 A. That -- this is not verbatim, but that the gist of | 13 his control booth. And as I would in every instance, I |
| 14 it was that Captain Moscone was not -- was not happy with | 14 identified myself and said hello. And my memory is that |
| 15 some of the changes that he saw were going to come. And | 15 he turned his back on me and didn't respond. But that |
| 16 it was basically around those. | 16 most of my information came from his being angry and upset |
| 17 Q. No specific date on which you -- | 17 with his being disciplined. |
| 18 A. I'm sorry. I can't recall. | 18 Q. And is that personal observation -- |
| 19 Q. That's fine. Same question for Carney. Or about | 19 A. No. |
| 20 Carney. | 20 Q. -- like you've -- |
| 21 A. Well, my memory was that Deputy Superintendent | 21 A. I heard. |
| 22 Carney was tasked with sort of overseeing this process, so | 22 Q. Where did you hear it from? |
| 23 my memory was that he had more direct communication and | 23 A. I don't recall. |
| 24 contact with Captain Moscone. So I don't remember | 24 Q. Anybody else among the ten plaintiffs? |

13 (Pages 46 to 49)

Virginia Dodge, RPR - Dunn & Goudreau Court Reporting

57

```
 1   Officers who take inmates out on work details, CWP crews,
 2   need to be deputized.
 3       Superintendents -- I'm not entirely sure that they
 4   need to be deputized, but given their requirements to
 5   respond 24/7 to the facility and that they're in unmarked,
 6   you know, law enforcement vehicles, traveling, they are
 7   deputized.
 8       I would say that may not be exhaustive, but it's the
 9   best --
10   Q.   It's pretty close.
11       People who didn't perform those functions who were
12   deputized, was that kind of a perk for them, given to them
13   by the sheriff?
14           MS. CAULO:  Objection.
15           You may answer.
16   A.   When we started, we redeputized everyone.  And at
17   that time, did not know how many people were deputy
18   sheriffs, why they were deputy sheriffs, but came to
19   understand that under the previous administration, Sheriff
20   Rouse was or did allow individuals who did not need to be
21   deputized in order to perform their job functions to
22   become deputy sheriffs.
23       So since that time, we have changed -- we have
24   developed a policy, and we've developed a practice of
```

DUNN & GOUDREAU

59

```
 1            MS. CAULO:  Objection.
 2   A.  *  What we did initially -- and were in the process of
 3   doing on an ongoing basis, but what we did initially is we
 4   redeputized everybody.  And then there was a period of
 5   time in which there was applications for people who wanted
 6   to be deputized who had never been deputized.
 7            And if they were an officer at that time in good
 8   standing, meaning they had no discipline, no serious MAP
 9   violations, they had their supervisor and the
10   superintendent of the facility where they worked sign off
11   on their application.
12            We were deputizing officers as deputy sheriffs, some
13   of whom did not require that status for their job
14   responsibilities, but were interested in working outside
15   details.
16            MR. PFAFF:  Okay.  Could you do me a favor?
17        Would you just read back the deponent's last
18        answer?
19
20             *   (Answer read.)
21
22   Q.   (By Mr. Pfaff)  So on new applications for the
23   position of deputy sheriff, if someone showed an interest
24   in working an outside detail and passed muster, if you
```

DUNN & GOUDREAU

69

1    A.    With respect to Paul Giglio, if that's the

2    pronunciation of his name, it was -- and I didn't know

3    this firsthand, but it was what was reported -- is that he

4    was a very negative influence and not someone deserving of

5    the privilege of being a deputy sheriff.

6    Q.    Was that Horgan or Sumpter that reported that?

7    A.    I don't recall.

8    Q.    Do you know who reported it?

9    A.    I don't recall.

10   Q.    Anybody else with respect to the ten plaintiffs?

11   A.    David Bergeron's name, I recall coming up in the

12   context of the -- now I can't remember if it was a

13   veterans or the pension thing.  But that he was -- it was

14   reported to me that he was -- or I recall it being said

15   that he was someone who was very critical of the

16   administration and was not supportive of some of the

17   changes.  But now I can't remember whether it was

18   around -- in the context of the veterans issue or the

19   pension.  I don't remember.

20   Q.    Do you recall any other incident that might have

21   been explained to you regarding Bergeron and why he should

22   not be a deputy sheriff?

23   A.    Not while this process was ongoing.  Since then,

24   I've learned, but not during this process.

DUNN & GOUDREAU

```
 1   Q.   (By Mr. Pfaff)  In other words, you might have had

 2   personal interaction with some of these individuals, and

 3   you could use that personal interaction as -- to make a

 4   determination if that person was in good standing?

 5          MS. CAULO:  Objection.

 6          You may answer.

 7   A.   No.

 8   Q.   (By Mr. Pfaff)  No.  You did not use your personal

 9   interaction with any of the deputized individuals to

10   recommend whether they continue on as deputy sheriff or be

11   decommissioned?

12          MS. CAULO:  Objection.

13          You may answer.

14   A.   My -- during the process in the fall of 2004 into

15   early 2005, to the extent that I had personal interaction,

16   positive or negative, that was relevant to the discussion

17   about whether or not that person should be -- remain a

18   deputy sheriff, I offered it.  But it was not a criterion

19   for someone's -- determination of someone being a

20   candidate or an officer in good standing.

21   Q.   (By Mr. Pfaff)  Do you know why the ten plaintiffs

22   were decommissioned?  Let's start with the first name.

23   David Bergeron.

24   A.   Again, the only thing I recall is knowledge of his
```

DUNN & GOUDREAU

David Bergeron, et al. vs. Andrea Cabral, Individually and as Sheriff of Suffolk County
Elizabeth Keeley                                                                            April 6, 2006

| Page 86 | Page 88 |
|---|---|
| 1  lack of support. I don't recall why he was | 1  was decommissioned? |
| 2  decommissioned. | 2  A.   My memory about Timothy Turley was that it pertained |
| 3  Q.   Would you have offered that knowledge of his lack of | 3  to the discipline that had been imposed and the nature of |
| 4  support? | 4  his misconduct. |
| 5  A.   I didn't -- did I -- did I? | 5  Q.   And who made the recommendation? |
| 6  Q.   Would you have offered that? In the manner that you | 6  A.   Well, he's a jail officer, so it would have been |
| 7  just previously described, if you had a personal | 7  Superintendent Sumpter. |
| 8  observation with any of these individuals in a positive or | 8  Q.   The next name is Al Moscone. Do you know why he was |
| 9  neg -- | 9  decommissioned? |
| 10  A.   I didn't know David Bergeron. I wouldn't know him | 10  A.   I recall discussion about Captain Moscone, having to |
| 11  if I fell over him. | 11  do with his change of heart, so to speak, in terms of |
| 12  Q.   Next name? John Grennon. Why was he | 12  being supportive of the changes that Gene -- excuse me -- |
| 13  decommissioned? | 13  Superintendent Sumpter was trying to implement at the |
| 14  A.   My recollection is that it was a recommendation from | 14  jail, particularly as it pertained to the transportation |
| 15  Superintendent Sumpter. | 15  division. Ultimately, I don't know the reason why his |
| 16  Q.   What was the recommendation? | 16  deputization was revoked. |
| 17  A.   That he was no longer in a position that required | 17  Q.   Did Sumpter make the recommendation? |
| 18  him to be a deputy sheriff. | 18  A.   Yes. |
| 19  Q.   Did Sumpter ever say that Grennon wanted to continue | 19  Q.   That would then, would it not, have been the reason |
| 20  to work private details? | 20  why he would have been decommissioned, the fact that |
| 21  A.   No. | 21  Sumpter made a recommendation that he shouldn't be deputy |
| 22  Q.   Next name? Lorne Lynch? | 22  sheriff? |
| 23  A.   Lorne Lynch. Again, my recollection is that he was | 23       MS. CAULO:  Objection. |
| 24  an individual that was not -- he was a negative influence | 24  A.   I'm sorry. Can that question be asked again? |

| Page 87 | Page 89 |
|---|---|
| 1  or a negative force, so to speak, but I don't recall what | 1  Q.   (By Mr. Pfaff)  Sure. Wouldn't that have been the |
| 2  the final determination was for why. | 2  reason then why Moscone was decommissioned, because |
| 3  Q.   Okay. Would you have recommended that he not be | 3  Sumpter recommended it? |
| 4  continued as a deputy sheriff because of your personal | 4       MS. CAULO:  Objection. |
| 5  interaction with him as previously described? | 5  A.   The recommendations were all -- the final list was |
| 6       MS. CAULO:  Objection. | 6  in part a collaboration from the different individuals who |
| 7       You may answer. | 7  were participating, Superintendent Harris, then- |
| 8  A.   I don't -- I think I offered my personal | 8  Superintendent Theiss, Horgan and Sumpter and myself. |
| 9  observations, but I deferred in significant part to the | 9  Ultimately, the list was submitted to the sheriff. But |
| 10  superintendents who run their facilities. | 10  when I didn't know specific reasons -- when I didn't have |
| 11  Q.   (By Mr. Pfaff)  Anybody else recommend Grennon not | 11  specific reasons, I deferred to the superintendent of the |
| 12  be -- not continue in the role as the deputy sheriff? | 12  facility. |
| 13  A.   I thought we were talking about Mr. Lynch. | 13  Q.   (By Mr. Pfaff)  The name on the list is William |
| 14  Q.   I'm sorry. Did I say Grennon? I meant to say | 14  Peneau. Do you know why he was decommissioned? |
| 15  Lynch. Anyone else recommend that Lynch should be | 15  A.   Primarily because of the incident or at least in my |
| 16  decommissioned? | 16  mind, involving his conduct towards Superintendent Sumpter |
| 17  A.   I don't recall. | 17  and then his falsifying a report about the incident. |
| 18  Q.   The next name is John Barnes. Do you know why he | 18  Q.   And the next name is Eric Dilibero. Do you know why |
| 19  was decommissioned? | 19  he was decommissioned? |
| 20  A.   No. | 20  A.   The discussion about Mr. Dilibero that I recall had |
| 21  Q.   The next name is John Ellis. Do you know why he was | 21  to do with his status of light duty or limited duty and |
| 22  decommissioned? | 22  that he was not in a position to assert any |
| 23  A.   No. | 23  responsibilities that would require him to be a deputy |
| 24  Q.   The next name is Timothy Turley. Do you know why he | 24  sheriff. |

                                                                                    23 (Pages 86 to 89)

94

```
 1   A.    Correct.

 2          MS. CAULO:  Objection.

 3   Q.    (By Mr. Pfaff)  So you didn't rely on that because

 4   that --

 5   A.    Well, I would some -- I would rely on it generally,

 6   but it wouldn't, for example, be accurate on training.  If

 7   the person was fully up to date with their training, that

 8   wouldn't be on there.  At some point, we had stopped

 9   inputting information into e-personnel because we were

10   moving over to another system, so -- but for the most

11   part, you could gauge the history of the person up to a

12   certain point on e-personnel.

13   Q.    Did you just review the disciplinary history of

14   individuals whom you knew and had interaction with?

15   A.    No.  I think I said that I would go to e-personnel

16   if I didn't know a name and wanted to see whether or not I

17   actually knew the person.  If I didn't recognize the name,

18   I would go and see if the photograph helped me connect the

19   person.  Sometimes if I knew the officer and wondering,

20   you know, what their history was, I might go to the

21   e-personnel.  But I didn't do it for every single person.

22   Q.    If any of these individuals who were

23   decommissioned -- strike that.

24          Did you know the political affiliation of the
```

95

```
 1   individuals who were decommissioned?

 2   A.    No.

 3   Q.    Did you know the extent of their union activities or

 4   involvement when they were decommissioned?

 5   A.    No.

 6   Q.    And those two topics did not come up during this

 7   review?

 8   A.    They were not factors that were considered for

 9   making this determination.  No.

10          MR. PFAFF:  This may be a good place to

11      break.

12

13               (A recess was taken.)

14

15          MR. PFAFF:  Back on.

16   Q.    (By Mr. Pfaff)  Ms. Keeley, were you on the policy

17   review commission as the chief of staff?

18   A.    Yes, I was.

19   Q.    And what were your duties and functions as to that

20   role?

21   A.    To attend the policy review meetings.

22   Q.    That was it?

23   A.    No.  To participate in the review of policies on an

24   ongoing basis.
```

DUNN & GOUDREAU



Volume: I
Pages: 1-120

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

            Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

            Defendant

DEPOSITION OF:  EUGENE SUMPTER, JR.

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 5, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

52

```
 1   head, I'd have to see the list.
 2   Q.    Okay.  David Bergeron?
 3   A.    No.
 4   Q.    John Grennon?
 5   A.    No.
 6   Q.    Lorne Lynch?
 7   A.    No.
 8   Q.    John Barnes?
 9   A.    No.
10   Q.    John Ellis?
11   A.    No.
12   Q.    Al Moscone?
13   A.    There are some issues with Al Moscone.  Yes.
14   Q.    What are the issues with Al Moscone's job
15   performance?
16   A.    I think Al Moscone has -- he's an employee that's
17   been around a very long time.  However, I think he hasn't
18   spent a lot of time as a supervisor, even though he has
19   held that rank for a long period of time.  And there have
20   been some issues in the past in regards to his
21   supervision.
22   Q.    Do you know what they are?
23   A.    Yes.
24   Q.    What are they?
```

DUNN & GOUDREAU

53

1   A.    He started out a couple -- a few years back, when he

2   was put in transportation, in charge of the transportation

3   division where he oversaw all of the transportation

4   officers, all of the transportation runs and hospitals

5   that had to be done on a daily basis during the day.

6   Q.    And he did not perform those functions capably?

7   A.    I think in the beginning, he did the best that he

8   could, coming from another position that -- where he

9   hadn't -- really not a lot of knowledge of how that

10  operation worked down there.

11        There was a time when we decided to make some

12  changes down there, and we actually included Captain

13  Moscone in those -- in helping us make those changes.  And

14  he had problems doing that.

15  Q.    Do you mean when he was transferred from the 7-to-3,

16  running transportation, to the 3-to-11?

17        MS. CAULO:  Objection.

18        You may answer.

19  A.    Prior to him being transferred.

20  Q.    (By Mr. Pfaff)  And has he had issues since then?

21  A.    I have heard -- I have had some feedback from shift

22  commanders and the deputy superintendent in regards to his

23  review of reports in his current position of running

24  floors as a supervisor.  Yes.

DUNN & GOUDREAU

54

```
 1   Q.    What shift commanders raised that issue?
 2   A.    Kevin Janielis.  Captain Janielis.
 3   Q.    Anybody else?
 4   A.    I don't recall if I had talked to any other shift
 5   commanders on that shift, which is the current shift he's
 6   on now.  Not when he was on the day shift; on the 3-to-11
 7   shift.
 8   Q.    I understand that.
 9         Was it a matter of efficiency when he was on the --
10   running the transportation division?
11   A.    That was a problem.  Yes.
12   Q.    What else was?
13   A.    He also had the responsibility as a captain to
14   oversee some of the other areas down there on that ground
15   level, which included booking, property.  So we'd also
16   asked that he would oversee those along with
17   transportation.  And there were issues in the property
18   area during his time down there.
19   Q.    I'm trying to find out what those issues are.  Are
20   those issues efficiency issues or something else?
21            MS. CAULO:  Objection.
22            You can answer.
23   A.    You can call it efficiency issues.  I can explain.
24   One of the issues is the procedure for how transportation
```

DUNN & GOUDREAU

55

```
 1   officers conducted searches in the morning time prior to
 2   detainees going to court, and the fact that custody staff
 3   who are assigned to those areas down there and also staff
 4   from upstairs would have to come down and do some of the
 5   duties of the transportation officers.  And we had asked
 6   that Al Moscone address that.  And he had always told us
 7   that he would, but never did.
 8   Q.    (By Mr. Pfaff)  Anything else about Moscone and his
 9   job performance?
10   A.    No.  That was the key issues during that time in
11   regards to transportation.
12   Q.    Okay.  How about with respect to William Peneau's
13   job performance?
14   A.    No.
15   Q.    Eric Dilibero?
16   A.    No.
17   Q.    Paul Giglio?
18   A.    No.
19   Q.    Timothy Turley?
20   A.    No.
21   Q.    Is the reason why then Moscone was recommended by
22   you to be decommissioned his job performance history?
23   A.    No.  Not just his job performance history.  No.
24   Q.    What were the other reasons for recommending that
```

DUNN & GOUDREAU

56

```
 1   Moscone be decommissioned?
 2   A.   It would be those reasons along with -- actually, it
 3   would be those reasons.  It was his supervisory capacity.
 4   Q.   All right.  Are there any of these ten plaintiffs
 5   who in your opinion do not have the department's mission
 6   or sheriff's mission as their interest?
 7   A.   I don't believe that they do.
 8   Q.   You don't believe that any of these --
 9   A.   All of them -- I don't -- I think that they -- let
10   me say this.  I think that all of them are good officers.
11   However, I don't think that they are really interested in
12   what the sheriff is doing.  I don't think that they want
13   to be a part of what she's attempting to accomplish.
14   Q.   What do you base that on?
15   A.   I base that on actions and on how they interact with
16   other people, how they communicate with other people, some
17   of which feel the same way they do and others of which
18   embrace what the sheriff is trying to do.
19   Q.   Is this opinion based on your personal observation
20   of these ten individuals interacting or communicating with
21   others?
22   A.   In some cases, yes.
23   Q.   Can you give me an example?
24   A.   Lieutenant Lynch, who in my opinion is the most
```

DUNN & GOUDREAU

57

```
 1   vocal of the crew, who will -- he speaks his mind.  And I
 2   respect him for that.  However, some of the things that he
 3   says around some of the people that he says it around are
 4   very negative to the operation of the facility, especially
 5   amongst newer employees.
 6   Q.    So then your concern is that he -- because of his
 7   position and what he says, he can influence those new
 8   employees?
 9            MS. CAULO:  Objection.
10   Q.   (By Mr. Pfaff)  I'm not trying to put words in your
11   mouth, but is that -- is that what your concern is?
12            MS. CAULO:  Objection.
13            You may answer.
14   Q.    (By Mr. Pfaff)  What's your concern?
15   A.    That is a concern, that newer employees coming in,
16   before they even get an opportunity to form their own
17   opinion of what they believe this department's all about,
18   I think they hear from Lieutenant Lynch.
19   Q.    Okay.  Have any of those new employees come to you
20   and said they've heard from Lieutenant Lynch?
21   A.    No.
22   Q.    Okay.  Any other examples with respect to any of
23   these ten plaintiffs?
24   A.    I'm forgetting where we were.
```

DUNN & GOUDREAU

60

```
1   A.    She did explain that Dave Bergeron was very
2   disrespectful in public towards her.
3   Q.    (By Mr. Pfaff)  When did she tell you this?
4   A.    I don't recall exactly when it was, but it had to be
5   sometime after the -- whenever it was.  I don't know.  I
6   don't have a date.
7   Q.    Right after the election?
8   A.    This wasn't after the election, I don't believe.  I
9   believe it was before the election.
10  Q.    Where were you when she had this conversation with
11  you?
12  A.    I don't recall.
13  Q.    Was anybody with you besides her?
14  A.    I don't recall.
15  Q.    Did the topic of Dave Bergeron's involvement with
16  her come up in discussing the deputy sheriff list?
17  A.    Yes.
18  Q.    So you did have a meeting with the sheriff with
19  respect to the deputy sheriff list?
20        MS. CAULO:  Objection.
21  A.    No.
22  Q.    (By Mr. Pfaff)  Then tell me how the topic of Dave
23  Bergeron came up.
24  A.    Victor Theiss, who was --
```

DUNN & GOUDREAU

61

```
 1              MS. CAULO:  Sorry.  With the sheriff or
 2      with the committee who were reviewing --
 3              MR. PFAFF:  No.  With the sheriff.
 4   Q.    (By Mr. Pfaff)  How did the topic of Dave Bergeron
 5   come up with the sheriff?
 6   A.    She was upset with her interaction with him out in
 7   public.  And she voiced that to me.
 8   Q.    In a meeting about the deputy sheriffs --
 9   A.    No.
10   Q.    -- list?  No?
11   A.    No.
12   Q.    Just an off-the-cuff conversation?
13   A.    This was prior to any annual review of deputy
14   sheriffs.
15   Q.    And did you pass that information on to the other
16   members of the committee?
17   A.    I didn't have to.  Victor Theiss, who was a member
18   of that committee, also witnessed it, I believe.
19   Q.    So Theiss informed the members of the committee?
20              MS. CAULO:  Objection.
21              You may answer.
22   A.    I don't recall that.  I don't recall if he did or
23   not.
24   Q.    (By Mr. Pfaff)  Was there a vote taken on names to
```

DUNN & GOUDREAU

63

1  decommissioning opposed by other members of the committee?

2  A.    I believe that there were some names that were on

3  that list that were taken off after discussion through the

4  committee.  Yes.

5  Q.    Do you know the names of the people who --

6  A.    I don't recall who they were or how many there were.

7  Q.    And the list, you say, is there were people on the

8  recommended list for decommission who were taken off?

9  A.    Yes.

10 Q.    Was Chuck Magner one of them, M-A-G-N-E-R?

11 A.    I don't recall whether he was or not.

12 Q.    And was the reason that Bergeron was taken off the

13 list his interaction with the sheriff?

14 A.    Yes.

15 Q.    Was that at the sheriff's request or order?

16 A.    No.  That was at the request of Victor Theiss,

17 myself and everyone else who learned of his interaction

18 with her.

19 Q.    But did the sheriff tell you during your

20 conversation with her about the interaction with her and

21 Bergeron that Bergeron should not be on the deputy

22 sheriffs list?

23 A.    No.

24 Q.    Did Sheriff Cabral ever come to you or to members of

DUNN & GOUDREAU

67

```
 1   Q.    Paul Giglio?  Did you recommend him for
 2   decommissioning?
 3   A.    Yes.  Paul Giglio and Eric Dilibero were along the
 4   same lines.
 5   Q.    In that they --
 6   A.    With both of them -- and I don't know that I
 7   mentioned it with Eric Dilibero, but he was not performing
 8   the job, but he was also -- both of them, Giglio and
 9   Dilibero, both had attitude issues also, which is another
10   key thing that I -- key component that I used in order to
11   decide who should be deputy sheriffs.
12   Q.    Would that attitude come under the umbrella of the
13   mission statement of the department and/or the sheriff?
14   Or would that be a sixth criteria that you used?
15   A.    I think --
16         MS. CAULO:  Objection.
17         You may answer.
18   A.    I think added to it would be another criteria along
19   with professionalism, integrity.  Attitude is very
20   important also.  Attitudes towards other staff, attitudes
21   towards inmates, attitudes toward superior officers,
22   command staff, the sheriff herself, were all taken in --
23   were all factors.
24   Q.    (By Mr. Pfaff)  So what was the attitude that you
```

DUNN & GOUDREAU

68

1   perceived to be Dilibero's?

2   A.    Dilibero's attitude was -- he was another member

3   that really had no use for the sheriff.  If she was around

4   or if the chief of staff was around and came into his area

5   of responsibility, he wouldn't acknowledge them.

6   Q.    How do you know that?

7   A.    I was there with him.  Just attitude problems like

8   that.  If you don't have the best interests of the sheriff

9   or you don't have respect for your own boss, then I don't

10  think that you should be out in the public.  I think you

11  need to be inside a building where you can be supervised.

12  And Eric Dilibero and Paul Giglio displayed that, those

13  attitudes.

14  Q.    How about William Peneau?  Did you recommend him --

15  A.    Yes.

16  Q.    -- to be decommissioned?  Why?

17  A.    I had a couple of issues, and I would consider them

18  isolated issues, with William Peneau.  I think William

19  Peneau is a decent officer for the most part.  However,

20  there were some incidents that occurred involving me

21  directly --

22  Q.    What were they?

23  A.    One -- actually, the first one probably was -- and

24  actually, I shouldn't say because I don't know which one

68

```
 1   perceived to be Dilibero's?
 2   A.    Dilibero's attitude was -- he was another member
 3   that really had no use for the sheriff.  If she was around
 4   or if the chief of staff was around and came into his area
 5   of responsibility, he wouldn't acknowledge them.
 6   Q.    How do you know that?
 7   A.    I was there with him.  Just attitude problems like
 8   that.  If you don't have the best interests of the sheriff
 9   or you don't have respect for your own boss, then I don't
10   think that you should be out in the public.  I think you
11   need to be inside a building where you can be supervised.
12   And Eric Dilibero and Paul Giglio displayed that, those
13   attitudes.
14   Q.    How about William Peneau?  Did you recommend him --
15   A.    Yes.
16   Q.    -- to be decommissioned?  Why?
17   A.    I had a couple of issues, and I would consider them
18   isolated issues, with William Peneau.  I think William
19   Peneau is a decent officer for the most part.  However,
20   there were some incidents that occurred involving me
21   directly --
22   Q.    What were they?
23   A.    One -- actually, the first one probably was -- and
24   actually, I shouldn't say because I don't know which one
```

DUNN & GOUDREAU

70

```
1   area in the control --
2   Q.    I'm sorry.  Did you say "back gate"?
3   A.    Yeah.  Back gate control room.
4         I left the facility in the morning to go over to
5   South Bay.  When I returned approximately two hours later,
6   he had two gates open at the same time.  He didn't realize
7   it.  It was a mistake.
8   Q.    Is that against policy?
9   A.    It's against policy.  Yes.  It should be one gate at
10  a time.
11        I drove in.  I parked.  When I drove in, he didn't
12  even realize that the second gate was open.  So I asked
13  him if there was a problem with the second gate.  Was it
14  not functioning?
15        And he said no.  He looked out and saw it was open.
16  He apologized.
17        That was the end of that.  I went into the facility.
18  A few hours later, probably one or two hours later, I came
19  back down --
20        Actually, when I went in that time to speak with
21  him, I also told him that no one else belonged inside the
22  control booth.  He had some other people in the control
23  room with him.  So I asked him to have them leave.  And he
24  did that.  That was the end of that.
```

1    A few hours later, I came back down to leave to go

2  back to South Bay, and there was one or two people in the

3  control booth again after I had told him not to have them

4  in there.

5    I didn't say anything to him.  I went on to my car,

6  got in, and I left.  Upon returning from South Bay the

7  second time, he opened up two gates again.  And so this

8  all happened in one day.

9    And this was close to the end of the shift.  So I

10  had asked that the shift commander have him come up to my

11  office.  I could talk to him because I'm going to have him

12  write a report and try to find out what the problem is

13  here, to have that happen two times in a row, along with

14  the other things I asked him not to do, and he did it.

15    I wanted to find out what the issue was.  Was this

16  blatant disrespect, or was this honest mistakes on more

17  than one occasion?  And that's what I did, and I talked to

18  him about it.

19    And the conversation didn't go well.  I would think

20  that someone -- an officer that has made mistakes like

21  that -- and I'll call them mistakes.  I'll give him that.

22  We'll say they're mistakes.

23    You would think you would come up and apologize and

24  do whatever I asked him to do, which is write a report.

72

```
 1    He didn't do that.  He was somewhat defensive about the
 2    whole thing.
 3         So if that kind of thing's happening inside, then I
 4    don't believe he's one that should be doing details or
 5    representing the sheriff's department outside the
 6    facility.
 7    Q.    How about Turley?  Did you recommend him to be
 8    decommissioned?
 9    A.    Yes.
10    Q.    Why?
11    A.    Turley.  Two things.  One, an incident that occurred
12    regarding an inmate altercation.  And two, also his
13    attitude after that and during this time period, same type
14    of disrespect.  When command staff came around such as the
15    chief of staff and even sometimes the sheriff, would not
16    acknowledge them.  But more importantly, the incident that
17    occurred.
18    Q.    The incident, did that lead to suspension?
19    A.    Yes.
20    Q.    How many days?
21    A.    Twenty days.
22    Q.    Has that been resolved?
23    A.    Yes.
24    Q.    Recently?
```

DUNN & GOUDREAU

75

```
 1   Q.    (By Mr. Pfaff)  I'm sorry.

 2   A.    Like I said, I had no problems with job performance

 3   with John Barnes, but I believe there were other issues in

 4   his activity or attitude towards the sheriff that I can't

 5   speak to, but I'm sure that other people can.  So I did

 6   agree with -- agree to his decommissioning.

 7   Q.    You did.  Was it based on someone else's

 8   recommendation?

 9   A.    Yes.  I would say so.

10   Q.    Who?

11   A.    I don't know.  I don't recall.

12   Q.    Do you know why Barnes was transferred out of

13   property?

14   A.    Yes.

15   Q.    Why?

16   A.    John Barnes worked a support service job, a job that

17   we have been reviewing every year.  And we make changes in

18   all areas of support services, and we felt that year was a

19   time to make changes in that area.

20   Q.    Why?

21   A.    To give other people an opportunity to work in

22   support services.

23   Q.    Support services is a -- considered to be a prime

24   job?
```

DUNN & GOUDREAU

```
 1   job performance as property manager?
 2   A.    No.
 3   Q.    John Grennon?  Did you recommend that he be
 4   decommissioned?
 5   A.    John Grennon, yes.  I don't recall if it's -- I
 6   don't know if I would say "recommended" or "agreed."  But
 7   I know that I agreed that he be decommissioned also.
 8   Q.    Who recommended that he be decommissioned?
 9   A.    Victor Theiss was the head of training, so I would
10   say Victor Theiss.
11   Q.    What did Theiss have to say about Grennon?
12   A.    I know that there were some issues regarding him
13   being truthful to trainees while he was inside the
14   training.
15   Q.    I'm sorry.  Being truthful --
16   A.    Being truthful while assigned to training.  And I
17   can't really speak specifically to those.
18         Also, he would be in the category with Ellis and
19   Barnes in his activity or attitude towards the sheriff,
20   which I really can't speak to.
21   Q.    Okay.  That attitude business was according to
22   Theiss?
23             MS. CAULO:  Objection.
24             You may answer.
```

DUNN & GOUDREAU

87

```
1    A.    Yes.
2    Q.    What was his job assignment before the change?
3    A.    Central control supervisor.
4    Q.    What is he now?
5    A.    He's a back gate supervisor.
6    Q.    Did you recommend that change?
7    A.    Yes.
8    Q.    Why?
9    A.    There's been talk in the past about having
10   supervisors in those two areas, both central control where
11   he came from and the back gate where he ended up.  We had
12   a sergeant in the back gate on the day shift that became a
13   lieutenant.  And there was a need to give him experience
14   working upstairs with inmates and to learn how to be a
15   supervisor up there.  So we put him upstairs, put another
16   lieutenant in his place on the day shift, and then we
17   moved Lorne Lynch to the back gate as a lieutenant on the
18   second shift, 3-to-11.  So the two most busiest shifts
19   where there's the most activity and the need for someone
20   with the ability to be accountable for all the equipment
21   that goes in and out, there are lieutenants on those two
22   shifts, 7-to-3 and 3-to-11.
23   Q.    Did his shift change as a result of that job
24   assignment?
```

DUNN & GOUDREAU

91

1    A.    No.

2    Q.    (By Mr. Pfaff)  It's not an efficiency argument?

3    A.    No.

4    Q.    Financial argument?

5    A.    No.  It's a performance.  It was his responsibility

6    to -- it goes deeper than that.  We did that.  We moved

7    those people, and we asked that he use that smaller number

8    of people to get the transportation done.  And we then

9    found that he was having trouble handling that for a few

10   reasons.

11        One of the reasons was he did the assignment of all

12   transportation shifts -- transportation trips in the

13   morning.  And from his desk, he's unable to see or

14   understand the number of transportation teams he has

15   around the area.  And therefore, he was assigning people

16   to go to areas were there might have already been another

17   truck from South Bay that could have done that work.  And

18   that was the type of consolidation we needed.

19        So in order for us to accomplish that, we turned

20   over that assignment of transportation officers in the

21   morning, the trips, to the communications officer who was

22   in charge of all the radio communications and has a

23   knowledge of where all individuals are around the city.

24   And he can better assign people to go to different areas.

DUNN & GOUDREAU

93

```
 1        answered the question yet.
 2   A.   I hadn't finished.
 3   Q.   (By Mr. Pfaff)  Okay.
 4   A.   Where I left off at with the communications officer
 5   taking over those assignments, those duties of -- his --
 6   Al Moscone's duties of assigning transportation trips,
 7   there was no need for a captain down in transportation
 8   anymore because those were his primary duties, and I've
 9   already spoke earlier about the fact that we expected him
10   to do -- be more of a supervisor in the other areas such
11   as property and he didn't do that.  So that was part of
12   it.
13        The other part was the fact that on the 3-to-11
14   shift, we ended up being short of supervisors.  We had one
15   supervisor that was moved to the 11-to-7 shift.  We had
16   another supervisor that was moved to the day shift, which
17   left the 3-to-11 shift short.  So that is also the reason
18   why Al Moscone went from transportation to the 3-to-11
19   shift.
20   Q.   Okay.  Was he relieved of any other
21   responsibilities?
22   A.   He was also at some point during -- prior to going
23   to transportation and while assigned to transportation, he
24   did have some other duties regarding contracts for
```

DUNN & GOUDREAU

1    A.    No.

2    Q.    (By Mr. Pfaff)  It's not an efficiency argument?

3    A.    No.

4    Q.    Financial argument?

5    A.    No.  It's a performance.  It was his responsibility

6    to -- it goes deeper than that.  We did that.  We moved

7    those people, and we asked that he use that smaller number

8    of people to get the transportation done.  And we then

9    found that he was having trouble handling that for a few

10   reasons.

11        One of the reasons was he did the assignment of all

12   transportation shifts -- transportation trips in the

13   morning.  And from his desk, he's unable to see or

14   understand the number of transportation teams he has

15   around the area.  And therefore, he was assigning people

16   to go to areas were there might have already been another

17   truck from South Bay that could have done that work.  And

18   that was the type of consolidation we needed.

19        So in order for us to accomplish that, we turned

20   over that assignment of transportation officers in the

21   morning, the trips, to the communications officer who was

22   in charge of all the radio communications and has a

23   knowledge of where all individuals are around the city.

24   And he can better assign people to go to different areas.

DUNN & GOUDREAU

102

1    A.    He was promoted to lieutenant.  As I recall, JOEASC

2    fought that promotion, along with other promotions that

3    came along with his, and won a decision for those

4    individuals to be returned to their previous rank of -- to

5    their previous ranks.

6         And then I believe that Sheriff Cabral made these

7    individuals temporary lieutenants under her

8    administration.  And during that time that he's been a

9    temporary lieutenant under her administration, he has not

10   performed the job duties of a lieutenant.

11        And at the time he was made temporary by her, there

12   was a need for lieutenants, for people to perform those

13   duties.  And then when he no longer was able to do that,

14   no longer performed those duties, it was when we -- didn't

15   demote him, but returned him to his permanent rank of

16   sergeant.

17   Q.    Any of those other individuals who had been

18   temporarily promoted to lieutenant, have they been

19   returned to their rank of sergeant?

20   A.    No.

21   Q.    You had testified earlier that you had no

22   involvement in the drafting of Exhibit 1.

23        MS. CAULO:  I don't think you showed him

24        Exhibit 1 before.

DUNN & GOUDREAU

116

```
1    right now, nor do I know what their days off are.
2    Q.    If the captain is out at the back gate, do you fill
3    it with a white shirt?
4    A.    There's not a captain at the back gate.
5    Q.    I'm sorry.  Lieutenant.  Sorry.
6          If a lieutenant is at the back gate, do you fill
7    with a lieutenant, if he's out?
8    A.    It would depend on the needs of the jail.  If
9    there's enough supervisors there, there may be -- there
10   may be a lieutenant assigned.  But it doesn't have to be a
11   lieutenant that works back there.  No.
12   Q.    It doesn't have to -- is there a lieutenant on every
13   shift at the back gate?
14   A.    No.
15         MS. CAULO:  Objection.  Asked and answered.
16         MR. PFAFF:  No.  I asked captain previous.
17   Q.    (By Mr. Pfaff)  Is there a lieutenant on every shift
18   at the back gate?
19   A.    No.
20   Q.    What shifts are there lieutenants assigned to the
21   back gate?
22   A.    7-to-3 and 3-to-11.
23   Q.    Did you change the policy of days off at some point
24   in time for lieutenants after they had picked their
```

117

```
 1   vacation?

 2          MS. CAULO:  Objection.

 3          You may answer.

 4   A.   There was days-off changes for supervisors.  I don't

 5   recall whether or not it was after vacation picks or when

 6   it was, but yes, there were some changes to days off.

 7          MR. PFAFF:  I think that's all I have.  I'm

 8      going to suspend the deposition.

 9          MS. CAULO:  Why?

10          MR. PFAFF:  Because I haven't had a chance

11      to look at the documents that you are going to

12      provide for me or automatic discovery

13      disclosure.

14          Just go off the record for a minute.

15

16             (Off-record discussion.)

17

18          MR. PFAFF:  Back on the record.

19          MS. CAULO:  For the record, Attorney Pfaff

20      has indicated that he's going to suspend the

21      deposition with respect to receiving the

22      initial disclosures from the defendant this

23      morning.

24          Note my objection for the reasons we
```

DUNN & GOUDREAU

1

```
 1                    Volume 1
 2                   Pages 1-86
                 Exhibits per index
 3

 4        UNITED STATES DISTRICT COURT

 5        DISTRICT OF MASSACHUSETTS

 6

 7      Civil Action No. 05-CV-11661-RGS

 8    ------------------------------:
                                    :
 9   Bergeron, et al                :
                  Plaintiff,        :
10                                  :
     V.                             :
11                                  :
     Andrea Cabral                  :
12                  Defendant.      :
13    ------------------------------:

14

15            DEPOSITION OF WILLIAM PENEAU, a witness
     called on behalf of the Defendant taken pursuant to the
16   Federal Rules of Civil Procedure, before Patricia M.
     Haynes, a Certified Shorthand Reporter and Notary Public
17   in and for the Commonwealth of Massachusetts, CSR No.:
     14620F, at the Offices of Suffolk County Sheriff's
18   Department, 200 Nashua Street, Boston, Massachusetts, on
     Friday, December 8, 2006, commencing at 2:00 p.m.
19

20

21

22

                    Copley Court Reporting
23            58 Batterymarch Street, Suite 317
                Boston, Massachusetts  02110
24                    (617) 423-5841
```

ORIGINAL

**5**

1       P R O C E E D I N G S

2           WILLIAM PENEAU,

3   having been previously sworn, was examined and testified

4   as follows:

5           MS. CAULO:  We'll mark the deposition

6   notice first.

7           (Document marked for identification as

8   Exhibit No. 1.)

9           MS. CAULO:  Today is December 8.  We are

10  here in the matter of Bergeron, et al versus Cabral.

11  Today we are having the deposition of William Peneau.

12  My name is Ellen Caulo.  I'm here on behalf of Sheriff

13  Cabral.

14           Same stipulations, all objections, except as

15  to form, reserved until trial; motions to strike

16  reserved until trial; and Mr. Peneau will have 30 days

17  to sign, waive the requirement of a notary?

18           MR. PFAFF:  Right.

19  DIRECT EXAMINATION BY MS. CAULO:

20  Q.   Please state your name.

21  A.   **William Peneau, P-E-N-E-A-U.**

22  Q.   And what is your rank, Mr. Peneau?

23  A.   **JO 1, Jail Officer 1**

24  Q.   Where do you reside?

**6**

1   A.   **17 Shan Pauly Drive, Billerica.**

2   Q.   Officer Peneau, I know that you've not been

3   here for the prior depositions.  Have you ever been

4   deposed before?

5   A.   **No.**

6   Q.   I want to briefly go over the rules.  I'll be

7   asking questions concerning the lawsuit that you and

8   some of your colleagues have filed against the sheriff.

9   If I ask you any questions that you don't understand,

10  please let me know and I'll do my best to make sure you

11  do understand the question.

12  A.   **Yes.**

13  Q.   And you need to provide audible, verbal

14  responses for the court reporter, no head shakes.

15  A.   **Yes.**

16  Q.   There's a temptation to nod your head.  If you

17  need to take a break at any point, that's completely

18  fine.  I would ask simply that if there's a question

19  before you, I would ask that you answer the question and

20  then we'll take the break.

21  A.   **Yes.**

22  Q.   Have you consumed any alcohol in the last 24

23  hours that would affect your ability to answer questions

24  today?

**7**

1   A.   **No.**

2   Q.   Have you taken any medication that would

3   affect your ability to answer questions today?

4   A.   **No.**

5   Q.   The last instruction is that even if you

6   anticipate the answer in response to my question, please

7   wait until the question is asked.

8   A.   **Okay.**

9   Q.   What did you do to prepare for your deposition

10  here today?

11  A.   **I spoke with my counsel for a few minutes**

12  **prior and had a small talk with John Barnes.**

13  Q.   Have you reviewed any documents in preparation

14  for your testimony today?

15  A.   **I read like three pages of his deposition but**

16  **I stopped.**

17  Q.   You found it scintillating apparently.  What

18  is your date of birth?

19  A.   **June 14, 1971.**

20  Q.   Are you married?

21  A.   **Yes.**

22  Q.   Do you have any children?

23  A.   **Two children.**

24  Q.   How old are they?

**8**

1   A.   **Nine and six.**

2   Q.   What is your educational background?

3   A.   **I graduated from Charlestown High.  And I did**

4   **a couple of semesters at Bunker Hill Community College,**

5   **no degree.**

6   Q.   If you would briefly describe your employment

7   history at the Suffolk County Sheriff's Department

8   beginning with when you were hired?

9   A.   **I was hired January of '91.**

10  Q.   What positions have you held?

11  A.   **Inside the jail?**

12  Q.   Let's step back.  You're a JO 1?

13  A.   **Yes.**

14  Q.   And you've retained that rank since your

15  employment?

16  A.   **Yes.**

17  Q.   Over the course of your 15 years in the

18  department?

19  A.   **Approaching 16.**

20  Q.   If you could briefly describe the various

21  areas that you have worked in within the institution?

22  A.   **I've worked booking on several occasions.**

23  **I've worked central control, SERT, several units, all**

24  **the units within the facility.  I worked transportation**

**9**

1  and I've done details, and I worked in records for

2  awhile.

3    Q.    When you say you've done details, I asked you

about the work you've done within the institution.  It's

fair to say that details are not part of the job as a

6  jail officer?

7    A.    Correct.

8    Q.    How did you get your job, did you know someone

9  who was working here?

10    A.    Yes. James O'Brien was working here at the

11  time, and he just asked me if I would be interested in a

12  job here and so I put in an application.

13    Q.    How did you know Mr. O'Brien?

14    A.    He was from Charlestown where I was originally

15  from.

16    Q.    Was Mr. O'Brien an officer or administrator at

17  that time?

18    A.    I think he was like in charge of the case

19  workers.

20    Q.    And the sheriff at that time was who?

21    A.    Ruffo.

22    Q.    Did you know him at all?

23    A.    No.

24    Q.    As a JO 1, Officer Peneau, what are your

**10**

1  responsibilities?

2    A.    Mainly care and custody.  And I don't know

what else you're looking for.

4    Q.    Have you ever worked in a support services

5  position?

6    A.    Yes, I worked transportation before.

7    Q.    When did you work transportation?

8    A.    Maybe the '95, '96 area.  I'm not 100 percent

9  sure.

10    Q.    That was under Sheriff Rouse or Ruffo?

11    A.    I started under Ruffo and then got removed

12  from that position under Rouse.

13    Q.    Since you were removed from transportation by

14  Sheriff Rouse in or about 1996, have you ever worked in

15  any other support services positions?

16    A.    Not as a permanent assignment.

17    Q.    What were --

18    A.    I mainly covered on a weekly or daily basis,

19  mainly in booking.

20    Q.    Does that happen currently?

21    A.    Yes.

22    Q.    What is your current assignment today?

23    A.    6-3 housing control today.

24    Q.    Are you in the middle of a quarterly

**11**

1  assignment currently?

2    A.    Approaching the end of it.  December is the

3  last month of your quarterly assignment.

4    Q.    Prior to this quarterly assignment to the 6-3

5  unit, where were you working before that?

6    A.    I was a 6-1 housing control backup.  Other

7  than that, I was floating.

8    Q.    Just generally over the course of the Cabral

9  administration, have you worked in the support services

10  position as a permanent assignment or just temporarily?

11    A.    Temporarily.

12    Q.    Have you ever received any discipline from the

13  Suffolk County Sheriff's Department?

14    A.    Yes.

15    Q.    Can you describe when and for what?

16    A.    I received some oral warnings years ago for I

17  believe like managing attendance, and a year or two ago

18  I received a one day suspension from something.

19    Q.    What was the one day suspension for?

20    A.    An incident that happened on the sixth floor

21  corridor.

22    Q.    Could you describe it, please?

23    A.    I was joking from behind a closed bathroom

24  door with another officer and Superintendent Sumpter

**12**

1  walked by and heard the joking and didn't like how I was

2  joking.

3    Q.    Did you know it was Superintendent Sumpter?

4    A.    No, not at all.

5    Q.    What transpired between you and Superintendent

6  Sumpter?

7    A.    He just waited outside for me to come out of

8  the bathroom.  I was inside.  And when I came out, he

9  was there.  And I thought I was just joking with another

10  officer who was there.

11    Q.    Before you came out of the bathroom, had he

12  asked who you were?

13    A.    To me?  No.

14    Q.    Did you get a written warning or did you get a

15  one day suspension?

16    A.    I got a one day suspension, but I believe they

17  gave the day back.

18        MS. CAULO:  We'll mark this.

19        (Document marked for identification as

20  Exhibit No. 2.)

21  BY MS. CAULO:

22    Q.    I'm placing before you a document marked as

23  Exhibit 2.  This is entitled a Written Warning Corrected

24  Copy, and it's dated October 31, 2006.  The letter

13

1 itself, the original date was February 4 of 2005. Does
2 this letter document or chronicle the incident that you
3 received the discipline for from Superintendent Sumpter?
4     A.   Can I read it?
5     Q.   Take your time.
6     A.   Yes, that's the incident. I never seen this.
7     Q.   The letter that's addressed to you, you've
8 never seen this before?
9     A.   No. He tried to have me sign an original
10 letter for the one day suspension, which I refused to
11 sign at that time, and I think they went through a
12 hearing on this. I never been issued this letter.
13    Q.   You indicated a few moments ago that
14 Superintendent Sumpter presented you with a letter about
15 a one day suspension?
16    A.   Yes.
17    Q.   For this very same incident?
18    A.   Yes.
19    Q.   And you read that letter at that time?
20    A.   Yes.
21    Q.   And you refused to sign it. Why did you
22 refuse to sign it?
23    A.   I didn't agree with what he was saying in the
24 letter. He was saying that I falsified a document in

14

1 the previous letter. I wrote in the report that I
2 wasn't 100 percent sure what I said because I was
3 joking. So I wasn't lying. I just wasn't sure what I
4 said.
5     Q.   Why don't you read this letter and I'll ask
6 you whether or not it accurately reflects the incident
7 that took place on January 31, 2005 between you and
8 Superintendent Sumpter?
9     A.   Now, what was the question?
10    Q.   Now that you've had an opportunity to read
11 this document, Exhibit 2, does it accurately reflect the
12 encounter you had with Superintendent Sumpter on
13 January 31, 2005?
14    A.   Yes.
15    Q.   The sheriff's department is a paramilitary
16 organization, correct?
17    A.   Yes.
18    Q.   In a paramilitary organization, is it
19 important to demonstrate respect to superior officers?
20    A.   Yes.
21    Q.   Are you familiar with the term "deputy
22 sheriff?"
23    A.   Yes.
24    Q.   How are you familiar with it?

15

1     A.   I've been, I was a deputy prior to this for
2 approximately 13 years.
3     Q.   Do you remember the first time that you were
4 appointed as a deputy sheriff?
5     A.   The exact date, no.
6     Q.   What year?
7     A.   I couldn't even be exact. I'd say maybe
8 around '93, '92.
9     Q.   Would that be within a year or two of your
10 beginning your employment with the Suffolk County
11 Sheriff's Department?
12    A.   Yes.
13    Q.   And the sheriff at that time was?
14    A.   Sheriff Ruffo.
15    Q.   Who swore you in?
16    A.   Ruffo.
17    Q.   Do you recall what the process was for you
18 becoming a deputy sheriff at that time in about '92,
19 '93?
20    A.   No, I don't recall.
21    Q.   Did you fill out an application?
22    A.   I think we had to submit something in writing,
23 but I don't know if it was an application or just a
24 letter.

16

1     Q.   After you were sworn in by Sheriff Ruffo and
2 became a deputy sheriff, did you receive any training
3 with respect to this new status that you had?
4     A.   I believe I took a detail class with Captain
5 Scaduto.
6     Q.   How long was that class work?
7     A.   I don't exactly recall. I just remember it
8 was maybe an hour.
9     Q.   Had you attended the academy before you began
10 your employment with the department?
11    A.   Not before, no.
12    Q.   Have you attended it since?
13    A.   Yes.
14    Q.   When?
15    A.   I believe I was here for like two, 2-1/2
16 years, and then I went to an academy.
17    Q.   How long was the academy?
18    A.   It was considered a veterans academy. It's
19 three weeks I think.
20    Q.   So that would have been about '93, '94?
21    A.   Yes.
22    Q.   After you became a deputy sheriff?
23    A.   Yes.
24    Q.   Since that time, have you received any

**25**

1    A.    Yes.

2    Q.    You indicated that you've never had an

3    opportunity in which you needed to arrest someone,

4    right?

5    A.    No.

6    Q.    You indicated previously that you performed

7    some details.  What are details?

8    A.    Outside paid work.

9    Q.    When did you first perform details as a deputy

10   sheriff while you were employed by the Suffolk County

11   Sheriff's Department?

12   A.    I'm not sure.

13   Q.    How frequently before April of 2005 did you

14   perform details?

15   A.    Just a couple a year I believe.

16   Q.    I want you to search your memory if you could

17   and tell me how often in 2003 did you perform any

18   details?

19   A.    I'm not 100 percent sure.  I don't know.

20   Q.    Less than five?

21   A.    I'd say probably around five.

22   Q.    How about 2004?

23   A.    Maybe less.

24   Q.    Did you perform any in 2005 prior to April

**26**

1    when you were decommissioned in January or February or

2    March of 2005.

3    A.    I don't believe I did.

4    Q.    And you believe that you performed less than

5    five in the calendar year 2004?

6    A.    Yes.

7    Q.    Are there any documents, calendars,

8    appointment books, that may document the number of times

9    that you performed details over the years?

10   A.    I'm not sure.  When I was doing details, it

11   wasn't as sophisticated as it is now.  It's a lot more

12   planned and organized now than when I was doing it.

13   Q.    It's fair to say that even though you were a

14   deputy sheriff, you didn't perform that many details

15   over the last five, ten years?

16   A.    No.

17   Q.    Fair to say you probably performed less than

18   20 details over the last 15 years?

19   A.    Yes.

20   Q.    Less than 15?

21   A.    Yes.

22   Q.    Less than ten?

23   A.    Yes.

24   Q.    Over the last 15 years?

**27**

1    A.    Yes.

2    Q.    And when you perform a detail, you're wearing

3    a uniform?

4    A.    Yes.

5    Q.    And a badge?

6    A.    Yes.

7    Q.    You interact with the public?

8    A.    Yes.

9    Q.    Do you interact with other law enforcement

10   occasionally when you do details?

11   A.    Yes.

12   Q.    You testified about the numbers of details

13   that you have performed over the last 15 years.  Since

14   2003 and 2004, did you seek out details, did you

15   volunteer for details?

16   A.    I was in the process of ordering a beeper from

17   Lieutenant Coppi just prior to, because they had just

18   gone to the beeper system and I was going to start doing

19   details more frequently than I was.

20   Q.    Didn't the beeper system come into being in

21   2004?

22   A.    I'm not sure when exactly it came in.

23   Q.    Showing you another policy, Officer Peneau.

24   This is policy S 520, the policy that pertains to

**28**

1    outside paid details.  If you can briefly look at that

2    and see if that refreshes your memory as to when the

3    pager system became the practice by which details were

4    assigned?

5    A.    Is there a date on here?

6    Q.    This policy is dated May 1, 2004?

7    A.    Yes.

8    Q.    I want to direct your attention to the second

9    page which describes the process for making details

10   available.  If you could look at paragraph five?

11   A.    Yes.

12   Q.    The pager system was in effect as early as May

13   of 2004, correct?

14   A.    Yes.

15   Q.    And in 2004, you didn't have a pager?

16   A.    No.

17   Q.    So you wouldn't have been eligible to perform

18   details per this policy, right?

19   A.    No.

20   Q.    And you didn't purchase a pager in 2005?

21   A.    No.

22   Q.    You said you were thinking about getting a

23   pager so that you could perhaps do details?

24   A.    Yes.

33

| | | |
|---|---|---|
| 1 | A. | Maybe on some of my old shirts. |
| 2 | Q. | But you still have your badge? |
| 3 | A. | Yes. |
| | Q. | How come you haven't turned that in? |
| 5 | A. | They never took it. I went to him and he |
| 6 | said, "Just keep it." They didn't have another badge to |
| 7 | issue me. |
| 8 | Q. | Is it different than the badge -- |
| 9 | A. | It just says deputy sheriff on it. |
| 10 | Q. | Is that it on you right there? |
| 11 | A. | Yes. |
| 12 | Q. | That badge says deputy sheriff on it? |
| 13 | A. | Yes. |
| 14 | Q. | You haven't since that date in April gone back |
| 15 | to Deputy Superintendent Carney and said I need a new |
| 16 | badge? |
| 17 | A. | No. |
| 18 | Q. | Other than Deputy Superintendent Carney, did |
| 19 | you speak with anybody else, anybody else meaning |
| 20 | anybody in the management of the department? |
| 21 | A. | No, I don't believe so. |
| 22 | Q. | Did you speak with Superintendent Sumpter? |
| 23 | A. | I don't think so. |
| 24 | Q. | Did you speak with Michael Harris? |

35

| | | |
|---|---|---|
| 1 | Q. | Mickey Walsh, was he an E Board member? |
| 2 | A. | I think he was. |
| 3 | Q. | Was he decommissioned? |
| 4 | A. | No. |
| 5 | Q. | It's fair to say that there were lots of reps |
| 6 | who were involved in your union and other unions who |
| 7 | weren't decommissioned, right? |
| 8 | A. | Yes. |
| 9 | Q. | So you never asked anyone other than Deputy |
| 10 | Superintendent Carney the reasons why you were |
| 11 | decommissioned? |
| 12 | A. | Not that I recall. |
| 13 | Q. | And you were aware in April of 2005 that you |
| 14 | had received discipline pertaining to an incident with |
| 15 | you and Superintendent Sumpter, correct? |
| 16 | A. | Yes. |
| 17 | Q. | Did anybody, whether you asked, ever tell you |
| 18 | why they thought you were decommissioned? |
| 19 | A. | No. |
| 20 | Q. | Did anyone ever tell you it was because of |
| 21 | your union activities? |
| 22 | A. | No. |
| 23 | Q. | Who did you support in the 2004 Suffolk County |
| 24 | Sheriff's election? |

34

| | | |
|---|---|---|
| 1 | A. | I don't think so. |
| 2 | Q. | Did you speak with Elizabeth Keeley? |
| 3 | A. | No, I don't think so. |
| 4 | Q. | Did you speak with Sheriff Cabral? |
| 5 | A. | No. |
| 6 | Q. | Did you inquire as to why you were being |
| 7 | decommissioned? |
| 8 | A. | When I talked to Carney, I think I might have |
| 9 | asked why. He said he wasn't 100 percent sure. |
| 10 | Q. | Weren't you curious? |
| 11 | A. | After the other ones were given out, it was |
| 12 | kind of -- I don't know. We were all union reps. |
| 13 | Q. | There were approximately 37 people who were |
| 14 | decommissioned. Were all of them union reps? |
| 15 | A. | No, but all the officers that work in the |
| 16 | union with me all got decommissioned. |
| 17 | Q. | Mark Turley, what was his role in the union? |
| 18 | A. | I think he was just a treasurer. |
| 19 | Q. | That's a union official, right? |
| | A. | Yes. |
| | Q. | Elected? |
| 22 | A. | Yes. |
| 23 | Q. | Was he decommissioned? |
| 24 | A. | No. |

36

| | | |
|---|---|---|
| 1 | A. | Support in which way? |
| 2 | Q. | Who did you want to win the race for Suffolk |
| 3 | County Sheriff in 2004? |
| 4 | A. | Murphy. |
| 5 | Q. | When did you decide that you wanted Stephen |
| 6 | Murphy to win? |
| 7 | A. | When -- |
| 8 | Q. | When did you decide to support his candidacy |
| 9 | for Suffolk County Sheriff? |
| 10 | A. | I didn't offer much in support. |
| 11 | Q. | Did you do any work on behalf of Stephen |
| 12 | Murphy's candidacy for Suffolk County Sheriff? |
| 13 | A. | No. |
| 14 | Q. | Did you hold any signs? |
| 15 | A. | No. |
| 16 | Q. | Did you participate in phone banks? |
| 17 | A. | No. |
| 18 | Q. | Did you volunteer on any committees? |
| 19 | A. | No. |
| 20 | Q. | March in any parades? |
| 21 | A. | No. |
| 22 | Q. | Attend any meetings? |
| 23 | A. | No. |
| 24 | Q. | Did you attend any fund raising events? |

37

1  A.  No.

2  Q.  Were you aware that Captain Moscone had

3  organized an event in late August or early September

4  approximately two weeks before the primary election to

5  raise money for Stephen Murphy?

6  A.  No.

7  Q.  Today do you know that he did that?

8  A.  Hearsay.  People might have talked, but I

9  don't know in particular.

10  Q.  Did you hear any conversation during the

11  summer and fall of 2004 about the election while you

12  were working at the jail?

13  A.  Did I hear talk about the election?

14  Q.  Yes.

15  MR. PFAFF:  Objection to form.

16  BY MS. CAULO:

17  A.  Yeah, I guess I heard talk about the election.

18  Q.  Did you have conversations with any of your

19  fellow employees about the election in the summer and

20  early fall of 2004 before the primary election?

21  A.  Not that I can recall, no.

22  Q.  Did you discuss the election for sheriff with

23  any of your colleagues?

24  A.  I may have, but I don't recall.

38

1  Q.  Did it matter to you?

2  A.  Did it matter who became sheriff?

3  Q.  Yes.

4  A.  Yes.

5  Q.  But you didn't do anything to support Mr.

6  Murphy?

7  A.  No.

8  Q.  Did you contribute any money?

9  A.  No.

10  Q.  Did you tell anybody in the department that

11  you were supporting Stephen Murphy's candidacy for

12  Suffolk County Sheriff?

13  A.  No.

14  Q.  You didn't tell any of your colleagues?

15  A.  Well, at a meeting we had a vote whether to

16  endorse Murphy and I voted.

17  Q.  How was that voting conducted, was it by paper

18  ballot, was it electronic?  Did you attend a meeting and

19  everybody raised their hand?  How did it work?

20  A.  I'm not 100 percent sure, but I believe I

21  might have handed it in in writing.  I'm not sure how it

22  was handled.

23  Q.  Was it a secret ballot?

24  A.  No.  I think it was handled via e-mail and

39

1  absentee ballot.  I'm not 100 percent sure though.

2  Q.  So other than attending a meeting and

3  participating -- did you vote at the meeting?  I'm

4  trying to understand how you registered your vote as

5  part of JOEASC to endorse Mr. Murphy's candidacy?

6  A.  Like I said, I think I handed it over in

7  writing, and I voted to endorse Mr. Murphy.

8  Q.  How were you aware that JOEASC was going to

9  conduct a vote to endorse a candidate?

10  A.  Well, it was addressed at a meeting.

11  Q.  Where was the meeting, do you remember?

12  A.  I'm not sure if it was here or not.

13  Q.  Spring, summer of 2004?

14  A.  I don't know.

15  Q.  Do you remember anybody who was there?

16  A.  No.

17  Q.  Was there a large contingent of JOEASC

18  members, small?

19  A.  I couldn't tell you.  I don't recall.

20  Q.  And you don't recall telling anybody at work,

21  any of your colleagues, your peers, that you were

22  supporting Stephen Murphy?

23  A.  No.

24  Q.  What evidence do you have that Sheriff Cabral

40

1  knew that you supported Stephen Murphy?

2  A.  I don't have any physical evidence.

3  Q.  How do you know that she knew that you were

4  supporting any candidate?

5  A.  Only the fact that I was a union

6  representative at the time.

7  Q.  Do you remember what the vote was?

8  A.  What the numbers were?

9  Q.  Yes.

10  A.  No.

11  Q.  Do you know any of your other fellow employees

12  who supported Stephen Murphy?

13  A.  No.  I know who some of the people that were

14  involved in some stuff for him, but I don't know, like,

15  what they did.  I know some people did some things.

16  Q.  What folks do you know of?  What employees of

17  the department do you know that did some work for Mr.

18  Murphy's candidacy?

19  A.  I'm not 100 percent sure.  I know I heard

20  people talking but just hearsay.

21  Q.  What have you heard?

22  A.  Well, you had told me Captain Moscone.

23  Q.  Who have you heard, not information you got

24  from me, who have you heard?

41

1    A.    I don't recall at this time.

2    Q.    You have no idea who of your fellow employees,

3    members of the union that voted to endorse Stephen

4    Murphy's candidacy, you have no idea of anybody's

5    individual names who supported Stephen Murphy?

6            MR. PFAFF:  Objection.  Asked and

7    answered.

8    BY MS. CAULO:

9    A.    No, I don't have a 100 percent knowledge of

10   who helped Stephen Murphy.

11   Q.    Who do you think helped Stephen Murphy,

12   whether you're a 100 percent sure or not?

13   A.    I wouldn't want to speculate.

14   Q.    How about your fellow plaintiffs, did you know

15   who they supported?

16   A.    I believe we were all in support of Murphy at

17   the time.

18   Q.    On what do you base that belief?

19   A.    Because we had a vote on it.

20   Q.    Did they tell you who they voted for?

21   A.    We had the meeting and we voted for it.

22   Q.    Did the vote occur right at that meeting or

23   could people vote on-line, could they --

24   A.    I believe some people voted at the meeting and

42

1    others -- like I said, I'm not 100 percent sure.

2    Q.    A Complaint has been filed on your behalf and

3    the other plaintiffs in this action, right?

4    A.    Yes.

5    Q.    And the Complaint was based on information

6    that you provided to your attorneys?

7            MR. PFAFF:  Objection.

8    BY MS. CAULO:

9    Q.    Did you provide information to your counsel in

10   order for them to file a Complaint on your behalf?

11   A.    Yes.

12   Q.    Have you had an opportunity to review the

13   Complaint that was filed on your behalf?

14   A.    No.

15   Q.    I show you the Complaint.  Take a look at it.

16   I direct your attention to paragraph 47.

17           MR. PFAFF:  That's the Complaint.

18   BY MS. CAULO:

19   Q.    Please look at paragraph 47.  It reads,

20   "Plaintiff William Peneau appointed as JOEASC grievance

21   administrator supported the Murphy campaign and held

22   signs for Murphy."  You didn't hold signs for Murphy,

23   did you?

24   A.    No.

43

1    Q.    And your testimony earlier was that you didn't

2    support the campaign, you didn't any work for the

3    campaign, right?

4    A.    No.

5    Q.    So the information contained in that paragraph

6    47, other than the fact that you were appointed as

7    grievance administrator, is not true, is it?

8    A.    Yes.

9    Q.    Right?

10   A.    Yes.

11   Q.    Did you have any conversations with Deputy

12   Superintendent Carney regarding the election for sheriff

13   in 2004?

14   A.    No.

15   Q.    Did you have any conversations with Deputy

16   Superintendent Carney regarding consequences for anybody

17   who did not support Sheriff Cabral's candidacy?

18   A.    No.

19   Q.    Did you have any conversations with

20   Superintendent Sumpter regarding the election for

21   sheriff in 2004?

22   A.    No.

23   Q.    Did you have any conversations with

24   Superintendent Sumpter regarding consequences for

44

1    employees who did not support Sheriff Cabral?

2    A.    No.

3    Q.    Have you had any conversations with Michael

4    Harris, with Gerry Walsh, with Elizabeth Keeley,

5    concerning the election for Suffolk County Sheriff in

6    2004?

7    A.    No.

8    Q.    Did any of those people ever advise you that

9    if you did not support Sheriff Cabral but supported

10   Stephen Murphy that there would be consequences?

11   A.    Me, no.

12   Q.    Did you ever hear from anybody else, any of

13   your fellow colleagues, any of your fellow employees,

14   that there would be consequences or retaliation for

15   anybody who supported Stephen Murphy instead of Sheriff

16   Cabral?

17   A.    No.

18   Q.    You never heard that?

19   A.    Can you repeat the question?  Did I hear if

20   there would be consequences for backing Murphy?

21   Q.    Yes.

22   A.    Just through rumors.

23   Q.    What rumors did you hear?

24   A.    You guys are in trouble, you backed the wrong

45

1  horse.
2      Q.    Was that before or after the election?
3      A.    I'm not sure if it was during, after or
   before. I'm not sure.
5      Q.    Who did you hear that from?
6      A.    Just word of mouth throughout the jail. I
7  don't know in particular who it was.
8      Q.    Who made the statement that "you guys are in
9  trouble, you backed the wrong horse?"
10     A.    I'm not 100 percent sure who said it.
11     Q.    You're not 100 percent sure, but who do you
12 believe it was that allegedly said that?
13     A.    I can't even guess.
14     Q.    And you don't recall who you heard it from?
15     A.    No.
16     Q.    Were you aware of the fact that JOEASC had put
17 out mailings to the general public in Suffolk County
18 prior to the sheriff election in 2004?
19     A.    I heard about it, yes.
20     Q.    Were you involved in the preparation of that?
21     A.    No.
22     Q.    At that point in time, you were the grievance
23 administrator?
24     A.    Yes.

46

1      Q.    How frequently did you attend union meetings?
2      A.    Other than E Board meetings, I tried to make
3  it to most of them.
4      Q.    So you didn't attend E Board meetings?
5      A.    No.
6      Q.    You attended the general meetings?
7      A.    General meetings, yes.
8      Q.    How often did they occur? I'm talking now the
9  period of 2003 to 2005.
10     A.    I can't be 100 percent sure. A couple of
11 times a year I believe.
12     Q.    So at most a couple of times a year?
13     A.    Yes.
14     Q.    Maybe less than that?
15     A.    Yeah.
16     Q.    Do you know who prepared the mailings put out
17 by JOEASC?
18     A.    No.
19     Q.    Did you read them before they went out?
       A.    No.
       Q.    Have you ever read them?
22     A.    No.
23     Q.    Do you know why JOEASC put them out?
24     A.    I believe there was a vote that was going to

47

1  be picket or mailings, and they voted on to picket or
2  have mailings.
3      Q.    Where did this vote take place?
4      A.    At a union meeting.
5      Q.    Did you attend that meeting?
6      A.    Yes.
7      Q.    So when you say, "I believe there was a vote,"
8  was there a vote or not a vote?
9      A.    It was several years ago, but I believe there
10 was a meeting and there was a vote at the meeting, a
11 majority vote.
12     Q.    What were the issues?
13     A.    Probably veterans benefits, dental, things
14 like that.
15     Q.    Do you know who of JOEASC was involved in
16 orchestrating these mailings?
17     A.    No.
18     Q.    You certainly weren't?
19     A.    No.
20     Q.    Prior to JOEASC coming into existence, it was
21 1134?
22     A.    Yes.
23     Q.    And you were a member of 1134?
24     A.    Yes.

48

1      Q.    What effect did the decertification from
2  AFSCME have on the members of JOEASC?
3      A.    We lost our dental benefits.
4      Q.    Why?
5      A.    I believe Delta didn't accept our application,
6  I believe.
7      Q.    Why did you have to reapply after you were
8  decertified?
9      A.    Because it was originally under the old union
10 I guess.
11     Q.    Under AFSCME?
12     A.    Yes.
13     Q.    Were you aware of that at the time that 1134
14 voted to decertify?
15     A.    I'm not sure if I was aware of it. I think
16 they were told that you just had to resubmit. We
17 weren't aware they weren't going to accept the
18 application.
19     Q.    When you say they, was that the leadership of
20 1134?
21     A.    No, the dental plan that we had.
22     Q.    Who is Tony Kaso?
23     A.    Some sort of liaison through Delta Dental.
24     Q.    Is he familiar with AFSCME?

49

1  A.  I believe so.
2  Q.  Do you know whether or not the members of then
3  Local 1134 and then subsequently JOEASC were informed by
4  AFSCME that if they voted to decertify they risked
5  losing their dental and vision coverage?
6  A.  No.
7  Q.  Did anyone from JOEASC leadership tell you
8  what the reasons were that the dental and vision
9  benefits were not available initially?
10  A.  I believe they said something to the effect
11  that they didn't accept our application as a union.
12  Q.  Other than the meeting in which you indicated
13  that the membership or those who were present at the
14  meeting voted to authorize JOEASC to send out mailings,
15  did you attend any other meetings concerning the
16  mailings?
17  A.  No.
18  Q.  And you never attended any E Board meetings?
19  A.  No.  I wouldn't say no no, but not a lot of
20  them.
21  Q.  Were you aware that JOEASC had a web site at
22  some point in 2003 and 2004?
23  A.  Yes.
24  Q.  Did you ever post anything on the web site?

50

1  A.  No.
2  Q.  And at that point in time, you were the
3  grievance administrator, right?
4  A.  At what date?
5  Q.  2003, 2004?
6  A.  2003, 2004?  Yeah, probably.
7  Q.  When did you become the grievance
8  administrator for JOEASC?
9  A.  As soon as JOEASC came about I was asked.
10  Q.  And for how long a period of time did you hold
11  the position of grievance administrator for JOEASC?
12  A.  Up until the election from when JOEASC came
13  into being up until the election.
14  Q.  Which was the fall of 2004?
15  A.  Yes.
16  Q.  So you held that position from whenever JOEASC
17  came into being sometime in 2003 until the next election
18  cycle, which was the fall of 2004?
19  A.  Yes.
20  Q.  During the period of time that you held the
21  position of grievance administrator for JOEASC, who was
22  authorized to put official postings on the web site?
23  And I mean postings on behalf of the JOEASC leadership
24  Board of Directors.

51

1  A.  I'm not 100 percent sure, but I believe you
2  had to be on the E Board.
3  Q.  Could any member of JOEASC post something as
4  if it came from the JOEASC Board of Directors?
5  A.  I don't know.
6     MR. PFAFF:  Objection to form.
7  BY MS. CAULO:
8  Q.  We talked about JOEASC voting to endorse
9  Stephen Murphy in the Suffolk County Sheriff's election.
10  Do you know if that election result was publicized?
11  A.  If the election was, the result was
12  publicized?
13  Q.  Whether the endorsement was publicized?
14  A.  Where?
15  Q.  Within the department?
16  A.  Word of mouth.
17  Q.  To your knowledge, did Sheriff Cabral ever
18  respond to the endorsement of Stephen Murphy?
19  A.  No, not that I know of.
20  Q.  To your knowledge, did the sheriff ever
21  address roll call concerning the campaign and election
22  for Suffolk County Sheriff in 2004?
23  A.  Pertaining to the campaign?
24  Q.  Yes.

52

1  A.  Not the campaign, no.
2  Q.  Pertaining to the election?
3  A.  No.  I think she addressed roll call about the
4  mailings.
5  Q.  At some point you recall Sheriff Cabral
6  addressing roll call concerning the issues of pension
7  benefits, veterans benefits?
8  A.  Yes.
9  Q.  Were you at those meetings?
10  A.  Yes.
11  Q.  Did you receive a handout?
12  A.  I'm not 100 percent sure if I did or not.
13     MS. CAULO:  We'll mark this as Exhibit 4.
14     (Document marked for identification as
15  Exhibit No. 4.)
16  BY MS. CAULO:
17  Q.  I'm placing before you Exhibit 4.  Please take
18  a look at that and see if that is in fact a handout that
19  Sheriff Cabral provided to employees when she addressed
20  roll call concerning some of the mailings put out by
21  JOEASC?
22  A.  Are you asking if I received this?
23  Q.  Yes.
24  A.  I don't recall.  I don't remember getting it

53

1  if I did.
2       Q.   You do recall that Sheriff Cabral addressed
3  roll call concerning the issues of dental and vision
   coverage?
5       A.   Yes, I do.
6       Q.   Concerning the issue of payments to the
7  retirement board, pension payments?
8       A.   I believe that was discussed.
9       Q.   Veterans benefits, was that one of the issues
10  that was discussed?
11      A.   Yes.
12      Q.   Pay raises that were allegedly made to
13  employees of the department?
14      A.   Yes.
15      Q.   The payment of a water bill at the House of
16  Correction?
17      A.   Yes.
18      Q.   You remember that?
19      A.   Something like that, yeah.
20      Q.   Did the sheriff ever tell you or anybody that
21  you're aware of in the department that if they didn't
22  support their candidacy there would be negative
23  consequences to one's status?
24      A.   No.

54

1       Q.   And nobody in management here ever told you
2  that?
3       A.   No.
4       Q.   Have you ever had any conversations with
5  Sheriff Cabral?
6       A.   Have I spoke with her?
7       Q.   Yes.
8       A.   Yes.
9       Q.   Do you remember where you spoke with her?
10      A.   No. I've come across her a few times.
11      Q.   What has the context been?
12      A.   Just small talk, how are things going.
13      Q.   Has it just been in passing because she
14  happens to be in the facility when you've been done
15  duty?
16      A.   Yes.
17      Q.   Have you had any interaction with Sheriff
18  Cabral in your capacity as the grievance administrator
19  for the union?
20      A.   No.
21      Q.   Have you had any interactions with Sheriff
22  Cabral in your capacity as a union official?
23      A.   No.
24      Q.   And you haven't had any interactions with her

55

1  concerning the election?
2       A.   No.
3       Q.   With respect to Elizabeth Keeley, who at that
4  time was chief of staff, did you ever have any
5  interactions with Elizabeth Keeley in your capacity as a
6  grievance administrator?
7       A.   I believe we might have had a hearing. I'm
8  not sure if the hearing ended up going forward, but she,
9  I believe she was scheduled for a hearing.
10      Q.   When you say she was scheduled, is she a
11  disciplinary hearing officer?
12      A.   Yeah, on behalf of the department I believe,
13  or something like that.
14      Q.   Do you remember which employee this involved?
15      A.   Could I ask him a question? I think it was --
16      Q.   There's a question pending.
17      A.   I think it was the Turley case. I'm not 100
18  percent sure.
19      Q.   Did you have any conversation with her about
20  that?
21      A.   No, not really.
22      Q.   Have you had any interactions in your capacity
23  as grievance administrator on behalf of JOEASC with
24  Michael Harris? I'm directing you to the point in time

56

1  in which you were a grievance administrator in 2003,
2  2004.
3       A.   Did I have discussions with Michael Harris?
4       Q.   Yes.
5       A.   Yes.
6       Q.   How frequently?
7       A.   Probably at least once a week.
8       Q.   And if you could describe those interactions?
9  What was the tone like? Were they hostile, were they
10  friendly?
11      A.   Well, they weren't super friendly. We argued
12  about some issues at the time. Mainly dental at the
13  time and then, you know, any other grievances that may
14  have come about in that time span as a union rep.
15      Q.   That's not unusual, is it, to have differences
16  of opinion and disagree with management?
17      A.   Not at all.
18      Q.   Was there anything unusual about your
19  interactions with Michael Harris that was different than
20  any other --
21      A.   No.
22      Q.   Was Sheriff Cabral responsible for the loss of
23  dental and vision benefits after 1134 decertified from
24  AFSCME?

| | | 57 |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Did the department make dental and vision |
| 3 | available to JOEASC members? | |
| | A. | Did they make it available? |
| 5 | Q. | Yes. |
| 6 | A. | Eventually we got a supplemental coverage. |
| 7 | Q. | COBRA payments? |
| 8 | A. | Yes. |
| 9 | Q. | Did the department pay those? |
| 10 | A. | I believe so.  Sometimes. |
| 11 | Q. | There was no -- |
| 12 | A. | There was a lot of problems with it. |
| 13 | Q. | There were problems with what? |
| 14 | A. | The way the coverage worked. |
| 15 | Q. | Were there any contributions from the |
| 16 | employees themselves for this coverage? | |
| 17 | A. | I believe a lot of people had to pay out of |
| 18 | pocket. | |
| 19 | Q. | I meant the COBRA payments, that the |
| 20 | department was going to assume the COBRA payments.  Did | |
| 21 | the employees contribute to your knowledge? | |
| 22 | A. | No. |
| 23 | Q. | They did not? |
| 24 | A. | No. |

| | | 58 |
|---|---|---|
| 1 | Q. | Was there an application process?  Was there |
| 2 | any eligibility criteria to your knowledge? | |
| 3 | A. | No.  I don't think there should have been.  I |
| 4 | think anyone who was an employee should be covered. | |
| 5 | Q. | Right, but did the employees themselves have |
| 6 | to actually fill out an application? | |
| 7 | A. | Yes. |
| 8 | Q. | Who was responsible for notifying the |
| 9 | employees that they needed to fill out the application, | |
| 10 | was that JOEASC? | |
| 11 | A. | I don't know who was responsible. |
| 12 | Q. | Did you fill out an application? |
| 13 | A. | Yes, I did. |
| 14 | Q. | Were you and your wife covered and your kids? |
| 15 | A. | Yeah. |
| 16 | Q. | You didn't have any difficulty -- |
| 17 | A. | No. |
| 18 | Q. | -- in getting those benefits? |
| 19 | A. | No. |
| | Q. | Do you know of anybody who did? |
| | A. | Being the grievance administrator at the time, |
| 22 | several people were having problems.  I don't recall | |
| 23 | exactly who, but they kept coming to me because their | |
| 24 | dentists were billing them and they weren't getting | |

| | | 59 |
|---|---|---|
| 1 | paid.  So we had to discuss it a lot with Mike Harris. | |
| 2 | Q. | When you say several, three or four? |
| 3 | A. | Could be more. |
| 4 | Q. | So how many are we talking about? |
| 5 | A. | I'm not 100 percent sure on the number. |
| 6 | Several.  I'd say close to 20 employees maybe.  Even | |
| 7 | more. | |
| 8 | Q. | Did they ultimately get covered and the bills |
| 9 | were paid? | |
| 10 | A. | I'm not 100 percent sure whether they had to |
| 11 | keep resubmitting or not.  I don't know. | |
| 12 | Q. | What were your duties and responsibilities as |
| 13 | a grievance coordinator for JOEASC between 2003 and | |
| 14 | 2004? | |
| 15 | A. | I was to keep track of grievances and assist |
| 16 | with the chief steward, Corporal Turley. | |
| 17 | Q. | How many grievances do you recall filing in |
| 18 | that time period of 2003, 2004? | |
| 19 | A. | Several.  I don't know the number.  I couldn't |
| 20 | even guess. | |
| 21 | Q. | When you were no longer the grievance |
| 22 | coordinator, you left that post sometime in the fall of | |
| 23 | 2004? | |
| 24 | A. | I believe so. |

| | | 60 |
|---|---|---|
| 1 | Q. | Did you do any work on behalf of the union |
| 2 | between the fall of 2004 and April of 2005? | |
| 3 | A. | I don't believe so. |
| 4 | Q. | Did you testify in any arbitrations on behalf |
| 5 | of union members in 2003, 2004? | |
| 6 | A. | No. |
| 7 | Q. | Did you testify at any disciplinary hearings |
| 8 | in 2003 or 2004 on behalf of union members? | |
| 9 | A. | Internal hearings, yes. |
| 10 | Q. | How many? |
| 11 | A. | I don't know the number.  Several Step 1 and |
| 12 | Step 2 hearings.  I didn't go to Step 3 that often but | |
| 13 | Step 1 and 2 dealing with Mike Harris and Sumpter and | |
| 14 | Carney several times. | |
| 15 | Q. | Did you yourself file any complaints against |
| 16 | the department in 2003 or 2004? | |
| 17 | A. | Myself, no, not that I recall. |
| 18 | Q. | Did the union file any grievances on your |
| 19 | behalf in 2003 or 2004? | |
| 20 | A. | I'm not sure date-wise. |
| 21 | Q. | Was there a grievance filed on behalf of you |
| 22 | in 2005 with respect to Exhibit 2, the discipline you | |
| 23 | received as a result of the interaction you had with | |
| 24 | Superintendent Sumpter? | |

61

1   A.   Yes.
2   Q.   Were you ever involved in any contract
3   negotiations on behalf of JOEASC in 2003?
    A.   No.
    Q.   In 2004?
6   A.   No.
7   Q.   You testified a bit about the change in
8   leadership that occurred in the fall of 2004 for JOEASC.
9   Do you know the folks who came in and were the new
10  leadership for JOEASC?
11  A.   Do I know them?
12  Q.   Their names?
13  A.   Yes.  I know -- I believe Michael Walsh was
14  the president, Sergeant Toulos was a vice president.
15  And I'm not sure if Sergeant Grant was and E Board
16  member.  Maybe Sergeant Paris.
17  Q.   Did Mark Turley remain as treasurer?
18  A.   I believe he started to.  It might have gotten
19  taken over by Mills.
20  Q.   Chris Mills?
21  A.   Yes.
22  Q.   How about Stan Andruszkiewcz, was he a
23  secretary or member of the E Board?
24  A.   I think he was an E Board member, yes.

62

1   Q.   It's fair to say those folks as elected
2   representatives of JOEASC engaged in union activity?
3   A.   Yes.
4   Q.   Which involved negotiating issues of concern
5   to the union with management?
6   A.   Yes.
7   Q.   Were they ultimately successful in obtaining a
8   contract that was ratified by the membership?
9   A.   Yes.
10  Q.   Do you have any information or knowledge
11  regarding the records or the record keeping practices of
12  JOEASC?
13  A.   No.
14  Q.   Were you aware that three of your fellow
15  plaintiffs, John Grennon, John Barnes and John Ellis,
16  met with Sheriff Cabral in 2004 concerning the mailings
17  that were put out by JOEASC?
18  A.   Yes.  I believe they told me that she called
19  them in the office, yes.
    Q.   What I would like you to do is tell me
    everything you recall about what they told you about
22  that meeting.
23  A.   They said she was very upset and that she
24  threatened to sue them.  Pretty much that I guess.

63

1   Q.   What do you recall specifically?  Take some
2   time and think carefully.  Your best memory of what Mr.
3   Grennon said, Mr. Barnes said and Mr. Ellis said?
4        MR. PFAFF:  Take them one at a time.
5   BY MS. CAULO:
6   Q.   Do you recall having a conversation with John
7   Grennon concerning a meeting he had with Sheriff Cabral
8   in 2004 concerning the mailings put out by JOEASC?
9   A.   I'm not sure if I had a discussion with him
10  because he was in training at the time.  I didn't see
11  that much of him.  But I believe John Barnes said that
12  the sheriff called him in and was yelling about the
13  mailings.  I don't know.
14       I don't know, that she was threatening to go
15  after their houses or -- I'm not sure.  I don't know
16  exactly.  But I remember it was something to that
17  effect.
18  Q.   What did John Barnes tell you they talked
19  about specifically, what were the topics?
20  A.   I believe it was mainly the mailings.  I think
21  it was the mailings.
22  Q.   Did Mr. Barnes tell you that he responded to
23  any of the sheriff's concerns or questions?
24  A.   No.  I think he made it sound like it was

64

1   pretty much one way in that meeting.
2   Q.   Have you told us everything you can recall
3   about what Mr. Barnes told you about that meeting?
4   A.   As far as I can recall, yes.
5   Q.   And your recollection is that Mr. Barnes told
6   you that Sheriff Cabral threatened to sue Mr. Barnes and
7   the others and take their houses?
8   A.   Something of that nature, yes.
9   Q.   And those words were attributed to Sheriff
10  Cabral?
11  A.   Yes.
12  Q.   Did Mr. Barnes file a grievance about the way
13  in which that conversation occurred, did he complain
14  about it?
15  A.   I'm not sure.
16  Q.   You were the grievance administrator, right?
17  A.   I guess I was, yeah.  He didn't do it through
18  me.  He didn't always file a grievance through me.
19  Q.   Did you have a conversation with Mr. Ellis
20  before the meeting he had with Sheriff Cabral?
21  A.   Not that I can recall.
22  Q.   The only person you spoke with about this
23  meeting was who?
24  A.   Barnes.

65

1     Q.   What union activity, Officer Peneau, did you
2 engage in that you allege was the reason that Sheriff
3 Cabral decommissioned you?
4     A.   I was mainly dealing with grievances on a
5 daily basis and sometimes having loud discussions with
6 Mike Harris and Superintendent Sumpter and Deputy
7 Carney.
8     Q.   Was it unusual for a grievance administrator
9 to have loud conversations with management?
10     A.   No, it wasn't.
11     Q.   Who took over as grievance administrator after
12 you left that post in the fall of '04?
13     A.   During Michael Walsh's presidency, I don't
14 think they had one.
15     Q.   Did they have a union steward?
16     A.   I just think they had the E Board and
17 president and vice president. I don't think they ended
18 up getting any stewards.
19     Q.   Were grievances filed on behalf of JOEASC
20 members after you were no longer the grievance
21 administrator?
22     A.   I'm sure.
23     Q.   Other than your role as the grievance
24 administrator, did you engage in any other union

66

1 activity?
2     A.   Meaning?
3     Q.   Did you do anything else on behalf of the
4 union?
5     A.   Yeah, if any employees got called down to the
6 sheriff's investigation department, I would, and they
7 wanted to invoke their rights.
8     Q.   Their Weingarten rights?
9     A.   Yes.
10     Q.   Did you do that in 2003, 2004?
11     A.   Yes.
12     Q.   How often?
13     A.   Whenever needed.
14     Q.   Other than as grievance administrator and
15 occasionally accompanying an employee who was going to
16 be interviewed by SID, did you engage in any other union
17 activity?
18     A.   No.
19     Q.   What evidence do you have that Sheriff Cabral
20 was aware that you were the grievance administrator for
21 JOEASC?
22     A.   I don't know if she knew particularly.
23     Q.   What evidence do you have that Sheriff Cabral
24 was aware that you engaged in any activity on behalf of

67

1 JOEASC in 2003 and 2004?
2     A.   What evidence do I have?
3     A.   Yes.
4     A.   I don't have any.
5     Q.   Please look at the Complaint again, Exhibit
6 26. What evidence do you have that Sheriff Cabral
7 decommissioned you because you engaged in union activity
8 as alleged in paragraph 26 of your Complaint?
9     A.   What was the question?
10     Q.   What evidence do you have that Sheriff Cabral
11 decommissioned you because you engaged in union activity
12 as set forth in paragraph 26 of your Complaint?
13     A.   I don't have any evidence.
14     Q.   *What evidence do you have that anyone
15 recommended you to be decommissioned because of your
16 involvement in union activities or your support for
17 Stephen Murphy?
18     A.   I don't have any physical evidence.
19     Q.   Do you have any evidence?
20     A.   The evidence that I'm a good employee and I'm
21 now decommissioned.
22     Q.   *Officer Peneau, you filed a federal lawsuit
23 alleging that Sheriff Cabral stripped you of your deputy
24 sheriff status because you were engaged in union

68

1 activity and because of your support for Stephen Murphy.
2 I'm asking you what is the evidence?
3         MR. PFAFF: Do you have any physical
4 evidence?
5         MS. CAULO: Read the question back.
6         (*Court reporter reads back noted question
7 as recorded.)
8         MR. PFAFF: Objection. Asked and
9 answered.
10 BY MS. CAULO:
11     Q.   You may answer.
12     A.   I think the fact I've been a good employee for
13 16 years and then all of a sudden out of the blue after
14 being involved in the union and being affiliated with
15 John Barnes, John Grennon, John Ellis, that all of a
16 sudden all of us mysteriously became officers in bad
17 standing with the department.
18     Q.   How were you affiliated with John Barnes and
19 John Grennon and John Ellis other than the fact you were
20 all in the same unit?
21     A.   They were all union reps at the time.
22     Q.   It's fair to say their involvement in the
23 union was far more extensive than yours?
24     A.   Correct.

74

1      Q.   Were you promoted under the Ruffo
2    administration?
3      A.   No.
4      Q.   Were you promoted under the Rouse
5    administration?
6      A.   No.
7      Q.   What is basis for your allegation in paragraph
8    60 that you continue to fear reprisal up to and
9    including termination because of your union activity and
10   support for Stephen Murphy?
11     A.   It seems to be that we are watched a lot
12   closer.  If we make a mistake, I think we will suffer a
13   lot more than someone else that might make a mistake.
14     Q.   Since April of 2005 when you lost your deputy
15   sheriff status, have you made any mistakes during the
16   course of your employment here?
17     A.   Not that I recall.
18     Q.   Who is watching you?
19     A.   I don't know.
20     Q.   Does Superintendent Sumpter come by every time
21   you're on shift to make sure you're doing your job?
22     A.   No.
23     Q.   Does Deputy Carney come by to make sure you're
24   doing your job?

### 77

1  were being done, and I would have been eligible to do
2  them because I was deputized at the time and I was
3  detail trained.
4     Q.  If you purchased a pager?
5     A.  Yes.
6     Q.  And you hadn't purchased a pager?
7     A.  No.
8     Q.  Are you aware of whether or not the number of
9  details has decreased since April of 2005?
10    A.  I believe they have decreased now, yes.
11    Q.  So regardless of whether or not you were
12 deputy sheriff, the option to do details may have
13 decreased anyway, right?
14    A.  Now, yes.
15    Q.  How much has your yearly income decreased
16 since you were decommissioned?
17    A.  I don't know.  I wasn't doing a lot of details
18 at the time.
19    Q.  You weren't doing any.
20    A.  I did some but not any that would show
21 anything at the time.
22    Q.  So your yearly income has not decreased since
23 you were decommissioned in April of 2005?
24    A.  No.

### 78

1     Q.  Do you work any other type of shifts?
2     A.  Yes.
3     Q.  Do you need to be a deputy sheriff to do
4  overtime?
5     A.  No.
6     Q.  How frequently do you do overtime shifts?
7     A.  On an average once a week.
8     Q.  Have you done them more or less since you were
9  decommissioned or has it remained the same?
10    A.  Probably the same.
11    Q.  Who controls the overtime process?
12    A.  JOEASC.
13    Q.  The union calls the list?
14    A.  The union controls the list.  The blue shirts
15 anyway.
16    Q.  Have you been denied to do overtime shifts by
17 the Cabral administration?
18    A.  No.
19    Q.  Are you familiar with the seven to one ratio?
20    A.  Yes.
21    Q.  That for every seven blue shirts hired, the
22 department was required to hire a superior officer, a
23 white shirt?
24    A.  Yes.

### 79

1     Q.  Has that since been repealed?
2     A.  Yes.
3     Q.  And who benefits from the repeal of a seven to
4  one ratio?
5        MR. PFAFF:  Objection.
6  BY MS. CAULO:
7     Q.  If the department is not required to hire a
8  white shirt for the seven to one ratio, does that make
9  more opportunities for overtime available for JOEASC
10 members?
11    A.  Yes.
12    Q.  To your knowledge, is JOEASC the only union
13 that endorsed a candidate for the Suffolk County Sheriff
14 election?
15    A.  I don't know.
16    Q.  Are you aware of whether or not the white
17 shirt union here supported a candidate for sheriff?
18    A.  I'm not aware if they did or not.
19    Q.  What other damages do you allege that you
20 suffered, if any?
21    A.  No other damages, just the fact that I wasn't
22 able to do details and the fact that I believe that the
23 letter just makes me look like a bad employee when I
24 don't believe that I am.

### 80

1     Q.  You haven't had your days off changed, have
2  you?
3     A.  No.
4     Q.  Have you had your shift changed?
5     A.  No.
6     Q.  Has there been any impact on your vacation?
7     A.  No.
8     Q.  No lost pay?
9     A.  No.
10    Q.  What emotional distress have you suffered as
11 alleged in paragraph 64?
12    A.  Well, it's a lot less stress to do a detail
13 than it is to be in the unit.  The only source of income
14 I have now, which I need, I have to do overtime.  It's
15 all internal.  It's a lot harder.
16    Q.  And the overtime you've done since you have
17 been decommissioned is about the same as before you were
18 decommissioned, correct?
19    A.  It might be a little more.  I'm not sure.
20    Q.  But not significantly more?
21    A.  No.
22    Q.  Have you received any mental health treatment
23 as a result of the allegations in your Complaint?
24    A.  No.



## Suffolk County Sheriff's Department

ANDREA J. CABRAL
SHERIFF

Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000



February 4, 2005

Officer William Peneau
200 Nashua Street
Boston, MA 02114

Corrected copy – October 31, 2006

EXHIBIT
2

WRITTEN WARNING

Dear Officer Peneau:

This letter serves as notice of a Written Warning due to your actions on Monday, January 31, 2005.

Specifically, on that date while I was touring the 6th floor, I overheard you make rude and offensive remarks while in the staff bathroom. When I inquired who was making the remarks, you responded through the bathroom door, "none of your fucking business." After exiting the bathroom, you were ordered by me to file a written report regarding your remarks. One hour later you submitted a written report indicating that you did not recall your remarks.

Your unprofessional behavior on January 31st constituted conduct unbecoming an officer and undermined the Department's expectations of all employees to act in a professional manner at all times. Furthermore, your failure to submit a truthful report concerning this incident, when ordered by the Superintendent, illustrated a blatant disregard for authority and violated the Department's trust in you. Such misconduct is unacceptable and will not be tolerated.

Your actions were in direct violation of Suffolk County Sheriff's Department Policy S220 – Employee Code of Conduct. Please be advised that future misconduct of this nature will result in more severe discipline, up to and including termination from the Suffolk County Sheriff's Department.

Sincerely,

Eugene Sumpter
Superintendent

Cc:     William Sweeney, Personnel



## Suffolk County Sheriff's Department



|  |  |
|---|---|
| Jail | House of Correction |
| 200 Nashua Street | 20 Bradston Street |
| Boston, MA 02114 | Boston, MA 02118 |
| (617) 635-1100 | (617) 635-1000 |

ANDREA J. CABRAL
SHERIFF

January 22, 2004



EXHIBIT
14
12.7.06 wT

-- Via Hand Delivery --
Corporal Timothy Turley
137 Dorchester Street, #2B
South Boston, MA 02127

### NOTICE OF TWENTY-DAY SUSPENSION

Dear Corporal Turley:

On December 31, 2003 you were suspended without pay and notified that a disciplinary hearing had been scheduled for January 9, 2004. Subsequently, the Department advised your J.O.E.A.S.C. representative that we would not conduct a disciplinary hearing and no objection was made, therefore the discipline imposed is based upon the Departments investigation into the incident that formed the basis for the charges against you.

You are hereby suspended without pay for a period of twenty working days as a result of your actions relative to the October 7, 2003 incident in the 4-2 Unit at the Nashua Street Jail. After considering all information gathered during this investigation, including your written report and taped interview with the Sheriff's Investigation Division, the Department has determined that you submitted a false, misleading or inaccurate report in violation of Suffolk County Sheriff's Department Policy S-220 § II(O), and that your actions were unbecoming an officer, in violation of Suffolk County Sheriff's Department Policy S-220 § II(N)(1).

Your actions were egregious, as they may have led to an erroneous discipline and possible criminal charges against a detainee. Please note that any future policy violations of this nature will result in the imposition of more severe disciplinary action, up to and including your termination. Please be advised that your suspension will conclude on January 28, 2004. If you have any questions, please contact your Shift Commander.

Sincerely,

Eugene Sumpler
Eugene Sumpler
Superintendent

cc: Elizabeth Keeley, Chief of Staff
Cliff Carney, Deputy Superintendent
Michael Harris, Director of Employee Relations
Richard Tranfaglia, Director of Personnel
John Barnes, J.O.E.A.S.C.
Stephen Pfaff, Esq.

1

```
            UNITED STATES DISTRICT COURT

             DISTRICT OF MASSACHUSETTS


   Volume: I

   ************************************
   DAVID BERGERON, ET AL,              :
                     Plaintiffs,       :
   vs                                  :
   ANDREA CABRAL,                      :
                     Defendant.        :
   ************************************

          DEPOSITION OF TIMOTHY TURLEY, a

   witness called on behalf of the Defendant,

   taken pursuant to the applicable provisions of

   the Massachusetts Rules of Civil Procedure,

   before William M. Jackson, Professional Court

   Reporter and Notary Public in and for the

   Commonwealth of Massachusetts, at the Nashua

   Street Jail, 200 Nashua Street, Boston,

   Massachusetts  02114, on January 9, 2007,

   commencing at 10:20 a.m.



          COPLEY COURT REPORTING, INC.
             59 Batterymarch Street
          Boston, Massachusetts  02110
                (617) 423-5841
              www.copleycourt.com
```



**ORIGINAL**



DISK ENCLOSED

**13**

1  A. 11-16-67.
2  Q. What's your educational background?
3  A. High school graduate.
4  Q. When was that?
5  A. I graduated in 1986.
6  Q. From?
7  A. Catholic Memorial High School. I attended
8     classes at Massasoit Community College and
9     UMass/Boston. I never achieved my
10    undergraduate degree.
11 Q. Do you have any certificates, any training?
12 A. I have basic correction officer training
13    academy, weapons, handcuffs, baton. All the
14    normal certificates that would go with my
15    position.
16 Q. That is the specialized training that you have
17    received while you have been an officer here?
18 A. Yes.
19 Q. Your formal education is high school, some
20    classes at Massasoit and UMass/Boston?
21 A. Yes.
22 Q. When did you begin your employment with the
23    Suffolk County Sheriff's Department?
24 A. In December of 1989.

**14**

1  Q. Why did you apply to become an officer at the
2     Suffolk County Sheriff's Department?
3  A. Prior to that date, from my graduation from
4     high school, I was working construction. We
5     hit a slight recession at that time and
6     government work seemed like a stable place to
7     be.
8  Q. Why the Suffolk County Sheriff's Department?
9  A. Well, I heard good things about it. A family
10    friend was employed here.
11 Q. Who was that?
12 A. He would have been, it was Paul Lewis. He is
13    now a judge at Boston Juvenile Court.
14 Q. What was his role here?
15 A. General counsel here at one point. I think he
16    served a couple of positions within the Kearney
17    and Rufo administrations.
18 Q. Did you know anybody else in the department
19    other than the general counsel, Paul Lewis?
20 A. I did.
21 Q. Who was that?
22 A. Some of the people that I went to high school
23    with started to get employment here. The
24    department was going through an expansion time

**15**

1     to work this facility, and it was just a place
2     that was hiring at the time with good benefits.
3  Q. Who were the other individuals that you knew?
4  A. There would have been Chuck Kelly. He is now a
5     Boston police officer. Greg Mastermario, he is
6     a New York police officer. Charles Wayland. I
7     knew him from the neighborhood. He is now a
8     lieutenant here. I am trying to think.
9  Q. What neighborhood was this?
10 A. Roslindale. I am Hyde Park, Roslindale, West
11    Roxbury. That section.
12 Q. Other than Paul Lewis and the general counsel,
13    did you know anybody else in management in the
14    department?
15 A. I knew vaguely, I knew who he was. Gerard
16    Horgan. I could not say that I knew him
17    personally. He is from Hyde Park.
18 Q. Did Mr. Lewis assist you in your application?
19 A. I know that he gave me a recommendation to
20    Sheriff Rufo.
21 Q. Now, when you were hired in December of 1989,
22    what was the rank that you were hired at?
23 A. That would have been jail officer, first grade.
24    That would have been an entry level position.

**16**

1  Q. For how long a period of time -- I understand
2     that now you are a corporal. For how long a
3     period of time did you hold the rank of JO1 or
4     put differently, when were you promoted to
5     corporal?
6  A. I think, I am going to say 1999.
7  Q. Who was the sheriff then?
8  A. Richard Rouse.
9  Q. So between 1989 when you were first hired and
10    1999 --
11 A. The date may be wrong on that promotion. I am
12    not sure.
13 Q. So for about ten years, you were a JO1?
14 A. Yes.
15 Q. If you could briefly describe the kinds of
16    assignments that you had, what were your duties
17    and responsibilities?
18 A. Initially, I was assigned to the Charles Street
19    Jail. Then we moved over here, and I would
20    have worked housing units within this facility,
21    and I covered the property room, I was assigned
22    down there for a while, transportation for at
23    least a year. I was assigned to the front desk
24    here in the lobby, reception. I floated for a

**17**

1     while, which could have put me anywhere. I
2     basically worked all the entry, all the
3     positions in entry level, an entry level
4     officer would have worked. I was on response
5     team for several years. Just about all the
6     positions.
7  Q. What were the circumstances surrounding your
8     promotion to corporal, what I mean by that, was
9     there an examination, a promotional process?
10 A. At the time, I believe you just applied and
11    there was some review process that I was not
12    aware of, but the sheriff would make the
13    appointment.
14 Q. Did you take an examination to qualify at that
15    time for the position of corporal?
16 A. I did not, no.
17 Q. When you were promoted to corporal in 1999,
18    approximately, how did your responsibilities
19    change from when you were a JO1?
20 A. I am a little sketchy on the date. I might
21    have been on transportation when I was
22    initially promoted. However, I was then
23    assigned to the community corrections, and I
24    was assigned to the women's resource center,

**18**

1     and I had an odd role there to perform. I
2     provided security at that facility, and I had a
3     patrol function. There was some community
4     issues that had to be satisfied by the sheriff.
5     They were concerned about bringing criminals
6     into that area. There was some history with
7     the Shaddock Hospital being so close.
8  Q. Where was the community corrections office?
9  A. Jamaica Plain. 501 Arborway. So there was a
10    neighborhood on the hill behind us. I had to
11    actually perform a patrol function for a couple
12    hours a day. Mostly when we had movement in
13    and out. They wanted to see the car in the
14    neighborhood to make sure our offenders went
15    straight back to the halfway house and did not
16    linger in that neighborhood. So basically to
17    make sure that they, there was this little
18    impact by our facility as possible.
19 Q. How long a period of time did you perform that
20    function of community corrections?
21 A. I believe just over a year.
22 Q. Did you receive any formalized training?
23 A. I went to the department of corrections, I
24    think it is in Medfield, their training

24

```
 1              I know that -- I don't remember that
 2        line being in the initial.  I think that would
 3        have stood out because I know they objected
 4        quite emphatically about there being no
 5        hearing.  I know in fact they objected to it.
 6        I was entitled to a hearing and I never
 7        received one.
 8   Q.   Other than the second line of the first
 9        paragraph, is this an accurate copy of the
10        letter that you received?
11   A.   Yes.  That is just going off my memory.
12   Q.   I take it that you have a copy of this?
13   A.   I do somewhere in my files.
14   Q.   Well, let's produce that and see if that is on
15        there?
16   A.   I just don't remember it.
17   Q.   That is fine.
18   A.   Yes.  Other than that, I do remember the
19        suspension itself.
20   Q.   So in January of 2004, you received a
21        twenty-day suspension.  My question to you, was
22        that twenty-day suspension still on your record
23        in 2005?
24   A.   Yes.
```

57

```
 1    A.    Yes.  I have to review it back.  If I was there
 2          in the first place, it would be gone quicker.
 3          It is less efficient.  That is my only point as
 4          far as that goes.  If I can get in there, get
 5          everything right the first time, we are out the
 6          door.  It is a numbers game on transportation.
 7          We move so many people.  It is more efficient.
 8          I mean, other than that, there is, there is
 9          nothing else to it aside from the
10          transportation function right now in my current
11          assignment.
12    Q.    So other than that, how does the deputy
13          sheriff's title effect your responsibilities as
14          a corporal leaving aside the issues of
15          transportation for the moment?
16    A.    Actually, it does not.  Other than the social,
17          you know, the stigmatism, there is nothing.  I
18          am not required to be a deputy sheriff to
19          supervise my subordinates.
20    Q.    What is the social criticism?
21    A.    It is a slight on the officer not to be sworn
22          in.
23    Q.    Are you treated differently by your peers?
24    A.    I would not know how to measure that.
```

60

```
 1          SID.  That might have happened a couple of
 2          times.  I am not sure how many times that
 3          happened.
 4     Q.   So those are folks for whom there was an
 5          outstanding warrant?
 6     A.   Yes.  That they knew was coming to the
 7          facility.  They told us to look out for.
 8     Q.   You spoke briefly before about the ability to
 9          earn income.  Are you familiar with details?
10     A.   I am.
11     Q.   What are they?
12     A.   They are paid private security safety functions
13          that the officers, both in this department and
14          all law enforcement, basically, perform for
15          construction and basically traffic movement,
16          and the movement of construction equipment
17          within traffic areas for the safety of the
18          citizens.
19     Q.   Are they part of your duties and
20          responsibilities as a jail officer?
21     A.   They are not.  Well, no.  For the most part,
22          no.
23     Q.   Well, how is working --
24     A.   No.
```

61

| | | |
|---|---|---|
| 1 | Q. | Working a private detail is not part of the |
| 2 | | functions that are provided outside of the four |
| 3 | | walls of the institution? |
| 4 | A. | Yes. |
| 5 | Q. | Have you ever performed details as deputy |
| 6 | | sheriff? |
| 7 | A. | Yes. |
| 8 | Q. | When? |
| 9 | A. | When we initially started the Big Dig, when we |
| 10 | | were invited on, I worked quite a bit. |
| 11 | Q. | What years were those? |
| 12 | A. | I would say in the late nineties. I can't be |
| 13 | | more specific than that. When we first started |
| 14 | | doing them in large numbers. |
| 15 | Q. | Large numbers? |
| 16 | A. | I also did them prior to that for Boston |
| 17 | | University, in the city of Chelsea, |
| 18 | | construction, to augment my income. |
| 19 | Q. | When was the last time that you performed a |
| 20 | | detail associated with the Big Dig? |
| 21 | A. | I cannot remember. It would be in the late |
| 22 | | nineties. |
| 23 | Q. | Does that mean 97/98? |
| 24 | A. | I would say '98. |

65

```
1    A.   I am sorry.  We are talking about income
2         property?
3    Q.   Yes.
4    A.   I just have one piece of income property.
5    Q.   Is that the only piece of income property that
6         you have?
7    A.   No.  I have had a couple.
8    Q.   I am trying to get a sense, first of all, when
9         you performed details in the Big Dig, how
10        frequently you performed details, and what were
11        the reasons that you did not perform details?
12             MR. STEWART:  Objection.  That's
13        rather compound.
14   Q.   I am trying to give the corporal a sense of
15        what --
16   A.   Why I didn't work details?  A number of
17        reasons.  I got married at one point.  I
18        recently had children.  There is a number of
19        things outside of here that occupies my time.
20        Timewise, I have not had the opportunity or
21        actually the desire.  I didn't want to work
22        them.
23   Q.   I just want to make sure that the record
24        accurately reflects when you did them, how
```

66

```
 1              frequently, when you began, when you ended.
 2     A.   I would say I began in 1991.  I ended doing
 3            them, I am going to say '98, roughly.  I would
 4            say maybe I did on average throughout that
 5            period one a month.  It is a guess.  I know I
 6            did spurts.  I don't know how to estimate.  I
 7            don't.
 8     Q.   Do you possess any records that would assist
 9            you in identifying the number of details that
10            you did during that period of time?
11     A.   I don't believe I do.  I moved since then.  I
12            am not a pack rat.  I dispose of stuff that
13            gets old.
14     Q.   I believe your testimony was that you, after
15            that, you simply were involved in other things
16            outside of the office that provided you with
17            some measure of income?
18     A.   Yes.
19     Q.   And other interests, right?
20     A.   Yes.
21     Q.   And no longer had the desire or interest or
22            inclination to do details?
23     A.   I stopped doing them.  I mean, it varied.  I
24            would have liked to have had the opportunity at
```

67

|    |    |                                                          |
|----|----|----------------------------------------------------------|
| 1  |    | some point; but, you know, for the most part, I          |
| 2  |    | don't like doing them.                                   |
| 3  | Q. | Details were available in 1999, is that right?           |
| 4  | A. | Yes.                                                     |
| 5  | Q. | In 2000, 2001, 2002?                                      |
| 6  | A. | I may have done BU commencements in '99. I am            |
| 7  |    | trying to remember. I am sketchy. My memory              |
| 8  |    | is not as good as it used to be. We are going            |
| 9  |    | back a ways now.                                         |
| 10 | Q. | Are you aware that beginning in about 2003,              |
| 11 |    | details associated with the Big Dig, you needed          |
| 12 |    | to purchase a pager?                                      |
| 13 | A. | Oh, yes. I heard about that.                             |
| 14 | Q. | You did not purchase a pager, did you?                   |
| 15 | A. | No. At that point, I mean, I figured it out.             |
| 16 |    | I was not working enough to pay for the damn             |
| 17 |    | thing. I would not buy it.                               |
| 18 | Q. | So you have never had a pager?                           |
| 19 | A. | I never purchased a pager, no.                           |
| 20 | Q. | Do you work overtime?                                     |
| 21 | A. | Not with any great frequency.                            |
| 22 | Q. | What does that mean?                                      |
| 23 | A. | Well, I did a double on Thanksgiving; but I was          |
| 24 |    | drafted.                                                  |

68

1    Q.   I mean the volunteer kind.

2    A.   You know, the last two years, maybe I did two

3         or three.  I am not big on overtime.  Again, I

4         have a lot of interests.

5    Q.   Do you have outside employment other than the

6         income property?

7    A.   I do not.

8              THE WITNESS: May I take a break?

9              MS. CAULO:  Absolutely.

10             (Whereupon a break was taken)

11   Q.   Back on the record.

12             How were you notified that you were

13        decommissioned?

14   A.   I believe by letter.

15             MS. CAULO:  Let's mark this as the

16        next exhibit, please.

17             (Letter dated April 21, 2005 was

18        marked as Exhibit Number 4 for identification)

19   Q.   I am placing before you what has been marked as

20        Exhibit Number 4.  I ask you to look at it and

21        see if you recognize it?

22   A.   Yes.

23   Q.   What do you recognize it to be, sir?

24   A.   This is the letter that informed me that I was

**79**

1   Q. How long a period of time have you held the
2      position of chief steward?
3   A. Two years.
4   Q. From April of '03?
5   A. Until '05.
6   Q. When in '05 did you stop being?
7   A. I think the elections were in September or in
8      the fall.
9   Q. The election of whom?
10  A. It would have been Michael Walsh.
11  Q. Could I refresh your memory, and suggest it was
12     in the fall of 2004?
13  A. Okay. Fall of 2004.
14  Q. So you held the position of chief steward until
15     April of '03 until the next series of
16     elections, which resulted in the election of
17     Mickey Walsh to the presidency of JOEASC?
18  A. Yes.
19  Q. That is approximately the fall of 2004?
20  A. Yes.
21  Q. When was the next time that you held the
22     position of chief steward?
23  A. Upon the completion of Michael Walsh's term,
24     John Grennon won the election for president.

**80**

1      He has asked me, he asked me to do the, perform
2      the role of chief steward.
3   Q. Was that before or after you were
4      decommissioned? You were decommissioned in
5      April of 2005.
6   A. I am going to say it was after.
7   Q. So your chief steward from April of '03 until
8      the fall of '04?
9   A. Yes.
10  Q. In your capacity as chief steward, what
11     interactions, specific interactions did you
12     have with Sheriff Cabral between April of '03
13     and the fall of 2004?
14  A. I represented John Ellis -- directly with
15     Sheriff Cabral?
16  Q. I said the fall of 2004. Okay. Yes. Yes.
17     Between April of '03 and the fall of 2004, what
18     specific interactions did you have with Sheriff
19     Cabral in your capacity as chief steward?
20  A. I only had one interaction directly with the
21     sheriff.
22  Q. Describe that for me, please?
23  A. John Ellis was summonsed by the sheriff to this
24     conference room, and I represented him, I was

**81**

1      his JOEASC representative at that encounter
2      with the sheriff at his request.
3   Q. At whose request, John Ellis?
4   A. Yes.
5   Q. Why was he summonsed to meet with Sheriff
6      Cabral in this conference room?
7   A. Actually, he was ordered by the sheriff.
8   Q. Is there a difference between summonsed and
9      ordered?
10  A. There is.
11  Q. How do you know the means by which John Ellis
12     came to be present, whether he was ordered or
13     summonsed?
14  A. John told me that he was ordered.
15  Q. You were not privy to that communication
16     between Sheriff Cabral and John Ellis?
17  A. No. At his request, I accompanied him.
18  Q. What did John Ellis tell you?
19  A. He was ordered and he was concerned because
20     previous to that, John Barnes and John Grennon
21     were also summonsed by Sheriff Cabral.
22  Q. Were they ordered or were they summonsed?
23  A. I don't know. I was not present.
24  Q. What was your understanding, how did you become

**82**

1      aware that Sheriff Cabral had met with John
2      Barnes and John Grennon?
3   A. They told me.
4   Q. What did they tell you?
5   A. They told me that it was quite unpleasant. She
6      threatened to sue them. It had to do with
7      communications the union officials had with the
8      press.
9   Q. What were you told specifically about the
10     purpose of the meeting?
11  A. I was told that he was ordered to be there. I
12     had exception with that.
13  Q. I am speaking first to the John Grennon and
14     John Barnes meeting.
15  A. I was told, they were summonsed, whether
16     ordered or.
17  Q. I wanted to stop you because I had not asked a
18     question. I know this is hard.
19        When did you become aware that John
20     Barnes and John Grennon had met with Sheriff
21     Cabral, before or after John Ellis had his
22     meetings?
23  A. Before.
24  Q. How were you made aware that John Barnes and

**83**

1      John Grennon were to meet with Sheriff Cabral?
2   A. I'm sorry. I found out after their meeting.
3   Q. But before John Ellis' meeting?
4   A. Yes.
5   Q. After they had a meeting, what did John Barnes
6      and John Grennon tell you about their meetings
7      with Sheriff Cabral?
8   A. That she was quite angry. It had to do with
9      their communications with the press, regarding
10     an issue involving veterans benefits that were
11     altered outside of the collective bargaining.
12     The specifics on the issues, well, that is what
13     it was about. It was about their functions as
14     union officials and then communications to the
15     president.
16  Q. How do you know it was about their functions as
17     union officials?
18  A. Well, they told me.
19  Q. What did they tell you?
20  A. That she took exception to their communications
21     with the press, and she was going to sue them.
22     She threatened civil action to take their
23     houses. I guess I was quite emotional.
24  Q. Tell me everything that you can remember -- did

**84**

1      you have one conversation with the two of them?
2   A. I don't know.
3   Q. Individually?
4   A. I don't know. I don't remember. I know it was
5      communicated to me. I just don't remember. I
6      spoke with them quite frequently back then.
7   Q. Do you know who else was at the meeting?
8   A. I believe Mr. Tompkins was present and maybe
9      Mike Harris. I know they were present in our
10     meeting.
11  Q. Did they tell you anything that Mr. Tompkins or
12     Mr. Harris may have said during this meeting?
13  A. They may have.
14  Q. Do you recall?
15  A. Not specifically.
16  Q. Do you recall, have you told us everything that
17     you can remember about what Sheriff Cabral
18     said?
19  A. No. Well, said in my presence?
20  Q. At the meeting that John Barnes and -- have you
21     told us everything that you recall?
22  A. I can't recall anything she said outside of my
23     presence.
24  Q. I am asking you to recall what John Barnes and

**Copley Court Reporting**

85

```
 1          John Grennon communicated to you concerning
 2          what Sheriff Cabral said to them?
 3     A.   I don't remember.
 4     Q.   Go ahead.
 5     A.   I don't remember.
 6     Q.   Were you familiar with the communication that
 7          Mr. Barnes, Mr. Grennon, and Mr. Ellis had with
 8          the press?
 9     A.   At the time, I was.
10     Q.   Were you familiar with mailing that they had
11          created and sent out?
12     A.   Yes.  All right.  It was the mailing, the super
13          voters.
14     Q.   What are super voters?
15     A.   I guess it is a list tabulated of people that
16          vote, frequency of people that vote.  They are
17          a key demographic for civil-minded citizens.  I
18          don't know.  Just people that would vote with
19          great frequency.
20     Q.   How did you get the list?
21     A.   I have no idea.
22     Q.   Were you involved in the creations of these
23          mailings?
24     A.   No.
```

109

```
 1            of our initiative.
 2     Q.     Did Sheriff Cabral support the formation of
 3            JOEASC?
 4     A.     She stayed neutral.  She did not stand in its
 5            way.
 6     Q.     She voluntarily recognized JOEASC, right?
 7     A.     Yes.  She allowed us to self-organize, which
 8            was, you know, she didn't influence it one way
 9            or the other.
10     Q.     She was not required to do that, right?
11     A.     I am not sure on the legal requirements as far
12            as allowing workers to self-organize.  I don't
13            know.  She may be.  I don't know.
14     Q.     She didn't object to it?
15     A.     She didn't object.
16     Q.     She didn't take any actions to impede your
17            abilities to self-organize?
18     A.     No.  She did not.
19     Q.     What effect of decertification of ASCME have on
20            the dental and vision --
21     A.     I'm sorry.  She recognized us.  I know she
22            recognized us before she legally had to.
23            Before there was a labor relations.  I do
24            remember that.
```

117

```
 1          Elizabeth Keeley?
 2     A.   Professional.
 3     Q.   Can you describe your relationship with Michael
 4          Harris?
 5     A.   More friendly and professional.  I got along
 6          good with Mike.
 7     Q.   Victor Theiss you previously characterized as?
 8     A.   Initially, I got along well with him.  Then it
 9          soured.  It was more, we were in adversary
10          roles as an advocate for the members.  I don't
11          know.  It was just more of an adversary role.
12          I don't know if he took things personal or not.
13          I don't know.  We didn't seem to hit it off.
14     Q.   Describe your relationship with Eugene Sumpter?
15     A.   Well, I have known him the longest.  Pretty
16          much professional all through his, it got
17          contentious after one specific hearing.
18     Q.   Which was?
19     A.   George McCallum's termination.
20     Q.   Why did it become contentious?
21     A.   He presented for the department.  As it was
22          communicated to me, through Superintendent
23          Horgan, I think he felt that the union ambushed
24          him in the hearing and somehow made him look
```

119

```
 1          internal JOEASC stuff.

 2    Q.    So you did not interact in any formal way as a

 3          member of JOEASC between the fall of '04 and

 4          April of '05?

 5    A.    You know, I did.  I took, it was like an

 6          off-duty bar fight.  SID was investigating a

 7          couple of officers.  I think there was two

 8          instances like that.  The vice president was

 9          Jack Tullis, him and Mike Walsh called, and for

10          the purposes of that investigation, Turley will

11          be the JOEASC representative.  I was requested.

12          Other than that, no.  I did not serve in a

13          permanent capacity.  Like a shift steward type

14          thing.

15    Q.    And you were, I believe, your testimony was

16          that you were not involved in any contract

17          negotiations on behalf of JOEASC?

18    A.    Since JOEASC, no.  Years ago with 1134.

19    Q.    That's a lifetime away.

20    A.    That is an ugly process, too.  I didn't want to

21          participate in that.

22    Q.    You did not want to participate in any contract

23          negotiations with JOEASC?

24    A.    Nor do I plan to in the present.
```

**133**

```
 1      jail, employees?
 2   A. Yes. There is a bunch. I would have to see a
 3      roster and look at it. I am trying to think
 4      offhand, who I have firsthand knowledge of
 5      working.
 6   Q. Or even knew about?
 7   A. I would say Al Moscone. The names come to me.
 8   Q. Captain Janelis?
 9   A. No. I don't know. Someone told me that he
10      did, but I can't say I have firsthand knowledge
11      about it.
12   Q. Lieutenant McCarthy?
13   A. You know, he was nervous after the election,
14      but I don't know. I don't know.
15   Q. Lieutenant Mullen?
16   A. I don't know.
17   Q. What work did you do?
18   A. Me? I met him a couple of times.
19   Q. When you say "him," Stephen Murphy?
20   A. A couple of times during the whole campaign. I
21      am trying to think. I went to a couple of
22      events.
23   Q. What events did you go to?
24   A. I went to something over in East Boston. Some
```

**134**

```
 1      time or whatever they call them. A function.
 2   Q. Who organized that?
 3   A. One of the Italian guys.
 4   Q. One of the Italian guys?
 5   A. I'm sorry to be vague. I would say it --
 6   Q. Stop for a second. Corporal, and I mean no
 7      disrespect by this, but you and nine other
 8      folks have filed a federal lawsuit accusing
 9      Sheriff Cabral of stripping you of your deputy
10      sheriff status because you were involved in the
11      union and you supported Stephen Murphy.
12   A. Yes.
13   Q. It is not helpful to say one of the Italian
14      guys.
15   A. I am going to say one of the Italian guys. I
16      mentioned Deleibro or even Al Moscone ran that
17      thing.
18   Q. You attended a fund-raiser in East Boston. Was
19      that the fund-raiser organized by Al Moscone?
20   A. It may have been.
21   Q. Was there another fund-raiser that was run by
22      Al Moscone that you attended?
23   A. No. I only went to one in East Boston.
24   Q. When you went to the fund-raiser in East
```

**135**

```
 1      Boston, who was present?
 2   A. Paul Giglio. I think I went with John Barnes.
 3      I am going to say Al Moscone. It is so vague.
 4      I go to a lot of events. I know a lot of the
 5      Italian guys from the department that live up
 6      there were there. Beyond that, my memory is
 7      not more specific than those guys, than those
 8      previously mentioned.
 9   Q. So that's one event that you went to. How many
10      other events did you go to?
11   A. I think I did three total.
12   Q. So what were the other two?
13   A. There was one in Roslindale. Jeremy Washburn
14      was there. I think Andy Doyle was there. He
15      was a department employee.
16   Q. Is he custody?
17   A. I think so.
18   Q. Were there any other department employees
19      there?
20   A. I am sorry. I can't specifically say.
21   Q. What was the other event?
22   A. There was one in Brighton.
23   Q. Who organized that one?
24   A. I don't remember.
```

**136**

```
 1   Q. Who was present from the department?
 2   A. I know Pat O'Brien was there. I think I met
 3      Grennon over there. Maybe Barnes was there. I
 4      am not a hundred percent on him. I think again
 5      Peter Cipriano was there. Brian Cullen.
 6   Q. Is he an employee of the department?
 7   A. He was. He is no longer.
 8   Q. Was he custody staff?
 9   A. Was.
10   Q. Did he leave voluntarily or was he?
11   A. Yes.
12   Q. Who else?
13   A. I believe he did. That is all I can really
14      remember.
15   Q. Did you contribute any money?
16   A. I did not.
17   Q. Did you participate in any phone banks?
18   A. I did.
19   Q. How many?
20   A. One.
21   Q. When in relationship to the campaign, I mean to
22      the election, rather?
23   A. I would say it was pretty close. Within the
24      week.
```

**137**

```
 1   Q. So the primary election, which was for all
 2      intents and purposes, the election of '04?
 3   A. Yes. Some time in late August maybe.
 4   Q. One phone bank. You indicated that you met
 5      with Stephen Murphy several times?
 6   A. Probably, two or three times.
 7   Q. By yourself or with other members of JOEASC?
 8   A. With other members.
 9   Q. What other members of the JOEASC?
10   A. I would say probably Barnes mostly, Grennon for
11      the most part.
12   Q. Did you volunteer on any committees?
13   A. Committees?
14   Q. Murphy campaign committees.
15   A. No.
16   Q. Did you march in any parades with Stephen
17      Murphy?
18   A. No.
19   Q. Did you hold any signs for him?
20   A. No.
21   Q. Did you have a sign at your house?
22   A. No.
23   Q. Did you have a bumper sticker on your car?
24   A. I did.
```

**138**

```
 1   Q. The car that you drove to work everyday?
 2   A. Yes.
 3   Q. When did you put that on?
 4   A. I don't recall. Some time prior to the
 5      election.
 6   Q. Well?
 7   A. I don't know when he announced. Shortly after
 8      our endorsement.
 9   Q. Shortly after the endorsement?
10   A. Yes.
11   Q. When you were at the phone bank, who else was
12      there from the department if you remember?
13   A. I think Dennis Harrison. I could be wrong.
14   Q. Is he an employee of the department?
15   A. Yes.
16   Q. Is he a custody officer?
17   A. Yes.
18   Q. I want you to look at the complaint that was
19      filed. If you can go to Paragraph 44.
20      Paragraph 44 says plaintiff Timothy Turley
21      carried campaign signs and worked the phone
22      banks in support of Stephen Murphy. You did
23      not carry campaign signs, did you?
24   A. To my memory, no.
```

140

```
 1              MS. CAULO:  Not in that fashion.
 2      A.   Other than those aforementioned, I can't
 3           remember specifically.  It was quite some time
 4           ago.
 5      Q.   How did you know that Captain Moscone was
 6           organizing the event in East Boston?
 7      A.   I don't remember.
 8      Q.   Did he call you to come and attend, do you
 9           know?
10      A.   Not that I remember.
11      Q.   Did you inform Deputy Superintendent Carney or
12           Superintendent Sumpter of your support for
13           Stephen Murphy?
14      A.   Not that I remember, no.
15      Q.   Did you have any communications with Michael
16           Harris concerning your support for Stephen
17           Murphy?
18      A.   That I recall, no.
19      Q.   Elizabeth Keeley?
20      A.   No.
21      Q.   Did you speak with Victor Theiss concerning
22           your support for Stephen Murphy?
23      A.   No.
24      Q.   Did you speak with Sheriff Cabral regarding her
```

141

```
 1              support for Stephen Murphy?
 2    A.    I did not.
 3    Q.    Angelo Rossi, did he run as an independent
 4          candidate?
 5    A.    I don't think so.  There was talk about it, but
 6          I don't think it ever happened.
 7    Q.    Did you have any conversations with Deputy
 8          Superintendent Carney regarding the sheriff's
 9          election in 2004?
10    A.    Deputy Carney?
11    Q.    Yes.
12    A.    Not that I remember.
13    Q.    Did you have any conversations with Deputy
14          Superintendent Carney regarding any
15          consequences for anybody not supporting Sheriff
16          Cabral?
17    A.    I did not.
18    Q.    Did you ever hear anyone talking about
19          consequences?
20    A.    Someone mentioned it, yes.
21    Q.    Who mentioned it?
22    A.    I think Barnes told me.
23    Q.    What did Barnes say to you?
24    A.    That there were going to be consequences.  I
```



**145**

1  A. Yes.
2  Q. So that does not refer to the twenty-day
3     suspension? I want to make sure I understand
4     your allegations.
5  A. The twenty-day suspension would have been prior
6     to the election.
7  Q. Exactly. The twenty-day suspension was prior
8     to Stephen Murphy even announcing his
9     candidacy; is that correct?
10 A. Right. The twenty-day suspension would have
11    been the adverse related to my union
12    affiliation. The loss of deputy sheriff status
13    would have directly related to the Murphy
14    campaign.
15 Q. So here it says adverse employment decision,
16    singular. What's the adverse decision made by
17    the sheriff?
18 A. That would be the twenty-day suspension.
19 Q. So what's the adverse employment decision made
20    by the sheriff?
21 A. That should have been pluralized, I guess.
22 Q. So there are two adverse employment decisions
23    that you allege the sheriff made?
24 A. That's correct.

**146**

1  Q. What involvement did she have in the twenty-day
2     suspension?
3  A. Again, she is the -- her specifically?
4  Q. Yes.
5  A. She is the head of the agency. Like I said
6     before, a senior employee was disciplined
7     without a hearing.
8  Q. How were you a senior employee, because you
9     have been here for seventeen years?
10 A. My seniority, yes.
11 Q. Did the sheriff sign the suspension letter?
12 A. Her name is at the top of the letterhead.
13 Q. So is it your position that the suspension was
14    because of your union affiliation and the
15    decommissioning was because of your support for
16    the Murphy campaign?
17 A. Yes.
18 Q. So you were decommissioned, not because of the
19    union work, you were decommissioned because you
20    supported Stephen Murphy?
21 A. That is my belief.
22 Q. So one was because of union affiliation, the
23    suspension, and one was because of Murphy
24    support, that was the decommissioning?

**147**

1  A. That is my belief.
2  Q. I would like to direct your attention to
3     Paragraph 26. Again, it is in effort to
4     clarify the allegations in your complaint. If
5     you look at 26, I want to understand your
6     testimony, with your not alleging that you were
7     decommissioned because you engaged in union
8     activity, you were alleging that you were
9     decommissioned because you supported Stephen
10    Murphy, is that your contention?
11 A. Yes.
12 Q. No allegation that you were decommissioned
13    because of union.
14       What is the evidence that you have
15    that you were decommissioned because of your
16    support for Stephen Murphy, what's the factual
17    basis for your allegation, that you were
18    decommissioned because of your support for
19    Stephen Murphy?
20 A. Absent any explanation by the department, it
21    was a collective action, and everyone
22    decommissioned to my knowledge was a Murphy
23    supporter.
24 Q. Is it fair to say that there are people that

**148**

1     are Murphy supporters that are not
2     decommissioned?
3  A. I don't know. I would say probably.
4  Q. Pat O'Brien for one, right?
5  A. I don't know his status.
6  Q. If I represent to you that he is a deputy
7     sheriff, and you know he was a pretty vocal
8     supporter of Stephen Murphy, right?
9  A. Yes.
10 Q. He was not decommissioned.
11       What's the evidence that you have
12    that Sheriff Cabral was even aware that you
13    were supporting Stephen Murphy?
14 A. I have none.
15 Q. What's the basis for your allegation in
16    Paragraph 59, Corporal, that you have been
17    bypassed for career advancement for recent
18    promotional opportunities because of your
19    involvement in union activities and/or support
20    for Stephen Murphy?
21 A. Well, acting sergeants were made, since the
22    time of this filing, and I was not promoted.
23 Q. If they were acting, were they temporary
24    sergeants?

**149**

1  A. They would have been acting. That is being
2     hammered out now. I guess a promotional exam
3     process is being implemented. It has not
4     started yet for the sergeants. Acting
5     sergeants were created. I was bypassed and I
6     assume that it had to do with, I was bypassed
7     by less experienced officers. I would have to
8     assume that it was related to my discipline.
9  Q. Is there a provision in the Collective
10    Bargaining Agreement that sets forth the
11    criteria for permanent promotions?
12 A. There is.
13 Q. That is Article 21?
14 A. Yes. There is a provision. I am not sure of
15    the specific number.
16 Q. Is there an exam that is part of the
17    requirements for permanent promotion?
18 A. Yes, there is.
19 Q. So what promotional opportunities, what
20    permanent promotional opportunities have you
21    been denied, Corporal Turley?
22 A. I don't believe -- all right. Permanent
23    promotional?
24 Q. Yes.

**150**

1  A. The temporary promotion I have been denied.
2     Permanent, none.
3  Q. And if it is temporary, it means it can be
4     taken away at any point in time, is that right?
5        MR. STEWART: Objection.
6  Q. Bad question.
7        Is there a provision in Collective
8     Bargaining Agreement, Article 11 that pertains
9     to temporary service in a higher or lower rank?
10 A. Yes.
11 Q. That's the provision in which individuals are
12    serving in a temporary higher rank?
13 A. Yes.
14 Q. In order for somebody to be permanently
15    promoted consistent with the Collective
16    Bargaining Agreement, you need to have the
17    promotional criteria set forth in Article
18    Number 21, right?
19 A. That is being hammered out right now. I don't
20    do the negotiations on that level. That is
21    still being worked out right now.
22 Q. Isn't there a provision in your current
23    Collective Bargaining Agreement that says in
24    order to be promoted, you have to pass an

151

1          examination, you have to be interviewed?

2     A.   Can we go off the record for a minute?

3               MS. CAULO:  Okay.

4               (Discussion off the record)

5     Q.   Back on the record.

6               In order to be permanently promoted

7          pursuant to the Collective Bargaining Agreement

8          that covers your employment as JOEASC member

9          with the department, you need to successfully

10         pass an examination, right?

11    A.   That is my understanding.

12    Q.   And you need to meet two other prerequisites,

13         be interviewed, and meet the other promotional

14         prerequisites set forth in the CVA?

15    A.   Yes.

16    Q.   My question to you, what promotional, and I

17         will use the term permanent promotional

18         opportunities, not temporary services pursuant

19         to Article 11, what permanent promotional

20         opportunities have you been denied because of

21         your union activities or support for Stephen

22         Murphy?

23              MR. STEWART:  Objection.  Asked and

24         answered.  He said permanent, none.

152

```
 1              MS. CAULO:  He has not answered this
 2       one, Rob, with all due respect.
 3              MR. STEWART:   He can answer.
 4    A.   No permanent promotions.
 5    Q.   What career advancement have you been denied?
 6              MR. STEWART:   Objection.  We are
 7       going around and around on Paragraph 59.  This
 8       is the first question that you asked him about,
 9       was Paragraph 59.
10    Q.   Is there any career advancement other than
11       promotions that you have been denied?
12    A.   No.  None.
13    Q.   Did you take the lieutenant's examination that
14       was offered in I believe February of '06?
15    A.   I believe I did.  Yes.
16    Q.   Based upon your test results, were you eligible
17       to be considered for permanent position?
18    A.   I was not.
19    Q.   How many current and former union officials
20       have been promoted through that process to your
21       knowledge?
22    A.   Probably, five or six.  In various capacities,
23       I don't know.  Some of the guys might have
24       served years ago.
```

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Volume: I


*************************************
MARTIN K. MICHELMAN,                :
                 Plaintiff,         :
vs                                  :
SUFFOLK COUNTY, ET AL,              :
                 Defendants.        :
*************************************

        DEPOSITION OF MARTIN K. MICHELMAN, a

witness called on behalf of the Defendants,

taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure,

before William M. Jackson, Professional Court

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Suffolk

County Sheriff's Department, 200 Nashua Street,

Boston, Massachusetts  02114, on October 3,

2006, commencing at 10:00 a.m.


            COPLEY COURT REPORTING, INC.
         58 BATTERYMARCH STREET - SUITE 317
            BOSTON, MASSACHUSETTS  02110
                  (617) 423-5841
                www.copleycourt.com

**ORIGINAL**

DISK
ENCLOSED

54

```
 1    A.   No.
 2    Q.   During your position as director of training,
 3         did you ever have to counsel an employee
 4         because of inappropriate behavior or conduct on
 5         the job?
 6    A.   Yes.
 7    Q.   Who was that?
 8    A.   John Grennon.
 9    Q.   When was that?
10    A.   I don't recall the exact time.  It was before
11         we moved to Chelsea.
12    Q.   What was the nature of the conduct?
13    A.   I observed John conducting union business
14         during training time.
15    Q.   Is it fair to say that is against department
16         policy?
17    A.   I do not know specifically whether that is or
18         is not, but I believe that it may be.
19    Q.   What did you do in response to that?
20    A.   I approached John Grennon and spoke to him,
21         indicating that I believed it was
22         inappropriate, and that he should not do that
23         again.  At any time he wants to conduct union
24         business, he needs to do it off duty hours or
```

55

1      when he is not conducting training on

2      department time.  He has to do it on his own

3      time.

4   Q.  Was there anyone else that you had to counsel

5      or discipline during your time as deputy

6      superintendent?

7   A.  I don't recall.  I don't believe so.

8   Q.  Was there ever a time when you considered

9      issuing discipline against someone under your

10     command?

11  A.  The Mark Fountain incident.

12  Q.  Any other ones?

13  A.  I don't recall any at this time, but there may

14     have been others.

15  Q.  Did you ever issue an oral warning to anyone?

16  A.  I did not.

17  Q.  Have you ever personally written a disciplinary

18     report reporting somebody in your chain of

19     command?

20  A.  During that time or as deputy superintendent?

21  Q.  Yes.

22  A.  I don't believe so.

23  Q.  How about during your career within the

24     Sheriff's Department?

1          Grennon's status in the training division?

2    A.    It is possible that we had, but I don't recall

3          at this time.

4    Q.    Did you inform anyone that John Grennon was

5          conducting union business during work time?

6    A.    I did, I believe, in conversation with

7          Elizabeth Keeley and Viktor Theiss.

8    Q.    When did that take place, if you recall?

9    A.    Well, shortly after I had the conversation with

10         Grennon, I brought it to their attention.

11   Q.    What was their response?

12   A.    I don't recall exactly.

13   Q.    Were you advised to discipline Mr. Grennon?

14   A.    No.  I don't believe that I was advised to

15         discipline him.  They may have advised me,

16         wanting to have done it, but I told them that I

17         handled it the way I handled it because I felt

18         it was the right way to do it at the time.

19   Q.    Did you ever have concerns about John Grennon's

20         suitability as a training officer with his --

21         strike that.

22              Have you ever informed anyone in

23         management that John Grennon was bad for the

24         department?

COPY

1

```
 1            COMMONWEALTH OF MASSACHUSETTS
              COMMISSION AGAINST DISCRIMINATION
 2                   MCAD NO. 00133417

 3
         -------------------------------------------
 4       ARLA SUTHERLAND,                          )
                     Complainant,                  )
 5                                                 )
             vs.                                   )
 6                                                 )
         SUFFOLK COUNTY SHERIFF'S DEPARTMENT,      )
 7                   Respondent                    )
         -------------------------------------------
 8

 9

10            DEPOSITION of LORNE LYNCH, called as a

11   witness by and on behalf of the Complainant,

12   pursuant to the applicable provisions of the

13   Massachusetts Rules of Civil Procedure, before

14   Margaret M. Hoey, Certified Shorthand Reporter No.

15   114693 and Notary Public within and for the

16   Commonwealth of Massachusetts, at the offices of

17   Eileen D. Agnes, Esq., 94 Lincoln Street,

18   Framingham, Massachusetts, on Friday, May 4, 2001,

19   commencing at 2:00 a.m.

20
                          EXHIBIT
21                        Lynch
                            4
22                        10-6-06    CW

23

24
```

G&M & ASSOCIATES
(617) 338-0030

13

| | | |
|---|---|---|
| 1 | | I have no problem. |
| 2 | A. | Sure.  Let me refresh my memory. |
| 3 | Q. | You have no present memory? |
| 4 | A. | Yeah, I do. |
| 5 | Q. | If you do, I would appreciate you testifying from |
| 6 | | memory as opposed to reading a report. |
| 7 | A. | Frank had poured her a cup of coffee.  I believe he |
| 8 | | put too much cream in it.  She stated, Frank, can |
| 9 | | you darken it up.  As a joke I had said, Like you |
| 10 | | like your men, hot and black. |
| 11 | Q. | And, sir, when you made that remark what did Arla |
| 12 | | Sutherland do? |
| 13 | A. | She looked at me and she said, That's a bit much.  I |
| 14 | | could see that she was upset about that.  She |
| 15 | | appeared to be upset, and she walked back into the |
| 16 | | building. |
| 17 | Q. | And prior to her walking into the building did you |
| 18 | | apologize to her? |
| 19 | A. | I attempted to, but she walked -- as soon as I had |
| 20 | | said it she had walked away kind of hastily. |
| 21 | Q. | She was upset?  Did she appear to you to be upset? |
| 22 | A. | She didn't scream it, she didn't yell it.  She said, |
| 23 | | That's a bit much, and walked away. |
| 24 | Q. | And at that time, sir, after making that remark, |

1

1       UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MASSACHUSETTS

3          Civil Action No. 05-CV-11661-RGS

4      *****************************************
                                                *
5   DAVID BERGERON, JOHN GRENNON,               *
    LORNE LYNCH, JOHN BARNES, JOHN ELLIS,       *
6   TIMOTHY TURLEY, AL MOSCONE,                 *
    WILLIAM PENEAU, ERIC DILIBERO and           *
7   PAUL GIGLIO,                                 *
                        Plaintiffs,             *
8                                                *
        vs.                                      *
9                                                *
    ANDREA CABRAL, INDIVIDUALLY and             *
10   as SHERIFF OF SUFFOLK COUNTY,               *
                        Defendant.              *
11                                               *
    *****************************************
12

13

14

15      **DEPOSITION OF LORNE LYNCH**, a witness
    called on behalf of the Defendant, taken pursuant
16   to the provisions of the Federal Rules of Civil
    Procedure, before Christine L. Warwick, a
17   Certified Shorthand Reporter and Notary Public in
    and for the Commonwealth of Massachusetts, at the
18   offices of the Suffolk County Sheriff's
    Department, 200 Nashua Street, Boston,
19   Massachusetts 02114, on Friday, October 6, 2006,
    commencing at 10:00 a.m.
20

21

22                                    🐦 **ORIGINAL**

23              COPLEY COURT REPORTING
24         58 Batterymarch Street, Suite 317
              Boston, Massachusetts 02110
                    (617) 423-5841

18

1     We went through here with metal detectors.

2  Q. Approximately, how many officers do you think were

3     assisting, facilitating the transfer from the

4     Charles Street Jail to the Nashua Street facility?

5  A. Probably 15, 20.

6  Q. Okay.  At some point, you moved over to the Nashua

7     Street facility, correct?

8  A. Yes.

9  Q. And your rank at that time was?

10 A. I was promoted I think just prior to coming into

11    this building.  I was promoted to the rank of

12    lieutenant.

13 Q. What year was that, if you recall?

14 A. 1990.

15 Q. So since 1990 to today's date, you've continued to

16    hold the rank of lieutenant, is that fair?

17 A. Yes, ma'am.

18 Q. Did you take an examination to be promoted from

19    JO-1 to corporal?

20 A. At no time did I take any examination for any

21    promotion.

22 Q. So your promotions to corporal to sergeant to

23    lieutenant were made by the sheriff without an

24    examination, is that right?

---

69

1  **Q.** You meant it as a joke?

2      MR. PFAFF: Objection. I'm instructing

3  the witness not to answer. It's been asked and

4  answered.

5      MS. CAULO: It hasn't been asked and

6  answered. We'll get the transcript.

7  **Q.** I'm asking you, What was funny about it?

8      MR. PFAFF: Objection. Asked and

9  answered. Don't answer it.

10 **Q.** Did Miss Sutherland think it was funny?

11     MR. PFAFF: Objection. Calls for

12 speculation. If you know whether or not she

13 thought it was funny, you can answer it.

14 **A.** **I believe she did not think it was funny.**

15 **Q.** How did you know that?

16 **A.** **As she walked away, she said -- let me think back**

17 **here. She had walked away in a manner that I**

18 **assumed that she was upset.**

19 **Q.** She didn't laugh?

20 **A.** **No, she didn't laugh.**

21 **Q.** She didn't get your joke?

22 **A.** **No.**

23     MR. PFAFF: Objection. Calls for

24 speculation.

COPLEY COURT REPORTING

(617) 423.5841

---

70

1  **Q.** Did anybody else get your joke? He's testified

2      MR. PFAFF: Objection. He's testified

3  there were no other witnesses.

4      MS. CAULO: No, he hasn't testified to

5  that. He said there were other people around.

6  We'll read back the transcript, Steve.

7      MR. PFAFF: All right. Go ahead. You

8  can have it, Lorne.

9  **A.** **I don't believe that anyone else other than Mark**

10 **Kulik would have heard what I said.**

11 **Q.** Did Mr. Kulik laugh?

12 **A.** **No.**

13     MS. CAULO: Mark this, please.

14     (Document was marked as Exhibit No. 3

15 for identification.)

16 **Q.** Lieutenant, placing before you a document which

17 has been marked as Exhibit No. 3, I ask you if

18 this is the letter of reprimand that was issued to

19 you by the Department for the comment that you

20 made to your colleague, Arla Sutherland, in April

21 of 2000?

22     MR. PFAFF: Do you have a copy for me?

23     MS. CAULO: Yes, I'm sorry. I thought

24 you had one.

COPLEY COURT REPORTING

(617) 423.5841

---

71

1      MR. PFAFF: I'm going to object. The

2  document speaks for itself. You may answer.

3  **A.** **Yes.**

4  **Q.** You were on duty at the time, right?

5  **A.** **Yes.**

6  **Q.** Miss Sutherland was on duty?

7  **A.** **Yes.**

8  **Q.** Were you a deputy sheriff at the time that you

9  made this comment?

10 **A.** **Yes.**

11 **Q.** Not only were you disciplined, but you were sued;

12 were you not?

13 **A.** **Yes.**

14 **Q.** As was the Department?

15 **A.** **Yes.**

16 **Q.** So the Department was sued because of the comment

17 that you made?

18     MR. PFAFF: Objection. That calls for a

19 legal --

20     MS. CAULO: I haven't finished my

21 question, so just --

22     MR. PFAFF: Okay.

23     MS. CAULO: -- wait a second.

24 **Q.** The Department was sued as a result of your

COPLEY COURT REPORTING

(617) 423.5841

---

72

1  conduct on this occasion, right?

2      MR. PFAFF: Objection. That calls for a

3  legal conclusion for which the witness is not

4  qualified to answer. You may answer if you know

5  why the Department was sued.

6  **A.** **I know why the plaintiff, what the plaintiff**

7  **stated why they were suing them because of**

8  **retaliation from the Department. That's what Arla**

9  **Sutherland stated in everything that I had read.**

10 I believe they were being sued for

11 retaliation, or that was her -- that was what she

12 was claiming, that Maura McDonough and Michael

13 Cawley along with a woman from EAP retaliated

14 against her because of whatever occurred after I

15 had made that remark.

16 So my point is that I made a comment. I

17 was sued. Why the Department was sued based on

18 what Miss Sutherland said was retaliatory conduct

19 by the personnel directors. And that's based on

20 depositions and hearings and things that I had

21 gone through prior to after what I had said.

22 **Q.** Fair to say that your comment set things in

23 motion?

24     MR. PFAFF: Objection.

COPLEY COURT REPORTING

(617) 423.5841

---

73

1    MS. CAULO: You may answer.
2    MR. PFAFF: You may answer.
3  A. I think it is a piece of it, yes.
4  Q. Well, there would have been no allegation of
5    retaliation had you not made this statement,
6    right?
7    MR. PFAFF: Objection. Calls for a legal
8    conclusion for which the witness is not qualified
9    to answer. You may have it, Lorne.
10 A. Can you repeat that?
11 Q. If you hadn't made this comment, Miss Sutherland
12   would not have been counseled and spoken with by
13   those other individuals, right?
14   MR. PFAFF: Objection. Same as before.
15   The question is also argumentative and conclusory
16   in nature.
17 A. I believe it was a vehicle to what happened, my
18   comment.
19 Q. So in addition to the Department being sued, you
20   were sued as well, right?
21   MR. PFAFF: Objection. Asked and
22   answered.
23 Q. Yes?
24 A. I was named as an individual along with other

COPLEY COURT REPORTING
(617) 423.5841

74

1    individuals within the Department as a defendant
2    in this case. I was one individual of five.
3  Q. The litigation was settled under the
4    administration of Sheriff Cabral, correct?
5  A. I can only tell you that I know it was dismissed.
6    I'm not aware of what the settlement was.
7  Q. Are you aware that it was settled?
8  A. Yes.
9  Q. Are you aware that the Department paid a sum of
10   money in order to settle the case?
11 A. I believe that's what I was -- I believe yes,
12   there was some monies involved in this, yes.
13 Q. And that the Suffolk County Sheriff's Department
14   under Sheriff Cabral paid that settlement fund,
15   settlement money?
16 A. I believe so. That was January of 2006.
17 Q. Have you seen the settlement agreement?
18 A. I haven't.
19 Q. And you're aware that the Suffolk County Sheriff's
20   Department under the administration of Sheriff
21   Cabral also paid for your attorney, right?
22 A. They were ordered to do so if I'm not mistaken.
23 Q. I asked you if you were aware that the Sheriff's
24   Department paid for your attorney?

COPLEY COURT REPORTING
(617) 423.5841

75

1  A. Yes.
2  Q. Okay. And that's --
3    MR. PFAFF: It was just a mere pittance,
4    by the way, just so the record is clear.
5  Q. And that's Mr. Pfaff right here, correct?
6  A. That would be him, yes.
7    MR. PFAFF: For the record, I was
8    Mr. Lynch's defense counsel in the Sutherland
9    matter.
10 Q. Not initially. Initially, the Department had
11   represented you?
12 A. Yes.
13 Q. Okay. Now, during the course of your career as a
14   lieutenant, during the course of your career with
15   the Suffolk County Sheriff's Department, have you
16   made any racial comments regarding fellow
17   employees?
18 A. No.
19 Q. Have you ever made any comments concerning a
20   fellow employee's ethnic or racial background?
21 A. No.
22 Q. Ethnic background?
23 A. No.
24 Q. Never?

COPLEY COURT REPORTING
(617) 423.5841

76

1  A. No.
2    MR. PFAFF: Objection.
3  Q. Have you ever made any comments that could be
4    construed as sexually harassing while at work?
5    MR. PFAFF: Objection. Calls for a legal
6    conclusion for which the witness is not qualified
7    to answer.
8  Q. I'm asking for your opinion. You may answer.
9  A. No.
10 Q. Have you ever made any comments that could be
11   construed as sexually offensive to anybody?
12   MR. PFAFF: Objection. Calls for a legal
13   conclusion for which the witness is not qualified
14   to answer. Are you saying, and you don't have a
15   time frame on it, Ellen, are you talking about in
16   his life? Are you talking about in his employment
17   here with Suffolk County?
18 Q. I think I made it clear I'm talking about your
19   employment at Suffolk County with respect to
20   fellow employees.
21 A. No, not that I recall.
22 Q. Have you ever made any derogatory comments towards
23   any racial or ethnic group while you were at work?
24   MR. PFAFF: Here at Suffolk County?

COPLEY COURT REPORTING
(617) 423.5841

162

1      couldn't do it alone.  That's actually when the

2      details on somewhat of a consistent rate started

3      to come through.

4  Q.  And would employees of the Department kind of

5      backfill when MDC couldn't fill out the detail

6      requests?

7  A.  Yes.

8  Q.  They would look to this Department?

9  A.  Yes.

10  Q.  Commencing then in about --

11  A.  That carried out to the Chelsea police, Revere and

12      other agencies as time went on.

13  Q.  Other agencies if they couldn't fill their need

14      for detail officers would contact the Suffolk

15      County Sheriff's Department?

16  A.  Yes.

17  Q.  How frequently -- beginning in 1986, how

18      frequently a year did you perform details?

19  A.  I never said no.

20  Q.  That doesn't help me here.  So how frequently

21      would you perform details per year?

22  A.  As time went on and we picked up more details, it

23      could -- from 1986 on?  It went from perhaps 15 to

24      20 details a year to on up to maybe 100.

COPLEY COURT REPORTING
(617) 423.5841

172

1   A.   Because we had talked about -- I think we may have
2        had a discussion as to who we supported and who we
3        believed would be a better sheriff for us.
4        Approximately two weeks prior to around that, a
5        week or two prior to his election, we went to a
6        function in East Boston and listened to what
7        Murphy had to say.
8   Q.   Who organized the function?
9   A.   I think it was Al Moscone.
10  Q.   Well, you think it was Al?
11  A.   Well, yeah, I believe it was -- I'm not sure who
12       else was involved in it.  I mean, you sat down.
13       You listened to what the guy had to say.  You
14       wrote a check, turn the check over.
15  Q.   Did Captain Moscone organize that event?
16  A.   He organized -- he had called me about attending
17       it.
18  Q.   Prior to him calling you to attend this event,
19       when did you first learn that he supported Steve
20       Murphy for the Suffolk County sheriff?
21  A.   I don't recall.
22  Q.   Well, if the event occurred a week or two weeks
23       before the September primary, in relation to that,
24       do you know when you learned?

COPLEY COURT REPORTING
(617) 423.5841

177

1  that whole event. I just -- I had received a call
2  from him. And we actually went over -- I just
3  listened to what Murphy had to say.
4  Q. Was his wife involved in organizing that event?
5  A. She was there. She was there.
6  Q. Who else organized it besides --
7  A. I don't know who else, but there were numerous
8  people I never saw there before. I would have to
9  say the majority of the people that I saw I'd
10  never seen there.
11  Q. Where was that?
12  A. In Boston, Orient Heights at a Chinese restaurant.
13  Q. Did you participate in any phone banks for Stephen
14  Murphy?
15  A. No.
16  Q. Attend any political meetings for him?
17  A. No.
18  Q. Volunteer on any committees?
19  A. No.
20  Q. Hold any signs?
21  A. No.
22  Q. March in any parades on his behalf?
23  A. No.
24  Q. A sign at your house?

COPLEY COURT REPORTING
(617) 423.5841

178

1  A. No.
2  Q. Do you have a bumper sticker on your car?
3  A. No.
4  Q. Did your wife have a bumper sticker on her car?
5  A. No.
6  Q. Did you work the polls on election day?
7  A. I did not, no.
8  Q. When you attended this fund-raiser with Captain
9  Moscone in late August and early September before
10  the 2004 primary, did you see any other employees
11  there from the Department?
12  A. Yes.
13  Q. Who did you see?
14  A. I saw Captain Coleman, Matty Mullen, Kevin
15  Janielis. I saw some former employees there, guys
16  who retired, Peter Cipriano. Like I say, the
17  majority of the people there I wasn't familiar
18  with. They were from that side of the tracks.
19  Meaning I'm from the other side of Boston. I
20  really don't know East Boston and that area very
21  well.
22  Q. Okay. I didn't know what side of the tracks you
23  were referring to.
24  A. It's south and north of Boston. I meant nothing

COPLEY COURT REPORTING
(617) 423.5841

179

1  else by that.
2  Q. Other than Captain Coleman, Captain Moscone,
3  Captain Janielis, and is it Lieutenant Mullen?
4  A. Matthew Mullen.
5  Q. I'm wondering what his status was?
6  A. He was a lieutenant, temporary lieutenant.
7  Q. Other than those individuals, and yourself, did you
8  see anybody else from the Department?
9  A. Not off the top of my head.
10  Q. Did you contribute any money to the Murphy
11  campaign?
12  A. Yes.
13  Q. By check or by cash?
14  A. Check.
15  Q. How much?
16  A. I don't recall. I don't recall if it was 100 or
17  200. I forget. Definitely at least a 100.
18  Q. How many times did you contribute money?
19  A. Just once.
20  Q. How did you make your support of Stephen Murphy
21  known within the Department?
22  A. I didn't.
23  Q. Were you vocal at all about your support for
24  Stephen Murphy within the Department?

COPLEY COURT REPORTING
(617) 423.5841

180

1  A. If someone asked me, I would say who I was
2  supporting, yes.
3  Q. How many times did people ask you?
4  A. Who knows. I don't recall -- I mean people asked,
5  but I don't recall who asked.
6  Q. Do you recall having discussions with fellow
7  employees about your support for Stephen Murphy?
8  A. No, not necessarily.
9  Q. What do you mean not necessarily? What do you
10  mean? Yes?
11  A. I mean I just don't recall anything that stands
12  out with having, with discussions with fellow
13  employees in regard to that. I mean, I don't
14  recall that.
15  Q. Did you tell Sheriff Cabral that you were
16  supporting Stephen Murphy for the Suffolk County
17  sheriff's race?
18  A. No.
19  Q. Did you tell Victor Theiss?
20  A. No.
21  Q. Did you tell Elizabeth Kelly, the chief of staff?
22  A. No.
23  Q. Did you tell Superintendent Sumpter that you were
24  supporting Stephen Murphy in the Suffolk County

COPLEY COURT REPORTING
(617) 423.5841

187

1    Q.  When you say we, what do you --

2    A.  Meaning me.  As the grievance coordinator, I went

3         in to see him.

4    Q.  So it was just you and Superintendent Sumpter?

5    A.  And Gene, yes.

6    Q.  Now, you just referenced a meeting that Captain

7         Janielis had with other unidentified people.  Who

8         did Captain Janielis meet?

9    A.  Captain Janielis I know was brought into the shift

10        commander's office after the election.

11   Q.  In September or November?

12   A.  September.

13   Q.  After the primary --

14   A.  I believe it was after the primary election.  I

15        know he had told him that he had attended a

16        Murphy, he was a Murphy supporter and that he had

17        attended Murphy's time in Orient Heights.

18   Q.  He told who?

19   A.  I believe it was Gene Sumpter and whoever was at

20        the meeting with him.  I know Captain Casey was at

21        the meeting with him.  I think Jerry Walsh was at

22        the meeting with him.  But this is what was

23        relayed to me.

24   Q.  Who related this to you?

188

```
 1    A.  Kevin did.

 2    Q.  Kevin Janielis?

 3    A.  Yes.

 4    Q.  Captain Janielis?

 5    A.  Yes.

 6    Q.  Who called him into this office, do you know?

 7    A.  I don't know.

 8    Q.  Tell me everything you recall about what he said

 9        to you about this meeting.

10    A.  He just said that he was called in, and they

11        discussed, that part of the discussion was the

12        political event that we attended.

13    Q.  Is Captain Janielis a deputy sheriff?

14    A.  Yes.

15    Q.  Has he been decommissioned?

16    A.  No.

17    Q.  So again --

18    A.  He's our shift commander.

19    Q.  So again, Lieutenant Lynch, do you have any

20        evidence, do you have any direct evidence that

21        Sheriff Cabral knew that you supported Steve

22        Murphy?

23    A.  Once again, I believe my conversation with Gene

24        Sumpter and the way he opened it up, they were
```

1



1          UNITED STATES DISTRICT COURT

2          DISTRICT OF MASSACHUSETTS

3

4     Volume: I

5     ****************************************
      DAVID BERGERON, ET AL,              :
6                    Plaintiffs,          :
      vs                                  :
7     ANDREA CABRAL,                      :
                     Defendant.           :
8     ****************************************

9            DEPOSITION OF ALBERT J. MOSCONE, a

10    witness called on behalf of the Defendant,

11    taken pursuant to the applicable provisions of

12    the Massachusetts Rules of Civil Procedure,

13    before William M. Jackson, Professional Court

14    Reporter and Notary Public in and for the

15    Commonwealth of Massachusetts, at the Nashua

16    Street Jail, 200 Nashua Street, Boston,

17    Massachusetts 02114, on September 27, 2006,

18    commencing at 10:00 a.m.

19

20

21          COPLEY COURT REPORTING, INC.
                101 TREMONT STREET
22          BOSTON, MASSACHUSETTS  02108
                 (617) 423-5841
23              www.copleycourt.com

24

**ORIGINAL**

DISK
ENCLOSED



**Page 7**

1. Q. Do any of those medications effect your ability
2. to answer or understand the questions?
3. A. No.
4. Q. Have you consumed any alcohol in last
5. twenty-four hours?
6. A. No.
7. Q. In preparation for your testimony here today,
8. Captain Moscone, did you review any documents?
9. A. Absolutely.
10. Q. What did you review, sir?
11. A. All the documents that were involved pertaining
12. to this case.
13. Q. What specific documents did you review?
14. A. Anything that was pertaining to this case.
15. Q. What I am asking you, Captain Moscone, what
16. documents did you review, specifically,
17. identify them for me, please.
18. A. I reviewed -- can I talk to counsel?
19.         MR. PFAFF:  No.  Answer the question.
20.         THE WITNESS:  I reviewed the
21. documents on my case on my discipline for
22. writing up a subordinate for sleeping on the
23. job.

**Page 8**

1. Q. You reviewed documents pertaining to discipline
2. that was made out to you concerning what?
3. A. Concerning how I wrote up a subordinate for
4. sleeping and how I got disciplined for it.
5. Q. In addition to those documents, what other
6. documents did you review in preparation for
7. your deposition testimony today?
8. A. I don't believe that I did review any other
9. documents.  I just looked at that document.
10. Q. So your answer is the only documents that you
11. have reviewed in preparation for today's
12. testimony is any documents pertaining to
13. discipline that was meted out to you when?
14. A. In November of '05.
15. Q. You reviewed nothing else?
16. A. Nothing else.
17. Q. Have you spoken with anyone in preparation for
18. your testimony here today?
19.         MR. PFAFF:  Objection.  You may not
20. answer regarding any conversations you have had
21. with counsel.
22. Q. Certainly, with the proviso, any conversations
23. that you had with counsel, have you spoken with
24. anyone else with regard to your testimony here

**Page 9**

1. today?
2. A. No.
3. Q. Have you spoken to any other plaintiffs in
4. preparation for your testimony here today?
5. A. Not in preparation for this here.  No.  I spoke
6. about the dates that everybody would be getting
7. called for.
8. Q. Other than that, you have not spoken to anyone
9. else for your testimony?
10. A. No.
11. Q. What's your date of birth, sir?
12. A. August 27, 1955.
13. Q. Can you describe your educational background,
14. please?
15. A. I graduated high school.  I took a couple of
16. law courses at Bunker Hill Community College.
17. I became an EMT.  That is pretty much it.  A
18. lot of training from this department.  Other
19. than that, that is all.
20. Q. When did you become an EMT?
21. A. 1999.
22. Q. When did you take law courses at Bunker Hill
23. Community College?
24. A. 1998, 1997.

**Page 10**

1. Q. Did you receive any degrees from Bunker Hill
2. Community College?
3. A. No, I did not.
4. Q. When did you begin your employment with the
5. Suffolk County Sheriff's Department?
6. A. January, 1983, I believe.
7. Q. Your current rank now is captain?
8. A. Yes.
9. Q. When were you promoted to captain, sir?
10. A. Around 1989.
11. Q. How did you get your job at the Suffolk County
12. Sheriff's Department?
13. A. I applied for it.
14. Q. Who was the sheriff then?
15. A. Dennis Kearney.
16. Q. Did you know Mr. Kearney before you applied?
17. A. Yes.
18. Q. How did you know him?
19. A. He grew up in East Boston where I grew up.  I
20. was friends with his younger brothers.
21. Q. When you began your employment with the Suffolk
22. County Sheriff's Department, and Mr. Kearney
23. was sheriff, what was the first rank that you
24. held?

**Page 11**

1. A. Jail officer.
2. Q. If you could, review for us the positions that
3. you have held and the ranks that you have held
4. since you commenced your employment with the
5. Sheriff's Department in January of 1983?
6. A. In 1986, I got promoted to a corporal.  In
7. approximately 1987, I got promoted to sergeant.
8. In 1988, I was promoted to lieutenant.  In
9. 1989, I believe I was promoted to captain.
10. Those are on or about dates.
11. Q. Who was the sheriff when you were promoted to
12. corporal?
13. A. Sheriff Rufo.
14. Q. Did you know at all before he became
15. sheriff?
16. A. He was the under sheriff for Sheriff Kearney at
17. the time.
18. Q. So you were familiar with him?
19. A. Yes.
20. Q. Did you take an examination to become corporal?
21. A. No.  There were no examinations at that time.
22. Q. Did you take an examination when you were
23. promoted to sergeant?
24. A. No.

**Page 12**

1. Q. Did you take an examination when you were
2. promoted to lieutenant?
3. A. No.
4. Q. Did you take an examination when you were
5. promoted to captain?
6. A. No.
7. Q. Which sheriff promoted you to those positions,
8. Captain?
9. A. Sheriff Rufo.
10. Q. In addition to the ranks that you have just
11. identified for us, what positions or
12. assignments have you had while at the Suffolk
13. County Sheriff's Department?
14.         MR. PFAFF:  Objection to the form.
15. You can answer.
16. A. As a corporal, I was assigned to radio
17. dispatch.  As a sergeant, I was put in charge
18. of the radios along with the radio dispatch.
19. As a lieutenant, I oversaw the central control,
20. front lobby, and the dispatch.  As captain, I
21. was in charge of communications,
22. transportation, booking room, property room,
23. and the vehicles.
24. Q. What were your duties and responsibilities when

16

```
 1              them there.  For instance, there was one

 2              individual that had a pimple on his back.  We

 3              got a phone call from the doctor, I forget the

 4              doctor's name, and he wanted to know why we

 5              brought this individual to that hospital for a

 6              pimple on his back.  I was concerned because,

 7              you know, every time you take a detainee out of

 8              this institution, you run the risk of an escape

 9              or a problem.  So I had a lot of concerns about

10              the hospital assignments as well as the short

11              staff on transportation.

12      Q.      So your suggestion to resolve this issue,

13              concern, was to add more staffing?

14      A.      Yes.

15      Q.      Was that the suggestion you made to Gerry

16              Horgan, Gerard Walsh?

17      A.      Yes.

18      Q.      Did you add any other suggestions to this

19              solution other than staffing?

20      A.      Not to my knowledge.

21      Q.      When were you moved out of central control to

22              transportation?

23      A.      I believe that it was in 1999.

24      Q.      Who moved you?
```

18

| | | |
|---|---|---|
| 1 | Q. | What did you tell him? |
| 2 | A. | Possibly that we may need more staff. |
| 3 | Q. | So you proposed the same solution that you |
| 4 | | proposed to Gerry Walsh and Gerard Horgan, that |
| 5 | | you needed more staff? |
| 6 | A. | Yes. |
| 7 | Q. | In addition, what other duties and |
| 8 | | responsibilities did you have when you were in |
| 9 | | transportation, Captain Moscone? |
| 10 | A. | For the last 18 years, since we have been in |
| 11 | | this building, I oversaw the contracts for the |
| 12 | | fire alarm system, the elevator system, the |
| 13 | | card reader, the radios, the leaps terminal, |
| 14 | | and not only did I see them on a day-to-day |
| 15 | | basis, I helped write a lot of the specs on the |
| 16 | | contracts. |
| 17 | Q. | Which contracts did you write the specs? |
| 18 | A. | The fire alarm system, the radio system, the |
| 19 | | elevators, the card reader. |
| 20 | Q. | When did you do that? |
| 21 | A. | Since we moved into this building.  I believe |
| 22 | | it was 1990. |
| 23 | Q. | Since the '90s, were you involved in the |
| 24 | | renegotiations of those contracts or different |

**19**

1  specs?
2  A. Yes. I believe that we had a three-year
3  contract on a lot of the contracts. It would
4  be three years that we had, you know, we write
5  contracts, every three years. I was doing it
6  along with, I believe it was Dan Martinez and
7  Tim Kenneally.
8  Q. These are the two other individuals that you
9  worked with respect to this contract?
10  A. Yes.
11  Q. Was there anybody else at the Sheriff's
12  Department at the Nashua Street Jail that was
13  responsible for overseeing any contracts?
14  A. For the same contracts?
15  Q. No. For other contracts.
16  A. I think there was maintenance that was involved
17  in a lot of other contracts. I don't know
18  specifically why.
19  Q. Had you received any training in contracts or
20  managing contracts?
21  A. Self taught.
22  Q. When you took over the transportation
23  department, and, again, remind me, what year
24  was that?

**20**

1  A. I believe that it was in 1999.
2  Q. What was your assessment of how the
3  transportation department was running in 1999?
4  A. The overall assessment was pretty adequate. I
5  thought it was set up really well.
6  Q. Did you think it was running efficiently?
7  A. Yes, it was. We just had to move with the
8  times. Like I told you, people were getting
9  sicker. There were more hospital runs, and we
10  needed more staff.
11  Q. What were your day-to-day responsibilities when
12  you were in charge of transportation in 1999?
13  A. Handling those contracts that we just spoke
14  about on a day-to-day basis. Elevators broke
15  down, radio equipment failed a few times,
16  vehicles would breakdown. The fire alarm
17  system, too, we would have problems with. It
18  was a busy day.
19  Q. In addition to maintaining the contracts and
20  fire alarms and if the elevator broke down or a
21  car broke down, what else did you do during the
22  day?
23  A. I had to deal with the day-to-day court trips,
24  the day-to-day hospital runs. We planned

**21**

1  before for the hospital appointments so we
2  could have the proper staffing dealing with all
3  the sick individuals, where we were going to inform
4  various institutions, which have an overflow,
5  and that was a concern. We had a lot of people
6  shipped out. When their court date was up, we
7  had to get them no matter where they were. We
8  had a lot of runs to Pittsfield and other
9  counties. On some occasions, Cedar Junction,
10  Norfolk. All over the state.
11  Q. During the period of time then from 1999 to
12  about 2003, when you were in charge of
13  transportation, did you come to any conclusions
14  that the transportation department could be run
15  more efficiently or effectively?
16  A. Well, there is always room for improvement.
17  There is just always room for improvement.
18  That is the only answer that I can give you.
19  Q. Were there any problems or concerns or issues
20  that you observed while you were in change of
21  transportation from 2000, 2003?
22  A. The only problems I saw were the trip schedules
23  and how busy we were getting.
24  Q. What did you do with respect to the trip

**22**

1  schedules to make the department run more
2  efficiently?
3  A. I had a lieutenant down there that was working
4  with me. He was handling all the South Bay
5  transportation trips. I had Mark Charles up in
6  discharge, overseeing it in the afternoon, and
7  I was handling the jail aspect of it to make
8  sure that everything went well.
9  Q. So you had assistants, two other individuals
10  working with you to manage the transportation
11  department?
12  A. You could say that, yes.
13  Q. In addition to transportation and managing of
14  the contracts, did you have any additional
15  responsibilities specifically with respect to
16  property?
17  A. Yes. I had the property, I felt that --
18  Q. What were your duties and responsibilities with
19  respect to property?
20  A. When we took over the property area, we had
21  audits that were not going well for the
22  property area. When I went down there, we
23  cleaned up all the problems and we got a good
24  report from the audit.

**23**

1  Q. When was this?
2  A. I want to say around 2000, 2001. Somewhere
3  around there.
4  Q. What specifically were your duties and
5  responsibilities with respect to the property
6  department?
7  A. We made sure that for thirty days, the property
8  was sent out to where it was supposed to go. I
9  noticed that there was a lot of property there
10  from years. We just had to clean it all up. I
11  worked with Gerry Walsh in cleaning up a lot of
12  that property as well.
13  Q. With respect to property, did that involve
14  searching the detainees before going to court?
15  A. Yes. Every detainee has to be searched before
16  going to court in the back of the shower room.
17  Q. Who was in charge of that responsibility, was
18  that your responsibility?
19  A. Yes. I was in charge of transport. I sent the
20  officers down there to make sure they were
21  doing what they were supposed to be doing.
22  Q. Were there ever any concerns raised with you
23  with respect to your supervision of the
24  property department while you were in charge of

**24**

1  transportation?
2  A. Not to my knowledge.
3  Q. After Sheriff Cabral became sheriff, were there
4  any concerns raised with you with respect to
5  the property department and the efficiencies of
6  getting individual searches before going to
7  court?
8     MR. PFAFF: Objection. Did he raise
9  any concerns about the process or other people?
10  Q. Did other people raise concerns with you, did
11  anybody raise concerns with you, address you
12  with respect to issues or problems that they
13  had with the property was being managed or
14  supervised?
15  A. No.
16  Q. In your estimation, how did you think the
17  property department was being managed and run?
18  A. While I was in charge of it?
19  Q. Yes.
20  A. Adequate. Good.
21  Q. How would you evaluate your performance,
22  Captain Moscone, with respect to your managing
23  of the contracts that you have identified?
24  A. Good.

Page 19 - Page 24                    **Copley Court Reporting**

```
                                              25
1   Q.  Did anybody ever raise any concerns with you
2       about your supervision of the area of
3       contracts?
4   A.  There were a lot of compliments by Tim
5       Kenneally.  One contract I saved a hundred
6       thousand dollars, over a hundred thousand
7       dollars.
8   Q.  What contract was that?
9   A.  The elevator claim.
10  Q.  When was that?
11  A.  2000, I believe.
12  Q.  Were there ever any occasions when bills were
13      paid for services that were not rendered?
14  A.  Not to my knowledge.
15  Q.  While you were in charge, were there ever any
16      issues when bills were paid to contractors that
17      were no longer doing business with the Suffolk
18      County Sheriff's Department?
19  A.  Not to my knowledge.
20  Q.  Did anybody in the department under the Cabral
21      administration ever bring to your attention
22      that there were concerns or issues concerning
23      the way you were managing contracts?
24  A.  No.
```

```
                                              26
1   Q.  Who took over the responsibility of managing
2       contracts that you previously had
3       responsibility for?
4   A.  Maintenance.
5   Q.  Who took over the responsibility in
6       maintenance?
7   A.  I don't know.
8   Q.  Was it Captain Morelli?
9   A.  Whoever was in charge of maintenance at the
10      time.
11  Q.  Do you recall who was in charge of maintenance
12      at the time?
13  A.  It might have been Captain Morelli;  I think he
14      was overseen by Deputy Cookson.  So maybe he
15      might have been indirectly involved in the
16      contracts.  I don't know.
17  Q.  Did you have any conversations with them after
18      they took over responsibilities of taking over
19      the contracts?
20  A.  No.
21  Q.  Did you discuss with them anything that you
22      learned and to transition them into managing
23      the contracts?
24  A.  Yes.  Yes, I did.
```

```
                                              27
1   Q.  What was that?
2   A.  That was with Captain Morelli.
3   Q.  When was that?
4   A.  On or around 2003, I believe.
5   Q.  Was that the period of time that the
6       responsibility for the contracts was moved from
7       you to Captain Morelli?
8   A.  Yes.
9   Q.  Captain Morelli at the time was the supervisor
10      of maintenance?
11  A.  That's correct.
12  Q.  Was he managing any contracts, to your
13      knowledge, prior to 2003?
14  A.  I don't know which ones; but I believe so.
15  Q.  He had experience handling contracts?
16  A.  I don't know.
17  Q.  To your knowledge.
18  A.  I don't know.  I know that I talked with him at
19      length when everything was turned over to him.
20  Q.  How would you evaluate Captain Morelli's
21      performance with respect to managing the
22      contracts after it was turned over to him?
23  A.  Excellent.
24  Q.  Directing your attention to 2004, was there an
```

```
                                              28
1       audit of the transportation department?
2   A.  By who?
3   Q.  Was there a review of the transportation
4       department by the Cabral administration?
5   A.  Yes, there was.
6   Q.  Do you recall when that commenced, when that
7       started?
8   A.  I don't know.  Maybe around 2003, I sat down
9       with Deputy Superintendent Gerry Walsh and
10      discussed a lot of the concerns just before I
11      got moved out of there.
12  Q.  What was the reason for the review of the
13      transportation department, who requested it?
14  A.  I don't recall.
15  Q.  Did you request a review of the transportation
16      department?
17  A.  I know I spoke to him at length about my
18      concerns.  Maybe I might have been part of it.
19      I don't know.
20  Q.  Did you request a review of the transportation
21      department?
22  A.  Not specifically.
23  Q.  When did you become aware that review or an
24      audit of the transportation department was
```

```
                                              29
1       going to be conducted?
2   A.  Early 2003.
3   Q.  Who told you?
4   A.  I believe it was Deputy Walsh.
5   Q.  Did he tell you why they were conducting a
6       review or an audit of the transportation
7       department?
8   A.  No.
9   Q.  Did you ask why?
10  A.  Yes.
11  Q.  What were you told?
12  A.  Just that they were reviewing staffing levels
13      and seeing if they can help us along with a lot
14      of the trips.  That was about it.  I don't
15      think they accepted my answer as far as more
16      manpower.  I don't know.
17  Q.  You made a suggestion to them that there should
18      be more manpower?
19  A.  Yes.
20  Q.  That was the solution that you suggested?
21  A.  Yes.
22  Q.  Were you involved in this review of the
23      transportation department?
24  A.  Yes, I was.
```

```
                                              30
1   Q.  Did you have the opportunity to participate and
2       offer input?
3   A.  Yes.
4   Q.  Who else was involved besides you and Gerry
5       Walsh?
6   A.  I believe Deputy Superintendent Carney might
7       have been involved.
8   Q.  Anybody else other than Deputy Superintendent
9       Carney, yourself, and Gerry Walsh?
10  A.  Yes.
11  Q.  Who?
12  A.  All three of them.
13  Q.  Nobody besides the three of you?
14  A.  Oh, yes.
15  Q.  What were the conclusions of the audit --
16      strike that.
17          What did you do, what was your
18      participation in it?
19  A.  Well, we had, I pulled together a court list
20      for the last, approximately, thirty days.  We
21      ranged approximately maybe 75 to 80 individuals
22      going to court on a daily basis.  We averaged
23      approximately five to seven hospital runs per
24      day.  I was concerned.
```

31

```
 1      Q.   I think my question was, what was your role in
 2           the audit, what did you do?
 3      A.   I just told them the concerns that I had.  Then
 4           we went from there.
 5      Q.   Was there a goal of the audit to make the
 6           transportation process more efficient and cost
 7           effective?
 8      A.   Yes.
 9      Q.   Were there concerns then that were raised that
10           the transportation department as it existed
11           under your supervision was not cost effective
12           and not efficient?
13      A.   If they were, they were never stated to me.
14           They never stated that to me.
15      Q.   Nobody ever said to you while you were in
16           charge of transportation under the Cabral
17           administration that transportation was not
18           running efficiently or ineffective in terms of
19           its cost?
20      A.   Not directly to me.
21      Q.   Did anybody ever say anything, even not direct,
22           what did you hear?
23      A.   I didn't hear much.
24      Q.   If you didn't hear much, what did you hear?
```

40

```
 1            were implemented after the audit report was
 2            generated?
 3                    MR. PFAFF:  Objection.
 4      A.    I didn't say that.
 5      Q.    I want to make sure that I understand your
 6            testimony.  I thought your testimony was that
 7            the transportation department ran the same way
 8            after the audit as it did before the audit?
 9      A.    I was not there long enough to find out how
10            long it ran.
11      Q.    During the period of time that you were there,
12            what did you do to support the recommendations
13            that were proposed as part of this audit
14            committee?
15      A.    I recommended to roll call, do the best that
16            you can, double up on the trips.
17      Q.    In your estimation, did you do everything that
18            was required of you in order to implement these
19            proposals that were listed in the audit report?
20      A.    Yes, I did.
21      Q.    Did you have any difficulty or problems in
22            implementing the changes?
23      A.    No.
24      Q.    Who was responsible for implementing these
```

41

```
 1              changes?
 2     A.   Deputy Walsh and Deputy Carney.
 3     Q.   As head of transportation, what
 4          responsibilities did you have?
 5     A.   I oversaw --
 6                MR. PFAFF:  Wait for the question to
 7          be finished.
 8     Q.   I recognize that it is hard.  It is an awkward
 9          way to have a conversation.
10                As supervisor of the transportation
11          department, what responsibility did you have,
12          Captain Moscone, to implement these changes and
13          to ensure that the changes and recommendations
14          were being implemented?
15     A.   Again, at roll call, I told people what needed
16          to be done, and that the staff that we normally
17          have, we were not going to be getting, and to
18          do the best that you can.
19     Q.   Did you ever express any displeasure or
20          disagreement to fellow employees about the
21          recommendations that were made?
22     A.   No.
23     Q.   Did you ever indicate to any fellow employees
24          or individuals assigned to transportation that
```

43

```
 1              (Document to 7-3 shift commanders
 2       from Deputy Superintendent Cliff Carney, dated
 3       October 22, 2004, re: Court transportation, was
 4       marked as Exhibit Number 3 for identification).
 5   Q.  I am placing before you what has been marked as
 6       Exhibit Number 3, Captain Moscone.  Do you
 7       recognize that?
 8   A.  Yes.
 9   Q.  What do you recognize that to be?
10   A.  A direct order.
11   Q.  Well, what is it, have you seen this before?
12   A.  Yes.  It was a change.
13   Q.  What did the change refer to, what is this
14       order?
15   A.  That the shift commander is going to handle the
16       hospital trips, and communications was going to
17       handle the daily jail trips and house of
18       corrections trips.
19   Q.  Do you know what necessitated the issuance of
20       this order on October 22?
21   A.  No.
22   Q.  Well, the order refers, does it not, to the
23       April 16, 2004 audit, which has been previously
24       marked as Exhibit Number 2; is that correct?
```

44

```
 1              MR. PFAFF:  Objection.

 2     A.   Yes.

 3     Q.   Do you know whether or not there was some

 4          concerns that the directive and the

 5          requirements to implement the proposals in the

 6          audit were not being done?

 7     A.   Not to my knowledge.

 8     Q.   Going back for a moment, Captain Moscone, to

 9          the audit that you helped prepare, Exhibit

10          Number 2.  Is it fair to say that one of the

11          concerns that the audit identified was that

12          trip assignment should originate from

13          communications, as opposed to transportation,

14          so it can be more efficient and better

15          consolidated?

16     A.   Repeat the question, please.

17              MS. CAULO:  Read the question back,

18          please.

19                 (Record read)

20              MR. PFAFF:  Objection.  The document

21          speaks for itself.

22     A.   Yes.

23     Q.   Was another area that was identified in the

24          audit -- strike that.
```

45

```
 1              Was another area that was reviewed
 2      and identified as a problem in the audit, was
 3      the issue of property and insuring that
 4      property of detainees went with them, and there
 5      was concern of how to more efficiently manage
 6      them?
 7              MR. PFAFF:  Objection.
 8   A.   Yes.
 9   Q.   And those were areas, transportation, trip
10      assignments, and property that were under your
11      supervision and control from about 1999 to
12      2004; is that correct?
13   A.   No.  That is not correct.  I didn't takeover
14      the property area -- I'm sorry.
15   Q.   Go ahead.
16   A.   I didn't takeover the property area until I
17      want to say 2002, 2001.
18   Q.   I thought your earlier testimony was that
19      property was one of your responsibilities after
20      you were moved to transportation in about 1999?
21   A.   No.  That is not correct.  That was added onto
22      me a couple of years later.  I am not sure what
23      year it was.
24   Q.   So property and transportation were your
```

49

1    A. Yes. Just as efficiently as when I was down
2       there.
3    Q. But it is running differently; is that correct?
4       MR. PFAFF: Objection. Asked and
5       answered.
6    A. I couldn't answer that. I am not down there.
7       I can only give you my opinion.
8    Q. Well, the proposals, the suggestions that were
9       recounted in Exhibit Number 2, the audit
10      report, were not being implemented when you
11      were in charge of supervision?
12   A. I don't know.
13   Q. When you were supervising the transportation
14      department, Captain Moscone -- strike that.
15          The audit recommended changes to the
16      way the transportation department should be
17      run; is that correct?
18   A. That's correct.
19   Q. Those recommendations, the matter in which --
20      strike that.
21          The audit suggested that it be done
22      differently than while you were running it, is
23      that fair to say?
24   A. Yes.

50

1    Q. So is it fair to say that the transportation
2       department is now being run differently than
3       when you were in charge?
4       MR. PFAFF: Objection. You asked if
5       the transportation department is running more
6       efficiently originally.
7    Q. You may answer.
8    A. Again, I am not down there on a day-to-day
9       basis. I can only guess. I can only give you
10      my opinion. I would hope that it would be
11      running efficiently.
12   Q. My question, is it being run differently than
13      the matter in which you ran it?
14      MR. PFAFF: Objection.
15   A. I am not down there, counsel. I don't know. I
16      can tell you that in my opinion, it probably is
17      run differently.
18   Q. When were you transferred out of
19      transportation?
20   A. December 29, 2003, I believe.
21   Q. You were transferred out of transportation
22      before the audit was conducted?
23   A. Again, I don't know if that year is correct.
24      It could be '03. It could be '04. I can't

51

1       recall. December 29 of '03 or '04.
2    Q. So you are not sure whether you were already
3       out of transportation before the audit was
4       conducted or afterwards?
5    A. I didn't say that.
6    Q. I am trying to be clear.
7    A. I am saying I don't know if it was '03 or '04.
8       I know it was December 29.
9    Q. Is there anything that would help you recall
10      what the date was?
11   A. There was a letter of my transfer. I don't
12      know if you have it.
13   Q. I don't. Do you have it?
14   A. No.
15   Q. Well, you had a copy of it?
16   A. I did.
17   Q. Who informed you that you were being
18      transferred?
19   A. I received a letter.
20   Q. From whom?
21   A. From the shift commander in an envelope handed
22      to me I believe with Superintendent Sumpter's
23      name along with Deputy Carney's signature on
24      it.

52

1    Q. What did the letter say?
2    A. That on December 29, '03 or '04, I can't
3       remember, you will be reporting to the three to
4       eleven shift.
5    Q. Were you provided any reasons for the transfer?
6    A. I inquired to Deputy Carney why. He said it
7       was just staffing. They needed my experience
8       on the three to eleven shift, I was told.
9    Q. Who else was present when you had the
10      conversation with Deputy Superintendent Carney,
11      anybody else?
12   A. No.
13   Q. Were you provided with any other reasons?
14   A. No.
15   Q. Were you advised or ever informed that one of
16      the reasons for the change in staffing was you
17      were not implementing the changes recommended
18      in the audit?
19   A. No.
20   Q. Did anyone ever discuss anything other than
21      staffing for the reason for your removal from
22      transportation?
23   A. No.
24   Q. Why do you think that you were transferred out

53

1       of transportation?
2    A. Retaliation for -- I am the president of the
3       union, and my political affiliation with Steve
4       Murphy, who happened to run for sheriff against
5       Sheriff Cabral.
6    Q. Why do you think that?
7    A. It is ironic how I got moved, the election was
8       in November, I was moved in December.
9    Q. So does that mean that you were -- I'm sorry,
10      did you finish your answer?
11   A. Right after the election in November, I was
12      moved out of there not even a month later.
13   Q. So then does that refresh your recollection if
14      it was December of 2003 or December of 2004?
15   A. It might have been '03 or '04. You might have
16      the date. I don't. When did the sheriff
17      become sheriff?
18   Q. Unfortunately, I ask the questions. You
19      answer.
20   A. I know. I am trying to get the date correct.
21   Q. Let's do it this way. With respect to the
22      election for sheriff, when were you moved,
23      before or after?
24   A. Right after the election.

54

1    Q. Why, what is the basis for your belief that you
2       were moved out of transportation in retaliation
3       for your being president of the union, and your
4       support for Steve Murphy?
5    A. I wrote a subordinate up for sleeping on a
6       detail. I received a letter of discipline.
7    Q. My question is, why do you believe that you
8       were moved out of transportation in retaliation
9       -- strike that.
10          Why do you believe on December 29 in
11      either '03 or '04 that you were moved out of
12      transportation for retaliation of your union
13      activities, president of the union, and your
14      support for Mr. Murphy?
15      MR. PFAFF: Objection. You just
16      answered. Answer it again.
17   A. I forgot what I answered. Can I have him
18      repeat that?
19          (Record read)
20   Q. When did you write a subordinate up for
21      sleeping on a detail?
22   A. November. Again, right after the election. I
23      am not sure.
24   Q. Why does that incident lead you to believe that

62

```
 1     A.    A less desirable assignment, a less desirable

 2           shift, and less desirable workload.

 3     Q.    Why was it less desirable an assignment to you?

 4     A.    I am the only captain in charge of a floor.

 5     Q.    Why is that less desirable?

 6     A.    Why is it less desirable?

 7     Q.    Yes.

 8     A.    Well, if you want to put captains on the floor,

 9           put all the captains on the floor.  Don't just

10           single out one person because of strictly

11           retaliation.

12     Q.    Why is the assignment less than desirable,

13           Captain, why is it less desirable?

14                 MR. PFAFF:  Objection.  Asked and

15           answered.

16     A.    In my personal opinion?

17     Q.    Yes.

18     A.    You are wasting a good guy on a floor.

19     Q.    Is it fair to say that other employees of the

20           department may not agree with your assessment

21           that it is less than a desirable position?

22                 MR. PFAFF:  Objection.  Speculation.

23     A.    Can I hear that one more time?

24     Q.    Sure.  Is it fair to say that other employees
```

63

```
 1            of the department might not agree with your
 2            assessment that a floor supervisor is a less
 3            desirable position?
 4                      MR. PFAFF:  Objection.
 5       A.   I don't mean that in a negative way.  I have a
 6            lot of respect for everybody that works here.
 7            As a captain, 24 years experience, a senior
 8            captain, it was wrong for them to move me to
 9            that position.
10       Q.   Were any other senior officers moved at that
11            time, captains, lieutenants, moved to different
12            shifts?
13       A.   I believe so.
14       Q.   You were not the only, I will use the
15            vernacular, white shirt, you were not the only
16            white shirt, if you will, moved to a different
17            shift or assignment in December of '03 or '04,
18            depending on what the actual date is?
19       A.   I was the only captain that was moved to a less
20            desirable shift.
21       Q.   In your opinion, it was less desirable?
22       A.   Yes.
23       Q.   Were there other lieutenants and captains who
24            were moved as well, also, correct?
```

68

| | | |
|---|---|---|
| 1 | A. | When I was in transportation, I was Monday |
| 2 | | through Friday, and had every weekend off. |
| 3 | Q. | When you went to the three-to-eleven shift, |
| 4 | | give that to me again, please? |
| 5 | A. | I had Friday and Monday, and every other |
| 6 | | Saturday and Sunday off. |
| 7 | Q. | That was a change from your prior? |
| 8 | A. | Along with the three to eleven hours. |
| 9 | Q. | Now, was your salary reduced now that you were |
| 10 | | no longer responsible for supervising |
| 11 | | transportation, the property area, managing |
| 12 | | contracts? |
| 13 | A. | I believe I lost department head's pay. |
| 14 | Q. | That's a differential? |
| 15 | A. | Yes. |
| 16 | Q. | Other than losing the department head |
| 17 | | differential, was your salary reduced because |
| 18 | | you were no longer responsible for property? |
| 19 | A. | No. |
| 20 | Q. | Was your salary reduced for no longer managing |
| 21 | | contracts? |
| 22 | A. | No. |
| 23 | Q. | Was your salary reduced other than the |
| 24 | | differential because now you were no longer |

1          managing transportation?

2   A.    No.

3   Q.    Did you get any differentials since the

4          transfer that you did not get before?

5   A.    Yes.

6   Q.    What were those?

7   A.    Weekend differential and the night differential

8          pay.

9   Q.    Is your salary, because you have two

10         differentials now, and you only had one

11         differential before, is your salary the same or

12         more?

13  A.    A little bit more.

14  Q.    I think I asked you this before, but I will ask

15         you again.  Is transportation a support

16         services position?

17  A.    Yes.

18  Q.    Do most support services positions have the

19         weekends off?

20  A.    Yes.

21  Q.    If you are a supervisor not in support

22         services, any supervisor, do you get the

23         weekend off?

24  A.    No.

**73**

1 charge of central control there as well as
2 dispatch and the front lobby over at Charles
3 Street?
4 A. No. At this facility.
5 Q. Were you in charge of central control over at
6 Charles Street?
7 A. No.
8 Q. But those were all, corporal and sergeant were
9 support services positions?
10 A. They were all support services.
11 Q. Did you always then have weekends off?
12 A. No. When we first moved to this building, I
13 believe I started with a Friday, Saturday off.
14 If you want to call Friday a weekend. Then I
15 guess it was changed to Sunday, Monday, and
16 then every other weekend. Then when I moved
17 into the transportation department, it was
18 Monday through Friday.
19 Q. When we left off, we were discussing your
20 discipline for the ferret incident. The
21 discipline was imposed because this individual
22 was allowed into the facility and he had a
23 ferret on his person?
24 A. He had a ferret concealed inside two jackets.

**74**

1 I happened to be the overall supervisor in
2 central control, and got a day's suspension.
3 Q. Since that incident in 1992, have you received
4 any other discipline?
5 A. I believe I got an oral warning for forgetting
6 to lock up a weapon. That was it.
7 Q. Have you received any other discipline?
8 A. Discipline that I told you earlier about, that
9 I came across a subordinate sleeping on a
10 detail, where that individual up, and I got a
11 letter of discipline for failure to supervise,
12 which I won an arbitration hearing.
13 MS. CAULO: Mark this, please.
14 (Written reprimand, dated December
15 13, 2004, was marked as Exhibit Number 4 for
16 identification)
17 Q. I am placing before you what has been marked as
18 Exhibit Number 4. I ask you if you recognize
19 this, Captain Moscone?
20 A. Yes.
21 Q. What do you recognize that to be?
22 A. A written reprimand.
23 Q. When was that discipline imposed?
24 A. November 13, 2004.

**75**

1 Q. So this was issued in November of 2004?
2 A. Yes.
3 Q. You are familiar with the complaint that your
4 attorney filed on your behalf?
5 A. Yes.
6 Q. This was imposed in December?
7 A. Yes.
8 Q. Let me show you this document, Captain Moscone,
9 and ask you if you recognize that as a
10 complaint that was filed on your behalf by your
11 attorney?
12 A. You are talking about the letter of reprimand
13 complaint?
14 Q. I am talking about that document there. The
15 complaint that is captioned David Bergeron, et
16 al versus Andrea Cabral. Is that the complaint
17 that was filed in the lawsuit that you and your
18 counsel has filed on behalf of you and the
19 other plaintiffs?
20 A. Yes.
21 Q. Directing your attention to Paragraph Number
22 27.
23 A. What page was that?
24 Q. Page Number 6. You have reviewed the

**76**

1 complaint; is that correct?
2 A. A while ago.
3 Q. Did you review it prior to it being filed?
4 A. Yes.
5 Q. Reading Paragraph Number 27. Despite the
6 sheriff's contention in the April 21, 2005
7 letter, the plaintiffs were losing their deputy
8 sheriff's position because they were members
9 not in good standing. Did I read that
10 correctly?
11 A. Yes.
12 Q. Is that an accurate statement?
13 MR. PFAFF: Objection.
14 A. Yes.
15 Q. Well, in fact, you had received discipline in
16 December of 2004?
17 A. That was overturned.
18 Q. At the time that this complaint was filed, that
19 discipline was imposed, was it not?
20 MR. PFAFF: Objection.
21 A. Yes.
22 Q. The discipline that was overturned by way of an
23 arbitration, that arbitration decision came
24 down in 2006?

**77**

1 A. Yes.
2 Q. This complaint was filed in 2005?
3 A. Yes.
4 Q. So at the time that this complaint was filed,
5 that Paragraph 27 was incorrect, because you
6 had been subjected to discipline in December of
7 2004; is that correct?
8 A. Yes.
9 Q. And that is Exhibit Number 4; is it not?
10 A. Yes.
11 Q. Are you familiar with the term deputy sheriff,
12 Captain Moscone?
13 A. Yes.
14 Q. How are you familiar with that term?
15 A. Deputy sheriff, it is sort of an honor to be
16 selected as a deputy sheriff for the Suffolk
17 County Sheriff's Department or any other
18 department.
19 Q. Why is it an honor?
20 A. Because you get to earn extra income, you have
21 more police powers, and you get to work the
22 details on the street.
23 Q. Do you have to have any special expertise or
24 talents to be deputy sheriff?

**78**

1 A. Training. You have to report training. They
2 teach you what to do while you are out there.
3 Just basic four hours detail class. You have
4 to become gun qualified.
5 Q. Is that after you get the title of deputy
6 sheriff?
7 A. It is prior to becoming deputy sheriff.
8 Q. Is there a requirement that you be gun
9 qualified before you become deputy sheriff?
10 A. Yes.
11 Q. Are there any tests that you need to take?
12 A. No.
13 Q. Any references?
14 A. No.
15 Q. Is there an application process?
16 A. Yes.
17 Q. When during your employment with the Suffolk
18 County Sheriff's Department did you first hold
19 the title deputy sheriff?
20 A. I believe it was six months after I first
21 started. Probably, June of 1984.
22 Q. That was under Sheriff Kerney?
23 A. Yes.
24 Q. What was the process for your becoming selected

94

1    Q.    When did you first begin performing details as
2          deputy sheriff?
3    A.    On or around 1985.
4    Q.    How frequently per year would you perform
5          details?
6    A.    Going through the last five years or from '94
7          on?
8    Q.    Well, let's start in the beginning.  When did
9          you start performing details, and how
10         frequently would you perform them?
11   A.    In 1985, we didn't have that many details.  We
12         had a few a year, I would say.
13   Q.    How about 1986?
14   A.    The same.
15   Q.    1987?
16   A.    I think that is the year that we received
17         details from BU.  We would do various football
18         games at the BU stadium.  If there was a bank
19         that they are responsible to have a detail, we
20         would do a detail outside of a bank that BU is
21         responsible for.  Ceremonies, graduations,
22         etcetera.
23   Q.    On average, what's your best estimate as to how
24         many details you were performing a year in 1988

95

```
 1          when BU started requesting details?
 2   A.     Approximately, twenty.
 3   Q.     How about in 1989?
 4   A.     Probably, about fifty.
 5   Q.     1990?
 6   A.     The same.
 7   Q.     Between 1990 and 1999, can you give me an
 8          average for how many details you do every year?
 9   A.     Each year?
10   Q.     Yes.  Approximately.
11   A.     Fifty.  Up until the Big Dig started.
12   Q.     When did the Big Dig start to impact the number
13          of details that you did?
14   A.     I'm not sure.  1997, 1998.  Somewhere around
15          there.
16   Q.     From 1997, 1998 to about 2004, how many details
17          did you do every year?
18   A.     A lot.
19   Q.     What's a lot?
20   A.     Money wise, probably between twenty and
21          $25,000.
22   Q.     Every year?
23   A.     I would say from 1999 to 2003 or 2004.
24   Q.     When you were doing those details, were you in
```

98

```
1    A.   I did two to three details a week up until that
2         date.
3    Q.   And who were they for?
4    A.   The Big Dig, state police.
5    Q.   To your knowledge, did the details associated
6         with the Big Dig decrease from 2005 going
7         forward until recently?
8    A.   I believe so.
9    Q.   The numbers of details were decreasing because
10        there was not a necessity, the project was
11        almost completed?
12   A.   Yes.
13   Q.   Until recently?
14   A.   Yes.
15   Q.   There were occasions when you were paid
16        directly from the entity that you were paid
17        directly for and other occasions that you were
18        paid through the department?
19   A.   Yes.
20   Q.   I know we received tax records, I believe, from
21        2002 forward.  Do you have copies of your tax
22        records prior to that would reflect detail
23        earnings?
24   A.   From 2002 current?
```

**103**

1  A. I believe so.
2  Q. Why did you go to a pager system?
3  A. To make it a little more effective. It was
4     getting huge.
5  Q. What do you mean?
6  A. We were having thirty a shift as opposed to
7     five when the Big Dig started rolling.
8  Q. That started to taper off?
9  A. Yes.
10 Q. There is far fewer Big Dig associated details
11    currently than there were in 2002, 2003, 2004;
12    is that correct?
13 A. Yes.
14 Q. Who did you support in your 2004 Suffolk County
15    Sheriff's election?
16 A. Stephen Murphy.
17 Q. Did you do any work on behalf of Mr. Murphy?
18 A. Some.
19 Q. What did you do?
20 A. Made telephone calls.
21 Q. What else?
22 A. Had a fund-raiser.
23 Q. You held a fund-raiser?
24 A. Yes.

**104**

1  Q. When did you hold the fund-raiser?
2  A. Two weeks prior to the election.
3  Q. When did you first start working for him, with
4     respect to his political campaign for sheriff?
5  A. It was late June.
6  Q. Of?
7  A. When was the election, in '03?  I am not sure
8     when the election was.  I helped him from June
9     on.
10 Q. So the June before the election going forward?
11 A. That's correct.
12 Q. So prior to the June of the election year, you
13    were not involved in any activities supporting
14    Mr. Murphy's candidacy; is that fair?
15 A. Somewhat.
16 Q. It is either fair or not fair.
17 A. I am not sure if it was May or June.  Yes.
18    That's correct.
19 Q. You indicated that you made some phone calls.
20    Where did you go to make these phone calls?
21 A. In my house.
22 Q. In addition to making phone calls, what kind of
23    phone calls were they?
24 A. Just friendly, friend phone calls.

**105**

1  Q. Did you work off a list, did you call your own
2     friends, how did this work?
3  A. There was a list generated for me by the Murphy
4     campaign.
5  Q. Who was your contact in the Murphy campaign,
6     did you meet with somebody regularly?
7  A. I just had one contact.  Anthony Albano.
8  Q. Did you ever go to any campaign meetings?
9  A. I might have gone to one.
10 Q. Did you ever volunteer for any committees?
11 A. No.
12 Q. Did you hold any signs?
13 A. No.
14 Q. Did you March in any parades?
15 A. During the election?
16 Q. Yes.
17 A. No.
18 Q. Did you have a sign at your house, a political
19    campaign sign, Murphy for sheriff?
20 A. I am not sure if I had a sign there or not.  I
21    may have.
22 Q. When did you put it up?
23 A. About a month before the election.
24 Q. Did you have a bumper sticker on your car?

**106**

1  A. No.
2  Q. You indicated that you held a fund-raiser.
3     What did you do in order to hold this
4     fund-raiser?
5  A. I called friends up, and had a small
6     fund-raiser at my friend's restaurant.
7  Q. Where was it?
8  A. East Boston.
9  Q. What's the restaurant?
10 A. Kailua Hawaiian.
11 Q. When was it?
12 A. It was two weeks before the election.
13 Q. How did you publicize it?
14 A. Word of mouth.  Phone calls.
15 Q. How many people were there?
16 A. Approximately, fifty.
17 Q. Were any employees from the department there?
18 A. Yes.
19 Q. How many?
20 A. Approximately, twenty.
21 Q. Who?
22 A. Rickey Colman, Kevin Janelis, Mike Donovan,
23    myself, Michael Sinelli, Dave McCarthy.  I
24    would have to look at my list.  I can't

**107**

1     remember the rest of the people down there.
2  Q. How did you contact these people and tell them
3     that there was a fund-raiser for Mr. Murphy?
4  A. Telephone.
5  Q. Was John Grennon?
6  A. No.
7  Q. Tim Turley?
8  A. No.
9  Q. Mark Turley?
10 A. No.
11 Q. David Bergeron?
12 A. No.
13 Q. John Ellis?
14 A. I don't believe so.
15 Q. William Pino?
16 A. No.
17 Q. Eric Deleibro?
18 A. Yes.
19 Q. Paul Giglio?
20 A. Yes.
21 Q. Did you contribute any money to the Murphy
22    campaign?
23 A. Yes.
24 Q. By cash or by check?

**108**

1  A. Check.
2  Q. How many times?
3  A. Once.
4  Q. How much?
5  A. I believe it was $200.
6  Q. Did you solicit money on that occasion for this
7     fund-raiser for Mr. Murphy?
8  A. Yes.
9  Q. Were the individuals asked to come and
10    contribute money to support his candidacy for
11    sheriff?
12 A. I don't believe so.
13 Q. Did you take any checks from them, these
14    individuals that arrived at this fund-raiser?
15 A. Yes.
16 Q. How much money did you raise for Mr. Murphy?
17 A. I believe it was under $5,000.
18 Q. In cash or check?
19 A. Check, I believe.
20 Q. All the money was provided to you by check or
21    by cash?
22       MR. PFAFF:  Objection.  Asked and
23    answered.  He said check.
24 A. I believe most of it was check.  I didn't

109

```
 1              handle it.
 2    Q.   Who handled it?
 3    A.   My wife.
 4    Q.   Was she the treasurer for the campaign?
 5    A.   No.
 6    Q.   Other than holding this fund-raiser, did you
 7         hold any position in the campaign?
 8    A.   No.
 9    Q.   Did your wife hold any position in the
10         campaign?
11    A.   No.
12    Q.   Other than holding this fund-raiser about two
13         weeks before the election, and making some
14         phone calls from your home, did you do anything
15         else in support of Mr. Murphy's candidacy for
16         sheriff?
17    A.   No.
18    Q.   Did you work the poles on election day?
19    A.   No.
20    Q.   How did you make your support for Steve Murphy
21         known?
22    A.   When people heard about that fund-raiser that I
23         had.  It went around like wildfire.  I did not
24         publicly come out and tell everybody who I was
```

110

```
 1              backing.
 2    Q.    Did you ever publicly come out and inform
 3          anyone who you were backing?
 4    A.    Outside of this facility?
 5    Q.    Yes.
 6    A.    Yes.
 7    Q.    Where?
 8    A.    My home.
 9    Q.    Inside your home?
10    A.    Yes.
11    Q.    Other than to your family, did you make your
12          support of Steve Murphy known publicly?
13    A.    No.
14    Q.    Was your name on a fund-raiser for Mr. Murphy?
15    A.    No.
16    Q.    The notification of this fund-raiser was done
17          solely by telephone?
18    A.    That's correct.
19    Q.    So there was no invitation sent by you,
20          addressed by you, and signed by you, inviting
21          people to come to a fund-raiser for Stephen
22          Murphy?
23    A.    There was an invitation.  Not with my name on
24          it.
```



```
                                          115
1   A. Yes.
2   Q. Is he a deputy sheriff?
3   A. I don't know.
4   Q. Did he run for sheriff?
5   A. I don't know that either.
    Q. You are not aware that Angelo Rossi ran for
7      sheriff?
8   A. My understanding is that he did not get enough
9      signatures. Are you considering that running?
10  Q. I am asking you.
11  A. No.
12  Q. Did he attempt to get signatures in order for
13     him to run for the office of sheriff?
14  A. I believe so.
15  Q. Was he intent on opposing Sheriff Cabral, if
16     you know?
17         MR. PFAFF: Objection on the record.
18     Objection as to speculation.
19  Q. Was Dave Bergeron involved in helping Mr.
20     Rossi in his campaign?
21  A. I don't know.
22  Q. Pat O'Brien. Do you know Pat O'Brien?
23  A. Yes.
24  Q. Is he an employee of the Sheriff's Department?
```

```
                                          116
1   A. Yes.
2   Q. Is he a deputy sheriff?
3   A. I think so.
4   Q. Did he support Steve Murphy?
5   A. Yes.
6   Q. Mark Turley, do you know him?
7   A. Yes.
8   Q. Is he the brother of your fellow plaintiff, Tim
9      Turley?
10  A. Yes.
11  Q. Is he an employee of the department?
12  A. Yes.
    Q. Is he a deputy sheriff?
    A. I don't know that.
15  Q. Did he support Stephen Murphy?
16  A. My opinion or guess?
17  Q. What is your understanding.
18  A. I believe so.
19  Q. Lieutenant Dave McCarthy, you know him, right?
20  A. Yes.
21  Q. You work with him in transportation?
22  A. Yes.
23  Q. Did he attend the fund-raiser that you held,
24     organized for Stephen Murphy?
```

```
                                          117
1   A. Yes.
2   Q. He supported Stephen Murphy?
3   A. Yes.
4   Q. Lieutenant Mullin, do you know him?
5   A. Yes.
6   Q. Is he an employee of the department?
7   A. Yes.
8   Q. Did he support Stephen Murphy?
9   A. Yes.
10  Q. Is he a deputy sheriff?
11  A. Yes.
12  Q. Is Lieutenant McCarthy a deputy sheriff?
13  A. I don't know that.
14  Q. William Noonan, do you know him?
15  A. Yes.
16  Q. Is he a former union official for your union?
17  A. No.
18  Q. Never was involved in union affairs for a
19     different union?
20  A. Possibly.
    Q. Do you know or not know?
    A. I don't know.
23  Q. Is he an employee of the department?
24  A. Yes.
```

```
                                          118
1   Q. Did he support Stephen Murphy?
2   A. I don't know.
3   Q. Did you have any conversations with Deputy
4      Superintendent Carney regarding the Suffolk
5      County Sheriff's election before the election?
6   A. The only conversation I remember having with
7      Deputy Superintendent Cliff Carney was the day
8      I received that transfer letter, I was still in
9      the transportation office, it was around
10     quarter-of-three, he walked by, he stuck his
11     head in, and said high. I stood up, stood up,
12     and asked him what this letter was for. He
13     turned around to me, and he said you shouldn't
14     have backed Murphy. That is the only
15     conversation that I had with Deputy Cliff
16     Carney regarding any type of conversation on
17     the election.
18  Q. When was that?
19  A. When I received that letter of transfer, I
20     believe, it was either November or December,
21     November or December.
22  Q. What did you say?
23  A. So it is political then.
24  Q. What did he say?
```

```
                                          119
1   A. He smiled and walked away.
2   Q. So when I asked you before what evidence did
3      you have that you were being transferred
4      because of your political affiliation, this is
5      something new?
6   A. You asked me about Sheriff Cabral.
7   Q. I asked you what evidence do you have, and we
8      will go back --
9          MR. PFAFF: Stop. Just ask the
10     question, you will get an answer.
11  Q. What evidence do you have that your transfer
12     out of transportation was a result of your
13     political affiliation, what's the basis for
14     that?
15  A. You can add that. I apologize.
16  Q. Is there anything else, Captain Moscone, other
17     than your writing up the subordinate officer,
18     your belief, because of the timing, and this
19     comment from Deputy Superintendent Carney, is
20     there anything else that's the basis for your
21     position that you were decommissioned and
22     transferred because of your support for Stephen
23     Murphy?
24  A. And my union beliefs.
```

```
                                          120
1   Q. Go ahead.
2   A. I told you earlier, we had a heated discussion,
3      myself and Chief Keeley. She had no idea what
4      I did other than transportation. She didn't
5      believe what I told her, the many hats I wore.
6      She, again, called me a liar. She apologized
7      to me the next morning by telephone call, I
8      believe, after talking to Superintendent Gerard
9      Horgan. And solely blamed me for that contract
10     in '03 not getting ratified.
11  Q. When she called you a liar, was there anybody
12     else present?
13  A. I know Mike Harris was in and out of that
14     office. I don't know if he heard her or not.
15  Q. When you say that she blamed you, she never
16     told you directly that she blamed you directly
17     for the contract not being ratified?
18  A. That's correct.
19  Q. In your twenty-four years as an employee of the
20     department and your work with the union, have
21     you ever been involved in other contract
22     negotiations?
23  A. Yes.
24  Q. You don't always agree with management; is that
```

Copley Court Reporting

121

1   correct?
2   A. Absolutely not.
3   Q. And sometimes the conversations, the
4       disagreements can be quite contentious?
5   A. Yes.
6   Q. People can say things that they regret?
7   A. I never do; but, yes.
8   Q. You have never said anything during the course
9       of union negotiations or contract negotiations
10      that you ever regretted?
11  A. No.
12  Q. Just on the union piece, I think you told me,
13      was it September of 2003 or '04, if you
14      remember?
15  A. I am not sure if it was '03 or '04. It was
16      around September, late August.
17  Q. Was it before or after the sheriff's election?
18  A. Before.
19  Q. The year before or the same year as the
20      sheriff's election?
21  A. I want to say it was the same year or maybe the
22      year before. I can't remember.
23  Q. So if it was the year before, you were not
24      transferred out of transportation until a

122

1       year-and-a-half later, if it was the year
2       before, is that fair?
3   A. I feel that had a strong input on me being
4       moved from transportation.
5   Q. And I understand that. I want to get the
6       timing right. If it was the year before the
7       election, it was about a year-and-a-half before
8       you were transferred; is that right?
9   A. Somewhat.
10  Q. Did you have any conversations with
11      Superintendent Sumpter regarding the 2004
12      sheriff's election?
13          MR. PFAFF: Objection. Time frame,
14      any conversation?
15  A. I don't recall.
16  Q. Did you ever tell Superintendent Sumpter that
17      you were backing Stephen Murphy for sheriff?
18  A. I don't believe so.
19  Q. Did you ever have any conversation with
20      Superintendent Sumpter before the election
21      regarding any consequences for anybody that
22      backed Stephen Murphy as opposed to Sheriff
23      Cabral?
24  A. Did I have any?

123

1   Q. Yes.
2   A. No. I don't believe so.
3   Q. Did you ever have any conversations other than
4       with Superintendent Carney, other than the one
5       you just described, in which he expressed to
6       you consequences or retaliation if you backed
7       Stephen Murphy for sheriff?
8   A. No.
9   Q. Did you hear of anybody else having any
10      conversations with anybody in the management of
11      the sheriff's department, specifically, Cliff
12      Carney, Sumpter, Mike Harris, Elizabeth Keeley
13      or Sheriff Cabral, if you back Stephen Murphy,
14      there will be consequences?
15  A. Not indirectly by either one of those people.
16      There was a lot of stuff floating around.
17  Q. What stuff floating around did you hear?
18  A. You better be careful who you are backing.
19  Q. Who said that?
20  A. Just talk. I don't remember who said it.
21      There was a lot of talk.
22  Q. By who, by management, by fellow employees?
23  A. Fellow employees, and conversation I had with
24      Cliff at that time. Other than that, no.

124

1   Q. Did Sheriff Cabral have an opponent in the
2       general election?
3   A. She ran unopposed.
4   Q. So the primary was in September; is that fair?
5   A. Yes.
6   Q. So after September, was the election pretty
7       much over?
8   A. I believe so.
9   Q. That was before you were transferred from
10      transportation; is that right?
11  A. Less than a month before, that's right.
12  Q. You were transferred in December?
13  A. Yes.
14  Q. And the primary was in September?
15  A. The final election was in November.
16  Q. I meant the primary.
17  A. Yes.
18  Q. And the election was in essence over in
19      September?
20  A. Yes.
21          MR. PFAFF: We can stipulate to that.
22  Q. Did you have any conversation with Michael
23      Harris concerning the election for Suffolk
24      County sheriff prior to the election?

125

1   A. I may have. I don't know what was actually
2       discussed. I don't recall.
3   Q. Did you ever inform Mr. Harris that you were
4       supporting Stephen Murphy for Suffolk County
5       sheriff?
6   A. I don't believe so.
7   Q. Did Mr. Harris ever communicate to you, if you
8       don't get on board with Sheriff Cabral, there
9       will be consequences?
10  A. No.
11  Q. With Elizabeth Keeley, other than the
12      conversation that you mentioned concerning the
13      contract negotiations, did you ever have any
14      other conversations with Elizabeth Keeley in
15      which your support for Sheriff Cabral was
16      raised?
17  A. No.
18  Q. Your support for Stephen Murphy?
19  A. No.
20  Q. Victor Theiss. Did you have any conversations
21      with Mr. Theiss regarding your support for
22      Stephen Murphy or Sheriff Cabral before the
23      2004 election?
24  A. No.

126

1   Q. Did you have any conversations with Sheriff
2       Cabral concerning the election for Suffolk
3       County sheriff?
4   A. Other than the conversation that I had with
5       Randy Chapman?
6   Q. Did you have any conversations with Sheriff
7       Cabral directly?
8   A. After the conversation I had with Randy
9       Chapman, I phoned Sheriff Cabral and told her
10      that I was not backing Stephen Murphy at that
11      time.
12  Q. Tell me about that conversation, when did it
13      occur?
14  A. Somewhere around March.
15  Q. Of the year of the election?
16  A. Yes.
17  Q. Where were you when you phoned?
18  A. I am not sure if I was in the office or on the
19      cell phone.
20  Q. Was anybody with you when you made the phone
21      call?
22  A. No.
23  Q. Did you get Sheriff Cabral directly?
24  A. Yes.

129

| | | |
|---|---|---|
| 1 | Q. | Did you have any subsequent conversations with |
| 2 | | Sheriff Cabral after this phone call in about |
| 3 | | March in the year of the election, concerning |
| 4 | | the election for sheriff? |
| 5 | A. | No. |
| 6 | Q. | After the election, after the primary election, |
| 7 | | did you have any communications with Sheriff |
| 8 | | Cabral? |
| 9 | A. | No. |
| 10 | Q. | After the primary election, did you have any |
| 11 | | communications with Cliff Carney, Eugene |
| 12 | | Sumpter, Elizabeth Keeley, Victor Theiss or |
| 13 | | Michael Harris between the primary in September |
| 14 | | and the general election in November, any |
| 15 | | conversation at all? |
| 16 | A. | Regarding the election, no. |
| 17 | Q. | Did you have any conversation with any of those |
| 18 | | individuals in which, between September and |
| 19 | | November of the year of the election, in which |
| 20 | | they indicated to you, because you supported |
| 21 | | Mr. Murphy, there would be consequences? |
| 22 | A. | No. |
| 23 | Q. | Your local again is 1163.  You were president |
| 24 | | of the union? |

130

```
 1      A.   Yes.

 2      Q.   When were you president of that local?

 3      A.   I just got re-elected last December.

 4      Q.   When were you first elected?

 5      A.   I think it was a year-and-a-half prior to that

 6           one.  Captain Holland resigned from that post.

 7      Q.   So 2003?

 8      A.   I believe so.  It is a two year election.

 9      Q.   Did your local endorse a candidate for sheriff?

10      A.   No.

11      Q.   Did you seek to have the local endorse a

12           candidate for the election?

13      A.   Absolutely not.

14      Q.   Do you know if JOEASC asked to endorse a

15           candidate for sheriff?

16      A.   In my opinion, I believe they did.

17      Q.   Were you aware of what the vote was?

18                MR. PFAFF:  The vote for what?

19                MS. CAULO:  The endorsement.

20      A.   I think it was a lot to one.  It was posted on

21           the union board.

22      Q.   Was it over three hundred to one?

23      A.   I can't remember.  It was a lot to one in Steve

24           Murphy's favor.
```

136

```
1              but it is not unusual.

2        Q.    The lines of communication were strained with

3              Sheriff Rouse between management and union?

4        A.    Not with our local.

5        Q.    With other locals?

6        A.    I believe somewhat.

7        Q.    You had a good relationship, your local with

8              Sheriff Rouse?

9        A.    Yes.

10       Q.    And you feel you do not have a good

11             relationship, your local, with this particular

12             sheriff?

13       A.    It is frosty.

14       Q.    What work did you do on behalf of the union

15             membership between 2002 and 2005?

16       A.    I was the secretary, and then I became, I

17             inherited the presidency, and then ran for

18             election last December, and I am the president

19             to this day.

20       Q.    What work did you do on behalf of the union

21             that brought you into meetings or disagreements

22             or contentions with management between that

23             period of time?

24       A.    We had grievances.  We had an open line at that
```

137

```
 1              time.  We communicated well.
 2    Q.   How many grievances did you file on behalf of
 3         the union in 2002, if you know?
 4    A.   2002?  Maybe one or two.
 5    Q.   How about 2003?
 6    A.   Maybe two.
 7    Q.   What about 2004?
 8    A.   One.
 9    Q.   Did you testify at any arbitrations on behalf
10         of union members in 2002?
11    A.   I don't believe so.
12    Q.   2003?
13    A.   I can't recall.
14    Q.   2004?
15    A.   I can't recall.
16    Q.   2005?
17    A.   My own grievance.
18    Q.   Was this in 2005 or 2006?
19    A.   You are right.  It was 2006.
20    Q.   Anything in 2005 that you can recall?
21    A.   I don't think so.
22    Q.   In your capacity as union president, did you
23         press any issues on behalf of the union that
24         caused you to become, to have disagreements
```

143

1          coordinator.

2     Q.    What does that mean?

3     A.    He handles all the grievances, if and when he

4           pursues them, and keeps everybody updated on

5           what is going on there.

6     Q.    I believe your testimony a few moments ago was

7           that there may have been one or two grievances

8           in 2002, maybe one in '03, you are not sure if

9           there were any in '04 or '05?

10    A.    I am not sure.

11    Q.    Is it fair to say that there were probably less

12          than ten grievances filed by your local between

13          2002 and 2005?

14    A.    That is fair to say.

15    Q.    Maybe less than five?

16    A.    That is fair.

17    Q.    Other than the grievance coordinator, before

18          becoming vice president, other than the

19          grievance coordinator, what other role did

20          Lieutenant Lynch play in your local from 2002

21          to 2005?

22    A.    He was on the negotiating team.

23    Q.    Was he present during this heated exchange that

24          you said you had with Elizabeth Keeley?

149

```
 1              for what discipline took place.  I was unjustly
 2              disciplined, letter of reprimand, for writing
 3              up a subordinate caught sleeping on paid
 4              detail.
 5      Q.      What promotional opportunities have you not
 6              been considered for?
 7      A.      I can't answer that.  I don't know.
 8      Q.      What promotional opportunities have you applied
 9              for?
10      A.      I don't believe that there was any posted.
11      Q.      What promotional opportunities have you been
12              asked to be considered for?
13      A.      None.
14      Q.      What career advancement have you been denied?
15      A.      Taking out of my assignment.
16      Q.      How is that a denial of your career
17              advancement?
18      A.      It is a punishment, I believe.
19      Q.      Why do you consider it a punishment?
20      A.      Because I was taken out of a position that I
21              was doing a good job through the years and was
22              put on a less desirable shift all because of my
23              union affiliation and political affiliation.
24      Q.      So other than being moved out of
```

150

```
 1           transportation, that is the only career
 2           advancement that you have been denied; is that
 3           your testimony?
 4      A.   Details.
 5      Q.   Is that a career advancement, details?
 6      A.   No.  It is money.
 7      Q.   I am speaking particularly about career
 8           advancement and promotions that you have
 9           claimed you have been denied in your complaint.
10      A.   Right.  When you are talking about career
11           advancement, you are talking about promotions
12           and raises; is that correct?
13      Q.   I am asking what career advancements you have
14           been denied.  These are things that you have
15           been denied you say.  What are they?
16      A.   I don't believe any at this time.
17      Q.   What's the basis for your allegation in
18           Paragraph 60 which I believe is in the next
19           page, you fear reprisals including dismissal
20           because of your political activities?
21      A.   I walk on egg shells in this place.  If they
22           can give me a failure to supervise, which I
23           did, writing that individual up, what else can
24           they do to me?  I am on egg shells.  I don't
```

160

```
 1    A.   This before they took the seven to one ratio
 2         away?
 3    Q.   Give me a time frame.  When did you stop
 4         working?
 5    A.   When they took the seven to one ratio away, we
 6         were working maybe two, three shifts a week.
 7         When they took the seven to one ratio away from
 8         us, once a month, twice a month.
 9    Q.   Have you done more or less overtime shifts
10         since you were decommissioned?
11    A.   Less.
12    Q.   Is that by your choice?
13    A.   No.
14    Q.   Who controls the overtime process?
15    A.   The union does.
16    Q.   Have you been denied the opportunity to do
17         overtime shifts?
18    A.   Only when they took the seven to one ratio
19         away.  We were denied the amount of overtime,
20         but as far as the overall denial of overtime,
21         no.
22    Q.   When you say they took the seven to one ratio
23         away?
24    A.   Administration.  Mike Harris, Gene Sumpter,
```

161

```
 1          Carney.
 2     Q.   Is that because there was an excessive amount
 3          of overtime at a higher rate of pay, was it
 4          explained to you why it was doing that?
 5     A.   Yes.
 6     Q.   What was the explanation?
 7     A.   They were trying to cut on costs.
 8     Q.   Do you think that was a reasonable thing for
 9          the department to do?
10     A.   At that time, it was just ironic after an
11          election, we supported the opponent and all
12          this stuff started happening.  I think if they
13          want to say that, it's bad timing.
14     Q.   You think the desire to cut costs was driven
15          because you supported the opponent in the
16          sheriff's election?
17     A.   That's correct.  Because I don't believe that
18          is the reason why they wanted to take the seven
19          to one ratio away.
20     Q.   Was the issue of excessive overtime costs ever
21          discussed with you in your capacity as union
22          president prior to the election?
23     A.   No.
24     Q.   Never?
```

1

VOLUME: I
PAGES: 1 through 231
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
05-CV-11661-RGS

*********************************
DAVID BERGERON, JOHN GRENNON,    )
LORNE LYNCH, JOHN BARNES,        )
JOHN ELLIS, TIMOTHY TURLEY,      )
AL MOSCONE, WILLIAM PENEAU,      )
ERIC DILIBERO and PAUL GIGLIO,   )
            Plaintiffs,          )
                                 )
        vs.                      )      **ORIGINAL**
                                 )
ANDREA CABRAL, Individually and  )
as SHERIFF OF SUFFOLK COUNTY,    )
            Defendant.           )
*********************************

**DEPOSITION OF JOHN ELLIS**, a witness called on
behalf of the Defendant, taken pursuant to the
Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
the Suffolk County Sheriff's Department, 200
Nashua Street, Boston, Massachusetts, on
January 18, 2007, commencing at 10:08 a.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110

COPLEY COURT REPORTING, INC.
(617) 423-5841

*DISK ENCLOSED*

14

1    process, and in most cases I saw them very

2    infrequently since high school.

3        Q.    Now, getting back to your educational

4    career, you started in the Department in 2000,

5    when did you begin to go back to Boston College to

6    get your degree?

7        A.    Most recently?

8        Q.    Yes.

9        A.    That would have been January of 2005.

10       Q.    Okay.

11       A.    And I took several courses that semester

12   right through the summer, both summer sessions

13   into the fall and wrapped it up.

14       Q.    I'm sorry, I thought you got your degree

15   in December of '04.

16       A.    '05, just a year ago, just over a year

17   ago.  I'm sorry if I said that.

18       Q.    Okay.  So, you began to go back at night

19   then, is that what it was?

20       A.    Yes.

21       Q.    So, you were hired in 2000 as JO1?

22       A.    Yes.

23       Q.    And that's your current rank?

24       A.    It is.

19

```
 1              MR. STEWART:  Objection.
 2    BY MS. CAULO:
 3        A.   Yes.
 4        Q.   Have you ever been disciplined --
 5        A.   I have not.
 6        Q.   -- by the Department?
 7        A.   I have not.
 8        Q.   Were you promoted under Sheriff Rouse?
 9        A.   I was not.
10        Q.   And the two Sheriffs you've served under
11    are Sheriff Rouse and Sheriff Cabral?
12        A.   Yes.
13        Q.   Are you familiar with the term Deputy
14    Sheriff, Officer Ellis?
15        A.   I am.
16        Q.   How are you familiar with that term?
17        A.   It is an appointment made by the Sheriff
18    if I'm not mistaken by S516, which is a position
19    appointed by the Sheriff based on one's respect
20    for the job, ability to display such qualities as
21    integrity and professionalism, and pragmatically
22    it ensues having all police powers afforded by
23    this Commonwealth of Massachusetts which in our
24    day-to-day functions on transportation, for
```

33

1    who said that he always considered me a gentleman,

2    so, I think there are shift commanders here that

3    view me in high regard and perhaps, I can only

4    speculate, but I think the reason I go outside

5    more often than some people is based on the fact I

6    won't embarrass the Department while I'm out

7    there.

8        Q.   Is there a correlation between one's

9    designation as a Deputy Sheriff and one's ability

10   to do hospital details?

11       A.   Not legal, I think someone can be made, I

12   think I'm a clear example, I continue to do

13   hospital details while not being a Deputy Sheriff.

14       I think my circumstances are unique to

15   this whole situation, but I think in a more

16   general sense the people who are given Deputy

17   Sheriff status, it's a nod from the Sheriff that

18   you are considered professional and of some

19   integrity.

20       Q.   When you said it's not legal, I'm trying

21   to understand what you meant by that?

22       A.   I know it's not required that I be a

23   Deputy Sheriff to be working outside hospital

24   details.

34

1      Q.   All right.

2      A.   They're not private paid details, so, it

3  doesn't fall under that policy.

4      Q.   Okay.  Does the Sheriff have to

5  demonstrate just cause before Deputy Sheriff

6  status is removed?

7           MR. STEWART:  Objection.

8  BY MS. CAULO:

9      A.   I believe the policy states that for any

10  reason she can do so, so, I would hope that just

11  cause would be part of that any reason but to the

12  letter of the law, she is allowed to take it away

13  for any reason.

14     Q.   Are there any functions of your current

15  position as an officer in a housing unit, a line

16  officer that requires Deputy Sheriff status?

17     A.   No.

18     Q.   Okay.  You mentioned details a few

19  moments ago, and I believe your testimony was that

20  they're private paid work outside the four walls

21  of the institution?

22     A.   Yes.

23     Q.   Did you perform any details when you

24  were, at any time after you were commissioned as a

35

1    Deputy Sheriff in or about January of '03?

2         A.   I did not.

3         Q.   Okay.  Why not?

4         A.   I wasn't doing a lot of overtime in

5    general at that point, to this day I think I did a

6    few more shifts last year, but I've never been one

7    to do a lot of overtime.

8              I do hope in the future if this situation

9    is resolved as such that I can become a Deputy

10   Sheriff again.

11             The one thing that's changed in my life

12   since April of '05 is that I'm now married and

13   have an eleven-month-old son, so, I have better

14   reasons to want to do overtime right now, so, I

15   hope that's the case in the future, but my claims

16   as part of this suit were never that I lost wages

17   per se.

18             I know there is other people in the suit

19   who were regular participants in the private paid

20   detail process.  I never made that claim.  My

21   concerns with this case are more to the letter I

22   received in conjunction with losing my Deputy

23   Sheriff status and it being implied as a form of

24   discipline, and it's my hope that when all the

COPLEY COURT REPORTING, INC.
(617) 423-5841

47

1    Sheriff Cabral retained her title.

2        Q.    Well, why don't we go there, and I'll get

3    back to the decommissioning.   In the 2004

4    election, who did you support?

5        A.    Steve Murphy.

6        Q.    When did you decide to support him?

7        A.    In the summer.

8        Q.    The summer of '04?

9        A.    Yeah, I don't know the date, but I made

10   the decision at a fund-raiser in Brighton to give

11   him a check for $500.

12       Q.    Why did you decide to support him and why

13   at that particular point in time?

14       A.    It was a decision I took very seriously

15   and the history of the candidates as it were,

16   obviously Sheriff Cabral was running, and we had

17   had some occasions to talk with her, but we

18   invited her from a union perspective to a forum

19   that we'd have at one of our general meetings, and

20   she declined to attend that, and there was some

21   friction going along with that.

22            The other candidates were more readily

23   available.   I remember Sean Jenkins was someone on

24   the Republican side who impressed me quite a bit,

COPLEY COURT REPORTING, INC.
(617) 423-5841

49

1    We were making suggestions as part of the

2    collective bargaining agreement that was going on

3    at the time and just some of the -- I'm sorry.

4            We were having monthly meetings on the

5    status of the jail, the term's escaping me right

6    now, but things that would pertain to the

7    conditions and such, and it just seemed that a lot

8    of times when we were bringing up issues, we were

9    kind of being stonewalled in terms of getting any

10   feeling of cooperation with the administration.

11           I believe a lot of what went on in 2004

12   was a result of stubbornness in fairness on both

13   sides, but I think a lot of it emanated from the

14   administration side in terms of trying to get

15   changes done, whereas in talking to Steve Murphy,

16   we felt there would be a better spirit of

17   cooperation between the ranks and the

18   administration and ultimately on a personal basis

19   led to me wanting to support him, and when we set

20   out for a vote later, I believe it was August of

21   '04, that we conducted a several week voting

22   process, we had decided in one of the subsequent

23   meetings to endorse a candidate, and we had a

24   vote, and I believe it was 122 to 1, everyone in

50

1    favor of Steve Murphy.

2        So, at that point the union endorsed

3    Steve Murphy as well, but I was, I was having a

4    difficult decision because I was impressed by

5    several of the candidates including Corporal Rossi

6    and very much Sean Jenkins I was impressed with,

7    so, it wasn't a foregone conclusion we'd support

8    Steve Murphy, but as the summer wore on and

9    candidates diminished, he seemed to be somebody

10   who would pose a better form of cooperation than

11   we saw at the time from Sheriff Cabral.

12       Q.   So, explain to me what you believed to be

13   a less than cooperative spirit emanating from the

14   administration?

15       A.   We had a number of issues on the table

16   that were unresolved.  I remember --

17       Q.   What were they?

18       A.   In this room in March of '04, Sheriff

19   Cabral met with us, and there were issues, the

20   veterans issues, the -- I'm sorry, the --

21       Q.   Let me stop you there, met with whom?

22       A.   The Sheriff?

23       Q.   Yes.

24       A.   I'm sorry, the executive board, JOEASC,

69

1    Q.    Okay.  You've mentioned Kevin O'Riordan,

2    Pat O'Brien, Dave Burke, John Barnes, John

3    Grennon.

4    A.    Yes, Paul Giglio was a vocal supporter of

5    Steve Murphy, Chris McDonald I believe was active

6    in the East Boston area for Steve Murphy, and

7    there may have been others.

8         I'm trying as best I can to remember, but

9    all of this was in the context of the fact we had

10   a 121 to 1 union vote supporting Steve Murphy, so,

11   my impression was the body overwhelmingly had

12   endorsed Steve Murphy as the candidate at that

13   point.

14   Q.    How did you make your support for Steven

15   Murphy known in the Department?

16   A.    I wasn't particularly vocal besides the

17   events, holding a sign in Oak Square, it was

18   pretty evident, but I know I saw, Tom DeRosa came

19   by me that night and he was working with the

20   administration in addition to his capacity as an

21   officer at the time, so, I'm sure word was out I

22   was holding the sign, which is fine.

23        There was nothing covert about that, but

24   I, I'm not somebody, I haven't been nor do I

COPLEY COURT REPORTING, INC.
(617) 423-5841

70

1　continue to be very vocal while I'm on duty.  I

2　don't think it's appropriate outside of maybe our

3　break periods to be talking about these sort of

4　things when we're working.

5　　　　One of the things I've heard as recently

6　from Captain Kelly this morning is that, "When all

7　this ended, you remained a gentleman, you went

8　back to work," and I thanked him for saying that

9　comment, and I did pride myself and continue to

10　pride myself on the fact that there is, when I'm

11　off duty and doing union work at the time I tried

12　to be as professional and as good as I could be,

13　but while I was in uniform that wasn't the time to

14　be doing that.  When I was in uniform it was time

15　to do the job.

16　　　　After, I believe it was November of '04

17　after the Sheriff's election, there was the JOEASC

18　election, I didn't seek reelection on the E board.

19　I ended up taking a post as a trustee just

20　checking the financial records quarterly to make

21　sure they were in order, but I made a decision at

22　that point I wasn't going to remain vocal as a

23　union member and try to set as an example it's

24　time to move on, go to work, and I've tried to do

COPLEY COURT REPORTING, INC.
(617) 423-5841

BERGERON, et al. v. ANDREA CABRAL

JOHN ELLIS, 1/18/07

74

1 body.
2    Q.   The body is comprised of individuals,
3 Officer Ellis, so, why don't you help us identify
4 how it was that the idea to draft and create
5 mailings and issue them out to the residents of
6 Suffolk County was generated?
7    A.   I don't recall exactly who that came
8 from.
9    Q.   What kind of discussion ensued when the
10 suggestion was made to create and issue mass
11 mailings?
12    A.   I think there was a list made of various
13 options at the time, that being one of them.
14 Subsequently, we met as an executive board and
15 discussed what options were things we'd be
16 interested in doing.
17       The external mailing, I go back to the
18 March meeting with the Sheriff where she was, I
19 think there was a lot of frustration that resulted
20 in the dental plan being used as leverage for the
21 collective bargaining agreement, and we wanted to
22 have this rectified, and I think we were feeling
23 like we needed to do something to demonstrate to
24 the public these were important issues, and the

75

1 external mailing became something that took off
2 after that.
3    Q.   So, who was present during the executive
4 board meeting that met to discuss the various
5 ideas that were proposed at the general membership
6 meeting?
7    A.   John Barnes, myself, John Grennon, the
8 treasurer was -- I'm sorry.
9    Q.   If I suggest to you it was Mark Turley?
10    A.   Mark Turley, yes, Robert Tullos was on
11 the E board, Mickey Walsh was on the E board, Mike
12 Cinelli was on the E board, but he wasn't there,
13 he didn't attend a lot of these things after he
14 got elected for some strange reason, but I believe
15 the six of us were there.
16    Q.   Was the decision made at the general
17 membership meeting to go ahead with the mailings,
18 or was that decision not made until the E board
19 met?
20    A.   As I recall, it was a suggestion at a
21 general meeting that the E board subsequently
22 decided as a request of the body to enact.
23    Q.   So, the decision was made at the general
24 meeting to do mailings?

76

1    A.   Well, I believe the suggestion came from
2 the general meetings. I don't recall exactly
3 what, I don't recall for sure, I'm sorry. I don't
4 know if there was another general meeting where
5 that was up for vote or not.
6    Q.   Who made the final decision to create and
7 issue the mailings?
8    A.   The executive board, we started drafting
9 it. I don't remember what the final trigger was
10 to that did that, I'm sorry.
11    Q.   Well, who wrote the content of these
12 mailings?
13    A.   We all contributed, it was a group
14 effort.
15    Q.   Who is we?
16    A.   The executive board, I'm sorry.
17    Q.   And who in the executive board?
18    A.   Everyone that I just mentioned with the
19 exception of Michael Cinelli who wasn't present
20 for most of this but input was gathered from
21 everyone else.
22    Q.   Everyone else, I want to make sure we're
23 clear, go ahead.
24    A.   Primarily John Barnes, I know he wrote

77

1 pieces of a draft, I think I remember John Grennon
2 writing bullet points, there were notes I took at
3 a meeting in terms of what was looking to be said,
4 and I believe at that same meeting Mickey Walsh
5 and Robert Tullos also made commentary, so, it was
6 a group effort.
7       When it actually came down to the
8 mechanics of writing it, I know I received an
9 E-mail from John Barnes with some notes. I
10 remember bullet points from John Grennon, so, I
11 think I got that via E-mail also, and I started to
12 draft on some of my own notes, and these are
13 drafts.
14       At one time we sent it to the attorneys
15 to check to see if we were within our rights with
16 everything that was said. I think John made some
17 suggestions at some point.
18    Q.   John Barnes or John Grennon?
19    A.   I beg your pardon, John Barnes, so, it
20 kind of bounced back and forth on the E-mail a
21 little bit before we came up with the final
22 version.
23       I was, I was the English major and the
24 secretary by election, so, I was the one

78

1 ultimately responsible for making sure that the
2 T's were crossed and the I's were dotted, but.
3    Q.   How many drafts were done?
4    A.   Two or three. Like I said, I think I
5 initially composed something, I guess it depends
6 what you consider a draft. John had an incomplete
7 draft, I'm sorry, John Barnes, I had bullet points
8 from John Grennon, had my own notes.
9       That first creation based on all these
10 incomplete documents was something I put together.
11 It went through a few minor changes, once with
12 John Barnes and another time going through the
13 attorney's office, and I believe it was ready to
14 go after that.
15    Q.   Where were they written?
16    A.   I did my part at home on my home computer
17 on my off hours.
18    Q.   Well, I believe your testimony earlier
19 was you compiled the entire thing, so, was the
20 final draft written on your home computer?
21    A.   Yes.
22    Q.   Okay. Do you have copies of the drafts?
23    A.   I gave everything up when we stepped
24 down. I'm assuming, I hope they still have drafts

79

1 with the current, I know we switched hands a
2 couple of times since the end of 2004, but
3 everything I had -- again, by this point I was
4 looking to go back to work as I referred to
5 earlier.
6       I wasn't looking to take active part.
7 Everything I had I gave over. It was a box I
8 think that ended up in the law office, and that
9 was it, so, I'm assuming everything I had at that
10 point is over there.
11    Q.   There is nothing on your hard drive?
12    A.   Nothing anymore, no.
13    Q.   When did you delete it?
14    A.   Shortly thereafter.
15    Q.   When is that?
16    A.   I don't know exactly what day.
17    Q.   Before or after you filed this lawsuit?
18    A.   Oh, well before that, yeah, shortly
19 after, once Mickey Walsh took over as president
20 and Robert Tullos as vice president, I made a
21 clean break with most of that.
22    Q.   Who had final approval in the content?
23    A.   The executive board, I received E-mails
24 saying this is good, this is good. Once it

121

1    Sheriff provide you, the membership of JOEASC and

2    all employees of the Department with information

3    concerning the pension fund?

4         A.   That was the letter I mentioned earlier I

5    mischaracterized, but there was a letter regarding

6    the pension fund on the shift commander's window

7    sometime in late '03.

8              MS. CAULO:  Let's mark another

9    exhibit, please.

10             (Exhibit No. 9, Memo dated 12/12/03,

11   marked for identification.)

12   BY MS. CAULO:

13        Q.   Placing before you a document, two pages,

14   a document that's been marked as Exhibit No. 9,.

15   Officer Ellis, I'll ask you to take a peek at it

16   and see if you recognize it?

17        A.   I believe this was the letter we were

18   referring to a moment ago that was posted outside

19   the shift commander's office, it's dated

20   December 12th of '03, and I have no reason to

21   think it was not posted in that time.

22        Q.   Did you read it when it was posted?

23        A.   I did.

24        Q.   I represent for the record this is a

122

1   memorandum to all Suffolk County Sheriff's

2   Department employees from Sheriff Andrea Cabral

3   dated December 12th of 2003 regarding April 2003

4   to June 2003 pension payments.

5        This was provided to you and every other

6   individual employed by the Department in December

7   of '03, correct, Officer Ellis?

8      A.   I remember it being posted outside the

9   shift commander's office, I don't recall getting a

10  personal copy.

11      Q.   You read it though?

12      A.   I did read it at the shift commander's

13  office, yes.

14      Q.   And in this memorandum, is it fair to say

15  that Sheriff Cabral informs all of the employees

16  as to why a payment to the City of Boston pension

17  fund was delayed, what the reasons for the delay

18  were, that the reasons primarily were the payment

19  of the 5.2 million dollar strip search settlement

20  which became due on the day she took office, is

21  that fair?

22      A.   That's characterized here, yes.

23      Q.   Does Sheriff Cabral go on to explain that

24  the Department doesn't pay its bills directly,

BERGERON, et al. v. ANDREA CABRAL                                    JOHN ELLIS, 1/18/07

**152**

1  Barnes.
2      Q.  Why aren't they signed by the other
3  people, why are they only signed by John Barnes or
4  John Grennon or you?
5      A.  I'm not sure how we came to that
6  decision.  I guess the thing was headed with the
7  president and vice president, and those were the
8  primary people we were looking to have it signed
9  by.  It may have been just a question of
10  appearance.
11      Q.  Is there anything in Exhibits No. 4, 5,
12  6, 7, or 8 that you feel doesn't display the level
13  of professionalism that you think employees should
14  maintain at all times whether they are in uniform
15  or not?
16          MR. STEWART:  Objection.
17  BY MS. CAULO:
18      A.  I stand by these documents.  These
19  documents were done as union officials working in
20  that capacity.  I don't see anything here that
21  were personal attacks or derogatory statements.
22          I think they were hard statements at
23  times to make given the state of the Department,
24  but we were faced with hard decisions, as the

**153**

1  Department was, but I stand by what we did here.
2      Q.  So, the statement "As an alternative to
3  handing out pay increases to her friends," you
4  think that was an appropriate thing to put in
5  about the Sheriff of Suffolk County?
6          MR. STEWART:  Objection.
7  BY MS. CAULO:
8      A.  I think it represented a very serious
9  problem that we were trying to address.  We
10  maintain that the 15F's were not used
11  appropriately and that's how we were trying to
12  characterize it with this letter.
13      Q.  I want to make sure I have exactly the
14  extent of your political involvement.  I believe
15  you indicated you made a one time contribution of
16  $500 by check to the Murphy campaign?
17      A.  That's correct.
18      Q.  You indicated you held signs I believe in
19  Oak Square on one occasion?
20      A.  Yes.
21      Q.  Just one occasion?
22      A.  One occasion in Oak Square, I was also
23  part of the Allston Brighton parade, and I marched
24  with Steve Murphy that day.  That was in

**154**

1  September.
2      Q.  September?
3      A.  Yes.
4      Q.  What other employees marched with Steve
5  Murphy that day?
6      A.  I don't remember any others in Brighton
7  that day.  Let me just, I don't recall.  There
8  were several dozen people, most of whom I didn't
9  know.  I was there because I had just finished the
10  Brian Honan road race, 5K memorial race which was
11  coinciding with the parade.
12          The race was over and the parade would
13  begin, so, I just finished up the road race, and I
14  came across Steve Murphy and he asked me to join
15  him.
16          We had already endorsed him at that
17  point, so, I decided to do so, but I don't recall
18  anyone else from the Department that day being
19  there.
20      Q.  You mentioned that Corporal DeRosa saw
21  you on one occasion I believe when you were
22  holding the sign in Oak Square?
23      A.  Yes.
24      Q.  Who else to your knowledge observed you

**155**

1  participating as a supporter of Steve Murphy?
2      A.  On election day itself I was working at
3  the Brighton Public Library which is a polling
4  place, and we were outside passing out literature
5  and that sort of thing, and Deputy Superintendent
6  Carney was doing the same for the Sheriff, so, I
7  spent several moments with him that day.
8      Q.  Describe that interaction if you will?
9      A.  It was kind of interesting because my
10  parents were also there, so, most of the time I
11  think we mutually agreed to talk about the Red
12  Sox, but there was no hostility or anything like
13  that.  We both knew why we were there and kind of
14  just went forward.
15      Q.  Have you ever had any hostility with
16  Deputy Superintendent Carney concerning the
17  election?
18      A.  Oh, no, I didn't mean to imply that.
19  Deputy Superintendent Carney has always been
20  forthcoming and professional with me.
21      Q.  How about Deputy Superintendent Sumpter?
22      A.  The same, I've had less dealings with him
23  over the years, but he's always been polite and
24  appropriate with me.

**156**

1      Q.  Has there been anybody in the Department
2  or the Sheriff senior management that displayed
3  hostility toward you because of your support for
4  Steve Murphy?
5      A.  Absolutely not.
6      Q.  Has anybody in the Sheriff senior
7  management communicated to you either directly or
8  indirectly that you'd suffer consequence for your
9  support of Steven Murphy?
10      A.  No.
11      Q.  Has anybody at all directly or indirectly
12  regardless of whether they're in the senior
13  management suggested you would suffer consequences
14  because of your support?
15      A.  Not to me, no.
16      Q.  You mentioned after roll call after the
17  primary election in 2004 that when your name was
18  called, you said, "Here for now."
19      A.  Right.
20      Q.  What prompted you to say that?
21      A.  Even getting dressed that morning there
22  were a lot of people saying good bye to me in jest
23  as locker rooms tend to be, so, it was perhaps my
24  attempt at trying to make a little light of the

**157**

1  situation, but at the same time I was glad that I
2  was there, I don't want to say to face the music,
3  but I was glad to be standing tall and not so much
4  in roll call that day but later in the day when I
5  was able to shake Superintendent Sumpter's hand
6  and congratulate them and stand up to the
7  situation.
8      Q.  And you're still here, aren't you?
9      A.  I am.
10      Q.  Did you ever have any discussions before
11  the election with Deputy Superintendent Carney
12  about your support of Steven Murphy?
13      A.  No.
14      Q.  Eugene Sumpter?
15      A.  No.
16      Q.  Michael Harris?
17      A.  No.
18      A.  Let's go back, Michael Harris only in the
19  sense of months and months before, Michael and I
20  enjoy running, so, there was a period of time
21  where I was meeting him outside the doors here,
22  and we were going for a couple of five mile runs
23  around the river, and there was one situation

167

1            I forget exactly who they determined who

2    was going to be who, but there were guys in place

3    immediately to keep the ship going with the

4    provision there would be an election in April and

5    it will be done properly at that point, but I know

6    people like Dave Bergeron had been in place but

7    knew he wasn't going to run for it.

8        Q.    But my question is the leadership came in

9    after you folks, I understand there was an

10   interim.

11       A.    I'm sorry.

12       Q.    Stay with me, April of '03 you are

13   elected, it's the first elections of JOEASC,

14   correct?

15       A.    Yes.

16       Q.    You and Mr. Barnes, Mr. Grennon, and

17   Mr. Turley are elected to the respective positions

18   that you held?

19       A.    Yes.

20       Q.    Thereafter the next time there was an

21   election for JOEASC occurred the latter part of

22   October '04?

23       A.    Yes.

24       Q.    So, for the period of April '03 to

168

1   October of '04, you were the recording secretary,
2   right?
3       A.   Yes.
4       Q.   What work did you do on behalf of the
5   union membership as the secretary between April of
6   '03 and the fall of '04?
7       A.   My primary functions were to record the
8   meetings, the general meetings, provide the
9   minutes.
10          We were doing that initially with the
11  executive board meetings, and I think John Grennon
12  initially brought it up they would rather have me
13  participate more actively in those sessions as
14  they were trying to write down everything, and I
15  think we referred to them as informal sessions at
16  that point.
17          In addition, by late September of '03, we
18  had started the collective bargaining process, the
19  negotiations, so, I was recording a lot of minutes
20  for those meetings early on.
21      Q.   Were you, when you say recording minutes
22  of those meetings, were those JOEASC meetings or
23  were those meetings of the contract negotiations?
24      A.   They were collective bargaining sessions.

COPLEY COURT REPORTING, INC.
(617) 423-5841

169

1      Q.    Okay.

2      A.    Michael Harris' secretary was recording

3  from their end, I was recording from our end, and

4  usually at the next meeting we'd exchange minutes.

5      Q.    Okay.  Other than the recording of what

6  transpired during those contract negotiation

7  meetings, did you actually actively participate at

8  the table in the contract negotiations?

9      A.    We tried to keep the number of voices

10  down to a minimum in the actual meeting itself,

11  so, there were times I made comments, but

12  oftentimes I was more busy writing down quotes and

13  trying to keep them accurate.

14      Q.    What specific interactions did you have

15  with Sheriff Cabral as secretary of JOEASC, and

16  I'm not referring to the meeting you had in April

17  of '04, holding that aside for the moment, what

18  specific interactions did you have with Sheriff

19  Cabral as secretary of JOEASC?

20      A.    I remember her, I believe it was the

21  month before where she came to address the

22  meeting, and that was, what I recall from that

23  meeting was her saying that the, the dental and

24  vision issue she had to hold that for leverage for

BERGERON, et al. v. ANDREA CABRAL                    JOHN ELLIS, 1/18/07

170

1 the collective bargaining agreement.
2        I don't recall saying a lot to her at
3 that meeting.
4    Q.   Who was present at that meeting?
5    A.   I know John Barnes was, I'm not sure John
6 Grennon was.  There was a period of time where
7 John Grennon was trying to make meetings, but he
8 was having difficulty because he was also at that
9 time in training.
10        So, there were, you know, academies and
11 training sessions going on, and we were getting
12 oftentimes relieved for a few hours to attend
13 these meetings while on our shift, but it was more
14 difficult for John to do so, so, I can't say with
15 certainty, I think Mark Turley was here.
16    Q.   So, you're not sure John Grennon was
17 there or John Barnes?
18    A.   John Barnes I believe was definitely
19 there.  I know John Grennon missed some meetings,
20 that may have been one of them, and we try not to
21 have everyone on the executive board at every
22 meeting because there are seven of us, and we try
23 to limit it to three or four guys here, so.
24    Q.   You believe you were there, Mr. Barnes,

171

1 and who else?
2    A.   I want to say Mark Turley was there.
3    Q.   How about the Sheriff Department,
4 anybody?
5    A.   Michael Harris and Steve Tomkins briefly
6 at the beginning but left shortly thereafter.
7    Q.   The meeting was in this room here?
8    A.   It was.
9    Q.   How long was the meeting?
10    A.   Rough guess, ninety minutes.
11    Q.   The purpose of it was what?
12    A.   Contract negotiations and other issues
13 coming up, and it was the Sheriff's opportunity to
14 at least get a snapshot of what was going on, but
15 coming away from the meeting it polarized things
16 more than anything else.
17    Q.   March of '03 or '04?
18    A.   '04 I believe.
19    Q.   Okay, March of '04?
20    A.   Yeah.
21    Q.   All right.
22    A.   Definitely not '03, we weren't in yet.
23    Q.   Other than dental and vision, what other
24 issues do you recall being discussed during this

172

1 meeting?  Well, I believe you said pension, what
2 else?
3    A.   Dental and vision was the primary thing I
4 remember, the pension may have been on the table,
5 the veterans issues may have been on the table,
6 the 15F forms I'm not sure we were really heating
7 up on that yet, I forget.
8        The thing that stands out in my mind is
9 talking about the dental and vision.
10    Q.   Okay.
11    A.   I'm sure there were other things
12 discussed, but that's sort of what I remember.
13    Q.   If you were in the midst of contract
14 negotiations, the issue that pertained
15 specifically to negotiations was dental and
16 vision?
17    A.   That was an issue, also just
18 compensation, they were offering us a 0 percent
19 increase at the time and trying to offer language
20 concessions in lieu of the fact there would be no
21 financial compensations in terms of a raise.
22    Q.   I'm trying to get a sense of what the
23 meeting is in the context of the ongoing contract
24 negotiations, the issue of payment into the

173

1 pension fund was not a contract issue, right?
2    A.   Not directly.
3    Q.   And the issue of the 15F letters was not
4 a contract issue?
5    A.   Correct.
6    Q.   And the veterans benefits was not a
7 contract issue?
8    A.   Correct.
9    Q.   I'm trying to get a sense of what the
10 contractual issues that were on the table that you
11 were trying to hammer out some understanding
12 about, and that was dental and vision?
13    A.   That's what I remember, it was three
14 years ago, I forget exactly what went on.  I'd
15 have to go back and see what the minutes were.
16    Q.   So, the minutes would reflect that you
17 believe?
18    A.   I believe so.
19    Q.   Would the minutes reflect Sheriff Cabral
20 saying she was holding that as a bargaining chip,
21 that meaning dental and vision?
22    A.   Yes.
23    Q.   Those were minutes you took?
24    A.   Yes.

174

1    Q.   And those minutes were given to the law
2 firm?
3    A.   Yes.
4    Q.   And the law firm we're talking about is
5 Merrick, Louison & Costello?
6    A.   That's correct.
7    Q.   Did you testify at any arbitrations on
8 behalf of union members in 2003 and 2004?
9    A.   I didn't testify, I went to one, not an
10 arbitration, it was an informal session, Tim
11 Turley was running it, and he was meeting with Jim
12 Davin I believe over I think it was a precursor to
13 some arbitration going on, and I was there to
14 observe because I was trying to learn the process
15 a little bit, but I've never testified at
16 arbitration.
17    Q.   Did you participate in any disciplinary
18 hearings?
19    A.   No.
20    Q.   Did you file any complaints against the
21 Department or Sheriff Cabral?
22    A.   I did not.
23    Q.   Were any grievances filed on your behalf?
24    A.   No.

175

1    Q.   You indicate that you were the secretary
2 at the contract negotiations, so, you didn't have
3 an active speaking role at those negotiations,
4 fair?
5    A.   I have made comments, sort of evolved.  I
6 was, very much just keep quiet and write in the
7 beginning, and as time went on I had more to say,
8 I think as a result of being more vocal in our own
9 meetings I ended up saying more in these meetings,
10 but initially it was purely writing.
11    Q.   Anything about those meetings that led
12 you to believe that the Department viewed you with
13 hostility or anger because you were participating
14 as a union member?
15    A.   Not at all.
16    Q.   How about anything during the course of
17 the contract negotiations or meetings that you've
18 had between union members and any member of the
19 administration where you detected hostility or
20 anger towards you and your fellow union members
21 for acting as a union member?
22    A.   No, I think there was frustration
23 occasionally voiced, Steve Tomkins, I remember one
24 sort of heated conversation regarding the 15F

COPLEY COURT REPORTING, INC.                    Page 170 - Page 175

177

1      A.   I think we were representing the union

2   side of things, I don't think we were trying to be

3   contrary per se, just defending our side.

4      Q.   In defending your side, were there

5   oftentimes you were at odds with management?

6      A.   Occasionally.

7      Q.   Did you ever perceive the fact you were

8   at odds because you were acting on behalf of the

9   membership was going to result in some sort of

10  adverse action taken against you or sanction?

11     A.   Nothing was ever said or implied to me

12  that would indicate that any remote disciplinary

13  action was going to occur to me until I met with

14  the Sheriff in April.

15     Q.   We'll get there in a moment.  Who

16  succeeded you as secretary of JOEASC if you

17  recall?

18     A.   Stan Andruszkiewcz,

19  A-N-D-R-U-S-Z-K-I-E-W-C-Z.

20     Q.   And who else was elected in October 2004?

21     A.   Let's see, who was the secretary, Mickey

22  became president, Mickey Walsh, Robert Tullos was

23  the vice president, was it Chris Mills that became

24  treasurer I believe.

178

1      Q.    Was it Mark Turley again?

2      A.    Mark initially was elected but stepped

3   down, and Chris took his place and subsequently

4   was elected, so.

5      Q.    As elected representatives of JOEASC, did

6   they engage in union activity and advocate

7   positions to your knowledge?

8      A.    They defended the membership position,

9   yes.

10     Q.    Did they engage in contract negotiations

11  to your knowledge?

12     A.    Yes.

13     Q.    Were they successful in getting a

14  contract?

15     A.    Ultimately, yes.

16     Q.    Okay.  If I represent to you that they

17  were all Deputy Sheriffs, were you aware of that?

18     A.    I'm not sure, it wouldn't surprise me.

19     Q.    Why do you think they weren't

20  decommissioned?

21     A.    I don't know.

22     Q.    Let's get to the meeting you had with

23  Sheriff Cabral, I believe you indicated it was in

24  April of 2004?

COPLEY COURT REPORTING, INC.
(617) 423-5841