1

Volume 1
Pages 1-216
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

-------------------------------:
                               :
Bergeron, et al                :
         Plaintiff,            :
                               :
V.                             :
                               :
Andrea Cabral                  :
         Defendant.            :
                               :
-------------------------------:

          DEPOSITION OF JOHN BARNES, a witness called on behalf of the Defendant taken pursuant to the Federal Rules of Civil Procedure, before Patricia M. Haynes, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, CSR No.: 14620F, at the Offices of Suffolk County Sheriff's Department, 200 Nashua Street, Boston, Massachusetts, on Tuesday, October 31, 2006, commencing at 10:15 a.m.

Copley Court Reporting
58 Batterymarch Street, Suite 317
Boston, Massachusetts  02110
(617) 423-5841

(617) 423-5841
COPLEY COURT REPORTING

10

1  two years at Suffolk University, and I'll exclude for
2  the moment the EMT certificate course, have you had any
3  other formal education?
4      A.  No, I have not.
5      Q.  When did you begin your employment with the
6  Suffolk County Sheriff's Department?
7      A.  September 29, 1993.
8      Q.  And who was the sheriff at the time you were
9  hired?
10     A.  Sheriff Robert Ruffo.
11     Q.  Did you know anyone in the department before
12 you were hired?
13     A.  Yes, Gerard Horgan.
14     Q.  And did Mr. Horgan advocate for your hiring?
15     A.  I'm not sure.  I filled out an application and
16 I passed in my application to the personnel department.
17 I put him down as a reference.  I don't know if he
18 advocated for my employment, I'm not sure.
19     Q.  How do you know Mr. Horgan?
20     A.  I grew up and was friends with his younger
21 brother, Tommy.
22     Q.  Did you know Sheriff Ruffo at all?
23     A.  No.
24     Q.  You were hired on September 29 of 1993.  What

11

1  was your rank that you were hired at?
2      A.   A Jail Officer 1.
3      Q.   Which is the same rank you hold now?
4      A.   Yes.
5      Q.   If you could, Officer Barnes, please describe
6  from 1993 when you commenced your employment with the
7  department to the current date the various jobs and
8  positions that you've held at the department?
9      A.   I pretty much worked in all areas of the
10 Nashua Street Jail, booking, records. Covering records
11 on occasion, filling in on a sick call, to that nature,
12 not assigned there on a permanent basis. Same thing
13 with the booking room.
14          I worked in classification for a short time
15 covering, after the retirement I think of Robert
16 Thibolt, who was the director of classification. For a
17 short period of time, I don't know how long that was or
18 when that exactly took place, I worked in the property
19 department.
20          And I worked throughout the facility in
21 different units. I worked on transportation -- when I
22 say worked in these areas, I wasn't specifically
23 assigned there. I may have been assigned for a day, for
24 a week, you know, based on the shift commander for that

13

BY MS. CAULO:
Q. Was there a training academy when you were first hired in September of 1993?
A. No, I never attended the academy.
Q. Did you have any training within the first year of your employment here?
A. Yes.
Q. What kind of training?
A. Basic in-service training, use of force, CPR, first responder. That's to the best of my recollection, I know the first year on the job that's what we were pretty much at.
Q. At any point during your tenure, it's now been almost 13 years in the department, have you attended the training academy?
A. I never had the academy, no.
Q. You said you attended some in-service classes on use of force, etcetera, during your --
A. Yes.
Q. When did you receive training?
A. Training is pretty much yearly. I can't recall specifically what training I had each year, but every year you had some type of retraining, whether it was recertification for CPR or it was gun qualifications

14

yearly. I don't recall exactly what other training would be yearly.
Now we technically do go to a 48 hour in-service training yearly that incorporates all the training into a one week span. Whereas in the past, you do a class maybe one week and then do another class a month later.
Q. When were you first given any sort of permanent assignment, if you will?
A. I was assigned to the property department. I can't recall the exact date.
Q. What year was that?
A. I want to say it was probably close to 1999 or 2000.
Q. Prior to that time, so from 1993 up until about 1999 or 2000, summarize for me the assignments that you had.
A. To the best of my recollection, I was assigned to the housing units within the facility. I was assigned to transportation assignments. I was assigned to outside hospital details. I was assigned to different areas within the facility, classification, kitchen, booking room, records.
Q. Were these discrete assignments, one day you

15

might be here and one day you might be some other place?
A. Correct.
Q. Who made the assignments?
A. I believe based on the shift commander.
Q. Can you tell me what your job responsibilities were as a line officer on the unit?
A. Care and custody of detainees. The care that needs to be rendered and custody and security of the facility.
Q. Prior to 1999 or 2000 when you indicate that you were assigned to property, had you had any long-term assignments to transportation?
A. I don't recall if they were long term. They were probably in regards to like quarterly assignments, not specific as long term, one year in duration. Most of the assignments were quarterly.
Q. When you were assigned to property, who was the sheriff at that time?
A. I want to say I was assigned to property under Sheriff Rouse.
Q. Prior to Sheriff Rouse being appointed sheriff to fill out the remaining term of Sheriff Ruffo, did you know Sheriff Rouse?
A. No.

16

Q. Did you apply for that position or assignment?
A. I was covering down there on certain times, and the gentleman that had the assignment was removed for, I don't know specifically what the reasons were. And at that time, Deputy John Flynn, who oversaw that area down in the property department, he recommended, based on my prior job performance, he recommended me for that position.
And when he asked me if I interested in it, I accepted.
Q. Who was individual that held the assignment to property prior to you?
A. I want to say Gregory Getchel.
Q. How long a period of time did Mr. Getchel hold the assignment to property?
A. I want to say in the duration of ten, 12 years.
Q. Is he still with the department?
A. Yes.
Q. What's his position now?
A. He's a corporal on the eleven to seven shift.
Q. Does he have weekends off?
A. To be honest with you, I don't know what his days off are.

```
                                                    17
 1   Q.   Fair to say that when he was in property, he
 2   had the weekends off?
 3   A.   Yes, he did.
 4   Q.   And when he was removed from property, he
 5   didn't have the weekends off anymore?
 6   A.   As far as I know, when he was initially
 7   removed, I think he may have maintained it for the
 8   duration of that time period.  But when the new year
 9   started, I'm sure he probably picked his shift and days
10   off, to the best of my recollection, according to
11   seniority of others.
12   Q.   Property is a support services position?
13   A.   Yes, it is.
14   Q.   When are they assigned, how frequently?
15   A.   I believe yearly.  I believe it's a yearly
16   assignment, support services.  I don't have any
17   understanding of exactly how long or what the duration
18   of each assignment may be.  Some people have it for a
19   year, some people have been there for years.
20   Q.   As compared to the other assignments, which I
21   think you referred to them as quarterly assignments?
22   A.   Yes.
23   Q.   What's the difference?
24   A.   You're pretty much assigned down there for a
```

```
                                                    18
 1   longer duration in that specific area.  Pretty much your
 2   daily function would be in that area, whereas when
 3   you're upstairs or when you're in the capacity as
 4   working as a line officer, the assignments change
 5   frequently.
 6            You can float for a three month assignment and
 7   end up throughout the building covering all different
 8   areas or you could be assigned to certain areas for
 9   three month assignments.
10   Q.   What were your duties and responsibilities in
11   property?
12   A.   I oversaw the storage of all the detainees
13   within the Suffolk County Sheriff's Department Nashua
14   Street Jail, the documentation of all their property,
15   jewelry, personal belongings, disposition of their
16   property, searching detainees as they come in from
17   court, going out to court.
18            It was pretty much the front line defense as
19   far as any contraband or trying to limit the contraband
20   or trying to detect any contraband coming into the
21   facility, safety and security of staff.
22   Q.   Do you do the searches?
23   A.   I do.
24   Q.   Does anyone else do the searches?
```

```
                                                    19
 1   A.   In the morning time, the transportation
 2   officers help.
 3   Q.   So you're not the only one responsible for
 4   doing searches to make sure contraband isn't being
 5   brought in?
 6   A.   No.  In the afternoon, it's yourself and one
 7   search officer.
 8   Q.   Who did you report to?
 9   A.   That would be, in the morning time I would say
10   I report in with the booking room officer, whoever was
11   assigned down there at the time.  And then I would go
12   back and open up the property room and set up for the
13   morning court preparation.
14   Q.   Is booking another support services position?
15   A.   Yes.
16   Q.   What are the other support services positions
17   within the jail?
18   A.   I want to say there's in excess of about over
19   30 I believe.
20   Q.   Give me some examples.
21   A.   Transportation, records, communications,
22   central control, booking room, canteen, maintenance,
23   kitchen, community affairs.  There's quite a few.
24   Q.   Who makes the assignments to the support
```

```
                                                    20
 1   services positions?
 2   A.   I'm not quite sure.  I want to say it would be
 3   a recommendation of your shift commander and also I
 4   probably want to say the overall decision would be the
 5   deputy superintendent and superintend.
 6   Q.   In your experience, you've been here 13 years,
 7   is that your understanding, that the superintendent and
 8   deputy superintendent make the decision?
 9   A.   I would say they have, yes.
10   Q.   And based upon information they received from
11   shift commanders?
12   A.   I would say so.
13   Q.   What are your hours?
14   A.   Seven to three.
15   Q.   Do you have weekends off?
16   A.   At what juncture, when I was assigned to
17   property?
18   Q.   Yes.
19   A.   Yes.
20   Q.   And when you were on a unit when you were a
21   line officer, did you have weekends off?
22   A.   When I wasn't in property, no.  It depends.
23   At the beginning, no.  And based on my seniority, I had
24   every other weekend off leading up to property and also
```

42

1    Statement, III, "A deputy sheriff holds this status at
2    the will of the sheriff, who my revoke such appointment
3    at any time and for any reason." Did I read that
4    correctly?
5        A.   Yes.
6        Q.   Is it your understanding, Officer Barnes, that
7    the sheriff may revoke deputy sheriff status of an
8    employee at any time and for any reason?
9        A.   Yes.
10       Q.   *Does just cause have to be established before
11   a sheriff can revoke an employee's deputy sheriff
12   status?
13       A.   Just cause in regards to what, discipline?
14       Q.   I'm asking you --
15       A.   Can you repeat the question? Sorry.
16            MS. CAULO:  Repeat the question, read it
17   back, please.
18            (*Court reporter reads back noted
19   testimony as recorded.)
20   BY MS. CAULO:
21       A.   To the best of my knowledge, no.
22       Q.   Turning to page two, it indicates in A 1 that
23   an individual who wishes to perform the powers of deputy
24   sheriff may submit an application for the privilege of

(617) 423-5841
COPLEY COURT REPORTING

57

1   Q.   Did you ever perform any details as deputy
2   sheriff?
3   A.   On occasion I believe, to the best of my
4   recollection, I never performed a security detail
5   outside the four walls of the Suffolk County Sheriff's
6   Department.
7   Q.   You say you haven't performed a security
8   detail. Have you performed any details outside the four
9   walls of the institution as a private paid detail?
10  A.   No.
11  Q.   So is it fair to say you've never performed a
12  detail as it is referred to in Exhibit 3, Policy S 520,
13  private paid details?
14  A.   Correct.
15  Q.   You've been deputy sheriff since about '94 and
16  '95, to April of 2005 and you never performed a private
17  paid detail?
18  A.   Correct, never volunteered for that
19  assignment.
20              (Brief recess.)
21  BY MS. CAULO:
22  Q.   To recap, Officer Barnes, you just indicated a
23  few moments ago that during the period of time that you
24  held the status of a deputy sheriff, you never performed

(617) 423-5841
COPLEY COURT REPORTING

64

1    Q.   I'm trying to get a sense of how many overtime
2  shifts you actually performed?
3    A.   I would say it wasn't specifically once a
4  month, but there were times where it could have been
5  twice, maybe three times a month. And then there were
6  times when you could go a couple of times you didn't do
7  it. I would say on average once a month.
8    Q.   Would there be records of your performing
9  overtime shifts in the department?
10   A.   I believe personnel may have those records.
11   Q.   So we could look at those records to determine
12  unequivocally in the years you've been working here how
13  often you have performed an overtime shift?
14   A.   Correct.
15   Q.   And overtime is a potential source of income,
16  is it not?
17   A.   Correct.
18   Q.   Is it fair to say, Officer Barnes, that the
19  needs of the department are such that overtime shifts
20  are held daily?
21   A.   Right now, absolutely, yes.
22   Q.   And last year?
23   A.   Absolutely.
24   Q.   And the year before that?

(617) 423-5841
COPLEY COURT REPORTING

65

```
 1        A.   I want to say over the last few years, yes.
 2        Q.   That's a significant source of potential
 3   income, correct?
 4        A.   Yes.
 5        Q.   That you have not availed yourself of?
 6        A.   All the time, no, absolutely not.  With
 7   overtime purposes, when you're called and you're
 8   available, you can take it.  It's not it's like a
 9   sign-up process where you sign up the day you do it.
10   But when overtime is available on certain days, you can
11   take it.
12        Q.   Have you actively sought out overtime
13   opportunities during your career?
14        A.   Actively, no.
15        Q.   It's fair to say that a number of officers
16   regularly work overtime shifts, right?
17        A.   I would say that's fair.
18        Q.   In fact, some of your fellow plaintiffs
19   regularly work overtime shifts, correct?
20        A.   Correct.
21        Q.   Lorne Lynch regularly works overtime?
22        A.   To the best of my knowledge.
23        Q.   Al Moscone works overtime?
24        A.   To the best of my knowledge.
```

73

1  after receiving this letter on April 21, 2005, this
2  being Exhibit 4?
3       A.   I can't recall, I don't recall.
4       Q.   Did you speak to any of your colleagues?
5       A.   I'm not sure.  I can't recall.
6       Q.   What was your reaction upon receiving this
7  letter?
8       A.   I had no idea why I was not in good standing.
9  I had no idea.
10      Q.   Were you surprised?
11      A.   Yes.
12      Q.   Were you shocked?
13      A.   I would say so, yes.
14      Q.   And you don't remember who you talked to about
15 it?
16      A.   Back in April 21, 2005 who I directly talked
17 to right after getting this, no, absolutely not.
18      Q.   Did you speak to any of the other officials in
19 your unit?
20      A.   I'm sure I may have had conversations with
21 them in regards to this letter, but I don't know exactly
22 who I had conversations with and what exactly was
23 discussed.
24      Q.   At the time, April 21, 2005, were you still an

74

1  official with JOEASC?
2     A.   No, I was not.
3     Q.   Who were the elected officials of JOEASC at
4  that time?
5     A.   Mike Walsh was the president, Robert Tullos
6  was the vice president.  The treasurer was Chris Mills I
7  believe.  The secretary I believe was, I want to say
8  Stan Androskevich (spelled phonetically).
9          The Executive Board was Steve Cinelli, William
10 Grant, and I can't recall the third one.
11    Q.   Did you call any of those individuals after
12 you received this letter to complain?
13    A.   I don't recall.  I don't recall, you know,
14 discussing this with them verbatim.  I don't recall
15 anything, no.
16    Q.   Did you speak with any of your colleagues to
17 see whether anyone else had been decommissioned?
18    A.   I know after the fact.  I don't know when,
19 directly when, exact dates, but I know that there were
20 certain people that did receive these letters.
21    Q.   Did you speak with anybody in management other
22 than Deputy Superintendent Cliff Carney concerning why
23 your status was revoked?
24    A.   No, I was trying to go up the chain of