## EXHIBIT LIST PART II

1.    Deposition testimony of John Barnes dated October 31, 2006;

2.    Deposition testimony of John Grennon dated January 19, 2007;

3.    West Roxbury Transcript, dated April 1, 2004;

4.    Boston City Paper, dated April 23, 2004;

5.    Letter entitled *What a Mess! Promises Not Kept* dated April 2, 2004 under John Barnes signature;

6.    Letter dated March 25, 2004 *What a Mess! Sheriff takes employees' Benefits* under John Grennon signature;

7.    Press release issued by John Ellis dated March 25, 2004;

8.    Deposition testimony of David Bergeron dated October 4, 2006;

9.    Deposition testimony of Paul Giglio dated December 13, 2006;

10.    Deposition testimony of Erik Dilibero dated December 13, 2006;

11.    Deposition of John Grennon dated February 26, 2007;

12.    Memorandum to Employees from Sheriff Cabral dated December 12, 2003;

13.    Memorandum to Employees from Sheriff Cabral dated April 28, 2004;

14.    Deposition testimony of John Barnes, dated December 7, 2006;

15.    Deposition testimony of Lorne Lynch dated November 2, 2006;

16.    Suffolk County Sheriff's Department Policy S201-Staffing;

17.    SCSD Position Description for JO –1;

18.    Deposition testimony of Viktor Theiss dated April 19, 2006 in the matter of *Michelman v. Cabral*.

19.    Deposition of Sheriff Andrea J. Cabral dated January 19, 2007, in the matter of *Michelman v. Cabral.* ,

20.    Deposition testimony of Superintendent Cliff Carney dated April 4, 2006;

21.     Transportation Audit dated April 16, 2004;

22.     Carney Transportation memorandum dated October 22, 2004;

23.     SCSD Policy S-520 Private Paid Details;

24.     Affidavit of Lieutenant James Coppi;

25.     Lynch detail earnings 2003-2005;

26.     Moscone detail earnings 2003-2005;

27.     SCSD Position Description for JO –5;

28.     Admissions of John Ellis, dated May 17, 2007;

29.     Admissions of John Grennon, dated May 18, 2007; and

30.     Affidavit of Ellen M. Caulo

1

Volume 1
Pages 1-216
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

------------------------------:
                              :
Bergeron, et al               :
            Plaintiff,        :
                              :
V.                            :
                              :
Andrea Cabral                 :
            Defendant.        :
                              :
------------------------------ :


        DEPOSITION OF JOHN BARNES, a witness
called on behalf of the Defendant taken pursuant to the
Federal Rules of Civil Procedure, before Patricia M.
Haynes, a Certified Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts, CSR No.:
14620F, at the Offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Tuesday, October 31, 2006, commencing at 10:15 a.m.




        Copley Court Reporting
    58 Batterymarch Street, Suite 317
      Boston, Massachusetts  02110
            (617) 423-5841

10

1      two years at Suffolk University, and I'll exclude for

2      the moment the EMT certificate course, have you had any

3      other formal education?

4          A.   No, I have not.

5          Q.   When did you begin your employment with the

6      Suffolk County Sheriff's Department?

7          A.   September 29, 1993.

8          Q.   And who was the sheriff at the time you were

9      hired?

10         A.   Sheriff Robert Ruffo.

11         Q.   Did you know anyone in the department before

12     you were hired?

13         A.   Yes, Gerard Horgan.

14         Q.   And did Mr. Horgan advocate for your hiring?

15         A.   I'm not sure.  I filled out an application and

16     I passed in my application to the personnel department.

17     I put him down as a reference.  I don't know if he

18     advocated for my employment, I'm not sure.

19         Q.   How do you know Mr. Horgan?

20         A.   I grew up and was friends with his younger

21     brother, Tommy.

22         Q.   Did you know Sheriff Ruffo at all?

23         A.   No.

24         Q.   You were hired on September 29 of 1993.  What

11

1     was your rank that you were hired at?

2          A.    A Jail Officer 1.

3          Q.    Which is the same rank you hold now?

4          A.    Yes.

5          Q.    If you could, Officer Barnes, please describe

6     from 1993 when you commenced your employment with the

7     department to the current date the various jobs and

8     positions that you've held at the department?

9          A.    I pretty much worked in all areas of the

10    Nashua Street Jail, booking, records.  Covering records

11    on occasion, filling in on a sick call, to that nature,

12    not assigned there on a permanent basis.  Same thing

13    with the booking room.

14          I worked in classification for a short time

15    covering, after the retirement I think of Robert

16    Thibolt, who was the director of classification.  For a

17    short period of time, I don't know how long that was or

18    when that exactly took place, I worked in the property

19    department.

20          And I worked throughout the facility in

21    different units.  I worked on transportation -- when I

22    say worked in these areas, I wasn't specifically

23    assigned there.  I may have been assigned for a day, for

24    a week, you know, based on the shift commander for that

13

```
 1  BY MS. CAULO:
 2      Q.   Was there a training academy when you were
 3  first hired in September of 1993?
 4      A.   No, I never attended the academy.
 5      Q.   Did you have any training within the first
 6  year of your employment here?
 7      A.   Yes.
 8      Q.   What kind of training?
 9      A.   Basic in-service training, use of force, CPR,
10  first responder.  That's to the best of my recollection,
11  I know the first year on the job that's what we were
12  pretty much at.
13      Q.   At any point during your tenure, it's now been
14  almost 13 years in the department, have you attended the
15  training academy?
16      A.   I never had the academy, no.
17      Q.   You said you attended some in-service classes
18  on use of force, etcetera, during your --
19      A.   Yes.
20      Q.   When did you receive training?
21      A.   Training is pretty much yearly.  I can't
22  recall specifically what training I had each year, but
23  every year you had some type of retraining, whether it
24  was recertification for CPR or it was gun qualifications
```

14

```
 1  yearly.  I don't recall exactly what other training
 2  would be yearly.
 3          Now we technically do go to a 48 hour
 4  in-service training yearly that incorporates all the
 5  training into a one week span.  Whereas in the past, you
 6  do a class maybe one week and then do another class a
 7  month later.
 8      Q.   When were you first given any sort of
 9  permanent assignment, if you will?
10      A.   I was assigned to the property department.  I
11  can't recall the exact date.
12      Q.   What year was that?
13      A.   I want to say it was probably close to 1999 or
14  2000.
15      Q.   Prior to that time, so from 1993 up until
16  about 1999 or 2000, summarize for me the assignments
17  that you had.
18      A.   To the best of my recollection, I was assigned
19  to the housing units within the facility.  I was
20  assigned to transportation assignments.  I was assigned
21  to outside hospital details.  I was assigned to
22  different areas within the facility, classification,
23  kitchen, booking room, records.
24      Q.   Were these discrete assignments, one day you
```

15

```
 1  might be here and one day you might be some other place?
 2      A.   Correct.
 3      Q.   Who made the assignments?
 4      A.   I believe based on the shift commander.
 5      Q.   Can you tell me what your job responsibilities
 6  were as a line officer on the unit?
 7      A.   Care and custody of detainees.  The care that
 8  needs to be rendered and custody and security of the
 9  facility.
10      Q.   Prior to 1999 or 2000 when you indicate that
11  you were assigned to property, had you had any long-term
12  assignments to transportation?
13      A.   I don't recall if they were long term.  They
14  were probably in regards to like quarterly assignments,
15  not specific as long term, one year in duration.  Most
16  of the assignments were quarterly.
17      Q.   When you were assigned to property, who was
18  the sheriff at that time?
19      A.   I want to say I was assigned to property under
20  Sheriff Rouse.
21      Q.   Prior to Sheriff Rouse being appointed sheriff
22  to fill out the remaining term of Sheriff Ruffo, did you
23  know Sheriff Rouse?
24      A.   No.
```

16

```
 1      Q.   Did you apply for that position or assignment?
 2      A.   I was covering down there on certain times,
 3  and the gentleman that had the assignment was removed
 4  for, I don't know specifically what the reasons were.
 5  And at that time, Deputy John Flynn, who oversaw that
 6  area down in the property department, he recommended,
 7  based on my prior job performance, he recommended me for
 8  that position.
 9          And when he asked me if I interested in it, I
10  accepted.
11      Q.   Who was individual that held the assignment to
12  property prior to you?
13      A.   I want to say Gregory Getchel.
14      Q.   How long a period of time did Mr. Getchel hold
15  the assignment to property?
16      A.   I want to say in the duration of ten, 12
17  years.
18      Q.   Is he still with the department?
19      A.   Yes.
20      Q.   What's his position now?
21      A.   He's a corporal on the eleven to seven shift.
22      Q.   Does he have weekends off?
23      A.   To be honest with you, I don't know what his
24  days off are.
```

17

1　　Q.　Fair to say that when he was in property, he
2　had the weekends off?
3　　A.　Yes, he did.
4　　Q.　And when he was removed from property, he
5　didn't have the weekends off anymore?
6　　A.　As far as I know, when he was initially
7　removed, I think he may have maintained it for the
8　duration of that time period.　But when the new year
9　started, I'm sure he probably picked his shift and days
10　off, to the best of my recollection, according to
11　seniority of others.
12　　Q.　Property is a support services position?
13　　A.　Yes, it is.
14　　Q.　When are they assigned, how frequently?
15　　A.　I believe yearly.　I believe it's a yearly
16　assignment, support services.　I don't have any
17　understanding of exactly how long or what the duration
18　of each assignment may be.　Some people have it for a
19　year, some people have been there for years.
20　　Q.　As compared to the other assignments, which I
21　think you referred to them as quarterly assignments?
22　　A.　Yes.
23　　Q.　What's the difference?
24　　A.　You're pretty much assigned down there for a

18

1　longer duration in that specific area.　Pretty much your
2　daily function would be in that area, whereas when
3　you're upstairs or when you're in the capacity as
4　working as a line officer, the assignments change
5　frequently.
6　　　　You can float for a three month assignment and
7　end up throughout the building covering all different
8　areas or you could be assigned to certain areas for
9　three month assignments.
10　　Q.　What were your duties and responsibilities in
11　property?
12　　A.　I oversaw the storage of all the detainees
13　within the Suffolk County Sheriff's Department Nashua
14　Street Jail, the documentation of all their property,
15　jewelry, personal belongings, disposition of their
16　property, searching detainees as they come in from
17　court, going out to court.
18　　　　It was pretty much the front line defense as
19　far as any contraband or trying to limit the contraband
20　or trying to detect any contraband coming into the
21　facility, safety and security of staff.
22　　Q.　Do you do the searches?
23　　A.　I do.
24　　Q.　Does anyone else do the searches?

19

1　　A.　In the morning time, the transportation
2　officers help.
3　　Q.　So you're not the only one responsible for
4　doing searches to make sure contraband isn't being
5　brought in?
6　　A.　No.　In the afternoon, it's yourself and one
7　search officer.
8　　Q.　Who did you report to?
9　　A.　That would be, in the morning time I would say
10　I report in with the booking room officer, whoever was
11　assigned down there at the time.　And then I would go
12　back and open up the property room and set up for the
13　morning court preparation.
14　　Q.　Is booking another support services position?
15　　A.　Yes.
16　　Q.　What are the other support services positions
17　within the jail?
18　　A.　I want to say there's in excess of about over
19　30 I believe.
20　　Q.　Give me some examples.
21　　A.　Transportation, records, communications,
22　central control, booking room, canteen, maintenance,
23　kitchen, community affairs.　There's quite a few.
24　　Q.　Who makes the assignments to the support

20

1　services positions?
2　　A.　I'm not quite sure.　I want to say it would be
3　a recommendation of your shift commander and also I
4　probably want to say the overall decision would be the
5　deputy superintendent and superintend.
6　　Q.　In your experience, you've been here 13 years,
7　is that your understanding, that the superintendent and
8　deputy superintendent make the decision?
9　　A.　I would say they have, yes.
10　　Q.　And based upon information they received from
11　shift commanders?
12　　A.　I would say so.
13　　Q.　What are your hours?
14　　A.　Seven to three.
15　　Q.　Do you have weekends off?
16　　A.　At what juncture, when I was assigned to
17　property?
18　　Q.　Yes.
19　　A.　Yes.
20　　Q.　And when you were on a unit when you were a
21　line officer, did you have weekends off?
22　　A.　When I wasn't in property, no.　It depends.
23　At the beginning, no.　And based on my seniority, I had
24　every other weekend off leading up to property and also

42

1      Statement, III, "A deputy sheriff holds this status at

2      the will of the sheriff, who my revoke such appointment

3      at any time and for any reason."  Did I read that

4      correctly?

5          A.    Yes.

6          Q.    Is it your understanding, Officer Barnes, that

7      the sheriff may revoke deputy sheriff status of an

8      employee at any time and for any reason?

9          A.    Yes.

10         Q.    *Does just cause have to be established before

11     a sheriff can revoke an employee's deputy sheriff

12     status?

13         A.    Just cause in regards to what, discipline?

14         Q.    I'm asking you --

15         A.    Can you repeat the question?  Sorry.

16              MS. CAULO:  Repeat the question, read it

17     back, please.

18              (*Court reporter reads back noted

19     testimony as recorded.)

20     BY MS. CAULO:

21         A.    To the best of my knowledge, no.

22         Q.    Turning to page two, it indicates in A 1 that

23     an individual who wishes to perform the powers of deputy

24     sheriff may submit an application for the privilege of

57

1      Q.    Did you ever perform any details as deputy

2   sheriff?

3      A.    On occasion I believe, to the best of my

4   recollection, I never performed a security detail

5   outside the four walls of the Suffolk County Sheriff's

6   Department.

7      Q.    You say you haven't performed a security

8   detail.  Have you performed any details outside the four

9   walls of the institution as a private paid detail?

10     A.    No.

11     Q.    So is it fair to say you've never performed a

12  detail as it is referred to in Exhibit 3, Policy S 520,

13  private paid details?

14     A.    Correct.

15     Q.    You've been deputy sheriff since about '94 and

16  '95, to April of 2005 and you never performed a private

17  paid detail?

18     A.    Correct, never volunteered for that

19  assignment.

20               (Brief recess.)

21  BY MS. CAULO:

22     Q.    To recap, Officer Barnes, you just indicated a

23  few moments ago that during the period of time that you

24  held the status of a deputy sheriff, you never performed

(617) 423-5841
COPLEY COURT REPORTING

64

1     Q.   I'm trying to get a sense of how many overtime

2   shifts you actually performed?

3     A.   I would say it wasn't specifically once a

4   month, but there were times where it could have been

5   twice, maybe three times a month.  And then there were

6   times when you could go a couple of times you didn't do

7   it.  I would say on average once a month.

8     Q.   Would there be records of your performing

9   overtime shifts in the department?

10     A.   I believe personnel may have those records.

11     Q.   So we could look at those records to determine

12   unequivocally in the years you've been working here how

13   often you have performed an overtime shift?

14     A.   Correct.

15     Q.   And overtime is a potential source of income,

16   is it not?

17     A.   Correct.

18     Q.   Is it fair to say, Officer Barnes, that the

19   needs of the department are such that overtime shifts

20   are held daily?

21     A.   Right now, absolutely, yes.

22     Q.   And last year?

23     A.   Absolutely.

24     Q.   And the year before that?

65

```
1         A.    I want to say over the last few years, yes.

2         Q.    That's a significant source of potential

3    income, correct?

4         A.    Yes.

5         Q.    That you have not availed yourself of?

6         A.    All the time, no, absolutely not.  With

7    overtime purposes, when you're called and you're

8    available, you can take it.  It's not it's like a

9    sign-up process where you sign up the day you do it.

10   But when overtime is available on certain days, you can

11   take it.

12        Q.    Have you actively sought out overtime

13   opportunities during your career?

14        A.    Actively, no.

15        Q.    It's fair to say that a number of officers

16   regularly work overtime shifts, right?

17        A.    I would say that's fair.

18        Q.    In fact, some of your fellow plaintiffs

19   regularly work overtime shifts, correct?

20        A.    Correct.

21        Q.    Lorne Lynch regularly works overtime?

22        A.    To the best of my knowledge.

23        Q.    Al Moscone works overtime?

24        A.    To the best of my knowledge.
```

73

```
 1     after receiving this letter on April 21, 2005, this

 2     being Exhibit 4?

 3          A.   I can't recall, I don't recall.

 4          Q.   Did you speak to any of your colleagues?

 5          A.   I'm not sure.  I can't recall.

 6          Q.   What was your reaction upon receiving this

 7     letter?

 8          A.   I had no idea why I was not in good standing.

 9     I had no idea.

10          Q.   Were you surprised?

11          A.   Yes.

12          Q.   Were you shocked?

13          A.   I would say so, yes.

14          Q.   And you don't remember who you talked to about

15     it?

16          A.   Back in April 21, 2005 who I directly talked

17     to right after getting this, no, absolutely not.

18          Q.   Did you speak to any of the other officials in

19     your unit?

20          A.   I'm sure I may have had conversations with

21     them in regards to this letter, but I don't know exactly

22     who I had conversations with and what exactly was

23     discussed.

24          Q.   At the time, April 21, 2005, were you still an
```

74

```
 1    official with JOEASC?

 2         A.   No, I was not.

 3         Q.   Who were the elected officials of JOEASC at

 4    that time?

 5         A.   Mike Walsh was the president, Robert Tullos

 6    was the vice president.  The treasurer was Chris Mills

 7    believe.  The secretary I believe was, I want to say

 8    Stan Androskevich (spelled phonetically).

 9              The Executive Board was Steve Cinelli, William

10    Grant, and I can't recall the third one.

11         Q.   Did you call any of those individuals after

12    you received this letter to complain?

13         A.   I don't recall.  I don't recall, you know,

14    discussing this with them verbatim.  I don't recall

15    anything, no.

16         Q.   Did you speak with any of your colleagues to

17    see whether anyone else had been decommissioned?

18         A.   I know after the fact.  I don't know when,

19    directly when, exact dates, but I know that there were

20    certain people that did receive these letters.

21         Q.   Did you speak with anybody in management other

22    than Deputy Superintendent Cliff Carney concerning why

23    your status was revoked?

24         A.   No, I was trying to go up the chain of
```

89

1    people around?

2        A.    I have no idea.  It could have been among

3    ourselves, it could have been in a group.  I have no

4    idea.

5        Q.    First I want to ask what you yourself did on

6    behalf of Steve Murphy and then we'll speak to what

7    JOEASC did.  What work did you do on behalf of Steve

8    Murphy?

9        A.    I held signs for him.

10       Q.    How often?

11       A.    I can't recall exactly how many times.  I did

12   a phone bank for him.

13       Q.    Where were the phone banks held?

14       A.    Roslindale.  I forget what the union was

15   there.  I did phone banks in Roslindale and on election

16   day at the IBEW.  The phone bank was a union office.

17       Q.    How often did you do the phone banks?

18       A.    Prior to the election, I want to say like

19   three times, like in August maybe once a week for three

20   weeks, and on election day I was doing phone banks at

21   the IBEW.

22       Q.    How many times did you hold signs?

23       A.    I want to say I did it once.  Once I did it,

24   and I can't recall exactly now, I think it was once or

```
 1      twice.  I know I did it once in Dorchester down at the
 2      Gallivan Boulevard area, in-between there and Adams
 3      Street.  I don't recall the date.
 4          Q.   When you were doing the phone banks, were
 5      there any other department employee there?
 6          A.   I did phone banks on election day, and I know
 7      I was doing phone banks with John Grennon, and I can't
 8      recall off the top of my head who was there during the
 9      phone banks.
10          Q.   You said you did them approximately three
11      times, and you identified John Grennon.  Is that your
12      best memory as to any other department employee that was
13      there?
14          A.   I can't recall.  I know there was numerous
15      people at each phone bank.  I know there was department
16      employees there, I just can't recall which ones were
17      there at each phone bank.
18          Q.   Is there anything you could look at or speak
19      to that would give you a better memory?
20          A.   No.  It was pretty much going there, and there
21      was a piece of paper that they have when you call that
22      you would pretty much go off the paper and ask them to
23      support Steve Murphy.
24          Q.   How were you notified they were holding phone
```

93

1     sign or participate in a phone bank?

2         A.    No.

3         Q.    John Grennon you mentioned was at one of the

4     phone banks?

5         A.    Yes.

6         Q.    Did you ever see John Grennon holding a sign?

7         A.    I don't recall.  I remember being at a time

8     where he attended in maybe July, late July or August.  I

9     forget exactly where it was.  I can't recall exactly

10    where it was.  It was one of the Steve Murphy times, and

11    John Grennon was there with me.  I don't recall exactly

12    what day it was or where the location was at this time.

13        Q.    How many events did you attend on behalf of

14    Steve Murphy?

15        A.    I want to say two.  One event was towards the

16    end of his election.  And that was at the Allston Sports

17    Depot in Brighton I believe it is, Brighton or Allston.

18        Q.    Who else was there besides you from the

19    department?

20        A.    I recall Pat O'Brien being there.

21        Q.    Pat O'Brien is an officer here at the jail?

22        A.    Correct.

23        Q.    Who else?

24        A.    I can't specifically say exactly who was

96

```
 1                    (Brief recess.)
 2    BY MS. CAULO:
 3         Q.    Did you contribute any money to the Murphy
 4    campaign?
 5         A.    $125.
 6         Q.    Was that a one-time contribution?
 7         A.    Yes.
 8         Q.    By check, by cash?
 9         A.    By check.
10         Q.    Were you aware that Captain Moscone had
11    organized a fund raiser in late August or early
12    September on behalf of Steve Murphy?
13         A.    I didn't know he organized a time, no.
14         Q.    Were you aware that there was a time that was
15    organized for Steve Murphy that he was involved in?
16         A.    Based on reviewing some of the transcripts, I
17    recall reading in regards to a function he attended,
18    yes.
19         Q.    When was the first time you learned about the
20    event that Captain Moscone was involved in?
21         A.    I really never talked to him prior to that in
22    regards to the function they were attending, no.
23         Q.    So at the time in late August or early
24    September of 2004, you were unaware that Captain Moscone
```

139

1   sporadic.

2        Q.   Were these hand addressed or was it a mass

3   mailing?

4        A.   We did a mass mailing.

5        Q.   How did that happen, how did you do that?

6   Explain it to me.

7        A.   The letter was created after collaboration

8   between a group of people and with some input from our

9   attorneys.  The letter was created, and we basically

10  utilized a mailing company to mail out to specific areas

11  of Suffolk County.

12       Q.   How was it paid for, what funds were used to

13  pay for it?

14       A.   With union funds.

15       Q.   Did you put the idea of mailings to a vote

16  before the membership?

17       A.   The membership actually approved this.  There

18  was specific things the membership approved prior to

19  this.  There was a general membership meeting prior to

20  this months before where the membership, there was a

21  motion put on the floor by certain members to either do

22  external picketing against the sheriff, external mailing

23  or some type of media advisory against the sheriff in

24  regards to issues that we felt strongly about.

140

```
 1          Q.    And the issues again were?

 2          A.    Dental and vision, veterans issue, pension

 3    fund.  I don't recall specifically.  Right now I got a

 4    brain freeze.

 5          Q.    Is that your best memory right now?

 6          A.    Yes.

 7          Q.    Where was the union meeting held?

 8          A.    Some of the union meetings were held in the

 9    visiting room, others were held externally at Florian

10    Hall and some at the Knights of Columbus in Charlestown.

11    I can't specifically say where it was held.

12          Q.    Were there minutes of these meetings?

13          A.    Possibly.

14          Q.    And those would have been recorded by John

15    Ellis as the recording secretary?

16          A.    Correct.

17          Q.    You indicated that the mailing was one letter

18    that went out to 5,000 residents?

19          A.    I would say maybe a little more based on some

20    of the unions that we sent it to.

21          Q.    Were there press releases sent to newspapers

22    as well?

23          A.    Yes, there were press releases sent out by

24    John Ellis.
```

141

1      Q.    I'm trying to get a sense of how many

2  mailings.  You indicated one letter and now in addition

3  to the letter there were also press releases.  How many

4  mailings in total are you aware that JOEASC authorized

5  to be sent out on behalf of the membership?

6      A.    There was one letter that was, one letter

7  created for unions and the letter created for residents.

8  Specifically one letter went strictly to the union

9  leaderships and the letter that went out to the

10 residents.

11     Q.    You indicated that a number of folks were

12 involved in writing these letters.  Who were they?

13     A.    I want to say the Board of Directors all had

14 input.

15     Q.    Who of the Board of Directors?

16     A.    I don't recall exactly what all input was put

17 in from each person, but I do recall --

18     Q.    Just the identification?

19     A.    I want to say John Grennon, John Ellis.  Tim

20 Turley, he wasn't on the Board of Directors but he was

21 the grievance administrator.  I want to say Bill Peneau,

22 Mark Turley.  I can't recall off the top of my head.

23     Q.    Robert Tullos?

24     A.    He may have.  I can't recall what input each

142

1   person gave, but I know each person knew about the

2   letter prior to it going out and each person had some

3   type of input on what should be put into the letter.

4       Q.   Other than those folks you've just identified,

5   who else had input into the drafting of this letter or

6   mailing?

7       A.   I know that the letter prior to being sent out

8   was sent to our legal representatives, and they actually

9   made some suggested changes to it.

10                  (Brief recess.)

11  BY MS. CAULO:

12      Q.   Where were the mailings written, Officer

13  Barnes, do you know, the actual process of filling them

14  out and typing them out?

15      A.   John Ellis was the secretary, and he pretty

16  much composed it, the final draft.

17      Q.   And where would that have happened, is there a

18  computer that he used at the department?

19      A.   No, he probably used his own I would say.

20      Q.   What was the purpose of these mailings?

21      A.   Basically we weren't considering them.  It was

22  an option that was approved by the membership until we

23  had a meeting on or about March of 2004 where we tried

24  to address some of these issues with Sheriff Cabral.

179

1              MS. CAULO:  We'll mark this as Exhibit 10.

2              (Document marked for identification as

3     Exhibit No. 10.)

4     BY MS. CAULO:

5         Q.    Please look at Exhibit 10.  Do you recognize

6     that, Officer Barnes?

7         A.    There's one section, "At their request, I met

8     with the leadership of Local 419, gave them the facts

9     and answered whatever questions they had.  I share with

10    you now the information provided in that meeting."

11             I don't recall that being in the one that I

12    reviewed prior.  Other than that, I recall seeing this

13    memo.  I don't know if it was posted on a bulletin board

14    or whatever the case may be, but I recall seeing this

15    memo.

16             Other than that last sentence of the first,

17    the last two sentences of the first paragraph, I don't

18    recall that being in there.

19        Q.    So when you say you recall seeing this, this

20    is a memorandum dated December 12, 2003 to all

21    department employees from Sheriff Andrea Cabral

22    regarding April 2003 to June 2003 pension payments?

23        A.    Correct.

24        Q.    And you recall receiving this memorandum, but

180

1    you do not recall reading the two sentences that talk

2    about 419, which is the union over at the House of

3    Correction?

4         A.    Correct.

5         Q.    Requesting a meeting with the sheriff and that

6    the sheriff in fact went and met with them concerning

7    the pension issue?

8         A.    Correct.

9         Q.    When you say you don't recall this being in

10    there, are you suggesting this was put in there

11    afterwards?

12         A.    I'm not making that suggestion.  I'm just

13    telling you that I don't recall that -- from the

14    memorandum that I read, I don't recall that being in

15    there.  I don't know if this was a different one or she

16    had more than one.

17              I don't recall that being in, from the

18    memorandum that I'm trying to recall, I don't recall

19    that being in there.

20         Q.    Were you aware that Local 419, which is the

21    officers and lieutenant's union over at the House of

22    Correction, requested that Sheriff Cabral meet with them

23    to address their concerns, theirs meaning 419's

24    concerns, concerning the pension issue?

1



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

```
*************************************
                                    *
DAVID BERGERON, JOHN GRENNON,       *
LORNE LYNCH, JOHN BARNES, JOHN ELLIS,*
TIMOTHY TURLEY, AL MOSCONE,         *
WILLIAM PENEAU, ERIC DILIBERO and   *
PAUL GIGLIO,                        *
                    Plaintiffs,     *
                                    *
     vs.                            *  VOLUME 1
                                    *
ANDREA CABRAL, INDIVIDUALLY and     *
as SHERIFF OF SUFFOLK COUNTY,       *
                    Defendant.      *
                                    *
*************************************
```

        DEPOSITION OF JOHN M. GRENNON, a witness
called on behalf of the Defendant, taken pursuant
to the provisions of the Federal Rules of Civil
Procedure, before Christine L. Warwick, a
Certified Shorthand Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of the Suffolk County Sheriff's
Department, 200 Nashua Street, Boston,
Massachusetts 02114, on Friday, January 19, 2007,
commencing at 1:05 p.m.

 **ORIGINAL**

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

COPLEY COURT REPORTING
(617) 423.5841

5

1        MS. CAULO:  With respect to the witness's

2    opportunity to read and sign the deposition, we're

3    going to waive the requirement of the notary; but

4    the witness shall have two weeks to read and sign.

5        **JOHN M. GRENNON,** of lawful age, being

6    first properly identified and duly sworn, deposes

7    and says as follows in answer to direct

8    interrogatories

9    **BY ATTORNEY CAULO:**

10   Q.  Sir, would you state your name, please, and your

11       occupation?

12   A.  John, middle initial M, as in Michael, last name

13       Grennon, G-R-E-N-N-O-N.  I'm employed as a

14       lieutenant at the Suffolk County Sheriff's

15       Department.

16   Q.  And when did you achieve the rank of lieutenant?

17   A.  Three weeks ago.

18   Q.  Which was in '07, January of '07?

19   A.  Yes, first Wednesday of '07, whatever that date

20       was.

21   Q.  Prior to that, sir, what was your rank?

22   A.  Jail officer, grade 1.

23   Q.  Where do you reside?

24   A.  I reside at 175 Nichols, N-I-C-H-O-L-S, Street,

14

1       held that position from May of 1994 until the

2       first Wednesday of January 2007.

3   Q.  How many sheriffs have you worked under?

4   A.  Three.

5   Q.  Were you promoted under Sheriff Rufo?

6   A.  No.

7   Q.  Were you promoted under Sheriff Rouse?

8   A.  No.

9   Q.  When you were hired, Lieutenant Grennon, what was

10      your understanding of where you would be assigned

11      within the Department?

12  A.  The Nashua Street Jail.

13  Q.  And within the Nashua Street Jail, what was your

14      understanding of where in particular you would be

15      assigned?

16  A.  No understanding.

17  Q.  Well, was it your understanding that you would be

18      assigned wherever the Superintendent wanted you to

19      be assigned?

20  A.  It was not my understanding.  I understood I'd be

21      assigned at the Nashua Street Jail where the shift

22      commander assigned me.

23  Q.  Who had the authority to make assignments?

24  A.  This would be speculation.  The shift commander,

18

1     have them off every three months.  So I don't
2     know what the current practice or policy is for
3     support service.  I know the loading dock
4     officer -- only because I deal with him each
5     morning.  I know the loading dock officer would
6     be support services.
7   Q.  You mentioned twelve months as a period of time in
8     which someone would have weekends off.  You also
9     mentioned assignments were made every 30 days or
10    every 90 days.  What's the difference with a
11    support services assignment?  How often are they
12    made?
13  A.  I believe yearly as opposed to quarterly.
14  Q.  Now, when you were first hired as a probationary
15    JO-1 and then thereafter as a permanent JO-1, can
16    you give us briefly an overview of what your
17    assignments were during the period of time that
18    you've worked here?  What kinds of different
19    things have you done?
20  A.  I've worked custody posts at the Nashua Street
21    Jail on each floor as unit officer, as escort
22    officer, as relief officer and as housing control
23    officer.  I've worked in the central control area.
24    I've worked in the back gate area.

19

```
 1              I've worked transportation on the seven
 2        to three shift and the three to eleven shift.
 3        I've worked on a SERT team.  Those are probably
 4        the positions.  I worked at the Nashua Street
 5        Jail.  I was also assigned to the training
 6        division as a staff instructor.  That's it.
 7   Q.   When were you first assigned to the training
 8        division as a staff instructor?
 9   A.   I don't recall.
10   Q.   Under whose instruction, Rufo, Rouse or Cabral?
11   A.   I don't recall.
12   Q.   Is there anything that would help you recall?
13   A.   Yes.
14   Q.   What would that be?
15   A.   The pay sheets.
16   Q.   The pay sheets?
17   A.   The rosters.  When you worked here, they have to
18        write down where you worked.  That would help me
19        figure out where I worked.
20   Q.   Do you have anything at home that would help you
21        figure out where you worked?
22   A.   I don't.
23   Q.   Do you have any calendars or diaries?
24   A.   I don't.
```

COPLEY COURT REPORTING
(617) 423.5841

26

```
 1      the years in the Department; and the function that
 2      I was performing at the training division was a
 3      managerial function.
 4   Q.  How so?
 5   A.  I was in charge of all of the scheduling.  I was
 6      in charge of approving vacations.  I was in charge
 7      of approving days off.  I was in charge of
 8      approving credit days, personal days, comp days.
 9      I was in charge of payroll.  I was certainly the
10      only JO-1 in the Department that had a manager's
11      identification number and log in into the KRONOS
12      payroll system.
13           I had access to the payroll data records
14      of everyone from Sheriff Cabral down to
15      probationary jail officers.  I was charged with
16      project creation.  I was charged with new
17      initiatives.  And there's much, much more.  I
18      just felt as though I was more than qualified for
19      the position, and I applied for it.
20   Q.  Who gave you the authority to do all of those
21      duties that you just testified about?
22   A.  Assistant Deputy Superintendent John O'Leary
23      initially and Captain John Scaduto secondarily;
24      and after Deputy Superintendent Michelman was
```

27

```
 1        promoted, he continues with that authorization.

 2    Q.  So at what point in time, Lieutenant, did you have

 3        all of these responsibilities that you've just

 4        described?  I'm just trying to get a point in time

 5        in which you had access to the payroll, when you

 6        were authorized to grant credit time and days off,

 7        at what point in time?

 8    A.  During the Rouse administration.  At some point

 9        during the Rouse administration, I assumed all of

10        those responsibilities.  I don't recall when I was

11        given a KRONOS access code, but I'm sure personnel

12        would have that information.

13    Q.  Well, Sheriff Rouse took office in October of

14        1996?

15    A.  Yes.

16    Q.  And left in or about October of 2002.  Where

17        within that period of time, if you could help me

18        out, as to when it was when you had these

19        additional responsibilities?

20    A.  I don't recall.  I'd have to see the timeline when

21        I worked in the training division.  I mean, I

22        don't recall when.  However, I signed the payroll

23        sheets.  So I'm sure that somebody here has access

24        to those things.  I don't recall.
```

28

```
 1   Q.  Was this when you were on a part-time basis when
 2       you had all this authority or when you were on a
 3       full-time basis?
 4   A.  Full-time basis.
 5   Q.  How long a period of time were you doing the
 6       training part-time?
 7   A.  Couple of years.  Specifically, I don't recall.
 8   Q.  Did you assume these responsibilities, or did you
 9       actually have a conversation with Deputy
10       Superintendent John O'Leary in which he granted
11       you them specifically; and thereafter, with
12       Mr. Scaduto, where he granted you them
13       specifically?
14   A.  I was granted these specifically.  There was never
15       an assumption.
16   Q.  And how about with Deputy Superintendent Martin
17       Michelman?
18   A.  Even more so.
19   Q.  What conversations did you have with Deputy
20       Superintendent Martin Michelman in which he
21       granted you these responsibilities?
22   A.  When he took over, he had a meeting with each of
23       the people that were working in the training
24       division.  And it was a reconfirmation or a
```

34

1      then been reassigned?

2   A. I don't know.  I've seen new faces over there.  I

3      don't know if they're assigned there permanently.

4      They've taught some classes.  I honestly don't

5      know what goes on in the training division.  I had

6      in-service classes with instructors that were not

7      there when I was there, but I don't know.

8   Q. Now, you indicated some sense of managerial duties

9      as you described them that you were responsible

10     for.  What other responsibilities or duties did

11     you have when you were in training on a full-time

12     basis?

13  A. Policy development.

14  Q. Such as?

15  A. Working on the Policy Review Committee with

16     Assistant Deputy Superintendent O'Leary, assisting

17     him in the developments, the writing, the

18     investigation, the research of new policies.

19  Q. Do you attend -- did you attend Policy Review

20     Committee meetings?

21  A. I don't recall.

22  Q. Do you recall that there were Policy Review

23     Committee meetings?

24  A. My recollection is there was a Policy Review

36

1   A.  I don't understand the question.

2   Q.  Okay.  Then I'll withdraw the question, and I'll

3       try to get one that you actually can answer.

4   A.  Thank you.

5   Q.  What classes did you teach?

6   A.  C.P.R.

7   Q.  What else?

8   A.  Cardiac defibrillation, sexual harassment,

9       discrimination in the workplace.

10  Q.  How often did you teach?

11  A.  I'm not done.

12  Q.  Pardon me for interrupting you.

13  A.  Preventing sexual misconduct within the workplace,

14      ethics and professionalism, constitutional law for

15      corrections, report writing, first responder,

16      introduction to corrections, history of the jails,

17      forced cell move, SERT, positional asphyxia,

18      reducing in-custody deaths.  There may be more,

19      but I don't recall them.

20  Q.  Were these separate and distinct modules, or were

21      these part of a particular curriculum for a day?

22  A.  They were separate and distinct classes and

23      modules that were applied at different levels of

24      training, in-service or recruit level or

COPLEY COURT REPORTING
(617) 423.5841

37

```
 1       specialized.
 2   Q.  Did you write any curriculum or materials for
 3       these?
 4   A.  Yes.
 5   Q.  Which ones did you write?
 6   A.  I don't recall.
 7   Q.  Were evaluations ever conducted of the training
 8       that was provided at, in the training academy and
 9       of the specific trainers?
10   A.  Yes.
11   Q.  Did you ever have an opportunity to see the
12       evaluations of your training?
13   A.  Yes.
14   Q.  Did you ever get any feedback in addition to these
15       evaluations on the trainings you conducted?
16   A.  Yes.
17   Q.  From whom did you receive feedback?
18   A.  Keith Medeiros, Martin Michelman, Patrick Bradley,
19       Richard Bradley, Michael Harris, Sheriff Rouse,
20       Special Sheriff Burns, Superintendent Feeney,
21       Captain Staffier, Captain Chambers.  Did I say
22       Deputy Superintendent O'Leary?  Did I say Martin
23       Michelman?  I'm trying to keep it above a certain
24       level and not casual comments like an officer
```

90

1      Commission.  I didn't handle any of the paperwork

2      that went there for the new group.

3   Q.  Is it fair to say that Sheriff Cabral voluntarily

4      recognized JOEASC as the bargaining unit for the

5      employees here at the Nashua Street Jail?

6   A.  Fair to say.

7   Q.  When was it that you first held an elected office

8      of this newly formed entity entitled JOEASC?

9   A.  We were interim officers when we took over in

10     February or when AFSCME ceased to exist.  I don't

11     know when the election was.  I think it may have

12     been April, but I'm not sure.

13  Q.  If I suggest to you it was in or around April of

14     '03, does that refresh your memory?

15  A.  That makes sense.

16  Q.  At that point in time, you were elected to the

17     position of what?

18  A.  Vice president.

19  Q.  And you held that position from April of 2003

20     until when?

21  A.  Oh, until -- I want to say until -- it was after

22     the election.  The election was November of --

23     when was the election?  November of 2004.  Early

24     2005 I want to say.

91

1    Q.  Well, the primary was in September of 2004?

2    A.  Yeah, I was thinking of the general election in

3        November.  I'm sorry.

4    Q.  Are you sure it wasn't October of 2004 when the

5        new leadership of JOEASC was elected?

6    A.  Quite possibly.  I don't recall, but quite

7        possibly.

8    Q.  Well, for purposes of -- let's say you served as

9        vice president from April of '03 to in or about

10       October, November of '04?

11   A.  Sure.

12   Q.  At what point in time of your tenure as vice

13       president of JOEASC did you come to feel that

14       Sheriff Cabral was antagonistic toward your union

15       activities?  I believe you said earlier it was

16       almost immediately?

17   A.  Did I use the word antagonistic?  I'm not sure.

18       Did I?

19   Q.  How would you characterize it?

20   A.  Initially?

21   Q.  Yes.

22   A.  She was unhappy with our union activity.

23   Q.  I use the word antagonistic.  You use the word

24       unhappy.  How were you aware that she was unhappy

119

```
 1      the new administration was elected in the fall of
 2      '04?
 3   A. It was passed over.  It was passed on to them.
 4   Q. How was that done?  Who was responsible for
 5      turning over those records?
 6   A. I would assume the secretary.
 7   Q. Do you know that?
 8   A. That he passed them over?
 9   Q. Yeah.
10   A. He was told to, and there was never a complaint
11      from Michael Walsh that he didn't get them.  So
12      yeah.
13   Q. Now, did you succeed Mickey Walsh as president of
14      JOEASC?
15   A. Yes.
16   Q. When did that occur?
17   A. April of 2006, on or about.
18   Q. And you held that position until your most recent
19      promotion to lieutenant?
20   A. Yes.
21   Q. Which caused you to be in a different union?
22   A. Yes.
23   Q. Did you receive JOEASC records from the
24      administration of Mickey Walsh?
```

124

```
 1   Q.  So what I'd like to know is what role did you play
 2       in the creation of those mailings that were issued
 3       under either your name, John Barnes or John Ellis?
 4   A.  The development of the letter.
 5   Q.  So talk to me about what role did you have in the
 6       development of that letter?
 7   A.  Making sure that it was focused on the issues at
 8       hand and not anything that was, you know,
 9       extraneous to what was going on, that we were
10       concerned about the veterans issues.  I mean, the
11       three major issues that we had here were the
12       veterans issues, the pension issue and the
13       benefits issue.  And that was it.  So it was
14       mainly more of a proofreading thing I think.
15   Q.  Did you draft any portion of it?
16   A.  Yeah.  I suppose -- I didn't type any of it, and
17       I'm not sure who typed it.
18   Q.  I'm talking about the process of creating it.  I'm
19       not talking about --
20   A.  I gave them ideas.
21   Q.  How did you give you ideas?
22   A.  Over the telephone.
23   Q.  Did you give them verbally, or did you give them
24       in written form?
```

136

1   Q.  Who is everybody?

2   A.  Well, everybody who was on the board of directors.

3       And John Barnes was here in this building, and he

4       was speaking to all of the board members on a

5       day-to-day basis because he was here.  John Ellis,

6       I believe, was the one typing it and proofreading

7       it for grammar and syntax and whatnot.  That's his

8       foray.

9           I'm absolutely involved in the letter.

10      I absolutely had input in the letter, absolutely

11      approved the letter.  I not trying to shirk that.

12      But the process, who typed it, where they typed

13      it and who said we'll put this line in and take

14      this line out, I'm not exactly sure to be honest

15      with you.

16          I mean, John Ellis, he's a great writer.

17      And he, you know, I had no concerns that he, that

18      it would be done improperly.  Does that -- I hope

19      that answers your question.  I have a feeling it

20      didn't, but I hope it does because -- I got phone

21      calls over probably a seven- to ten-day period

22      that it was being worked on, and then it was just

23      done.  I'm completely responsible for it.  I'm

24      not saying I'm not.  But it was just done.





EXHIBIT
8

**Thursday, April 1, 2004**

**Jail officer union calls on leaders to join their fight**

The Jail Officers and Employees Association of Suffolk County recently called upon Massachuse leaders as well as local Suffolk County opinion leaders to join them in their struggle with Suffolk Andrea Cabral.

In two letters sent by the union, the Jail Officers and Employees Association of Suffolk County IL AFL-CIO, members outline several instances whereby the department has not fulfilled its end of collective bargaining agreement.

The letter sights a misuse of money owed to pension benefits, a lack of dental and vision health delinquent payment of water bills and a dishonoring of agreements with veteran employees who called away to duty.

In one scathing passage, President John Barnes said, "We urge every local union member to se clear message to Sheriff Cabral: this kind of callous disregard for the welfare of working men an not be tolerated. Let Sheriff Cabral know that 'integrity' does matter." He also adds, "When she w by Republican Gov. Jane Swift to the post of Sheriff, Ms. Cabral said she was going to 'clean up the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation an worse. As an alternative to handing out pay increases to her friends, the Sheriff needs to get con departments fiscal mess. A mess of her own making."

The Cabral administration has come under fire for diverting funds from the officer's pensions to within the office. Recently, the Boston Herald reported that Cabral instructed her administration jobs and pay raises to friends and past acquaintances of the sheriff. The administration has also of mismanaging its fiscal resources and creating its own budget shortfall of more than $3 millior

***** the preceding article was originally printed in the West Roxbury Transcript weekly newspap 2004.

Boston City Paper, April 23, 2004, Page 7

# WHAT A MESS!

## PROMISES NOT KEPT

**JAIL OFFICERS & EMPLOYEES
ASSOCIATION OF SUFFOLK COUNTY
IUPA LOCAL 900 AFL-CIO**

*The following letter was recently mailed to voters.*

Imagine an elected official who took a $5 million deficit and turned it into a several million dollar larger problem. In the process, imagine that same official taking employee pension money and money set aside for employee dental and vision care and using the money attempting to balance her budget. Imagine things getting so bad that the Water and Sewer Commission sends out a notice threatening to shut off the water because you owe thousands of dollars in unpaid bills.

Sound unbelievable? Well, in fact, for the Sheriff of Suffolk County, the story is true and it gets worse. Even though the Sheriff's Department is broke, she has found the money needed to give pay boosts to a number of new hires including a group of her friends and supporters. Here are some facts that every citizen needs to know.

### Pension Benefits:

Everyone realizes that pension funds are a sacred trust between an employee and his or her employer. It is a promise of benefits that allow an employee to plan for their retirement future. Both the employee and the governmental unit contribute to the retirement fund. Sadly, the Sheriff has broken that sacred trust by using the money appropriated for the pension fund to pay other bills. The Sheriff's actions are a direct violation of MGL c 32 S25 (6)(a) and (b), which threatens serious injury to the contractual pension rights, benefits and the retirement system. As a result, employees have been forced to sue the Sheriff to protect their interest and families future.

In all, over $2.1 million dollars is missing from the City of Boston Retirement Fund. This figure is expanding monthly with interest payments, which already have reached approximately $100,000.00.

### Dental and Vision Care;

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.

### Water Bills:

Recently, the Sheriff's Department received a notice that it owed the City $22,000 in overdue water bills. As a result, the Water and Sewer Commission has threatened to shut off the water.

### Pay Raises:

Since being appointed, the Sheriff has brought in a number of new employees, including former colleagues and friends, and has handed out pay increases totaling in excess of over $450,000.00 even though the Department is millions of dollars in the red. In fact, many of these pay increases for these new employees have been substantial, totaling in excess of over $400.00 per week.

When she was appointed by Republican Jane Swift to the post of Sheriff, Ms. Cabral said she was going to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it worse. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the department's fiscal mess. A mess of her own making!

Sincerely,
John Barnes
President, JOEASC
IUPA #900, AFL-CIO
200 Nashua Street, Boston, MA 02114

### John F. Kennedy Library Public Forum

## Averting "The Final Failure"

Historian Sheldon Stern will discuss the Cuban Missile Crisis and his new book *Averting The Final Failure*, a first-ever narrative account of the secret Executive Committee meetings between President Kennedy and his most trusted advisors during the thirteen days of the Cuban missile crisis. Boston Globe columnist Brian McGrory will moderate this discussion.
**Sunday, May 16, 2:00 p.m. to 3:30 p.m., at the John F. Kennedy Library and Museum, Columbia Point, Boston.** All forums are free and open to the public. For reservations and further information, please call 617-514-1643

## FREE GED, MCAS & JOB TRAINING CLASSES

# METRO
# INSURANCE
# AGENCY

## AUTO & HOME
## INSURANCE
## SPECIALISTS

# 323-5500

### 1783 CENTRE ST., WEST ROXBURY

## Travel By Judie Leon

42 Corinth Street
Roslindale, MA 02131

## 617-469-4500

### FLY-AWAY VACATION SPECIALS

# ARUBA
STARTING AT
# $799.00
APRIL 3 – JUNE 19, 2004
SELECTED DATES
Per Person. Plus Tax

# PUERTO PLATA
APRIL 4 – APRIL 24, 2004
SELECTED DATES
STARTING AT
# $899.00
Per Person. Plus Tax

# PUNTA CANA
APRIL 4 – JUNE 19, 2004
SELECTED DATES
STARTING AT
# $999.00

"WHERE SERVICE IS OUR POLICY"
CALL AND ASK ABOUT THE PRICES ON MANY OTHER VACATION DESTINATIONS
TravelbyJudie@aol.com





**Jail Officers' & Employees
Association of Suffolk County**
IUPA Local 900 AFL-CIO
200 Nashua Street
Boston, MA 02114



*John Barnes, President*

*John Grennon, Vice-President*

April 2, 2004



## What a Mess!
### Promises Not Kept

John Ellis
*Secretary*

Mark Turley
*Treasurer*

Robert Tullos
*Executive Board*

Michael Walsh
*Executive Board*

Michael Cinelli
*Executive Board*

Tim Turley
*Chief Steward*

William Peneau
*Grievance Administrator*

Kevin O'Riordan
*Trustee*

Michelle Fitzpatrick
*Trustee*

Richard Rosetti
*Trustee*

Imagine an elected official who took a $5 million deficit and turned it into a several million dollar larger problem. In the process, imagine that same official taking employee pension money and money set aside for employee dental and vision care and using the money attempting to balance her budget. Imagine things getting so bad that the Water and Sewer Commission sends out a notice threatening to shut off the water because you owe thousands of dollars in unpaid bills.

Sound unbelievable? Well, in fact, for the Sheriff of Suffolk County, the story is true and it gets worse. Even though the Sheriff's Department is broke, she has found the money needed to give pay boosts to a number of new hires including a group of her friends and supporters. Here are some facts that every citizen needs to know.

<u>Pension Benefits:</u>

Everyone realizes that pension funds are a sacred trust between an employee and his or her employer. It is a promise of benefits that allow an employee to plan for their retirement future. Both the employee and the governmental unit contribute to the retirement fund. Sadly, the Sheriff has broken that sacred trust by using the money appropriated for the pension fund to pay other bills. The Sheriff's actions are a direct violation of MGL c 32, § 25 (6)(a) and (b), which threatens serious injury to the contractual pension rights, benefits and the retirement system. As a result, employees have been forced to sue the Sheriff to protect their interest and families future.

*In all, over $2.1 million dollars is missing from the City of Boston Retirement Fund.* This figure is expanding monthly with interest payments, which already have reached approximately $100,000.00.

<u>Dental and Vision Care:</u>

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*



_Water Bills:_

Recently, the Sheriff's Department received a notice that it owed the City $22,000 in overdue water bills. As a result, the Water and Sewer Commission has threatened to shut off the water.

_Pay Raises:_

Since being appointed, the Sheriff has brought in a number of new employees, including former colleagues and friends, and has handed out pay increases totaling in excess of over $450,000.00 even though the Department is millions of dollars in the red.  In fact, many of these pay increases for these new employees have been substantial, totaling in excess of over $400.00 per week.

When she was appointed by Republican Jane Swift to the post of Sheriff, Ms. Cabral said she was going to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it worse. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess. . A mess of her own making!

Sincerely,

**John Barnes**
President, JOEASC
IUPA #900, AFL-CIO

Presorted Standard
U.S. Postage
Paid
Permit No. 231
No. Reading, MA

\*\*\*\*\*\*\*\*AUTO\*\*5-DIGIT 02127  T9  P1
Francis Collins
10 Pacific St # 3
South Boston MA 02127-2929

Jail Officers' & Employees
Association of Suffolk County
IUPA Local 900 AFL-CIO

200 Nashua Street
Boston, MA 02114



EXHIBIT

A



**Jail Officers' & Employees Association of Suffolk County**
**IUPA Local 900 AFL-CIO**
200 Nashua Street
Boston, MA 02114

*John Barnes, President*                    *John Grennon, Vice-President*

**John Ellis**
Secretary

**Mark Turley**
Treasurer

**Robert Tufion**
Executive
Board

**Michael Walsh**
Executive
Board

**Michael Cinelli**
Executive
Board

**Tim Turley**
Chief
Steward

**William Peressi**
Grievance
administrator

**Kevin O'Riorden**
Trustee

**Michelle Fitzpatrick**
Trustee

**Richard Rosetti**
Trustee

March 25, 2004

Dear Friends:



EXHIBIT

## What a Mess!

### Sheriff Takes Employee Benefits

The current Sheriff of Suffolk County has been taking employee benefits away from the hardworking men and women of the Suffolk County Sheriff's Department and now she actually has the nerve to seek union support in her campaign for election.

Here are some facts that every union brother and sister should know.

**Pension Benefits:**

Everyone realizes that pension funds are a sacred trust between an employee and his or her employer. It is a promise of benefits that allow an employee to plan for their family's retirement future. Both the employee and the governmental unit contribute to the retirement fund.

Unfortunately, the Sheriff has broken this sacred trust by misusing the money appropriated for the pension fund to pay other bills. The Sheriff's actions are a direct violation of MGL c 32, § 25 (9)(a) and (b) *which threatens serious injury to the contractual pension rights, benefits and the retirement system*. With no other recourse available, as a result, employees have been forced to sue the Sheriff to protect their interest and families future.

*In all, over $2.1 million dollars is missing from the City of Boston Retirement Fund.* This figure is expanding monthly with interest payments, which already have reached approximately $100,000.00. If all Governmental Units used this practice, the City of Boston Pension Fund would face serious problems.

**Dental and Vision Benefits:**

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*

EXHIBIT

Page 2

March 25, 2004

**Dental and Vision Care:**

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*

**Water Bills:**

Recently, the Sheriff's Department received a notice that it owed the City $22,000 in overdue water bills. These bills were for a building that the Sheriff's Department leases to the federal government. As a result, the Water and Sewer Commission has threatened to shut off the water.

**Military Employees:**

Military employees who have been activated by the United States of America to protect our freedom have been away for extended periods from their family. When they return back to work at the Suffolk County Sheriff's Department, they are being informed that they are not going to receive their accrued vacation and/or sick time. *Sadly, these individuals may have to go another year without having the quality family time they all deserve based on the Sheriff's decision not to grant them vacation accruals because they were away representing our Country the previous year.*

**Pay Raises:**

With the financial mess at the Sheriff's Department, you would expect that the Sheriff would be doing everything possible, including cutting every unnecessary expense, to get things back on the right track. But, that simply is not what's happening.

Since her appointment, the Sheriff has brought in a number of new employees, including former colleagues and friends, and she has handed out pay increases totaling in excess of over $450,000.00 even though the Department is millions of dollars in the red. In fact, many of these pay increases for these new employees have been substantial, totaling in excess of over $400.00 per week.

When she was appointed by Acting Governor Swift to become Sheriff, Ms. Cabral promised to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it much, much worse. Being Sheriff is a tough job. The current Sheriff has made the job that much more difficult. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess.

Sincerely,

John Grennon

John Grennon
Executive Secretary, JQEASC
IUPA #900, AFL-CIO



**Jail Officers' & Employees
Association of Suffolk County**
IUPA Local 900 AFL-CIO
200 Nashua Street
Boston, MA 02114





EXHIBIT
7
10/31/06

*John Barnes, President*                    *John Grennon, Vice-President*

John Ellis
Secretary

Mark Turley
Treasurer

Robert Tuttos
Executive
Board

Michael
Welsh
Executive
Board

Michael
Cinelli
Executive
Board

Tim Turley
Chief
Steward

William
Pereaia
Grievance
administrator

Kevin
O'Riorden
Trustee

Michelle
Fitzpatrick
Trustee

Richard
Rosell
Trustee

March 25, 2004

**Immediate Release**                    **Contact: JOEASC**

{ John Ellis
617-592-7953 } executive
Secretary

**Jail Officer Union Calls on Union and Opinion Leaders to Join their fight**

BOSTON: The Jail Officers and Employees Association of Suffolk County today called upon Massachusetts union leaders as well as local Suffolk County opinion leaders to join them in their struggle with Suffolk County Sheriff Andrea Cabral. In two letters sent by the union, the Jail Officers' & Employees Association of Suffolk County IUPA Local 900 AFL-CIO, members outline several instances whereby the Department has not fulfilled its end of the current collective bargaining agreement.

The letter sights a misuse of money owed to pension benefits, a lack of dental and vision health coverage, delinquent payment of water bills, and a dishonoring of agreements with veteran employees who have been called away to duty.

In one scathing passage, President John Barnes remarks, "We urge every local union member to send a loud and clear message to Sheriff Cabral: this kind of callous disregard for the welfare of working men and women will not be tolerated. Let Sheriff Cabral know that "integrity" does matter." He also adds, "When she was appointed by Republican Jane Swift to the post of Sheriff, Ms. Cabral said she was going to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it worse. As an alternative to handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess. A mess of her own making!"

The Cabral Administration has come under fire for diverting funds from the officer's pensions to pay other bills within the office. Recently the Boston Herald reported that Sheriff Cabral instructed her administration to dole out jobs and pay raises to friends and past acquaintances of the Sheriff. The administration has also been accused mismanaging its fiscal resources and creating its own budget shortfall of over $3 million.

XXX

1

```
 1                          Volume 1
                           Pages 1-162
 2                        Exhibits per index

 3
              UNITED STATES DISTRICT COURT
 4
                 DISTRICT OF MASSACHUSETTS
 5

 6           Civil Action No. 05-CV-11661-RGS

 7
        ------------------------------:
 8                                     :
     Bergeron, et al                   :
 9                Plaintiff,           :
                                       :
10      V.                             :
                                       :
11      Andrea Cabral                  :
                     Defendant.        :
12                                     :
        ------------------------------:
13

14               DEPOSITION OF DAVID BERGERON, a witness
     called on behalf of the Defendant taken pursuant to the
15   Federal Rules of Civil Procedure, before Patricia M.
16   Haynes, a Certified Shorthand Reporter and Notary Public
     in and for the Commonwealth of Massachusetts, CSR No.:
17   14620F, at the Offices of Suffolk County Sheriff's
     Department, 200 Nashua Street, Boston, Massachusetts, on
18   Wednesday, October 4, 200, commencing at 10:15 a.m.

19

20

21

22                  Copley Court Reporting
                        101 Tremont Street
23              Boston, Massachusetts  02108
                        (617) 423-5841
24
```

28

1       Q.    What union is that, sir?

2       A.    The Jail Officers and Employees Association,

3   otherwise known as JOEASC.

4       Q.    Is there a collective bargaining agreement

5   that covers the terms and conditions of your employment

6   as a member of JOEASC?

7       A.    Yes.

8       Q.    Are there any provision within your collective

9   bargaining agreement currently or at any time governing

10  deputy sheriff status?

11      A.    No.

12      Q.    The department has policies that they

13  promulgate that employees are required to comply with;

14  is that correct?

15      A.    Yes.

16      Q.    Are those policies available on the internet?

17      A.    Yes.

18      Q.    To your knowledge?

19      A.    Yes.

20      Q.    They are also distributed or available in the

21  shift commander's office?

22      A.    I have never seen them.  They used to be years

23  ago.

24      Q.    The policies used to be distributed?

43

```
1         A.    I don't know.  What does disparage means?

2         Q.    Do you think people who speak ill of the

3    sheriff and say make comments about her that are

4    unflattering and inappropriate should be a deputy

5    sheriff?

6         A.    I'm not sure about that.  No.

7         Q.    They should not?

8         A.    They should not.

9         Q.    Do you think people who accuse the sheriff of

10   giving pay raises to her friends and employees when they

11   know that that did not happen should be deputy sheriffs?

12        A.    No.

13        Q.    Have you performed details?

14        A.    In the past, yes.

15        Q.    When?

16        A.    Probably 2000.

17        Q.    When was the first time you recall performing

18   any details?

19        A.    I really don't know.  It would be a Boston

20   University detail.  Those were the first ones I did.  I

21   would have to say '95.

22        Q.    How frequently did you perform details in '95?

23        A.    I don't recall.

24        Q.    Frequently, infrequently, give us your best
```

44

1     estimate?

2          A.    I don't even recall '95.

3          Q.    How about 1996, did you perform any details?

4          A.    I couldn't answer that correctly.

5          Q.    1997?

6          A.    Sorry, I don't remember how many I did.

7          Q.    When was the last time you recall performing

8     any paid details as a deputy sheriff?

9          A.    My best guess is 2000.

10         Q.    Did you ever keep any records or calendars of

11    the details you performed and when you performed them?

12         A.    I used to.  I don't know where it is.

13         Q.    You do you still have them?

14         A.    No.  I looked for them and I don't have them.

15         Q.    So calendar year 2000 was the last time that

16    you performed any details as a deputy sheriff, is that

17    fair?

18         A.    That is my best recollection.

19         Q.    Have you performed any details in 2003?

20         A.    If I did, they were very few, I don't recall.

21         Q.    How about 2004?

22         A.    No.

23         Q.    Prior to April of 2005, any details?

24         A.    No.

45

1   Q.   So '04, no, '05, no, and what about '03?
2   A.   It's possible. I don't recall how many or if
3   I did any.
    Q.   Did you ever perform any details associated
    with the Big Dig?
6   A.   Yes.
7   Q.   When was that?
8   A.   You're asking me for dates, and I can't
9   remember when I did them. I don't recall.
10  Q.   Did you perform any paid details associated
11  with the Big Dig in 2003?
12  A.   I cannot honestly answer you.
13  Q.   Do you have any records pertaining to details
14  that you performed in 2003?
15  A.   No.
16  Q.   Any calendars, any schedules?
17  A.   No.
18  Q.   It's fair to say, Sergeant Bergeron, that
19  since the year 2000, you performed very few, if any,
20  details?
21  A.   That's what it looks like, yeah.
22  Q.   Details are performed outside the four walls
23  of the institution?
24  A.   Yes.

46

1   Q.   When you're performing a detail, are you
2   wearing a department uniform and badge?
3   A.   Yes, I am.
4   Q.   Do you ever have a department cruiser with you
5   when you're performing details?
6   A.   I have, yes.
7   Q.   Do you interact with the public when you're
8   doing details?
9   A.   Yes.
10  Q.   It's fair to say you interact with the general
11  public more on a detail than when you're working on a
12  unit inside the facility?
13  A.   Yes.
14  Q.   Do you interact with other law enforcement
15  officers when you're doing details?
16  A.   Yes.
17  Q.   It's fair to say that you're a representative
18  of the Suffolk County Sheriff's Department when you're
19  outside performing a paid detail in public, correct?
20  A.   Yes.
21  Q.   To your knowledge, have details associated
22  with the Big Dig decreased over the last several years?
23  A.   That's what I've heard.
24  Q.   And you've heard that from your colleagues who

47

1   performed details?
2   A.   I would imagine so, yes.
3   Q.   Have you heard from fellow employees who
4   weren't getting as many details as they did before?
5   A.   Yeah, I've heard some griping about it.
6   Q.   Who did you support in the 2004 Suffolk County
7   Sheriff's election?
8   A.   At what time?
9   Q.   Did you support one candidate first and then
10  another?
11  A.   Yes.
12  Q.   Who did you first support?
13  A.   Angelo Rossi.
14  Q.   Who is Angelo Rossi?
15  A.   Angelo Rossi is an employee of the Suffolk
16  County Sheriff's Department.
17  Q.   Does he have a rank?
18  A.   He is a corporal.
19  Q.   You indicated you supported him for sheriff.
20  Please explain that.
21  A.   Angelo for sometime had wanted to run for
22  sheriff even before Sheriff Cabral came in. I told him
23  that if he was serious about it that I would help him.
24  And he was serious about it, and I helped him get

48

1   signatures going door to door until -- I think he got
2   disqualified in March. What happened was --
3   Q.   March of?
4   A.   March of '04. He voted in a preliminary
5   election, and he didn't realize that he in effect
6   changed his party. So he got disqualified. He was an
7   independent. So I was free from being involved in any
8   of the politics until JOEASC, the union, endorsed
9   Murphy.
10  Q.   When was that?
11  A.   I'm not sure what the date was, but it was
12  pretty close to, pretty close after April. Probably May
13  or June I would guess.
14  Q.   You indicated that you got signatures for
15  Angelo Rossi?
16  A.   Yes.
17  Q.   Did you have any particular capacity with
18  respect to his efforts to become sheriff of Suffolk
19  County?
20        MR. PFAFF: Objection.
21  BY MS. CAULO:
22  Q.   Did you have a role in his campaign?
23  A.   No. I was basically just helping him get
24  signatures. I tried to help him in any way I could. I

49

```
 1    was very much a novice.  I really didn't know what I was
 2    doing, but I was trying to help.
 3          Q.   Were you his campaign manager?
 4          A.   No.
 5          Q.   Did you let people know in the department that
 6    you were assisting him in his run for Suffolk County
 7    Sheriff?
 8          A.   I'm sure they found out.  I'm sure word got
 9    out.  I don't think many people took him seriously
10    though because he had, when he announced his attempt to
11    run for sheriff, there weren't many people there from
12    work.  The word wasn't really out at work -- or they
13    didn't take him seriously.  I'm not sure which.
14          Q.   He's a deputy sheriff, is that right?
15          A.   I don't know.
16          Q.   If I tell you he was a deputy sheriff and not
17    decommissioned, would you know that?
18          A.   If you told me that, then yes.
19          Q.   And he ran for sheriff?
20          A.   Yes.
21          Q.   At some point you indicated you supported
22    someone else for sheriff after Mr. Rossi's candidacy was
23    derailed when he was disqualified.  Who was that?
24          A.   Stephen Murphy.
```

50

```
1          Q.   And when do you recall that you began to
2    support Stephen Murphy?
3          A.   The one and only time I did support him was in
4    the final election for sheriff, that one day I held a
5    sign.  It was at Holy Name School in West Roxbury.
6          Q.   Did you participate in any phone banks?
7          A.   No.
8          Q.   Did you attend any meetings?
9          A.   No.
10         Q.   Did you volunteer on any meetings?
11         A.   No.
12         Q.   Other than holding a sign at Holy Name School
13   on one occasion, did you hold any other signs?
14         A.   No.
15         Q.   Did you march in any parades?
16         A.   No.
17         Q.   Did you have a sign at your house?
18         A.   I think I did.
19         Q.   When did you put it on?
20         A.   I didn't put it on.
21         Q.   Who did?
22         A.   I don't know.  I think I did.  I'm not sure if
23   I did or not.
24         Q.   Did someone come and put a sign on your
```

51

1   property without telling you?

2       A.   Well, every time there's an election -- I

3   mean, I know a lot of people around.  My neighbors might

4   put something up.  Usually they will ask me.  I don't

5   recall if I had one.

6       Q.   Do you recall if you had any signs on your

7   property in September of 2004 in support of any

8   candidacy?

9       A.   I'm going to have to say no, because I can't

10  answer yes 100 percent.

11      Q.   Did you have any stickers on your car?

12      A.   I had an Angelo Rossi sticker on my truck.

13      Q.   No Stephen Murphy sticker?

14      A.   No.

15      Q.   And you indicated that some point your JOEASC

16  union endorsed a candidate for sheriff?

17      A.   Yes.

18      Q.   That was Stephen Murphy?

19      A.   Yes.

20      Q.   Do you recall what the vote was?

21      A.   No, I don't.

22      Q.   Was it pretty overwhelming?

23      A.   I don't recall.

24      Q.   Was it about 300 to one?

61

1  Murphy?

2     A.   **No.**

3     Q.   How did you make your support of Stephen

Murphy known?

5     A.   **By showing up to vote and holding a sign for**

6  **him with my union shirt on.**

7     Q.   So when you showed up to vote, presumably no

8  one was in the booth with you, right?  No one knew that

9  you supported Steve Murphy until you told them?

10     A.   **Until I picked up the sign, that's correct.**

11     Q.   How vocal were you about your support for

12  Stephen Murphy here at the department?

13     A.   **Not at all.**

14     Q.   Did you tell anybody at work, your fellow

15  employees, that you were supporting Stephen Murphy for

16  sheriff?

17     A.   **I don't recall doing that.  I knew I had a**

18  **responsibility that when the union endorsed the man, I**

19  **had a responsibility to at least show up and hold a sign**

20  **for him.**

21     Q.   Why did you have that responsibility?

22     A.   **Because I believe if you're part of a union**

23  **and they have endorsed someone, you back up the union.**

24     Q.   Do you believe that if your union takes a

62

1  stand and sends out information that's not accurate

2  about the sheriff do you need to support that as well?

3            MR. PFAFF:  Objection.

4  BY MS. CAULO:

5     A.   **Do I believe that I should support a union**

6  **that sends out inaccurate messages?**

7     Q.   Yes.

8     A.   **No.**

9     Q.   So your loyalty to your union extends to what,

10  to an endorsement of the candidate?

11     A.   **No, it doesn't extend just to the endorsement**

12  **of a candidate.  I for a lot of time have been involved**

13  **in a union.  I may not be the most articulate person**

14  **around, but I care and I try to help out.  So I try to**

15  **do whatever I can for the union.**

16     Q.   I'm just trying to understand why it was that

17  the endorsement by JOEASC caused you to believe that you

18  needed to go out and hold a sign, that's all.

19     A.   **When I was in Local 103, the electrical union,**

20  **that was part of what we did, became politically**

21  **involved.  I thought, and I still think, that any union**

22  **that is affected by politics should be involved in**

23  **politics, at least have a voice.  And that's why I did**

24  **what I did.**

63

1     Q.   Is it fairly common in your experience for

2  unions to take some action or to have that voice and to

3  make their stands known?

4     A.   **The unions that I'm from, yes.**

5     Q.   Did you tell anybody at work that you

6  supported Stephen Murphy?

7     A.   **I don't recall ever having done that.**

8     Q.   Did you have any discussions with any of your

9  fellow employees about your support of Stephen Murphy?

10     A.   **No recollection whatsoever of any of that.**

11     Q.   Did you inform Deputy Superintendent Cliff

12  Carney at any time before the election in 2004 that you

13  were supporting Stephen Murphy?

14     A.   **No.**

15     Q.   At any point after the primary election in

16  2004, did you inform Deputy Superintendent Cliff Carney

17  that you supported Stephen Murphy?

18     A.   **No.**

19     Q.   Did you inform Superintendent Gene Sumpter

20  prior to the September primary in 2004 that you

21  supported Stephen Murphy?

22     A.   **No.**

23     Q.   After the primary election, did you inform

24  Superintendent Sumpter that you supported Stephen

64

1  Murphy?

2     A.   **No.**

3     Q.   Same question for Michael Harris, did you

4  inform him prior to the September 2004 primary that you

5  supported Stephen Murphy?

6     A.   **No.**

7     Q.   Afterwards did you tell him you supported

8  Stephen Murphy in the election?

9     A.   **No.**

10     Q.   Elizabeth Keeley, did you inform her prior to

11  the September 2004 primary that you supported Stephen

12  Murphy?

13     A.   **No.**

14     Q.   Did you tell her afterwards that you had voted

15  for and supported Stephen Murphy?

16     A.   **No.**

17     Q.   Victor Theiss, did you inform him of your

18  support of Stephen Murphy before and after the election?

19     A.   **No.**

20     Q.   Sheriff Cabral, did you inform her of your

21  support for Stephen Murphy?

22     A.   **Vocally?**

23     Q.   Yes, directly?

24     A.   **No.**

66

1     A.   No.

2     Q.   Did you have any communication with Sheriff

3 Cabral on the primary day, September 14, while you were

4 at Holy Name School?

5     A.   No.

6     Q.   This is general election day?

7     A.   No, this is September the election I'm talking

8 about.

9     Q.   The primary, right?

10    A.   I thought the primary was March 2.

11    Q.   If I suggest to you that the primary was held

12 in September in which Democrat Stephen Murphy squared

13 off against Democrat Sheriff Cabral, would that refresh

14 your memory?

15    A.   Yes.

16    Q.   Is it fair to say that Sheriff Cabral won the

17 primary, right?

18    A.   Yes.

19    Q.   And she had no opponent in the November

20 general election?

21    A.   Correct.

22    Q.   There was no Republican opponent?

23    A.   Correct.

24    Q.   So the primary was in September.

70

1  do you have that Sheriff Cabral knew you supported

2  Stephen Murphy other than that one date, September 14,

3  2004, as you described at the election?

4      A.   That would be the only time she would know

5  that I was supporting him.

6      Q.   Since that date, since September 14 of 2004,

7  prior to your decommissioning in April of 2005, have you

8  had any conversations with Sheriff Cabral concerning

9  your support for Stephen Murphy?

10     A.   No.

11     Q.   Have you had any conversations with her at all

12 concerning your political affiliation?

13     A.   No.

14     Q.   Have you had any conversations with Sheriff

15 Cabral at all since September 14 of 2004?

16     A.   No.

17     Q.   What other fellow employees are you aware of

18 here at the Nashua Street Jail who supported Stephen

19 Murphy?

20     A.   You mean who I'm aware of now?

21     Q.   Yes.

22     A.   Al Moscone, Eric Dilibero, Paul Giglio, John

23 Grennon, John Barnes and John Ellis.  Those are the only

24 people that I know for sure.

74

1    employees who supported Stephen Murphy?

2        A.    No.

3        Q.    Before or since the election?

4        A.    No.

5        Q.    Have you had any conversation with Michael

6    Harris concerning any consequences for anybody who did

7    not support Sheriff Cabral?

8        A.    No.

9        Q.    Have you had any conversations with Elizabeth

10   Keeley concerning consequences for those who did not

11   Support Sheriff Cabral?

12       A.    No.

13       Q.    Victor Theiss, have you had any conversations

14   with him regarding consequences for people who supported

15   Stephen Murphy and not Sheriff Cabral?

16       A.    No.

17       Q.    Has Sheriff Cabral ever told you there would

18   be consequences if you did not support her candidacy for

19   Suffolk County Sheriff?

20       A.    No.

21       Q.    Did you attend the union meeting at which

22   there was a vote to endorse Sheriff Cabral?

23       A.    I do not recall being there.

24       Q.    Did you vote?

75

```
 1          A.    I don't remember.

 2          Q.    Do you know there was an election?

 3          A.    An election?

 4          Q.    JOEASC vote, not election, vote?

 5          A.    To endorse?

 6          Q.    Yes, to endorse Stephen Murphy?

 7          A.    I thought that was held on-line.

 8          Q.    Tell me everything you know about the vote.

 9          A.    That's all I remember.  I'm pretty sure that

10    there was a vote taken on-line.

11          Q.    Did you vote on-line?

12          A.    I don't recall voting at all.

13          Q.    Did you have any discussions with anybody

14    concerning the on-line vote for JOEASC's endorsement of

15    Stephen Murphy?

16          A.    I can't recall any conversations with anybody

17    about the endorsement.

18          Q.    Fair to say that the majority of custody

19    employees at the Nashua Street Jail supported Stephen

20    Murphy in the race for Suffolk County Sheriff?

21          A.    I can't honestly answer that.  I don't know.

22          Q.    What is your belief?

23          A.    I would say probably -- I don't know.  Those

24    are the only people that I knew that were involved or
```

81

1  concerning the picture that was appearing on -- what web
2  site?
3      A.    Sheriff Cabral's web site. The gist is, that
   I can remember, I had called Mark Miller, the web master
   for the jail, web master for that campaign web site. I
6  called him and I asked him to take me off. He said he
7  would get back to me. And Mr. Tompkins called me.
8          We had a short conversation. I told him that
9  I didn't want my picture on that, it doesn't seem
10 appropriate. He said, "Well, the picture was taken in
11 the public domain so the picture can stay up there." I
12 said well, "I'm a public employee. The picture was
13 taken without my knowledge or consent. I would really
14 like to take it off."
15         And he did. So it was amiable enough, but I
16 could tell that from his tone he wasn't happy with it.
17     Q.    Did you tell Mr. Tompkins to inform Sheriff
18 Cabral that you weren't supporting her candidacy?
19     A.    No, I did not.
20     Q.    What were the circumstances surrounding the
21 conversations you had with Sheriff Cabral as described
22 on page 35 of your Complaint?
23     A.    That was the March 2 discussion I had with
24 Sheriff Cabral at the Holy Name Church parking lot. I

82

1  went to the Holy Name Church to vote, and there was a
2  pickup truck with a huge Cabral sign on it. I said I, I
3  said to myself, I wonder whose truck that is? And there
4  were Cabral signs everywhere. I didn't expect to see
5  this. I think I was there in the afternoon. It was
6  pretty quiet.
7          As I approached, a woman asked me to sign a
8  ballot petition for Sheriff Cabral. I said, "No, thank
9  you, I'm only here to vote." She asked me again. I
10 said, "No, thank you, I'm only here to vote." And at
11 that time, I was walking behind Sheriff Cabral to walk
12 around her. She was facing the other way.
13         That woman got the sheriff's attention and
14 told her that I wouldn't sign the ballot petition.
15     Q.    What did you hear her say?
16     A.    Who, the woman to Sheriff Cabral?
17     Q.    Yes.
18     A.    I can't remember exactly what she said. It
19 was something along the lines of, she was making a joke
20 out of it. Sheriff, he won't sign your ballot petition,
21 something like that. So she turned towards me and goes,
22 "Why won't you sign my ballot petition?" I said, "I'm
23 just here to vote." She introduced herself to me.
24     Q.    Had you met her before?

83

1      A.    Yes, twice that I remember. I said, "I know
2  who you are. I work for you." She started laughing.
3  She said, "That happens a lot." I said, "I bet it
4  does." So she went on to say, "Why won't you sign the
5  ballot petition?" I said, "I'm just here to vote.
6  You're my boss. I really don't want to get into this."
7          She said, "I'm here to talk." I said, "I'm
8  just here to vote." "Well, I'm here to talk. Let's
9  talk about it." And then we had a fairly long
10 conversation for about 20 minutes I guess. And she
11 asked me what was on my mind. And I talked to her about
12 quite a few things.
13     Q.    What did you talk to her about?
14     A.    Well, I told her -- before I start that, I
15 told her the reason why I didn't sign the petition was
16 because I was disappointed in her and angry at her
17 administration. She said, "But why?" I said, "Well,
18 there are a lot of things. For instance, the dental,
19 the lack of dental."
20         She told me that she provided more than she
21 was required to, and I disagreed with her because there
22 were so many people that were going to have dental work
23 done. And by the time they would go to the dentist
24 office, there would be no insurance. I'm not sure if

84

1  the payments were paid in such a way that it was
2  difficult for people to get benefits from it.
3          I also spoke to her about Angelo Rossi. I
4  said, "Do you know Angelo Rossi?" She says, "Yeah, I
5  just heard about him. I read about him in the local
6  papers." I said, "You've never heard about him before?"
7  She said, "No."
8          I said, "Well, he tried to get a hold of you.
9  He wanted to talk to you about him running for sheriff."
10 She said, "No, I didn't know that." I said, "He told
11 your secretary. She never told you?" She said, "I
12 never heard about it."
13         The secretary later told Angelo the sheriff
14 didn't want to see him. But she claims she didn't know
15 anything about Angelo. I said, "All right." Every time
16 we would talk about a topic, she would say, "What else
17 is on your mind?"
18         A couple of times during this conversation,
19 Matt O'Malley came over, twice I believe. Matt wanted
20 to talk to her aside from me. And she said, "I'm all
21 right here, Matt." And I looked at Matt, and I was kind
22 of surprised that he would come over and try to take her
23 away from this.
24         I said, "Don't worry, Matt. She's okay.

85

1  She's my boss."  I was trying to have a little fun with
2  it.  So she is like, "Go on."  We also discussed the
3  raises.  I said, "You know, it just doesn't look good.
4  You're giving out raises to your people up top and there
5  are other people doing without."  She said, "I didn't
6  give them raises.  It appears you gave them raises."
7  raises."
8         And she went on to describe the F 15 wage
9  acceleration forms.  I told her I understood what that
10  was, I understand what it means.  But she was adamant
11  that it was not a raise.  I said, "Okay, let me put it
12  to you this way.  You start on day one and you have X.
13  Day 366 you now have X plus $400 a week.  That's a
14  raise."
15         She said, "It's not a raise."  So we didn't
16  agree on that either.  We talked about veteran benefits,
17  the vacations for the veterans.  She told me, I believe
18  she said she had a legal opinion that she was correct on
19  that.  And we went on to another topic.  I'm trying to
20  remember what else we talked about.
21         I told her that I work quite a bit of overtime
22  and with all the problems that we had at the jail I had
23  only seen her twice.  I don't know how many months she
24  was in by then.  I said, "That's unacceptable from my

86

1  point of view.  You should be spending more time at the
2  jail, some more hands-on stuff."
3         And she said she was busy cultivating
4  relationships up at the State House to get money for the
5  jail, at the court houses and the House of Correction.
6  I can't think of anything else.  It was a 20 minute
7  conversation a couple of years ago.
8         I'm sure there's probably more issues.  Mostly
9  they were the issues of the day that we talked about.
10  Like I said, at the end of it, we were smiling.  She
11  shook my hand, I shook her hand.  I went in to vote.  I
12  actually wished her luck on the election.
13  Q.  What was your tone of voice?
14  A.  I would say pretty much like I'm talking to
15  you.
16  Q.  Were you loud?
17  A.  I don't think so.
18  Q.  Were you angry?
19  A.  No.
20  Q.  Were you upset?
21  A.  No.
22  Q.  Were you insistent in terms of making sure she
23  listened to you?
24  A.  No more than she was with me.

87

1  Q.  Well, talk to me about what you mean by that.
2  A.  I mean, you know, she was, she had her
3  opinions, and she wasn't going to step away from those
4  opinions.  It just appeared to me that we just had
5  different opinions, that's all.  I mean, I don't think I
6  was negative at all in my conversation.
7         You want me to define insistent or define how
8  she was speaking to me.  I mean, I didn't take anything
9  negative away from that except I would have liked more
10  definitive answers than I got.  Other than that, that's
11  it.
12  Q.  Did you attempt to get more definitive answers
13  from Sheriff Cabral other than what she was providing
14  you?
15  A.  If she didn't answer me, I said, "I don't
16  agree with that either."
17  Q.  Did you challenge her?
18  A.  No.
19  Q.  Were you loud?
20         MR. PFAFF:  Objection.  Asked and
21  answered.
22  BY MS. CAULO:
23  A.  I don't believe I was.
24  Q.  You wanted answers to your questions, correct?

88

1  A.  Yes.
2  Q.  You didn't like the answers that the sheriff
3  was giving you; is that correct?
4  A.  Some of them could have been more definitive.
5  Q.  And how did you tell her that?
6  A.  I didn't.  I don't remember saying anything
7  about it.  I remember moving on from one question to the
8  next saying, "We don't agree on that either."
9  Q.  What was your tone when you said that?
10  A.  Just what I said to you.
11  Q.  You why do you think Matt O'Malley came up two
12  times to see if she was all right?
13  A.  I would imagine -- do you want me to speculate
14  why he came over?
15  Q.  I want to tell me why you think it is that
16  he came over.
17  A.  She was spending too much time with me.
18  Q.  Why did you feel it necessary to say we are
19  all right here?
20  A.  Because she said, "I'm okay."
21  Q.  Why did you feel the need to say that?
22  A.  Because she said, "I'm okay," that's why.  Why
23  she said she's okay, I really don't know.
24  Q.  Why did you feel the need to say --

106

```
1        A.    I don't remember exactly what was in it.

2        Q.    Did it concern dental benefits?

3        A.    I don't remember what was in it.

4        Q.    Do you recall anything that was in it?

5        A.    I don't recall what the content of that mass

6    mailing was.

7        Q.    What issues did it raise?

8        A.    I don't recall exactly what was in the letter.

9    I had nothing to do with the letter.  I wasn't involved

10   with the letter.

11       Q.    Do you know who sent this out on behalf of

12   JOEASC?

13       A.    John Grennon's name is on it.  Is this it?  If

14   this is it, John Grennon's and John Barnes' name are on

15   it.

16       Q.    What was your knowledge about who sent it out?

17       A.    I didn't have any prior knowledge of it going

18   out.  I believe after it had been sent out is when I

19   found out about it.  What was in it I didn't know until

20   after I read it I guess.

21       Q.    When you read it, do you have any recollection

22   of agreeing with what the union was stating about the

23   issues?

24       A.    I agreed with the dental.  I didn't know
```

125

1  said, "Thank you." That was the extent of the
2  conversation.
3      Q.    That was it?
4      A.    I think she was speaking with another officer.
5  I don't remember who the officer was. And I just spoke
6  with Mr. Horgan for a short time. I don't remember, you
7  know, about nothing.
8      Q.    Other than that brief interaction, any other
9  interaction with her?
10     A.    No.
11     Q.    The sheriff's department is a paramilitary
12 organization?
13     A.    Yes.
14     Q.    Respect is important in a paramilitary
15 organization?
16     A.    Yes.
17     Q.    Chain of command --
18     A.    Yes.
19     Q.    -- is important?
20     A.    Yes.
21     Q.    You indicated earlier that you belong to
22 JOEASC. Do you hold any current positions in JOEASC?
23     A.    I'm a vice president.
24     Q.    When were you elected, Sergeant Bergeron?

126

1      A.    I believe it was in April in '04.
2      Q.    Before April of '06, did you hold any elective
3  office within JOEASC?
4      A.    Only appointed interim government. Between
5  AFSCME and the new JOEASC, there was a group of us that
6  helped with stepping away from AFSCME and forming our
7  own organization. But we were only seated for as long
8  as it took to put an election together.
9      Q.    Is it fair to say that interim government was
10 no longer active sometime in the spring of '03 or
11 beforehand?
12             MR. PFAFF: Objection.
13 BY MS. CAULO:
14     Q.    Do you recall when JOEASC came into being and
15 you were no longer involved?
16             MR. PFAFF: Do you mean when JOEASC was
17 recognized by the --
18 BY MS. CAULO:
19     Q.    When JOEASC was recognized as a labor
20 relations commission and thereafter held elections for
21 its officials, do you recall when that was?
22     A.    No, I don't know exactly.
23     Q.    What interaction when you were part of this
24 interim government did you have with Sheriff Cabral?

127

1      A.    Actually, I believe John Grennon and John
2  Barnes were the point people with the sheriff. I don't
3  recall ever speaking to her.
4      Q.    Did you as part of this interim government
5  before JOEASC was officially recognized by the LRC
6  undertake any official work or action on behalf of
7  JOEASC?
8      A.    I believe there was one meeting that we had to
9  set up assignments for people, labor management, that
10 sort of thing. Other than that, no.
11     Q.    Other than your recent election to the office
12 of vice president, have you ever held an elected
13 position with the local JOEASC other than the interim
14 government you described?
15     A.    With JOEASC? Other than the vice president
16 that I have now, no.
17     Q.    Did you do any work at all on behalf of the
18 union membership between 2000 subsequent to JOEASC being
19 recognized by the LRC? Did you do any work on behalf of
20 the union membership after that day up until April of
21 '05?
22     A.    After the date of JOEASC being recognized up
23 until 2005?
24     Q.    Yes.

128

1      A.    I attended the trials in the Federal Court
2  with the officers.
3      Q.    You're referring to the trials that took place
4  in the Federal District Court concerning officers who
5  were accused of physically assaulting detainees?
6      A.    Yes.
7      Q.    That was the spring of '03?
8      A.    I believe it was. It finished up in April I
9  believe.
10     Q.    Other than that?
11     A.    None that I can remember.
12     Q.    So you weren't an E board member?
13     A.    For JOEASC, no.
14     Q.    You weren't a union steward?
15     A.    No.
16     Q.    Or elected official up until April of '06?
17     A.    If we are not talking about the interim
18 government, that's correct.
19     Q.    Between JOEASC being recognized by the LRC in
20 April of 2005 when you were decommissioned, did you do
21 any work on behalf of JOEASC?
22     A.    No.
23     Q.    Did you have any occasion to represent JOEASC
24 on issues of labor management with any member of Sheriff

129

```
1    Cabral's administration, again that same time period?
2    A.   No.
3    Q.   Did you file any grievances?
     A.   No.
5    Q.   Then what is your allegation in paragraph 37
6    of your Complaint, Sergeant Bergeron, that you were
7    decommissioned and denied promotions because of your
8    union activity?
9    A.   Well, between those dates I don't have an
10   argument, but being part of the interim government is
11   what I was thinking about.
12   Q.   What I need you to do is give me your best
13   memory as to what are those dates, what period of time
14   were you part of that interim government?  Sheriff
15   Cabral was appointed sheriff in November of 2002.
16   A.   It was either March or April.
17   Q.   Of --
18             MR. PFAFF:  Best memory.
19   BY MS. CAULO:
20   Q.   Of what year?
21   A.   Of '05.  No, that's wrong.  It was '02 to '03.
22   It would be '03.
23   Q.   How much into '03 were you part of this --
24   A.   My best recollection is February or March.
```

130

```
1    Q.   And that was the end?
2    A.   Then I was out.  Whenever the election was
3    held for JOEASC is when I stepped down.
4    Q.   What activity in your capacity as part of this
5    interim government in February or March of '03 did you
6    have on behalf of your membership with the Cabral
7    administration?
8    A.   None.
9    Q.   Did you testify at any arbitrations on behalf
10   of union members in 2003?
11   A.   No.
12   Q.   2004?
13   A.   No.
14   Q.   2005?
15   A.   No.
16   Q.   Again, what is the basis for your allegation
17   in paragraph 37 that Sheriff Cabral decommissioned you
18   and refused to promote you because of your union
19   activity?
             MR. PFAFF:  Asked and answered.  He
     already answered that.
22   BY MS. CAULO:
23   Q.   You may answer.
24   A.   Those questions are starting to sound the
```

131

```
1    same.  Can you give it to me again, please?
2    Q.   What is the basis for the allegation in
3    paragraph 37, the Complaint you filed against Sheriff
4    Cabral, that you were decommissioned because you engaged
5    in union activity?
6             MR. PFAFF:  Objection.  Asked and
7    answered.
8             MS. CAULO:  Not that way.
9    BY MS. CAULO:
10   A.   I don't know what to say.  I just thought
11   maybe because of my opinions, which agree with JOEASC
12   opinions, may have hurt my career with the sheriff.
13   Q.   How did you make Sheriff Cabral aware of your
14   opinions?
15   A.   When she asked me to speak to her at the March
16   2 election.
17   Q.   March 2 of 2004?
18   A.   Yes.
19   Q.   And that wasn't official union work?
20   A.   No.
21   Q.   That was you as Sergeant Bergeron, employee,
22   discussing your opinion on these issues, right?
23   A.   It was me discussing my opinions as well as
24   what a lot of members thought.  It was my opinion.
```

132

```
1    Q.   Do you have any evidence that any of your
2    fellow plaintiffs were decommissioned because of their
3    support for Stephen Murphy?
4    A.   No.
5    Q.   Do you have any evidence they were
6    decommissioned because of their involvement with union
7    activities either for JOEASC or the white shirt union?
8    A.   Only that at that meeting with, the one where
9    the sheriff came in the cafeteria where she said that
10   those who mailed this out will be held accountable.
11   Q.   What meeting is this?
12   A.   The roll call that she distributed the
13   handouts.
14   Q.   So those who mailed this out, are you
15   referring to what was previously marked as Exhibit 4?
16   A.   Yes.
17   Q.   What exactly did she say about being held
18   accountable?
19   A.   That's what I remember her saying.
20   Q.   Did she say you would be held accountable
21   because the information contained in here was false?
22   A.   I don't have specific recollection of that,
23   but I believe that's the gist of what she said.
24   Q.   She said the people who sent this out knowing
```

141

1     Q.   For '98 and '99?

2     A.   No.  They went to 2000 I believe or 2001.

3     Q.   You said you worked overtime shifts?

4     A.   Yes.

5     Q.   Do you continue to work overtime shifts?

6     A.   Yes.

7     Q.   Who controls the overtime process?

8     A.   The overtime is made available when the shift

9  commander decides that he needs to fill slots in for the

10  next shift.  The overtime is called by usually a union

11  official by seniority.

12     Q.   So the union controls who gets called for

13  overtime shifts, right?

14     A.   They call the list, yes.

15     Q.   The department doesn't manage the overtime

16  list, right?

17     A.   They just inform the caller how many slots

18  that they need.

19     Q.   Did Sheriff Cabral or anyone in her

20  administration deny you the opportunity to do overtime?

21     A.   No.

22     Q.   So again, what is the basis for the allegation

23  in paragraph 30 that you lost a significant source of

24  potential income?

148

1    forth in the Collective Bargaining Agreement?

2         A.    That's correct.

3         Q.    That involves a promotional examination?

4         A.    Yes.

5         Q.    That's the examination you took an scored --

6         A.    An 85.

7         Q.    That process is yet to be completed?

8         A.    That's correct.

9         Q.    You haven't been denied any career advancement

10   at this point in time on a permanent basis, right?

11        A.    Not on a permanent basis, no.

12        Q.    Support services positions, what are those?

13        A.    Support service positions are those positions,

14   they are favorable positions.  They are usually less

15   inmate contact, say the loading dock or the kitchen.

16   You have better days off, usually every weekend.  Though

17   they don't pick their days off, they get them appointed

18   or given to them.

19        Q.    Those are usually Monday to Friday positions?

20        A.    Yes, but not all of them.

21        Q.    The department selects employees to fill those

22   positions?

23        A.    Yes, they do.

24        Q.    To your knowledge, the superintendent or

**ORIGINAL**  1

Volume:    1
Pages:     1 - 124
Exhibits:  See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No: 1:05-CV-11661-RGS

DAVID BERGERON, JOHN GRENNON, LORNE LYNCH, JOHN )
BARNES, JOHN ELLIS, TIMOTHY TURLEY, AL MOSCONE, )
WILLIAM PENEAU, ERIK DILIBERO and PAUL GIGLIO,  )
                                   Plaintiffs,   )
                     v.                        )
ANDREA CABRAL, INDIVIDUALLY and as SHERIFF OF    )
SUFFOLK COUNTY,                                  )
                             Defendant.    )

DEPOSITION OF **PAUL A. GIGLIO**, a Witness

called on behalf of the Defendant, taken pursuant

to the applicable provisions of the Massachusetts

Rules of Civil Procedure, before Maureen

Nashawaty, a Notary Public within and for the

Commonwealth of Massachusetts, held at the

offices of the Suffolk County Sheriff's

Department, 200 Nashua Street, Boston, MA, on

Wednesday, December 13, 2006, commencing at 1:30

p.m.

**COPLEY COURT REPORTING, Inc.**
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5811

COPLEY COURT REPORTING

**DISK ENCLOSED**

12

1     A.     Yes, I do.

2     Q.     Where did you obtain the one year of

3  college?

4     A.     Embry Riddle Aeronautical University in

5  Daytona Beach, Florida.

6     Q.     What is that?

7     A.     The No. 1 aeronautical school in the

8  country.

9     Q.     Why did you go there?

10    A.     To become an aeronautical engineer -- a

11  rocket scientist if you will.

12    Q.     What caused you to change your mind?

13    A.     It is very hard to study in Daytona

14  Beach.

15    Q.     Fair enough.

16           When did you first get hired with the

17  department?

18    A.     September 1st, 1989.

19    Q.     Where is that in relation to your

20  difficulty studying on Daytona Beach?

21    A.     It was four years after my failed

22  college background.

23    Q.     What did you do in the intervening four

24  years?

14

1      Q.    You have known him since when?

2      A.    Childhood.

3      Q.    Was he someone who assisted you in

4  getting your job here?

5      A.    He helped.  I guess you could say that,

6  yes.

7      Q.    You put him down as a reference?

8      A.    I believe I put his mother down as a

9  reference, I believe -- it has been a long time.

10     Q.    Sure.  He was already working at the

11 department, Mr. Giglio?

12     A.    Yes, he was.

13     Q.    Did you know the Sheriff at the time?

14     A.    No.

15     Q.    You were hired as a JO-1 and you remain

16 as a JO-1?

17     A.    Yes.

18     Q.    What are your duties and

19 responsibilities as a Jail Officer 1?

20     A.    The same as any other JO-1 -- care,

21 custody, control.

22     Q.    In the 17 years in the department, my

23 math isn't great --

24     A.    17 years, 3 months.

20

1    testified earlier, physical restrictions with

2    your return to work, right?

3         A.    Yes.

4         Q.    Okay.  During the period of time that

5    you were out injured and then have come back,

6    were you physically able to perform details?

7         A.    Before I was injured?

8         Q.    No, after the injury?

9         A.    No.

10        Q.    Have you ever been disciplined by the

11   Department, Officer?

12        A.    Yes, I was.

13        Q.    For what and when?

14        A.    When I first started.  I was told that

15   I said something over the radio by then

16   Superintendent Jack Brassil, and the way it was

17   put to me was I was on SERT that day and I had a

18   partner with me, and he said, well, if it wasn't

19   you that said it, if it was your partner, then he

20   is fired.  Did you say it?  So I said, yes, I

21   did, and I got a three-day suspension.

22        Q.    So Superintendent Brassil is no longer

23   with the Department?

24        A.    No, he is not.

Deposition of Erik P. Dilibero, Vol. I, 12/13/06                    Bergeron, et al. v. Andrea Cabral

**31**

```
 1      Q.   What type of functions did you perform,
 2  Officer Giglio when you were a Deputy Sheriff, as
 3  a Deputy Sheriff?
 4      A.   Transportation, you are able to sign
 5  court papers, outside of that, details.
 6      Q.   How does a Deputy Sheriff's status or
 7  title effect your responsibility as a Jail
 8  Officer?
 9      A.   Well, it just helps you when you are on
10  the road, you can sign court papers.
11          If you are not a Deputy, you can't sign
12  court papers.
13      Q.   Where is the requirement, if you could
14  point that out to me, where is the requirement
15  that you need to be a Deputy Sheriff in order to
16  sign court papers?
17      A.   That is what I was told when I started.
18      Q.   Have you ever seen anything that said
19  that?
20      A.   I believe my Captains have told me
21  that.
22      Q.   What kind of authority did you have as
23  a Deputy Sheriff other than your testimony that
24  you could sign court papers, what kind of
```

**32**

```
 1  authority did you have above and beyond what you
 2  would have as a Jail Officer?
 3      A.   I believe you would have arrest powers
 4  from what I understand.
 5      Q.   Have you ever used those arrest powers?
 6      A.   No, I haven't.
 7      Q.   Have you ever made an arrest as a
 8  Deputy Sheriff?
 9      A.   No, I haven't.
10      Q.   Are there any functions, essential
11  functions of your current position that require a
12  Deputy Sheriff status?
13      A.   No.
14      Q.   Are there any functions of any position
15  that you have held as an employee of the
16  department that requires a Deputy Sheriff status?
17      A.   When I was on the road, yes.
18      Q.   When you were on the road, were you on
19  the road by yourself or do you have a partner?
20      A.   You have a partner.
21      Q.   If you were on the road and there was a
22  requirement that you sign court papers and your
23  partner was a Deputy Sheriff, then your partner
24  could do it?
```

**33**

```
 1      A.   Yes.
 2      Q.   You mentioned a moment ago details.
 3  What are details?
 4      A.   Details are -- I described them. They
 5  are working out in the street when there is a
 6  job -- Big Dig -- I have done details -- the
 7  graduation of Boston University. I have done
 8  details -- the High School Superbowls at Boston
 9  University. Those are details.
10      Q.   Okay. So they are work performed as a
11  Jail Officer with the Deputy Sheriff status
12  outside of the four walls of the institution?
13      A.   It is a way to make extra money, yes.
14      Q.   It is not part of your responsibilities
15  as an officer, correct?
16      A.   No.
17      Q.   By your testimony it is clear that you
18  have performed details as a Deputy Sheriff.
19          Can you tell me how often you performed
20  details as Deputy Sheriff?
21      A.   It was whenever the opportunity arose,
22  you had a lot of people trying to get these
23  details and there may only have been a handful of
24  the time not like it is now with the Big Dig.
```

**34**

```
 1  The Big Dig created unlimited details, but back
 2  before the Big Dig, it was -- you may have gotten
 3  two or three for the day if that was it and you
 4  had to be lucky enough to get one.
 5      Q.   So give me your best estimate as to how
 6  frequently, let's say, before the Big Dig
 7  details, strike that.
 8          When did the details associated with
 9  the Big Dig start to increase?
10      A.   I don't know dates offhand. Probably
11  when the Big Dig started, that is when they
12  increased it substantially.
13      Q.   Well, how often did you perform a
14  detail associated with the Big Dig?
15      A.   I have never performed a detail, well,
16  I did, I'm sorry. I did details when the Big Dig
17  first started.
18          If I could grab two a week, I would get
19  them depending on if I got called, depending on
20  my day off. It has to be pretty much your day
21  off unless it was a 3:00 to 11:00 detail or a
22  midnight detail, but it wasn't as regimented back
23  then as it is now.
24      Q.   Okay. Is it fair to say that you
```

**35**

```
 1  didn't perform details then that frequently
 2  during the course of a year?
 3      A.   Not as much as they are doing now, no.
 4      Q.   How about in 1999, 2000, do you know
 5  how many details you performed?
 6      A.   I don't know.
 7      Q.   Did you perform any?
 8      A.   I believe I did.
 9      Q.   Less than five?
10      A.   I don't know.
11      Q.   Do you have any records --
12      A.   No, I don't.
13      Q.   -- that would help you?
14      A.   No.
15      Q.   Did you keep a calendar of the details
16  you performed?
17      A.   No, I don't.
18      Q.   Who did you perform the details for?
19      A.   I believe it was Boston Police.
20      Q.   Okay. And how would you get paid --
21  through the department or from the Boston Police
22  Department?
23      A.   You would pass the slip in with the
24  Department and they would send it over to Boston
```

**36**

```
 1  Police and Boston Police would send the check.
 2      Q.   Would there be records here at the
 3  Department with respect to details that you
 4  performed?
 5      A.   I would think they would keep a record
 6  of it.
 7      Q.   Since your injury, have you performed
 8  any details?
 9      A.   No.
10      Q.   Have you produced your tax returns?
11      A.   No, I haven't.
12      Q.   Okay.
13          MS. CAULO:  Okay.
14          MR. STEWART:  Yes.
15      Q.   Presumably your tax returns would
16  indicate whatever income you received from
17  whatever details you had done?
18      A.   I would believe so.
19      Q.   So certainly since your injury which
20  was either in 2002 or 2003, you haven't performed
21  any details?
22      A.   No.
23      Q.   You are not clear as to how frequently
24  you performed details before that?
```

Page 31 - Page 36                                        **Copley Court Reporting**

34

1    The Big Dig created unlimited details, but back

2    before the Big Dig, it was -- you may have gotten

3    two or three for the day if that was it and you

4    had to be lucky enough to get one.

5        Q.    So give me your best estimate as to how

6    frequently, let's say, before the Big Dig

7    details, strike that.

8            When did the details associated with

9    the Big Dig start to increase?

10       A.    I don't know dates offhand.  Probably

11   when the Big Dig started, that is when they

12   increased it substantially.

13       Q.    Well, how often did you perform a

14   detail associated with the Big Dig?

15       A.    I have never performed a detail, well,

16   I did, I'm sorry.  I did details when the Big Dig

17   first started.

18           If I could grab two a week, I would get

19   them depending on if I got called, depending on

20   my day off.  It has to be pretty much your day

21   off unless it was a 3:00 to 11:00 detail or a

22   midnight detail, but it wasn't as regimented back

23   then as it is now.

24       Q.    Okay.  Is it fair to say that you

52

1      Q.    Did you report that conversation to

2  anybody?

3      A.    I believe I might have said it to John

4  Barnes, I am not sure.

5      Q.    Okay.  So other than Deputy

6  Superintendent Carney and Mr. Tomkins, is there

7  anybody else that you discussed your Deputy

8  Sheriff status with?

9      A.    Not that I can recall.

10     Q.    When did you begin to support Stephen

11  Murphy in the 2004 Suffolk County Sheriff

12  election?

13          When did you decide to support him?

14     A.    I supported him in the election before

15  that for City Councillor at Large and then when

16  he announced that he was going to run for

17  Sheriff, I was still one of his supporters.

18     Q.    Did you do any work on his behalf?

19     A.    Yes, I did.

20     Q.    What did you do?

21     A.    I was in the office on the phones.

22     Q.    The campaign office?

23     A.    Yes.

24     Q.    Where was that located?

52

1     Q.    Did you report that conversation to

2 anybody?

3     A.    I believe I might have said it to John

4 Barnes, I am not sure.

5     Q.    Okay.  So other than Deputy

6 Superintendent Carney and Mr. Tomkins, is there

7 anybody else that you discussed your Deputy

8 Sheriff status with?

9     A.    Not that I can recall.

10    Q.    When did you begin to support Stephen

11 Murphy in the 2004 Suffolk County Sheriff

12 election?

13          When did you decide to support him?

14    A.    I supported him in the election before

15 that for City Councillor at Large and then when

16 he announced that he was going to run for

17 Sheriff, I was still one of his supporters.

18    Q.    Did you do any work on his behalf?

19    A.    Yes, I did.

20    Q.    What did you do?

21    A.    I was in the office on the phones.

22    Q.    The campaign office?

23    A.    Yes.

24    Q.    Where was that located?

53

```
 1        A.     It was in East Boston.

 2        Q.     How frequently did you do that?

 3        A.     Not frequently -- at the time I was out

 4   injured.  My back was bothering me.  I am very

 5   limited to what I could do.

 6               If they were holding signs, I would go

 7   and hold signs for maybe 20 minutes and then I

 8   would go back home.

 9        Q.     Had you returned to work on a light

10   duty status then?

11        A.     No.

12        Q.     So you were still --

13        A.     I was out on light duty -- I was not on

14   light duty -- I was out injured.

15        Q.     This is 2004?

16        A.     I believe so.

17        Q.     So you weren't back at work in 2004?

18        A.     No.

19        Q.     You returned to work in 2005?

20        A.     I don't know -- I need -- I couldn't

21   even say give me a calendar -- I don't know.  I

22   am sure the department has that information.

23        Q.     Okay.  Other than being in the campaign

24   office and occasionally holding signs, what else
```

61

1    you have just identified were working for him?

2        A.    I know the union was backing them.

3        Q.    Did you ever see them out on the

4    campaign trail doing anything for Mr. Murphy?

5        A.    No, I have never seen them but talking

6    to them, they would tell me what they were doing.

7        Q.    What did they tell you?

8        A.    They were manning the phone banks.

9        Q.    Were all of them doing that?

10       A.    Yes, from what I understand, yes.

11       Q.    How frequently do you know?

12       A.    I don't know offhand how frequently but

13   I know election night they were.

14       Q.    When you manage a phone bank, you do

15   that in an office and you are dialing up

16   prospective voters, right?

17       A.    Yes.

18       Q.    You are not doing it on a street

19   corner?

20       A.    No, when you do phone bank, you are in

21   an office.

22       Q.    How vocal were you within the

23   department about your support for Stephen Murphy?

24       A.    I wasn't vocal.  I tried to keep it as

62

```
 1    low key as possible.

 2         Q.    Did you tell anybody at work that you

 3    were supporting Stephen Murphy?

 4         A.    I am sure people would ask me who I was

 5    voting for and I would tell him.

 6               I wouldn't tell them how far I was in

 7    because if he loses, there are consequences.

 8         Q.    Did you inform Cliff Carney that you

 9    were supporting Stephen Murphy?

10         A.    Not that I recall, no.

11         Q.    Superintendent Sumpter?

12         A.    Not that I recall.

13         Q.    Michael Harris?

14         A.    Not that I recall.

15         Q.    Elizabeth Keeley?

16         A.    Not that I recall.

17         Q.    Sheriff Cabral?

18         A.    No.

19         Q.    Steven Tomkins?

20         A.    No.

21         Q.    Did you have any conversations with any

22    of those folks that I have just identified about

23    the election before the election?

24         A.    I didn't have conversations but I
```

Deposition of Erik P. Dilibero, Vol. I, 12/13/06      Bergeron, et al. v. Andrea Cabral

**67**

1  A. I brought an attorney, okay -- an
2  employee who is retired now who was working the
3  Steve Murphy campaign?
4  Q. Who was that?
5  A. Peter Cipriano.
6  Q. Who else who is currently employed or
7  active employees of the department were there if
8  you remember?
9  A. I remember Captain Moscone. I remember
10 Erik Dilibero being there. I remember Lieutenant
11 Lynch being there.
12 Q. Was Captain John Ellis there?
13 A. I believe Captain John Ellis was there,
14 yes.
15 Q. Lieutenant Mullen?
16 A. I am not sure if Lieutenant Mullen was
17 there. I don't recall.
18 Q. What officers can you recall or do you
19 know were supporters of Stephen Murphy other than
20 the individuals that you have identified as part
21 of the union -- what other individuals within the
22 department that you are aware of supported
23 Stephen Murphy?
24 A. Joe Ciccia was a supporter.

**68**

1  Q. Okay.
2  A. He was a supporter.
3  Q. Is he employed?
4  A. Yes, he is.
5  Q. Is he a Deputy Sheriff?
6  A. I don't know.
7  Q. Okay, who else?
8  A. I don't know.
9  Q. Lieutenant McCarthy?
10 A. I don't know if Lieutenant McCarthy was
11 involved in it.
12 Q. Did you ever have any conversations
13 with Jerry Walsh regarding the election for
14 Sheriff?
15 A. No.
16 Q. And have you testified to all of the
17 conversations that you had with any of the senior
18 management folks concerning the election for
19 Suffolk County Sheriff?
20 A. Have I testified?
21 Q. Yes. You have talked about a
22 conversation, strike that.
23 Who in the senior management have you
24 had a conversation -- bad question.

**69**

1  Prior to the election for Suffolk
2  County Sheriff, did you have any conversations
3  concerning the election and any potential
4  consequences with Michael Harris?
5  A. Not that I recall, no.
6  Q. Eugene Sumpter?
7  A. Not that I recall, no.
8  Q. Cliff Carney?
9  A. Not that I recall.
10 Q. Elizabeth Keeley?
11 A. No.
12 Q. Sheriff Cabral?
13 A. No.
14 Q. Steven Tomkins?
15 A. No.
16 Q. After the election, did you have any
17 conversation with any of those folks concerning
18 the results of the election?
19 A. Not that I recall.
20 Q. Other than the conversation that you
21 had with Steven Tomkins in East Boston when you
22 were both supporting Mr. Scarpiccio?
23 A. Yes, yes.
24 Q. Did you contribute any money to the

**70**

1  Murphy campaign?
2  A. Yes, I did.
3  Q. How much?
4  A. I want to say either 50 or a hundred
5  dollars.
6  Q. Okay. One time or more than one time?
7  A. I think it was twice.
8  Q. And was that by check or cash?
9  A. I believe it was by check.
10 Q. All right. Was that when you attended
11 one of these fund-raisers?
12 A. Yes, only when I attended the
13 fund-raisers.
14 Q. Are you familiar with the mailings that
15 JOEASC put out prior to the Sheriff's election in
16 2004?
17 A. I don't remember, no.
18 Q. The mailings that I am referring to are
19 the ones that were sent to media outlets and
20 residents of Suffolk County concerning the
21 pension payments, the water bill, the Veterans'
22 benefits and dental and vision benefits?
23 A. I remember something like that. I mean
24 I don't know who did it. I remember hearing

**71**

1  something about it, yes.
2  Q. Were you involved in the preparation of
3  those mailings?
4  A. No, I wasn't.
5  Q. Did you know who was involved in the
6  preparation of those mailings?
7  A. I don't know.
8  Q. Were you currently working at that time
9  or were you out injured -- this was March and
10 April of 2004?
11 A. I am not sure. I came back in March.
12 Q. Of 2004?
13 A. I came back in March, yes, yes, I don't
14 know if it was 2004, but I came back, it was one
15 week less than a year.
16 March 18th is when I was injured. It
17 was a week before that the following year.
18 Q. Let's come at it a different way.
19 Were you actually working in the
20 department when the election for Sheriff actually
21 happened or were you out injured?
22 A. I was working in the department.
23 Q. You had returned to work before then?
24 A. I returned, yes.

**72**

1  Q. Do you recall seeing any of these "Dear
2  Friend" letters?
3  A. I may have read one that was in a booth
4  or in Central Control.
5  I remember seeing it. I can't tell you
6  where I saw it. I don't remember where it was.
7  Q. Were you involved in any way with the
8  decision to make those mailings?
9  A. No.
10 Q. In the preparation of them?
11 A. No.
12 Q. Do you know who wrote them?
13 A. No.
14 Q. Okay. Do you know what the purpose of
15 them was?
16 A. I believe whoever wrote that letter was
17 wanting to get their point across like any
18 letter.
19 Q. I am going to show you a couple of
20 things to see if it refreshes your memory.
21 Looking at an exhibit that was marked
22 Exhibit 6 in the deposition of John Barnes, and I
23 show that to you and see if that refreshes your
24 memory as whether or not you had any involvement

Page 67 - Page 72      **Copley Court Reporting**

Bergeron, et al. v. Andrea Cabral

Deposition of Erik P. Dilibero, Vol. I, 12/13/06

**85**

1 these this mailing, I would have said the same
2 thing I said about this mailing when I read it.
3 Is it true or is it someone just
4 sitting at the typewriter bored typing away?
5 Q. And, in fact, often times issues are
6 complicated, aren't they?
7 A. In the facility?
8 Q. Issues pertaining to benefits and the
9 issues that are raised in this letter entitled
10 "What a Mess"?
11 A. Are they complicated?
12 Q. Yes.
13 A. If they are in the contract, they are
14 not complicated. They are cut and dry.
15 Q. All right.
16 A. So I guess it turns into interpretation
17 at that point.
18 Q. When you belonged to 1134 before it
19 became JOEASC, did you hold any position in 1134?
20 A. No, I did not.
21 Q. After JOEASC was formed, did you hold
22 any position?
23 A. No, I did not.
24 Q. To your knowledge did Sheriff Cabral

**86**

1 support the formation of JOEASC?
2 A. I don't know.
3 Q. Okay. Do you know whether or not she
4 voluntarily recognized JOEASC?
5 A. I don't know.
6 Q. Okay. If you would, Officer Giglio,
7 can you describe the union activity you were
8 involved in between the formation of JOEASC and
9 April of 2005 -- so if JOEASC was formed in '03,
10 any union activity you engaged in?
11 A. None.
12 Q. Did you advocate any positions on
13 behalf of the union?
14 A. No, not that I recall, no.
15 In AFSCME, I was in negotiations for
16 one of the contracts when it was AFSCME.
17 Q. Okay, that was before Sheriff Cabral?
18 A. Yes, that was before Sheriff Cabral.
19 Q. While it has been JOEASC and under the
20 administration of Sheriff Cabral have you been
21 involved in any union activity?
22 A. No.
23 Q. Have you had any interactions with
24 Sheriff Cabral in your capacity as a member of

**87**

1 JOEASC?
2 A. No.
3 Q. Have you had any interactions with
4 Michael Harris or Elizabeth Keeley in your
5 capacity as a member of JOEASC?
6 A. On business pertaining to the union?
7 Q. Yes.
8 A. No.
9 Q. Have you testified in any arbitrations
10 of any union members in 2003 and 2005?
11 A. No.
12 Q. Have you testified in any disciplinary
13 hearings on behalf of union members in 2003, 2004
14 and 2005?
15 A. No.
16 Q. Did you file any complaints against the
17 department in 2003, 2004, 2005?
18 A. I asked that a grievance be put in for
19 my physical fitness.
20 Q. Was that done?
21 A. I don't know. I don't believe so.
22 Q. When you say that you asked that a
23 grievance -- who filed grievances on behalf of
24 the union?

**88**

1 A. Back then it was the President and the
2 Vice President of our union which was Michael
3 Walsh which was President and Jack Tullos was our
4 Vice President.
5 Q. And you asked them to file a grievance
6 on your behalf?
7 A. Every day.
8 Q. Did they do so?
9 A. I never got a direct answer.
10 Q. Is it fair to say that the union is the
11 only entity that can file a grievance? You can't
12 do it on your own?
13 A. I don't believe so, no.
14 Q. And the department has no control over
15 what grievances are filed on behalf of the union,
16 is that right?
17 A. I believe so, yes.
18 Q. Okay. You were not involved in any
19 contract negotiations on behalf of JOEASC?
20 A. No.
21 Q. Do you have any knowledge or
22 information regarding the recordkeeping practices
23 of JOEASC?
24 A. No.

**89**

1 Q. Were you aware that your fellow
2 plaintiffs, John Grennon, John Ellis and John
3 Barnes met with Sheriff Cabral sometime in 2004
4 regarding the mailings that were put out by
5 JOEASC?
6 A. No, I don't know that, no.
7 Q. Were you ever told about such a
8 meeting?
9 A. People may have been talking about it
10 but I don't recall it.
11 Q. Okay. If you would, Officer Giglio, I
12 am going to ask you for a few moments, I am going
13 to ask you some questions about the complaint
14 that was filed on your behalf.
15 What union activity did you engage in
16 that you allege was the reason that Sheriff
17 Cabral decommissioned you?
18 A. I did not allege that it was because of
19 the union. It had nothing to do with the union.
20 It was because I backed Stephen Murphy.
21 Q. So if you could look at Paragraph 26 of
22 your complaint and I am going to ask you what
23 evidence do you have that Sheriff Cabral
24 decommissioned you because you engaged in union

**90**

1 activity as set forth in Paragraph 26?
2 A. "Support or contributions to
3 defendant's political opponents Stephen Murphy".
4 26...
5 Q. "All plaintiffs because of their
6 protected union activity as members and/or
7 elected or appointed officials of either JOEASC."
8 A. I am a member.
9 Q. Other than the fact that you were a
10 member of the union --
11 A. Yes.
12 Q. -- is that the only activity that you
13 say was the basis, one of the bases for
14 decommissioning you?
15 A. No, it had nothing to do with because I
16 was a member. It had everything to do with
17 because I was backing Steve Murphy.
18 Q. Okay, what evidence do you have that
19 Sheriff Cabral knew that you, Paul Giglio,
20 supported Stephen Murphy for Sheriff in the 2004
21 election?
22 A. Do I have anything in writing? No.
23 Do I have a film of it? No.
24 But is it a known thing in the

Deposition of Erik P. Dilibero, Vol. I, 12/13/06                    Bergeron, et al. v. Andrea Cabral

**91**

1  department that I backed Steve Murphy?
2  Absolutely.
3          And in this department if one person
4  knows something, everybody knows something.
5      Q.  A few moments ago I was asking you
6  about who other folks supported and you couldn't
7  tell me?
8      A.  To the capacity that I was supporting
9  him was what you were asking.
10     Q.  You have filed a complaint.  You and
11 your fellow plaintiffs filed a complaint alleging
12 that Sheriff Cabral retaliated against you?
13     A.  Yes.
14     Q.  And stripped you of your Deputy Sheriff
15 status because you supported Stephen Murphy.
16         I am trying to ask you and understand
17 what evidence do you have that she in fact knew
18 that you did and then took such retaliatory
19 action?  What is the basis for that allegation in
20 your complaint?
21     A.  The basis would be Mike Harris saying
22 to me this is not personal -- it is business.
23         The basis would be Mike Caldwell saying
24 to me that we put a bad test in our mouths --

**92**

1  meaning the management when you thought that
2  Steve Murphy was going to walk through the door.
3      Q.  A few moments ago when we were talking
4  about the conversation that you had with Michael
5  Harris and we can ask the Reporter to go back to
6  there if we need to, my recollection is that the
7  statement this is not personal, this is business
8  referred to the fitness examination?
9      A.  That refers to -- it was all about the
10 fitness but it was also about everything else.
11     Q.  Okay, well, what I need you to do is to
12 try to tell me is to make that connection.
13         Show me how that conversation that
14 occurred in the context of a discussion about a
15 fitness examination is evidence that Sheriff
16 Cabral knew you supported Stephen Murphy and
17 retaliated against you by stripping you of your
18 Deputy Sheriff status?
19     A.  I don't know if you can prove that it
20 came from Sheriff Cabral.  Would Deputy Sumpter
21 make a move without Sheriff Cabral's okay?
22         Would anybody do anything without the
23 Sheriff's okay in here?  I don't believe so.  The
24 Sheriff is the Captain of this ship.  Anybody

**93**

1  below her that makes a decision should come
2  through the Sheriff.  She is liable for whoever
3  she puts in charge below her.
4          So regardless of who makes that
5  decision, ultimately she is the supreme commander
6  in charge of who does what.
7      Q.  Where is the evidence that the decision
8  to strip you of your Deputy Sheriff status was
9  based solely on the fact that you supported
10 Stephen Murphy -- Sheriff Cabral she made that
11 decision but where is the evidence of that?
12         MR. STEWART:  Objection.  Asked and
13 answered.
14     Q.  You may answer.
15     A.  In what Steve Tomkins said to me again.
16 It was what was said.  It was actions that were
17 taken.  Could you point back -- did I sit down
18 and write everything down as it was happening,
19 the time and the date -- no, no one does that.
20     Q.  When you were engaged in these -- did
21 Sheriff Cabral ever see you at a campaign event
22 or ever see you out holding a sign for
23 Mr. Murphy?
24     A.  No.

**94**

1      Q.  Was it ever reported to you that she
2  was aware that you knew that you were supporting
3  Stephen Murphy?
4      A.  No.
5      Q.  What evidence do you have that any of
6  your fellow plaintiffs were decommissioned
7  because of their support for Stephen Murphy or
8  their involvement in union activities?
9      A.  I don't know.
10     Q.  If you look at the complaint again, I
11 want to direct your attention to Paragraph 59,
12 what is the basis for your allegation in
13 Paragraph 59 that you have been bypassed for
14 career advancement through recent promotional
15 opportunities because of your involvement with
16 union activities or your support for Stephen
17 Murphy?
18     A.  There were promotions given out -- was
19 I given one -- no -- do I know why?  I can only
20 speculate.
21     Q.  What promotions were given out that
22 were not given to you?
23     A.  They gave out a handful of Corporals, a
24 handful of sergeants, a handful of Lieutenants.

**95**

1      Q.  Were the Lieutenants temporary or
2  permanent?
3      A.  I believe all of the positions were
4  temporary.
5      Q.  If it was temporary, it was not a
6  permanent position?
7      A.  It was not permanent, but why couldn't
8  I have a temporary one.
9      Q.  Did you inquire about the reasons why
10 you weren't selected?
11     A.  I know the reasons why.  If I am in bad
12 standing and I can't be a Deputy Sheriff, what is
13 the odds I can be promoted?
14     Q.  When were these temporary appointments
15 made to Corporal and Sergeant?
16     A.  After the letter had come out.
17     Q.  So it was after April of '05?
18     A.  Yes.
19     Q.  Was there a recent
20 Lieutenant's examination given?
21     A.  Yes.
22     Q.  Did you take it?
23     A.  No.
24     Q.  Why not?

**96**

1      A.  Why waste my time?  It is a waste of
2  time at this point. If I can't be a Deputy
3  Sheriff, do you really believe I am going to be
4  made a Lieutenant?
5      Q.  Does the contract that you currently
6  have with the department require examination for
7  permanent promotions?
8      A.  Yes, it does.
9      Q.  In order to be considered for a
10 permanent promotion, do you need to take and pass
11 an examination?
12     A.  Yes, you do.
13     Q.  And you chose not to take the
14 examination?
15     A.  Correct.
16     Q.  Go to Paragraph 60 if you would,
17 Officer, what is the basis for your allegation in
18 Paragraph 60 that you continue to fear reprisals
19 up to and including termination because of your
20 union activity and support for Stephen Murphy?
21     A.  Why do I continue to fear reprisals?
22     Q.  Yes.
23     A.  Because I do.
24     Q.  What is that based on?

Page 91 - Page 96                                    **Copley Court Reporting**

104

1    point on, no, you can't do details.  You are

2    injured.

3        Q.    Right, and you can't do details now

4    because you are injured?

5        A.    Yes.

6        Q.    And the reason that you can't do

7    details is because you are injured, is that

8    correct?

9        A.    Exactly.

10        Q.    My question is what is the basis for

11    your allegation in Paragraph 30 that you have

12    lost a significant source of potential income as

13    a result of your decommissioning?

14        A.    I don't believe that that pertains to

15    me as of this period of time.

16        Q.    Has your yearly income decreased since

17    you were decommissioned?

18        A.    No.

19        Q.    Do you work overtime?

20        A.    When I can, yes.

21        Q.    How frequently do you work overtime?

22        A.    I would probably say six hours a week.

23        Q.    And what does that -- what is that

24    based on?

COPLEY COURT REPORTING

105

1      A.    They have three hours -- whenever

2  someone who works 10 to 6 takes the overtime,

3  they need someone for three hours.

4      Q.    Okay.

5      A.    I like to take the three-hour overtime

6  because after doing eight hours my back is sore.

7            So if I take the three, it is not as

8  bad.  I can still go home and ice my back and

9  still feel okay.

10     Q.    So your ability to do overtime is

11  contingent upon how well you feel?

12     A.    Exactly.

13     Q.    Which has nothing to do with

14  decommissioning?

15     A.    Overtime has nothing to do with that,

16  no.

17     Q.    Have you been denied the opportunity to

18  do overtime shifts?

19     A.    When I first came back to work I was.

20     Q.    Why was that?

21     A.    I wasn't allowed to do any overtime at

22  all.  I was strictly brought back light duty --

23  eight hours a day.

24     Q.    Okay, why were you not allowed to do

**ORIGINAL**

Volume:   1
Pages:    1 - 131
Exhibits: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No: 1:05-CV-11661-RGS

DAVID BERGERON, JOHN GRENNON, LORNE LYNCH, JOHN )
BARNES, JOHN ELLIS, TIMOTHY TURLEY, AL MOSCONE, )
WILLIAM PENEAU, ERIK DILIBERO and PAUL GIGLIO,  )
                              Plaintiffs,       )
                v.                              )
ANDREA CABRAL, INDIVIDUALLY and as SHERIFF OF   )
SUFFOLK COUNTY,                                 )
                              Defendant.        )

DEPOSITION OF **ERIK P. DILIBERO**, a

Witness called on behalf of the Defendant, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

offices of the Suffolk County Sheriff's

Department, 200 Nashua Street, Boston, MA, on

Wednesday, December 13, 2006, commencing at 10:15
a.m.

*COPLEY COURT REPORTING, Inc.*
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

**DISK ENCLOSED**

16

1    promoted and the different positions that you

2    have worked at?

3         A.    Well, I started as a Jail Officer.  I

4    can't give you the dates on when I was promoted.

5         Q.    Just, you know, you can generally tell

6    me.

7         A.    I was promoted before, I believe before

8    we came into this building.

9         Q.    Promoted to what rank?

10        A.    Jail II.

11        Q.    Which is?

12        A.    Which would have been -- which was a

13   Specialist at the time which is a Corporal now.

14        Q.    When you were promoted to that rank,

15   who was the Sheriff?

16        A.    Bob Rufo.

17        Q.    Was there an examination?

18        A.    No.

19        Q.    Did you apply for the position if you

20   recall?

21        A.    Yes, I did.

22        Q.    Do you know how long you had been on

23   the job before you were promoted to Specialist?

24        A.    It was two or three years.  I am not

COPLEY COURT REPORTING

18

```
 1    Street Jail?
 2        A.    I believe so.  It was right in the
 3    transition end of the Charles Street Jail because
 4    they needed, they were hiring so many people,
 5    they needed people that ranked training, other
 6    people.
 7        Q.    What was the next rank you held?
 8        A.    Sergeant.
 9        Q.    And when was that?
10        A.    I am not sure.
11        Q.    Who was the Sheriff?
12        A.    Bob Rufo.
13        Q.    Did you take an examination?
14        A.    No, I did not.
15        Q.    Okay.  For how long a period of time
16    did you hold the rank of Sergeant?
17        A.    I am not sure how long or what the time
18    frame was.  It was quite awhile, a few years
19    until I got promoted to Lieutenant.
20        Q.    And during this period of time, now we
21    are talking about 1987 up to what about year --
22    why don't we cap it to when you were promoted to
23    the rank of Lieutenant?  Do you recall when that
24    was?
```

COPLEY COURT REPORTING

Deposition of Erik P. Dilibero, Vol. I, 12/13/06                    Bergeron, et al. v. Andrea Cabral

**19**

1   A.   I don't remember the date.  I can't
2   tell you.
3   Q.   Let me show you a document and see if
4   it refreshes your memory.  I am showing you this
5   letter signed on behalf of Sheriff Rouse by
6   Special Sheriff Brian Burns.
7        Does that refresh your memory as to
8   when it was that you were appointed to the rank
9   of Lieutenant?
10  A.   Yes, it does.  It would be February
11  1st, 2000, I believe, right.
12  Q.   February 1st, 2000?
13  A.   Yes.
14  Q.   And actually you were appointed to the
15  rank of Temporary Lieutenant, right?
16  A.   Correct.
17  Q.   So between 1987 when you were first
18  hired to February of 2000 when you were appointed
19  to the position of Temporary Lieutenant, could
20  you briefly describe the kinds of job
21  responsibilities that you had and assignments?
22  A.   From the beginning of my career did you
23  say?
24  Q.   Yes, please.

**20**

1   A.   In the beginning, I just worked on the
2   tiers.
3   Q.   That was working on the tiers?
4   A.   On the tiers, we had tiers back then.
5   It was units, just, doing major counts, respond
6   to any altercations, I worked in the annex, the
7   modulars.
8   Q.   Those were different areas of the
9   Charles Street Jail?
10  A.   Yes.
11  Q.   Okay.
12  A.   And I worked on transportation after
13  getting qualified for handgun qualification,
14  baton and all of the requirements to get onto
15  transportation.
16      I worked transportation -- I actually
17  worked on transportation, I was a Permanent
18  Transportation Officer.
19  Q.   When was that, sir?
20  A.   I don't remember the date when I was --
21  Q.   Was that here at the Nashua Street
22  Jail?
23  A.   Yes, it was here at the Nashua Street
24  Jail, yes.

**21**

1   Q.   So it was sometime in the 1990 --
2   A.   I am terrible with dates.  I couldn't
3   tell you.
4   Q.   All right.
5   A.   Also from Transportation, I worked
6   downstairs in Booking for about two years, and
7   worked in all areas of the jail, naturally,
8   Lobby, Central Control, SERT, Units, I worked in
9   the Control Booths and I was promoted to
10  Lieutenant, Temporary Lieutenant, and a short
11  time after that I was appointed to Permanent
12  Lieutenant and I was a Permanent Lieutenant for
13  approximately four years, and then the department
14  lost the arbitration or whatever, and they put me
15  back to a Temporary Lieutenant.
16  Q.   Well, I can stop you there for a
17  second.
18      Was there an unfair labor practice
19  filed by the Blue Shirts Union?
20  A.   Yes.
21  Q.   So that was 1134 at the time?
22  A.   Yes, I believe so.
23  Q.   So an action was taken by your fellow
24  employees to protest the permanent promotions to

**22**

1   Lieutenant of yourself and some other folks,
2   right?
3   A.   Six other people.
4   Q.   And the department wanted to keep you
5   as Permanents, is that correct?
6   A.   I was Permanent.  I don't know -- we
7   were -- the seven of us were all kept in the dark
8   about the whole proceedings.  We couldn't go to
9   any proceedings, and we only got tidbits of
10  information from the department on the status of
11  this case.
12  Q.   Okay.  Well, as you understand it,
13  certainly, the reason why the department had to
14  remove you from a permanent status to a temporary
15  status was because the Blue Shirts Union 1134 at
16  the time challenged the department's right to
17  make you permanent, isn't that correct?
18  A.   I believe so.  I don't know.  I don't
19  know the -- I have never seen the paperwork on
20  the whole case, but I guess they challenged, you
21  know, they challenged, you know, the seven
22  positions.  I don't know whether it was permanent
23  or temporary at the time when they started it.  I
24  couldn't tell you.

**23**

1   Q.   Is it your testimony that you were
2   unaware that the 1134 challenge --
3   A.   I know --
4   Q.   Let me ask the question.
5       Is it your testimony that the 1134
6   challenged the department's right to make you and
7   the other six folks Permanent Lieutenants?
8   A.   I am just telling you that I wasn't
9   sure whether I was a temporary or a permanent at
10  the time that they challenged it.  I know that
11  they challenged it.
12  Q.   And you are certainly aware that the
13  department lost that unfair labor practice that
14  was filed by 1134, right?
15  A.   Correct.
16  Q.   As a result of that, they could no
17  longer keep you as a permanent, you and the six
18  other folks had to be Temporary Lieutenants once
19  again?
20  A.   Correct.
21  Q.   Okay.  I want to make sure that we are
22  clear that the reason that you went from
23  permanent to temporary was not because the
24  department wanted to do that, it was because the

**24**

1   Union 1134 challenged that designation and we
2   were required to comply with that ruling of the
3   Labor Relation's Commission?
4   A.   That is correct.
5       It was also clear that she also stated
6   that she would back all seven of us and keep us
7   Temporary Lieutenants no matter what.
8   Q.   Who are you referring to?
9   A.   Sheriff Cabral.
10  Q.   When did she tell you this?
11  A.   She did not tell me this -- she told
12  others to tell me -- she told the other
13  lieutenants because I was off that day and she
14  had a meeting with them and she stated that she
15  would stand by us with the decision that we lost
16  and that she would keep us Temporary Lieutenants.
17  Q.   When was this meeting?
18  A.   I couldn't tell you what date.
19  Q.   Well, can you tell me what year?
20  A.   Soon after -- right after you lost the
21  case.  You have the files there, I'm sure.
22  Q.   Well, I am asking you the questions.  I
23  don't know what files I have here.
24  A.   I don't remember when it was, the exact

28

1            After the LRC decision and effective

2    March of 2004 you were a Temporary Lieutenant,

3    right?

4        A.    Correct.

5        Q.    And accordingly your permanent rank was

6    that of Sergeant, correct?

7        A.    I don't understand you.

8        Q.    Well, if you are a Temporary

9    Lieutenant, what is your permanent rank, sir?

10       A.    My permanent, right before this finding

11   came down, I was a Permanent Lieutenant.

12       Q.    Right.

13       A.    And then I was a Sergeant prior to

14   that.

15       Q.    Right.  And if you are a Temporary

16   Lieutenant, what is your permanent rank as of

17   March of 2004, you are not a Permanent

18   Lieutenant, you are temporary, what is your

19   permanent rank in March of 2004 as you understood

20   it, sir?

21       A.    I was a -- as I understand it -- I was

22   a Temporary Lieutenant working in that grade.  I

23   didn't consider myself a Sergeant back then

24   because, you know, it was all new to me.

29

1          I was a Permanent Lieutenant for four

2    years, and then the finding came down and they

3    put us back to Sergeant, and then they said you

4    are, on the same day they gave us a letter saying

5    you are back to Sergeant rank and working

6    Temporary Lieutenant.  I believe that that is

7    what the letter stated.

8          Q.    Is it your testimony --

9          A.    So it would be Sergeant.

10         Q.    Is it your testimony that when you were

11   a Temporary Lieutenant in March of 2004 that you

12   didn't know that your permanent rank was that of

13   Sergeant?

14         A.    Well, they gave us a letter stating in

15   the same day that you are a sergeant and you are

16   back to Temporary Lieutenant.

17         Q.    Sure, you are working in a higher rank,

18   in a higher grade per a provision of the

19   collective bargaining agreement as a Temporary

20   Lieutenant?

21         A.    Correct.

22         Q.    And your permanent rank was that of

23   Sergeant, correct?

24         A.    Right.

COPLEY COURT REPORTING

30

1      Q.    You were removed from temporary service

2   when?

3      A.    I was demoted on January 19th, 2005.

4      Q.    Now, is the second or third time you

5   referred to yourself as being demoted.

6            How were you demoted to rank of

7   Sergeant if that was your permanent rank?

8      A.    Because I was working.

9            MR. STEWART:  Go ahead.

10     A.    Because I was working as a Temporary

11   Lieutenant.

12     Q.    All right.

13     A.    I was a Lieutenant.

14     Q.    I am trying to understand how it was

15   that you were demoted to what your permanent rank

16   was?

17     A.    I was a white shirt.

18     Q.    Uh huh.

19     A.    If they needed to take a -- the way the

20   contract states, I believe is if they needed to

21   take someone from temporary status, it would be

22   the least senior person, and I believe I was the

23   second or third highest person as a Temporary

24   Lieutenant, so I believe it was demotion.

COPLEY COURT REPORTING

33

1    Compensation, Sergeant Dilibero?

2        A.    Yes, I have.

3        Q.    And when was that, sir?

4        A.    I got injured, I was on a 3:00 to 11:00

5    shift, I believe it was -- I am not sure of the

6    date -- it was a 201 fight on the 3:00 to 11:00

7    shift.  On November 30th, I got hurt.  I hurt my

8    back, and I was out on comp from then.

9        Q.    Is that the injury that you described

10   earlier in the deposition for which you are

11   taking the medication where you injured your

12   L-5/S-1?

13       A.    Yes.

14       Q.    For how long a period of time were you

15   out?  Do you remember?

16       A.    I am not sure.  I can't tell you

17   exactly -- months.

18       Q.    Okay.  At some point did you return to

19   work?

20       A.    I did.

21       Q.    Were there any restrictions on your

22   ability to return to work?

23       A.    Yes.

24       Q.    And what was that?  What were those?

COPLEY COURT REPORTING

34

1       A.    I was -- when I first came back I was

2   working four hours, four hours a day, and no

3   inmate contact, and working in Central Control or

4   the Medical Booth.

5       Q.    How long is the normal shift, sir?

6       A.    Eight hours.

7       Q.    For how long a period of time did you

8   work on this light duty status four hours a day

9   either in the Central Control or in the Medical

10  Booth?

11      A.    I am not sure exactly how long I was on

12  that but I took myself off the four hours and I

13  went to my doctor and came back to eight hours

14  myself.

15      Q.    Do you remember when that was?

16      A.    I want to say like July or August of

17  2005 maybe -- I am not sure what the date was.

18      Q.    Well, let me ask you this.  Was it

19  before or after -- if I suggest to you that you

20  were decommissioned in April of 2005, was it

21  before or after that date?

22      A.    It was probably after.

23      Q.    Okay.  So is it fair to say that you

24  were on this accommodated status for a fairly

35

1    lengthy period of time, maybe over a year?

2        A.    Yes.

3        Q.    So for over a year the department

4    permitted you to work a four-hour day either in

5    the Central Control or in the Medical Control, is

6    that right?

7        A.    It was in Central Control until like

8    December of 2005.  I was in work at Central

9    Control all of that time and I believe in

10   December they brought a Captain back to the shift

11   and I went to the Medical Booth.

12       Q.    And you remained in the Medical Booth

13   from December of '04?

14       A.    Yes.

15       Q.    To July or August of '05?

16       A.    Yes, maybe, yes.

17       Q.    I am trying to get a sense of how long

18   a period of time you remained in that?

19       A.    I forget.  I don't recall the dates.  I

20   have them but I don't recall them.  Like I said,

21   I am bad with dates.

22       Q.    Would that be reflected in your

23   calendars?

24       A.    Yes, most of the time I wrote down

COPLEY COURT REPORTING

37

```
1        A.    The letter that they sent me -- yes,
2   the letter the department sent me saying I had to
3   come back to work.
4        Q.    This is a letter from Superintendent
5   Sumpter dated March 22, 2004 indicating that the
6   department has agreed to accommodate the
7   restrictions necessitated by your injury to allow
8   to you come back to work, is that fair?
9        A.    Correct.
10       Q.    And does that refresh your memory as to
11  when it was that you returned to work with
12  accommodations provided to you by the department?
13       A.    It does.
14       Q.    March of 2004?
15       A.    Yes.
16       Q.    I believe your testimony was that your
17  injury occurred in November of '03, is that
18  right?
19       A.    I might have said '04.  I am not
20  even --
21       Q.    I am trying to get a sense.  You were
22  injured before you returned to work obviously?
23       A.    Right.
24       Q.    How long do you remember being out of
```

38

1  work as a result of the altercation that resulted

2  in the injury to your back?

3      A.    A few months -- I am not sure.  I

4  believe five or six months I was out of work.  I

5  am not sure.

6      Q.    I am asking for your best memory not an

7  exact date.

8      A.    Yes.

9      Q.    So your best memory is that for the

10  five or six months before March of 2004 you were

11  out of work as a result of the injury that you

12  sustained at work?

13      A.    Correct.

14      Q.    You returned to work in March of 2004

15  per the arrangement that you worked out with

16  Superintendent Sumpter where you would work a

17  shortened shift and only be assigned to the

18  Central Control or the Medical Booth with no

19  inmate contact, is that right?

20      A.    Correct.

21      Q.    At some point you left Central Control

22  and went to the Medical Booth and you believe

23  that that was December of '04 per your looking at

24  your calendars?

COPLEY COURT REPORTING

63

1    per year did you perform details?

2        A.    Not often.  When I first started, I did

3    quite few and then I stopped doing details pretty

4    much after that -- after -- I can't say when but

5    I stopped doing them all together.

6        Q.    Can you give me your best memory as to

7    when it was that you ceased doing them?

8        A.    Probably early 1990's, I am not sure.

9        Q.    So, since the early 1990's, is it fair

10   to say that you haven't performed any details?

11       A.    It is fair to say.

12       Q.    Okay.  And certainly during the period

13   of time that you sustained your work-related

14   injury in '03 and then coming back to work and

15   being on light duty, you weren't in a physical

16   condition to perform details, correct?

17       A.    Correct.

18       Q.    Right?

19       A.    Right.

20       Q.    So no details in 2001, 2002, 2003, 2004

21   and 2005?

22       A.    Correct.

23       Q.    And you believe --

24       A.    Yes.

COPLEY COURT REPORTING

84

1   concerning the election for Sheriff in 2004?

2       A.    I don't believe so.

3       Q.    Did you have any conversation with

4   Superintendent Sumpter regarding the election for

5   Sheriff in 2004?

6       A.    I don't believe so.

7       Q.    At any point did Deputy Superintendent

8   Sumpter indicate to you that there would be

9   consequences for Murphy supporters if Sheriff

10  Cabral was elected?

11      A.    I didn't have any conversations.

12      Q.    Did you have any conversations with

13  Jerry Walsh concerning the election for Sheriff

14  in 2004?

15      A.    No.

16      Q.    How about with Michael Harris?

17      A.    No.

18      Q.    Elizabeth Keeley?

19      A.    No.

20      Q.    Sheriff Cabral?

21      A.    No.

22      Q.    The only conversation that you had with

23  anybody concerning the election and I mean by

24  anybody, anybody in a senior management staff

88

1     on election day -- getting scolded by people

2     coming in.

3          Q.    Don't talk to me.

4          A.    Yes.

5          Q.    Other than the work that you did on

6     primary day on the school in East Boston, did you

7     do anything else to support Mr. Murphy's

8     candidacy for Suffolk County Sheriff?

9          A.    I contributed to his campaign fund.

10         Q.    How much money?

11         A.    I'm not sure, maybe like 300.

12         Q.    How many times?

13         A.    Only once.

14         Q.    Okay.

15         A.    I am not sure.

16         Q.    Check, cash?

17         A.    It could have been 5 -- probably a

18    check, no cash.

19         Q.    And it was $300.00?

20         A.    Approximately -- I am not sure how

21    much.

22         Q.    Do you remember when it was that you

23    made that contribution?

24         A.    No, I don't recall.

89

1      Q.    I'm sorry?

2      A.    No, I don't recall.

3      Q.    Okay, other than the contribution to

4   the campaign and the working at the pole on

5   election day -- did you do any other work for Mr.

6   Murphy's candidacy?

7      A.    Hung some signs.

8      Q.    I'm sorry?

9      A.    Hung some signs for him.

10     Q.    Okay.

11     A.    And that is about it.

12     Q.    Did you organize any events?

13     A.    I did not, no.

14     Q.    Did you organize any fund-raisers?

15     A.    No, I did not.

16     Q.    Did you participate in any phone banks?

17     A.    No.

18     Q.    Did you attend any campaign meetings?

19     A.    Yes.

20     Q.    How many?

21     A.    Maybe one.

22     Q.    Did you go with anybody else from the

23   department?

24     A.    Let's back up a little.  When you say

COPLEY COURT REPORTING

92

1    was around the time that he announced --

2         A.    I believe so.

3         Q.    Okay.  Did you attend any other

4    meetings or dinners concerning the campaign,

5    Stephen Murphy's campaign?

6         A.    I went to a fund-raiser, a couple of

7    fund-raisers.  I know that Captain Moscone had

8    thrown a fund-raiser for him, and I attended that

9    one and I probably attended maybe one other one,

10   I am not sure.

11        Q.    The fund-raiser that was organized by

12   Captain Moscone, do you recall where that was?

13        A.    I am not sure exactly.

14        Q.    Do you recall where that was?

15        A.    I believe it was the Kaluha Hawaiian in

16   East Boston.

17        Q.    How did you know that Captain Moscone

18   was organizing the event?  How did you hear about

19   it?

20        A.    I don't recall.

21        Q.    Who else from the department was there?

22        A.    Lorne Lynch, John Barnes, Paul Giglio,

23   I believe, I believe Captain John Ellis -- I

24   can't remember who else.

COPLEY COURT REPORTING

94

1    back then -- no, hanging signs.  I put a sign on

2    my mother's fence next to her house, that is

3    about it, and I had got locations for other ones,

4    that is about as much as I hung I think.

5         Q.    Did you organize any other employees

6    from the department to assist you in these

7    efforts?

8         A.    No, I kept quiet in the department.

9         Q.    You kept quiet --

10        A.    I tried to not talk about my political

11   beliefs.

12        Q.    I'm sorry, you kept your political

13   beliefs to yourself?

14        A.    Correct.

15        Q.    Did you tell anybody in the department,

16   any of your fellow employees that you were

17   supporting Stephen Murphy?

18        A.    I don't recall.

19             Other than people who were at the

20   meeting, I don't recall.  I know people came up

21   to me and asked me about things.  I don't usually

22   talk much about my goings on.

23        Q.    Were you vocal at all about your

24   support for Steve Murphy in the institution?

95

1        A.    What do you mean by vocal?

2        Q.    Did you express your support for Steve

3    Murphy while you were on the job?

4        A.    No, I don't believe that I did.

5        Q.    Okay.  When you were working the polls

6    at election day or when you were -- you said you

7    hung the signs at your mom's house or a fence

8    there -- did you ever see David Bergeron?

9        A.    See David Bergeron -- I work with him.

10   I have seen him.

11       Q.    I meant in the context of a campaign.

12   Let me ask the question again.

13            Did you ever see David Bergeron outside

14   of the department working for Mr. Murphy?

15       A.    No.

16       Q.    John Ellis?

17       A.    No.

18       Q.    John Grennon?

19       A.    No.

20       Q.    John Barnes?

21       A.    No.

22       Q.    Other than John Barnes was at the

23   Kaluha Hawaiian fund-raiser that you said Captain

24   Moscone organized?

COPLEY COURT REPORTING

Bergeron, et al. v. Andrea Cabral                    Deposition of Erik P. Dilibero, Vol. I, 12/13/06

**97**

1  Q.  Elizabeth Keeley?
2  A.  No.
3  Q.  Stephen Tompkins?
4  A.  No.
5  Q.  What evidence do you have that Sheriff
6  Cabral knew that you supported Steve Murphy?
7  A.  What evidence?  I don't understand the
8  question.
9  Q.  What evidence do you have that Sheriff
10  Cabral knew that you supported Stephen Murphy and
11  were working on his behalf?
12  A.  I know that Roseann Maher knew about it
13  that I was supporting Stephen Murphy, and I knew
14  other people in the department knew that I was
15  helping Steve Murphy.
16  Q.  Let me stop you there.  What other
17  people in the departments?
18  A.  People that saw me at the fund-raiser
19  knew that we were supporting Steve Murphy and I
20  am sure as you know, jail has no secrets --
21  everyone knows everyone's business.
22  Q.  You didn't know who David -- who Tim
23  Turley was supporting, did you ?
24  A.  At the time I don't know -- you know, I

**98**

1  don't go around asking him but I know at the time
2  of Captain Moscone's fund-raiser, everyone knew
3  who was there and who wasn't.
4  Q.  Sure, the folks who was there?
5  A.  Everyone knew who was there, the
6  administration knew who.
7  Q.  How did the administration know who was
8  there?
9  A.  It is a good question.
10  Q.  I am asking you.  That is the beauty of
11  these.  I ask the questions.  You have to answer.
12  A.  I don't know.  Everyone knew who was
13  there.  They asked how was the time last time
14  night.  They knew -- everyone knew I was at a
15  Murphy fund-raiser.
16  Q.  A few moments ago I was asking you
17  about the extent of your conversations that you
18  had with Deputy Superintendent Carney,
19  Superintendent Sumpter, Jerry Walsh, Mike Harris
20  concerning the election -- did any of those
21  people ever ask you about the fund-raiser that
22  Captain Moscone organized?
23  A.  No.
24  Q.  Who were these folks that asked you

**99**

1  about the fund-raiser?
2  A.  Other officers of the jail.
3  Q.  My question to you is what evidence do
4  you have that Sheriff Cabral was aware that you
5  supported Stephen Murphy?
6  A.  I don't have any.
7  Q.  You mean that she was aware that you
8  were at a fund-raiser for Stephen Murphy?
9  A.  I don't have any evidence.
10  Q.  Are you familiar, Sergeant Dilibero,
11  with any of the mailings that JOEASC put out
12  prior to the Sheriff's election in 2004?
13  A.  I'm not sure of the mailings, no.
14  Q.  Well, at the time that these mailings
15  were put out, it was in April and March of 2004,
16  at that time you were working as a Temporary
17  Lieutenant?
18  A.  Correct.
19  Q.  And the union that you belonged to was?
20  A.  AFSCME.
21  Q.  Local 3643, is that it?
22  A.  3643 -- maybe, something like that.
23  Q.  I will take your belief that it was
24  3643 -- I am not sure either.

**100**

1  A.  Yes.
2  Q.  Were you involved at all with JOEASC at
3  that time?
4  A.  No, I was Vice President of AFSCME.
5  Q.  Did you have any input or any
6  involvement with the mailings that JOEASC put out
7  concerning the Veteran's benefits, the water
8  bill, pension, dental and vision benefits?
9  A.  No.
10  THE WITNESS:  Could we take a quick
11  break?
12  MS. CAULO:  Sure.
13  (Short Pause.)
14  Q.  Sergeant Dilibero, did Sheriff Cabral
15  ever tell you that if you didn't, or anybody
16  didn't support her candidacy, that there would be
17  negative consequences for one's job?
18  A.  No, she never did.
19  Q.  Did anybody ever say that?
20  A.  Not that I am aware of.
21  Q.  Did the Sheriff ask you to contribute
22  to her political campaign?
23  A.  No.
24  Q.  Did you ever discuss the campaign for

**101**

1  Sheriff with Sheriff Cabral?
2  A.  No.
3  Q.  Did you ever discuss Stephen Murphy
4  with Sheriff Cabral?
5  A.  No.
6  Q.  How about Elizabeth Keeley?
7  A.  No.
8  Q.  Have you had any interactions with
9  Sheriff Cabral personally?
10  A.  Just to introduce myself when she first
11  came in.  I knew her back in '87, I believe, when
12  she was working at the jail and I just wanted to
13  say "hi" to her.  I was a Lieutenant at the time
14  and I saw her in the hallway and I introduced
15  myself.  She was with Superintendent Sumpter at
16  the time, I don't know if he was Superintendent
17  at the time but she was with him.
18  As far as my reaction, that is about
19  it.
20  Q.  And that was back in 2002 when she was
21  appointed or first came on the job?
22  A.  I believe so.
23  Q.  Okay.  And other than that -- none?
24  A.  No.

**102**

1  Q.  Okay.  You indicated a few moments ago
2  that at some point you were Vice President of
3  AFSCME, that means you were Vice President of the
4  Local 3643?
5  A.  Yes.
6  Q.  When did you become Vice President of
7  Local 3643?
8  A.  I don't recall.
9  Q.  How about a year?
10  A.  I could guess, but probably I am wrong
11  what year it was.
12  Q.  Give me your best estimate and for what
13  period of time?
14  A.  Maybe like possibly 2003.
15  Q.  To what?
16  A.  Until I became it was when I became
17  Temporary Lieutenant, I believe is when it
18  stopped.  It wasn't right afterwards or whatever
19  that they figured it out.
20  Q.  So until about 2004 then?
21  A.  Yes, somewhere around there.  I am not
22  sure.
23  Q.  So you held that position until you had
24  to go back to being a Temporary Lieutenant from a

103

1  Permanent Lieutenant, is that what your testimony
2  is?
3      A.   I believe so, yes.
4      Q.   We know that you became, you resorted
5  to being, that is not the right word -- you went
6  back to being a Temporary Lieutenant in March of
7  2004, and I believe we know that by one of the
8  exhibits here, right -- Exhibit No. 1, right?
9      A.   Uh huh.
10     Q.   Yes.
11     A.   Yes.
12     Q.   Okay. So what were your duties and
13 responsibilities as Vice President of the local
14 during that period of time? What does that
15 entail? What do you do?
16     A.   Good question.
17     Q.   What do you do?
18     A.   Pretty much nothing. At the time
19 Captain Sheehan was President. He pretty much
20 did all of the work -- basically fell into the
21 Vice Presidency and showed up at a meeting, and
22 they were nominating people and no one showed up
23 and I was there, and they said pretty much do you
24 want to do it and I said, yes, sure -- why not --

104

1  not that there was much to do for the white
2  shirts at that time. He did it -- Captain
3  Sheehan did everything. Any meetings or any
4  things that I have gone to is like some AFSCME
5  seminars -- that is about it. I didn't really do
6  anything.
7      Q.   I was going to ask you to describe the
8  union work that you did that you were involved in
9  during that period of time?
10     A.   Pretty much just union meetings, you
11 know, I have gone to union meetings, you know,
12 discussed stuff from union meetings of what was
13 going on, you know, passing out, you know, our
14 holiday Stop & Shop cards and that is about it
15 really.
16     Q.   Okay.
17     A.   The white shirt union wasn't very vocal
18 or anything at the time. We didn't do much.
19     Q.   Was Captain Moscone an elected official
20 in the union at that time?
21     A.   He was after Captain Sheehan retired.
22 I believe he became the president.
23     Q.   Do you know when that was?
24     A.   Not exactly the date, no.

105

1      Q.   So at the period of time you were Vice
2  President, Captain Sheehan was President?
3      A.   He was and then Captain Harlin I
4  believe became the President and then Captain
5  Moscone after that.
6          I believe that is how it went.
7      Q.   Were you ever Vice President under
8  Captain Moscone?
9      A.   I believe I was, I am not sure.
10     Q.   Okay.
11     A.   I am not sure.
12     Q.   Okay, during this period, did you file
13 any grievances on behalf of the union?
14     A.   No.
15     Q.   Did you testify at any arbitrations
16 on behalf of union members during the period of
17 time that you were active in or involved in the
18 union?
19     A.   No.
20     Q.   Did you testify at any disciplinary
21 hearings?
22     A.   No.
23     Q.   Did you file any complaints against the
24 department as a union official?

106

1      A.   No.
2      Q.   Did the Sheriff ever address roll call
3  concerning union activity or concerning the
4  actions of Local 3643?
5      A.   Not that I am aware of.
6      Q.   What specific interactions did you have
7  with Sheriff Cabral in your capacity as either a
8  member of 3643 or as Vice President of the local?
9      A.   None that I am aware of.
10     Q.   How about the interactions that you had
11 with Michael Harris in your capacity as Vice
12 President of the local or simply as a member?
13     A.   I may have gone to a meeting once. I
14 don't even recall what the meeting was about. It
15 could have been like -- just like a -- I am not
16 even sure what it was about. I forget what it
17 was.
18     Q.   How about Elizabeth Keeley, did you
19 ever have any specific interactions with her in
20 your capacity as a member of 3643 or Vice
21 President of the local?
22     A.   No.
23     Q.   Were you involved in contract
24 negotiations on behalf of the union?

107

1      A.   No.
2      Q.   Is it fair to say that your activity on
3  behalf of the union was primarily ceremonial -- I
4  mean you didn't have a lot of responsibilities to
5  do?
6      A.   That is pretty much how the presidents
7  ran it back then. So it was ceremony -- figure
8  head.
9      Q.   Whoever was holding the presidency did
10 the work?
11     A.   Usually, you know, the most I would do
12 is I would write, you know, write some stuff up
13 on meetings that were being held or, you know,
14 looked into some matters for contract stuff
15 mainly, but other than that I didn't really do
16 anything.
17     Q.   Okay. When you returned to your
18 permanent rank of sergeant, you now became a
19 member of JOEASC, right, is that correct?
20     A.   Correct.
21     Q.   And I believe earlier you testified
22 that President Mickey Walsh was the President of
23 JOEASC at that point in time?
24     A.   Yes, I think so.

108

1      Q.   Do you recall who the other folks were
2  who were D-Board members or elected officials?
3      A.   Sergeant Tullis was, I believe, the
4  Vice President -- and D-Board -- I couldn't tell
5  you.
6      Q.   Do you know who the Treasurer was?
7      A.   Offhand, I don't know.
8      Q.   Was it Mark Turley do you know?
9      A.   I don't know.
10     Q.   How about Stan Anduszkiewcz, was he
11 involved?
12     A.   I know he was.
13     Q.   And this was in the fall of 2004 going
14 into 2005?
15     A.   I know about Stan. I filed my
16 grievance with him.
17     Q.   The grievance concerning the rank?
18     A.   Yes, the rank.
19     Q.   And that was in when?
20     A.   March.
21     Q.   Of 05?
22     A.   No.
23     Q.   You were restored to your permanent
24 rank of Sergeant back in January of '05, right?

109

1    A.    Back in January of '05.

2    Q.    Okay.

3    A.    Yes, so it is somewhere around there.

4    Q.    Is it fair to say Mickey Walsh, Bob

5    Tullis and Stan Anduszkiewcz were active on

6    behalf of JOEASC and its members?

7              MR. STEWART:  Objection.

8    A.    I am not sure.

9    Q.    You weren't active in JOEASC?

10    A.    No.

11    Q.    Were you aware that your fellow

12    plaintiffs, John Grennon, John Barnes and John

13    Ellis met with Sheriff Cabral regarding the

14    mailings that JOEASC had put out?

15    A.    I may have heard something.  I don't

16    know whether they did or not.  I may have heard

17    that they met with her.

18    Q.    Did you speak with -- did you speak

19    with any of those three individuals concerning

20    the meeting that they may have had with Sheriff

21    Cabral?

22    A.    I don't, no.

23    Q.    Do you remember being told anything

24    about the meeting?

COPLEY COURT REPORTING

110

1      A.    No.

2      Q.    Sergeant Dilibero, what union activity

3    did you engage in that you allege was the reason

4    that Sheriff Cabral decommissioned you?

5      A.    I have no idea.

6      Q.    I am going to show you the complaint

7    that your counsel has filed on your behalf as

8    well as the other plaintiffs' behalf.

9           What evidence do you have that Sheriff

10   Cabral was even aware that you were a member of

11   Local 3643?

12     A.    I don't know.

13     Q.    What evidence do you have that she was

14   aware that you were Vice President for that

15   period of time between '03 and '04?

16     A.    She probably read it in documents, my

17   union contract, my name is on the top of that as

18   being Vice President.

19     Q.    Okay, did you sign the contract in your

20   capacity as Vice President?

21     A.    I believe so.  I am not sure.

22     Q.    But you weren't involved -- I'm

23   sorry -- I didn't mean to cut you off -- you

24   weren't involved in the negotiations at the time?

COPLEY COURT REPORTING

112

1   in Paragraph 59 -- so I will ask you to turn to

2   Paragraph 59 that you have been bypassed for

3   career advancement for recent promotional

4   activities because of your involvement in union

5   activities or support for Stephen Murphy?

6       A.   I was -- that is all I know is that

7   Lieutenant put me back to a Sergeant and I lost

8   my Deputy Sheriff status and I had no

9   disciplinary -- nothing disciplinary ever

10  happened to me to become that -- again, model

11  officer in the department.

12      Q.   So why is it that you are concluding

13  that you were put back to your permanent position

14  of Sergeant and you were decommissioned because

15  of your union activities or your support for

16  Stephen Murphy?

17           MR. STEWART:   Objection.

18      A.   The only thing I have done is supported

19  Steve Murphy and all of this came afterwards.

20      Q.   Okay.

21      A.   My life was turned upside down.

22      Q.   What promotional opportunities have you

23  not been this considered for?

24      A.   I don't know.

Page 121

```
 1   have been denied?
 2       A.   If I was a Deputy Sheriff, I would be
 3   doing details right now, and in the shortcoming,
 4   I am doing a lot of overtime, I am not a person
 5   that did overtime.
 6       Q.   Your testimony earlier was that you
 7   haven't done any details since the early 1990's,
 8   is that correct?
 9       A.   After losing money as a Lieutenant, I
10   need money now, and I would be doing a lot of
11   overtime and I would be doing details, I need the
12   money.
13       Q.   Did you work overtime shifts before you
14   were decommissioned?
15       A.   Not a lot.
16       Q.   How frequently would you work overtime
17   shifts before you were decommissioned in April of
18   '05?
19       A.   Well, when I was injured, I was working
20   four hours, I couldn't work any overtime, so.
21       Q.   Sure, I mean before your injury?
22       A.   Before I was injured, I don't know,
23   maybe one a month, two a month.
24       Q.   Okay.  Have you done more or less
```

Page 122

```
 1   overtime shifts since you have been
 2   decommissioned?
 3       A.   I have been doing more.
 4       Q.   How frequently are you doing overtime
 5   now?
 6       A.   I try to do one a month -- I mean one a
 7   week.
 8           Like this month I haven't -- it depends
 9   on the situation with my back, if I am feeling
10   good I do them, but I have been pretty much doing
11   one a week trying to, this month I haven't -- I
12   got maybe one in, I haven't been -- my back has
13   been acting up so I haven't been working.
14       Q.   Have you been denied the opportunity to
15   do any overtime shifts?
16       A.   No.
17       Q.   Has Sheriff Cabral or anyone in her
18   administration denied you the opportunity to do
19   overtime?
20       A.   No.
21       Q.   Is it fair to say that if your back is
22   acting up preventing you from doing perhaps as
23   much overtime as you would like, it would also
24   pose a problem for you to do details?
```

Page 123

```
 1       A.   Not as much.
 2       Q.   Why is that?
 3       A.   Doing over time in the jail and
 4   basically stuck to one little area, sitting down
 5   for a long period of time, a lot of details are
 6   only a couple of hours, four hours, it is not a
 7   whole eight hour shift, you can move around, you
 8   can stretch more, you know, actually at one point
 9   I had issues when I was working four hours a day,
10   you know, just to get relief to go downstairs and
11   stretch out because I was in the medical booth
12   and they had issues with that and wanted it in a
13   letter from me which people go out and smoke, as
14   you know, way too often out there.
15           They can go smoke but I was telling
16   them I needed to go for 10 minutes for a stretch
17   and they had issues with it and who "they" are
18   was Superintendent Sumpter.
19       Q.   Do you continue to get physical,
20   physical treatment for your back?
21       A.   I do my own.  There is no use doing the
22   therapy.  I do it, you know, sit ups and I walk
23   and do everything I had done at physical therapy,
24   learned from physical therapy.
```

Page 124

```
 1       Q.   It is your testimony that you think
 2   that you could physically perform the duties and
 3   responsibilities of being out on the highway
 4   doing a detail?
 5       A.   I am doing it now.
 6       Q.   You are not doing details out on the
 7   highway?
 8       A.   I am not doing details.  I am going on
 9   the highway, driving cruisers, I am on full duty,
10   I chose to be.  I don't want to be restricted.
11       Q.   What other damages do you allege that
12   you have suffered, Sergeant Dilibero, other than
13   what you have testified to?
14       A.   Emotional.
15       Q.   Okay.  Why don't you tell me about
16   that.  What emotional distress have you suffered
17   as alleged in Paragraph 64 of your complaint?
18       A.   Well, like I said, fear of losing my
19   job, getting disciplined, you know, as, you know,
20   really to get disciplined, I pretty much do my
21   job and I know I am not going to be disciplined
22   by other officers, but all of this has let up to
23   me being fearful of losing my job.
24       Q.   And have you received any form of
```

Page 125

```
 1   mental health treatment as a result of the
 2   allegations in your complaint?
 3       A.   No.
 4       Q.   Have you received any mental health
 5   treatment in the last five years?
 6       A.   Describe mental health treatment.
 7       Q.   Well, have you gone to a psychiatrist,
 8   a social worker, a psychologist?  Have you
 9   received any form of counseling?
10       A.   I have been to a marriage counselor and
11   that is pretty much part of all of this too.
12       Q.   Well, what impact, if any, have the
13   allegations in your complaint had your on
14   marriage?
15       A.   I have been working more, not seeing my
16   family, more agitated about this stuff, fear, you
17   know, being in fear, I used to stay up nights.
18       Q.   Are you currently in marriage
19   counseling?
20       A.   Yes.
21       Q.   Okay.  Are you receiving any medication
22   for any of this emotional distress that you have
23   talked about?
24       A.   No.
```

Page 126

```
 1       Q.   Are you losing sleep?
 2       A.   Not as much as before all of this
 3   started happening.  I would wake up in the middle
 4   of the night and couldn't go back to sleep
 5   thinking about this stuff.
 6       Q.   Has that continued or has that abated?
 7       A.   Pretty much abated now.
 8       Q.   Okay.  Have you had your days off
 9   changed as a result of the allegations in your
10   complaint?
11       A.   They are by choice.
12       Q.   So you get to choose that?
13       A.   Yes.
14       Q.   Has your shift changed?
15       A.   No.
16       Q.   I am going to ask you a couple of more
17   questions about some of the other claims by your
18   fellow plaintiffs, okay?
19       A.   Yes.
20       Q.   Were you involved in the audit that was
21   conducted of the Transportation Division?
22       A.   No.
23       Q.   Were you --
24       A.   Not that I am aware of.
```

1

1          Volume 2
2          Pages
           Exhibits per index

3

4          UNITED STATES DISTRICT COURT

5          DISTRICT OF MASSACHUSETTS

6          Civil Action No. 05-CV-11661-RGS

7

8     -------------------------------:
                                     :
9    Bergeron, et al                 :
                    Plaintiff,       :
                                     :                  ORIGINAL
10   V.                              :
                                     :
11   Andrea Cabral                   :
                    Defendant.       :
12                                   :
     -------------------------------:
13

14

15          CONTINUED DEPOSITION OF JOHN GRENNON, a
     witness called on behalf of the Defendant taken pursuant
16   to the Federal Rules of Civil Procedure, before Patricia
     M. Haynes, a Certified Shorthand Reporter and Notary
17   Public in and for the Commonwealth of Massachusetts, CSR
     No.: 14620F, at the Offices of Suffolk County Sheriff's
18   Department, 200 Nashua Street, Boston, Massachusetts, on
     Monday, February 26, 2007, commencing at 10:00 a.m.

19

20

21

22

23          Copley Court Reporting
          58 Batterymarch Street, Suite 317
          Boston, Massachusetts  02110
24              (617) 423-5841

89

1      Q.    B, "Professionalism is expected at all times

2   both in demeanor and appearance."  Is that correct?

3      A.    Yes, it is.

4      Q.    Pursuant to S 520, was there a new system that

5   went into effect with respect to how deputy sheriffs

6   could participate in working details?

7      A.    I don't believe so.

8      Q.    Was there a requirement that folks who wanted

9   to do details needed to purchase a pager?

10     A.    Yes.

11     Q.    Is that something that was different than the

12  practice that existed before?

13     A.    Yes.

14     Q.    So in order to work paid details starting in

15  or around 2003, one had to purchase a deeper?

16     A.    Yes.

17     Q.    Did you purchase a beeper in 2003?

18     A.    I purchased a beeper.  I don't recall when.

19     Q.    Isn't it correct, lieutenant, that you did not

20  purchase a pager or a beeper until 2005, sometime in

21  April, shortly before you were decommissioned?

22     A.    Probably, yes.

23     Q.    Probably yes or yes?

24     A.    Yes.

90

```
 1        Q.    So you didn't have one in 2003?

 2        A.    No.

 3        Q.    You didn't have one in 2004?

 4        A.    Correct.

 5        Q.    And you didn't purchase one until 2005, about

 6   a week before you were decommissioned; is that right?

 7        A.    Yes, it is.

 8        Q.    So prior to that date, you were not able to

 9   work details pursuant to this policy, correct?

10        A.    I chose not to work details.  I was in school.

11   My plan was when I finished up with school, I was going

12   to get a pager, which I did, and start working details.

13        Q.    Maybe you didn't understand the question.

14   Pursuant to this policy, you were not eligible to work

15   private paid details in 2003 and 2004, correct?

16        A.    I'd have to read.  That's correct.

17        Q.    Why did you purchase a pager in or about April

18   of 2005?

19        A.    Because I was done with my school obligations

20   and decided to start doing details again.

21        Q.    When did you finish your school obligations?

22        A.    Early 2005 I believe.

23        Q.    What school obligations were those?

24        A.    Paramedic school.
```

95

1    paramedic course, you were also working for the outside

2    --

3        A.    On a per diem basis.

4        Q.    So you chose to continue working for the

5    ambulance company as opposed to doing details, is that

6    fair?

7        A.    I did because it was crucial to my studies.

8        Q.    Why was it crucial to your studies?

9        A.    Keeping up my psychomotor skills, No. 1, and

10   treating patients No. 2.

11       Q.    That was necessary in order for you to

12   complete the program?  Was it a requirement of the

13   program?

14       A.    I don't know.

15       Q.    You took the program.  Was it a requirement

16   you continue as an EMT?

17       A.    I honestly don't recall if it was a

18   requirement for the program.

19       Q.    Or was it a choice that you decided to make

20   because it worked for you?

21       A.    It definitely enhanced my education.

22       Q.    And instead of working there, you could have

23   actually done details if you so desired if you had

24   purchased a pager?

96

1    A.    Yeah.  If I purchased a pager, I could have

2  done details.  I chose not to because of the paramedic

3  program.  It was very, very important for my studies

4  that I did that.  I would have made a lot more money if

5  I did details here, but I wanted to become a paramedic.

6    Q.    How much money did you make in doing details

7  in 2000?

8    A.    I don't recall.

9    Q.    2001?

10   A.    I don't recall.

11   Q.    2002?

12   A.    I don't recall how much money I made on any

13 details in any of the past years.  I don't have that in

14 front of me.

15   Q.    I have your tax returns, but I don't believe I

16 have any 1099s or any documents that would support that.

17 Those would be in your possessions.

18         MS. CAULO:  I'm asking if we can

19 supplement Mr. Grennon's tax records that would indicate

20 the money he received from detail work between 2000 and

21 2003.

22 BY MS. CAULO:

23   A.    If I did any detail work, they would be in my

24 taxes.  I don't have any documents.  Those tax returns

115

```
1    were going to make a decision?

2         A.    I suppose I was.

3         Q.    Were you required to get approval?

4         A.    Depending on what the decision was, yeah,

5    absolutely.  Absolutely.  If we were having a meeting

6    that had anything to do with the Collective Bargaining

7    Agreement, I would have felt it necessary to get

8    approval from him.

9              If I was looking to schedule a meeting, I

10   would have had to get his approval because he would have

11   had to attend.  I can't think of any specifics where I

12   had to actually call him up and get approval for doing

13   something.

14        Q.    How would you characterize the way that you

15   worked together in your respective roles?  Was it kind

16   of have a shared responsibility in terms of the decision

17   making process?

18        A.    I would agree with that.  It was a shared

19   responsibility to run the organization.  Some shared

20   decisions were made, but there was also some blind

21   support also that if John made a decision and if he knew

22   I would be behind it 100 percent.

23        Q.    What work did do you as vice president on

24   behalf of the union membership between April of '03 and
```

116

1    say October of '04 when the new administration came in,

2    thereabouts?

3         A.    I think I was already out in October '04.  I

4    think.  What kind of work?  Contract negotiations, a lot

5    of that.  Some labor management stuff.  What else?

6         Q.    Describe to me the contract negotiations.

7         A.    I sat on the contract negotiation team.

8         Q.    Who else did?

9         A.    John Barnes was there.  I believe Mike Walsh

10   was there.  John Ellis was definitely there taking

11   notes.

12        Q.    What was your role?

13        A.    John was the primarily the negotiator, and we

14   had some rules that if you wanted to say something that

15   you would need to call for a caucus and then step out.

16   The role was basically listening, the role was to have a

17   discussion before contract negotiations about what the

18   points were going to be that day, go into the room and

19   kind of keep your mouth shut and see how it went, have a

20   few caucuses during the contract negotiations to offer

21   suggestions or counterpoints to the administration or

22   whatever came up, you know.

23            And then to meet after contract negotiations

24   to see where we were with our goals and where the

127

1      Q.    Did you testify in any disciplinary hearings

2   on behalf of union members in 2003, 2004, 2005?

3      A.    No, I don't believe so.

4      Q.    When was the last time that you held the

5   elected position with JOEASC?

6      A.    January 2, 2007.

7      Q.    Prior to that, when were you reelected to a

8   position with JOEASC?

9      A.    April of 2006.  And I don't know which day.

10     Q.    So April of '06 to January 2 of 2007 you held

11  the position of what?

12     A.    President.

13     Q.    What union activity did you engage in as

14  president of JOEASC between April of '05 and January 2

15  of '07?

16     A.    The day-to-day runnings of the organization,

17  attended meetings for the organization, including labor

18  management meetings.  Dealing with the deputy

19  superintendent on a regular basis.

20     Q.    Was it '05 or '06 that you were elected?

21     A.    April of '06.  It was April of '06 to January

22  of '07.

23     Q.    Did you file any grievances during that period

24  of time?

135

```
1        Q.    Why don't you describe specifically what work
2   you did on behalf of Mr. Murphy.
3        A.    I introduced him at our JOEASC veterans'
4   night.
5        Q.    When was that?
6        A.    Before the primary but after the endorsement
7   by the officers.
8        Q.    If we are using for purposes of today that the
9   endorsement is around August and the primary is
10  September of 2004, sometime between those two dates you
11  did what?
12       A.    I MC'd an event at a VFW Post in Hyde Park
13  that we had called our Veterans' Appreciation Night.  We
14  had people returning from Iraq, and we had quite a few
15  political people there, state reps and that kind of
16  thing, and Stephen Murphy had come.
17            It was after the endorsement vote was held,
18  and I had introduced him that evening to the crowd and
19  to the families that were there as the person that we
20  were supporting for sheriff.  To answer your question,
21  that would be one thing that I did politically active.
22       Q.    What else?
23       A.    I donated money to Stephen Murphy's campaign.
24       Q.    How many times?
```

136

1      A.    I believe I donated a check for $100 and I

2   believe at least a $25 contribution for like one of

3   those, hi, how are you doing type breakfasts, and

4   possibly another one.  I know one check for a 100 and

5   the total amount didn't exceed 150.  It was either 125

6   or 150.

7      Q.    When were these contributions made?

8      A.    During his campaign.  I'm going to say

9   probably, it was definitely in the summer of 2004.

10     Q.    Around the time of the endorsement, before the

11  endorsement?

12     A.    I believe right after the endorsement.

13     Q.    So if the endorsement is in August, we are

14  talking somewhere between August and September of 2004?

15     A.    Yes.

16     Q.    And you MC'd an event at the vets, and you

17  introduced him to the people who were assembled, you

18  gave two, maybe three contributions not exceeding $150.

19  What else did you do?

20     A.    I held signs for him.

21     Q.    How many times?

22     A.    More than five, less than ten.

23     Q.    Who was present at the department that you

24  recognized as employees on these more than five, less

137

1    than ten occasions?

2         A.    I don't remember seeing any employees from the

3    department.

4         Q.    Nobody?

5         A.    Nobody.

6         Q.    Tim Turley?

7         A.    I don't remember seeing anybody from the

8    sheriff department holding signs for Stephen Murphy.

9         Q.    Other than holding signs, and again, when did

10   you hold signs?  Was this between August and September

11   also?

12        A.    No.  This could have been earlier.  As a

13   matter of fact, I believe it was earlier when he started

14   to ramp his campaign up.  I would say it was before and

15   after the endorsement vote from the union.

16        Q.    What else?

17        A.    Telephone banking.

18        Q.    When did you do that?

19        A.    Evenings during the summer of 2004 at the

20   union hall in Roslindale, I believe it was the plasters'

21   union hall, maybe one or two nights a week for about a

22   month.

23        Q.    What's the total amount of times you did it do

24   you think?

138

```
1       A.    Let's say eight.

2       Q.    Who was with you from the department?

3       A.    Nobody from the department.

4       Q.    Anything else?

5       A.    No, I don't believe so.

6       Q.    How is it that the sheriff would know that you

7   were involved in this activity on behalf of Mr. Murphy?

8       A.    A bumper sticker on my car.

9       Q.    For how long a period of time did you have the

10  bumper sticker on your car?

11      A.    I'd say about a week.  I would only think that

12  she would know because the director of training and the

13  head of SID knew about it, so I would assume she would

14  know about that.

15      Q.    That's an assumption, you don't have any

16  direct evidence or information that she knew you had a

17  bumper sticker on your car?

18      A.    Correct.

19      Q.    To your knowledge, did any other employees of

20  the department have Stephen Murphy bumper stickers on

21  their car?

22      A.    Yes.

23      Q.    Who?

24      A.    I remember Jeremy Washburn had a sticker on
```

140

```
 1        Q.    Who else other than yourself and Mr. Washburn

 2   were you aware that had a Steve Murphy bumper sticker on

 3   the back of their car?

 4        A.    I don't remember specifics.

 5        Q.    Other than the bumper sticker you had on your

 6   car for about a week, how else would Sheriff Cabral know

 7   you were an active supporter of Steve Murphy?

 8        A.    I don't know how she would know.  I could only

 9   make assumptions.

10        Q.    Did you have any direct conversation with

11   Sheriff Cabral concerning your support for Stephen

12   Murphy

13        A.    I did not.

14        Q.    How about Elizabeth Keeley concerning your

15   support for Steve Murphy?

16        A.    I did not.

17        Q.    Did you have any conversations with Cliff

18   Carney or Eugene Sumpter concerning the race for Suffolk

19   County Sheriff in 2004?

20        A.    I did not.

21        Q.    How did you make your support known for

22   Stephen Murphy within the department?

23        A.    I don't believe I did.

24        Q.    Were you vocal at all about your support for
```

141

1    Steve Murphy within the department?

2        A.    I assume I was, through the union only through

3    our endorsement.  It was on our web site, that type of

4    thing.

5        Q.    I'm talking about you personally?

6        A.    Did I discuss it during my day-to-day

7    activities?  No.

8        Q.    What employees at the Nashua Street jail to

9    your knowledge supported Stephen Murphy?

10        A.    John Barnes, Lornie Lynch, Dave Bergeron, Al

11    Mo scone.  I don't recall any others.

12        Q.    Mark Turley?

13        A.    I don't recall if he supported him or not.

14        Q.    Pat O'Brian?

15        A.    I don't recall.

16        Q.    And how do you know that those particular

17    individuals that you just identified supported Stephen

18    Murphy?

19        A.    Because we've talked about it.

20        Q.    Before or after the election?

21        A.    Before and after.

22        Q.    How much communication did you have with Al

23    Moscone and Lornie Lynch concerning the race for Suffolk

24    County Sheriff before the election?

142

1      A.    Not a lot, but we had communicated to them

2   because they were running the Superior Officers Union

3   that we had interviewed candidates and we had made a

4   decision that we were going to support Stephen Murphy

5   for sheriff.

6          I believe at the time they had said that they

7   were going to talk to their members about it or they

8   were going to meet with Steve or something.  I don't

9   really recall them officially saying that they were

10  going to, that the Superior Officers local was going to

11  support them.  In fact, I don't believe they ever did

12  endorse anyone.

13     Q.    Did you attend any campaign events on behalf

14  of Stephen Murphy?

15     A.    Yeah, I did, at least one.

16     Q.    Do you recall where it was?

17     A.    I attended at least two.  I attended election

18  night the after election whatever you call it, party.

19  It wasn't much of a party.  And I attended one other

20  function for him.  I'm thinking Anthony's Pier 4, but

21  I'm not sure.

22          It may have been the $100 check that I wrote,

23  but I do remember attending one function for him and

24  Anthony's Pier 4 is sticking in my mind.

179

```
 1        Q.    Is it your contention that Mr. Barnes and Mr.

 2   Ellis were the people responsible for the contents of 7,

 3   8 and 9?

 4        A.    And Attorney Condon.

 5        Q.    What did Attorney Condon contribute?

 6        A.    E-mail streams back and forth.

 7        Q.    Were you a part of those e-mail streams?

 8        A.    I was not.

 9        Q.    Why weren't you part of those e-mail streams?

10   You were still vice president of union, weren't you?

11        A.    I was busy I guess.  I wasn't here.  I don't

12   know why.

13        Q.    Well, didn't you get e-mail over in Chelsea?

14        A.    No.  I got them group wise.

15        Q.    Did you call them and say I want to be

16   involved in this?

17        A.    No.

18        Q.    No. 8 references the pension benefits and also

19   as does No. 9.  That pertains to a lawsuit that you as

20   an individual plaintiff and JOEASC filed, correct?

21        A.    Yes.

22        Q.    And that lawsuit was filed in December of

23   2003?

24        A.    I believe so.
```

189

```
 1          Q.    To your knowledge, once the decision was made
 2     to issue the mailings marked at 7, 8 and 9, did anyone
 3     go back to the union membership to get their thoughts on
 4     what the contents should be?
 5          A.    I don't know.
 6          Q.    Your testimony is that only Mr. Ellis, Mr.
 7     Barnes and Mr. Condon were responsible for the content?
 8          A.    Yes.  And if anybody was to go back to the
 9     membership, it would have been one of them since they
10     were here.
11          Q.    Did you speak with the press concerning the
12     pension issue?
13          A.    I believe I did.
14          Q.    When was that, sir?
15          A.    I don't recall.
16          Q.    Do you recall what was the nature of the
17     inquiry and what you communicated to them?
18          A.    I remember them calling me, but I don't recall
19     what was said, no.
20          Q.    To your knowledge, do you know why none of the
21     information that's contained in Exhibit 10 was not
22     contained within the mailings 7, 8 and 9?
23          A.    I don't.
24          Q.    What conversation did you have with Victor
```

209

1    implemented a weekly activity report that they had to

2    fill out and hand in to me.

3        Q.    What period of time was this?

4        A.    I'm going to say late '03 all the way until I

5    was transferred from the training division.

6        Q.    Have you worked more or less overtime since

7    you've been reassigned to the Nashua Street jail?

8        A.    Much less.

9        Q.    Why is that?

10       A.    Not available.

11       Q.    Who controls the overtime process here at the

12   jail?

13       A.    The blue shirts' union.

14       Q.    Which is the union that you were vice

15   president of and then president?

16       A.    Correct.

17       Q.    Is there anything that the department or

18   Sheriff Cabral has done to deny you overtime since

19   you've been here at the Nashua Street jail?

20       A.    No.

21       Q.    Other than what you have testified to here

22   today and on the first day of your deposition, what

23   additional evidence do you have that Sheriff Cabral

24   decommissioned you because you were engaged in union

# Memorandum

**To:**   All SCSD Employees

**From:** Sheriff Andrea Cabral

**Date:** 12/12/03

**Re:**   April 2003 – June 2003 Pension Payments

---

In the past two weeks, needless anxiety has been created regarding the Department's contribution payments to the City of Boston pension fund in the last 3 months of fiscal year 2003. Last Monday, a reporter from the Boston Globe contacted our Communications Division and inquired about the delayed payments. This reporter had virtually no other information other than the fact that the payments had not yet been made. While we were in the process of gathering accurate information to respond to her questions, she directly contacted other Department employees and shared her limited information. In this regard, I would like to commend Officers William Dowd and Mike Powers for their professionalism and sound judgment in handling this situation. At their request, I met with the leadership of Local 419, gave them the facts and answered whatever questions they had. I share with you now, the information provided in that meeting.

As you know, in March of 2003, I authorized payment in the amount of $5.2 million dollars in settlement of a class action lawsuit against Suffolk County involving the illegal strip searches conducted at the Nashua Street Jail between 1995 and 1999. The settlement agreement in that case was signed during the previous administration. The first payment was due in May, 2003 and the payment deadline was November 29, 2003, the date I was sworn into office. In addition to the original amount and accrued interest, the federal court also subsequently imposed contempt fines in the amount of $3000 per day with an increase of $1000 each Monday that the settlement remained unpaid. The only fiscally responsible option was to pay the settlement, though I made it clear to the court that the money would be taken from the Department's operating budget as there were no surplus funds to pay it.

The Department does not pay any of its bills directly. All payments are made through the City of Boston. Department does not control or maintain employee pension contributions - these are deducted by the City of Boston in each employee's paycheck and that deduction is reflected on each employee's pay stub. As an employer, the Department also makes a contribution to the pension and it submits monthly requests to the City of Boston to make pension payments from its account. The settlement payment caused a substantial deficit in our budget for the remaining three months of fiscal year 2003. We were able to significantly reduce this deficit by saving $1 million dollars in overtime and streamlining management costs by an additional $700,000 by the end of FY03. Notwithstanding these savings, payments to a number

of vendors and the Department's contribution to the pension fund for the months of April, May and June of 2003 have been delayed.

Clearly, the remainder of this deficit could have been eliminated through layoffs. I chose not to do that. Instead, I sought and received a supplemental appropriation from the Legislature and have contracted with Immigration and Customs Enforcement for the rental of Building 8 as a means of generating revenue sufficient to alleviate our debt over time.

**Let me be clear: There are no retired members of this Department who have failed or will fail to receive their pension checks as a result of this delay. No current Department employee's pension is or ever was at risk. As the Retirement Board can confirm, <u>all</u> pension payments for FY04 (July through November) have been made. This is not, nor was it ever, an issue worthy of the amount of concern that was so recklessly raised.**

# MEMO

**TO:**       ALL DEPARTMENT EMPLOYEES

**FROM:**    SHERIFF ANDREA J. CABRAL

**DATE**     APRIL 28, 2004

---

Recently, a press release and companion memo disparaging this Sheriff and the Suffolk County Sheriff's Department was sent to the print media.  (See attached release and memo)  The release and memo contain demonstrably false information, characterized as fact. In the absence of media interest in its content, the memo was admittedly mailed to approximately "12,000 opinion makers and voters."

Regrettably, despite all of the good work and progress this Department has made in the last 16 months, this unprecedented and highly unacceptable conduct has cast this Department, once again, in a negative public light.  It requires clear correction. I will address each issue in turn.

## Dental and Vision Coverage

**The allegation that the Sheriff "[took] ...money set aside for employee dental and vision care and [used] the money to balance her budget" is false.**

In the course of their decision to de-certify from AFCSME, the JOEASC Association leadership was notified that their members could lose their dental and vision benefits coverage.  (See attached letter.)  Notwithstanding that risk, the leadership chose to move forward with de-certification and apparently made no provision for the possibility that members' benefits might be lost.  When that risk became a reality, JOEASC leadership prevailed upon this administration for help.

JOEASC members from have been repeatedly told that it is the Department's obligation to provide dental and vision benefits, even in the absence of a contract.  This is untrue.  The unique circumstances led to the loss of these benefits and the Department has made clear attempts to maintain the status quo and bargain the issue in good faith.

The MPE dental and vision benefits JOEASC members enjoyed as members of Local 1134, were provided through their affiliation with AFSCME.  JOEASC voluntarily severed that affiliation and, as a result, lost the benefits provided by the MPE plan.  The frequently cited case of *Commonwealth of Massachusetts, Secretary of Administration*

*and Finance v. Massachusetts Correction Officers Federated Union* provides no precedent for the proposition that the Department must find and provide a substitute plan in the absence of a contract.  (See attached.[1])

In that case, the Massachusetts Correction Officers Federated Union (MCOFU) filed a prohibited practice charge with the LRC alleging that the Commonwealth had discontinued required contributions to an independently administered health plan on behalf of statewide bargaining Unit 4.  Without notice to the Union and an opportunity to bargain to agreement or impasse, the Commonwealth had unilaterally stopped making payments to the Fund following MCOFU's decision to de-certify from AFSCME and represent its own members.

The Commonwealth's conduct in that case and the Department's current actions are clearly distinguishable.

First, the Department never unilaterally stopped making payments to any health plan.  JOEASC's removal from that plan was not something over which the Department had control.  Second, once removed, there was no plan for the Department to pay into.  In the cited case, MCOFU had successfully de-certified from AFSCME for the purpose of representing its own 3000 members in bargaining Unit 4 and there was an independently administered Health and Welfare Fund that the Commonwealth was contractually obligated to

Despite severe budgetary constraints and the Department's lack of contractual obligation to do anything more than provide an opportunity for JOEASC to bargain the issue of dental and vision coverage to agreement or impasse, I agreed to assume the cost of eligible members' benefits under COBRA.  Under COBRA, JOEASC members have continued to receive full medical, dental and vision coverage without incurring any costs for co-payments or premiums.  I agreed to this as a show of good faith, to avoid detrimental consequences to JOEASC members and because I was assured by JOEASC leadership that good faith negotiations on a contract would commence in a timely fashion.  I assumed those costs in April of 2003 and have continued paying them to the present day.  To date, this department has absorbed over $200,000 in COBRA payments on behalf of JOEASC's members.

If there are JOEASC members who currently do not have dental or vision benefits, it is because they do not meet the eligibility criteria for COBRA and not because the Department is denying them dental and vision coverage.

---

[1] It is important to note that this case is a Superior Court decision and, unlike a decision of the Appeals Court or the Supreme Judicial Court, carries no weight as legal precedent.

**Payments to the Retirement Board**

The allegations that "the Sheriff has broken [a] sacred trust by misusing the money appropriated for the pension fund to pay other bills" and that "over $2.1 million dollars [are] missing from the City of Boston Retirement Fund" are false.

When I paid the 5 million dollar settlement in the *Mack* case, an inherited problem, a budget deficit was created. At the time I authorized payment of the settlement, interest on the original $5 million dollars was accruing at 12% per month - $50,000 – and the court had ordered that contempt fines be assessed at $3,000 per day, increasing by $1,000 per day every Monday the settlement remained unpaid. Clearly, it would have been fiscally irresponsible to have initiated a protracted court battle to sort out the complex issues of civil liability between this Department, Suffolk County and the City of Boston. I took responsibility for the settlement and ordered it paid.

This administration has not mismanaged any part of the budget and has not enlarged our deficit in any way. In fact, we cut approximately $700,000 in wasteful spending and eliminated approximately $1 million dollars in overtime costs from our FY'03 budget and anticipate similar success in FY'04. Any increase in the deficit is attributable to significant increases for fixed costs, like utilities, food, medical care, etc., and the fact that the federal government has cut certain federal reimbursement programs for inmates and pre-trial detainees in half, causing a further budget loss approximately 2.5 million dollars.

The budget shortfall required some hard decisions to make it through the end of FY'03. I consciously chose not to institute a series of layoffs, which would have been the quickest way to eliminate the deficit. Instead payments to many of the Department's vendors and the Department's employer contribution to the Retirement Board for the months of April, May and June were delayed. This was done with the expectation that the delay would only be temporary and that revenue from Building 8 and/or a legislative supplemental appropriation would sufficiently accrue to make the payments.

As originally anticipated, sufficient revenue has been generated and this month, the Retirement Board received the delayed payments for April, May and June of FY'03.

As I stated in my earlier clarification on this issue, no employee pensions were compromised, nor was there ever any misuse of pension funds or any allegation of any wrongdoing by the Retirement Board.

Yesterday, the lawsuit filed by JOEASC against me, in my capacity as Suffolk County Sheriff was dismissed, with prejudice, because JOEASC had no legal standing to file suit it could not show that the association had suffered any injury as a result of my decision to delay the payments to the Retirement Board.

<u>Accrual of Leave and other Benefits for Employees in the Military</u>

**The allegation that the Department, through its Sheriff, has "dishonored agreements with veteran employees…[who] may have to go another year without having quality family time they all deserve based on the Sheriff's decision not to grant them vacation accruals…" is false.**

This Department has great respect for the men and women who serve in the military and cares deeply about the welfare of every employee here who serves their country in this way.   This Department and I, personally, take the unfounded allegations of unfairness toward these employees very seriously.  My father is an Army Veteran and my brother who has made his career in the military, is an active duty Master Sergeant in the Air Force who returned from Iraq last March.

First, I have never said, "It's not our fault you decided to join the military." Statements attributing this comment to me are a lie and it is equally unfair to attribute such words to this administration.  Further, public assertions of a denial of benefits are completely wrong and a simple reading of the relevant law makes this clear.  The proposed language of M.G.L. Chapter 137 **does not state** that "employees…continue to accrue sick, vacation and personal (time) while on leave." It states that "employees **shall not lose** any seniority…accrued vacation leave, sick leave, personal leave, compensation time or earned overtime…"  There is a fundamental difference between the loss of benefits already accrued through prior service and the continued accrual of benefits while on leave. The legislation refers to the former.

Moreover, the federal Uniformed Services Employment and Reemployment Rights Act (UNSERRA) **does not** entitle employees to accrue vacation during the period of their absence.  The relevant seniority rights described in section 4316 of the Act refer to vacation eligibility and not vacation accrual.  For example, if an employee, who is entitled to 4 weeks vacation after 4 years of service, served for one year in the military, upon return he or she would be treated as a 5 year employee.  If, pursuant to the employer's vacation policy, a 5 year employee is entitled to 5 weeks vacation, the employee would retain seniority and get those 5 weeks the next year.

In any case, the M.G.L. Chapter 137 of the Acts of 2003 currently applies only to state employees.  **The Act does not and will not apply to city and county employees – and this includes employees of this Department - until the legislation is approved by the County Commissioners**. As of yet, the County Commissioners have not approved the legislation.  Thus, most of the benefits outlined in the legislation are not yet legally protected by state law.

Notwithstanding that fact, and from the beginning of my administration, this Department has provided all the benefits in the legislation and more:

a.  Employees called into military service receive the difference between their military pay and their base pay at the Department. Since November 2002, I have paid over $500,000 in additional pay to the 20 Department employees who have been called into active duty. Specifically, from November 30, 2002 to December 12, 2003, without any obligation, this Department has paid $113,037.02 to the five employees who publicly claimed a denial of benefits;

b.  Employees do not lose any seniority, accrued vacation leave, sick leave, personal leave or compensation time. All accrued time they have when they leave for military service is waiting for them when they return;

c.  Beyond the accruals themselves, we credit their time away toward their in service years. They continue to receive step increases in salary and they are credited the time away toward vacation eligibility overall;

d.  This Department also makes no distinction between annual reserve duty and training versus active duty when it comes to these benefits and pays its employees the salary differential for training time; and

e.  Under federal law, employees on military leave also accrue vacation from the military that they are entitled to use upon their return from service and before they return to work. The military accords vacation in the following increments based upon the number of days in service.
    0-180 days - 2 weeks vacation
    180 – 360 days – 4 weeks vacation
    360 days or more – 6 weeks vacation
    The five employees who claimed denial of benefits were each given at least four (some as many as six) weeks vacation to spend with friends and family immediately upon their return to civilian life.

### Alleged Pay Raises

The allegation that the Sheriff "has handed out pay increases totaling in excess of "$450,000"... to "friends and colleagues" is false.

Upon becoming sheriff, one of the first budget decisions I made was to freeze management step increases, longevity payments and sick time buyback. Nearly sixteen months later, these freezes remain in place. I also eliminated many unnecessary management positions, consolidated others and hired people to fill management positions at lower salaries than their predecessors made. As a result, this Department

saved approximately $700,000 in FY'03 and continues to realize those savings in FY'04.

I have made a concerted effort to promote from within and employees who were promoted to positions of greater responsibility have received salary increases commensurate with those promotions. All other so-called "MM" employees have remained at their original salaries.

The so-called Rule 15F procedure required by the City of Boston does not constitute a pay raise and any attempt to describe it as such is a blatant mischaracterization of the Rule.

Simply put, regardless of the actual salary offered and agreed to by an "MM" employee, the City of Boston, for bookkeeping reasons, initially enters that employee onto the system at Step 1. At some later point, employees are coded in at their intended Step, which reflects the original salary at which the employee was hired. This has been the procedure for many years and the Department does not control it. Two important points should be understood:

1. The difference in initial salary listed in the payroll record – which reflects Step 1 - and the actual salary recorded later does not constitute a pay increase; and

2. This process was fully explained to the relevant parties (who were encouraged to seek accurate information directly from the City of Boston) well before allegations of "pay boosts to friends and supporters" were made.

Finally, the names of 37 employees, presumably those whose alleged pay increases constitute the "over $450,000," were listed in a unsigned companion memo distributed at the House of Correction approximately two weeks ago. It is disgraceful that these employees, some of whom belong to other unions within the Department were mentioned by name and salary. Further, of the 37, 2 employees are listed twice, at least three have not worked here for more than a year and 21 were unknown to me before I came to the Department. One in particular, Debbie Driscoll, is doing the work of two prior managers at half their combined salaries.

### Payment of Water Bill

**The allegation that the Sheriff's Department is facing a water shutoff because it "owe[s] the City $22,000 in overdue water bills" is false and misleading.**

Well before this allegation was publicly made, the Boston Herald, which had originally printed a factually inaccurate story about the issue, had already issued a retraction. First, the bill was for Building 8, not the Jail or the House of

Correction. To the extent that any Department facility was ever in danger of a water shut-off, it was only in Building 8. While the total bill was $22,000, it included $7,000 in penalties, all of which were waived upon the Department's explanation of the cause for the delay. The Department was not completely responsible for the original $15,000 bill. Two of the contractors associated with the construction of Building 8 were responsible for $8,000 of that amount. In any event, the Department's portion of the bill was paid before the Herald story ran and before the false allegation was made.

This was a minor administrative issue that had no relevance to the daily work of JOEASC's membership and no employee was adversely affected. The failure to include accurate information regarding the details of the situation falsely left the impression that a Department-wide water shutoff was imminent.

1

1  UNITED STATES DISTRICT COURT

2  DISTRICT OF MASSACHUSETTS

3

4  Volume: II

5  **************************************
   DAVID BERGERON, ET AL,              :

6                    Plaintiffs,       :
   vs                                  :

7  ANDREA CABRAL,                      :
                    Defendant.         :

8  **************************************

9        **DEPOSITION OF JOHN BARNES**, a witness

10  called on behalf of the Defendant, taken

11  pursuant to the applicable provisions of the

12  Massachusetts Rules of Civil Procedure, before

13  William M. Jackson, Professional Court Reporter

14  and Notary Public in and for the Commonwealth

15  of Massachusetts, at the Nashua Street Jail,

16  200 Nashua Street, Boston, Massachusetts

17  02114, on December 7, 2006, commencing at 2:00

18  p.m.

19

20

21       COPLEY COURT REPORTING, INC.
              101 TREMONT STREET

22      BOSTON, MASSACHUSETTS  02108
              (617) 423-5841

23          www.copleycourt.com

24

**ORIGINAL**

*DISK ENCLOSED*

16

```
 1            elected --
 2    Q.    Was there --
 3    A.    There was an interim period.
 4                MR. PFAFF:  Off the record.
 5                (Discussion off the record)
 6    Q.    Back on the record.
 7                I am speaking about the period in
 8          time after which JOEASC was formed and there
 9          were in fact elections for the officials of the
10          union.
11    A.    As I testified before, the president was
12          myself, John Barnes.  The vice president was
13          John Grennon.  The treasurer was Mark Turley.
14          The secretary was John Ellis.  The executive
15          board was Mike Sinelli, Robert Tulo, Michael
16          Walsh.  Those would be your board of directors.
17    Q.    How long did those individuals that you have
18          just identified continue to serve in that
19          capacity, from 2003 until when?
20    A.    October of 2004, I believe.
21    Q.    Prior to JOEASC, the bargaining unit was what?
22    A.    ASCME, Local 1130 for Council 93.
23    Q.    If you could, please, describe what the
24          relationship was between Local 1134 and ASCME?
```

80

```
1    A.   There was a recent examination for lieutenant,

2         that's correct.

3    Q.   Did you take that?

4    A.   Not for the lieutenant.

5    Q.   Has there been any other examination offered?

6    A.   No, there has not recently.

7    Q.   Is there an examination upcoming for any other

8         positions?

9    A.   There is nothing posted as of yet.

10   Q.   What is your understanding of whether or not

11        there is going to be another promotional

12        examination opportunity offered to individuals

13        here at the jail?

14             MR. PFAFF:  Objection.

15   A.   I am speculating on this, too.  I believe that

16        there is going to be an examination for a

17        corporal and sergeants.

18   Q.   Are you going to take that examination?

19   A.   I plan on it, yes.

20   Q.   You did not take the lieutenant's examination?

21   A.   Correct.  The reason why, I do not believe that

22        an officer, as JO1, should be promoted from a

23        JO1 to a lieutenant.  My personal opinion is,

24        maybe one, two ranks at the most, but I think,
```

83

| | | |
|---|---|---|
| 1 | Q. | Have you been denied the opportunity to do any |
| 2 | | overtime shifts between 2003 and 2006? |
| 3 | A. | No, I have not. |
| 4 | Q. | Sheriff Cabral or anybody in her administration |
| 5 | | has never denied you the opportunity to do any |
| 6 | | overtime? |
| 7 | A. | No. |
| 8 | Q. | What's the seven to one ratio? |
| 9 | A. | When seven blue shirts, JOEASC members would be |
| 10 | | hired, after seven, JOEASC members would hire |
| 11 | | one shirt local.  I don't know the local number |
| 12 | | would be hired as the eighth overtime. |
| 13 | Q. | Has that been repealed by the department? |
| 14 | A. | I want to say that was removed. |
| 15 | Q. | Is it fair to say that JOEASC members would |
| 16 | | benefit from the removal of the seven to one |
| 17 | | ratio? |
| 18 | A. | It would take away that one opportunity every |
| 19 | | eighth overtime for an additional JOEASC Number |
| 20 | | 3.  Instead of it stopping at seven, and hiring |
| 21 | | one white shirt, it would increase the |
| 22 | | opportunities by one, for the eighth overtime. |
| 23 | Q. | So removal of the seven to one ratio would in |
| 24 | | fact benefit members of JOEASC? |

84

| | | |
|---|---|---|
| 1 | A. | Yes, it would. |
| 2 | Q. | It would increase number of overtime |
| 3 | | opportunities for JOEASC members? |
| 4 | A. | Yes, it would. |
| 5 | Q. | To your knowledge, was the JOEASC union the |
| 6 | | only union that voted to endorse Steve Murphy |
| 7 | | in the Suffolk County Sheriff's Department? |
| 8 | A. | Yes. |
| 9 | Q. | Officer Barnes, have you suffered any loss of |
| 10 | | income since you were decommissioned in April |
| 11 | | of 2005? |
| 12 | A. | Opportunity, yes.  Loss, no. |
| 13 | Q. | So no loss of actual income? |
| 14 | A. | No. |
| 15 | Q. | As we discussed last week, you did not |
| 16 | | volunteer for any overtime details prior to |
| 17 | | your decommissioning in April of '05; is that |
| 18 | | correct? |
| 19 | A. | That's correct. |
| 20 | Q. | What emotional distress have you suffered as |
| 21 | | alleged in Paragraph 64 of your complaint as a |
| 22 | | result of your decommissioning? |
| 23 | A. | Just a fear that you are going to be |
| 24 | | terminated, worrying about how you are going to |

93

```
 1              anywhere from 260 to three hundred.
 2       Q.    It is fair to say that the majority of the
 3              officers employed as blue shirts, officers at
 4              the jail are not assigned to support services
 5              positions; is that correct?
 6       A.    That's correct.  You have a certain amount of
 7              sergeants that based upon their rank, there is
 8              a few in support services, but most of them are
 9              in supervisory roles upstairs with line
10              officers.
11       Q.    Most of the officers are line officers; is that
12              correct?
13       A.    That's correct.
14       Q.    So are you suggesting that a line officer
15              position is a punitive assignment?
16       A.    No.
17                   MR. PFAFF:  Objection.
18       A.    I would not say it is punitive.  I would say
19              support services position is more desirable.
20       Q.    To you?
21       A.    To me based on my preference, yes.
22       Q.    That may not be the case for other officers who
23              work here at the department; is that correct?
24                   MR. PFAFF:  Objection.
```

96

```
 1              MR. PFAFF:  Objection.
 2     A.   It would be fair for anyone.  Yes.
 3     Q.   So the property officer position was not John
 4          Barnes' position; is that right?
 5     A.   There is no position in the buildings that is
 6          delegated specifically to one person.
 7          Absolutely not.
 8     Q.   Do you have weekends off currently?
 9     A.   Based on seniority, I have every other week.
10     Q.   As part of the collective bargaining agreement,
11          given your seniority, you are able to pick your
12          days off?
13     A.   Yes.
14     Q.   You have availed yourself of this.  So instead
15          of having every weekend off, you have every
16          other weekend off?
17     A.   Yes.
18     Q.   Can you pick your shift as part of the
19          Collective Bargaining Agreement?
20     A.   Yes.
21     Q.   You have maintained the day shift that you had
22          previously when you were on property?
23     A.   Yes, I did.
24     Q.   Can you also pick your vacation?
```

97

```
 1      A.   Yes.

 2      Q.   Is that done by seniority?

 3      A.   Collective bargaining, based on seniority.

 4      Q.   So your removal from property has not had any

 5           impact on your ability to pick your vacation?

 6      A.   No, it did not.

 7      Q.   When you were hired as a jail officer, what was

 8           your understanding as to what your assignment

 9           would be way back thirteen-years ago when you

10           were hired?

11      A.   Needs of the facility, needs of the department.

12      Q.   What was your understanding about what shift

13           you were going to work?

14      A.   Initially, you were at the discretion of the

15           department.  Whatever shift they wanted to put

16           you on based on staffing levels, they could

17           assign you.  Through collective bargaining, we

18           were able to obtain additional benefits for our

19           members that allowed you to pick your shift by

20           seniority based on availability of slots.

21      Q.   So your transfer out of property has resulted

22           in your being assigned to a unit, and now

23           instead of having every weekend off, you only

24           have every other weekend off?
```

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


Volume: II

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DAVID BERGERON, ET AL,                    :
                    Plaintiffs,           :
vs                                        :
ANDREA CABRAL,                            :
                    Defendant.            :
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


            CONTINUED DEPOSITION OF LORNE LYNCH,

a witness called on behalf of the Defendant,

taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure,

before William M. Jackson, Professional Court

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Suffolk

County House of Correction, 20 Bradston Street,

Boston, Massachusetts  02118, on November 2,

2006, commencing at 2:00 p.m.


        COPLEY COURT REPORTING, INC.
      58 BATTERYMARCH STREET - SUITE 317
        BOSTON, MASSACHUSETTS  02108
              (617) 423-5841
            www.copleycourt.com

ORIGINAL

DISK
ENCLOSED

32

```
1          blue shirt, then it would go to a blue shirt
2          instead of a white shirt?
3     A.   I disagree that work would be appropriate for a
4          blue shirt.  There could be positions that the
5          white shirt could be placed in to cover that
6          area.
7     Q.   Well, I will ask the question again.  If the
8          practice is repealed, Lieutenant Lynch, does it
9          not require the department to hire a white
10         shirt at a higher rate of compensation for work
11         that could be performed by a blue shirt at a
12         lower rate of compensation, it would result
13         inevitably in more overtime opportunities for
14         blue shirts, right?
15              MR. CONDON:  Objection.  You may
16         answer.
17    A.   It would open up more overtime for the blue
18         shirts, yes.
19    Q.   And the blue shirts belong to JOEASC?
20    A.   Yes.
21    Q.   So the repeal of that practice arguably would
22         benefit members of JOEASC, right?
23    A.   Repeat the question.
24    Q.   The repeal of the seven-to-one ratio, as you
```

36

```
1              and we rotate that list as to whatever is
2              available.  It is very difficult to say when we
3              would be hired and not hired.  It is spur of
4              the moment.  It is when they can't get anyone
5              else on a Sunday afternoon or a Saturday
6              morning, on a Friday night, on Christmas, on
7              Thanksgiving.  Those are the times, generally,
8              where we would get called when they could not
9              fill the position.
10    Q.    Do you refuse those positions?
11    A.    I refuse nothing.
12    Q.    I am trying to understand it.  Are you
13            objecting to the fact that you get called on a
14            Saturday or Sunday to do an overtime shift or
15            -- I don't understand your testimony.
16    A.    My testimony is, when they call me, I work.
17    Q.    Has that been your practice throughout your
18            career at the department or is that something
19            relatively new?
20    A.    I have always worked.
21    Q.    Overtime?
22    A.    Yes.
23    Q.    Have you done more or less overtime shifts
24            since you were decommissioned in April of 2005?
```

37

```
 1      A.   I have done more overtime.

 2      Q.   I believe that you testified to this earlier.

 3           I want to make sure that the record is clear.

 4           Who controls the overtime process?

 5      A.   I don't understand your question.  "The

 6           process."

 7      Q.   What is the process for being called for

 8           overtime, who calls you, does the

 9           superintendent call, does the deputy

10           superintendent call you?  The union you said

11           controls you?

12      A.   Controls the list.  You are asking two

13           different questions here.  The list, we control

14           the list.  The administration would make a

15           decision on whether they need someone if they

16           do not have enough help.  That would go through

17           by way of a shift commander.

18      Q.   If the shift commander makes the recommendation

19           that a particular shift is short bodies, what

20           happens from that point forward?

21      A.   They would grab an individual from JOEASC and

22           that individual would begin to call officers by

23           way of a list, depending on how many that they

24           needed that day.  Sometimes they need four,
```

53

```
 1          year.
 2     Q.   When were you elected?  Let's do it that way.
 3     A.   So many things have happened, Counselor, in
 4          regards to the temporary positions.  We had an
 5          individual working that was a vice president by
 6          the name of Eric Deleibro that is also a
 7          codefendant in this case.  He was reduced to
 8          the rank of sergeant.  So he was no longer in
 9          that position.  We had no elections, but we
10          more or less filled in for whatever he may have
11          done, individuals would step up and do whatever
12          his duties were until the last election.
13          Individuals from within the union would cover
14          them.
15     Q.   To be clear, Eric Deleibro was a temporary
16          lieutenant, his permanent rank was sergeant?
17     A.   Yes.
18     Q.   You are currently the vice president?
19     A.   Yes.
20     Q.   Do you recall at what point in time you became
21          vice president of 3643?
22     A.   The last election.
23     Q.   2006, 2005?
24     A.   I believe it was approximately about a year
```

54

```
 1            ago.  Eight months to a year ago.
 2     Q.     It was after this lawsuit was filed?
 3     A.     That I became vice president?
 4     Q.     Yes.
 5     A.     Yes.
 6     Q.     Prior to that, did you hold any elected
 7            position?
 8     A.     Yes.
 9     Q.     What was that?
10     A.     Grievance officer and on the executive board.
11     Q.     What are the duties and responsibilities of a
12            grievance officer or coordinator?
13     A.     If a member approaches you with an issue, could
14            pertain to anything from a pay discrepancy to
15            termination, I would file the proper paperwork
16            to begin the grievance procedure.
17                   MR. CONDON:  If I could interrupt.  I
18            want to clarify that the witness referred to
19            Eric Deleibro as co-defendant.  He is a
20            co-plaintiff.
21                   THE WITNESS:  I'm sorry.
22     Q.     So those are the duties and responsibilities of
23            a grievance coordinator?
24     A.     Yes.
```

61

```
 1      A.   Captain Moscone.

 2      Q.   Captain Moscone filed this grievance in 2003

 3           and it refers to Captain Breslin?

 4      A.   (Witness peruses document).  I believe this is

 5           what I was referring to when I said Lieutenant

 6           Bracken.

 7      Q.   And Captain Moscone filed that one?

 8      A.   Yes.

 9      Q.   Here is another grievance dated September 19,

10           2003.  Who filed that one?

11      A.   That would have been Al Moscone.

12      Q.   So you did not file this one either?

13      A.   I did not file it, no.

14      Q.   Hear is a grievance dated September 15, 2004.

15           Who filed that one?

16      A.   I did.

17      Q.   Does that refresh your recollection at all,

18           Lieutenant Lynch, as to any grievance that you

19           yourself filed on behalf of any union officials

20           between 2003 and 2005?

21      A.   Yes.

22      Q.   Do you recall filing any grievance other than

23           the one on behalf of Captain Moscone that was

24           filed in December of 2004?
```

62

1    A.    No.

2    Q.    You indicated that you attended two to three

3          bargaining sessions as part of the negotiating

4          team in the summer of 2003; is that correct?

5    A.    Yes.

6    Q.    Do you recall besides yourself who else

7          represented the union, who else was there?

8    A.    Captain Moscone, and Billy Noonan, and members

9          of the South Bay local.

10   Q.    Do you recall who they would have been?

11   A.    Each session is different.  People cannot show

12         up to some of them.  It varied.  Once again, I

13         would have to say it was Captain Brown, John

14         Scatuto.  I am not sure if he was gone then,

15         but Gary Boles maybe.

16   Q.    So your memory is that from 3643, just the two

17         to three sessions that you recall attending in

18         the summer of 2003, were just you and Bill

19         Noonan from 3643?

20   A.    And Captain Moscone.

21   Q.    And anybody else?

22   A.    I don't recall.

23   Q.    And Captain Brown, John Scatuto and Gary Boles,

24         perhaps, from the house of correction?



| Chapter I | Policy #: | References: | |
|---|---|---|---|
| **Institutional Operations** | S201 | MGL<br>103 CMR 914.03; 926.02<br>ACI: 3-4247<br>ALDF-3D-10 | Page 1 of 1 |
| *Special Management Housing*<br>**Assignments & Transfers** | *Date of Issue:*<br><br>January 1, 2000<br>*Date:*<br><br>September 25, 2004 | *Approved:*<br><br><br>Andrea J. Cabral, Sheriff | |

**EXHIBIT**
17
11-2-06

## Purpose

To maintain a balanced staffing pattern through the periodic review of shift and days-off assignments, staffing allocations and post assignments.

## Policy Statements

I.   Staffing assignments and transfers shall be predicated on the security needs of the facility.
II.  An annual assessment of staffing requirements shall be conducted at each facility.
III. The Superintendent shall direct the redeployment of staff when the staffing assessment demonstrates that the operational security needs of the facility would thereby be best served.
IV.  Whenever possible, officers assigned to special management housing units shall have completed their probationary periods.

## Procedures

I.   **Quarterly Rotation of Staff**
  A. *General Population and Non-Custody Post Assignments*
     1. Each quarter, the Deputy Superintendent of Operations is to prepare a staffing roster that endeavors to rotate the assignment of staff between posts.
     2. The proposed staffing roster is submitted to the Superintendent for approval.
     3. Upon approval, the staffing roster is communicated to the Shift Commanders, who in turn communicate the changes to the affected officers.

  B. *Special Management Housing*
     1. In making the determination as to how best to deploy security personnel, the Deputy Superintendent of Operations will consider such factors as experience, training, job performance and skill.
     2. Due to the intense nature of the population, officers assigned to special management housing posts may be rotated between assignments more frequently than officers assigned to posts in the general population.
     3. Requests for re-assignment from a special management housing unit can be made by an officer on his/her own behalf or by a ranking officer.
     4. Requests are to be submitted to the Deputy Superintendent of Operations with the reasons supporting the transfer clearly stated.

POSITION DESCRIPTION

POSITION TITLE: Jail Officer (JO-1)

GENERAL STATEMENT OF DUTIES AND RESPONSIBILITIES

As public servants, Jail Officers employed by Suffolk County must conduct themselves in an exemplary manner both on and off duty. They must know and scrupulously observe the Suffolk County Sheriff's Department's standards of employee conduct.

Jail Officers maintain care, custody and control of inmates in accordance with departmental policies and procedures. To provide such care, custody and control, Jail Officers must tour assigned areas (which requires them to climb approximately fifteen stairs); observe inmate activity in person and on closed circuit monitors; identify inmates who have behavioral, medical or other problems so that appropriate safety and security measures may be taken; and perform general security duties to prevent escape, disorder, rule infractions and harm to inmates, visors and staff. The general security duties performed by Jail Officers require them to search inmates, visitors, cells and other areas for weapons and contraband; monitor and regulate inmate and staff movement; maintain and record inmate counts, cell assignments and other pertinent information; escort inmates within and outside the institution; use and maintain keys and other equipment; and supervise inmate work details.

Jail Officers are supervised and directed by superior officers and must be able to understand and carry out moderately complex oral and written instructions. They are required to prepare accurate written reports and communicate orally and in writing with their superior officers, inmates and staff. Jail Officers must respond to emergency situations, including incidents involving inmate violence. To respond to such situations, they must be able to employ emergency equipment, restraints, weapons (including firearms) and force when necessary. They must also lift equipment, perform assisted lifting of inmates, exercise sound judgment and work under pressure in stressful situations.

All Jail Officers must participate in training and be available to assume special, temporary, and/or provisional assignments and duties. Such assignments and duties include without limitation: transportation; maintenance; front entrance; public affairs; communications; storeroom-canteen; and infirmary.

Jail Officer (JO-1)
Position Description
Page 2

SUPERVISION RECEIVED

Jail Officers work under the general supervision of a lieutenant or sergeant who reviews work for compliance with regulations.

SUPERVISION EXERCISED

N/A

ESSENTIAL FUNCTIONS OF POSITION

1. Regular, punctual and predictable attendance at assigned workplace and post;

2. Knowing, complying with and enforcing departmental policies and security procedures;

3. Patrolling assigned areas (including two tiered areas with approximately fifteen stairs) for extended time periods performing general security duties;

4. Obeying moderately complex oral and written orders;

5. Observing inmate and staff activity in person and on closed circuit monitors;

6. Searching cells, footlockers and other areas;

7. Frisking inmates and performing strip searches;

8. Listening for possible disturbances;

9. Maintaining inmate counts, making accurate written entries in log books and preparing accurate written reports;

10. Opening and closing doors and gates manually and electronically;

11. Communicating orally;

12. Using communication, emergency and other equipment;

13. Applying handcuffs, other restraints and safety devices;

JJail Officer – JO-1
Position Description
Page 3

14. Performing restraining and self-defense techniques;

15. Lifting emergency equipment (e.g. fore extinguisher) and performing assisted lifting of inmates;

16. Participate in training;

17. Dealing effectively with inmates one-on-one and in large groups;

18. Dealing calmly and effectively with stressful situations, including emergencies;

19. Exercising good judgment.

ADDITIONAL FUNCTIONS OF POSITION

1. Carrying and discharging a firearm;

2. Carrying and defensive use of baton;

3. Operating a motor vehicle;

4. Performing computer assisted work;

5. Lifting more than 50 pounds;

6. Performing routine maintenance work;

7. Working outdoors in all types of weather.

1

Volume I
Pages 1 to 120
Exhibits 1 to 6

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
                           :
MARTIN K. MICHELMAN,        :
       Plaintiff,      :
                           :
      vs.              :  Civil Action
                           :  No. 05-CV-11577
SUFFOLK COUNTY, SUFFOLK  :
COUNTY SHERIFF'S DEPARTMENT,  :
and ANDREA J. CABRAL, IN HER  :
OFFICIAL AND INDIVIDUAL    :
CAPACITIES,               :
          Defendants.    :
                           :
- - - - - - - - - - - - - - - - -x

      DEPOSITION OF VIKTOR THEISS, a witness
called on behalf of the Plaintiff, taken pursuant to
the Federal Rules of Civil Procedure, before Ken A.
DiFraia, Registered Professional Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Rodgers, Powers & Schwartz LLP,
18 Tremont Street, Boston, Massachusetts, on
Wednesday, April 19, 2006, commencing at 10:56 a.m.

PRESENT:

    Rodgers, Powers & Schwartz LLP
        (by Robert S. Mantell, Esq.)
        18 Tremont Street, Suite 500,
        Boston, MA 02108, for the Plaintiff.

    Suffolk County Sheriff's Department
        (by Kathleen M. Cawley, Esq.)
        200 Nashua Street, Boston, MA 02114,
        for the Defendants.

ALSO PRESENT:  Martin K. Michelman

        * * * * *

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

Martin K. Michelman   v.
Suffolk County, et al.

Viktor Theiss
Vol. 1, April 19, 2006

**Page 105**

[1] A: I don't remember, late 2003.
[2] Q: At the hearing, what were you asked?
[3] A: I don't remember.
[4] MS. CAWLEY: Can we take five minutes.
[5] (Recess at 2:00 p.m.)
[6] BY MR. MANTELL: (2:07 p.m.)
[7] Q: I want to ask you to look at Keeley Exhibit
[8] No. 8.
[9] A: (Examines document) Okay.
[10] Q: My first question is going to be, in
[11] general, do you recognize this document?
[12] A: No.
[13] Q: Did you ever indicate to Mr. Michelman that
[14] Sheriff Cabral wanted Mr. Grennon terminated?
[15] A: Terminated?
[16] Q: Terminated.
[17] A: No.
[18] Q: Or transferred?
[19] A: Out of training, yes.
[20] Q: Why did the Sheriff want Mr. Grennon
[21] transferred out of training?
[22] A: She felt he did not adequately represent
[23] her best interests.
[24] Q: Why is that?

**Page 106**

[1] MS. CAWLEY: Objection.
[2] Q: You can answer.
[3] A: Based on her interactions with him, she
[4] felt that he was not accurate in his dealings with
[5] her, that he would say one thing, do anything thing.
[6] And there was an instance involving a
[7] lawsuit about pensions where he had stated that he
[8] was satisfied and that there was not going to be an
[9] issue, and then shortly thereafter, he was the lead
[10] plaintiff in the suit.
[11] His dealings caused her to believe he was
[12] not supportive of her agenda and mission and he
[13] shouldn't represent her.
[14] Q: What was the issue involving pensions?
[15] A: I don't know the exact details. I was not
[16] part of that.
[17] Q: Was that a union related issue?
[18] A: It had something to do with — I couldn't
[19] tell you. I just know the vagaries.
[20] Q: So she was angry that he was a plaintiff in
[21] this suit involving pensions?
[22] MS. CAWLEY: Objection.
[23] A: You would have to ask her how she felt.
[24] Q: I'm asking you about your communications

**Page 107**

[1] with her.
[2] A: She never indicated anger to me.
[3] Q: Why did she feel that his participation in
[4] the lawsuit created a problem?
[5] MS. CAWLEY: Objection.
[6] A: She felt that his previous statement that
[7] the matter had been resolved based upon meetings
[8] that she had with him and then the fact that
[9] subsequently obviously the suit is filed, which
[10] meant it was not resolved, that that was indicative
[11] he was not being honest about his interactions with
[12] her about her.
[13] Q: Did Sheriff Cabral ever indicate to you
[14] that she felt Mr. Grennon's union activity was
[15] detrimental to the Sheriff's Department?
[16] A: Again, in dealing with him, her interaction
[17] with him caused her to believe that he was not
[18] trustworthy, et cetera. She didn't express it in
[19] terms of his union activities.
[20] The only issue about union activities came
[21] up where at one point it was reported to me by Marty
[22] that John was engaged in union activity during the
[23] day, something apparently that is prohibited.
[24] Q: Did you ever indicate to Mr. Michelman that

**Page 108**

[1] you wanted Mr. Grennon fired?
[2] A: I don't remember using the term "fired."
[3] Q: Did you ever indicate to Mr. Michelman that
[4] you wanted Mr. Grennon transferred?
[5] A: That I particularly did?
[6] Q: Yes.
[7] A: Or that I was acting on someone's behalf?
[8] Q: Either one.
[9] A: I don't recall saying I wanted him
[10] transferred.
[11] Q: How about acting on someone's behalf?
[12] A: I don't recall exactly, but I could have.
[13] Q: It's your recollection that the Sheriff
[14] wanted Mr. Grennon transferred; is that correct?
[15] A: Yes.
[16] Q: Where did she want him transferred to?
[17] A: Just back out of the training. Training is
[18] a select spot. You are picked to be in training.
[19] You just go back to being an officer.
[20] Q: Was there any discussion regarding
[21] termination of Grennon with you?
[22] A: No, not that I recall.
[23] Q: Did you terminate Mr. Grennon?
[24] A: No.

## In The Matter Of:

*Martin K. Michelman   v.*
*Suffolk County, et al.*

---

*Andrea J. Cabral*
*Vol. 1, March 2, 2006*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File CABRAL.V1, 104 Pages*
*Min-U-Script® File ID: 2928375046*

## Word Index included with this Min-U-Script®

Martin K. Michelman  v.
Suffolk County, et al.

Andrea J. Cabral
Vol. 1, March 2, 2006

---

Page 57

[1] training Department. I don't recall having those
[2] discussions with him, though, after Mr. Theiss was
[3] put in place, but I believe I may have had a couple
[4] of conversations with him before then.
[5]     Q: Is it fair to say that after Mr. Theiss was
[6] placed above Mr. Michelman you trusted Mr. Michelman
[7] less?
[8]     A: It's fair to say that after Mr. Michelman
[9] sent the e-mail and I had the conversation with him
[10] about the e-mail, I had concerns about his judgment
[11] and was unsure of its consistency and strength.
[12]     Q: At some point did you make the decision
[13] that Mr. Michelman should be let go?
[14]     A: Yes, following his hearing.
[15]     Q: Okay. Well, before his hearing did you
[16] come to any conclusions whether he should be let go
[17] or not?
[18]     A: I hadn't concluded that he should be let
[19] go. There had been some additional things that had
[20] occurred that caused me some additional concern
[21] around his — there were more — they were the same
[22] things, the judgment things.
[23]     Q: Okay. Well, what happened in that
[24] intervening time?

Page 58

[1]     A: I recall having — checking in with
[2] Elizabeth and or Victor from time to time around how
[3] things were going with sort of supporting Marty and
[4] bringing him along. And I don't specifically recall
[5] what was said, but I — my memory is that their
[6] efforts weren't meeting with the amount of success
[7] we were hoping for.
[8]     Q: Okay. Go ahead. I don't want to interrupt
[9] you.
[10]     A: Some of it was around when there are issues
[11] and problems within a division a manager needs to
[12] have the ability to bring people into his office,
[13] discuss with them what the problems are, and sort of
[14] have a remedial plan; either it's something that is
[15] going to warrant discipline or it is a failing or a
[16] shortcoming that, with appropriate support, can be
[17] ameliorated.
[18]     And my recollection is that Marty didn't
[19] really have an ability to do that, and that he was
[20] not good at documenting — he would have numbers of
[21] complaints about a variety of different people and
[22] what they were doing wrong, but he wouldn't properly
[23] document what was going wrong and then follow up on
[24] that documentation by, you know, dealing with the

Page 59

[1] problem or problems the employee was showing.
[2]     Q: Is that something you were experiencing or
[3] were you told?
[4]     A: That's something I was told.
[5]     Q: Do you know who told you he was not good at
[6] documenting?
[7]     A: My recollection is Elizabeth and or Victor
[8] Theiss.
[9]     Q: Can you recall any incident, with
[10] specificity, concerning Mr. Michelman's continued
[11] problems after the reassignment?
[12]     A: I actually recall a conversation myself
[13] with Mr. Michelman in my office, and I don't
[14] remember when it took place. I actually don't
[15] recall whether it was before or after Victor Theiss
[16] was supervising him. But he was — he had some
[17] issues in particular with John Grennon and John
[18] Grennon's behavior in the training Department.
[19]     And I understood what he was talking about.
[20] I understood that it was a problem, and I discussed
[21] it with him, but I also said to him, "I put you in
[22] place. You're the training director. You have to
[23] document the issues. When they come up, you have to
[24] document it right then, and you have to deal with it

Page 60

[1] right then and then you have to let us know
[2] basically what the result of your dealing with it
[3] is."
[4]     So I remember having that conversation with
[5] him, and we were probably discussing other things
[6] around the training division as well. But I
[7] specifically remember my saying to him, "You have to
[8] make a record of this. If this is somebody that's a
[9] problem in the training division, and you don't
[10] think he's appropriate to be a trainer, you can't
[11] just say to it to me. You have to say it in writing
[12] and to them. And then we have to deal with the
[13] disciplinary action."
[14]     Q: Was it your understanding that Mr.
[15] Michelman let an inappropriately long period of time
[16] pass without documenting the problem?
[17]     A: My memory is that he was telling me about a
[18] series of issues with this particular person and
[19] they were not — to my recollection — were not
[20] documented anywhere. So I don't have any
[21] recollection of over how long a period of time they
[22] had existed. But I know that I think he knew Mr.
[23] Grennon from before he was made training director as
[24] well. I think Mr. Grennon was in training. But to

---

61

1    the extent that they occurred in his capacity as

2    training director, he was obligated as a manager to

3    do that.  So there just didn't seem to be the will

4    to sort of take that extra step and sort of do

5    something about it.

6        Q.   Okay.  Again, during the period from the

7    reassignment to the termination, are you aware of

8    any other incident which you felt Mr. Michelman

9    performed inappropriately?

10       A.   There was an incident around the training

11   of the -- the scheduling of the training and the

12   training of certain SERT officers.  And what I

13   recall is someone -- and I don't recall who it

14   was -- who showed me a list that Mr. Michelman put

15   out of who was going to be trained among SERT

16   officers, and that it created problems in that there

17   was first an issue about a particular shift

18   commander getting their SERT officers in before

19   other SERT officers, and there was also the fact

20   that the superintendent had not been consulted --

21   and I think this happened after Victor Theiss was in

22   place.  And I don't believe he was told or consulted

23   that this was going to happen, and it was sort of

24   another unilateral decision by Mr. Michelman that



Volume: I
Pages: 1-114

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE |
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY |
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC |
DILIBERO and PAUL GIGLIO, |
|
       Plaintiffs |
|
vs. |
|
ANDREA CABRAL, Individually and as |
Sheriff of Suffolk County, |
|
       Defendant |

DEPOSITION OF:  CLIFF CARNEY

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 4, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

1   sheriff.

2   Q.    2003?  Yes?

3   A.    Yes.

4   Q.    Do you know how long prior to you going into that

5   position that that situation existed?

6   A.    No.

7   Q.    Whose decision was it to transfer Lynch?

8   A.    The final decision was from Superintendent Sumpter.

9   Q.    And Lynch went from what position?

10  A.    Floor supervisor on 3-to-11, or actually --

11  Q.    With weekends off?

12  A.    No.

13  Q.    Floor supervisor on 3-to-11 with what days off?

14  A.    At that time, out Friday, Saturday, Sunday, Monday.

15  Q.    Every other?

16  A.    Mm-hmm.

17  Q.    Yes?

18  A.    Yes.

19  Q.    And he went from that position to what?

20  A.    Thursday, Tuesday, Saturday, Sunday.

21  Q.    And is Lynch still in that position now?

22  A.    No.

23  Q.    What position is he in now?

24  A.    He's on the back gate.

DUNN & GOUDREAU

78

```
 1   Q.    Sorry?

 2   A.    He's on the back gate control.

 3   Q.    How long has he been on the back gate control?

 4   A.    Since January, I believe.

 5   Q.    Of this year?

 6   A.    Yes.

 7   Q.    And why was he transferred to that position?

 8   A.    Yearly review, staffing levels.  We wanted to staff

 9   a different area.

10   Q.    So you did a yearly review?

11   A.    A yearly review of our needs to run the facility.

12   Not the officers.

13   Q.    I see.  So the yearly review you're talking about is

14   the -- scheduling or staffing review?

15   A.    Yes.

16   Q.    And why did you feel a need to transfer Lynch in

17   January of 2006?

18   A.    We wanted coverage on the gate control with a white

19   shirt.

20   Q.    I'm sorry.  I didn't hear you on that.  You wanted

21   what?

22   A.    We wanted coverage on the back gate with a white

23   shirt.

24   Q.    Had you ever had coverage on the back gate?
```

DUNN & GOUDREAU

**Suffolk County Jail**

# Memo

E X L

| | |
|---|---|
| **To:** | Superintendent Eugene Sumpter |
| **From:** | Deputy Superintendent Gerry Walsh |
| | Deputy Superintendent Cliff Carney |
| | Captain Albert Moscone |
| **Date:** | 4/16/2004 |
| **Re:** | Transportation |

Over the last few months Deputy Carney, Captain Moscone and I have audited the Transportation process at the Jail. For the review, we looked at the daily routes, interviewed staff, observed the practices, and considered departmental history and culture. There are some issues that need to be addressed. We feel that with some changes, improvements to the Transportation process can be attained.

## Goal

To make the Transportation process more efficient and cost effective.

## Situation

Due to staffing constraints, the Jail was forced to collapse posts and reassign officers to other positions. The Transportation Department staffing level was not affected by the redeployment. Currently, there are 27 officers assigned to Transportation every day. The break down is has follows; 19 officers assigned from the Jail and 8 assigned from the HOC. Included among the 19, are a Captain and a Lieutenant. On occasion, the Transportation Department will request additional officers to cover hospital trips. The Jail has also hired overtime to pickup detainees housed by the DOC at the Plymouth Jail.

When transporting detainees there are many factors to bear in mind. The classification status of the detainees must be considered. Male and females need to be separated at all times. Protective custody, keep separate, juveniles, and special needs (mental ill, wheel chair, etc.) detainees, all pose challenges for transportation because of the separation issues. The Jail transports detainees to and from the DOC, other counties, detoxes, juvenile facilities, hospitals, courts and South Bay.

1

Because of overcrowding, the Jail has 476 detainees transferred to 18 different facilities across the state. Due to other facility restrictions, the Jail is limited in who is eligible for transfer. For example, detainees with mental health issues cannot be moved to other counties. This has led to the Jail being forced to ship out the healthier detainees. As a result, the jail has seen an increase in the percentage of detainees with medical issues, which has added to the number of trips to hospitals.

Part of the reason the jail is dealing with severe overcrowding issues is that the Suffolk County Courts have faced cutbacks in their staffing levels resulting in the prolongation of court cases and longer incarceration periods for detainees. With longer periods of incarceration, the detainees are going to court less often. Even though the Jail has seen an increase in the number of detainees in custody, the number of court trips has been reduced.

<u>Problem</u>

The Communications Department takes over responsibility for the assignments of the transportation routes after the vehicles have left the Jail for the first trip. Also, the trips originating from the HOC are not always coordinated with the Jail trips. These routes could be better consolidated. The Communications Department has a better understanding of the flow of the trips; Transportation needs for the whole day, and is able to arrange mutual aid assistance with other counties. If the Jail improved the merging and coordination of all the trips, we would better deploy the runs to reduce the amount of Transportation staff needed.

There is an additional issue with the detainees assigned to the HOC. Their property is stored at the Jail. The property does not follow the body, which is the accepted correctional practice. This forces the Transportation Department to pick up and transport all HOC detainees back to the Jail to change for court. This practice is reversed at the end of the day upon the detainees return from court. These transports could be eliminated if the property followed the body.

The Jail cannot forecast the number of hospital trips that will be needed on a daily basis. Too often, the Transportation Department requests additional staff to meet the need for hospital runs. This should only happen in unusual situations and not as frequently as it currently occurs.

<u>Data Collection</u>

To audit the Transportation Department, Deputy Carney, Captain Moscone and I looked at the daily schedule for courts and pickups and developed a plan for the routes to meet the mission for that day. We then compared the routes to what were the deployed routes from Transportation for the day. We factored in all of the issues that are to be considered when transporting detainees. This was done on March 19, 26, April 1, 5, 6, and 9th. Each day we looked at the schedule we felt there could have been a better consolidation of the trips and the Transportation Department should have sent officers back to the main Jail.

As part of our review, we interviewed Captain Kelley and Lt. Cowell, the 7-3 shift commanders, Lt. Pollard, the 11-7 shift commanders, Nurse Luzaitis, and Sgt. Charles in Communications to determine the best processes for Transportation. We also incorporated personal observations and history into our audit. It should be noted that not all of the interviewed staff agreed with our assessments.

<u>Solutions</u>

After completing the data collection and analysis process, we feel the efficiency and cost effectiveness of the Transportation Department can improve. We offer the following four recommendations:

1. Trip assignments should originate from the communications office. Having the Communications office take control of the trip assignments after they started their first run causes confusion. Trips can be better consolidated if they are consistently assigned throughout the day. The HOC and Jail Transportation needs are the same entity and should be treated as such, the Communication Department will be able to facilitate this. The Communication Department will review Transportation needs the night before and determine the amount of Transportation officers assigned for the next day. Transportation needs fluctuate each day, so should the staffing.

2. Reassign 6 officers from Transportation to the Main Jail and let the shift commanders assume responsibility for the assignment of hospital trips. This would allow for the shift commander to utilize the officers as needed and determine if additional staffing is required to complete the hospital trips. Currently, the shift commanders are requesting additional help from Transportation, we feel it should be the other way around.

3. The issue of the property that belongs to the detainees housed at the HOC needs to be reviewed. Their property is stored at the Jail even though they are housed at South Bay. This is causing major logistical and security problems. The detainees at the HOC are transported back to the Jail for the sole purpose of changing their clothes for a court appearance. This creates an unnecessary burden on the Transportation, Property and Booking Departments, at the Jail. The Jail booking area is extremely busy every morning without adding South Bay detainees. If the detainees changed for court at South Bay, they could be transported directly to court, alleviating any security or logistical issues that occur with their return to the Jail. This recommendation will increase the burden of the Booking and Property areas at the HOC. Major Paul DeFazio, ADS Dave Agnew, and Deputy Carney, have met to discuss this issue and are working on a solution.

4. The Transportation vans should be reconfigured to include a third compartment that would allow for more special transports to be added to a regular trip. This will cut down on the need to use a separate vehicle or a whole side of a van, to

transport certain detainees. This refurbishing project is presently ongoing and should continue.

Most departments have had to face the reality of doing more with less. The Transportation Department should not be the exception. The number of trips to courts has been reduced and the number of officers assigned to transportation remained level. With these recommendations, we should be able to fulfill all necessary Transportation responsibilities with improved cost effectiveness.



## Suffolk County Sheriff's Department



Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

ANDREA J. CABRAL
SHERIFF

To:    7-3 Shift Commanders
       Captain Albert Mascone
       Lt. David McCarthy
       All Communication officers

From:  Deputy Superintendent Cliff Carney

Date:  October 22, 2004

Re:    Court transportation

Effective immediately, staff will refer to the attached memo dated April 16, 2004, concerning the assignments of the court transportation trips that originate from the Jail and the HOC. The communication's officer at the jail shall assign all court transportation trips. Shift commanders are responsible for hospital trip assignments. Failure to comply with this directive will result in discipline.



| Chapter III | Policy #: | References: | |
|---|---|---|---|
| Institutional Operations | S520 | MGL c. 147, §8a<br>103 CMR<br>ACI: 3<br>3-ALDF- | Page 1 of 3 |
| Security and Control | Date of Issue: | Approved: | |
| Private Paid Details | January 1, 2000 | | |
| | Date:<br>May 1, 2004 | Andrea J. Cabral, Sheriff | |

## PURPOSE
To establish Suffolk County Sheriff's Department (SCSD) policy and procedures regarding the privilege of Paid Security Details.

## CANCELLATION
This policy cancels all previous SCSD policy statements, bulletins, directives, orders, notices, rules or regulations regarding Paid Security Details that are inconsistent with this policy.

## DEFINITIONS
*Paid Security Details* – Paid compensation from an outside agency for services rendered by a Deputy Sheriff of Suffolk County.

*Detail Coordinator* – A person appointed by the Sheriff to facilitate the planning, organizing, and directing of assigned paid security details.

## POLICY STATEMENTS
I.    Prior to any SCSD personnel being assigned to or accepting any paid security detail as a Deputy Sheriff with an outside agency, he/she must first meet the following qualifications:
    a.  Must be selected and sworn in as a Deputy Sheriff of Suffolk County by the Suffolk County Sheriff.
    b.  Must meet all stipulations of the SCSD firearms qualifications and SCSD Firearms Policy (S508) prior to being authorized to carry a department issued firearm.
    c.  Must have successfully completed SCSD Detail Training.
    d.  Must be an employee in good standing whose current job performance is commensurate with the duties and responsibilities expected of public law enforcement officers.
    e.  Each employee is required to seek, obtain, keep current and provide documentation of all of the above qualification standards.

## PROCEDURES
I.    **Active List**
    A.  The Office of Employee Relations shall establish and maintain an active list of all those employees who are eligible for paid security details.
    B.  The list shall be updated and reviewed regularly, verified through the SCSD Training Department and provided to the Detail Coordinator.

EXHIBIT
3



SS20 Private Paid Details                                Page 2 of 3

The Detail Coordinator shall be responsible for administering all outside paid details utilizing the following criteria:

1. Only those employees who appear on the active list shall be used for paid security details.
2. Details will be assigned to only those employees who are not scheduled for work on their regular assignment with the SCSD. There are no exceptions to this policy for SCSD personnel.
3. Details are unscheduled and sporadic. Selections will be based upon the employee's immediate availability.
4. Details will be selected fairly and equitably on a rotating basis from a single detail list.
5. All notifications for available details will be made by the Detail Coordinator via pagers, which must be acquired at the employee's own expense. Immediate response is required of the employee. Employees who cannot be contacted will be credited with a refusal. The Detail Coordinator will not conduct notification for assignment via telephone, telephone answering machines or third party messages.
6. The Detail Coordinator shall be responsible for maintaining specific records regarding notifications for details (i.e. acceptance, refusal, no response, unable to contact). All details records will be available for monthly review by the Office of Employee Relations.

II.   **Request for Services**
    A. All outside agencies requiring detail services shall submit the request directly to the Detail Coordinator.
    B. Direct assignment of details from an outside agency is not permitted.

III.  **Uniforms and Equipment**
    A. Unless otherwise specified by the Detail Coordinator, employees should appear for detail in the uniform authorized by the Sheriff's Department.
       1. Air Force Style (Detail) Hat;
       2. Sheriff's Department issued BAPERN radio, where required;
       3. Safety Vest or Straps, where required;
       4. Department issued firearm where required;
       5. Department issued vehicle where required and authorized;
       6. Employees shall only use the authorized equipment in accordance with the Use of Force Continuum as stipulated in S505, Use of Force.
    B. All detail equipment must be returned IMMEDIATELY upon completion of detail assignment.

IV.   **Rules and Regulations**
    A. Employees working a paid security detail are an emissary of the Suffolk County Sheriff's Department.
    B. Professionalism is expected at all times both in demeanor and appearance.
    C. All SCSD employees are bound by SCSD policies and procedures.

## SEVERABILITY CLAUSE

If any article, section, subsection, sentence, or clause of these regulations is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Sheriff, or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of these regulations.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DAVID BERGERON ET AL.,                  )
          Plaintiffs                    )
                                        )
          v.                            )
                                        )          C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY             )
And SHERIFF OF SUFFOLK COUNTY,          )
          Defendant                     )
_____)

## AFFIDAVIT OF LIEUTENANT JAMES M. COPPI

I, James M. Coppi, being duly sworn do hereby depose and state:

1. My name is James M. Coppi and I am employed as a Lieutenant at the Nashua Street Jail.

2. Since 2001, I have been the Detail Coordinator at the Nashua Street Jail. I am responsible for administering all outside paid details pursuant to the criteria set forth in Department Policy S520. The outside details coordinated through this policy include: details for the Central Artery project (Big Dig); State Police; Boston University Police; Boston Police Department, MBTA Police, Turnpike Authority; and Chelsea Police.

3. I maintain an active list of employees who meet the qualifications set forth in Policy S520 and are therefore eligible for outside paid details. Only those employees who appear on the active list and are not scheduled to work their regular shift are eligible for outside details.

4. Since September 2003, all notifications for available details have been made by sending out a simultaneous computer message to all pager numbers assigned to eligible employees. The pagers must be purchased by employees at their own expense. Employees who do not purchase pagers are not notified of available detail work.

5. Employees William Peneau, Paul Giglio, John Barnes, and Tim Turley have never purchased a pager and have never been notified of available detail work.

6. Employees Ellis and Bergeron purchased pagers. Since September 2003, Mr. Bergeron has worked only one detail on August 9, 2004. Mr. Ellis has

1

never worked a detail. Plaintiff Dilibero had a pager in 2003 but never worked a detail during that time period. Dilibero did not purchase a pager in 2004 or 2005.

7.    John Grennon purchased a pager for the first time in April 2005 but did not work any details since he purchased the pager.

8.    I am aware that John Barnes and John Ellis were reappointed Deputy Sheriff in May 2007. Neither John Barnes nor John Ellis has purchased a pager since their reappointment.

9.    Lorne Lynch and Al Moscone both purchased pagers and have been consistently notified to work details and have worked details between September 2003 and April 2005.

10.   Details are unscheduled and sporadic. The number of available details has declined significantly since I began maintaining records in September 2003. From September to December 2003, eligible employees worked 1,892 details. In 2004, employees worked 7,341 details. In 2005, employees worked 4,878 details. In 2006, employees worked 801 details. In 2007, employees have worked 89 details.

Signed Under The Pains And Penalties Of Perjury This 26th day of July, 2007.

                              /s/James M. Coppi
                              James M. Coppi

## Summary of Details Worked by Officer

### 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   LYNCH, LORNE F. JR. Dpty.

| | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|
| Contract # PM 333033 | Saturday, 1/11/2003 | 8 | 0 | Night | 1/11/2003 |
| Contract # PM 333039 | Monday, 1/13/2003 | 8 | 0 | Night | 1/18/2003 |
| Contract # PM 333024 | Thursday, 1/16/2003 | 8 | 0 | Night | 1/18/2003 |
| Contract # PM 333028 | Friday, 1/24/2003 | 8 | 0 | Night | 1/25/2003 |
| Contract # MM 000004 | Thursday, 3/6/2003 | 8 | 0 | Night - RAMP A | 3/8/2003 |
| Contract # PM 333028 | Tuesday, 3/11/2003 | 8 | 0 | Night | 3/15/2003 |
| Contract # PM 333039 | Monday, 3/17/2003 | 8 | 0 | Night | 3/22/2003 |
| Contract # MM 000004 | Monday, 3/24/2003 | 8 | 0 | Day Const | 3/29/2003 |
| Contract # PM 333028 | Tuesday, 3/25/2003 | 8 | 2 | Day Const | 3/29/2003 |
| Contract # MM 000004 | Wednesday, 3/26/2003 | 8 | 0 | Day Const | 3/29/2003 |
| Contract # PM 333028 | Thursday, 3/27/2003 | 8 | 2 | Day Const | 3/29/2003 |
| Contract # PM 333016 | Friday, 3/28/2003 | 8 | 4 | Day Const - 190 | 3/29/2003 |
| Contract # PM 333016 | Sunday, 3/30/2003 | 8 | 4 | Day Const - 180 | 4/5/2003 |
| Contract # PM 333039 | Thursday, 4/3/2003 | 8 | 1 | Day Const | 4/5/2003 |
| Contract # PM 333016 | Sunday, 4/6/2003 | 8 | 0 | Night | 4/12/2003 |
| Contract # PM 333028 | Friday, 4/11/2003 | 8 | 2 | Day Const | 4/12/2003 |
| Contract # PM 333016 | Sunday, 4/13/2003 | 8 | 0 | Night | 4/19/2003 |
| Contract # PM 333039 | Wednesday, 4/16/2003 | 8 | 0 | Night | 4/19/2003 |
| Contract # PM 333028 | Tuesday, 4/22/2003 | 8 | 1 | Day Const | 4/26/2003 |
| Contract # PM 333028 | Wednesday, 4/23/2003 | 8 | 1 | Day Const | 4/26/2003 |
| Contract # PM 333028 | Monday, 4/28/2003 | 8 | 1 | Day Const | 5/3/2003 |
| Contract # PM 333028 | Wednesday, 4/30/2003 | 8 | 1 | Day Const - LAT | 5/3/2003 |
| Contract # PW 002074 | Monday, 5/5/2003 | 8 | 0 | Night | 5/10/2003 |
| Contract # PM 333042 | Saturday, 5/10/2003 | 8 | 0 | Night | 5/10/2003 |
| Contract # PM 333024 | Tuesday, 5/13/2003 | 8 | 0 | Day Const | 5/17/2003 |
| Contract # PM 806000 | Friday, 5/16/2003 | 8 | 0 | Night | 5/17/2003 |
| Contract # PM 333028 | Monday, 5/19/2003 | 8 | 1 | Day Const | 5/24/2003 |
| Contract # PM 333039 | Tuesday, 5/20/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333038 | Wednesday, 5/21/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333039 | Thursday, 5/22/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333028 | Wednesday, 5/28/2003 | 8 | 1 | Day Const | 5/31/2003 |
| Contract # PM 333033 | Friday, 5/30/2003 | 8 | 0 | Day Const | 5/31/2003 |
| Contract # PM 333028 | Monday, 6/2/2003 | 8 | 1 | Day Const | 6/7/2003 |
| Contract # PM 333028 | Friday, 6/6/2003 | 8 | 1 | Day Const | 6/7/2003 |
| Contract # PM 333028 | Monday, 6/9/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract # PM 333028 | Wednesday, 6/11/2003 | 8 | 0 | Day Const | 6/14/2003 |

| | | | | | |
|---|---|---|---|---|---|
| Contract #PM 333028 | Thursday, 6/12/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract #PM 333031 | Friday, 6/13/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract #PM 333042 | Tuesday, 6/17/2003 | 4 | 0 | Day Const - 060 | 6/21/2003 |
| Contract #PM 333041 | Wednesday, 6/18/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract #PM 333024 | Thursday, 6/19/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract #PM 333015 | Friday, 6/20/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract #PM 333028 | Monday, 6/23/2003 | 8 | 1 | Day Const | 6/28/2003 |
| Contract #PM 333031 | Thursday, 6/26/2003 | 8 | 0 | Day Const | 6/28/2003 |
| Contract #PM 333028 | Monday, 6/30/2003 | 8 | 1 | Day Const | 7/5/2003 |
| Contract #PM 333039 | Saturday, 7/5/2003 | 4 | 0 | Night | 7/5/2003 |
| Contract #PM 333028 | Monday, 7/7/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract #PM 333028 | Tuesday, 7/8/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract #PM 333028 | Friday, 7/11/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract #PM 333039 | Monday, 7/14/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract #PM 333028 | Tuesday, 7/15/2003 | 8 | 1 | Day Const | 7/19/2003 |
| Contract #PM 333028 | Wednesday, 7/16/2003 | 8 | 1 | Day Const | 7/19/2003 |
| Contract #PM 333039 | Thursday, 7/17/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract #PM 333042 | Tuesday, 7/29/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract #PM 333039 | Wednesday, 7/30/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract #PM 333039 | Thursday, 7/31/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract #PM 333039 | Friday, 8/1/2003 | 8 | 2 | Night | 8/2/2003 |
| Contract #PM 333028 | Monday, 8/11/2003 | 8 | 0 | Day Const | 8/16/2003 |
| Contract #PM 333028 | Wednesday, 8/13/2003 | 8 | 1 | Day Const | 8/16/2003 |
| Contract #PM 333043 | Thursday, 8/14/2003 | 8 | 0 | Day Const | 8/16/2003 |
| Contract #PM 333043 | Friday, 8/15/2003 | 4 | 0 | Day Const | 8/16/2003 |
| Contract #PM 333033 | Friday, 8/15/2003 | 4 | 0 | Night | 8/16/2003 |
| Contract #PM 333028 | Monday, 8/18/2003 | 8 | 1 | Day Const | 8/23/2003 |
| Contract #PM 333033 | Tuesday, 8/19/2003 | 8 | 0 | Day Const | 8/23/2003 |
| Contract #PM 333028 | Thursday, 8/21/2003 | 8 | 1 | Day Const | 8/23/2003 |
| Contract #PM 200334 | Friday, 8/22/2003 | 8 | 0 | Day Const | 8/23/2003 |
| Contract #PM 333039 | Wednesday, 8/27/2003 | 8 | 0 | Day Const | 8/30/2003 |
| Contract #PM 333028 | Wednesday, 9/3/2003 | 8 | 0 | Day Const | 9/6/2003 |
| Contract #PM 333037 | Monday, 9/8/2003 | 8 | 0 | Day Const | 9/13/2003 |
| Contract #PM 333031 | Tuesday, 9/9/2003 | 8 | 0 | Day Const | 9/13/2003 |
| Contract #PW 002074 | Friday, 9/12/2003 | 8 | 0 | Day Const | 9/13/2003 |
| Contract #PM 333042 | Tuesday, 9/16/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract #PM 333042 | Wednesday, 9/17/2003 | 4 | 0 | Night | 9/20/2003 |
| Contract #PM 333042 | Friday, 9/19/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract #PM 333042 | Saturday, 9/27/2003 | 8 | 0 | Day Const | 9/27/2003 |
| Contract #PM 333042 | Monday, 9/29/2003 | 8 | 0 | Day Const - 160 | 10/4/2003 |
| Contract #PM 333024 | Monday, 9/29/2003 | 8 | 0 | Night | 10/4/2003 |

| Contract # PM 333042 | Wednesday, 10/1/2003 | 8 | 0 | Day Const - 160 | 10/4/2003 |
| Contract # PM 333042 | Thursday, 10/2/2003 | 8 | 0 | Night | 10/4/2003 |
| Contract # PM 333039 | Saturday, 10/4/2003 | 8 | 0 | Day Const - 220 | 10/4/2003 |
| Contract # PM 333028 | Wednesday, 10/8/2003 | 8 | 1 | Day Const | 10/11/2003 |
| Contract # PM 333042 | Tuesday, 10/14/2003 | 8 | 0 | Day Const | 10/18/2003 |
| Contract # PM 333041 | Friday, 10/17/2003 | 8 | 0 | Day Const | 10/18/2003 |
| Contract # PM 333028 | Tuesday, 10/21/2003 | 8 | 1 | Day Const | 10/25/2003 |
| Contract # PM 333044 | Friday, 10/24/2003 | 8 | 1 | Day Const | 10/25/2003 |
| Contract # PM 333041 | Monday, 10/27/2003 | 8 | 0 | Day Const | 11/1/2003 |
| Contract # PM 333040 | Thursday, 10/30/2003 | 8 | 0 | Day Const | 11/1/2003 |
| Contract # PM 333028 | Friday, 10/31/2003 | 8 | 0 | Night | 11/1/2003 |
| Contract # PM 333044 | Thursday, 11/13/2003 | 8 | 0 | Day Const | 11/15/2003 |
| Contract # PM 333033 | Friday, 11/14/2003 | 8 | 0 | Day Const | 11/15/2003 |
| Contract # PM 333039 | Monday, 11/17/2003 | 8 | 1 | Day Const | 11/22/2003 |
| Contract # PM 333044 | Tuesday, 11/18/2003 | 8 | 1 | Day Const | 11/22/2003 |
| Contract # PM 333039 | Wednesday, 11/19/2003 | 8 | 0 | Day Const | 11/22/2003 |
| Contract # PM 333039 | Friday, 11/21/2003 | 8 | 4 | Day Const | 11/22/2003 |
| Contract # PM 200331 | Monday, 11/24/2003 | 8 | 0 | Day Const | 11/29/2003 |
| Contract # MM 000004 | Tuesday, 12/2/2003 | 8 | 0 | Day Const | 12/6/2003 |
| Contract # PM 333043 | Friday, 12/5/2003 | 8 | 0 | Day Const | 12/6/2003 |
| Contract # PM 333033 | Thursday, 12/11/2003 | 8 | 0 | Day Const - LAT | 12/13/2003 |
| Contract # PM 333028 | Tuesday, 12/16/2003 | 8 | 0 | Day Const | 12/20/2003 |
| Contract # PM 333028 | Wednesday, 12/17/2003 | 8 | 1 | Day Const | 12/20/2003 |
| Contract # PM 333027 | Friday, 12/19/2003 | 8 | 4 | Day Const | 12/20/2003 |
| Contract # MM 000004 | Saturday, 12/20/2003 | 8 | 0 | Night | 12/20/2003 |
| **Total Hours:** | | 796 | 49 | | |

$22,288.00        $2,058.00

$24,346.00

| Grand Total: | 796 Hrs Regular | 49 Hrs Overtime |

## Summary of Details Worked by Officer

| | LYNCH, LORNE F. JR. Dpty. | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|---|
| Contract | #MM 000004 | Sunday, 1/11/2004 | 8 | 2 | Night | 1/17/2004 |
| Contract | #PM 333043 | Thursday, 1/15/2004 | 8 | 0 | Night | 1/17/2004 |
| Contract | #PM 333042 | Monday, 1/19/2004 | 8 | 0 | Night | 1/24/2004 |
| Contract | #PM 333042 | Saturday, 2/7/2004 | 8 | 0 | Day Const | 2/7/2004 |
| Contract | #PM 333042 | Monday, 2/23/2004 | 8 | 0 | Night | 2/28/2004 |
| Contract | #PM 333042 | Saturday, 3/6/2004 | 8 | 0 | Day Const | 3/6/2004 |
| Contract | #PM 333042 | Monday, 3/8/2004 | 8 | 0 | Night | 3/13/2004 |
| Contract | #PM 333042 | Friday, 3/26/2004 | 8 | 0 | Night | 3/27/2004 |
| Contract | #PM 333028 | Monday, 3/29/2004 | 8 | 2 | Day Const | 4/3/2004 |
| Contract | #PM 333039 | Friday, 4/2/2004 | 8 | 0 | Night | 4/3/2004 |
| Contract | #PM 333039 | Monday, 4/5/2004 | 8 | 0 | Night | 4/10/2004 |
| Contract | #PM 333044 | Wednesday, 4/14/2004 | 8 | 1 | Day Const | 4/17/2004 |
| Contract | #PM 333042 | Friday, 4/16/2004 | 8 | 0 | Day Const | 4/17/2004 |
| Contract | #PW 002074 | Tuesday, 4/20/2004 | 8 | 0 | Night | 4/24/2004 |
| Contract | #PM 333044 | Thursday, 4/22/2004 | 8 | 1 | Day Const | 4/24/2004 |
| Contract | #PM 333028 | Friday, 4/23/2004 | 8 | 2 | Day Const | 4/24/2004 |
| Contract | #PM 333042 | Wednesday, 4/28/2004 | 8 | 0 | Day Const | 5/1/2004 |
| Contract | #PM 333044 | Friday, 4/30/2004 | 8 | 0 | Night | 5/1/2004 |
| Contract | #PM 333042 | Monday, 5/3/2004 | 8 | 0 | Night | 5/8/2004 |
| Contract | #PM 333024 | Wednesday, 5/5/2004 | 8 | 0 | Day Const | 5/8/2004 |
| Contract | #PM 333042 | Thursday, 5/6/2004 | 8 | 0 | Day Const | 5/8/2004 |
| Contract | #PM 333027 | Wednesday, 5/12/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract | #PM 333027 | Thursday, 5/13/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract | #PM 333027 | Friday, 5/14/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract | #PM 333040 | Monday, 5/17/2004 | 4 | 0 | Night | 5/22/2004 |
| Contract | #PM 333042 | Wednesday, 5/19/2004 | 8 | 0 | Day Const | 5/22/2004 |
| Contract | #PM 333042 | Monday, 5/24/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract | #PM 333042 | Wednesday, 5/26/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract | #PM 333032 | Friday, 5/28/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract | #PM 333042 | Wednesday, 6/2/2004 | 8 | 0 | Day Const | 6/5/2004 |
| Contract | #PM 333032 | Monday, 6/7/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract | #PM 333044 | Tuesday, 6/8/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract | #PM 333044 | Wednesday, 6/9/2004 | 4 | 0 | Night | 6/12/2004 |
| Contract | #PM 333042 | Thursday, 6/10/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract | #PM 333024 | Wednesday, 6/16/2004 | 8 | 0 | Day Const | 6/19/2004 |
| Contract | #PM 333039 | Thursday, 6/17/2004 | 8 | 0 | Day Const | 6/19/2004 |

| | | | | | |
|---|---|---|---|---|---|
| Contract #PM 333039 | Friday, 6/18/2004 | 8 | 0 | Day Const | 6/19/2004 |
| Contract #PM 333039 | Saturday, 6/19/2004 | 4 | 0 | Night | 6/19/2004 |
| Contract #PM 333024 | Monday, 6/21/2004 | 8 | 0 | Day Const | 6/26/2004 |
| Contract #PM 333024 | Wednesday, 6/30/2004 | 8 | 0 | Day Const | 7/3/2004 |
| Contract #PM 333039 | Thursday, 7/1/2004 | 8 | 0 | Day Const | 7/3/2004 |
| Contract #PM 333033 | Monday, 7/12/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333043 | Tuesday, 7/13/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333039 | Wednesday, 7/14/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333027 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333043 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333044 | Monday, 7/19/2004 | 8 | 1 | Day Const | 7/24/2004 |
| Contract #PM 333043 | Monday, 7/19/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333043 | Tuesday, 7/20/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333042 | Wednesday, 7/21/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333042 | Thursday, 7/22/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333044 | Sunday, 8/1/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333044 | Monday, 8/2/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333043 | Tuesday, 8/3/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333043 | Wednesday, 8/4/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333044 | Friday, 8/6/2004 | 8 | 1 | Day Const | 8/7/2004 |
| Contract #PM 333039 | Monday, 8/16/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333039 | Tuesday, 8/17/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333044 | Wednesday, 8/18/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333044 | Thursday, 8/19/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333039 | Friday, 8/20/2004 | 8 | 2 | Night | 8/21/2004 |
| Contract #PM 333043 | Tuesday, 8/24/2004 | 8 | 0 | Night | 8/28/2004 |
| Contract #PM 333042 | Thursday, 8/26/2004 | 8 | 0 | Day Const | 8/28/2004 |
| Contract #PM 333044 | Friday, 8/27/2004 | 8 | 1 | Day Const | 8/28/2004 |
| Contract #PM 333044 | Monday, 8/30/2004 | 8 | 2 | Day Const | 9/4/2004 |
| Contract #PM 333044 | Tuesday, 8/31/2004 | 8 | 1 | Day Const | 9/4/2004 |
| Contract #PM 333044 | Thursday, 9/2/2004 | 8 | 1 | Day Const | 9/4/2004 |
| Contract #PM 333044 | Monday, 9/13/2004 | 8 | 2 | Day Const | 9/18/2004 |
| Contract #PM 333024 | Tuesday, 9/14/2004 | 8 | 0 | Day Const | 9/18/2004 |
| Contract #PM 333039 | Wednesday, 9/15/2004 | 8 | 0 | Day Const | 9/18/2004 |
| Contract #PM 333039 | Thursday, 9/16/2004 | 8 | 0 | Night | 9/18/2004 |
| Contract #PM 333042 | Friday, 9/17/2004 | 8 | 4 | Night | 9/18/2004 |
| Contract #PM 333039 | Monday, 9/20/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract #PM 333043 | Tuesday, 9/21/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract #PM 333039 | Wednesday, 9/22/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract #PM 333043 | Thursday, 9/23/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract #PM 333044 | Monday, 9/27/2004 | 8 | 2 | Day Const | 10/2/2004 |

| | | | | | |
|---|---|---|---|---|---|
| Contract #PM 333039 | Tuesday, 9/28/2004 | 8 | 0 | Night | 10/2/2004 |
| Contract #PM 333039 | Wednesday, 9/29/2004 | 8 | 0 | Night | 10/2/2004 |
| Contract #PM 333042 | Friday, 10/1/2004 | 8 | 0 | Day Const | 10/2/2004 |
| Contract #PM 333042 | Tuesday, 10/5/2004 | 8 | 0 | Night | 10/9/2004 |
| Contract #PM 333042 | Friday, 10/8/2004 | 8 | 0 | Day Const | 10/9/2004 |
| Contract #PM 333044 | Wednesday, 10/13/2004 | 8 | 0 | Night | 10/16/2004 |
| Contract #PM 333044 | Thursday, 10/14/2004 | 8 | 0 | Night | 10/16/2004 |
| Contract #PM 333042 | Tuesday, 10/19/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract #PM 333043 | Wednesday, 10/20/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract #PM 333044 | Friday, 10/22/2004 | 8 | 2 | Day Const | 10/23/2004 |
| Contract #PM 333044 | Saturday, 10/23/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract #PM 333044 | Wednesday, 10/27/2004 | 8 | 1 | Day Const | 10/30/2004 |
| Contract #PM 333044 | Thursday, 10/28/2004 | 8 | 1 | Day Const | 10/30/2004 |
| Contract #PM 333044 | Wednesday, 11/3/2004 | 8 | 1 | Day Const | 11/6/2004 |
| Contract #PM 333039 | Saturday, 11/6/2004 | 8 | 0 | Night | 11/6/2004 |
| Contract #PM 333044 | Monday, 11/8/2004 | 8 | 2 | Day Const | 11/13/2004 |
| Contract #PM 333044 | Tuesday, 11/9/2004 | 8 | 1 | Day Const | 11/13/2004 |
| Contract #PM 333044 | Friday, 11/12/2004 | 8 | 1 | Day Const | 11/13/2004 |
| Contract #PM 333044 | Tuesday, 11/16/2004 | 8 | 1 | Day Const | 11/20/2004 |
| Contract #PM 333033 | Friday, 11/19/2004 | 8 | 0 | Day Const | 11/20/2004 |
| Contract #PM 333040 | Wednesday, 12/1/2004 | 8 | 0 | Day Const | 12/4/2004 |
| Contract #PM 333043 | Thursday, 12/2/2004 | 8 | 0 | Night | 12/4/2004 |
| Contract #PM 333042 | Monday, 12/13/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract #PM 333043 | Tuesday, 12/14/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract #PM 333042 | Wednesday, 12/15/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract #PM 333032 | Thursday, 12/16/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract #PM 333042 | Saturday, 12/18/2004 | 8 | 1 | Night | 12/18/2004 |
| Contract #PM 333032 | Monday, 12/20/2004 | 8 | 0 | Night | 12/25/2004 |

**Total Hours:** **828** **36**

$23,184.00     $1,512.00

$24,696.00

| Grand Total: | 828 | Hrs Regular | 36 | Hrs Overtime |
|---|---|---|---|---|

## Summary of Details Worked by Officer

| 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 LYNCH, LORNE F. JR. Dpty. | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|
| Contract # PM 333042 | Tuesday, 1/4/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | Thursday, 1/6/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 200331 | Friday, 1/7/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | Saturday, 1/8/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333032 | Friday, 1/14/2005 | 8 | 0 | Night | 1/15/2005 |
| Contract # PM 333032 | Friday, 1/21/2005 | 8 | 0 | Night | 1/22/2005 |
| Contract # PM 333039 | Wednesday, 2/9/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333042 | Friday, 2/11/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333043 | Saturday, 2/12/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333032 | Friday, 2/25/2005 | 8 | 0 | Night | 2/26/2005 |
| Contract # PM 333039 | Saturday, 3/12/2005 | 8 | 0 | Day Const | 3/12/2005 |
| Contract # PM 333043 | Friday, 3/18/2005 | 8 | 0 | Night | 3/19/2005 |
| Contract # PM 333043 | Friday, 4/1/2005 | 8 | 0 | Night | 4/2/2005 |
| Contract # PM 333044 | Wednesday, 4/6/2005 | 8 | 0 | Night | 4/9/2005 |
| Contract # PM 333042 | Friday, 4/22/2005 | 8 | 0 | Night | 4/23/2005 |
| | **Total Hours:** | **120** | **0** | | |

$3,360.00          $0.00

$3,360.00

| Grand Total: | 120 | Hrs Regular | 0 | Hrs Overtime |
|---|---|---|---|---|

*Page 1 of 1*

## Summary of Details Worked by Officer

| MOSCONE, ALBERT J. Dpty. | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|
| Contract # PM 333019 | Thursday, 1/16/2003 | 8 | 0 | Night | 1/18/2003 |
| Contract # MM 000004 | Thursday, 3/6/2003 | 8 | 0 | Night - 1A PLA | 3/8/2003 |
| Contract # PM 333039 | Saturday, 3/15/2003 | 8 | 0.5 | Day Const | 3/15/2003 |
| Contract # PM 333033 | Sunday, 3/16/2003 | 8 | 1 | Night | 3/22/2003 |
| Contract # PM 333033 | Wednesday, 3/19/2003 | 8 | 1 | Night | 3/22/2003 |
| Contract # PM 333037 | Thursday, 3/27/2003 | 4 | 0 | Night | 3/29/2003 |
| Contract # PM 333016 | Saturday, 3/29/2003 | 8 | 0.5 | Day Const | 3/29/2003 |
| Contract # PM 333042 | Sunday, 3/30/2003 | 8 | 4 | Night - 1000 | 4/5/2003 |
| Contract # PM 333028 | Friday, 4/4/2003 | 8 | 1 | Night | 4/5/2003 |
| Contract # PW 002074 | Tuesday, 4/8/2003 | 8 | 0 | Night | 4/12/2003 |
| Contract # PM 333028 | Tuesday, 4/15/2003 | 8 | 1 | Night | 4/19/2003 |
| Contract # PM 333039 | Thursday, 4/17/2003 | 8 | 0 | Night | 4/19/2003 |
| Contract # PM 333028 | Thursday, 4/24/2003 | 8 | 1 | Day Const | 4/26/2003 |
| Contract # PM 333042 | Monday, 5/5/2003 | 8 | 0.5 | Night | 5/10/2003 |
| Contract # PM 333028 | Thursday, 5/8/2003 | 8 | 0 | Day Const | 5/10/2003 |
| Contract # PM 333031 | Thursday, 5/15/2003 | 8 | 0.5 | Night | 5/17/2003 |
| Contract # PM 333042 | Tuesday, 5/20/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333040 | Wednesday, 6/4/2003 | 8 | 0.5 | Night | 6/7/2003 |
| Contract # PM 333042 | Saturday, 6/7/2003 | 8 | 0 | Night | 6/7/2003 |
| Contract # PM 333040 | Monday, 6/23/2003 | 8 | 0 | Night | 6/28/2003 |
| Contract # PM 333040 | Monday, 6/30/2003 | 8 | 0 | Day Const | 7/5/2003 |
| Contract # KW 012121 | Monday, 6/30/2003 | 8 | 0.5 | Night | 7/5/2003 |
| Contract # PM 333037 | Wednesday, 7/2/2003 | 8 | 0 | Day Const | 7/5/2003 |
| Contract # PW 002074 | Thursday, 7/3/2003 | 8 | 0 | Day Const | 7/5/2003 |
| Contract # PM 333040 | Monday, 7/14/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract # PM 333033 | Tuesday, 7/15/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract # PM 333033 | Wednesday, 7/16/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract # PM 333041 | Saturday, 7/19/2003 | 8 | 0 | Night | 7/19/2003 |
| Contract # PM 333041 | Monday, 8/11/2003 | 8 | 0.5 | Night | 8/16/2003 |
| Contract # KM 033494 | Sunday, 8/17/2003 | 8 | 1.5 | Night | 8/23/2003 |
| Contract # PM 333038 | Tuesday, 8/19/2003 | 8 | 0 | Night | 8/23/2003 |
| Contract # PM 333041 | Monday, 8/25/2003 | 8 | 0 | Day Const | 8/30/2003 |
| Contract # PM 333040 | Tuesday, 9/2/2003 | 8 | 0 | Day Const | 9/6/2003 |
| Contract # PM 333039 | Friday, 9/5/2003 | 8 | 0 | Day Const | 9/6/2003 |
| Contract # PM 200243 | Saturday, 9/13/2003 | 8 | 2 | Day Const | 9/13/2003 |
| Contract # PM 333042 | Monday, 9/15/2003 | 8 | 0 | Night | 9/20/2003 |

*Page 1 of 2*

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333042 | Thursday, 9/18/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract # PM 333042 | Friday, 9/19/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract # PM 333031 | Tuesday, 9/23/2003 | 8 | 0 | Night | 9/27/2003 |
| Contract # PM 333031 | Friday, 10/3/2003 | 8 | 0 | Night | 10/4/2003 |
| Contract # PM 333042 | Saturday, 10/4/2003 | 8 | 0 | Day Const | 10/4/2003 |
| Contract # PM 333042 | Tuesday, 10/7/2003 | 8 | 0 | Night | 10/11/2003 |
| Contract # PM 333042 | Wednesday, 10/8/2003 | 8 | 0 | Night | 10/11/2003 |
| Contract # PM 333027 | Thursday, 10/16/2003 | 8 | 0 | Night | 10/18/2003 |
| Contract # PM 333039 | Monday, 10/20/2003 | 8 | 0 | Night | 10/25/2003 |
| Contract # PM 200330 | Thursday, 10/23/2003 | 8 | 0 | Night | 10/25/2003 |
| Contract # PM 333031 | Wednesday, 10/29/2003 | 8 | 0 | Night | 11/1/2003 |
| Contract # PM 333027 | Tuesday, 11/4/2003 | 8 | 0 | Night | 11/8/2003 |
| Contract # PM 333024 | Sunday, 11/9/2003 | 8 | 0 | Day Const | 11/15/2003 |
| Contract # PM 333028 | Friday, 11/14/2003 | 8 | 4 | Night | 11/15/2003 |
| Contract # PM 333043 | Saturday, 11/29/2003 | 8 | 0 | Day Const - LAT | 11/29/2003 |
| Contract # PM 333033 | Thursday, 12/4/2003 | 8 | 0 | Night | 12/6/2003 |
| Contract # MM 000004 | Friday, 12/12/2003 | 8 | 0 | Day Const | 12/13/2003 |
| Contract # PM 333028 | Wednesday, 12/17/2003 | 8 | 0 | Night | 12/20/2003 |
| Contract # PM 333027 | Friday, 12/19/2003 | 8 | 1 | Day Const | 12/20/2003 |
| Contract # PM 333042 | Saturday, 12/27/2003 | 8 | 0 | Night | 12/27/2003 |

|  | **Total Hours:** | 444 | 21 | | |
|---|---|---|---|---|---|
| | | $12,432.00 | $882.00 | | |
| | | | $13,314.00 | | |

| **Grand Total:** | 444 **Hrs Regular** | 21 **Hrs Overtime** |
|---|---|---|

## Summary of Details Worked by Officer

| | MOSCONE, ALBERT J. Dpty. | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|
| Contract #PM 333028 | Thursday, 1/29/2004 | 4 | 0 | Night | 1/31/2004 |
| Contract #PM 333042 | Saturday, 1/31/2004 | 8 | 0 | Day Const - ST- | 1/31/2004 |
| Contract #PM 333039 | Saturday, 2/28/2004 | 8 | 0 | Night | 2/28/2004 |
| Contract #PM 333039 | Tuesday, 4/6/2004 | 8 | 0 | Night | 4/10/2004 |
| Contract #PM 333042 | Wednesday, 4/14/2004 | 8 | 0 | Night | 4/17/2004 |
| Contract #PM 333042 | Thursday, 4/15/2004 | 8 | 0 | Night | 4/17/2004 |
| Contract #PM 333042 | Wednesday, 5/5/2004 | 8 | 0 | Night | 5/8/2004 |
| Contract #PM 333042 | Tuesday, 5/11/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract #PM 333027 | Friday, 5/14/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract #PM 333042 | Tuesday, 6/1/2004 | 8 | 0 | Night | 6/5/2004 |
| Contract #PM 333042 | Wednesday, 6/2/2004 | 8 | 0 | Night | 6/5/2004 |
| Contract #PM 333043 | Wednesday, 6/16/2004 | 8 | 0 | Night | 6/19/2004 |
| Contract #PM 333042 | Friday, 6/18/2004 | 8 | 0 | Night | 6/19/2004 |
| Contract #PM 333042 | Friday, 6/25/2004 | 8 | 0 | Night | 6/26/2004 |
| Contract #PM 333043 | Friday, 7/9/2004 | 8 | 0 | Night | 7/10/2004 |
| Contract #PM 333027 | Tuesday, 7/13/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333027 | Wednesday, 7/14/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333043 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333027 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract #PM 333043 | Monday, 7/19/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333043 | Tuesday, 7/20/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333043 | Wednesday, 7/21/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract #PM 333043 | Monday, 8/2/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333043 | Friday, 8/6/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract #PM 333043 | Tuesday, 8/10/2004 | 8 | 0 | Night | 8/14/2004 |
| Contract #PM 333043 | Wednesday, 8/11/2004 | 8 | 0 | Night | 8/14/2004 |
| Contract #PM 333027 | Saturday, 8/14/2004 | 8 | 2 | Day Const | 8/14/2004 |
| Contract #PM 333043 | Wednesday, 8/18/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333043 | Thursday, 8/19/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract #PM 333043 | Wednesday, 8/25/2004 | 8 | 0 | Night | 8/28/2004 |
| Contract #PM 333043 | Friday, 8/27/2004 | 8 | 4 | Night | 8/28/2004 |
| Contract #PM 333039 | Monday, 8/30/2004 | 8 | 0 | Night | 9/4/2004 |
| Contract #PM 333043 | Tuesday, 9/7/2004 | 8 | 0 | Night | 9/11/2004 |
| Contract #PM 333027 | Wednesday, 9/8/2004 | 8 | 0 | Night | 9/11/2004 |
| Contract #PM 333027 | Thursday, 9/9/2004 | 8 | 0 | Night | 9/11/2004 |
| Contract #PM 333039 | Friday, 9/10/2004 | 8 | 4 | Night | 9/11/2004 |

*Page 1 of 2*

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333039 | Saturday, 9/11/2004 | 8 | 1 | Night | 9/11/2004 |
| Contract # PM 333042 | Thursday, 9/16/2004 | 8 | 0 | Night | 9/18/2004 |
| Contract # PM 333039 | Saturday, 9/18/2004 | 8 | 1 | Night | 9/18/2004 |
| Contract # PM 333027 | Monday, 9/20/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract # PM 333043 | Thursday, 9/23/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract # PM 333027 | Saturday, 9/25/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract # PM 333039 | Friday, 10/1/2004 | 8 | 1 | Night - 12 HRS | 10/2/2004 |
| Contract # PM 333039 | Tuesday, 10/5/2004 | 8 | 0 | Night | 10/9/2004 |
| Contract # PM 333039 | Friday, 10/8/2004 | 8 | 4 | Night | 10/9/2004 |
| Contract # PM 333043 | Tuesday, 10/19/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract # PM 333039 | Saturday, 10/23/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract # PM 333039 | Wednesday, 10/27/2004 | 8 | 0 | Night | 10/30/2004 |
| Contract # PM 333039 | Thursday, 10/28/2004 | 8 | 0 | Night | 10/30/2004 |
| Contract # PM 333039 | Saturday, 10/30/2004 | 8 | 2 | Night | 10/30/2004 |
| Contract # PM 333039 | Wednesday, 11/3/2004 | 8 | 0 | Night | 11/6/2004 |
| Contract # PM 333039 | Friday, 11/5/2004 | 8 | 1 | Night | 11/6/2004 |
| Contract # PM 333043 | Sunday, 11/7/2004 | 8 | 0 | Day Const | 11/13/2004 |
| Contract # PM 333043 | Saturday, 11/13/2004 | 8 | 3 | Night | 11/13/2004 |
| Contract # PM 333039 | Tuesday, 11/16/2004 | 8 | 0 | Night | 11/20/2004 |
| Contract # PM 333039 | Thursday, 11/18/2004 | 8 | 0 | Night | 11/20/2004 |
| Contract # PM 333043 | Saturday, 11/20/2004 | 8 | 1 | Night | 11/20/2004 |
| Contract # PM 333042 | Thursday, 12/2/2004 | 8 | 0 | Night | 12/4/2004 |
| Contract # PM 333042 | Saturday, 12/11/2004 | 8 | 0 | Day Const | 12/11/2004 |
| Contract # PM 333042 | Wednesday, 12/15/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333039 | Thursday, 12/16/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333032 | Thursday, 12/23/2004 | 8 | 0 | Night | 12/25/2004 |
| Contract # PM 333043 | Thursday, 12/30/2004 | 8 | 0 | Night | 1/1/2005 |
| | **Total Hours:** | **500** | **24** | | |
| | | $14,000.00 | $1,008.00 | | |
| | | | $15,008.00 | | |

| | | | |
|---|---|---|---|
| **Grand Total:** | **500** Hrs Regular | **24** Hrs Overtime | |

## Summary of Details Worked by Officer

| | MOSCONE, ALBERT J. Dpty. | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|---|
| Contract # PM 333043 | | Monday, 1/3/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | | Friday, 1/7/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | | Saturday, 1/8/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333032 | | Friday, 1/14/2005 | 8 | 1 | Night | 1/15/2005 |
| Contract # PM 333042 | | Friday, 2/11/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333043 | | Saturday, 2/26/2005 | 8 | 1 | Night | 2/26/2005 |
| Contract # PM 333039 | | Saturday, 3/5/2005 | 8 | 0 | Mid Const | 3/5/2005 |
| Contract # PM 333043 | | Saturday, 3/12/2005 | 4 | 0 | Night | 3/12/2005 |
| Contract # PM 333043 | | Saturday, 3/19/2005 | 8 | 0 | Night | 3/19/2005 |
| Contract # PM 333043 | | Friday, 4/1/2005 | 8 | 0 | Night | 4/2/2005 |
| Contract # PM 333038 | | Wednesday, 4/13/2005 | 8 | 0 | Night | 4/16/2005 |
| | **Total Hours:** | | **84** | **2** | | |
| | | | $2,352.00 | $84.00 | | |
| | | | | $2,436.00 | | |

| Grand Total: | 84 Hrs Regular | 2 Hrs Overtime |
|---|---|---|

POSITION DESCRIPTION

POSITION TITLE:  Captain (JO-5)

GENERAL STATEMENT OF DUTIES AND RESPONSIBILITIES

    Supervisor of both staff and officers of equal or lesser rank as assigned by the Superintendent.  Command staff person within the Sheriff's Department.  Performs assignments and duties in furtherance of Sheriff's Department goals and objectives.  Performs related work as required.

SUPERVISION RECEIVED

    Works under the general supervision of the Superintendent and such other personnel as assigned by the Superintendent.

SUPERVISION EXERCISED

    Supervises such other officers and civilian staff as assigned by the Superintendent or his designee.

DUTIES AND RESPONSIBILITIES

1.  Must be able to perform all duties and responsibilities and functions of any custodial officer within the Suffolk County Sheriff's Department.

2.  Responsible for the management, administration, discipline, security and proper function of the division, office, department, assignment, post, or duties assigned.

3.  Assists the Superintendent in the smooth and efficient running of the Suffolk County Sheriff's Department.  May receive upper level command staff responsibilities and assignments and issue orders and assure compliance in conformance with same

4.  Exercises sound independent judgment and strong leadership in carrying out the policies and directives of the Suffolk County Sheriff's Department..

Captain (JO-5)
Position Description
Page Two

5.   Issues orders and directly supervises other officers and staff to assure furtherance of Suffolk County Sheriff's Department goals, objectives, and policies.

6.   Responsible for providing full and accurate status reports on any division, post, office, department, assignment, or duties assigned.

7.   May delegate certain assignments and tasks but has ultimate responsibility for all functions under his/her purview and jurisdiction.

8.   Has all the same duties and responsibilities of a lieutenant in addition to the above.

9.   Availability and ability to assume special, temporary, or provisional assignments and duties which may include but not be limited to:  transportation, front office, maintenance, public affairs, storeroom-canteen, or communications

10.  Such other duties and assignments as the Sheriff may assign from time to time.

QUALIFICATIONS

1.   Superior knowledge and understanding of the goals, directives, rules, and regulations of the Suffolk County Sheriff's Department.

2.   Considerable knowledge of sound correctional administration and methods, procedures, and operations of a correctional facility.

3.   Demonstrable ability to supervise staff and deal effectively with individuals and groups and maintain discipline.

4.   Flexibility and ability to learn and perform new duties and skills as assigned.

5.   Proficiency in writing reports and directives.

6.   A high school graduate and two years experience as a lieutenant OR equivalent, OR any combination of experience and training which provides the knowledge, skills and abilities indicated above.

7.   Maintain a valid Massachusetts Drivers License.

8.   Must have requisite continuous service as mandated by collective bargaining agreement.

CAPTAIN-JO-5
8-28-2001

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
     Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
     Defendant.

**PLAINTIFF, JOHN ELLIS' RESPONSE TO DEFENDANT,
SHERIFF ANDREA CABRAL'S REQUEST FOR ADMISSIONS**

**Admission No: 1**

Admit that the following individuals held these positions in JOEASC prior to April 2005:

Michael Walsh-President/Executive Board, Stan Andruszkiewicz-Secretary, Mark Turley-

Treasurer, Robert Tullos-Vice-President/Executive Board, Michael Cinelli-Executive Board,

Kevin O'Riordan-Trustee, Michelle Fitzpatrick-Trustee and Richard Rosetti-Trustee.

**Response No. 1**

Admitted.

**Admission No: 2**

Admit that the following individuals all held the title of Deputy Sheriff prior to April 2005 and

were not decommissioned by Defendant Sheriff Cabral: Michael Walsh, Stan Andruszkiewicz,

1

Mark Turley, Robert Tullos, Michael Cinelli, Kevin O'Riordan, Michelle Fitzpatrick and

Richard Rosetti.

**Response No. 2**

The plaintiff does not have access to the documents that would indicate whether or not the

individuals mentioned in Request for Admission No. 2 were not decommissioned.  Further

answering, the plaintiff states that the defendant would have this information.

**Admission No. 3**

Admit that pursuant to M.G.L. c. 37,  § 3 and SCSD Policy S516(a) Defendant Sheriff Andrea

Cabral has the authority to appoint and remove Deputy Sheriffs, and (b) Deputy Sheriffs serve

at the will of the Sheriff and may be removed at any time and for any reason.

**Response No. 3**

Denied.

**Admission No. 4**

Admit that Plaintiff, John Ellis, had never worked a paid detail or requested to work a paid

detail as a Deputy Sheriff prior to being decommissioned in April 2005.

**Response No. 4**

Admitted.

**Admission No. 5**

Admit to date, Plaintiff John Ellis has not suffered any demonstrable economic damages as a

result of his decommissioning in April 2005.

2

**Response No. 5**

    Denied.

**Admission No. 6**

    Admit that Plaintiff John Ellis maintains that Exhibits 4, 5 & 6 to his deposition (mailings dated March 25, 2004 and April 2, 2004) attached here as Exhibit A, were written primarily by Plaintiffs Ellis, Grennon and Barnes.

**Response No. 6**

    Admitted.

**Admission No. 7**

    Admits that (a) Plaintiff John Ellis chose not to take the Lieutenant's promotional exam that was offered in February 2006, and (b) Plaintiff John Ellis has not been denied any permanent promotional opportunities from October 2002 to date.

**Response No. 7**

    Admitted.

**Admission No. 8**

    Admit that Defendant Sheriff Cabral promoted the following former union officials to the rank of Lieutenant in January 2007: Michael Walsh, Robert Tullos and Plaintiff John Grennon.

**Response No. 8**

    Admitted to the best of the plaintiff's knowledge.

3

Signed under the pains and penalties of perjury this _7_ day of _____May_____ , 2007.

_____

John Ellis

As to objections:

_____

Douglas I. Louison BBO# 545191
Stephen C. Pfaff BBO# 553057
Merrick, Lousion & Costello, LLP
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

## CERTIFICATE OF SERVICE

I, Stephen C. Pfaff, hereby certify that on the 21st day of _May_ , 2007, I served the foregoing by causing a copy to be mailed, postage prepaid, directed to Ellen Caulo, Esquire Deputy General Counsel, Suffolk County Sheriff's Department, 200 Nashua Street, Boston, MA 02114

_____

Stephen C. Pfaff

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
     Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
     Defendant.

### PLAINTIFF JOHN GRENNON'S RESPONSE TO DEFENDANT SHERIFF ANDREA CABRAL'S REQUEST FOR ADMISSIONS

#### Admission No. 1

Admit that (a) Plaintiff John Grennon did not purchase a pager in 2003 and 2004 and therefore was ineligible to perform details as a Deputy Sheriff in 2003 and 2004; and (b) Plaintiff John Grennon purchased a pager shortly before he was decommissioned in April 2005 and did not perform any details in 2005.

#### Response No. 1

(a)    Admit that defendant Grennon did not purchase a pager but deny the remaining requests.

(b)    Admitted.

1

**Admission No. 2**

Admit that to date, Plaintiff John Grennon has not suffered any demonstrable economic

damages as a result of his decommissioning in April 2005.

**Response No. 2**

Denied.

**Admission No. 3**

Admit that (a) Plaintiff John Grennon worked as Jail Officer 1 under the administrations of

Sheriff Rufo and Sheriff Rouse, and was not promoted by either Sheriff Rufo or Sheriff Rouse; (b)

Defendant Sheriff Cabral promoted Plaintiff John Grennon to the rank of Lieutenant in January 2007'

and (c) at the time he was appointed to the rank of Lieutenant, Plaintiff John Grennon was President of

JOEASC.

**Response No. 3**

    (a)    Admitted.

    (b)    Admitted.

    (c)    Admitted.

**Admission No. 4**

Admit that the following individuals held these positions in JOEASC at some point prior to April

2005: Michael Walsh-President/Executive Board, Stan Andruszkiewicz-Secretary, Mark

Turley-Treasurer, Robert Tullos-Vice-President/Executive Board, Michael Cinelli-Executive

Board, Kevin O'Riordan-Trustee, Michelle Fitzpatrick-Trustee and Richard Rosetti-Trustee.

2

**Response No. 4**

    Admitted.

**Admission No. 5**

    Admit that the following individuals all held the title of Deputy Sheriff prior to April 2005 and

were not decommissioned by Defendant Sheriff Cabral: Michael Walsh, Stan Andruszkiewicz,

Mark Turley, Robert Tullos, Michael Cinelli, Kevin O'Riordan, Michelle Fitzpatrick and

Richard Rosetti.

**Response No. 5**

    The defendant does not have access to the documents that would indicate whether the

individuals were commissioned or decommissioned. And further answering, the plaintiff says that

defendant Cabral would have this information.

**Admission No. 6**

    Admit that private paid details are not part of the job responsibilities of officers employed by

Suffolk County at the Nashua Street jail for the Suffolk County Sheriff's Department.

**Response No. 6**

    Admitted.

**Admission No. 7**

    Admit that the repeal of the 7:1 ratio (the practice of hiring one "white shirt" officer for every 7

"blue shirt" officers on overtime) creates more overtime opportunities for JOEASC members.

**Response No. 7**

    Admitted, to the extent that there are opportunities for JOEASC members to perform details.

<u>Admission No. 8</u>

Admit that Plaintiff John Grennon (a) maintains that he had no involvement in the writing of

Exhibits 7, 8 & 9 to Plaintiff John Grennon's deposition (mailings dated March 25, 2004 and

April 2, 2004) and attached here as Exhibit A; and (b) maintains that Plaintiff John Ellis, Plaintiff

John Barnes and Attorney Dave Condon were responsible for the written content of Exhibit A

(mailings dated March 25, 2004 and April 2, 2004).

<u>Response No. 8</u>

(a)     Admitted.

(b)     Admitted to the extent that this was so testified during deposition.

<u>Admission No. 9</u>

Admit that if Plaintiff John Grennon had remained in the Training Division there was no

guarantee that he would have received a temporary appointment to a higher rank.

<u>Response No. 9</u>

Admitted.

Signed under the pains and penalties of perjury this _18_ day of ___May___, 2007.

_____
John Grennon

As to objections:

Douglas I. Louison BBO# 545191
Stephen C. Pfaff BBO# 553057
Merrick, Lousion & Costello, LLP
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

## CERTIFICATE OF SERVICE

I, Stephen C. Pfaff, hereby certify that on the 21st day of May, 2007, I served the foregoing by causing a copy to be mailed, postage prepaid, directed to Ellen Caulo, Esquire Deputy General Counsel, Suffolk County Sheriff's Department, 200 Nashua Street, Boston, MA 02114

Stephen C. Pfaff

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
DAVID BERGERON ET AL.,                  )
        Plaintiffs                      )
                                        )
        v.                              )
                                        )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY             )
And SHERIFF OF SUFFOLK COUNTY,          )
        Defendant                       )
_____)

## AFFIDAVIT OF ATTORNEY ELLEN M. CAULO

I, Ellen M. Caulo do hereby state under the pains and penalties of perjury that the following is true to the best of my knowledge and belief:

1. My name is Ellen M. Caulo.  I am an attorney in good standing in the Commonwealth of Massachusetts and Massachusetts United States District Court.

2. The document attached as Exhibit 3 herein is a true and accurate copy of deposition testimony taken of Elizabeth Keeley on February 28, 2006 in the matter of *Michelman v. Cabral*, *C.A. 05-11577-RGS*;

3. The document attached as Exhibit 6 herein is a true and accurate copy of deposition testimony taken of Viktor Theiss on May 8, 2006;

4. The document attached as Exhibit 8 herein is a true and accurate copy of the deposition testimony taken of Sheriff Cabral on January 22, 2007;

5. The document attached as Exhibit 9 herein is a true and accurate copy of Suffolk County Sheriff's Department Policy S-516-Deputy Sheriffs;

6. The document attached as Exhibit 10 herein is a true and accurate copy of the deposition testimony taken of Elizabeth Keeley on April 6, 2006;

7. The document attached as Exhibit 11 herein is a true and accurate copy of the deposition testimony taken of Eugene S. Sumpter, Jr. on April 5, 2006;

8. The document attached as Exhibit 12 herein is a true and accurate copy of the deposition testimony taken of William Peneau on December 8, 2006;

1

9.  The document attached as Exhibit 13 herein is a true and accurate copy of the Written Warning issued to William Peneau dated February 4, 2005;

10. The document attached as Exhibit 14 herein is a true and accurate copy of the Notice of Twenty-Day Suspension issued to Corporal Timothy Turley dated January 22, 2004;

11. The document attached as Exhibit 15 herein is a true and accurate copy of the deposition testimony taken of Timothy Turley on January 9, 2007;

12. The document attached as Exhibit 16 herein is a true and accurate copy of the deposition testimony taken of Martin Michelman on October 3, 2006 in the matter of *Michelman v. Cabral, CA 05-11577*.

13. The document attached as Exhibit 17 herein is a true and accurate copy of the deposition testimony taken of Lorne Lynch on May 4, 2001 in the matter of *Arla Sutherland v. Suffolk County Sheriff's Department, MCAD No. 00133417*;

14. The document attached as Exhibit 18 herein is a true and accurate copy of the deposition testimony taken of Lorne Lynch on October 6, 2006;

15. The document attached as Exhibit 19 herein is a true and accurate copy of the deposition testimony taken of Albert Moscone on September 27, 2006.

16. The document attached as Exhibit 20 herein is a true and accurate copy of the deposition testimony taken of John Ellis on January 8, 2007;

17. The document attached as Exhibit 21 herein is a true and accurate copy of the deposition testimony taken of John Barnes on October 31, 2006;

18. The document attached as Exhibit 22 herein is a true and accurate copy of the deposition testimony taken of John Grennon on January 19, 2006;

19. The document attached as Exhibit 23 herein is a true and accurate copy of a mailing published in the West Roxbury Transcript on April 1, 2004;

20. The document attached as Exhibit 24 herein is a true and accurate copy of a mailing published in the Boston City Paper on April 23, 2004;

21. The document attached as Exhibit 25 herein is a true and accurate copy of a letter entitled *What a Mess! Promises Not Kept*, dated April 2, 2004 under the signature of John Barnes.

22. The document attached as Exhibit 26 herein is a true and accurate copy of a letter entitled *What a Mess! Sheriff takes employees' Benefits*, dated March 25, 2004, under the signature of John Grennon.

23. The document attached as Exhibit 27 herein is a true and accurate copy of a Press Release issued by John Ellis on March 25, 2004;

24. The document attached as Exhibit 28 herein is a true and accurate copy of deposition testimony taken of David Bergeron on October 4, 2006;

25. The document attached as Exhibit 29 herein is a true and accurate copy of deposition testimony taken of Paul Giglio on December 13, 2006;

26. The document attached as Exhibit 30 herein is a true and accurate copy of deposition testimony taken of Erik Dilibero on December 13, 2006;

27. The document attached as Exhibit 31 is a true and accurate copy of deposition testimony taken of John Grennon on February 26, 2007;

28. The document attached as Exhibit 32 herein is a true and accurate copy of a Memorandum to Employees from Sheriff Cabral dated December 12, 2003;

29. The document attached as Exhibit 33 herein is a true and accurate copy of a Memorandum to Employees from Sheriff Cabral dated April 28, 2004;

30. The document attached as Exhibit 34 herein is a true and accurate copy of deposition testimony taken of John Barnes on December 7, 2006;

31. The document attached as Exhibit 35 herein is a true and accurate copy of deposition testimony taken of Lorne Lynch on November 2, 2006;

32. The document attached as Exhibit 36 herein is a true and accurate copy of Suffolk County Sheriff's Department Policy S201-Staffing;

33. The document attached as Exhibit 37 herein is a true and accurate copy of Suffolk County Sheriff's Department Position Description JO-1;

34. The document attached as Exhibit 38 herein is a true and accurate copy of deposition testimony of Viktor Theiss on April 19, 2006 in the matter of *Michelman v. Cabral, CA No. 05-11577*;

35. The document attached as Exhibit 39 herein is a true and accurate copy of deposition testimony taken of Sheriff Andrea J. Cabral on January 19, 2007 in the matter of *Michelman v. Cabral, CA No. 05-11577*;

36. The document attached as Exhibit 40 herein is a true and accurate copy of deposition testimony taken of Superintendent Cliff Carney on April 4, 2006;

37. The document attached as Exhibit 41 herein is a true and accurate copy of the Transportation Audit dated April 16, 2004;

38. The document attached as Exhibit 42 herein is a true and accurate copy of the Carney Transportation Memorandum dated October 22, 2004;

39. The document attached as Exhibit 43 herein is a true and accurate copy of Suffolk County Sheriff's Department Policy S-520 Private Paid Details;

40. The document attached as Exhibit 45 herein is a true and accurate copy of the Lynch detail earnings for 2003-2005;

41. The document attached as Exhibit 46 is a true and accurate copy of the Moscone detail earnings for 2003-2005;

42. The document attached as Exhibit 47 herein is a true and accurate copy of the Suffolk County Sheriff's Department Position Description for JO-5;

43. The document attached as Exhibit 48 herein is a true and accurate copy of the Admissions of John Ellis dated May 17, 2007; and

44. The document attached as Exhibit 49 is a true and accurate copy of the Admissions of John Grennon, dated May 18, 2007.

Signed under the pains and penalties of perjury this 13th day of August 2007.

/s/ Ellen M. Caulo
Ellen M. Caulo