UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
     Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
     Defendant.

## PLAINTIFFS' MOTION IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Now come the Plaintiffs and hereby oppose the Defendant's Motion for Summary

Judgment, and request this Honorable to deny same.

Plaintiffs have attached a Memorandum of Law in support of their Motion.

Plaintiffs, Bergeron, Grennon, Lynch,
Barnes, Ellis, Turley and Moscone,
By their attorney,

/s/ *Stephen C. Pfaff*
_____
Douglas I. Louison BBO# 545191
Stephen C. Pfaff BBO# 553057
Merrick, Lousion & Costello, LLP
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

1

<u>CERTIFICATE OF SERVICE</u>

I, Stephen C. Pfaff, hereby certify that on the 21st day of September, 2007, I served the foregoing by causing a copy to be directed electronically to Ellen Caulo, Esquire, Deputy General Counsel, Suffolk County Sheriff's Department, 200 Nashua Street, Boston, MA 02114.

/s/ *Stephen C. Pfaff*
_____
Stephen C. Pfaff

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
      Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
      Defendant.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT CABRAL'S MOTION FOR SUMMARY JUDGMENT

## I.    STATEMENT OF THE CASE

The plaintiffs bring this action for First Amendment violations pursuant to 42 U.S.C. § 1983, alleging that the defendant retaliated against them because of their union activity political affiliation.  While each individual plaintiff faced separate and distinct retaliation, the following applies to all plaintiffs:  (1) on or about April 21, 2005, all plaintiffs were members of the Jail Officers and Employees Association of Suffolk County ("JOEASC") [1] or AFSCME Council 93 [2] ; (2) on or about April 21, 2005, all plaintiffs were decommissioned from their Deputy Sheriff positions by a letter from Suffolk County Sheriff's Department Superintendent of Human Resources, Michael J. Harris (see attached Exhibit A – letter of April 21, 2005 to plaintiff Lynch

---

[1]      Bergeron, Grennon, Barnes, Ellis, Turley, Peneau, Dilibero and Giglio.

[2]      Moscone and Lynch.

1

from Harris); and (3) all were supportive of defendant Cabral's political opponent, Steven Murphy.

The defendant Cabral has moved for summary judgment as to all counts by all plaintiffs. The plaintiffs hereby oppose said motion and request that summary judgment be entered for them.

This Court should deny the Defendants' Motion for Summary Judgment.

## II.    STANDARD OF REVIEW

A motion for summary judgment will be granted when all the relevant pleadings, viewed in the light most favorable to the non-moving party, present no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  F.R.Civ.P. 56(c); Aponte-Santiago v. Lopez-Rivera, 957 F.2d 40, 41 (1st Cir.1992);   Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990); Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir.1990).

## III.    ARGUMENT

### SUMMARY JUDGMENT MUST BE DENIED BECAUSE THE RECORD EVIDENCE DEMONSTRATES THAT CABRAL ILLEGALLY RETALIATED AGAINST THE PLAINTIFFS FOR EXERCISING THEIR CONSTITUTIONAL RIGHTS

To state a retaliation claim under Section 1983, plaintiffs must establish three elements: (1) that the expressions which are alleged to have provoked the retaliatory actions relate to matters of public concern; (2) that the alleged retaliatory action deprived plaintiff of some valuable benefit; and (3) that there was a causal relationship between the protected expression and the retaliatory action.  Storlazzi v. Bakey, 894 F.Supp. 494, 501 (D. Mass. 1995), aff'd Storlazzi v. Bakey, 68 F.3d 455 (1st Cir. 1995).  If plaintiffs satisfy this burden, defendant has an

opportunity to demonstrate, by preponderance of the evidence, that the adverse actions would have been the same regardless of the protective conduct.  Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977).  When a public employee's expressions relate to matters of public concern, the "strength of the employee's First Amendment interests, and any parallel public interest in the information which the employee sought to impart, [must be balanced] against the strength of the countervailing governmental interest in promoting efficient performance of the public service the government agency or entity must provide through its employees."  O'Connor v. Steeves, 994 F.2d 905, 912 (1st Cir. 1993), citing Pickering v. Board of Education, 391 U.S. 563 (1968).  The burden remains on the defendant as the employer to demonstrate that the interest in efficiently performing its public function outweighs plaintiffs' First Amendment interest in free expression on matters of public concern.  Connick v. Myers, 461 U.S. 138 (1983).

Defendant in this case is not entitled to summary judgment on plaintiffs' §1983 claims. The record evidence demonstrates that:  (1) plaintiffs' expressions which provoked defendant's retaliatory actions related to matters of public concern; (2) defendant's adverse actions deprived each plaintiff of certain valuable benefits; and (3) defendant's actions were causally related to plaintiffs' protected activities and defendant has failed to demonstrate that the Suffolk County Sheriff's Office interest in efficiently performing its public function outweighed plaintiffs' First Amendment right of free speech on matters of public concern.  Finally, the evidence shows that Defendants' adverse employment actions against plaintiffs would not have been the same in the absence of plaintiffs' protected speech and conduct.

3

A.    **Plaintiffs' Expressions Which Provoked Retaliation Related to General Union**
**Matters Which Were Not Purely Personal to the Plaintiffs and Therefore**
**Constitute Expressions on Matters of Public Concern.**

Public employees enjoy protection in a variety of situations when they are disciplined for exercising rights held to be protected by the First Amendments guarantee of freedom of speech and association.  Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731 (1968).  Freedom of speech and association is applicable to labor union activities of public employees.  City of Madison Joint Sch. Dist. v. Wisconsin Pub. Relations Comm'n, 429 U.S. 167, 97 S.Ct, 421 (1976); Labov v. Lalley, 809 F.2d 220 (3rd Cir. 1987); Henderson v. Huecker, 744 F.2d 640 (8th Cir. 1984).  Public employees' activities in joining, advocating, and participating in labor union organizations are protected from employer retaliation under the First Amendment.  Smith v. Arkansas State Hwy. Employees, Local 1315, 441 U.S. 463, 99 S.Ct. 1826 (1979); Childers v. Independent School District, 676 F.2d 1338 (19th Cir. 1982) (reassignment because of union activities is actionable); AFSCME Local 749 v. Ment, 945 F.Supp. 30 (D. Conn. 1996) (claim of mass discharges in retaliation for union activities is actionable on deprivation-of association grounds).

Several cases in this jurisdiction have held that expressions relating to union activities (unless purely personal) are expressions on matters of public concern.  See Meaney v. Denver, 170 F.Supp. 2d 46, 55 (D.Mass. 2001) (blowing truck horn during union picket was an expression on matters of public concern), rev'd in part by Meaney v. Denver, 326 F.3d 283 (1st Cir. Mass. 2003); Fuentes v. Hampden County Sheriff's Dept., 2004 WL 1490434 (D.Mass. 2004).  Cases from other jurisdictions support this view.  See, McKinley v. City of Eloy, 705 F.2d 1110 (9th Cir. 1983) (police union representative's criticizing failure to award raises and

commenting on the general state of management-union relations constituted speech on matters of public concern); Wulf v. City of Wichita, 644 F.Supp. 1211 (D.Kan.1986) (letter complaining of union-busting constituted speech on matters of public concern).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, supra, 461 U.S. at 147-48. In this case, all plaintiffs were active members and supporters of the correctional officers union, JOEASC and AFSCME Local 93. Plaintiffs were all appointed Deputy Sheriffs by Defendant Cabral prior to April of 2005, some more than once. At the time the defendant took the retaliatory actions against plaintiffs, JOEASC and AFSCME Local 93 and the Sheriff's Office were in  stalled negotiations over a new collective bargaining agreement (CBA). Plaintiffs openly expressed their views in support of JOEASC's position in negotiations and the dissatisfaction with the position taken by the defendant on a number of issues, including but not limited to, dental and vision benefits, military benefits, and the Sheriff's funding of the pension plan. These expressions made by the plaintiffs related to matters of public concern and thus were entitled to constitutional protection. See Meaney v. Denver, 170 F.Sup. 2d 46, 55 D. Mass. (2001). As will be shown below, the expressions made by the plaintiffs provoked Sheriff Cabral's retaliatory actions. Plaintiffs' expressions in advocating JOEASC's position in the negotiations with the Sheriff's Office related to general union matters and were not "purely personal" to plaintiffs.

**JOEASC History**

On January 13, 2003, JOEASC filed a petition with the Massachusetts Labor Relations Commission claiming that AFSCME Council 93 no longer had the majority support of its

membership.  On February 24, 2003, AFSCME Council 93 disclaimed interest in representing

the members for the purposes of collective bargaining.  On March 28, 2003, Human Resources

Director Michael Harris issued a letter on behalf of Sheriff Cabral voluntarily recognizing

JOEASC as the designated collective bargaining agent for all employees in job grades JO-1, JO-

2, JO-3 and RN-8.

Pursuant to the petition filed by JOEASC on January 13, 2003, the designated interim

officers for JOEASC were four of the plaintiffs:  John Barnes, President, John Grennon, Vice

President, Timothy Turley, Treasurer and David Bergeron, Executive Secretary.  These

individuals -- with the exception of Bergeron, who was replaced by Plaintiff Ellis were

eventually voted by the membership as the first full time officers of JOEASC.


Almost immediately upon the creation and recognition of JOEASC, four issues – pension

benefits, dental and vision care benefits, and military benefits and pay raises – became issues of

contention between JOEASC and Sheriff Cabral.  The contentious atmosphere that developed

because of the parties' respective stance in these issues led defendant Cabral to state that she

would hold the Union and certain individuals accountable for publicly raising concerns regarding

these matters.  (Ex. 1, Barnes Deposition, Day 2, Page 43).

In addition, as will be shown, defendant Cabral was well aware of the Union's active

endorsement of her opponent, Steven Murphy, in the election for Suffolk County Sheriff and the

plaintiffs' support of Murphy.  Because of the plaintiffs' support for Murphy, defendant Cabral

retaliated against the plaintiffs.

6

1.    __Pay Raises__

Just before Defendant Cabral recognized JOEASC as the newly formed collective bargaining agent (replacing AFSCME Local 1134), Cabral's Chief of Staff, Elizabeth Keiley sent out a budget update memorandum to "All Non-Union Employees." (Exhibit A).   At the same time, both JOEASC and AFSCME Local 3463 were engaged in protracted and contentious contract negotiations for a new successor collective bargaining agreement in which the Sheriff was offering no money for pay raises.  Both Unions then learned that despite the Chief of Staff's Memorandum, the Sheriff's administrative staff had received significant raises through so-called "Fifteen" letters.  (Ex. 2, Grennon Deposition, Page 181).   Obviously, pay raises to the Sheriff's staff was an issue for JOEASC and Local 3463 when they were being offered no money for a successor contract.

2.    __Dental and Vision Benefits__

Because of the Union's dissolution of their association with AFSCME Local 1134, and creation of JOEASC, the Massachusetts Public Employees Fund (MPEF) cancelled JOEASC's dental and vision benefits because the MPEF was a product of AFSCME.  Despite the Sheriff's pronouncement to the Union that she would strive to immediately substitute a dental plan to be provided Union members, it became clear by June of 2003 that the Sheriff's initial plans had changed, and that she was now utilizing dental and vision as bargaining leverage to negotiate a successor collective bargaining agreement. (See Cabral Affidavit, paragraph 19).   In fact, Superintendent Michael Harris indicated on numerous occasions that the Department would discontinue providing dental and vision coverage for JOEASC members because of the upcoming expiration of the CBA  (Harris Affidavit, paragraph 28-29).  In June of 2003, Harris

informed Barnes and Grennon that if no successor Collective Bargaining Agreement was reached by June 30, 2003, the existing agreement would expire, and JOEASC would lose their COBRA coverage (which includes dental and vision benefits) due to the expiration of the contract.  Barnes and Grennon were shocked at such an admission and argued that it was unethical and illegal.  Harris responded by saying "no, it's life."  Barnes and Grennon asked if the Sheriff has knowledge of this, and Harris responds by saying "she knows all about this." (See Affidavit of John Grennon.).  COBRA benefits are paid late to JOEASC members, and in many instances, members are no longer covered.  (Barnes Deposition, Day 2, Page 33).

Finally, on September 30, 2003, Harris informed Barnes that the Sheriff would no longer pay COBRA benefits after September 30, 2003 unless a successor CBA was signed.  When Barnes and Grennon expressed his concern, Harris laughed and said "your membership is going to kill you guys, sign the contract, and we will give you guys everything back. . . these guys are watching their kids and wives get hurt, we can't lose here, just sign the contract."  (Grennon Affidavit).

The issue of dental and vision benefits was further exacerbated in November of 2003 when Harris informed Barnes that the JOEASC's attempt to transfer its membership into a different dental plan. was no longer an option.  Harris, speaking with defendant Cabral's knowledge and input, indicated that "no way -- you guys need to sign a TA [tentative agreement] before this happens."  (Grennon Affidavit).

That same month – October, 2003 –  John Grennon and John Barnes were asked to see the Sheriff's assistant, Steve Thompkins, who berates both of them for sending a Union newsletter to persons outside the department (including the Boston City Council and other labor

organizations within the county of Suffolk).  When informed by Barnes and Grennon, that it is

their view that the Sheriff is corrupting the contractual negotiation by using the dental and vision

benefits as leverage, Thompkins exploded and said "I represent Sheriff Cabral and her needs"

and that "you fuckers are going to pay for this and your careers here are fucking over!"

(Grennon Affidavit).

### 3.    Pension Benefits

In December of 2003, JOEASC learned a major pension fund discrepancy existed

between what was owed by the Sheriff to the City of Boston Retirement Fund on behalf of

members of JOEASC, and what was actually paid by the Sheriff into that fund.  Specifically, a

pension fund payment of over $2,000,000.00 due in June of 2003 for the period of April to June

of 2003 had not been made (Exhibits B and C).  In addition, a payment of over $660,000.00 due

in November of 2003 had not been made.  In response to this discrepancy, JOEASC filed suit

against the Sheriff, asking the Court to compel the Sheriff to remit the already appropriated

funds to the City of Boston Retirement Fund on behalf of JOEASC members.  This return further

inflamed defendant Cabral, witness her retort to plaintiff Grennon on or about the day after the

filing of the Complaint at the academy graduation when she threatened to kick Grennon in the

head (Grennon Deposition, Day 2, p.149).

### 4.    Military Benefits

In January of 2004, JOEASC members who were activated for the Gulf War were

notified that they did not accrue any vacation and sick time in 2003 because they were not in

work for at least 32 weeks during calendar year 2003 (Id. at p. 172).

Shortly after this meeting on the issue of military benefits, the Union began organizing

informational pickets directed at Sheriff Cabral on the issue of stalled contract negotiations, dental and vision benefits, and military benefits.

As an attempt to resolve the outstanding issues, JOEASC requested a meeting with the Sheriff in March of 2004.  In attendance at the meeting were plaintiffs Barnes, Grennon and Ellis, and three other Union officials.  Representing the Sheriff's Department were the Sheriff herself, Superintendent Eugene Sumpter and Harris.  The purpose of the meeting was to express to the Sheriff how her decisions regarding these issues had impacted morale.  During this meeting, JOEASC members again requested the Sheriff to transfer the Union membership to a new dental plan, but the Sheriff refused indicating that such a transfer would take away the Department's bargaining leverage for on-going Collective Bargaining negotiations.  The meeting ended contentiously, and on March 17, 2004, JOEASC filed four charges of prohibitive practice with the Labor Relations Commission.  (Grennon Deposition, Day 2, Pages 141-203).

In addition, JOEASC sent letters to members of the State Legislature and the Governor's office regarding the issue of the non-appropriation of the almost $2.1 million dollars toward the pension fund, and raised concerns that the Sheriff's requested $2.1 million dollar supplemental budget would not immediately be placed towards complete payment of the pension debt (Exhibits B and C).  On March 27, 2004, the Union authorized a direct mailing to Suffolk County voters and Suffolk County elected officials requesting their support and assistance in resolving outstanding labor management issues.  Approximately 10,000 letters were sent out. When Barnes and Grennon informed Thompkins that 10,000 letters had been mailed to random sample of voters and to all elected officials in Suffolk County, Thompkins responded by saying "you guys are going to get shitcanned for this"  (Grennon Affidavit).

10

On or about April 1, 2004, Grennon and Barnes were summoned to the Sheriff's office, and were met there by Cabral, Thompkins, Sumpter and Harris. For the next three hours, Barnes and Grennon were berated by Sheriff Cabral who was incensed about the external pressure that the Union was applying regarding the disputed issues. Cabral told Grennon and Barnes "who the fuck are you two to this agency?" As well as "I can take your homes for this, and I think I am going to do just that," and that "the two of you and Ellis have committed a crime" and finally that "you two make me fucking sick." The meeting ended with Cabral's assistant Steve Thompkins threatening to take their houses (Grennon Deposition, Day 2, pp. 191-203).

In April 2005, the plaintiffs were stripped of their Deputy Sheriff status by Sheriff Cabral in a letter dated April 5, 2005 by Superintendent Harris ( Exhibit D).

### B.    Sheriff Cabral's Adverse Actions Deprived the Plaintiffs of Valuable Benefits

Transfers in particular are often considered to be the equivalent of discharges, especially where they result in loss of pay or benefits or are part of a campaign of harassment for exercise of ones First Amendment rights. Simpson v. Weeks, 510 F.2d 240 (8th Cir. 1978) cert. den'd 443 U.S. 911 (1979); Anderson v. Central Point School District, 746 F.2d 505 (9th Cir. 1984); Allen v. Scribner, 812 F.2d 426 (9th Cir. 1987).

 Moreover, despite the Defendant's assertion to the contrary that the Deputy Sheriff's position is an appointed position subject to the whim of the Sheriff, two cases involving plaintiffs who were stripped of their Deputy Sheriff have survived the Defendant's attempt at summary judgment despite the fact that they were appointed by the Sheriff and served at the pleasure of the appointing Sheriff. In Diruzza v. County of Tehma, et al., 206 F.3d 1104, 9th Cir. (2000) the Circuit Court ruled that the District Court had erred in granting summary

11

judgment where there were disputed material facts regarding the Defendants took adverse

action against the plaintiff by stripping him of his Deputy Sheriff's position, and whether

political retaliation was a substantial or motivating factor.  Id. at 313-314.  In Bass v. Richards,

et al., 308 F.3d 108110ᵗʰ Cir. (2002), the Court found that the decommissioning of the Plaintiff

of his Deputy Sheriff status constituted an act of infringement upon protected activity because it

punished or threatened to punish somebody because of their protected speech.  The Court noted

that

> The Commission was a valuable government benefit. . . . Depriving and
> threatening to deprive [plaintiff] of such a benefit was punishment that
> could inhibit speech and thus infringe upon [plaintiff's] First Amendment
> rights.  Id. at Page 1088. [3]

All the Plaintiffs were stripped of their Deputy Sheriff position.  The appointment to the

position of Deputy Sheriff provides an individual the ability to work a paid detail as well as

transport prisoners. (Barnes Deposition, Day 1, Page 48)  Any person working a paid detail has

to be a Deputy Sheriff (Exhibit E,  Policy S520).  In addition, as a Deputy Sheriff, one has the

powers to effectuate arrests (Id. at Page 51).  Working a paid detail was additional income for

---

[3]       In addition, the Court in Bass recognized that a reasonable official would have
known that decommissioning a person from his status of Deputy Sheriff based on his expressed
preference for one individual's philosophy over another during a campaign is a free speech
violation, and thus the Defendant was not entitled to qualified immunity.  The Bass Court also
recognized that the First Amendment prohibits the dismissal of an employee because of his
privately held political beliefs, and that support of political opponents is not valid grounds for an
adverse employment action against the government employee, his position does not demand
political loyalty.  Bass at 1090, 1091 quoting Elrod v. Burns, 427 U.S. 347, 351 (1976).

        Finally, the Bass Court noted that Plaintiffs are not required to demonstrate that they
suffered an adverse employment action "because of their support for an actual candidate.
Rather, it was sufficient that they were fired for failing to endorse or pledge allegiance to a
particular political ideology."  Id. at Page 1091

many of the Plaintiffs, and Defendant Cabral deprived them of that benefit, and any future benefit to earn income, because of their Union activity and/or political affiliation – a violation of the First Amendment.  See Bass and DiRuzza.

The position of Deputy Sheriff is a financial benefit because no one can work a road detail without being deputized.  As Barnes indicated in his deposition, he had a now growing family, and after being sworn in as Deputy Sheriff in 2003, he began to work additional details so as to provide for his family.  When that ability to work details was taken away from him, with the decommissioning of his Deputy Sheriff status, he suffered the ability to make extra income working a road detail (Barnes Deposition, Day 1, pp. 60-61).

### 1.    John Barnes

Barnes worked in the property department of the Nashua Street Jail for approximately five years.  He continued this position in the Property Department well into his term as permanent President of JOEASC.  However, he was transferred from the property department to the job of a line officer in a housing unit within the jail cell in 2004.  The position in the property department was one of the more privileged positions at Nashua Street.  First, the position was a Monday through Friday position, allowing for the plum perk of having weekends off.  In addition, a 2003 audit of the department included an evaluation of Barnes as an excellent employee who performed his job above and beyond all expectations.  (Barnes deposition, Day 2, p. 89).

### 2.    John Grennon

In October of 2005, John Grennon was transferred out of the training division after

being there for approximately five years.  Prior to Grennon's transfer, in September of 2004,

Superintendent Theiss visited him and informed Grennon that he was coming to lunch.  Theiss

then told Grennon that this was the last chance for Grennon to start behaving or he would lose

his position in the training division (Grennon Deposition, day 2, p.16).  That day Theiss told

Grennon that the Sheriff was upset that Grennon was attending academy graduations and telling

the graduates what a great job the Sheriff was doing but at the same time attacking her with

respect to her position on Union issues.  When Grennon's predecessor, as head of the training

division, Marty Michelman, was fired, Theiss gave Grennon a warning that the Sheriff would

do the same to him if he would keep up his Union activity.

In addition, Grennon had actually been a candidate for the position of director of

training which was eventually awarded to Michelman.  In July of 2003, however, he was called

into Keiley's office regarding a matter concerning the Union honor guard, and as to whether or

not they would be receiving straight time or compensatory time for their duties.  During the

course of the conversation, Keiley was informed by Grennon that until the matter was resolved,

the officers were not going to participate in the events, as it was a voluntary participation.

Despite the fact that Grennon had requested the meeting, during the course of the conversation,

Keiley presented to Grennon his application for the director of training position, saying to

Grennon "I understand you have applied for the director of training position?"  Grennon

responded that he did but that it had nothing to do with the issue regarding the honor guard.

Keiley took back the application and put it back into the folder in her desk and indicated that it

had everything to do with this issue, and that she wanted the issue rectified before the Sheriff

was embarrassed further (Grennon Deposition, Day 2, pp. 84-86).

When Grennon was transferred out of training, his computer was removed from his office along with a hard drive – the first time that anybody in the training division had been transferred without a request or 10-day notice; had their computer removed upon being transferred; had computer confiscated by SID[4] (Grennon Affidavit).

Grennon was also the liaison between the Employee Assistance Program ("EAP"), contract with Martin Michaelson and members of JOEASC.  In December of 2004, Grennon was removed from that position, with Superintendent Harris indicating that "no future training for the Employees Assistance Program will be granted as long as John Grennon's name was on there."  (Grennon Deposition, Day 2, p. 217).

Grennon has suffered severe emotional stress, the

> biggest emotional stress is being told by people in the upper echelon of the department that you can fired or you've committed a crime. And then being taken out of the EAP.  I never did anything wrong to be taken out of EAP.  (Id. at p. 220).

As a result of him being stripped of his position in the training division, as of February 26, 2007, he has lost approximately $50,000.00.

### 3.    Al Moscone

In December of 2004, shortly after the election for Suffolk County Sheriff in which Defendant Cabral opposed Steven Murphy, Moscone was transferred from his position as Captain in charge of transportation, to a Captain in charge of one of the housing units in the jail. To date, Moscone is the only Captain who is in charge of such a housing unit floor, and the assignment is a less desirable one in that his shift has been changed, and he must now work

---

[4]    Sheriff's Investigation Division is the Internal Affairs department.

weekends.

When Moscone worked transportation, it was a Monday through Friday position with every weekend off.  Now, when he was transferred to a housing floor, he was transferred to the 3 to 11 shift with Friday and Monday and every other weekend off.  In addition, because of his transfer, he lost department head pay and, because he was decommissioned from his Deputy Sheriff position in April 2005, he lost the ability to work details and collect additional money.

Moscone also held a fundraiser for the Sheriff's political opponent Steven Murphy in the race for the 2004 Suffolk County Sheriff's position.   In addition to the fundraiser, Moscone made phone calls on behalf of Murphy soliciting the support of others for Murphy's candidacy (Moscone Deposition, Page 104).

Moscone also contributed money to Murphy's campaign in the form of $200.00 (Id. at Page 108).  He raised $5,000 for Murphy's campaign.  Id.

In addition, Moscone had a conversation with chief of staff Elizabeth Keiley in which he expressed his disappointment with the Department's position of withholding benefits – dental and vision, military and pension – from members of JOEASC.  When Moscone expressed to Keiley that the Sheriff's decision was wrong and that he and AFSCME Local 93 stand strongly in support of JOEASC, he was summoned immediately to Keiley's office and warned that his job could be in danger.  Moscone was also called a liar by Elizabeth Keiley. Id. at Page 120.

### 4.    Lorne Lynch

Lynch is the current Vice President of Local 3643, Superior Officers.  Prior to being elected Vice President, he was the Grievance Coordinator and the one person responsible for filing Captain Al Moscone's grievance regarding the reprimand received by him for his

disciplining a subordinate who had fallen asleep.  In Lynch's position as Grievance

Coordinator, he vigorously supported the position of JOEASC on the issues of military,

pension, dental and vision benefits.

Lynch was also on the Local 3643 bargaining team and as such recommended to Local

1163 in 2003 to reject the Sheriff's proposal for a three year contract because it contained no

provisions for a monetary raise.  As such, he has been targeted by the Defendant and retaliated

against because of his support of JOEASC and Captain Moscone.

Regarding his political support of Sheriff Cabral's opponent Steven Murphy, Lynch

attended a fundraiser hosted by Moscone in East Boston.  Within days of that fundraiser, he was

informed by his immediate superior Captain Janelis, that the Sheriff was "pissed off" that he

attended the fundraiser.  Since that time, he has had his selected weekly days off of Friday and

Monday changed to Tuesday and Thursday – despite the fact that two individuals appointed to

the position of temporary Lieutenant have received Fridays and Mondays off.  In addition, he

was informed by Superintendent Carney in May of 2005 – one month after he had been

decommissioned as Deputy Sheriff – that the Sheriff considers "two types of good standing,"

i.e., those who do their job well and those who support Sheriff Cabral.

Plaintiff Lynch worked hundreds of details in the three years prior to the

decommissioning of his Deputy Sheriff status (Exhibit F).  The financial loss to the Lynch has

been devastating, as he has lost over approximately $25,000 to $30,000 per year because of his

decommissioning (Exhibit F

Finally, in September of 2005 – just after the Sheriff's election – Lynch became the only

Lieutenant not sent for training on the use of the new fire extinguishers for Nashua Street.

17

### 5. **Dave Bergeron**

In March of 2004, Plaintiff Bergeron had a chance encounter with Defendant Cabral at the Holy Name Church during Cabral's campaign. (Bergeron Deposition, Page 81-96). Cabral indicated that she wished to talk to Bergeron (Id. at Page 83). Bergeron began to discuss with her his concern about the issue of the lack of dental benefits to JOEASC members (Id.). Bergeron also discussed the pay raises that were given to Cabral's staff (Id. at Page 95), indicating "you know, it just doesn't look good. You're giving out raises out to your people up top and there are other people doing without." (Id. at Page 85).

In September of 2004, Bergeron was seen by the Defendant holding a sign for the Defendant's political opponent, Steven Murphy (Id. at Page 65).

In addition to the confrontation with the Sheriff at Holy Name Church and Bergeron's support for Murphy, in April of 2005 – after JOEASC had sent out the newsletter – Defendant Cabral, along with Superintendents Horgan, Theiss, Sumpner and Harris – met with the Union during a mandatory roll call at the 3:00 P.M. to 11:00 P.M. shift change to rebut the newsletter. (Id. at Page 98). Bergeron posed the following question directly to Sheriff Cabral "Did you in any way use our dental benefits as a bargaining leverage [during contract negotiations]?" (Id. at Page 100). Shortly thereafter, he was stripped of his Deputy Sheriff's position.

### 6. **John Ellis**

Ellis has never been disciplined. (Ellis Deposition, Page 37) He went to an event in Brighton to support Murphy and dropped off a check. (Ellis Deposition, Page 68) Ellis confronted Thompkins about the pay raise. (Ellis Deposition, Page 99) Ellis supported Murphy (Ellis Deposition, Page 155) by passing out brochures at the Boston Public Library on election

day.  Ellis was cautioned by Harris not to endorse anybody.  (Ellis Deposition, Page 158) Ellis

had a conversation with the Sheriff  (Ellis Deposition, Page 188) in which she was angry.  It

was a stressful, confrontational encounter.  (Ellis Deposition, Page 197).   This confrontation

led to his decommissioning.

### 7.    **William Peneau**

Peneau was the grievance coordinator for JOEASC between 2003 and 2004.    (Peneau

Deposition, Page 59) Peneau had arguments with Harris (Peneau Deposition, Page 56)

regarding dental benefits.  Peneau was the person involved in filing the Turley grievance.

(Peneau Deposition, Page 55).    (Peneau Deposition, Page 68).  Penaueu was retaliated because

of his support for Murphy.

### 8.    **Eric Dilibero**

Dilibero was appointed temporary Lieutenant instead of full time Lieutenant in violation

of an LRC decision.  (Dilibero Deposition, Page 24) Dilibero supported Murphy.  (Dilibero

Deposition, Page 85, 87) Dilibero went to a couple of fundraisers.  (Dilibero Deposition, Page

92)

Dilbero was lost his Deputy Sheriff status because of his support for Murphy.

### 9.    **Timothy Turley**

Turley had a 20 day suspension appealed and reduced.  (Turley Deposition, Page 92)

Turley was Chief Steward and he had a contentious relationship with Theiss.  (Turley

Deposition, Page 71) He recalls John Ellis being summoned to the Sheriff's Department and

speaking with Sheriff Cabral (Turley Deposition, Page 80) The meeting with John Ellis, the

Sheriff, Harris and Thompkins was contentious, with Thompkins threatening a lawsuit.  (Turley

19

Deposition, Page 101) Turley was disciplined in January of 2004 for a matter in October of

2003 (Turley Deposition, Page 124-126) Turley supported Murphy.  (Turley Deposition, Page

140) Turley was disciplined without a hearing.   (Turley Deposition, Page 146).

> **10.     Paul Giglio**

Giglio backed Murphy–a well-known fact in the department (Giglio deposition, p. 90-

91).  Because of this fact, he was stripped of his Deputy Sheriff status.

> **B.     Plaintiff's Were Retaliated Against Because of Their Political Support of Defendant Cabral's Opposition**

To establish a *prima facie* case of political discrimination, Plaintiffs must show that their

political affiliation was a substantial and motivating factor in an adverse employment action.

Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977).

Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 431 lst Cir. (2005).  Political affiliation alone need

not be the controlling factor, however; a Plaintiff can show that advocacy of political ideas was

a substantial and motivating factor behind the challenged employment action, as well.

Rodriguez-Garcia v. Municipality of Caguas, 495 F.3d 1, 8, lst Cir. (2007), quoting Peguero-

Moronta v. Santiago, 464 F.3d 29, 45 lst Cir. (2006).  Although the First Circuit has indicated

that an employee must prove by clear and convincing evidence that his or her job had been

rendered "unreasonably inferior" to the norm for that position, the United States Supreme Court

has indicated that even trivial acts of political discrimination by a government employer can

give rise to a Constitutional claim.  Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990).

The Defendant has admitted in her own affidavit that she was aware that certain of the

plaintfifs were supporting her opponent.   Given the fact that her staff admitted that those who

supprted Murphy would be paid back, it can hardly be viewed that the plaintiffs were stripped

of their deputy sheriff status for non-political reasons.    Therefore, summary judgment must

fail.

      **C.**      **Sheriff Cabral's Adverse Actions Were Causally Connected to the Plaintiffs' Protected Expressions as Union Officials and Cabral Has Not Demonstrated that the Sheriff's Department Interests in Efficiently Performing its Public Function Outweighed Plaintiffs' Right of Free Speech on Matters of Public Concern.**

To the extent that the Defendant argues that she had no direct knowledge of the

Plaintiffs' political affiliation (Defendants Brief, Page 30) and did not take into consideration

political affiliation or Union activity in decommissioning the Plaintiffs or transferring them,

there is irrefutable evidence to the contrary.  The deposition testimony of Deputy

Superintendent Gene Sumpter adequately described how involved the Sheriff was in

employment decisions.  When asked who was involved in transferring Plaintiff Grennon out of

his training position, Sumpter responded:

> Victor Theiss, I know, who headed up training, made that decision.
> And, I am sure through the Sheriff.  We couldn't do anything without
> her. . .  (Emphasis added) (Sumpter deposition, Page 84)

Further proof that the Plaintiffs political consideration and Union activity was cause for

their decommissioning lies with members of the ad hoc [5]committee created to review the

position of Deputy Sheriff.  Sumpter himself confirmed that the activities of Union officials

(Grennon, Lynch, Barnes, Moscone, etc.) were reasons for decommissioning them as Deputy

Sheriff.

---

[5]      Apparently, this ad hoc consisted of Superintendents Sumpter, Horgan, Theiss, Keiley, and Harris (Sumpter Deposition, Page 29-30), with Keiley being the person in charge because she held the rank of Chief of Staff.

A.      . . . I think it was.  It would have been discussed in that context and that there was an attitude issue, not necessarily with whatever it was they were doing but how they went about doing it.  How they interacted with people in the department was the discussion. . .

Q.      So the interaction of – or how they reacted or interacted with other members of the department was reviewed, not just how they interacted or reacted in their official job function, but also how they interacted in their official Union function?

Ms. Caulo, Objection.  You may answer.

A.      Yes.

Superintendent Michael Harris then admitted that this ad hoc Committee considered political affiliation – i.e., the support of Defendant Cabral's opponent, Steven Murphy – as a consideration in recommending names to be decommissioned.

Q.      Well, was the support of Sheriff Cabral's opponent in the last election a consideration by you or the ad hoc committee in recommending those 37 names to be decommissioned?

A.      I recall that there might have been some discussion on that.

(Harris Deposition, Page 120)

Finally, the Sheriff herself stated at deposition that

There are no secrets, as you well know Mr. Pfaff, at the House of Correction and the jail.  Information is transmitted from everybody from the janitorial staff straight on up to the Sheriff to others.

(Cabral Deposition, Page 48)

The Sheriff herself was involved in the review process, requesting from Keiley an update as to how the Committee was doing (Cabral Deposition, Page 86).   The Sheriff also spoke with committee member Horgan about the considerations being used by the committee in reviewing individuals.  (Id. at Page 102)   Factors considered by the Defendant in evaluating the

22

Deputy Sheriff's position included discipline history, comportment or demeanor within the institution (Id. at Page 93), the ad hoc committee would then review individuals, and make arrests and present it to the Sheriff with recommendations.  (Id. at Page 98) Ultimately, Sheriff Cabral made the decision to decommission based on a recommended list from the ad hoc committee.  (Id. at Page 126-127)

### PLAINTIFFS HAVE COMPLIED WITH DEFENDANT'S DISCOVERY REQUEST AND THE COURT'S ORDER OF DISCOVERY

Plaintiffs have responded to Defendant's repeated requests for discovery to the best of their ability and in accordance with the discovery requirements of the Federal Rules of Civil Procedure (See Affidavit of Attorney Stephen C. Pfaff) There has been no dilatory action or wilful disregard in responding to Defendant's documents.  This is not a matter in which the Plaintiffs have failed to provide any discovery documentation to the Defendant (see Plaintiffs Responses to Defendant's First Request for Production of Documents).

To the extent that medical records have not been produced, Plaintiffs' counsel has attempted to procure the medical records of Plaintiff John Grennon, which is the heart of Defendant's argument that this case should be dismissed for failure to file discovery. Grennon's medical records have not been produced because Grennon appeared for marriage therapy with his ex-wife who will not sign a release to procure those records.  (See Affidavit of Attorney Stephen C. Pfaff)

It is not without irony that the Plaintiffs note that Defendant's primary Summary Judgment argument begins with an allegation of lack of discovery cooperation by the Plaintiffs, and not the merits of the plaintiff's complaint.  This is an attempt by the Defendant to avoid the

23

real issue in this matter, which deals with her decisions to decommission the Plaintiff and to transfer some of them because of their Union activity and political affiliation.

To that end, the Defendant is in receipt of the newsletter issued by the Plaintiffs describing the Plaintiffs' frustration with the Defendant's position on military benefits, dental and vision benefits and pay raises. At the heart of this dispute is simply the fact that the Plaintiffs were retaliated against because of their position with respect to these issues and the publication of this matter to the general public. Moreover, with respect to wages earned by the Plaintiffs while working as Deputy Sheriffs, the Defendant apparently has the information as to how much money was earned by Plaintiffs Moscone and Lynch. The other Plaintiffs have made statements indicating that they did not work much or at all in terms of doing details, and so there are no records with respect to the income earned by those individuals.

Finally, with respect to an allegation of any box delivered to Plaintiffs' counsel's office by Plaintiff Ellis, Defense Brief, Page 6, any and all documents delivered to Plaintiffs' counsel's office have been provided to defense counsel. (See Affidavit of Attorney Stephen C. Pfaff)

Respectfully, the issue of not providing discovery is simply a red herring and is an attempt by the Defendant to avoid the real issues of retaliation because of the Plaintiffs' Union activities and political affiliation.

## IV.    CONCLUSION

For all the reasons above, Plaintiffs move that Defendant's Motion for Summary Judgment be denied.

Plaintiffs, Bergeron, Grennon, Lynch,
Barnes, Ellis, Turley and Moscone,

24

By their attorney,

/s/ *Stephen C. Pfaff*

_____

Douglas I. Louison BBO# 545191
Stephen C. Pfaff BBO# 553057
Merrick, Lousion & Costello, LLP
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

CERTIFICATE OF SERVICE

     I, Stephen C. Pfaff, hereby certify that on the 21st day of September, 2007, I served the foregoing by causing a copy to be directed electronically to Ellen Caulo, Esquire, Deputy General Counsel, Suffolk County Sheriff's Department, 200 Nashua Street, Boston, MA 02114.

                     /s/ *Stephen C. Pfaff*

                     _____

                     Stephen C. Pfaff

26