

**EXHIBIT 1**

---

DAVID BERGERON, ET AL.,
Plaintiffs,

vs

ANDREA CABRAL,
Defendant.

DEPOSITION OF JOHN BARNES

COPLEY COURT REPORTING, INC.
101 TREMONT STREET
BOSTON, MASSACHUSETTS 02108
(617) 423-5841
www.copleycourt.com

---

**Page 4**

P R O C E E D I N G S

MS. CAULO: For the record this is
the matter of Bergeron versus Andrea Cabral, et
al. I am Ellen Caulo. Today is December 7,
2006 for the continuation of the deposition of
John Barnes, which was suspended on October 31.
    Mr. Barnes, you are still under oath.
    MR. BARNES: I understand.
        JOHN BARNES
a witness called on behalf of the respective
parties, having been previously duly sworn,
was examined and testified as follows:
        DIRECT EXAMINATION
BY MS. CAULO:
Q. Are there any answers or testimony that you
    gave on the prior date of your deposition that
    you wish to change?
A. I did fill out an errata sheet in regards to
    corrections to spelling and missed words that I
    saw. I faxed that over to the law firm the
    other day.
Q. I have not seen the errata sheet; but other
    than typographical, there is no substance of
    anything that you wish to change?

---

**Page 5**

A. No.
Q. I don't know if you recall, but at some point,
    the last time that you were here, I was asking
    you some questions concerning the issue of
    veterans benefits. Do you recall that
    testimony?
A. Yes.
Q. I believe, it is fair to say, that the union's
    position was that there was a certain statute,
    Chapter 37 of the acts of 2003 that not only
    applied to jail officers, but that provided for
    the accrual of vacation time while they were
    serving in military duty?
A. I don't know if that was the union's position,
    but I know the union's view on that statute.
Q. I want to quickly point your attention to Page
    148 of your testimony. Just if you could read
    there and see. Having done that, read it, I
    will ask you what the union's position was.
A. We filed a grievance based on past practice.
    Yes. After reviewing the law, we, to the best
    of my recollection, we felt after consultation
    from our law firm that the law may apply to our
    individual members.

---

**Page 6**

Q. I want to make sure that I am characterizing
    your testimony correctly. Regardless of your
    testimony, I am characterizing the union's
    position, you as president of the union, the
    statute applied to jail officers, and it
    specifically allowed for officers who were
    fulfilling their military obligation to accrue
    vacation time while they were on leave, is that
    fair?
A. It is fair to say that we had questions in
    regards to whether it applied or didn't apply.
    The answer that we received back from Richard
    Transfaglia, who was in charge of personnel at
    the time, it did apply to our officers, and it
    gave vacation accruals to one of our members
    when he returned, and in turn that ended up
    being taken from him.
Q. Who is Tom Kelly?
A. He is secretary of veterans affairs, I believe.
Q. Did you have communications with Mr. Kelly
    concerning whether or not this statute that we
    have been discussing applied to jail officers
    and whether or not it specifically allowed for
    officers to accrue vacation time while they

---

**31**

Q. ...on your meaning -JOEASC...
...participate in the Mass.
...oes Fund was not something over
...partment had any control; is that
...
A. ...lieve the department had any control.
...er, basically, the obligation that
...to JOEASC was through the Collective
...ning Agreement.
Q. ...to make sure it is clear. Your, meaning
...ASC's inability to be covered under the
...s. Public Employees Fund, after you
...certified, was not a result of anything that
...e department did or did not do; is that
...orrect?
A. i believe not. I never indicated that.
Q. I am not asking, suggesting that you did. I am
-- strike that.
I'm asking you whether or not that
is true, that the department did not do
anything that resulted in your ineligibility to
participate in the Mass. Public Employees Fund;
is that correct?
A. To the best of my knowledge, that's correct.

**32**

MR. PFAFF: We will stipulate to
that.
Q. The department then voluntarily paid COBRA for
your members to obtain dental and vision
coverage; is that correct?
MR. PFAFF: Objection. We have been
over this. Asked and answered. You may have
it one last time.
A. If they use the word voluntary. We felt they
were obligated through the Collective
Bargaining Agreement that they had to continue
coverage. That was an option provided to them.
Q. In fact, they did; is that correct?
A. They did.
Q. At the time that you sent out these mailing,
and the mailing being the exhibits that were
previously marked as Exhibits 5 through 9, the
mailing that we discussed the last time that
you were being deposed went out in March and
April of 2004, do you recall those?
A. Around that, yes.
Q. At the time that those mailings went out, the
department was paying COBRA payments for dental
and vision benefits for JOEASC members; is that

**33**

correct?
A. The department was sporadically paying payments
on time which resulted in numerous
interruptions of benefits for our members and
denial of coverage for our members, and we were
also informed by the sheriff that she was using
dental vision as bargaining leverage. That's
correct.
Q. That was a yes or no question. Let me ask it
again. At the time that you sent the mailing
out in March and April of 2004, those mailing
being exhibits previously marked as 5 through
9, the department was in fact making COBRA
payments for dental and vision benefits for
JOEASC members?
A. They were making payments, but untimely.
MR. PFAFF: Objection.
Q. At any time, did you issue a retraction or a
clarification of the information that was
provided in those mailings in March and April
of 2004?
A. No. We felt our stance, we stuck by our
stance.
Q. Did you think it was important, now, these

**34**

2    Suffolk County?
3 A. Residents, I would say.
4 Q. They were sent out to residents?
5 A. Yes.
6 Q. They were given to media outlets?
7 A. Yes.
8 Q. They were published in the print media?
9 A. Yes.
10 Q. Do you think it would have been important for
11    the public at large and these media outlets to
12    know that the department was in fact making
13    COBRA payments for dental and vision benefits
14    for JOEASC members?
15        MR. PFAFF: Objection. Calls for
16    speculation. You may answer.
17 A. If I recall, based on the letter, if I could
18    review the letter, I would be able to answer it
19    better.
20 Q. Would it have been important for these folks to
21    know?
22        MR. PFAFF: Objection. Speculation.
23 A. I need to review the letter. I don't believe
24    in the letter that we put that the department

**35**

1    was not making payments. We had an issue that
2    they were not making payments timely, and we
3    had interruptions and people were not being
4    covered, and I believe that is what the letter
5    states. that we were having issues with dental
6    and vision. I don't recall the specifics of
7    what exactly.
8 Q. I will show you one. Exhibit Number 8. It is
9    a press release that was printed in the West
10    Roxbury Transcript, and it is quoting you, in
11    one scathing passage, President John Barnes --
12    strike that.
13        Before that, it says the letter
14    cites misuse of money owed to pension benefits,
15    a lack of dental and vision, delinquent payment
16    of water bills and dishonoring of honoring
17    agreements of employees called away on duty.
18    Did I read that correctly.
19        MR. PFAFF: We will stipulate to
20    that. The question is, did she read it
21    correctly?
22 A. Yes.
23 Q. Now, having read that and reviewed it, did you
24    issue a retraction or a correction -- strike

**36**

1    that.
2        Did you issue a retraction or
3    correction given the fact that the department
4    was in fact making COBRA payments for dental
5    and vision benefits for your members?
6 A. No, we did not.
7 Q. You issued these press releases in order to --
8    strike that.
9        What was the purpose of issuing
10    these press releases?
11 A. As I indicated prior --
12        MR. PFAFF: Objection. Asked and
13    answered.
14 Q. You may answer.
15 A. As I indicated prior, there were options
16    provided to the association based on a motion
17    put to the floor by members at a general
18    membership meeting in regards to the issues
19    that we are facing to, A, do external
20    picketing, B, do an external mailing or C. do a
21    media inquiry to let the public know the issues
22    that we are facing.
23 Q. Well, these mailings. I believe you testified
24    to the last time that we were not written by

43

```
 1   Q.  Did she ask you any specific questions
 2       concerning who wrote the mailing, did she ask
 3       you any questions concerning the accuracy or
 4       the truth of the information contained in those
 5       mailings?
               MR. PFAFF:  Objection.  That is a
 7       multiple question.  Which one do you want
 8       first?
 9   Q.  Did she ask you any questions concerning the
10       accuracy of the information contained in the
11       mailings?
12   A.  She portrayed her stance, I know, I really
13       can't recall exactly everything that was said
14       out of her mouth.
15   Q.  What did you say about the information, for
16       example, on the dental and vision benefits?
17   A.  I don't think that we had an opportunity to
18       really discuss and get elaborate on our stance.
19       We were more in there to listen to what she had
20       to say.  How she was unhappy with the letter,
21       and how we were going to be held accountable,
22       and it was liable and slanderous.
23   Q.  Is that your best memory of everything that the
24       sheriff said during the course of this one-hour
```

44

```
 1       meeting?
 2   A.  Yes.
 3   Q.  You do not recall anything else?
 4           MR. PFAFF:  Objection.
 5   A.  I do not recall.  No.
 6   Q.  At any point, did you indicate that the
 7       information, at any point, did you apologize?
 8   A.  No.  Not for the letter.
 9   Q.  Did you apologize at all?
10           MR. PFAFF:  Objection.
11   A.  No.
12   Q.  Did you indicate at any point that the
13       information that was contained within those
14       mailings was not accurate?
15   A.  No.  Not that I recall.
16   Q.  How about Mr. Grennon, what did he say?
17   A.  I don't recall.  I don't recall.  Like I said,
18       the only thing I kept hearing is held
19       accountable and liable and slanderous.  I don't
20       really, I don't recall specifics of
21       conversations of what was said.
22   Q.  Did Mike Harris say anything?
23   A.  If he did, he did not say much.
24   Q.  Do you recall anything that he said?
```

45

```
 1   A.  I don't recall.
 2   Q.  And Steve Tompkins, the only thing you recall
 3       him saying is what?
 4   A.  When they were walking out the door, he
 5       stopped, turned to Officer Grennon and myself
 6       and said do you have families, do you have
 7       houses, how would you feel losing your house?
 8   Q.  What did you say?
 9   A.  I didn't say anything.
10   Q.  You indicated that the folks the sheriff
11       directed to meet with her concerning these
12       mailing were yourself, Mr. Grennon and Mr.
13       Ellis?
14   A.  That's correct.
15   Q.  There was no direction for Tim Turley to meet
16       with her?
17   A.  Not that I am aware of.
18   Q.  Was there any discussion of Steve Murphy during
19       this hour-long meeting?
20   A.  I can't recall specifics.  I don't recall.  I
21       know his name might have been mentioned.  I
22       don't recall specifics.
23   Q.  If you know his name might have been mentioned,
24       I am asking everything that you recall talking
```

46

```
 1       about.
 2   A.  I don't recall exactly what was said.  I think
 3       she inquired in regards -- what was the issue
 4       on that?  I can't recall.  I really can't.  I
 5       can't recall.
 6   Q.  Did you discuss the JOEASC endorsement for
 7       Suffolk County sheriff?
 8   A.  It was prior to that.  No, we did not.
 9   Q.  Did you discuss the election at all?
10   A.  No.  We did not.
11   Q.  Is it fair to say that she was meeting with you
12       and Mr. Grennon and subsequently with Mr.
13       Ellis because of the mailing that the three of
14       you, had gone out under your name; is that
15       correct?
16           MR. PFAFF:  Objection.
17   A.  Yes.
18           MR. PFAFF:  Speculation as to why the
19       sheriff did what she did.
20   Q.  Did she tell you why she was meeting with you?
21   A.  Initially, no.  We had no idea why she wanted
22       us there.
23   Q.  When you were here in this room?
24   A.  When we were here, she indicated that she was
```

47

```
 1       upset with the letter.
 2   Q.  When you kept saying the letter, there were
 3       four or five different mailings or three
 4       different mailings?
 5   A.  As far as I know, there was, there might be
 6       different dates on the press release, but there
 7       was one actual mailing.  There was a mailing to
 8       union officials that went out at a different
 9       time, and a mailing to residents that went out
10       at a different time, but it was all one letter.
11   Q.  When we are talking about the mailing, we are
12       talking about what had been previously marked
13       as Exhibits 5, 6, 7, 8, and 9; is that correct?
14   A.  Yes.
15   Q.  You can take a peak at those.  Is that correct?
16   A.  That's correct.
17   Q.  When you arrived for this meeting, you and John
18       Grennon met with the sheriff, she told you the
19       purpose of this meeting was to talk about her
20       displeasure regarding these mailings put out
21       under JOEASC, you, John Grennon and John Ellis?
22   A.  Yes.
23   Q.  That is the reason why she wanted to meet with
24       the three of you, right?
```

48

```
 1   A.  I believe so.
 2   Q.  She didn't ask to meet with Tim Turley?
 3           MR. PFAFF:  Objection.
 4   A.  To the best of my recollection, no.
 5   Q.  To your knowledge, did she ask to speak to Tom
 6       Turley?
 7   A.  To the best of my recollection, no, sir.
 8   Q.  To your knowledge, did she ask to speak with
 9       any of the E board members?
10   A.  To the best of my recollection, no.
11   Q.  Did she ask to meet with any other member of
12       JOEASC other than the folks whose name appeared
13       on these mailings?
14   A.  To the best of my recollection, no.
15           MR. PFAFF:  Objection.
16   Q.  It is fair to say that she was meeting with you
17       concerning these mailings and not the fact that
18       you were members of JOEASC; is that right?
19           MR. PFAFF:  Objection.
20   A.  To the best of my recollection, she was upset
21       based on the letters that were mailed in our
22       capacity as union officials.
23   Q.  That is something else that you remember her
24       discussing?
```

**85**

```
 1   your family and children if you do get
     ...ted.  When you go home and you look at
     ...mily, my family means the world to me.
     ...told that I could possibly suffer adverse
     ...on because of what I did really hit home on
     ...e.  That is why I really didn't want to get,
     ...ecome involved with the union.
     ...Who told you that?
     ...What's that?
     ... You were going to suffer adverse actions,
        consequences?
     3  A.  Based on what was portrayed to me by Mike Walsh
    14      of possibly being terminated, it really set in,
    15      it sunk in.  It sunk in.  It made me put things
    16      in perspective that when sometimes you think
    17      what is doing right for the membership in turn
    18      could be what is wrong for yourself or family.
    18  Q.  Describe specifically any emotional pain that
    19      you have suffered?
    20  A.  Other than the constant fear of not knowing if
    21      there is going to be retribution or not, it
    22      weighs heavy on you.  Emotionally, it weighs on
    23      you.  You go home to your wife, and you look at
    24      your kids, and, I don't know, I can't describe
```

**86**

```
 1      it.  The last thing you want to do is put them
 2      in a situation where you cannot provide for
 3      them.  Emotionally, it takes a toll on you
 4      because you are thinking about that.
 5  Q.  What facts can you direct me to that form the
 6      basis for this constant concern or fear that
 7      you have of retribution?
 8          MR. PFAFF:  Objection.  Asked and
 9      answered.
10  A.  Like I indicated, I believe that at one time it
11      was a considering factor by this
12      administration.  I don't know to this date if
13      it still is not.  I don't know.
14  Q.  Have you received any mental health treatment
15      in the last five years?
16  A.  No, I have not.
17  Q.  Have you received any mental health treatment
18      as a result of the allegations in your
19      complaint?
20  A.  No.
21  Q.  Are you on any medication as a result of the
22      allegations in this complaint?
23  A.  No, I am not.
24  Q.  Previously, you indicated that you transferred
```

**87**

```
 1      from your position in property in January of
 2      '05?
 3  A.  Yes.
 4  Q.  And you were transferred to become a line
 5      officer in the 161 unit; is that right?
 6  A.  I am assigned up there currently, yes.
 7  Q.  That was not your initial assignment subsequent
 8      to your transfer?
 9  A.  I have worked different assignments since my
10      transfer to property.
11  Q.  How did you learn that you were transferred out
12      of property?
13  A.  When the shift selection started, my name
14      appeared.  I was never officially informed that
15      I was being removed.  I was just on the list.
16      No one, once your name is on that list, you are
17      picking your shift and days off, you are no
18      longer in that position, which is excluded from
19      the selection process.
20  Q.  So when you are in a support services position,
21      you automatically get, it is automatically days
22      and it is automatically weekends off, so there
23      is no need for you to select?
24  A.  Depending on what position it is, the position
```

**88**

```
 1      that I was in, it was Monday through Friday,
 2      weekends off, seven to three shift.
 3  Q.  Did you have a conversation with anybody,
 4      specifically, the superintendent, Gene Sumpter
 5      or the deputy superintendent Cliff Carney,
 6      after you realized that you were on a list to
 7      select a shift and your days off?
 8  A.  No.  I don't recall any specific conversation
 9      in regards to that.
10  Q.  Did you have any conversation with anybody,
11      with Mr. Sumpter, Gene Sumpter or Cliff Carney
12      regarding your transfer out of property?
13  A.  No.  No, I don't recall that.
14  Q.  At any time after you were transferred out of
15      property, did you have any conversations with
16      superintendent, deputy superintendent or anyone
17      concerning the reasons why?
18  A.  To the best of my recollection, no.
19  Q.  The conversation that you have spoken about at
20      length with Mickey Walsh that occurred some
21      time in the fall of 2004, did he mention to you
22      that you might be transferred out of property?
23  A.  No, he did not.
24  Q.  Prior to your transfer out of property, do you
```

**89**

```
 1      have any incling whatsoever that you were going
 2      to be transferred?
 3          MR. PFAFF:  Objection.
 4  A.  No.  I believe that year, it was either that
 5      year or it might have been the prior year that
 6      I received the job I was doing there.  I didn't
 7      think I was going to be moved out of there for
 8      job performance, I got a commendation based on
 9      my performance from the department of
10      correction audit.  I didn't, I had no idea why
11      I was being removed.
12  Q.  Who replaced you as the property officer?
13  A.  Edoardo Vargas.
14  Q.  Where had he been, do you know what his
15      assignment was prior to him being moved into
16      property?
17  A.  He was I believe working upstairs as a line
18      officer.
19  Q.  Is he still employed by the department?
20  A.  Yes, currently.
21  Q.  What is his position right now?
22  A.  Line officer.
23  Q.  Who is currently in the property department?
24  A.  Thomas Johnson.  He was the property officer on
```

**90**

```
 1      the three-to-eleven shift.
 2  Q.  Now he is on the seven-to three shift?
 3  A.  Yes.
 4  Q.  Did he succeed Edoardo Vargas?
 5  A.  Edoardo Vargas went out injured.  I don't
 6      recall exactly when.  They ended up placing me
 7      down there to cover for him for most of the
 8      duration that he was out.
 9  Q.  How long a period of time was that?
10  A.  I want to say that I was down there for a good
11      three or four month span.
12  Q.  When you were down there covering for Mr.
13      Vargas during his injury period, were you
14      getting weekends off?
15  A.  No.
16  Q.  So the department, who asked you to fill in for
17      him?
18  A.  It was assignment by shift commander.
19  Q.  So you did that for three or four months and
20      you had your weekends off?
21  A.  No.  I did not have weekends off at that time.
22      I had my -- I picked on seniority, but I was
23      not provided the weekend off based on the
24      assignment.
```



Volume 2
Pages
Exhibit & per

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-cv-11661-RGS

- - - - - - - - - - - - - - - - -

Bergeron, et al          Plaintiff,

V.

Andrea Cabral           Defendant.

- - - - - - - - - - - - - - - - -

CONTINUED DEPOSITION OF JOHN GRENNON, a
witness called on behalf of the Defendant taken pursuant
to the Federal Rules of Civil Procedure, before Patricia
M. Haynes, a Certified Shorthand Reporter and Notary
Public in and for the Commonwealth of Massachusetts, CSR
No. 146209, at the Offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Monday, February 26, 2007, commencing at 10:00 a.m.

Copley Court Reporting
58 Batterymarch Street, Suite 313
Boston, Massachusetts  02110
(617) 423-5841

---

**COPLEY COURT REPORTING** BOSTON MA 02110
617-423-5841

RANCES:

County Sheriff's Department
(en M. Caulo, Esquire)
shua Street
, Massachusetts 02114
l for the Defendant

, Louison & Costello, LLP
bert Stewart, Esquire
erymarch Street
, Massachusetts 02110
l for the Plaintiffs

RESENT:

en Cawley, Assistant General Counsel

---

3

| Witness | Direct | Cross | Redirect | Recross |
JOHN GRENNON
(By Ms. Caulo)      4

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 2  Letter of 7/16/04 from Mr. Harris | | 41 |
| 3  Deputy sheriff application | | 60 |
| 4  Appointment policy | | 63 |
| 5  Policy S 520 | | 87 |
| 6  Letter of decommissioning | | 100 |
| 7  Press release | | 134 |
| 8  Press release | | 134 |
| 9  Letter sent to voters | | 134 |
| 10  Letter regarding pension benefits | | 187 |

---

4

1          P R O C E E D I N G S

2               JOHN GRENNON,

3     having been previously sworn, was examined and testifie

4     as follows:

5               MS. CAULO:  Today is Monday, February 2

6     2007.  This is the continuation of the deposition of

7     John Grennon.  Mr. Grennon, you've just been sworn. 2

8     are going to continue with your testimony.

9     DIRECT EXAMINATION BY MS. CAULO

10          Q.   Have you had an opportunity, sir, to review

11     the transcript of your first day of testimony in this

12     matter?

13          A.   **Yes.**

14          Q.   Do you want to change any of your answers

15          A.   **I don't believe so.**

16          Q.   I want to follow up on a couple of things we

17     covered on that earlier date.  In reference to your

18     testimony concerning the office that you utilized at the

19     training division in Chelsea, you indicated on some th

20     you came in and things had been removed from that

21     office.  Do you recall that testimony?

22          A.   **I do.**

23          Q.   Was any personal property removed from th

24     office that you used at Chelsea?

**Page 13 (left, partially cut off)**

Is it your personal property or do they belong

It's a legal question. I don't know the
to that one.

I'm asking your opinion?

I don't have an opinion on it, to be honest
..

You indicated these were your things that you
ld have been returned to you. I'm trying to
se --

Well, I'm not asking for exclusive license to
would just like the copies of what I was working
would have them. I teach other places, I do
in other places. Not that I would use sheriff
ient material for lectures outside of the
department, certainly not without permission,
e of the research efforts that went into those
ations, the raw data, I would have liked to have

When was this conversation that you had with
cheiman where you had dinner with him after he
inated, do you recall?

I don't. Pardon me, dinner was in Somerville
taurant called Red Bones, but I don't recall

**Page 14 (bottom left, partially cut off)**

was. It was after he was terminated.

You recall where you had dinner?

I do.

But you don't recall when in time. Was it in

I can guaranty you it was in 2004. It was
s termination -- he was fired in June. Maybe
ere around August 2004, but it was definitely

Have you had any contact with him since then?

None. His lawyer, yes.

That would be Rob Mantei?

Yes.

You indicated that you had conversations with
eiman between I believe you said January and his
ion sometime in June. You also indicated that
conversations with Tom Robinson and Keith
in which they recounted to you their
tions with Victor Theiss. How many
tions did you have with Tom Robinson?

I don't recall.

Less than ten, more than ten?

I don't recall.

What was communicated to you in these

**Page 15 (top right)**

1   conversations? Was it more than one?
2       A.   Oh, sure.
3       Q.   Less than five, more than five?
4       A.   I don't recall, honestly.
5       Q.   Give me your best estimate as it how many
6   conversations you think you had and what was
7   communicated to you by Tom Robinson.
8       A.   I would --
9            MR. STEWART:  Objection to the first part.
10  It's answered already.
11  BY MS. CAULO:
12      A.   I don't know how many conversations I had, and
13  I have no guess how many conversations I had.  The
14  content of those conversations, that the general
15  consensus among the trainers is that I was removed from
16  the training division because of my activity on behalf
17  of the officers' union here at Nashua Street.
18           That discussions had taken place between the
19  trainers, specifically the Nashua Street trainers, that
20  they were going to ask to be transferred back to the
21  jail kind of in protest, which I asked them not to do.
22  It was kind of cutting their nose off to spite their
23  face.
24           And just conversations that Victor Theiss was

1   at the training division making statements that were
2   derogatory towards me.  But he made those statements
3   while I was there, too.
4       Q.   What were the statements he made?
5       A.   Well, he would frequently threaten me.  At one
6   point he told me I had to quit the union, that I had to
7   resign as vice president if I wanted to stay in
8   training.
9       Q.   When did he say that to you?
10      A.   Numerous times in early 2004, numerous.  He
11  took me out to lunch one day at a restaurant on Broadway
12  in Chelsea and told me it was my last chance to start
13  behaving.
14           I asked him what he meant by that, and he told
15  me that the sheriff can't have me in training if I'm
16  going to be critical of her administration.  I told him
17  I wasn't being critical of her administration.
18      Q.   What specifically was he referring to when he
19  said you were being critical of her administration?
20      A.   I don't remember him being specific that day.
21      Q.   What did you take it to mean?
22      A.   He had mentioned in the past that it upset the
23  sheriff a great deal that I would go to academy
24  graduations and tell the students and tell the parents

Q. Do you think you were more or less qualified than Mr. Michelman for this position?

A. **As qualified.**

Q. Do you think that Mr. Michelman had any greater qualifications than you had?

A. **Yes.**

Q. What were those?

A. **He possessed a master's degree and I had a bachelor's degree.**

Q. A few moments ago you said you were as qualified?

A. **Yes.**

Q. With the exception of the difference in he had a master's degree and you had a bachelor's degree, is that the only distinction between your qualifications?

A. **Where he was more qualified?**

Q. Yes.

A. **Yes.**

Q. That's it?

A. **I would say so.**

Q. Did you ever tell Victor Theiss that you were applying for the director's position simply to gain a forum to present your ideas and opinions but at the end you would step aside for Mr. Michelman?

1 the way they were conducting themselves.

2 Q. Is there a distinction between the sheriff's

3 management of the department and her administration?

4 A. **I think so.**

5 Q. Why don't you explain to me that.

6 A. **Well, if someone under Sheriff Cabral is**

7 **conducting themselves inappropriately and not under her**

8 **orders, then that's a reflection on them. I don't**

9 **believe that's a reflection on the sheriff.**

10 Q. So the interactions you had with Victor Theiss

11 were not a reflection of Sheriff Cabral?

12 A. **Not as much as they were a reflection on**

13 **Victor Theiss.**

14 Q. Were they a reflection at all of Sheriff

15 Cabral?

16 A. **I suppose.**

17 Q. In what fashion, how?

18 A. **It seemed that she was condoning his actions.**

19 Q. How did it seem like that?

20 A. **He was telling me how upset she was, and he**

21 **was telling me that she thought I was a hypocrite. And**

22 **he was telling me that she was saying, "I'll take him**

23 **out of training if this continues."**

24 Q. So when was it that your assessment or your

---

46

A. **Absolutely not.**

Q. Did you ever say anything like that to Mr. Theiss?

A. **Not that I recall.**

Q. Did you ever say anything like that to anyone else?

A. **Not that I recall.**

Q. Did you ever say anything like that to Mr. Michelman?

A. **Not that I recall.**

Q. What was your reaction to the appointment of Sheriff Cabral as Sheriff of Suffolk County in November of 2002?

A. **I was elated.**

Q. Why were you elated?

A. **The department was in rough shape. We needed a change. And from what I knew of Sheriff Cabral, I thought that was a great appointment.**

Q. At any point did your feelings towards her administration change from that initial elation?

A. **Yes.**

Q. When?

A. **Never towards Sheriff Cabral but towards members of her administration when I was disappointed in**

48

1 elation at her appointment as sheriff of Suffolk County

2 changed?

3 A. **It really didn't.**

4 Q. On the first day of your testimony, you

5 indicated that your relationship with the sheriff was

6 initially good but soon after her appointment, she

7 became unhappy with your activities.

8 I'm asking you whether or not at any point you

9 came to be displeased with her as sheriff or her

10 management of the department?

11 A. **Not displeased with her and not displeased**

12 **with her management of the department, displeased that**

13 **we couldn't come to some decisions on the issues that we**

14 **were having with her.**

15 Q. And --

16 A. **Our issues, to finish, the issues we had with**

17 **her are those on point issues that I told you, vision,**

18 **dental and pension and the veterans' benefits. I don't**

19 **believe those are a reflection on what she is doing with**

20 **this department and the changes that are taking place**

21 **here.**

22 Q. What other individuals did you experience an

23 unpleasant interaction with that you attributed to the

24 sheriff? You mentioned Victor Theiss. Anyone else in

...o is that April, May of 2003?
1 I don't recall to be honest with you. That's
2 something I probably could check for you and get a
3 date, but I don't recall. We had meetings with
4 Michael Harris on this issue in labor management,
5 and I know Michelle has documented it.
6 Do you have any of those in front of
7 you? Because I'd be more than happy to stipulate
8 the dates for you. I just don't recall.
9
10 Q. What was your understanding of what effect
11 decertification would have on the membership
12 immediately after you severed your relationship
13 with AFSCME?
14 A. Well, I had no understanding of decertification
15 because we didn't decertify.
16 Q. Well, self organizing and no longer have an
17 affiliation with AFSCME 93?
18 A. My understanding was through conversations with
19 Michael Harris that our collectively bargaining
20 agreement would continue until we negotiated the
21 next one. Michael Harris said he thought it was a
22 good idea that what we were doing, and he had high
23 hopes and that he was going to arrange a meeting
24 with the Sheriff, which we did have.

COPLEY COURT REPORTING
(617) 423.5841

---

1 And when we left, the Sheriff wished us
2 luck. We sat in that office at Nashua Street,
3 John Barnes, myself, Michael Harris and the
4 Sheriff. And we met with AFSCME Council 93, the
5 Executive Director Tony Caso. Anthony Caso was
6 his name.
7 We did not decertify from AFSCME.
8 AFSCME disclaimed us. They let us go
9 voluntarily. So there were no hearings, and
10 there were no proceedings. And Anthony Caso told
11 us -- one quote I remember clearly is that we
12 were bad for business and that they were going to
13 disclaim us.
14 He wished us well, and he wasn't looking
15 to hurt anybody. And good luck to you guys. And
16 we left the office. So my understanding was that
17 there would be no changes to our collective
18 bargaining agreement, no changes to our benefits,
19 no changes to anything.
20 Q. I'm not talking about your collective bargaining
21 agreement. I'm talking about what was your
22 understanding of where your dental and vision
23 benefits came from when you were part of an
24 organization that was affiliated with AFSCME?

COPLEY COURT REPORTING
(617) 423.5841

---

1 A. Our dental and vision benefits come from the
2 collective bargaining agreement. It was the
3 responsibility of the Department to provide those,
4 and the vendor that we were using was the Mass.
5 Public Employees' Fund, not AFSCME.
6 And we were under the impression that
7 that would just continue because that was a
8 financial relationship between the Sheriff and
9 the Mass. Public Employees' Fund.
10 Q. What is the basis for your belief that it was a
11 financial relationship between the Suffolk County
12 Sheriff's Department directly and the Mass. Public
13 Employees' Fund?
14 A. Because the Suffolk County Sheriff's Department
15 negotiated a contract for us that said that they
16 would provide dental and vision benefits, not that
17 AFSCME or any other group would. They were
18 provided, so the Department provided them for us.
19 And the Department chose to use the Mass. Public
20 Employees' Fund.
21 Q. That had nothing to do with AFSCME Council 93 and
22 your affiliation with 1134?
23 A. No, no. Not to my knowledge, it didn't. The
24 benefits were not -- the dental and vision

COPLEY COURT REPORTING
(617) 423.5841

---

1 benefits were not tied to the union. The
2 non-union employees here have them. So no, my
3 understanding was that there was no relationship.
4 Q. And you were never informed by anybody at AFSCME,
5 Tony Caso, Jimmy Breslin concerning the effect
6 self organizing would have on the dental and
7 vision benefits that you received under the Mass.
8 Public Employees' Fund?
9 A. Absolutely not.
10 Q. Never?
11 A. Never.
12 Q. Is the Sheriff's Department a paramilitary
13 organization?
14 A. Can you define paramilitary?
15 Q. I'm asking you. What do you think?
16 A. I don't know what paramilitary is.
17 Q. How would you define the Sheriff's Department
18 then?
19 A. That it's a government agency, a non-public safety
20 government agency.
21 Q. I'm talking about organizational structure. I'll
22 ask it differently.
23 A. Yes.
24 Q. Is there a chain of command?

COPLEY COURT REPORTING
(617) 423.5841

it was.

Q.   It's fair to say the majority of the persons voting decided to support a candidate other than Sheriff Cabral, right?

A.   **Yes.**

Q.   Did the sheriff ever tell you directly or indirectly if you didn't support her candidacy there would be consequences?

A.   **No, she didn't tell me that.**

Q.   Did you ever believe that to be the case?

A.   **Yes.**

Q.   Why did you believe that?

A.   **She made a comment at an academy graduation one day at Boston University. We were taking a group picture after the graduation exercises, and she was behind me and she made a comment that one good swift kick in the head and all my problems would be gone.**

**And I turned and looked. And some people took it as a joke. I actually had stood up and scurried away and looked. And then that was the end of it. I was right in front of her. It was kind of clear to me at that point that she didn't like me.**

Q.   When did this take place?

A.   **We were at a graduation ceremony at the**

---

150

**Sherman Auditorium at Boston University.**

Q.   2004, 2005?

A.   **I don't recall.**

Q.   Well, when were there academy graduations while you were there?

A.   **I don't recall, but the training division would be able to tell you when this was. It was a very cold night. It was an evening and it was at Boston University. The graduation had taken place, and the group picture was being held afterwards.**

Q.   And what transpired again?

A.   **I got down on one knee in front of the sheriff, because she was standing in the second row, and she made a statement, which most people found to be funny, that one good swift kick in the head and all my problems would be gone.**

Q.   Whose problems?

A.   **All of her problems. And all the guys from training had a big chuckle and laugh out of it. I got up and scurried and came back and took the pictures and that was it.**

Q.   You scurried as part of a joke?

A.   **I didn't find it to be a joke at all.**

Q.   What did you scurry away from? Describe what

---

151

you did.

A.   **I stood up and took several steps forward and turned around and took a look at her.**

Q.   Did you have any communication with her?

A.   **No. I recall she wasn't talking to me at the time.**

Q.   Why wasn't she talking to you at the time?

A.   **No idea.**

Q.   Was there a period of time that she wasn't speaking to you?

A.   **Quite a long period of time.**

Q.   What level of interaction did you have with Sheriff Cabral such that there would be a period of time when she wasn't talking to you? How frequently did you actually speak with her?

A.   **I didn't speak to her much at all. But when I called her office about matters, I never got a call back. When I called and asked for meetings, I never got a response back.**

Q.   What was the channel for requesting meetings with the sheriff?

A.   **There is none.**

Q.   Is it appropriate for you to contact the sheriff directly or --

---

152

A.   **Absolutely. As vice president of the union, absolutely, yeah.**

Q.   You wouldn't go through employee relations?

A.   **No.**

Q.   Or chief of staff?

A.   **Not when I thought they rose to that level.**

Q.   What issues did you feel rose to the level of requiring a direct meeting with the sheriff in which you initiated it directly?

A.   **The dental and vision benefits being terminated for our members.**

Q.   When were they terminated? I thought the department was paying COBRA payments?

A.   **Sporadically. There were quite a few months where the payments weren't made or they were made late, and members were almost on a monthly basis tell us they weren't receiving benefits. And that was a problem.**

Q.   What other times did you seek to speak with the sheriff directly and she didn't speak to you?

A.   **I don't recall.**

Q.   You don't recall or there wasn't any other occasions?

A.   **There were other occasions, I just don't recall when they were. It was a long time ago.**

Q.    Did you ever have any conversation with anybody in the sheriff'S senior management or administration in which you said we are not going to take any illegal action with respect to the pension issue?

A.    I don't remember that, no.

Q.    How did the issue of the water bill affect you and JOEASC?

A.    It didn't affect me at all.  You'd have to ask John Barnes how it affected JOEASC, I don't know.

Q.    What was the significance of the issue raised in '89 with respect to pay raises?

A.    We were upset that some nonunion administrative employees were being offered or being granted significant pay raises, and we weren't seeing the same offers made at our collective bargaining meetings.

Q.    What are 15 F letters?

A.    Pay acceleration letters to the City of Boston where an individual goes from a lower step to a higher step bypassing steps in-between.

Q.    What was the factual basis for your allegation that the sheriff had handed out pay raises to former colleagues and friends in excess of over $450,000?

189

1  Q.   To your knowledge, once the decision was made
2  to issue the mailings marked at 7, 8 and 9, did anyone
3  go back to the union membership to get their thoughts on
4  what the contents should be?
5  A.   I don't know.
6  Q.   Your testimony is that only Mr. Ellis, Mr.
7  Barnes and Mr. Condon were responsible for the content?
8  A.   Yes.  And if anybody was to go back to the
9  membership, it would have been one of them since they
10  were here.
11  Q.   Did you speak with the press concerning the
12  pension issue?
13  A.   I believe I did.
14  Q.   When was that, sir?
15  A.   I don't recall.
16  Q.   Do you recall what was the nature of the
17  inquiry and what you communicated to them?
18  A.   I remember them calling me, but I don't recall
19  what was said, no.
20  Q.   To your knowledge, do you know why none of the
21  information that's contained in Exhibit 10 was not
22  contained within the mailings 7, 8 and 9?
23  A.   I don't.
24  Q.   What conversation did you have with Victor

190

1  Theiss concerning the action that JOEASC was going to
2  take with respect to the delayed payments to the pension
3  issue?
4  A.   I don't believe I had a conversation with him.
5  Q.   So no conversation whatsoever?
6  A.   I don't recall one.
7  Q.   Did you have a conversation with Michael
8  Harris concerning what JOEASC was going to do with
9  respect to the pension issue?
10  A.   I don't believe so.
11  Q.   Were there any conversations between you or
12  member of the E board with the sheriff's department
13  senior management concerning any action you were
14  intending to take with respect to the delayed pension
15  payments?
16  A.   I can't speak to those.
17  Q.   To your knowledge?
18  A.   I have no knowledge.
19  Q.   What was your purpose in filing the lawsuit
20  that you filed in December of 2003?
21  A.   I believe to compel the department to make
22  full payment to the pension fund of monies that should
23  have been there.
24  Q.   And why did you feel it was necessary to

191

1  initiate a lawsuit in order to attain that result?
2  A.   We felt it was egregious, that that was a
3  very, very important issue and a very big part of taking
4  this job, the pension that comes with it.  And we
5  thought that court action would prevent that from
6  happening again, especially if we got a judge's order.
7  Q.   So your purpose in doing it was what?
8  A.   To get the monies put back into the pension
9  fund.
10  Q.   Well, they weren't taken out, right?
11  A.   I'm sorry, to get the monies that should have
12  been put there put there and by possibly getting the
13  court to act on it preventing it from happening again.
14  But again, that lawsuit was filed by our attorneys, and
15  you would have to ask them more specifically what the
16  intent was behind it.
17  Q.   You're a named plaintiff.
18  A.   I am.
19  Q.   You are a client.
20  A.   Yes.  They needed a name and they used mine.
21  Q.   They did it with your authorization, right?
22  A.   Yes, they did.
23  Q.   You authorized your counsel to file a lawsuit?
24  A.   Yes, we did.  We filed on their

192

1  recommendation.
2  Q.   When were you advised that Sheriff Cabral
3  wanted to meet with you and John Barnes concerning the
4  documents that were marked as exhibits 7, 8 and 9?
5  A.   The day we met with her.
6  Q.   Who advised you?
7  A.   Marty Michelman.
8  Q.   What did he tell you?
9  A.   He said, "I just got a phone call.  The
10  sheriff wants to see you in her conference room
11  immediately.  Put your uniform on and get over there."
12  Q.   Did he tell you anything else?
13  A.   No.  He asked me, "What did you do?  They're
14  not happy."  I said, "I have no idea."
15  Q.   When you got here, where was the meeting?
16  A.   In this room.
17  Q.   Who was present?
18  A.   Mike Harris, Steve Tompkins, Sheriff Cabral,
19  myself, John Barnes.  I believe Eugene Sumpter, but I'm
20  not exactly sure.
21  Q.   What was discussed?
22  A.   Nothing was discussed.  We got yelled at for
23  three hours.
24  Q.   What did Sheriff Cabral talk to you about?

1     A.  **Sheriff Cabral didn't talk to me about**
2  **anything.  Sheriff Cabral sat in that seat at the end of**
3  **the table and told us, she asked us who the hell we**
4  **thought we were with these letters.  She demanded a**
5  **retraction for these letters.**
6         **She told us that we had committed libel and**
7  **slander.  She told us she could fire us.  She told us**
8  **that she could attach our assets.  And then she**
9  **questioned us about every inch of the letters.**
10    Q.  So the focus of this meeting was the issue of
11  the pension benefits as characterized in this document?
12    A.  **No.  The focus was we got yelled at for three**
13  **hours.  There was no focus or agenda to the meeting.  We**
14  **were brought over here to be screamed at for three hours**
15  **and to be threatened for three hours.  That was the**
16  **focus of the meeting.**
17    Q.  Sheriff Cabral threatened you over the course
18  of three hours?
19    A.  **Numerous times.**
20    Q.  What issues did she indicate that she was not
21  pleased about, were those the issues that were in those
22  documents, the pension, dental, vision, the pay raises,
23  the water bill and veteran benefits?
24    A.  **She was not pleased about our behavior she**

1  Sheriff Cabral concerning bargaining chips occurred at
2  the meeting that she asked you and Mr. Barnes to attend
3  regarding these mailings, 7, 8 and 9?
4     A.  **She made that statement in this room.  This**
5  **was not a meeting to discuss these letters.  This was**
6  **not a meeting with any agenda.  This was we were being**
7  **yelled at for our behavior that started with the lawsuit**
8  **in December that was culminating in this.**
9         **We were not brought in there to discuss the**
10  **content of these letters.**
11    Q.  Tell me exactly everything that you can recall
12  that Sheriff Cabral said to you about your behavior.
13    A.  **I already did.**
14    Q.  Give it to me again.
15    A.  **Can you read it back?**
16    Q.  No.  I'm asking what did she tell you that she
17  was concerned about, a three hour conversation, three
18  hour meeting, what did she tell you she was concerned
19  about?
20    A.  **I've already answered this question.  Please**
21  **read it back to me.**
22    Q.  Are you refusing to answer the question,
23  lieutenant?
24    A.  **My point is I've already answered it, and I'd**

194

1  said.  **She was not pleased about the letters.  She**
2  **demanded a retraction.  She was not pleased about us**
3  **talking to the press.  She was not pleased about a**
4  **lawsuit being filed.  She wasn't pleased -- it was three**
5  **hours of not being pleased with us.**
6     Q.  Did you discuss anything other than the
7  content of those mailings?
8     A.  **I don't recall.**
9     Q.  Did you discuss the contract negotiations?
10    A.  **Yes.**
11    Q.  What contract negotiations did you discuss?
12    A.  **Ones that were pending I believe.**
13    Q.  What specifically?
14    A.  **The dental and vision benefits.  When we**
15  **brought the dental -- when we talked about the**
16  **department not following through with their contractual**
17  **obligations to provide dental and vision benefits at**
18  **this meeting when we were defending ourselves, that's**
19  **when the statement was made that she wasn't going to**
20  **give us dental and vision benefits because it was a**
21  **bargaining chip.**
22    Q.  That was right here?
23    A.  **In this room.**
24    Q.  Wait.  The comment that you attribute to

196

1  like to know what I already said because I'll reiterate
2  those points.
3     Q.  What did she say that she was displeased about
4  your behavior?  That's a different question.  What about
5  your behavior displeased her?
6     A.  **She was upset or she was mad at the activities**
7  **that we were engaging in as a union.**
8     Q.  What activities did she tell you that she was
9  upset about?
10    A.  **She thought was the letter was sabotage.  She**
11  **asked who wrote this letter.  She brought up the dental,**
12  **she brought up Richard Tranfaglia in the meetings that**
13  **we had had.  And I remember the sheriff saying they had**
14  **brought a rep in from dental and it was almost resolved.**
15         **And I remember we came back and said it was**
16  **resolved.  Richard Tranfaglia said it was resolved.  He**
17  **said we with are all set.  Then Mike Harris came in and**
18  **said it's not resolved outside the bargaining table.**
19         **It was like all done, and I remember us trying**
20  **to explain that to her.  We were at a very great**
21  **disadvantage in this room.**
22    Q.  When she asked who wrote this letter, what did
23  you say?
24    A.  **I believe I said I didn't write the letter,**

187

1  somebody in the union wrote the letter.  I believe

2  that's what I said to her.

3      Q.    What did Mr. Barnes say?

4      A.    I don't recall what Mr. Barnes said.

5      Q.    Did he acknowledge that he wrote the letter?

6      A.    I don't recall, to be honest.

7      Q.    Did you tell Sheriff Cabral that David Condon

8  had participated in the writing of the letter?

9      A.    I don't believe we did.

10      Q.    What else did she say about the content of the

11  these letters?

12      A.    I don't remember the specifics.  I do remember

13  her thumbing through it and making point by point.  I do

14  remember her doing that, but I don't remember what she

15  said.  It was a very, very, very stressful environment.

16  To remember anything out of this meeting is difficult.

17      Q.    Was the sheriff reviewing any documents in

18  front of her other than 7, 8 and 9?

19      A.    I don't know.

20      Q.    When she went through them point by point, did

21  you have copies of them in front of you?

22      A.    No.

23      Q.    And when she went through point by point, did

24  she ask you things about the pension benefits as is

198

1  stated there?

2      A.    She asked us -- during this conversation, she

3  had asked about the pension benefits or she had made

4  statements about the pension benefits and she had made

5  statements the dental and vision and she had made

6  statements about the veterans' benefits.  I remember her

7  rebutting the letter, I do remember that.

8      Q.    So the sheriff went through the letters that

9  were issued and rebutted the contentions that were set

10  forth in those letters, is that fair?

11      A.    Fair.

12      Q.    Other than the characterization of these

13  issues as set forth in those documents, did the sheriff

14  discuss any other aspects of your behavior?

15      A.    She was unhappy that I stood in front of the

16  jail one morning and handed out a flyer that outlined to

17  the membership what was going on with the pension fund

18  discrepancy and the lawsuit that was filed.

19      Q.    When was that?

20      A.    I'm going to say it was right around the time

21  the lawsuit was filed.  Probably that weekend.

22      Q.    December of '03?

23      A.    Yeah.

24      Q.    What other aspects of your behavior or

199

1  activity did she identified as being not pleased with?

2      A.    I don't recall any at this time.

3      Q.    Is there anything that would help you

4  remember?

5      A.    Talking to Barnes maybe.

6      Q.    Other than speaking with Officer Barnes, is

7  your memory exhausted as to what was said during the

8  course of this three hour meeting with Sheriff Cabral

9  concerning these letters?

10      A.    I remember Sheriff Cabral saying that we

11  contributed nothing to the department.  And she had, was

12  outlining everything that she has done for the agency

13  and everything she has brought to the agency.  And then

14  she asked us, "What do you two contribute?  What do you

15  actually do here to make it a better department?"  I

16  remember being asked that question because I took great

17  offense to it.

18      Q.    Did she ask you whether or not the information

19  contained in those mailings was accurate?

20      A.    I don't recall.

21      Q.    Did she ask you to apologize?

22      A.    She asked us to, not to apologize, she asked

23  us to do a retraction.

24      Q.    Did you agree to issue a retraction?

200

1      A.    No.

2      Q.    Did you issue a retraction?

3      A.    No.

4      Q.    You indicated that she threatened you.  How

5  did she threaten you?

6      A.    That she could take our jobs away from us,

7  that the only reason we were union officials is because

8  she allowed us to be union officials.

9      Q.    Is that a quote?

10      A.    I believe so, yeah.

11      Q.    The only reason you were a union official is

12  she allowed you to be?

13      A.    Yea.  And then in a subsequent conversation,

14  indicating because we were employed here, we could be

15  union officials.  Because I didn't understand it.  It

16  was only because of our employment at this department

17  that we were in the positions we were in.

18      Q.    How else would you say she threatened you?

19      A.    Other than firing us?

20      Q.    She didn't fire you, right?

21      A.    She didn't, no.

22      Q.    The question is, How did she communicate a

23  threat to you?

24      A.    She told us that we had violated the law, that

201

1  we had committed a crime.

2  Q.  What was that?

3  A.  It was either libel or slander. I'm not sure
which one it was. And I remember telling her that the
pension lawsuit and any of these letters or all of these
letters or anything that we do goes through Merrick,
Louison & Costello.

8  And I remember her telling me that we had
gotten bad advice from our lawyers, and they wouldn't be
the ones at the end of the day being punished for it.

11  Q.  Anything else that you can recall that Sheriff
Cabral said?

13  A.  I don't.

14  Q.  Did anyone else speak other than Sheriff
Cabral?

16  A.  Michael Harris spoke.

17  Q.  What did he say?

18  A.  I don't recall, but I know he spoke.

19  Q.  Do you recall what he spoke about if not the
exact words?

21  A.  I don't.

22  Q.  Did Mr. Tompkins say anything?

23  A.  Other than at the door, I don't believe so.

24  Q.  What did he say at the door?

203

1  Q.  I asked you if you took any notes?

2  A.  I sent them what happened in the conversation.
I sent them a brief paragraph on what happened at the
meeting.

5  Q.  When you say sent them?

6  A.  Dave Condon

7  MS. CAULO:  It's clearly discoverable,
Rob. I'm sure it falls within prior discovery requests.
I'll make an official request for it now. But any and
all notes written by Lieutenant Grennon concerning this
meeting is something that needs to be turned over.

12  MR. STEWART:  I'll bring it up to them.

13  BY MS. CAULO:

14  A.  I can assure you that Attorney Pfaff doesn't
know that exists.

16  Q.  Why can you assure me of that?

17  A.  Because he asked us for all notes that we had
for this case and if we had any e-mails and what not,
and I would have presented it to him. If there's a
disconnect here, that's my fault. I will look for it,
but I sent it to Dave Condon aside from the case. It
was more of --

23  Q.  Are there any other notes or documents or
writings that you have that you didn't feel fell within

202

1  A.  That he could take our houses.

2  Q.  Was that on your way out?

3  A.  Oh, yes.

4  Q.  Did Mr. Sumpter say anything?

5  A.  I don't recall.

6  Q.  Did you take any notes during it?

7  A.  I don't believe so.

8  Q.  Did you take any notes afterwards?

9  A.  I did.

10  Q.  Where are those notes?

11  A.  Dave Condon might have them. We had called,
when we left here, as soon as we hit the front door, we
called Merrick, Louison & Costello on the cell phone,
Dave Condon specifically, and told him what had just
happened.

16  My specific concern was being fired, and my
second concern I told him was going to jail. And my
third concern was losing any assets that I had. Dave
was very upset. He got Doug Louison and Steve Pfaff on
the phone.

21  MR. STEWART:  Stop right there. Don't
reveal things that took place between you and your
attorneys.

24  BY MS. CAULO:

204

1  the request from Attorney Pfaff that now you feel that
do?

3  MR. STEWART:  Objection. If there's
answerable material, we'll provide it obviously.

5  BY MS. CAULO:

6  A.  No.

7  Q.  Did Mr. Barnes prepare any notes?

8  A.  You'd have to ask Mr. Barnes.

9  Q.  In your presence did Mr. Barnes prepare any
notes?

11  A.  I didn't see him prepare any notes.

12  Q.  To your knowledge, did Mr. Ellis prepare any
notes of his meeting with the sheriff?

14  A.  I have no knowledge of his meeting.

15  Q.  Other than yourself and Mr. Ellis and Mr.
Barnes, did the sheriff ask to meet with any other union
officials regarding these meetings to your knowledge?

18  A.  I don't know.

19  Q.  To your knowledge, did either Mark or Tim
Turley meet with the sheriff concerning these meetings?

21  A.  I don't know.

22  Q.  This is a Complaint that you and your
colleagues filed in this matter, correct?

24  A.  Yes.

205

1    Q.    Directing your attention to paragraph 32 of
2    the Complaint, what's the basis for your allegation in
3    paragraph 32 that a line officer position is less
.    desirable than the one you held in training?
5    A.    The schedule is different. The overtime is
6    not available as it was in training. I don't have every
7    holiday off. I have to pick my vacations with a hundred
8    other people instead of picking them whenever I want.
9    Those are a few.
10    Q.    Days off were what, Saturday, Sunday?
11    A.    Saturday, Sunday.
12    Q.    And that's because training goes from Monday
13    through Friday?
14    A.    Yes.
15    Q.    Fair to say that the majority of officers who
16    are at the Nashua Street jail do not have Saturday and
17    Sunday off?
18    A.    Every Saturday and Sunday, no. The majority
19    have every other.
20    Q.    What is the factual basis for your allegation
21    that the reassignment to the jail cost you a substantial
22    amount of money due to the fact that training had
23    mandatory overtime?
24    A.    The factual basis would be that I made a lot

206

1    of money in training on overtime, and those overtime
2    opportunities are not here at the jail.
3    Q.    What's the mandatory overtime that existed at
4    Chelsea training?
5    A.    For recruit academies, we had to be in before
6    the students very, very early in the morning. And we
7    were there late in the afternoon either for a little
8    while helping the students or a little while getting our
9    normal job duties done or for an additional eight hours
10    doing custody in-service training at night.
11    Q.    How frequently did you do overtime while you
12    were in training?
13    A.    Almost every week.
14    Q.    How many hours every week on average?
15    A.    I would have to look. I don't have a guess
16    for you.
17    Q.    And where would those records be, with the
18    department or your own records?
19    A.    The department.
20    Q.    What specifically was the amount of income
     that you believe you lost as a result of your transfer
22    from training to the jail?
23    A.    I would have to calculate it, I don't know.
24    Q.    Give me your best estimate right now.

207

1    A.    I would say somewhere in the vicinity of
2    50,000.
3    Q.    $50,000 in total or a $50,000 year?
4    A.    $50,000 in total.
5    Q.    How much per year?
6    A.    I would say between 15 and $20,000 a year.
7    Q.    Did it vary or is it constant?
8    A.    The overtime was pretty constant. There
9    weren't too many dry spells.
10    Q.    Who authorized it?
11    A.    I pretty much authorized it. The officers
12    over there submitted their payroll to me. They signed
13    it. They accounted for what they did, what the hours
14    were, what they were entitled to in overtime. And I
15    submitted it into the group-wide system and they got
16    paid.
17    Q.    What was the requirement that that amount of
18    overtime be necessary and who authorized that?
19    A.    I'm not sure that anybody actually authorized
20    it. But Deputy Michelman was aware and Deputy O'Leary
21    was aware that in order for the pace of training to be
22    where it was, it was going to require overtime for
23    almost everybody.
24    Q.    I'm talking about the period of time post

208

1    Sheriff Cabral, so after Mr. O'Leary was no longer
2    employed by the department. Who authorized the overtime
3    during that period of time?
4    A.    Deputy Michelman.
5    Q.    Did you authorize your own overtime or did you
6    go through Deputy Michelman?
7    A.    I paid everybody overtime and then submitted
8    the sheets to Deputy Michelman so he knew who was
9    getting what and how much they were getting.
10    Q.    Did you determine whether or not a request for
11    overtime was reasonable?
12    A.    I did.
13    Q.    That was --
14    A.    No, I didn't determine whether it was
15    reasonable, I just put the overtime in. There was a
16    great deal of responsibility on these instructors'
17    behalf. No one was stealing any money. I did implement
18    the system that the department does not currently have
19    and didn't have before I implemented it, which was a
20    payroll exception form that I made and asked the
21    officers to fill it out and sign their name so I
22    couldn't be accused of padding their overtime shall we
23    say.
24        And they did that. And then I also

Q. Is that a permanent promotion or can they be removed from that designation at any time?

A. They can be removed at any time. And when a testing procedure is finalized, they would have to take the test and pass it in order to be made permanent.

Q. So those individuals you've just identified, Mr. Robinson and Mr. Zaferakis, and who was the other individual?

A. Mojica.

Q. Were not permanently promoted?

A. No.

Q. So you weren't denied a permanent promotional opportunity after your transfer from training, correct?

A. I was not.

Q. In fact, you had been given a permanent promotional opportunity, if you will, by Sheriff Cabral this past January, correct?

A. Correct.

Q. And going back to the temporary appointments of Mr. Zaferakis, Mr. Robinson and Mr. Mojica, why do you think that you would have received them instead of those folks?

A. Based on my record in the training division, based on my seniority there. I was there the longest

**214**

out of the three of them. And based on the role that I was performing, which was much more of an administrator, much more of a management role in training rather than just a staff instructor.

Q. Did the sheriff have discretion in making temporary?

A. She does.

Q. Then why is this your qualifications would essentially trump her discretion?

A. They would never trump her discretion.

Q. So there's no guaranty the temporary appointments that were given to those three individuals would have gone to you, correct?

A. Correct. An argument can be made though.

Q. What's the EAP?

A. The employee assistance program.

Q. What does it mean to be a JOEASC liaison to—

A. Can you tell me where you're reading from?

Q. I'm looking at your Complaint in which you allege that you were removed, paragraph 33 -- I'm just asking you, lieutenant, I'm asking what is the JOEASC liaison for EAP?

A. I was a member of the employees assistance

**215**

program as both a peer counselor and as the designated infection control officer as a member of JOEASC.

Q. What does a peer counselor do for EAP?

A. We are on a pager system. When someone is having a tough time, whether it be alcohol or drug or psychiatric or a critical incident related problem, they could call in here and ask to speak to a peer counselor.

And we would then talk to them and depending on the outcome of the conversation be able to terminate the conversation without incident or refer them to a medical doctor or to a psychiatric facility or to an alcohol treatment program.

Q. Is there a role called a JOEASC liaison for EAP?

A. No, there isn't.

Q. This Complaint was issued after your counsel conferred with you and your fellow plaintiffs, right?

A. I don't recall.

Q. Well, did you provide information to your attorneys that formed the basis for the factual allegations that are contained in this Complaint, sir?

A. I did.

Q. So what's the basis for your allegation in paragraph 33 that says, "In addition to Grennon's

**216**

transfer from training to that of a line officer, he was removed as the liaison for JOEASC for the employees assistance program?"

A. Well, that's what I was doing. I was the liaison between EAP and members of JOEASC where there were superior officers that were also peer counselors, and they would deal with the superior officers.

Q. I just asked you whether there was a role or position as liason for JOEASC for EAP, and you told me there was not.

A. I'm not thinking of liaison as a title, I'm thinking of it as action.

Q. How did you get to liaison for JOEASC for EAP?

A. I was appointed by Lieutenant Dan Ryan.

Q. Did you volunteer for that?

A. I did.

Q. Did Sheriff Cabral have any involvement in who Lieutenant Dan Ryan selects from the people who volunteer?

A. That I don't know.

Q. So what's your allegation in your Complaint that you were removed as that liaison in retaliation for your union activities in support for Steve Murphy?

A. Lieutenant Dan Ryan contacted me and said he

217

was going to need my pager back. I asked him why, and
he said he was called by Michael Harris and that Michael
Harris told him that no future training for the
employees assistance program would be granted as long as
John Grennon's name was on there.

And Dan Ryan asked why that was, and he said,
"That comes straight from the sheriff. She won't
approve any list that he's on." And that was it. And I
asked Lieutenant Ryan if I had done a good job, and he
said, "You did a great job."

I asked if the infection control program was
going to continue, and he said it was with Captain Mike
Powers at South Bay. I brought my pager in and gave it
to Sergeant McCarthy at the time.

Q.   When you say removed as the liason for JOEASC,
what are you talking about? Are you talking about your
role as infection control officer or is that some other
role where you counsel individuals who have concerns or
problems?

A.   Both roles. I was no longer permitted to
liason between EAP and Lieutenant Ryan and members of
the local.

Q.   Lieutenant Ryan told you that you were no
longer able to do so because of communications he had

219

1   this. You go from teaching people how to do their job
2   to being removed, and there's definitely some stress
3   that goes along with that. There's some ridicule that
4   goes along with that.
5   Q.   Is it unusual in a corrections environment to
6   suffer ridicule from your peers and colleagues?
7                 MR. STEWART:  Objection.
8   BY MS. CAULO:
9   A.   Yeah, I would say it's unusual. I would say
10  jokes are one thing, but ridicule and things like that
11  is different.
12  Q.   Is that how you interpreted this, as being
13  ridiculed?
14  A.   I believe so. The defrocked thing really
15  bothered me.
16  Q.   Who ridiculed you?
17  A.   I saw it posted on the board in the locker
18  room. Nobody specifically said it to me. I saw it on
19  the wall.
20  Q.   It wasn't directed to John Grennon?
21  A.   One of the characters had my name on it. I
22  saw another one with Al Moscone and Lornie Lynch, a guy
23  holding a crate with a monkey coming out of it or
24  something. There's a lot of cartoons in this jail.

218

with Michael Harris?
A.   Yes.
Q.   Did you go and speak with Michael Harris
concerning that?
A.   No.
Q.   When did you cease to be involved with EAP?
A.   I'm going to say late 2004, maybe November or
December of 2004. It may have even been closer to
January of 2005. Someplace in that ballpark.
Q.   The emotional distress that you allege you
suffered in your Complaint --
A.   What number?
Q.   Paragraph 64. What emotional distress have
you suffered as alleged in paragraph 64 of your
Complaint?
A.   A stressful work environment, getting
transferred, being worried about being sued and being
worried about being charged with a crime, being
transferred. It's embarrassing.
Some of the officers when we got
decommissioned, there was jokes in the locker room or
posted that we had been defrocked and comparing us to
priests that had sexually assaulted children.
There's definitely a change in stature with

220

1            The biggest emotional distress is being told
2   by people in the upper echelon of the department that
3   you can be fired or you've committed a crime. And then
4   being taken out of the EAP. I never did anything wrong
5   to be taken out of EAP. I did a hell of a job.
6            I started this blood borne pathogen program
7   here. We didn't have one. I did a hell of a job in the
8   training division. I was lecturing nationally. Who has
9   done that? Tell me what JO 1 here has been published.
10  I did nothing wrong, and this is what it resulted in.
11           This is where we are today. It's been
12  stressful, it's very stressful. I came back to this
13  jail. My shift commander took me aside and told me he
14  was told by the superintendent to bury me.
15  Q.   Who told you that?
16  A.   Captain Kevin Janellis, February 15, 2005.
17  Q.   What specifically did Captain Janellis tell
18  you on February 15, 2005?
19  A.   I came in and saw that I had been moved from
20  transportation to a double bunked housing unit. I said,
21  "I was on transportation last night. What happened?"
22  He said, "Come here." And he brought me into the
23  lieutenant's office and closed the door and he said,
24  "The superintendent said you can't go out on the road

sheets

Harris told him that no future training for the employees assistance program would be granted as long as John Grennon's name was on there.

And Dan Ryan asked why that was, and he said, "That comes straight from the sheriff. She won't approve any list that he's on." And that was it. And I asked Lieutenant Ryan if I had done a good job, and he said, "You did a great job."

I asked if the infection control program was going to continue, and he said it was with Captain Mike Powers at South Bay. I brought my pager in and gave it to Sergeant McCarthy at the time.

Q. When you say removed as the liason for JOEASC, what are you talking about? Are you talking about your role as infection control officer or is that some other role where you counsel individuals who have concerns or problems?

A. Both roles. I was no longer permitted to liason between EAP and Lieutenant Ryan and members of the local.

Q. Lieutenant Ryan told you that you were no longer able to do so because of communications he had

218

with Michael Harris?

A. Yes.

Q. Did you go and speak with Michael Harris concerning that?

A. No.

Q. When did you cease to be involved with EAP?

A. I'm going to say late 2004, maybe November or December of 2004. It may have even been closer to January of 2005. Someplace in that ballpark.

Q. The emotional distress that you allege you suffered in your Complaint --

A. What number?

Q. Paragraph 64. What emotional distress have you suffered as alleged in paragraph 64 of your Complaint?

A. A stressful work environment, getting transferred, being worried about being sued and being worried about being charged with a crime, being transferred. It's embarrassing.

Some of the officers when we got decommissioned, there was jokes in the locker room or posted that we had been defrocked and comparing us to priests that had sexually assaulted children.

There's definitely a change in stature with

2 to being removed, and there's definitely some stress
3 that goes along with that. There's some ridicule that
4 goes along with that.
5    Q.  Is it unusual in a corrections environment to
6 suffer ridicule from your peers and colleagues?
7         MR. STEWART: Objection.
8 BY MS. CAULO:
9    A.  Yeah, I would say it's unusual. I would say
10 jokes are one thing, but ridicule and things like that
11 is different.
12    Q.  Is that how you interpreted this, as being
13 ridiculed?
14    A.  I believe so. The defrocked thing really
15 bothered me.
16    Q.  Who ridiculed you?
17    A.  I saw it posted on the board in the locker
18 room. Nobody specifically said it to me. I saw it on
19 the wall.
20    Q.  It wasn't directed to John Grennon?
21    A.  One of the characters had my name on it. I
22 saw another one with Al Moscone and Lornie Lynch, a guy
23 holding a crate with a monkey coming out of it or
24 something. There's a lot of cartoons in this jail.

220

1         The biggest emotional distress is being told
2 by people in the upper echelon of the department that
3 you can be fired or you've committed a crime. And then
4 being taken out of the EAP. I never did anything wrong
5 to be taken out of EAP. I did a hell of a job.
6         I started this blood borne pathogen program
7 here. We didn't have one. I did a hell of a job in the
8 training division. I was lecturing nationally. Who has
9 done that? Tell me what JO 1 here has been published.
10 I did nothing wrong, and this is what it resulted in.
11         This is where we are today. It's been
12 stressful, it's very stressful. I came back to this
13 jail. My shift commander took me aside and told me he
14 was told by the superintendent to bury me.
15    Q.  Who told you that?
16    A.  Captain Kevin Janellis, February 15, 2005.
17    Q.  What specifically did Captain Janellis tell
18 you on February 15, 2005?
19    A.  I came in and saw that I had been moved from
20 transportation to a double bunked housing unit. I said,
21 "I was on transportation last night. What happened?"
22 He said, "Come here." And he brought me into the
23 lieutenant's office and closed the door and he said,
24 "The superintendent said you can't go out on the road

EXHIBIT

3

Volume 1
Pages 1-216
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

Bergeron, et al        Plaintiff,

v.

Andrea Cabral        Defendant.

DEPOSITION OF JOHN BARNES, a witness
called on behalf of the Defendant, taken pursuant to the
Federal Rules of Civil Procedure, before Patricia M.
Haynes, a Certified Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts, CSR No.
14620P, at the Offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Tuesday, October 31, 2006, commencing at 10:15 a.m.

Copley Court Reporting
58 Batterymarch Street, Suite 317
Boston, Massachusetts  02110
(617) 423-5841

---

INDEX

Witness       Direct  Cross  Redirect  Recross

JOHN BARNES
(By Ms. Caulo)    4

EXHIBITS

| Exhibit No. | | Page |
|---|---|---|
| 1 | Deposition | 4 |
| 2 | Policy S 516 | 40 |
| 3 | Policy S 520 | 44 |
| 4 | Revocation letter | 66 |
| 5 | Mailing to unions | 152 |
| 6 | Mailing to Suffolk County Residents | 152 |
| 7 | Press release | 152 |
| 8 | Copy of article from West Roxbury Transcript | 152 |
| 9 | Copy of press release from Boston City Paper, 4/23/04 | 152 |
| 10 | Memo from Sheriff Cabral, 12/12/03 | 179 |
| 11 | Posting from JOEASC web site | 203 |

4

---

APPEARANCES:

Suffolk County Sheriff's Department
(By: Ellen M. Caulo, Esquire)
200 Nashua Street
Boston, Massachusetts 02114
Counsel for the Defendant

Merrick, Louison & Costello, LLP
(By: David Condon, Esquire)
67 Batterymarch Street
Boston, Massachusetts 02110
Counsel for the Plaintiffs

2

---

PROCEEDINGS

(Document marked for identification as
Exhibit No. 1.)

JOHN BARNES,

having been previously sworn, was examined and test

as follows:

MS. CAULO:  For the record, my name is

Ellen Caulo, Deputy General Counsel for the Suffolk

County Sheriff's Department.  We are here in the ma

of Bergeron, et al versus Andrea Cabral.  Today is the

deposition of John Barnes, who has just been sworn.

Exhibit 1 has been marked, which is the not

of taking deposition.

David, we've been operating under the usu

stipulations, all objections, except as to form, are

reserved until trial, all motions to strike reserved

until trial.  And Mr. Barnes will have 30 days within

which to review the transcript and sign, requireme

the notary waived.

MR. CONDON:  That's agreed.

DIRECT EXAMINATION BY MS. CAULO:

Q.  Please state your name and rank.

A.  **My name is John Barnes, Jail Officer**

Q.  And where are you employed, Officer Ba

11/07/2006

4

**45**

(Witness confers with counsel.)

...ments ago before the break, Officer
...re you a document which has been
...vate paid details, now marked as
...to you it is the policy that was
... effect on May 1 of 2004. Is that fair?

8    A.    Correct.
9    Q.    I want to review with you what this policy
10 covers. Looking at Policy Statements I-D, "Must be an
11 employee in good standing whose current job performance
12 is commensurate with the duties and responsibilities of
13 public law enforcement officers." Did I read that
14 correctly?
15    A.    Yes, you did.
16    Q.    That was what was expected of an individual
17 who was going to perform private paid details in May of
18 2004?
19    A.    Correct.
20    Q.    Second page, IV, Rules and Regulations, A,
21 "Employees working a private paid security detail are an
22 emissary of the Suffolk County Sheriff's Department,"
23 correct?
24    A.    Correct.

**46**

1    Q.    B, "Professionalism is expected at all times
2 both in demeanor and appearance." Did I read that
3 correctly?
4    A.    Yes.
5    Q.    C, "All Suffolk County Sheriff's Department
6 employees are bound by department policies and
7 procedures." Did I read that correctly?
8    A.    Correct.
9    Q.    And that certainly was your understanding of
10 an individual who had the privilege of being a deputy
11 sheriff working private paid details, that they would in
12 fact be an emissary of the department, correct?
13    A.    Correct.
14    Q.    And it was your understanding that
15 professionalism would be expected at all times in both
16 appearance and demeanor, correct?
17    A.    Absolutely.
18    Q.    Just to go back for a moment. I want to make
19 sure I got the testimony accurately. You recall filling
20 out an application to become a deputy sheriff when
21 Sheriff Rouse was appointed, correct?
22    A.    To the best of my knowledge.
23    Q.    You don't have a recollection of filling out
24 such an application when Sheriff Ruffo was sheriff?

**47**

1    A.    To the best of my knowledge.
2    Q.    Is it your recollection you simply wanted to
3 be one and you were sworn in?
4    A.    I don't recall. I don't recall if I was
5 recommended by a shift commander or if I was recommended
6 by a deputy superintendent or superintendent, I don't
7 recall.
8    Q.    Is it fair to say that you filled out an
9 application to become a deputy sheriff when Sheriff
10 Cabral came in in 2002?
11    A.    I filled out an application sometime shortly
12 thereafter.
13    Q.    Either in the latter part of '02 or '03?
14    A.    I believe it may have been '03.
15    Q.    You indicated earlier that it's a privilege to
16 be a deputy sheriff, correct?
17    A.    Yes.
18    Q.    Was it within the authority of the sheriff to
19 evaluate the process for selecting deputy sheriffs?
20    A.    I believe they have recently done that for the
21 first time last year.
22    Q.    I'm asking you is it within the authority of
23 any sheriff to evaluate the process for selecting deputy
24 sheriffs?

**48**

1    A.    Yes.
2    Q.    Would that be within a sheriff's prerogative?
3    A.    Yes.
4    Q.    Is it within the authority of any sheriff to
5 determine criteria for a deputy sheriff?
6    A.    Yes.
7    Q.    Is it within a sheriff's authority to
8 determine what kind of qualifications would allow one to
9 be appointed as a deputy sheriff?
10    A.    Yes.
11    Q.    Once you were sworn in initially under Sheriff
12 Ruffo and then thereafter under Rouse and current
13 Sheriff Cabral, what was your understanding of your
14 status, were you permanent or at will?
15    A.    I would say at will.
16    Q.    What type of functions did you perform as
17 deputy sheriff from the moment you were first sworn in
18 in '94 or '95, whenever it was?
19    A.    Pretty much the functions I perform as a
20 deputy sheriff was handling court papers and signing of
21 court papers and the transportation of prisoners,
22 detainees.
23    Q.    Handling court papers and transportation of
24 detainees?

1    Q.    Did you ever perform any details as deputy
2    sheriff?
3    A.    **On occasion I believe, to the best of my**
**recollection, I never performed a security detail**
**outside the four walls of the Suffolk County Sheriff's**
6    **Department.**
7    Q.    You say you haven't performed a security
8    detail.  Have you performed any details outside the four
9    walls of the institution as a private paid detail?
10    A.    **No.**
11    Q.    So is it fair to say you've never performed a
12    detail as it is referred to in Exhibit 3, Policy S 520,
13    private paid details?
14    A.    **Correct.**
15    Q.    You've been deputy sheriff since about '94 and
16    '95, to April of 2005 and you never performed a private
17    paid detail?
18    A.    **Correct, never volunteered for that**
19    **assignment.**
20            (Brief recess.)
21    BY MS. CAULO:
22    Q.    To recap, Officer Barnes, you just indicated a
23    few moments ago that during the period of time that you
24    held the status of a deputy sheriff, you never performed

58

1    a private paid detail, correct?
2    A.    **Correct.**
3    Q.    Are you familiar, though, with what one does
4    when one performs a private paid detail?
5    A.    **Pretty much.**
6    Q.    And generally employees of the department who
7    are deputy sheriffs wear a Suffolk County Sheriff's
8    Department uniform?
9    A.    **Yes.**
10    Q.    Do they wear a badge?
11    A.    **Yes.**
12    Q.    Do they often use a department cruiser?
13    A.    **On occasions.  More so than not recently.**
14    Q.    And do employees who are deputy sheriffs
15    performing private paid details interact with the public
16    when they perform details?
17    A.    **Yes.**
18    Q.    Do they interact with other law enforcement
19    agencies and officials?
~~    A.    **Absolutely.**
     Q.    You're familiar with the Complaint filed on
22    your behalf by your counsel in this matter, right?
23    A.    **Correct.**
24    Q.    I want to show you this and tell me if that is

1    in fact the Complaint that was filed on your behalf by
2    your attorneys?
3    A.    **It appears to be, yes.**
4    Q.    If I could direct your attention to page six.
5    Before we get there, Officer Barnes, this Complaint was
6    filed on behalf of you and your fellow plaintiffs by
7    your attorneys based upon information you provided to
8    them, right?
9    A.    **Correct.**
10    Q.    Directing your attention to paragraph 30.
11    A.    **Yes.**
12    Q.    Of the Complaint that was filed on your
13    behalf.  It indicates, "By removing the plaintiffs from
14    their deputy sheriff positions, they are no longer able
15    to work private paid details and all have lost a
16    significant source of potential income."  Did I read
17    that correctly?
18    A.    **Yes.**
19    Q.    What source of significant income have you
20    lost, Officer Barnes, as a result of your deputy sheriff
21    status being revoked in April of 2005?
22    A.    **The ability to volunteer for details.**
23    Q.    Have you ever volunteered for a detail?
24    A.    **No, I have not.**

60

1    Q.    What is the basis for your assertion that you
2    have lost a significant source of potential income,
3    what's the factual basis for that, Officer Barnes?
4    A.    **Potential.  I recently just started doing**
5    **details because of need for extra funds based on hocke**
6    **for my child, $500 there, and football.  And all the**
7    **extracurricular activities are starting to pile up.**
8            **The need to generate extra income, you know,**
9    **is more so now than it has been in the past.**
10    Q.    How old are your children?
11    A.    **Nine, seven and three, soon to be four.**
12    Q.    And do you own your own home?
13    A.    **Yes.**
14    Q.    Do you have expenses?
15    A.    **Absolutely.**
16    Q.    Do you pay a mortgage?
17    A.    **Yes.**
18    Q.    Does your wife work?
19    A.    **Yes, she does.**
20    Q.    Prior to April of 2005, I want to make sure
21    the record is clear, had you ever volunteered to do a
22    private paid detail?
23    A.    **No, I had not.**
24    Q.    So what's the basis for the allegation you

63

1   have lost a significant source of potential income, how
2   would you evaluate significant source of potential
3   income when you've never volunteered to do a private
4   paid detail?
5        A.   I would go by potential where there have been
6   employees here who have made in excess of 30, $40,000
7   extra a year performing details.  And the potential is
8   there to make that money if needed.
9        Q.   You're a named plaintiff?
10       A.   Correct.
11       Q.   This Complaint was filed on behalf of you as
12  well as the other individuals, correct?
13       A.   Correct.
14       Q.   Where is the factual basis for your assertion
15  in this complaint that you, John Barnes, have lost a
16  significant source of potential income based upon the 12
17  years or so that you've held the status of deputy
18  sheriff and have never volunteered for one private paid
19  detail?
20       A.   Up until this Complaint, I have not
21  volunteered for a detail.  But I lost potential once I
22  was decommissioned if I wanted to perform the detail to
23  generate any extra money.
24       Q.   Do you perform overtime?

62

1        A.   On occasions.
2        Q.   How frequently in the course of your 13 year
3   career with the Suffolk County Sheriff's Department have
4   you performed overtime?
5        A.   It was scattered at the beginning -- I can't
6   recall exactly how many shifts, but it was scattered at
7   the beginning portions of it.  When I was assigned to
8   the property department, we pretty much monthly would do
9   a carousal audit on the property.
10            Sometimes people get bailed off hours and
11  their bag is still on there, so we have to perform an
12  audit to remove that and document the proper paperwork.
13  On occasion, if I was assigned to property, maybe on
14  average once a month, sometime when DOC was coming in,
15  we would more often do it to catch up with basically
16  documentation purposes.
17            So basically in the property room, I would say
18  on average maybe one a month for the duration of my time
19  down there.  After coming out of the property room,
20  recently I have started doing some extra shifts.  A lot
21  of times when I performed overtime prior to recent
22  overtime opportunities, I used to utilize taking the
23  compensation time so I could have more time off with my
24  family down the road.

64

1        When I was in property and I would perform the
2   overtime opportunities, I would in turn recommend
3   compensation time instead of pay so I could have time
4   off with my family for quality of life issues.
5        Q.   That was a choice you made?
6        A.   Absolutely.
7        Q.   So if I'm characterizing your testimony
8   correctly, beginning in about 1999 or 2000 you were
9   assigned to the property office, right?
10       A.   Yes.
11       Q.   And on occasion, maybe once a month, you
12  performed an overtime shift?
13       A.   An audit of the carousal.
14       Q.   Is it fair to say that didn't happen every
15  month?
16       A.   Yes, that's fair to say.
17       Q.   So maybe it wasn't once a month, it was a
18  couple of times a year?
19       A.   Sometimes it could be twice a month, sometimes
20  it would be -- like I said, when DOC came in and there
21  was an audit of the property room, we would perform more
22  stuff off duty on weekends, Saturdays and Sundays.  You
23  didn't really have the time and function to do it while
24  you were working your shift.

64

1        Q.   I'm trying to get a sense of how many overtime
2   shifts you actually performed?
3        A.   I would say it wasn't specifically once a
4   month, but there were times where it could have been
5   twice, maybe three times a month.  And then there were
6   times when you could go a couple of times you didn't do
7   it.  I would say on average once a month.
8        Q.   Would there be records of your performing
9   overtime shifts in the department?
10       A.   I believe personnel may have those records.
11       Q.   So we could look at those records to determine
12  unequivocally in the years you've been working here how
13  often you have performed an overtime shift?
14       A.   Correct.
15       Q.   And overtime is a potential source of income,
16  is it not?
17       A.   Correct.
18       Q.   Is it fair to say, Officer Barnes, that the
19  needs of the department are such that overtime shifts
20  are held daily?
21       A.   Right now, absolutely, yes.
22       Q.   And last year?
23       A.   Absolutely.
24       Q.   And the year before that?



EXHIBIT
4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Volume: I

* * * * * * * * * * * * * * * * * *
DAVID BERGERON, ET AL,
                    Plaintiffs,
    vs.
ANDREA CABRAL,
                    Defendant.
* * * * * * * * * * * * * * * * * *

DEPOSITION OF ALBERT J. MOSCONE, a
witness called on behalf of the Defendant,
taken pursuant to the applicable provisions of
the Massachusetts Rules of Civil Procedure,
before William M. Jackson, Professional Court
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Nashua
Street Jail, 200 Nashua Street, Boston,
Massachusetts 02114, on September 27, 2006,
commencing at 10:00 a.m.

COPLEY COURT REPORTING, INC.
101 TREMONT STREET
BOSTON, MASSACHUSETTS 02108
(617) 423-5841
www.copleycourt.com

---

APPEARANCES:

MERRICK, LOUISON & COSTELLO, LLP
    (By Stephen C. Pfaff, Esquire)
    67 Batterymarch Street
    Waterfront, Massachusetts 02110
    (617)
    on behalf of the Plaintiff,

COMMONWEALTH OF MASSACHUSETTS
SUFFOLK COUNTY SHERIFF'S DEPARTMENT
    (By Ellen M. Caulo, Deputy General
    Counsel)
    200 Nashua Street
    Boston, Massachusetts 02114
    (617)
    on behalf of the Defendant.

---

I N D E X

Witness                          Direct

ALBERT J. MOSCONE

    (By Ms. Caulo)                  4

E X H I B I T S

No.        Description             Page

---

PROCEEDINGS

4

MS. CAULO:  Please, mark the
Deposition Notice as Exhibit Number 1.
(Notice of Taking Deposition was
marked as Exhibit Number 1 for identification)

MS. CAULO:  Please, swear in the
witness.

ALBERT J. MOSCONE

a witness called on behalf of the respective
parties, having been identified by license, and
being first duly sworn, was examined and
testified as follows:

DIRECT EXAMINATION

BY MS. CAULO:

Q.  Good morning.  We are here in the matter of
Bergeron, et al versus Andrea J. Cabral.  Today
we are taking the deposition of Albert Moscone.
My name is Ellen Caulo on behalf of Andrea J.
Cabral.  With me is Associate General Counsel,
Kathy Cawley.  Would you like to introduce
yourself?

MR. PFAFF:  I am Stephen Pfaff,
representing the Plaintiff, Captain Albert
Moscone.  Usual stipulations?

---

5

MS. CAULO:  Yes.  All objections
except as to form are reserved until trial.
All motions to strike, unresponsive answers, to
trial.  Mr. Moscone will have thirty days to
sign and we waive the requirement of a notary.

MR. PFAFF:  Yes.  Sign under the
pains and penalties of perjury.  I will get a
copy of the transcript.  When I get it, I will
send it to you, you will read it, sign it, and
do that within thirty days.  Okay.

THE WITNESS:  Okay.

Q.  State your name, please.

A.  Albert John Moscone.

Q.  Where do you reside?

A.  189 Crescent Avenue, Revere, Massachusetts.

Q.  Captain Moscone, I am Ellen Caulo.  You are
aware that I am here representing Sheriff
Cabral?

A.  Yes.

Q.  I understand that you have been present for
many of the depositions that have already been
taken in this matter; but I want to remind you
what the rules and procedures are.

A.  Okay.

---

6

Q.  I am here certainly to ask questions concerning
the lawsuit that you and the other named
plaintiffs have filed against Sheriff Cabral.
If I ask you any question that you do not
understand, please, let me know, and I will do
my best to rephrase it.

A.  Okay.

Q.  You must give audible, verbal responses so the
court reporter can take down your answers.

A.  Okay.

Q.  If you need to take a break at any time, let me
know.  If there is a question before you,
answer the question, and then we can take a
break.

A.  Okay.

Q.  Do you understand these rules?

A.  Yes.

Q.  Have you taken any medication in the last
twenty-four hours?

A.  Yes.

Q.  What is that?

A.  I am a diabetic.  I have arrythmia.  So I take
Arytena for my arrythmia.  I take Metformin for
my diabetes.

---

103

1　A.　I believe so.
2　Q.　Why did you go to a pager system?
3　A.　To make it a little more effective.  It was
4　　　getting huge.
5　Q.　What do you mean?
　　A.　We were having thirty a shift as opposed to
　　　five when the Big Dig started rolling.
8　Q.　That started to taper off?
9　A.　Yes.
10　Q.　There is far fewer Big Dig associated details
11　　　currently than there were in 2002, 2003, 2004;
12　　　is that correct?
13　A.　Yes.
14　Q.　Who did you support in your 2004 Suffolk County
15　　　Sheriff's election?
16　A.　Stephen Murphy.
17　Q.　Did you do any work on behalf of Mr. Murphy?
18　A.　Some.
19　Q.　What did you do?
20　A.　Made telephone calls.
21　Q.　What else?
22　A.　Had a fund-raiser.
23　Q.　You held a fund-raiser?
24　A.　Yes.

104

1　Q.　When did you hold the fund-raiser?
2　A.　Two weeks prior to the election.
3　Q.　When did you first start working for him, with
4　　　respect to his political campaign for sheriff?
5　A.　It was late June.
6　Q.　Of?
7　A.　When was the election, in '03?  I am not sure
8　　　when the election was.  I helped him from June
9　　　on.
10　Q.　So the June before the election going forward?
11　A.　That's correct.
12　Q.　So prior to the June of the election year, you
　　　were not involved in any activities supporting
　　　Mr. Murphy's candidacy; is that fair?
　　A.　Somewhat.
16　Q.　It is either fair or not fair.
17　A.　I am not sure if it was May or June.  Yes.
18　　　That's correct.
19　Q.　You indicated that you made some phone calls.
20　　　Where did you make these phone calls?
21　A.　In my house.
22　Q.　In addition to making phone calls, what kind of
23　　　phone calls were they?
24　A.　Just friendly, friend phone calls.

105

1　Q.　Did you work off a list, did you call your own
2　　　friends, how did this work?
3　A.　There was a list generated for me by the Murphy
4　　　campaign.
5　Q.　Who was your contact in the Murphy campaign,
6　　　did you meet with somebody regularly?
7　A.　I just had one contact.  Anthony Albano.
8　Q.　Did you ever go to any campaign meetings?
9　A.　I might have gone to one.
10　Q.　Did you ever volunteer for any committees?
11　A.　No.
12　Q.　Did you hold any signs?
13　A.　No.
14　Q.　Did you March in any parades?
15　A.　During the election?
16　Q.　Yes.
17　A.　No.
18　Q.　Did you have a sign at your house, a political
19　　　campaign sign, Murphy for sheriff?
20　A.　I am not sure if I had a sign there or not.  I
21　　　may have.
　　Q.　When did you put it up?
23　A.　About a month before the election.
24　Q.　Did you have a bumper sticker on your car?

106

1　A.　No.
2　Q.　You indicated that you held a fund-raiser.
3　　　What did you do in order to hold this
4　　　fund-raiser?
5　A.　I called friends up, and had a small
6　　　fund-raiser at my friend's restaurant.
7　Q.　Where was it?
8　A.　East Boston.
9　Q.　What's the restaurant?
10　A.　Kailua Hawaiian.
11　Q.　When was it?
12　A.　It was two weeks before the election.
13　Q.　How did you publicize it?
14　A.　Word of mouth.  Phone calls.
15　Q.　How many people were there?
16　A.　Approximately, fifty.
17　Q.　Were any employees from the department there?
18　A.　Yes.
19　Q.　How many?
20　A.　Approximately, twenty.
21　Q.　Who?
22　A.　Rickey Colman, Kevin Janelis, Mike Donovan,
23　　　myself, Michael Sinelli, Dave McCarthy.  I
24　　　would have to look at my list.  I can't

107

1　　　remember the rest of the people down there.
2　Q.　How did you contact these people and tell them
3　　　that there was a fund-raiser for Mr. Murphy?
4　A.　Telephone.
5　Q.　Was John Grennon?
6　A.　No.
7　Q.　Tim Turley?
8　A.　No.
9　Q.　Mark Turley?
10　A.　No.
11　Q.　David Bergeron?
12　A.　No.
13　Q.　John Ellis?
14　A.　I don't believe so.
15　Q.　William Pino?
16　A.　No.
17　Q.　Eric Deleibro?
18　A.　Yes.
19　Q.　Paul Giglio?
20　A.　Yes.
21　Q.　Did you contribute any money to the Murphy
22　　　campaign?
23　A.　Yes.
24　Q.　By cash or by check?

108

1　A.　Check.
2　Q.　How many times?
3　A.　Once.
4　Q.　How much?
5　A.　I believe it was $200.
6　Q.　Did you solicit money on that occasion for this
7　　　fund-raiser for Mr. Murphy?
8　A.　Yes.
9　Q.　Were the individuals asked to come and
10　　　contribute money to support his candidacy for
11　　　sheriff?
12　A.　I don't believe so.
13　Q.　Did you take any checks from them, these
14　　　individuals that arrived at this fund-raiser?
15　A.　Yes.
16　Q.　How much money did you raise for Mr. Murphy?
17　A.　I believe it was under $5,000.
18　Q.　In cash or check?
19　A.　Check, I believe.
20　Q.　All the money was provided to you by check or
21　　　by cash?
22　　　　MR. PFAFF:  Objection.  Asked and
23　　　answered.  He said check.
24　A.　I believe most of it was check.  I didn't

Copley Court Reporting

115

```
 1   A.  Yes.
 2   Q.  Is he a deputy sheriff?
 3   A.  I don't know.
 4   Q.  Did he run for sheriff?
 5   A.  I don't know that either.
     Q.  You are not aware that Angelo Rossi ran for
         sheriff?
 8   A.  My understanding is that he did not get enough
 9       signatures.  Are you considering that running?
10   Q.  I am asking you.
11   A.  No.
12   Q.  Did he attempt to get signatures in order for
13       him to run for the office of sheriff?
14   A.  I believe so.
15   Q.  Was he intent on opposing Sheriff Cabral, if
16       you know?
17           MR. PFAFF:  Objection on the record.
18       Objection as to speculation.
19   Q.  Was Dave Bergeron involved in helping Mr.
20       Rossi in his campaign?
21   A.  I don't know.
22   Q.  Pat O'Brien.  Do you know Pat O'Brien?
23   A.  Yes.
24   Q.  Is he an employee of the Sheriff's Department?
```

116

```
 1   A.  Yes.
 2   Q.  Is he a deputy sheriff?
 3   A.  I think so.
 4   Q.  Did he support Steve Murphy?
 5   A.  Yes.
 6   Q.  Mark Turley, do you know him?
 7   A.  Yes.
 8   Q.  Is he the brother of your fellow plaintiff, Tim
 9       Turley?
10   A.  Yes.
11   Q.  Is he an employee of the department?
12   A.  Yes.
     Q.  Is he a deputy sheriff?
     A.  I don't know that.
     Q.  Did he support Stephen Murphy?
16   A.  My opinion or guess?
17   Q.  What is your understanding.
18   A.  I believe so.
19   Q.  Lieutenant Dave McCarthy, you know him, right?
20   A.  Yes.
21   Q.  You work with him in transportation?
22   A.  Yes.
23   Q.  Did he attend the fund-raiser that you held,
24       organized for Stephen Murphy?
```

117

```
 1   A.  Yes.
 2   Q.  He supported Stephen Murphy?
 3   A.  Yes.
 4   Q.  Lieutenant Mullin, do you know him?
 5   A.  Yes.
 6   Q.  Is he an employee of the department?
 7   A.  Yes.
 8   Q.  Did he support Stephen Murphy?
 9   A.  Yes.
10   Q.  Is he a deputy sheriff?
11   A.  Yes.
12   Q.  Is Lieutenant McCarthy a deputy sheriff?
13   A.  I don't know that.
14   Q.  William Noonan, do you know him?
15   A.  Yes.
16   Q.  Is he a former union official for your union?
17   A.  No.
18   Q.  Never was involved in union affairs for a
19       different union?
20   A.  Possibly.
     Q.  Do you know or not know?
     A.  I don't know.
23   Q.  Is he an employee of the department?
24   A.  Yes.
```

118

```
 1   Q.  Did he support Stephen Murphy?
 2   A.  I don't know.
 3   Q.  Did you have any conversations with Deputy
 4       Superintendent Carney regarding the Suffolk
 5       County Sheriff's election before the election?
 6   A.  The only conversation I remember having with
 7       Deputy Superintendent Cliff Carney was the day
 8       I received that transfer letter, I was still in
 9       the transportation office, it was around
10       quarter-of-three, he walked by, he stuck his
11       head in, and said high.  I stood up, stood up,
12       and asked him what this letter was for.  He
13       turned around to me, and he said you shouldn't
14       have backed Murphy.  That is the only
15       conversation that I had with Deputy Cliff
16       Carney regarding any type of conversation on
17       the election.
18   Q.  When was that?
19   A.  When I received that letter of transfer, I
20       believe, it was either November or December,
21       November or December.
22   Q.  What did you say?
23   A.  So it is political then.
24   Q.  What did he say?
```

119

```
 1   A.  He smiled and walked away.
 2   Q.  So when I asked you before what evidence did
 3       you have that you were being transferred
 4       because of your political affiliation, this is
 5       something new?
 6   A.  You asked me about Sheriff Cabral.
 7   Q.  I asked you what evidence do you have, and we
 8       will go back --
 9           MR. PFAFF:  Stop.  Just ask the
10       question, you will get an answer.
11   Q.  What evidence do you have that your transfer
12       out of transportation was a result of your
13       political affiliation, what's the basis for
14       that?
15   A.  You can add that.  I apologize.
16   Q.  Is there anything else, Captain Moscone, other
17       than your writing up the subordinate officer,
18       your belief, because of the timing, and this
19       comment from Deputy Superintendent Carney, is
20       there anything else that's the basis for your
21       position that you were decommissioned and
22       transferred because of your support for Stephen
23       Murphy?
24   A.  And my union beliefs.
```

120

```
 1   Q.  Go ahead.
 2   A.  I told you earlier, we had a heated discussion,
 3       myself and Chief Keeley.  She had no idea what
 4       I did other than transportation.  She didn't
 5       believe what I told her, the many hats I wore.
 6       She, again, called me a liar.  She apologized
 7       to me the next morning by telephone call, I
 8       believe, after talking to Superintendent Gerard
 9       Horgan.  And solely blamed me for that contract
10       in '03 not getting ratified.
11   Q.  When she called you a liar, was there anybody
12       else present?
13   A.  I know Mike Harris was in and out of that
14       office.  I don't know if he heard her or not.
15   Q.  When you say that she blamed you, she never
16       told you directly that she blamed you directly
17       for the contract not being ratified?
18   A.  That's correct.
19   Q.  In your twenty-four years as an employee of the
20       department and your work with the union, have
21       you ever been involved in other contract
22       negotiations?
23   A.  Yes.
24   Q.  You don't always agree with management; is that
```

**EXHIBIT**

**5**

3

I N D E X

Witness        Direct  Cross  Redirect  Recross
DAVID BERGERON
(By Ms. Caulo)    4

Volume 1
Pages 1-162
Exhibits s per ind

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

Bergeron, et al
            Plaintiff,

V.

Andrea Cabral
            Defendant.

DEPOSITION OF DAVID BERGERON, a witness called on behalf of the Defendant taken pursuant to the Federal Rules of Civil Procedure, before Patricia M. Haynes, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, CSR No. 14620F, at the Offices of Suffolk County Sheriff's Department, 200 Nashua Street, Boston, Massachusetts, on Wednesday, October 4, 200, commencing at 10:15 a.m.

Copley Court Reporting
101 Tremont Street
Boston, Massachusetts  02108
(617) 423-5841

6           E X H I B I T S

7   Exhibit No.                          Page

8   1  Deposition Notice                 30

9   2  Copy of Policy S 516              30

10  3  Copy of Policy S 520              32

11  4  Copy of mailing                   105

12  5  Sheriff's response to Exhibit 4   111

13  6  Notification of Decommissioning   135

2

APPEARANCES:

Suffolk County Sheriff's Department
(By: Ellen M. Caulo, Esquire)
200 Nashua Street
Boston, Massachusetts 02114
Counsel for the Defendant


Merrick, Louison & Costello, LLP
(By: Stephen C. Pfaff, Esquire
67 Batterymarch Street
Boston, Massachusetts 02110
Counsel for the Plaintiffs

4

1       P R O C E E D I N G S

2       DAVID BERGERON,

3   having been previously sworn, was examined and testified

4   as follows:

5       MS. CAULO:  This is the matter of

6   Bergeron, et al versus Sheriff Andrea Cabral.  Today we

7   are taking the deposition of David Bergeron.

8       The usual stipulations, all objections, except

9   as to form, reserved until trial, all motions to strike

10  are reserved until trial.  Mr. Bergeron will have 30

11  days to review and sign the deposition waiving the

12  requirement of the notary.

13      MR. PFAFF:  Sign under the pains and

14  penalties of perjury.

15  DIRECT EXAMINATION BY MS. CAULO:

16      Q.   Please state your name and your rank.

17      A.   **David C. Bergeron, sergeant.**

18      Q.   Where do you reside?

19      A.   **141 Weld Street, West Roxbury.**

20      Q.   As you know, my name is Ellen Caulo.  I'm the

21  Deputy General Counsel for the Suffolk County Sheriff's

22  Department.  I represent Sheriff Cabral in the Complaint

23  that you and fellow employees have brought against her.

24      For purposes of today's deposition, I'm going

10/09/2006 01:31:08 PM

**65**

1    Q.    What evidence do you have that Sheriff Cabral

2  knew that you supported Stephen Murphy?

3      A.    **The day of the September election, I was at**

4  **Holy Name Church. I picked up a sign after I voted, and**

5  **I stood there with that sign. The sign was a Stephen**

6  **Murphy sign. The sheriff was standing there probably**

7  **about 20 feet away from me.**

8      **She was with Victor Theiss. And Matt O'Malley**

9  **was there back and forth. I said hello. Matt O'Malley**

10  **nodded. And the rest of the day there was no**

11  **communication. I was there -- they were there for about**

12  **three hours. So I'm sure she saw me. I know Mr. Theiss**

13  **saw me.**

14    Q.    How do you know Mr. Theiss saw you?

15      A.    **It appeared he was staring at me. I don't**

16  **know if he was just looking past me or whatever. He**

17  **seemed to catch my gaze I guess. It appeared to me he**

18  **was staring at me.**

19    Q.    What other employees from the Suffolk County

20  Sheriff's Department were there at Holy Name Church on

21  primary day?

22      A.    **None that I remember.**

23    Q.    Any other JOEASC members there holding signs

24  while you were there?

**66**

1      A.    **No.**

2    Q.    Did you have any communication with Sheriff

3  Cabral on the primary day, September 14, while you were

4  at Holy Name School?

5      A.    **No.**

6    Q.    This is general election day?

7      A.    **No, this is September the election I'm talking**

8  **about.**

9    Q.    The primary, right?

10      A.    **I thought the primary was March 2.**

11    Q.    If I suggest to you that the primary was held

12  in September in which Democrat Stephen Murphy squared

13  off against Democrat Sheriff Cabral, would that refresh

14  your memory?

15      A.    **Yes.**

16    Q.    Is it fair to say that Sheriff Cabral won the

17  primary, right?

18      A.    **Yes.**

19    Q.    And she had no opponent in the November

20  general election?

21      A.    **Correct.**

22    Q.    There was no Republican opponent?

23      A.    **Correct.**

24    Q.    So the primary was in September.

**67**

1      A.    **Okay.**

2    Q.    Was there any other date that you appeared at

3  an election booth on election day holding a sign for

4  Stephen Murphy other than September 14? I just want to

5  make sure we are talking about the same day.

6      A.    **No.**

7    Q.    March 2 had to do with a date on which Angelo

8  Rossi was disqualified?

9      A.    **Right. He voted in the election. He was an**

10  **independent. And when he voted, it was the Democrat**

11  **presidential primary. And because he voted in that, he**

12  **got disqualified.**

13    Q.    And that was?

14      A.    **The March 2 presidential.**

15    Q.    The primary election for president?

16      A.    **Yes.**

17    Q.    The presidential primary?

18      A.    **Yes.**

19      (Off the record discussion.)

20  BY MS. CAULO:

21    Q.    The election that we have been discussing

22  where you were holding a sign for Stephen Murphy, that

23  was the primary election for Suffolk County Sheriff, is

24  that fair?

**68**

1      A.    **Yes.**

2    Q.    And that was in September of 2004?

3      A.    **Yes.**

4    Q.    On that date when you were at Holy Name School

5  in the parking lot as described in paragraph 37 of your

6  Complaint, did you have any conversation with Sheriff

7  Cabral?

8      A.    **No.**

9    Q.    Did you have any communication with her?

10      A.    **No.**

11    Q.    You indicated that Matt O'Malley nodded at

12  you, is that a fair characterization of your testimony?

13      A.    **Yes.**

14    Q.    And he was working with Sheriff Cabral in

15  support of her candidacy?

16      A.    **He was there with her, yes.**

17    Q.    Did Sheriff Cabral nod at you?

18      A.    **No.**

19    Q.    Did she wave to you?

20      A.    **No.**

21    Q.    Did she approach you?

22      A.    **She walked past me.**

23    Q.    How far away was she when she walked past you?

24      A.    **Close enough to reach out and touch each**

81

1  concerning the picture that was appearing on -- what web
2  site?
3      A.    Sheriff Cabral's web site. The gist is, that
4  I can remember, I had called Mark Miller, the web master
5  for the jail, web master for that campaign web site. I
6  called him and I asked him to take me off. He said he
7  would get back to me. And Mr. Tompkins called me.
8          We had a short conversation. I told him that
9  I didn't want my picture on that, it doesn't seem
10 appropriate. He said, "Well, the picture was taken in
11 the public domain so the picture can stay up there." I
12 said well, "I'm a public employee. The picture was
13 taken without my knowledge or consent. I would really
14 like to take it off."
15         And he did. So it was amiable enough, but I
16 could tell that from his tone he wasn't happy with it.
17     Q.    Did you tell Mr. Tompkins to inform Sheriff
18 Cabral that you weren't supporting her candidacy?
19     A.    No, I did not.
20     Q.    What were the circumstances surrounding the
21 conversations you had with Sheriff Cabral as described
22 on page 35 of your Complaint?
23     A.    That was the March 2 discussion I had with
24 Sheriff Cabral at the Holy Name Church parking lot. I

82

1  went to the Holy Name Church to vote, and there was a
2  pickup truck with a huge Cabral sign on it. I said I, I
3  said to myself, I wonder whose truck that is? And there
4  were Cabral signs everywhere. I didn't expect to see
5  this. I think I was there in the afternoon. It was
6  pretty quiet.
7          As I approached, a woman asked me to sign a
8  ballot petition for Sheriff Cabral. I said, "No, thank
9  you, I'm only here to vote." She asked me again. I
10 said, "No, thank you, I'm only here to vote." And at
11 that time, I was walking behind Sheriff Cabral to walk
12 around her. She was facing the other way.
13         That woman got the sheriff's attention and
14 told her that I wouldn't sign the ballot petition.
15     Q.    What did you hear her say?
16     A.    Who, the woman to Sheriff Cabral?
17     Q.    Yes.
18     A.    I can't remember exactly what she said. It
19 was something along the lines of, she was making a joke
20 out of it. Sheriff, he won't sign your ballot petition,
21 something like that. So she turned towards me and goes,
22 "Why won't you sign my ballot petition?" I said, "I'm
23 just here to vote." She introduced herself to me.
24     Q.    Had you met her before?

83

1      A.    Yes, twice that I remember. I said, "I know
2  who you are. I work for you." She started laughing.
3  She said, "That happens a lot." I said, "I bet it
4  does." So she went on to say, "Why won't you sign the
5  ballot petition?" I said, "I'm just here to vote.
6  You're my boss. I really don't want to get into this."
7          She said, "I'm here to talk." I said, "I'm
8  just here to vote." "Well, I'm here to talk. Let's
9  talk about it." And then we had a fairly long
10 conversation for about 20 minutes I guess. And she
11 asked me what was on my mind. And I talked to her about
12 quite a few things.
13     Q.    What did you talk to her about?
14     A.    Well, I told her -- before I start that, I
15 told her the reason why I didn't sign the petition was
16 because I was disappointed in her and angry at her
17 administration. She said, "But why?" I said, "Well,
18 there are a lot of things. For instance, the dental,
19 the lack of dental."
20         She told me that she provided more than she
21 was required to, and I disagreed with her because there
22 were so many people that were going to have dental work
23 done. And by the time they would go to the dentist
24 office, there would be no insurance. I'm not sure if

84

1  the payments were paid in such a way that it was
2  difficult for people to get benefits from it.
3          I also spoke to her about Angelo Rossi. I
4  said, "Do you know Angelo Rossi?" She says, "Yeah, I
5  just heard about him. I read about him in the local
6  papers." I said, "You've never heard about him before?"
7  She said, "No."
8          I said, "Well, he tried to get a hold of you.
9  He wanted to talk to you about him running for sheriff."
10 She said, "No, I didn't know that." I said, "He told
11 your secretary. She never told you?" She said, "I
12 never heard about it."
13         The secretary later told Angelo the sheriff
14 didn't want to see him. But she claims she didn't know
15 anything about Angelo. I said, "All right." Every time
16 we would talk about a topic, she would say, "What else
17 is on your mind?"
18         A couple of times during this conversation,
19 Matt O'Malley came over, twice I believe. Matt wanted
20 to talk to her aside from me. And she said, "I'm all
21 right here, Matt." And I looked at Matt, and I was kind
22 of surprised that he would come over and try to take her
23 away from this.
24         I said, "Don't worry, Matt. She's okay.

85

1   She's my boss. I was trying to have a little fun with
2   it. So she is like, "Go on." We also discussed the
3   raises. I said, "You know, it just doesn't look good.
4   You're giving out raises to your people up top and there
5   are other people doing without." She said, "I didn't
6   give them raises." I said, "It appears you gave them
7   raises."
8         And she went on to describe the F 15 wage
9   acceleration forms. I told her I understood what that
10  was, I understand what it means. But she was adamant
11  that it was not a raise. I said, "Okay, let me put it
12  to you this way. You start on day one and you have X.
13  Day 366 you now have X plus $400 a week. That's a
14  raise."
15        She said, "It's not a raise." So we didn't
16  agree on that either. We talked about veteran benefits,
17  the vacations for the veterans. She told me, I believe
18  she said she had a legal opinion that she was correct on
19  that. And we went on to another topic. I'm trying to
20  remember what else we talked about.
21        I told her that I work quite a bit of overtime
22  and with all the problems that we had at the jail I had
23  only seen her twice. I don't know how many months she
24  was in by then. I said, "That's unacceptable from my

86

1   point of view. You should be spending more time at the
2   jail, some more hands-on stuff."
3         And she said she was busy cultivating
4   relationships up at the State House to get money for the
5   jail, at the court houses and the House of Correction.
6   I can't think of anything else. It was a 20 minute
7   conversation a couple of years ago.
8         I'm sure there's probably more issues. Mostly
9   they were the issues of the day that we talked about.
10  Like I said, at the end of it, we were smiling. She
11  shook my hand, I shook her hand. I went in to vote. I
12  actually wished her luck on the election.
13  Q.   What was your tone of voice?
14  A.   I would say pretty much like I'm talking to
15  you.
16  Q.   Were you loud?
17  A.   I don't think so.
18  Q.   Were you angry?
19  A.   No.
20  Q.   Were you upset?
21  A.   No.
22  Q.   Were you insistent in terms of making sure she
23  listened to you?
24  A.   No more than she was with me.

87

1   Q.   Well, talk to me about what you mean by that.
2   A.   I mean, you know, she was, she had her
3   opinions, and she wasn't going to step away from those
4   opinions. It just appeared to me that we just had
5   different opinions, that's all. I mean, I don't think I
6   was negative at all in my conversation.
7         You want me to define insistent or define how
8   she was speaking to me. I mean, I didn't take anything
9   negative away from that except I would have liked more
10  definitive answers than I got. Other than that, that's
11  it.
12  Q.   Did you attempt to get more definitive answers
13  from Sheriff Cabral other than what she was providing
14  you?
15  A.   If she didn't answer me, I said, "I don't
16  agree with that either."
17  Q.   Did you challenge her?
18  A.   No.
19  Q.   Were you loud?
20        MR. PFAFF: Objection. Asked and
21  answered.
22  BY MS. CAULO:
23  A.   I don't believe I was.
24  Q.   You wanted answers to your questions, correct?

88

1   A.   Yes.
2   Q.   You didn't like the answers that the sheriff
3   was giving you; is that correct?
4   A.   Some of them could have been more definitive.
5   Q.   And how did you tell her that?
6   A.   I didn't. I don't remember saying anything
7   about it. I remember moving on from one question to the
8   next saying, "We don't agree on that either."
9   Q.   What was your tone when you said that?
10  A.   Just what I said to you.
11  Q.   You why do you think Matt O'Malley came up two
12  times to see if she was all right?
13  A.   I would imagine -- do you want me to speculate
14  why he came over?
15  Q.   I want you to tell me why you think it is that
16  he came over.
17  A.   She was spending too much time with me.
18  Q.   Why did you feel it necessary to say we are
19  all right here?
20  A.   Because she said, "I'm okay."
21  Q.   Why did you feel the need to say that?
22  A.   Because she said, "I'm okay," that's why. Why
23  she said she's okay, I really don't know.
24  Q.   Why did you feel the need to say --

89

```
 1    A.    Because the sheriff said it.  And I thought I
 2  would be jovial about it.  I would say, "She's okay,
 3  she's my boss."
 4    Q.    Was there anything about your interaction that
 5  would cause someone to think things were not okay?
 6    A.    I don't think so.
 7    Q.    Other than Matt O'Malley, who else was there?
 8    A.    Victor Theiss was walking around during a lot
 9  of this.
10    Q.    Where was he in relation to you?
11    A.    He stood next to the sheriff, behind the
12  sheriff, walked away frequently.  He was just walking
13  around.
14    Q.    Where was he in relation to you during the
15  time you were having the conversation with Sheriff
16  Cabral, close enough to hear?
17    A.    For a short time.
18    Q.    Was Matt O'Malley in a position to hear?
19    A.    No.
20    Q.    During the entire 20 minutes that you were --
21    A.    He did come over, but he didn't stand there
22  listening to the conversation.
23    Q.    Who else was present?
24    A.    My wife.
```

90

```
 1    Q.    Where was she?
 2    A.    Standing right next to me.
 3    Q.    Was she present during the entire
 4  conversation?
 5    A.    Yes.
 6    Q.    Did she say anything?
 7    A.    My wife, no.  She said hello and shook her
 8  hand, the sheriff's hand, when we left.
 9    Q.    Other than your wife, was there anybody else
10  present during the conversation?
11    A.    I think Ms. Conroy.  I don't know who the
12  woman was that was taking the ballot petition
13  signatures, but she was nearby.
14    Q.    Do you know who that person is?
15    A.    No, I don't.
16    Q.    Is she an employee of the office?
17    A.    I don't know who she is.
18    Q.    You mentioned Ms. Conroy.  Who is that?
19    A.    I believe it was Liz Conroy.  That's who I
    think was there.
21    Q.    Taking the signatures?
22    A.    No.  The woman taking the signatures, I don't
23  know who she was.  I believe it was Liz Conroy that was
24  there.
```

91

```
 1    Q.    Where was Ms. Conroy in relation to you and the
 2  sheriff when you were speaking with the sheriff?
 3    A.    Much like Victor Theiss, pop in, pop out, pop
 4  in, pop out.  Nobody stayed right there the whole time
 5  we were talking.  I mean, the sheriff wanted to pull me
 6  aside to talk to me and for whatever reason they didn't
 7  hang out with us.
 8    Q.    Was it an animated conversation?
 9    A.    I would say it was.
10    Q.    Describe to me how it was animated.
11         MR. PFAFF:  Objection.  He just answered.
12  He described for you in detail his memory as to the
13  conversation.  You've already asked him if he was upset,
14  if he was antagonistic.  He's described it for you.
15  BY MS. CAULO:
16    Q.    You may answer.  You just indicated to me that
17  the conversation was animated.  Please tell me how it
18  was animated.
19    A.    You know, like, for instance, when I explained
20  the raise, you know, talking with your hands.  The
21  sheriff was doing the same thing.
22    Q.    Do you know who Russell Roberts is?
23    A.    I have an idea who he is.  Is he in a lot of
24  parades?
```

92

```
 1    Q.    I have no idea.  Is he an employee of the
 2  office?
 3    A.    No.
 4    Q.    Is he an investigator?
 5    A.    I don't know what he does.
 6    Q.    Was he present at Holy Name on March 2?
 7    A.    I'm not sure if it was him.
 8    Q.    So is there anybody else other than Victor
 9  Theiss, Matt O'Malley, Ms. Conroy, Sheriff Cabral and
10  your wife and perhaps this other individual?  Describe
11  this other individual to me, this male.
12    A.    He might be Hispanic, light skinned black man.
13  He had a baseball cap.  I don't remember anymore than
14  that.
15    Q.    Anybody else?
16    A.    There were people milling about, but I don't
17  know who they were.
18    Q.    Did you read Victor Theiss' deposition?
19    A.    A couple of months ago, yeah.
20    Q.    Were you present during his deposition?
21    A.    Yes.
22    Q.    Do you recall him testifying about what his
23  observations were concerning your conversation with
24  Sheriff Cabral on March 2 at Holy Name School?
```

93

1      A.   Not exactly.

2      Q.   Do you recall that he said that you were angry

3  and upset?

4      A.   I don't recall him saying that.  If he did, he

5  did.

6      Q.   Do you recall that he testified that he was

7  concerned?

8      A.   No.

9      Q.   When you read his testimony, did you agree

10  with the way he characterized the interaction between

11  you and --

12         MR. PFAFF:  Objection.  He doesn't recall

13  the testimony.

14  BY MS. CAULO:

15      A.   I don't remember what he said.

16      Q.   Would you agree with me that there are other

17  forums or places more appropriate to discuss issues

18  pertaining to labor management than on primary day?

19         MR. PFAFF:  Objection.

20  BY MS. CAULO:

21      A.   I thought since the sheriff thought it was

22  appropriate, it would be appropriate.

23      Q.   Were you disrespectful in any way to Sheriff

24  Cabral?

95

1      Q.   Does that refresh your recollection as to how

2  Victor Theiss characterized the interaction that you had

3  with Sheriff Cabral on March 2, 2004 at the Holy Name

4  School?

5      A.   Yes, ma'am.

6      Q.   Is it fair to say that he characterized it as

7  a "very heated" discussion?

8      A.   That's how he characterized it.

9      Q.   Now that you've been refreshed by what Mr.

10  Victor Theiss' testimony was with respect to what he

11  observed about that interaction, do you agree with his

12  characterization that the exchange between you and

13  Sheriff Cabral was heated?

14      A.   No.

15      Q.   Not at all?

16      A.   No.

17      Q.   Is it your testimony it was purely

18  conversational?

19         MR. PFAFF:  Objection.  He's already

20  testified as to what the type of conversation was.  He

21  doesn't agree with Theiss.  What's the next question?

22  BY MS. CAULO:

23      Q.   You may answer.

24      A.   Can I have the question again?

94

1      A.   No.

2      Q.   Was your behavior unprofessional when you

3  interacted with Sheriff Cabral on March 2?

4      A.   No.

5      Q.   Was your behavior professional?

6      A.   I believe it was, yes.

7      Q.   Would you agree with me that even if you

8  disagree with the sheriff that you should be respectful

9  and professional in your interactions with her?

10      A.   Yes.

11         MS. CAULO:  Let's take a short break.

12         (Brief recess.)

13  BY MS. CAULO:

14      Q.   I have one copy of this, but I'll represent to

15  you, Sergeant Bergeron, that that is a page from Victor

16  Theiss' deposition, page 11 from his deposition that was

17  taken on May 8, 2006.

18      A.   I remember this now.

19      Q.   I'll ask you to look at lines 12 through 15,

20  if you would, of that deposition.  Once you do that, let

21  me know.

22      A.   Okay.

23      Q.   Have you read that?

24      A.   Yes.

96

1      Q.   Would you describe it as conversational?

2      A.   A little more animated than conversational.

3  Like I said, both of us were using our hands while we

4  were speaking.  Both of us I believe are passionate in

5  our opinions.

6      Q.   How did you communicate your passion about

7  your opinions to Sheriff Cabral?

8      A.   I --

9         MR. PFAFF:  Objection.  Asked and

10  answered.  I instruct the witness not to answer the

11  question.

12         MS. CAULO:  There is no privilege and no

13  objection.  There's no appropriate instruction to not --

14         MR. PFAFF:  I just gave you -- as counsel

15  I tell you not to answer.  You have your rights.

16         MS. CAULO:  We'll continue the deposition.

17  And if we need to get intervention by the court, we

18  will.

19  BY MS. CAULO:

20      Q.   After you left Holy Name School on March 2,

21  did you discuss your interaction with Sheriff Cabral

22  with anyone else?

23      A.   I believe I talked to my wife about it.  I

24  can't remember anyone else.

97

```
1    Q.    Did you discuss it with any fellow member of
2    JOEASC?
3    A.    That day?
     Q.    At any time?
5    A.    I may have.  I may have talked to Barnes.  I
6    may have talked to Rossi.  Other than that, I don't
7    recall.
8    Q.    John Barnes at that point in time in March of
9    2004 was the president of JOEASC?
10   A.    I believe so.
11   Q.    And the issues that you discussed with Sheriff
12   Cabral were of importance to the membership of JOEASC,
13   correct?
14   A.    Yes, they were.
15   Q.    And Sheriff Cabral gave you her position on
16   these issues that you raised with her?
17   A.    Yes.
18   Q.    Would it have been important for you to
19   communicate her position to the president of JOEASC?
20   A.    It's the same position she had throughout.
21   The question is, Would it be important for me to discuss
22   that with members of JOEASC?
23   Q.    Yes.
24   A.    I think so.
```

98

```
1    Q.    Did you?
2    A.    I don't recall.
3    Q.    That's your best memory?
4    A.    It's my best memory.  I believe I may have
5    spoken to Barnes.  But as far as what the conversation
6    was, I don't remember.
7    Q.    That interaction with Sheriff Cabral occurred
8    in March of 2004?
9    A.    Yes.
10   Q.    And when were you decommissioned as a deputy
11   sheriff?
12   A.    I believe it was April or May of 2005.
13   Q.    So almost more than a year later?
14   A.    Yes.
15   Q.    I'm placing the Complaint that your attorney
16   filed on your behalf before you.  What were the
17   circumstances surrounding Sheriff Cabral's appearance at
18   roll call as described in paragraph 36 of your
19   Complaint?
     A.    You want me to describe what happens?
     Q.    What were the circumstances, yes.
22   A.    The circumstances were I believe it was a
23   mandatory roll call held in the cafeteria on entry.
24   Most of the officers on the shift were there.
```

99

```
1    Q.    This was the --
2    A.    Three to eleven shift.  We were told the
3    sheriff wanted to speak to us.  So we were waiting for
4    it.  And when she came in, she came in with boxes of
5    handouts I guess they were and put them on the table.  I
6    believe it was Gerard Horgan, Victor Theiss, Eugene
7    Sumpter, Mike Harris.
8         They were all standing at the door.  The
9    sheriff was at a table near the door that goes into the
10   cafeteria, and the rest of the administrative people
11   were lined up across the door.  She went on to discuss
12   what she said were mailings that went out that were
13   untruthful.  I don't remember exactly what she said.
14        There were some handouts basically saying what
15   she was saying past out.  An officer, I believe it was
16   George Flaherty, stood up and she either couldn't hear
17   him or didn't understand what he was saying.  It was
18   about Chapter 800.  I'm not sure what the question was
19   about.
20        She didn't answer the officer.  The officer
21   got loud, and the sheriff said, "Have that man removed."
22   Q.    When you say got loud, what do you mean, what
23   did Officer Flaherty do?
24   A.    He wanted to know why she didn't know what
```

100

```
1    Chapter 800 was, that's what it was.
2    Q.    What was his tone?
3    A.    He seemed angry.
4    Q.    Was it respectful?
5    A.    No.
6    Q.    How would you characterize it?
7    A.    Angry.
8    Q.    Was it appropriate?
9    A.    No, I don't think so.
10   Q.    It wasn't appropriate for him to address the
11   sheriff in that manner?
12   A.    That is correct.
13   Q.    After he addressed the sheriff in a manner
14   that you described as not being appropriate, did Sheriff
15   Cabral ask that he be removed?
16   A.    Yes.
17   Q.    What was the next thing?
18   A.    That's when I asked her a question.  She said,
19   "Does anybody else have any questions?"  I said, "Yes."
20   I don't remember my exact words but something like, Did
21   you in any way use our dental benefits as bargaining
22   leverage?  And she said, "No, no."  And several of the
23   administrators said, "No, no, no."  And that was it.
24   That's the only thing I asked her.
```

101

```
1    Q.    Bargaining leverage for what?
2    A.    The contract.
3    Q.    Which contract?
     A.    The Collective Bargaining Agreement between
5    JOEASC and the Suffolk County Sheriff's Department.
6    Q.    I should be more precise.  Which contract was
7    that, which year?  Were you currently in contract
8    negotiations?
9    A.    Yes.
10   Q.    Describe to me what you knew about that at
11   that time.
12   A.    About what I knew about the contract?
13   Q.    Why is it you asked Sheriff Cabral whether or
14   not the dental plan was being used as a bargaining
15   leverage during contract negotiations, why did you ask
16   that question?
17   A.    That's what the bargaining committee was
18   coming out of the meetings telling us.
19   Q.    What were you told?
20   A.    That the department was withholding dental
21   benefits until we got a contract, until we signed a
22   contract.
23   Q.    Who was on the bargaining committee?
24   A.    I think -- I'm not sure, I don't remember.
```

102

```
1    Q.    Were you?
2    A.    No.
3    Q.    Were you present during any of the contract
4    negotiations?
5    A.    No.
6    Q.    Do you have personal knowledge of what
7    occurred during the contract negotiations?
8    A.    The dental issue was a very big issue at the
9    time and the fact that, we were being told it was being
10   used as a bargaining tool and that was not a very good
11   thing.
12   Q.    I guess the question was, Did you have
13   personal knowledge?
14   A.    Personal knowledge, no.
15   Q.    So your knowledge was based upon what you were
16   told by others?
17   A.    Yes.
18   Q.    The others that told you this, were they
19   members of the bargaining team for JOEASC?
     A.    They would have to be, yes.
     Q.    Were you told this by John Barnes?
22   A.    I told you, I don't remember who it was.
23   Q.    But I'm asking a separate question.  Do you
24   recall John Barnes telling you that withholding of
```

103

```
1    dental was being used as a bargaining leverage in
2    contract negotiations?
3             MR. PFAFF:  Objection.  His answer is he
4    doesn't know what told him.
5    BY MS. CAULO:
6    Q.    You may answer.
7    A.    I don't recall.
8    Q.    Did John Grennon tell you that?
9    A.    No.
10   Q.    Do you recall anybody in JOEASC, either an E
11   board member, bargaining unit member?
12   A.    Maybe Sergeant Robert Tullos.
13   Q.    Who is Sergeant Robert Tullos?
14   A.    I don't know if he was on the negotiating team
15   then.  I believe he was an E board member at the time.
16   He was vice president after that in '04.  But at the
17   time, I believe he was an E board member.
18   Q.    And you believe he is the one that told you
19   that the department was withholding dental benefits as a
20   leverage in contract negotiations?
21   A.    I believe it was him, yes.
22   Q.    Is he a deputy sheriff?
23   A.    I have no idea.
24   Q.    The Flaherty that you mentioned, what was his
```

104

```
1    first name?
2    A.    George.
3    Q.    What was your tone when you asked the question
4    at roll call of Sheriff Cabral regarding dental
5    benefits?
6    A.    I don't remember any specific tone.
7    Q.    Were you respectful?
8    A.    I think so.
9    Q.    Were you professional?
10   A.    Yes.
11   Q.    Did she answer your question?
12   A.    Yes.
13   Q.    I believe your testimony was that the roll
14   call appearance by Sheriff Cabral precipitated a mailing
15   that had gone out from JOEASC, is that your
16   understanding?
17   A.    Yes.
18   Q.    Were you familiar with that mailing?
19   A.    No.  I had seen it after it had gone out.  It
20   was around the jail.  The union had past these out to I
21   guess they are called opinion voters or, people that
22   vote all the time.  Evidently there's a list of people
23   that vote all the time.  This was sent to them.
24             MS. CAULO:  We'll mark this as the next
```

**EXHIBIT**

**6**

1

COPLEY COURT REPORTING, INC.
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

DATE:  February 2, 2007

TO:   Robert Stewart, Esq.
      Merrick, Louison & Costello, LLP
      67 Batterymarch Street
      Boston, Massachusetts 02110

RE:   David Bergeron, et al. v. Andrea Cabral

      DEPOSITION OF JOHN ELLIS

Dear Attorney Stewart:

     Enclosed herewith is your copy of the
transcript of the deposition of John Ellis,
Volume I, Pages 1-231, taken on January 18, 2007
in the above-referenced case.  Please arrange to
have the witness read the transcript and sign the
signature page.  Any corrections to be made to
the deposition are to be made separately on the
enclosed errata sheet and signed by the witness.
Once completed, please forward a copy of the
signature page and errata sheet to Ellen M.
Caulo, Esq.  Corrections should not be made
directly to the transcript.
     Thank you for your cooperation.  If you have
any questions, you may contact me at the
above-listed telephone number.

                              Very truly yours,


                              Julie A. Healey


CC:   Ellen M. Caulo, Esq.
      File

37

1    time for Deputy Sheriff again, and it would be

2    hinged on whether I was in good standing at that

3    time or not, so, while it didn't explicitly state

4    I lost this good standing, it seemed to be the

5    message that was being portrayed in this letter,

6    so, I viewed that as a form of discipline because

7    I don't understand why to this moment that I'm

8    being viewed as an officer and as someone other

9    than exceptional standing.

10         I've never been disciplined, I perform my

11   duties I think better than average, my recent

12   evaluation where the objective criteria listed

13   were all on a one to five, and I received four's

14   and five's in every category.

15         I don't mean to sound arrogant, it's not

16   what I mean to portray at all, but I think I'm a

17   better than average employee, and to me it was a

18   form of discipline to lose a Deputy Sheriff

19   status.

20     Q.   How do you reconcile S516 then which

21   indicates that Deputy Sheriff may be removed at

22   any time and for any reason with your belief that

23   the decommissioning was a form of discipline?

24     A.   I believe the letter stated as such.  I

68

I held signs one day with Dave Burke and Pat O'Brien again at Oak Square, which is Brighton, I knew that John was an avid supporter.

Q.    John?

A.    I'm sorry, John Barnes.  He was doing a lot of volunteer work, phone banks as well on different nights than I was.  I believe John Grennon was taking part.

I, after the fact, had heard of a fund-raiser that Captain Moscone had put on.  I was not aware of it until after the fact, but I heard about that afterwards.

Q.    How did you hear about that afterwards or where did you hear about it?

A.    I believe John Barnes approached me and said if I went and I said I didn't know about it, and he said, "Oh, he had an event the other night," and I was, like, okay.  I went to an event in Brighton initially where I dropped off my check.

Q.    Anybody from the Department at that event in Brighton?

A.    Not that I recall, no, not that particular event.

CONDENSED

99

job position, which was step 1.

    Q.   Well, how do you know that, sir?

    A.   I believe that was information given to me through John Barnes, and I also --

    Q.   So, it's your testimony --

    A.   I'm sorry.

    Q.   No, go ahead.

    A.   I remember when this issue was raised I had a conversation with Steve Tomkins regarding it, and he essentially, I forget word for word, but he was denying they were pay raises also, but he was saying, I asked him they're hired, they're hired at a certain rate, yes, he said yes, and then the form 15F comes in and they're given extra money for the same position, yes, yes.

    So, I do remember getting some confirmation from Steve Tomkins although he wasn't agreeing it was a pay raise, he was stipulating that the position was cited at one rate and through virtue of the 15F letter they were given another rate once they came in.

    Q.   Did you go and speak to any of these individuals and ask them what the salary was they were offered and the salary they accepted in

155

participating as a supporter of Steve Murphy?

A.    On election day itself I was working at the Brighton Public Library which is a polling place, and we were outside passing out literature and that sort of thing, and Deputy Superintendent Carney was doing the same for the Sheriff, so, I spent several moments with him that day.

Q.    Describe that interaction if you will?

A.    It was kind of interesting because my parents were also there, so, most of the time I think we mutually agreed to talk about the Red Sox, but there was no hostility or anything like that.  We both knew why we were there and kind of just went forward.

Q.    Have you ever had any hostility with Deputy Superintendent Carney concerning the election?

A.    Oh, no, I didn't mean to imply that.  Deputy Superintendent Carney has always been forthcoming and professional with me.

Q.    How about Deputy Superintendent Sumpter?

A.    The same, I've had less dealings with him over the years, but he's always been polite and appropriate with me.

158

1   where he didn't, this was, I'm going to guess

2   March of '04, so, we were far away from endorsing

3   anyone at that point, but I do remember him

4   cautioning us against wanting to endorse anyone

5   and staying neutral, and you know, it was just him

6   sort of putting that out there in what was

7   otherwise a non Sheriff, non job related

8   conversation during the run.

9       Q.    Let's talk about that.  At the point

10  where you were having this conversation while you

11  guys are running around the river talking about

12  JOEASC's thinking about endorsing a candidate in

13  the election, did you mention specific

14  individuals?

15      A.    It was, I think we were mentioning the

16  candidates in a general sense.  In March of '04,

    we weren't leaning towards anybody in particular,

    except Angelo Rossi, although I think at the time

    we were having this run there was some questions

    whether he would be able to get on the ballot or

    not, but there had been some talk that there would

    be an endorsement.

        It had already come up at a meeting that

    perhaps we would endorse a candidate, so, I think

188

1

2  A.  No, ultimately no.

3  Q.  No discipline was imposed on Mr. Grennon?

4  A.  No.

5  Q.  So, you arrived --

6  A.  Unless I'm trying to think of the timing,
7  he lost his assignment in training, I don't know
8  if you call that discipline, but he ultimately
9  lost his assignment in training, this was much
10 later, so, I don't think it was a direct result of
11 this meeting.

12 Q.  Are reassignments disciplinary?

13 A.  Technically, no.

14 Q.  You arrived with -- so, there was no
15 discipline imposed to Mr. Grennon, correct?

16 A.  Correct.

17 Q.  You arrived for your meeting in the
18 company of Mr. Turley, correct?

19 A.  Correct.

20 Q.  What conversations did you have with
21 Mr. Turley prior to arriving at the meeting or in
22 preparation for the meeting?

23 A.  It was just sort of a wait and see
24 attitude.  I wasn't entirely sure what was going
   to face me, but I asked him to attend, and he

197

stressful confrontational sort of thing at first, and I don't think the intent by us initially was to upset her on a personal basis, I know it wasn't.

So, some of the personal anger that was coming from her I think was a little bit concerning initially.

Q.   Did you articulate that to her?

A.   Not in so many words, no, I was just trying to be polite.

Q.   Did you speak about why it is that you felt -- did you indicate to her who participated in creating these mailings?

A.   We had similar questions to the ones you asked me earlier, and I think if I recall correctly I outlined the process in a similar manner.

Q.   So, that is to say what, you told her yourself, Mr. Barnes, and Mr. Grennon created these with the input of Mickey Walsh and Jack Tullos?

A.   I'm sure I told her it was a collaborative effort of everyone on the executive board.

EXHIBIT

7

Volume 1
Pages 1-86
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

--------------------------------:
                                 :
Bergeron, et al                  :
                Plaintiff,       :
                                 :
V.                               :
                                 :
Andrea Cabral                    :
                Defendant.       :
                                 :
--------------------------------:

        DEPOSITION OF WILLIAM PENEAU, a witness
called on behalf of the Defendant taken pursuant to the
Federal Rules of Civil Procedure, before Patricia M.
Haynes, a Certified Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts, CSR No.:
14620F, at the Offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Friday, December 8, 2006, commencing at 2:00 p.m.

            Copley Court Reporting
        58 Batterymarch Street, Suite 317
        Boston, Massachusetts  02110
                (617) 423-5841

Copley Court Reporting  101 Tremont St. #500  Boston MA 02108  617·423·5841

1    concerning the election?

2        A.    No.

3        Q.    With respect to Elizabeth Keeley, who at that

4    time was chief of staff, did you ever have any

5    interactions with Elizabeth Keeley in your capacity as a

6    grievance administrator?

7        A.    I believe we might have had a hearing.  I'm

8    not sure if the hearing ended up going forward, but she,

9    I believe she was scheduled for a hearing.

10       Q.    When you say she was scheduled, is she a

11   disciplinary hearing officer?

12       A.    Yeah, on behalf of the department I believe,

13   or something like that...

14       Q.    Do you remember which employee this involved?

15       A.    Could I ask him a question?  I think it was --

16       Q.    There's a question pending.

17       A.    I think it was the Turley case.  I'm not 100

18   percent sure.

19       Q.    Did you have any conversation with her about

20   that?

21       A.    No, not really.

22       Q.    Have you had any interactions in your capacity

23   as grievance administrator on behalf of JOEASC with

24   Michael Harris?  I'm directing you to the point in time

Condensed
Transcript

in which you were a grievance administrator in 2003, 2004.

A.    Did I have discussions with Michael Harris?

Q.    Yes.

A.    Yes.

Q.    How frequently?

A.    Probably at least once a week.

Q.    And if you could describe those interactions? What was the tone like?  Were they hostile, were they friendly?

A.    Well, they weren't super friendly.  We argued about some issues at the time.  Mainly dental at the time and then, you know, any other grievances that may have come about in that time span as a union rep.

Q.    That's not unusual, is it, to have differences of opinion and disagree with management?

A.    Not at all.

Q.    Was there anything unusual about your interactions with Michael Harris that was different than any other --

A.    No.

Q.    Was Sheriff Cabral responsible for the loss of dental and vision benefits after 1134 decertified from AFSCME?

Condensed
Transcript

1    paid.  So we had to discuss it a lot with Mike Harris.

2        Q.    When you say several, three or four?

3        A.    Could be more.

4        Q.    So how many are we talking about?

5        A.    I'm not 100 percent sure on the number.

6    Several.  I'd say close to 20 employees maybe.  Even

7    more.

8        Q.    Did they ultimately get covered and the bills

9    were paid?

10       A.    I'm not 100 percent sure whether they had to

11   keep resubmitting or not.  I don't know.

12       Q.    What were your duties and responsibilities as

13   a grievance coordinator for JOEASC between 2003 and

14   2004?

15       A.    I was to keep track of grievances and assist

16   with the chief steward, Corporal Turley.

17       Q.    How many grievances do you recall filing in

18   that time period of 2003, 2004?

19       A.    Several.  I don't know the number.  I couldn't

20   even guess.

21       Q.    When you were no longer the grievance

22   coordinator, you left that post sometime in the fall of

23   2004?

24       A.    I believe so.

Condensed
Transcript

activity and because of your support for Stephen Murphy.
I'm asking you what is the evidence?

          MR. PFAFF:  Do you have any physical
evidence?

          MS. CAULO:  Read the question back.

          (*Court reporter reads back noted question
as recorded.)

          MR. PFAFF:  Objection.  Asked and
answered.

BY MS. CAULO:

   Q.   You may answer.

   A.   I think the fact I've been a good employee for
16 years and then all of a sudden out of the blue after
being involved in the union and being affiliated with
John Barnes, John Grennon, John Ellis, that all of a
sudden all of us mysteriously became officers in bad
standing with the department.

   Q.   How were you affiliated with John Barnes and
John Grennon and John Ellis other than the fact you were
all in the same unit?

   A.   They were all union reps at the time.

   Q.   It's fair to say their involvement in the
union was far more extensive than yours?

   A.   Correct.



EXHIBIT

8

Volume:    1
Pages:     1 – 131
Exhibits:  See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No: 1:05-CV-11661-RGS

DAVID BERGERON, JOHN GRENNON, LORNE LYNCH, JOHN )
BARNES, JOHN ELLIS, TIMOTHY TURLEY, AL MOSCONE, )
WILLIAM PENEAU, ERIK DILIBERO and PAUL GIGLIO,  )
                              Plaintiffs,        )
                v.                               )
ANDREA CABRAL, INDIVIDUALLY and as SHERIFF OF    )
SUFFOLK COUNTY,                                  )
                              Defendant.         )

DEPOSITION OF **ERIK P. DILIBERO**, a

Witness called on behalf of the Defendant, taken

pursuant to the applicable provisions of the

Massachusetts Rules of Civil Procedure, before

Maureen Nashawaty, a Notary Public within and for

the Commonwealth of Massachusetts, held at the

offices of the Suffolk County Sheriff's

Department, 200 Nashua Street, Boston, MA, on

Wednesday, December 13, 2006, commencing at 10:15
a.m.

*COPLEY COURT REPORTING, Inc.*
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

DISK ENCLOSED

24

1    Union 1134 challenged that designation and we

2    were required to comply with that ruling of the

3    Labor Relation's Commission?

4         A.    That is correct.

5         It was also clear that she also stated

6    that she would back all seven of us and keep us

7    Temporary Lieutenants no matter what.

8         Q.    Who are you referring to?

9         A.    Sheriff Cabral.

10        Q.    When did she tell you this?

11        A.    She did not tell me this -- she told

12   others to tell me -- she told the other

13   lieutenants because I was off that day and she

14   had a meeting with them and she stated that she

15   would stand by us with the decision that we lost

16   and that she would keep us Temporary Lieutenants.

17        Q.    When was this meeting?

18        A.    I couldn't tell you what date.

19        Q.    Well, can you tell me what year?

20        A.    Soon after -- right after you lost the

21   case.  You have the files there, I'm sure.

22        Q.    Well, I am asking you the questions.  I

23   don't know what files I have here.

24        A.    I don't remember when it was, the exact

1    level was this conversation that you have

2    referred to with Deputy Superintendent Carney?

3        A.    That and Roseann Maher, we were having

4    conversations that day about, you know, that she

5    knew I was there, but we didn't have a

6    conversation about who -- I was in Steve Murphy

7    badge and she was in her Cabral badge or whatever

8    handing out pamphlets and we were just talking.

9        Q.    Okay, I was going to start to ask you

10    about that.

11            What can you tell me about your

12    conversation or interaction with Roseann Maher on

13    the primary day?

14        A.    Yes.

15        Q.    Okay.

16        A.    What was the interaction?

17        Q.    Yes, what was the interaction?

18    Describe to me the conversation?

19        A.    I know Roseann all of my life -- just

20    general talking -- about kids, family, her sons.

21        Q.    Are you from the same area of the City

22    of Boston?

23        A.    Yes.

24        Q.    So you knew each other before you

1  Q.    I'm sorry?

2  A.    The Donald Mackay School.

3  Q.    Where is that?

4  A.    In East Boston -- between Cottage

5  Street, I believe the address is on.  I don't

6  know the exact address.

7  Q.    Okay.  Did Miss Maher indicate to you

8  that there would be negative consequences to you

9  because you were supporting Steve Murphy?

10  A.    No.

11  Q.    Did she ever suggest that to you?

12  A.    No.

13  Q.    Did she ever imply that to you?

14  A.    No.

15  Q.    Did she ever indicate that she was

16  going to inform other individuals that you were

17  there supporting Steve Murphy?

18  A.    No.

19  Q.    You indicated that at this one occasion

20  you were at the poles, what were you doing on

21  that date -- handing out literature -- holding a

22  sign?

23  A.    Yes, handing out literature, basically

24  standing around doing nothing, what everyone does

was around the time that he announced --

A.    I believe so.

Q.    Okay.  Did you attend any other meetings or dinners concerning the campaign, Stephen Murphy's campaign?

A.    I went to a fund-raiser, a couple of fund-raisers.  I know that Captain Moscone had thrown a fund-raiser for him, and I attended that one and I probably attended maybe one other one, I am not sure.

Q.    The fund-raiser that was organized by Captain Moscone, do you recall where that was?

A.    I am not sure exactly.

Q.    Do you recall where that was?

A.    I believe it was the Kaluha Hawaiian in East Boston.

Q.    How did you know that Captain Moscone was organizing the event?  How did you hear about it?

A.    I don't recall.

Q.    Who else from the department was there?

A.    Lorne Lynch, John Barnes, Paul Giglio, I believe, I believe Captain John Ellis -- I can't remember who else.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS



Volume: I

```
*************************************
DAVID BERGERON, ET AL,              :
                Plaintiffs,         :
vs                                  :
ANDREA CABRAL,                      :
                Defendant.          :
*************************************
```

**DEPOSITION OF TIMOTHY TURLEY**, a

witness called on behalf of the Defendant,

taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure,

before William M. Jackson, Professional Court

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Nashua

Street Jail, 200 Nashua Street, Boston,

Massachusetts  02114, on January 9, 2007,

commencing at 10:20 a.m.

**COPLEY COURT REPORTING, INC.**
**59 Batterymarch Street**
**Boston, Massachusetts  02110**
**(617) 423-5841**
**www.copleycourt.com**



DISK
ENCLOSED

concerning the reasons why you were
decommissioned?

A.   Not that I recall.

Q.   Were you curious?

A.   I was curious.

Q.   What was your reaction when you received the
letter?

A.   Well, I was pretty angry.

Q.   What did you do about it?

A.   Well, this went out en masse to a bunch of
fellow officers.  We discussed it and we had
decided that, you know, it was retaliatory in
nature.

Q.   Who is the we?

A.   Some fellow officers.

Q.   What fellow officers are those, sir?

A.   I believe John Barnes, John Grennon, I believe
John Ellis.  Basically, the then union
officials of JOEASC.

Q.   Why did you decide that it was retaliatory in
nature?

A.   Well, you may find this hard to believe, but I
had a somewhat contentious relationship with
Mr. Theiss in my duties as chief steward.  He

He has asked me, he asked me to do the, perform
the role of chief steward.

Q.   Was that before or after you were
decommissioned?  You were decommissioned in
April of 2005.

A.   I am going to say it was after.

Q.   So your chief steward from April of '03 until
the fall of '04?

A.   Yes.

Q.   In your capacity as chief steward, what
interactions, specific interactions did you
have with Sheriff Cabral between April of '03
and the fall of 2004?

A.   I represented John Ellis -- directly with
Sheriff Cabral?

Q.   I said the fall of 2004.  Okay.  Yes.  Yes.
Between April of '03 and the fall of 2004, what
specific interactions did you have with Sheriff
Cabral in your capacity as chief steward?

A.   I only had one interaction directly with the
sheriff.

Q.   Describe that for me, please?

A.   John Ellis was summonsed by the sheriff to this
conference room, and I represented him, I was

TRANSCRIPT
CONDENSED

A.    I was suspended without cause for twenty

working days.

Q.    Is that the sole source of your displeasure

with Sheriff Cabral?

A.    Yes.

Q.    Why is she responsible for your suspension for

twenty-working days?

A.    She is the constitutional head of this agency.

Q.    I am trying to understand what it is that she

did or knew or was involved in with respect to

your suspension for twenty days?

A.    She allowed me to be -- I am a long term

employee.  I was suspended without a hearing.

She was a lawyer.  There was a sense of due

process along the line.  I was clearly denied.

That was my displeasure with the sheriff.

Q.    How about, did you read these, were you

familiar with the contents of these missives?

A.    With what in particular?

Q.    The pension benefits, the dental and vision

benefits, water bill, military employees, pay

raises, did any of the issues or any of the

topics in these communications that were sent

to the super voters by Mr. Ellis, Mr. Barnes

TRANSCRIPT

lawsuit was threatened against John.

Q.    Who threatened the lawsuit?

A.    I believe it was Tompkins.  The sheriff
informed John he would not have his position in
the union if he was not a jail officer first.
I took exception to that.  I pointed out that
he was elected by the membership.  He is a jail
officer.  That the two positions are unrelated
basically.  There is a separate and distinct
function there.  I explained that her authority
over him to not extend into his function as a
union official.  That was unpleasant to say the
least.  Like I said, there were several
recesses, and calls to Merrick, Louison and
Costello people.  It was agreed upon, finally,
that John would not face disciplinary action
for his conversation.  It was somewhat
reluctant.  She did not want to agree to that.
After several recesses, it was agreed and she
wanted me out of the room.  It was John's
decision to meet with the sheriff privately at
that point, and it is my understanding that the
meeting was quite extended.  I want to say it
was two hours.  They had a long meeting after

TRANSCRIPT

everybody, the other candidates.  All three, she was not ruled out from an organizational standpoint by JOEASC at that point.  She was for me personally.

Q. So you get disciplined in January of '04 for an incident that occurred in about October of '03. When did you decide to support -- that was the reason why you chose not to support Sheriff Cabral?

A. Yes.  It was more so that.

Q. So when was it, the election was in?

A. It probably would be the day I got that disciplinary letter.  That is not when I decided on Steve Murphy.

Q. That was my question.  When did you decide to support Steve Murphy?

A. We evaluated as an organization, JOEASC evaluated all the candidates and met with them. There was a twofold thing.  I remember that there was a strategy invoked on these mailings. It would he, A, give us leverage at the table that we otherwise did not have through the press, and interest in the sheriff's office, and, B, effective change at the leadership.  So

TRANSCRIPT

it was like a twofold thing.  I remember
discussing that at some point.

Q.   With whom?

A.   With the other union officials.

Q.   Who were?

A.   Barnes, Grennon, maybe my brother.

Q.   We spent a whole lot of time talking about
these mailing, Exhibits 5 through 9, and what
you knew about them.

A.   As far as the specific content of them, I was
not in an editorial position, but as far as
like what we were going to do, how we were
going to do it, she was not ruled out from an
organizational standpoint.  From a personal
standpoint, when I got suspended, I could not
throw the lever for her.  I think she stood by
and there was an injustice against me.  I think
it was clearly because of my union activity.  I
could not in good consciousness vote for her.

Q.   Because of your union activity?

A.   My suspension.

Q.   So your suspension in January of 2004 was
because of the one encounter that you had with
Sheriff Cabral in the spring of '03?  I am

TRANSCRIPT

trying to understand, what was the suspension based upon?

A.   It would be my interactions with Victor Theiss and possibly Eugene Sumpter in those hearings that were prior to my suspension.

Q.   Your contention is that the sheriff, that your suspension in January of 2004, was based upon your involvement in some hearings that occurred in 2003?

A.   Yes.  That's right.

Q.   And why do you believe that?  Let me withdraw the question.

What evidence do you have that Victor Theiss communicated with Sheriff Cabral his relationship with you?

A.   I have nothing else from the department for a cause for that discipline.  I never had a cause hearing.  Your report is not true.  It was never demonstrated to me why it was not true. I never had a hearing.  I represented George McCallum.  I had a contention with the superintendent at that time, Deputy Superintendent Sumpter.  Sumpter then became superintendent.  One of the first things he did

TRANSCRIPT

MS. CAULO:  Not in that fashion.

A.    Other than those aforementioned, I can't
      remember specifically.  It was quite some time
      ago.

Q.    How did you know that Captain Moscone was
      organizing the event in East Boston?

A.    I don't remember.

Q.    Did he call you to come and attend, do you
      know?

A.    Not that I remember.

Q.    Did you inform Deputy Superintendent Carney or
      Superintendent Sumpter of your support for
      Stephen Murphy?

A.    Not that I remember, no.

Q.    Did you have any communications with Michael
      Harris concerning your support for Stephen
      Murphy?

A.    That I recall, no.

Q.    Elizabeth Keeley?

A.    No.

Q.    Did you speak with Victor Theiss concerning
      your support for Stephen Murphy?

A.    No.

Q.    Did you speak with Sheriff Cabral regarding her

TRANSCRIPT

Q.   What involvement did she have in the twenty-day
     suspension?

A.   Again, she is the -- her specifically?

Q.   Yes.

A.   She is the head of the agency.  Like I said
     before, a senior employee was disciplined
     without a hearing.

Q.   How were you a senior employee, because you
     have been here for seventeen years?

A.   My seniority, yes.

Q.   Did the sheriff sign the suspension letter?

A.   Her name is at the top of the letterhead.

Q.   So is it your position that the suspension was
     because of your union affiliation and the
     decommissioning was because of your support for
     the Murphy campaign?

A.   Yes.

Q.   So you were decommissioned, not because of the
     union work, you were decommissioned because you
     supported Stephen Murphy?

A.   That is my belief.

Q.   So one was because of union affiliation, the
     suspension, and one was because of Murphy
     support, that was the decommissioning?

TRANSCRIPT



EXHIBIT

10

1

Volume:      1
Pages:       1 - 124
Exhibits:    See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. No: 1:05-CV-11661-RGS

DAVID BERGERON, JOHN GRENNON, LORNE LYNCH, JOHN )
BARNES, JOHN ELLIS, TIMOTHY TURLEY, AL MOSCONE, )
WILLIAM PENEAU, ERIK DILIBERO and PAUL GIGLIO,  )
                                  Plaintiffs,   )
            v.                                )
ANDREA CABRAL, INDIVIDUALLY and as SHERIFF OF   )
SUFFOLK COUNTY,                                 )
                         Defendant.     )

DEPOSITION OF **PAUL A. GIGLIO**, a Witness

called on behalf of the Defendant, taken pursuant

to the applicable provisions of the Massachusetts

Rules of Civil Procedure, before Maureen

Nashawaty, a Notary Public within and for the

Commonwealth of Massachusetts, held at the

offices of the Suffolk County Sheriff's

Department, 200 Nashua Street, Boston, MA, on

Wednesday, December 13, 2006, commencing at 1:30

p.m.

*COPLEY COURT REPORTING, Inc.*
58 Batterymarch Street
Boston, Massachusetts  02110
(617) 423-5841

DISK ENCLOSED

1    activity as set forth in Paragraph 26?

2        A.    "Support or contributions to

3    defendant's political opponents Stephen Murphy".

4    26...

5        Q.    "All plaintiffs because of their

6    protected union activity as members and/or

7    elected or appointed officials of either JOEASC."

8        A.    I am a member.

9        Q.    Other than the fact that you were a

10   member of the union --

11       A.    Yes.

12       Q.    -- is that the only activity that you

13   say was the basis, one of the bases for

14   decommissioning you?

15       A.    No, it had nothing to do with because I

16   was a member.  It had everything to do with

17   because I was backing Steve Murphy.

18       Q.    Okay, what evidence do you have that

19   Sheriff Cabral knew that you, Paul Giglio,

20   supported Stephen Murphy for Sheriff in the 2004

21   election?

22       A.    Do I have anything in writing?  No.

23             Do I have a film of it?  No.

24             But is it a known thing in the

91

department that I backed Steve Murphy?

Absolutely.

And in this department if one person

knows something, everybody knows something.

Q.    A few moments ago I was asking you

about who other folks supported and you couldn't

tell me?

A.    To the capacity that I was supporting

him was what you were asking.

Q.    You have filed a complaint.  You and

your fellow plaintiffs filed a complaint alleging

that Sheriff Cabral retaliated against you?

A.    Yes.

Q.    And stripped you of your Deputy Sheriff

status because you supported Stephen Murphy.

I am trying to ask you and understand

what evidence do you have that she in fact knew

that you did and then took such retaliatory

action?  What is the basis for that allegation in

your complaint?

A.    The basis would be Mike Harris saying

to me this is not personal -- it is business.

The basis would be Mike Caldwell saying

to me that we put a bad test in our mouths --



**EXHIBIT**
**11**

# ORIGINAL

Volume: I
Pages: 1-120

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

       Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

       Defendant

DEPOSITION OF:  EUGENE SUMPTER, JR.

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 5, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

sheriff, Victor Theiss.  I don't know who else had input

into it.

Q.    Did you have input?

A.    The only thing I recall from that situation was

being informed or being asked if I would be able -- if I

had a position for John Grennon, should he come back to

the jail.  And I said absolutely.  Yes.

Q.    So you were not involved in transferring him back to

the jail from his training position at the Chelsea

facility?

A.    No.

Q.    Who was?

        MS. CAULO:  Objection.  Asked and answered.

        MR. PFAFF:  I'm sorry.  I don't recall his

    answer.

Q.    (By Mr. Pfaff)  Was it Theiss and the sheriff?

A.    Victor Theiss, I know, who headed up training, made

that decision.  And I'm sure through the sheriff.  We

couldn't do anything without her.  So I would say Victor

Theiss and the sheriff.

Q.    Have you talked with Victor Theiss as to his reasons

why he made this transfer?

A.    There were discussions around it, and I don't

recall.

1    A.    I didn't know that he was, if he was.

2    Q.    Were the activities of those -- of Grennon, Lynch,

3    Barnes and Moscone as union officials; were their

4    activities discussed as reasons for decommissioning them

5    as deputy sheriff?

6    A.    If their activities included poor attitudes,

7    inappropriate behavior, then yes, it was.  I think it was.

8    It would have been discussed in that context, in that

9    there was an attitude issue, not necessarily with whatever

10   it was they were doing, but how they went about doing it.

11   How they interacted with people in the department was the

12   discussion.  Not any type of union activity.

13   Q.    So the interaction of -- or how they reacted or

14   interacted with other members of the department was

15   reviewed; not just how they interacted or reacted in their

16   official job function, but also how they interacted in

17   their official union function?

18            MS. CAULO:  Objection.

19            You may answer.

20   A.    Yes.

21            MR. PFAFF:  I'd like to take five minutes,

22            and I don't think I have much more.

23

24                    (A recess was taken.)

EXHIBIT

*12*

# ORIGINAL

Volume: I
Pages: 1-126

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

       Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

       Defendant

DAY 1 - VOLUME I

DEPOSITION OF:  MICHAEL HARRIS

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 4, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

1    A.    That they were specifically decommissioned because

2    of political affiliation?

3    Q.    Right.

4    A.    Not that I'm aware of.

5    Q.    Do you know any of those names on that list who were

6    decommissioned because they supported Sheriff Cabral's

7    opponent in the last election?

8    A.    Not that I'm aware of.

9    Q.    Well, was the support of Sheriff Cabral's opponent

10   in the last election a consideration by you or the *ad hoc*

11   committee in recommending those 37 names to be

12   decommissioned?

13   A.    I recall that there might have been some discussion

14   on that.

15   Q.    Where were you when you had this discussion?

16   A.    I believe in the conference room at the house of

17   correction.

18   Q.    With whom were you present?

19   A.    I was present.  And I recall, I believe,

20   Superintendent Horgan, Superintendent Sumpter,

21   Superintendent Theiss.

22   Q.    Was there anybody else present?

23   A.    I'm not sure.  Elizabeth Keeley could possibly have

24   been there, but I don't recall.

EXHIBIT

_13_

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

------------------------------
                                            *
JOHN GRENNON, LOREN LYNCH,                  *
JOHN BARNES, DAVID BERGERON,                *
JOHN ELLIS, TIMOTHY TURLEY,                 *
AL MASCONE, WILLIAM PENEAU,                 *
ERIC DILIBERO AND PAUL GIGLIO               *
     Plaintiffs                             *CA No. 05-11661-RGS
vs.                                         *
                                            *
ANDREA CABRAL, IND. AND AS                  *
SHERIFF OF SUFFOLK COUNTY                   *
     Defendant                              *
------------------------------


DEOSITION OF:  SHERIFF ANDREA CABRAL

MERRICK LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

January 22, 2007

Commenced at 10:00 a.m.


LESLIE A. D'EMILIA
Court Reporter

ORIGINAL

DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

1    answered.

2    A.  I don't know.  I don't remember.

3    Q.  And who did you learn was on this group that Keeley

4        was putting together?

5    A.  It was the superintendents and that includes

6        Mike Harris.

7    Q.  Anybody else?

8    A.  I don't--not to my knowledge.

9    Q.  Was Viktor Theiss part of this?

10   A.  Well, he was the superintendent.

11   Q.  Well you didn't mention him earlier.

12   A.  Well, I said the superintendents.  I mean all of

13       them, house, jail, TID, and human resources.

14   Q.  And did these individuals--strike that.  Did this

15       group meet with you on a regular basis to discuss

16       this?

17   A.  No.

18   Q.  Did you receive information from Keeley that the

19       group was meeting to review the process of deputy

20       sheriffs?

21   A.  I can recall on a couple of occasions because it

22       was--it seemed to me that it was taking a while,

23       asking her about it.  "How are we doing on that,"

24       and she would give me an update, and she may very

Page 93

that this document was revised to reflect the deputy

sheriff position to be more meaningful?

       MS. CAULO:  Objection.

.. I don't think that that's necessarily true.

). What were the factors or criteria involved in making

the deputy sheriff position more meaningful?

\. Depending--it depends on if you're talking about new

officers versus veteran officers.  If you're talking

about veteran officers who had previously been

deputized.  We looked at the history or considered

the history of discipline.  The officer's

comportment or demeanor within the institution.

They had to undergo a details training that was

provided by the training academy.

Q. To become a deputy sheriff?

A. You had to--you had to--well certainly if you wanted

to do details, and that was the primary reason most

people wanted to be a deputy sheriff.  You had to be

firearms qualified, and I can't remember now if the

NERPI training was part of it or we later

incorporated it.  There may have been some

additional training, and we also looked at

attendance, what we call MAPS.

Q. Well, let's talk about new officers now.  You

Page 98

about the people who were making their

recommendations to me.  I wasn't looking at

everybody's discipline.  I was actually not involved

in this very much at all, the deputy thing at all.

Before you go on I want to ask you this question

then.  The people who made the recommendations to

you, are those the people in the group that Keeley

put together?

MS. CAULO:  Objection.

The people that made the recommendations--I got the

recommendations from the superintendents.

. Just the superintendents?

. I don't know whether or not there was anybody else

there when--I don't know, but I remember that they

were coming from the superintendents.

. And forgive me my ignorance, but the superintendents

would be Sumpter, Harris, Horgan, and Theiss; right?

. I'm sorry, I'm really talking about Sumpter,

primarily Sumpter and Horgan.

. We'll get into this later, but primarily the two

people who made the recommendations as to whether or

not a person was qualified to be deputy sheriff were

Sumpter or Horgan?

. In terms of--I'm sorry.

DUNN & GOUDREAU

Page 126

merged.  Those are two completely separate things.

.  That's fine.  So that's what I'm getting at.

.  Yes.

!.  At some point in time did you get a list of

   individuals who were going to be appointed to the

   position of deputy sheriff as a result of this

   seeking to making it more meaningful?

\.  I got a list.  I'm not sure now if the list was--I

   think it was the people who were being

   decommissioned.

2.  How many names were on that list?

\.  Oh, I don't know.

2.  Did you have any input into the names of that list

   getting on the list?

A.  No.

Q.  Who gave you the list?

A.  I think it was Elizabeth Keeley.  I'm not entirely

   sure, but I think it was Elizabeth Keeley.

Q.  Do you know the names of the people on it?

A.  I couldn't tell you now who was on that list.

   Obviously the plaintiffs.

Q.  Did you have a discussion with Keeley or the

   superintendents or members of your executive staff

   regarding this list?

A. I may have had a conversation with Elizabeth about the list. I think there were--

Q. What was the conversation about?

A. There were--I don't remember exactly. I think that there were--at some point on the list I remember I had some questions about some of the people whose names were on the list, and that was--

Q. Who?

A. I don't remember now who it was. Sometimes I would just see someone, and then I'd--they were on this list, and I couldn't kind of remember what it was--why they would be decommissioned. I might make an inquiry about that.

Q. Do you know how those names arrived on the list, the process involved in creating it?

A. Aside from the fact that they were the recommendations of the people who were looking at the process?

Q. Right.

A. No.

Q. Do you know if there was an informal vote taken by the people looking at the process as to put somebody on or take somebody off the list?

A. I have no idea.



## Budget Update

To: All Non-Union Employees

From: Elizabeth Keeley, Chief of Staff

Date: February 25, 2003

Re: Budget Crisis

Every state, county and city agency and department in the Commonwealth is operating under the current fiscal crisis. We are working diligently to balance our FY03 budget and preparing the Department's FY04 funding.

Until further notice, **all step raises**, longevity bonuses and sick leave buy back payments not yet processed will be suspended. If we are able to resume making these payments we will, **but the Department must first be assured that it can meet all of its other essential expenditures.**

The professionalism and support that many of you have demonstrated during the first months of this new administration is greatly appreciated. Thank you for your understanding and patience during these difficult times.



**Jail Officers' & Employees
Association of Suffolk County
IUPA Local 900 AFL-CIO**
200 Nashua Street
Boston, MA 02114





EXHIBIT

B

**John Barnes, President**                    **John Grennon, Vice-President**

John Ellis
Secretary

Mark Turley
Treasurer

Robert Tuffos
Executive
Board

Michael
Walsh
Executive
Board

Michael
Cinelli
Executive
Board

Tim Turley
Chief
Steward

William
Peneau
Grievance
administrator

Kevin
O'Riorden
Trustee

Michelle
Fitzpatrick
Trustee

Richard
Rosetti
Trustee

March 25, 2004

EXHIBIT

JB

5

10/31/06 PMK

Dear Friends:

## What a Mess!

### Sheriff Takes Employee Benefits

The current Sheriff of Suffolk County has been taking employee benefits away from the hardworking men and women of the Suffolk County Sheriff's Department and now she actually has the nerve to seek union support in her campaign for election.

Here are some facts that every union brother and sister should know.

**Pension Benefits:**

Everyone realizes that pension funds are a sacred trust between an employee and his or her employer. It is a promise of benefits that allow an employee to plan for their family's retirement future. Both the employee and the governmental unit contribute to the retirement fund.

Unfortunately, the Sheriff has broken this sacred trust by misusing the money appropriated for the pension fund to pay other bills. The Sheriff's actions are a direct violation of MGL c 32, § 25 (6)(a) and (b)"which threatens serious injury to the contractual pension rights, benefits and the retirement system". With no other recourse available, as a result, employees have been forced to sue the Sheriff to protect their interest and families future.

*In all, over $2.1 million dollars is missing from the City of Boston Retirement Fund.* This figure is expanding monthly with interest payments, which already have reached approximately $100,000.00. If all Governmental Units used this practice, the City of Boston Pension Fund would face serious problems.

**Dental and Vision Benefits:**

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*

**Dental and Vision Care:**

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*

**Water Bills:**

Recently, the Sheriff's Department received a notice that it owed the City $22,000 in overdue water bills. These bills were for a building that the Sheriff's Department leases to the federal government. As a result, the Water and Sewer Commission has threatened to shut off the water.

**Military Employees:**

Military employees who have been activated by the United States of America to protect our freedom have been away for extended periods from their family. When they return back to work at the Suffolk County Sheriff's Department, they are being informed that they are not going to receive their accrued vacation and/or sick time. *Sadly, these individuals may have to go another year without having the quality family time they all deserve based on the Sheriff's decision not to grant them vacation accruals because they were away representing our Country the previous year.*

**Pay Raises:**

With the financial mess at the Sheriff's Department, you would expect that the Sheriff would be doing everything possible, including cutting every unnecessary expense, to get things back on the right track. But, that simply is not what's happening.

Since her appointment, the Sheriff has brought in a number of new employees, including former colleagues and friends, and she has handed out pay increases totaling in excess of over $450,000.00 even though the Department is millions of dollars in the red. In fact, many of these pay increases for these new employees have been substantial, totaling in excess of over $400.00 per week.

When she was appointed by Acting Governor Swift to become Sheriff, Ms. Cabral promised to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it much, much worse. Being Sheriff is a tough job. The current Sheriff has made the job that much more difficult. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess.

Sincerely,

John Grennon

John Grennon
Executive Secretary, JOEASC
IUPA #900, AFL-CIO





EXHIBIT
C

**Jail Officers' & Employees
Association of Suffolk County
IUPA Local 900 AFL-CIO**
200 Nashua Street
Boston, MA 02114

*John Barnes, President*

*John Grennon, Vice-President*

April 2, 2004



EXHIBIT
6

## What a Mess!
### Promises Not Kept

John Ellis
*Secretary*

Mark Turley
*Treasurer*

Robert Tullos
*Executive Board*

Michael Walsh
*Executive Board*

Michael Cinelli
*Executive Board*

Tim Turley
*Chief Steward*

William Peneau
*Grievance Administrator*

Kevin O'Riordan
*Trustee*

Michelle Fitzpatrick
*Trustee*

Richard Rosetti
*Trustee*

Imagine an elected official who took a $5 million deficit and turned it into a several million dollar larger problem. In the process, imagine that same official taking employee pension money and money set aside for employee dental and vision care and using the money attempting to balance her budget. Imagine things getting so bad that the Water and Sewer Commission sends out a notice threatening to shut off the water because you owe thousands of dollars in unpaid bills.

Sound unbelievable? Well, in fact, for the Sheriff of Suffolk County, the story is true and it gets worse. Even though the Sheriff's Department is broke, she has found the money needed to give pay boosts to a number of new hires including a group of her friends and supporters. Here are some facts that every citizen needs to know.

### Pension Benefits:

Everyone realizes that pension funds are a sacred trust between an employee and his or her employer. It is a promise of benefits that allow an employee to plan for their retirement future. Both the employee and the governmental unit contribute to the retirement fund. Sadly, the Sheriff has broken that sacred trust by using the money appropriated for the pension fund to pay other bills. The Sheriff's actions are a direct violation of MGL c 32, § 25 (6)(a) and (b), which threatens serious injury to the contractual pension rights, benefits and the retirement system. As a result, employees have been forced to sue the Sheriff to protect their interest and families future.

*In all, over $2.1 million dollars is missing from the City of Boston Retirement Fund.* This figure is expanding monthly with interest payments, which already have reached approximately $100,000.00.

### Dental and Vision Care:

Employees at the Suffolk County Sheriff's Department have a right to expect that money specifically put aside for dental and vision care according to their collective bargaining agreement, to protect their family's health care needs, would be used for that purpose. *Now, when these employees or their family members show up at their appointments, they are either being denied care or forced to pay the entire bill.*

## Water Bills:

Recently, the Sheriff's Department received a notice that it owed the City $22,000 in overdue water bills. As a result, the Water and Sewer Commission has threatened to shut off the water.

## Pay Raises:

Since being appointed, the Sheriff has brought in a number of new employees, including former colleagues and friends, and has handed out pay increases totaling in excess of over $450,000.00 even though the Department is millions of dollars in the red. In fact, many of these pay increases for these new employees have been substantial, totaling in excess of over $400.00 per week.

When she was appointed by Republican Jane Swift to the post of Sheriff, Ms. Cabral said she was going to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it worse. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess. A mess of her own making!

Sincerely,

**John Barnes**
President, JOEASC
IUPA #900, AFL-CIO

Jail Officers' & Employees
Association of Suffolk County
IUPA Local 900 AFL-CIO

200 Nashua Street
Boston, MA 02114

\*\*\*\*\*\*\*\*\*\*AUTO\*\*5-DIGIT 02127  T9  P1
Francis Collins
10 Pacific St # 3
South Boston MA 02127-2929

Presorted Standard
U.S. Postage
Paid
Permit No. 231
No. Reading, MA







## *Suffolk County Sheriff's Department*

**ANDREA J. CABRAL**
**SHERIFF**

Jail
200 Nashua Street
Boston, MA 02114
(617) 635-1100

House of Correction
20 Bradston Street
Boston, MA 02118
(617) 635-1000

April 21, 2005

Dear Officer John Barnes,

The privilege to be deputized is one that the Sheriff takes very seriously and she expects and requires that all employees be members in good standing. We recently completed the annual review of all deputies and your Deputy Sheriff privileges are revoked effective this date.

Please return your Deputy Sheriff badge and identification card to Deputy Superintendent Carney no later than Monday May 2, 2005. If you are an officer in good standing and otherwise qualified you may submit an application for Deputy Sheriff after May 2006.

Sincerely,

*Michael J. Harris*

Michael J. Harris
Superintendent of Human Resourses



| Chapter III | Policy #: | References: |
|---|---|---|
| **Institutional Operations** | **S520** | **MGL** c. 147, §8a |
| | | 103 **CMR** |
| | | **ACI**: 3 |
| | | 3-**ALDF**- |

*Page 1 of 3*

| Security and Control | Date of Issue: | Approved: |
|---|---|---|
| **Private Paid Details** | January 1, 2000 | |
| | Date: | |
| | May 1, 2004 | Andrea J. Cabral, Sheriff |

## PURPOSE
To establish Suffolk County Sheriff's Department (SCSD) policy and procedures regarding the privilege of Paid Security Details.

## CANCELLATION
This policy cancels all previous SCSD policy statements, bulletins, directives, orders, notices, rules or regulations regarding Paid Security Details that are inconsistent with this policy.

## DEFINITIONS
*Paid Security Details* – Paid compensation from an outside agency for services rendered by a Deputy Sheriff of Suffolk County.

*Detail Coordinator* – A person appointed by the Sheriff to facilitate the planning, organizing, and directing of assigned paid security details.

## POLICY STATEMENTS
I.  Prior to any SCSD personnel being assigned to or accepting any paid security detail as a Deputy Sheriff with an outside agency, he/she must first meet the following qualifications:
   a. Must be selected and sworn in as a Deputy Sheriff of Suffolk County by the Suffolk County Sheriff.
   b. Must meet all stipulations of the SCSD firearms qualifications and SCSD Firearms Policy (S508) prior to being authorized to carry a department issued firearm.
   c. Must have successfully completed SCSD Detail Training.
   d. Must be an employee in good standing whose current job performance is commensurate with the duties and responsibilities expected of public law enforcement officers.
   e. Each employee is required to seek, obtain, keep current and provide documentation of all of the above qualification standards.

## PROCEDURES
I.  **Active List**
   A. The Office of Employee Relations shall establish and maintain an active list of all those employees who are eligible for paid security details.
   B. The list shall be updated and reviewed regularly, verified through the SCSD Training Department and provided to the Detail Coordinator.



The Detail Coordinator shall be responsible for administering all outside paid details utilizing the following criteria:

1. Only those employees who appear on the active list shall be used for paid security details.
2. Details will be assigned to only those employees who are not scheduled for work on their regular assignment with the SCSD. There are no exceptions to this policy for SCSD personnel.
3. Details are unscheduled and sporadic. Selections will be based upon the employee's immediate availability.
4. Details will be selected fairly and equitably on a rotating basis from a single detail list.
5. All notifications for available details will be made by the Detail Coordinator via pagers, which must be acquired at the employee's own expense. Immediate response is required of the employee. Employees who cannot be contacted will be credited with a refusal. The Detail Coordinator will not conduct notification for assignment via telephone, telephone answering machines or third party messages.
6. The Detail Coordinator shall be responsible for maintaining specific records regarding notifications for details (i.e. acceptance, refusal, no response, unable to contact). All details records will be available for monthly review by the Office of Employee Relations.

## II.   Request for Services

A. All outside agencies requiring detail services shall submit the request directly to the Detail Coordinator.
B. Direct assignment of details from an outside agency is not permitted.

## III.   Uniforms and Equipment

A. Unless otherwise specified by the Detail Coordinator, employees should appear for detail in the uniform authorized by the Sheriff's Department.
   1. Air Force Style (Detail) Hat;
   2. Sheriff's Department issued BAPERN radio, where required;
   3. Safety Vest or Straps, where required;
   4. Department issued firearm where required;
   5. Department issued vehicle where required and authorized;
   6. Employees shall only use the authorized equipment in accordance with the Use of Force Continuum as stipulated in S505, Use of Force.
B. All detail equipment must be returned IMMEDIATELY upon completion of detail assignment.

## IV.   Rules and Regulations

A. Employees working a paid security detail are an emissary of the Suffolk County Sheriff's Department.
B. Professionalism is expected at all times both in demeanor and appearance.
C. All SCSD employees are bound by SCSD policies and procedures.

**SEVERABILITY CLAUSE**
If any article, section, subsection, sentence, or clause of these regulations is for any reason held to be unconstitutional, contrary to statute, in excess of the authority of the Sheriff, or otherwise inoperative, such decision shall not affect the validity of any other article, section, subsection, sentence, clause or phrase of these regulations.



EXHIBIT

F

# Summary of Details Worked by Officer

| 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 | LYNCH, LORNE F. JR. Dpty. | | Reg. Hours | Overtime | Type | Week Ending |
|---|---|---|---|---|---|---|
| Contract | #PM 448000 | Friday, 2/8/2002 | 8 | 0 | Day Const | 2/9/2002 |
| Contract | #PM 333028 | Thursday, 2/14/2002 | 8 | 1 | Day Const - LAT | 2/16/2002 |
| Contract | #PM 333028 | Thursday, 2/21/2002 | 8 | 0 | Day Const | 2/23/2002 |
| Contract | #PM 333028 | Friday, 3/1/2002 | 8 | 1.5 | Day Const | 3/2/2002 |
| Contract | #PM 333028 | Monday, 3/4/2002 | 8 | 2 | Day Const | 3/9/2002 |
| Contract | #PM 333031 | Monday, 3/11/2002 | 8 | 0 | Night | 3/16/2002 |
| Contract | #PM 333028 | Thursday, 3/14/2002 | 8 | 0 | Day Const | 3/16/2002 |
| Contract | #PM 333037 | Friday, 3/22/2002 | 8 | 0.5 | Day Const | 3/23/2002 |
| Contract | #PM 333028 | Monday, 4/1/2002 | 8 | 2 | Night | 4/6/2002 |
| Contract | #PM 333028 | Thursday, 4/4/2002 | 8 | 1 | Day Const | 4/6/2002 |
| Contract | #PM 333028 | Tuesday, 4/16/2002 | 8 | 0 | Night | 4/20/2002 |
| Contract | #PM 333016 | Wednesday, 4/17/2002 | 8 | 0.5 | Night | 4/20/2002 |
| Contract | #PM 333028 | Thursday, 4/18/2002 | 8 | 0 | Night | 4/20/2002 |
| Contract | #PM 333016 | Friday, 4/19/2002 | 8 | 0.5 | Night | 4/20/2002 |
| Contract | #PM 333033 | Monday, 4/22/2002 | 8 | 0.5 | Day Const | 4/27/2002 |
| Contract | #PM 333037 | Wednesday, 4/24/2002 | 8 | 0 | Night | 4/27/2002 |
| Contract | #PM 333028 | Saturday, 4/27/2002 | 8 | 1 | Night | 4/27/2002 |
| Contract | #PM 333027 | Wednesday, 5/1/2002 | 8 | 0 | Day Const | 5/4/2002 |
| Contract | #PM 333028 | Thursday, 5/2/2002 | 4 | 0 | Day Const | 5/4/2002 |
| Contract | #PM 333028 | Tuesday, 5/7/2002 | 8 | 1 | Day Const | 5/11/2002 |
| Contract | #PM 333028 | Thursday, 5/9/2002 | 8 | 0 | Day Const | 5/11/2002 |
| Contract | #PM 333028 | Friday, 5/10/2002 | 8 | 0 | Day Const - LAT | 5/11/2002 |
| Contract | #PM 333037 | Friday, 5/17/2002 | 8 | 0 | Night | 5/18/2002 |
| Contract | #PM 333015 | Sunday, 5/19/2002 | 8 | 0 | Night | 5/25/2002 |
| Contract | #PM 333024 | Thursday, 5/23/2002 | 8 | 2 | Day Const | 5/25/2002 |
| Contract | #PM 333015 | Saturday, 5/25/2002 | 8 | 0 | Night | 5/25/2002 |
| Contract | #MM 000001 | Monday, 6/3/2002 | 8 | 0 | Night | 6/8/2002 |
| Contract | #PM 333016 | Saturday, 6/8/2002 | 8 | 0.5 | Night | 6/8/2002 |
| Contract | #PM 333019 | Tuesday, 6/11/2002 | 8 | 1 | Day Const | 6/15/2002 |
| Contract | #PM 333015 | Wednesday, 6/12/2002 | 8 | 0 | Day Const | 6/15/2002 |
| Contract | #PM 333024 | Thursday, 6/13/2002 | 8 | 2 | Day Const | 6/15/2002 |
| Contract | #MM 000001 | Sunday, 6/16/2002 | 8 | 0.5 | Day Const | 6/22/2002 |
| Contract | #PM 333028 | Thursday, 6/20/2002 | 8 | 1 | Day Const | 6/22/2002 |
| Contract | #PM 333015 | Sunday, 6/23/2002 | 8 | 0 | Day Const | 6/29/2002 |
| Contract | #PM 333039 | Wednesday, 6/26/2002 | 8 | 1 | Day Const | 6/29/2002 |
| Contract | #PM 333010 | Sunday, 7/7/2002 | 8 | 0 | Night | 7/13/2002 |

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 200124 | Wednesday, 7/10/2002 | 8 | 0 | Night | 7/13/2002 |
| Contract # PM 333033 | Thursday, 7/11/2002 | 8 | 0 | Night | 7/13/2002 |
| Contract # PM 333015 | Monday, 7/15/2002 | 8 | 0 | Night | 7/20/2002 |
| Contract # PM 333032 | Wednesday, 7/17/2002 | 8 | 0 | Day Const | 7/20/2002 |
| Contract # PM 333028 | Thursday, 7/18/2002 | 8 | 1 | Day Const | 7/20/2002 |
| Contract # PM 333028 | Friday, 7/19/2002 | 8 | 2 | Day Const | 7/20/2002 |
| Contract # PM 333015 | Saturday, 7/20/2002 | 8 | 0.5 | Night | 7/20/2002 |
| Contract # MM 000001 | Thursday, 7/25/2002 | 8 | 0.5 | Night | 7/27/2002 |
| Contract # PM 333016 | Wednesday, 8/7/2002 | 8 | 0.5 | Night | 8/10/2002 |
| Contract # MM 000001 | Friday, 8/9/2002 | 8 | 0 | Night | 8/10/2002 |
| Contract # PM 333015 | Saturday, 8/17/2002 | 8 | 0 | Night | 8/17/2002 |
| Contract # PM 333037 | Tuesday, 8/20/2002 | 8 | 1 | Day Const | 8/24/2002 |
| Contract # PM 333037 | Wednesday, 8/21/2002 | 8 | 0 | Day Const | 8/24/2002 |
| Contract # PM 333028 | Thursday, 8/22/2002 | 8 | 1.5 | Day Const | 8/24/2002 |
| Contract # PM 333016 | Sunday, 8/25/2002 | 8 | 0.5 | Night | 8/31/2002 |
| Contract # PM 333037 | Monday, 8/26/2002 | 8 | 0 | Night | 8/31/2002 |
| Contract # PM 333028 | Wednesday, 8/28/2002 | 8 | 1 | Day Const | 8/31/2002 |
| Contract # PM 333028 | Thursday, 8/29/2002 | 8 | 1 | Day Const | 8/31/2002 |
| Contract # MM 000001 | Saturday, 8/31/2002 | 8 | 0 | Night | 8/31/2002 |
| Contract # PM 333016 | Tuesday, 9/3/2002 | 8 | 0.5 | Day Const | 9/7/2002 |
| Contract # PM 333015 | Friday, 9/6/2002 | 8 | 0 | Day Const | 9/7/2002 |
| Contract # PM 333016 | Sunday, 9/8/2002 | 8 | 0.5 | Night | 9/14/2002 |
| Contract # PW 002074 | Thursday, 9/12/2002 | 8 | 0 | Day Const | 9/14/2002 |
| Contract # PM 333028 | Tuesday, 9/17/2002 | 8 | 0 | Day Const | 9/21/2002 |
| Contract # PM 333028 | Wednesday, 9/25/2002 | 8 | 1 | Day Const | 9/28/2002 |
| Contract # PM 333028 | Monday, 10/7/2002 | 8 | 1 | Day Const | 10/12/2002 |
| Contract # PM 333041 | Thursday, 10/10/2002 | 8 | 1 | Day Const | 10/12/2002 |
| Contract # MM 000001 | Saturday, 10/12/2002 | 8 | 0 | Night | 10/12/2002 |
| Contract # MM 000001 | Monday, 10/14/2002 | 8 | 0 | Night | 10/19/2002 |
| Contract # PM 333015 | Wednesday, 10/16/2002 | 8 | 0 | Day Const | 10/19/2002 |
| Contract # PM 333024 | Thursday, 10/17/2002 | 8 | 2 | Day Const | 10/19/2002 |
| Contract # MM 000001 | Sunday, 10/20/2002 | 8 | 0 | Night | 10/26/2002 |
| Contract # PM 333039 | Monday, 10/21/2002 | 8 | 0 | Night | 10/26/2002 |
| Contract # PM 333037 | Tuesday, 10/22/2002 | 8 | 0 | Night | 10/26/2002 |
| Contract # PM 333039 | Thursday, 10/24/2002 | 8 | 0 | Night | 10/26/2002 |
| Contract # PM 333040 | Friday, 10/25/2002 | 8 | 1.5 | Night | 10/26/2002 |
| Contract # PM 333028 | Monday, 10/28/2002 | 8 | 2 | Day Const | 11/2/2002 |
| Contract # PM 333039 | Wednesday, 10/30/2002 | 8 | 0 | Day Const | 11/2/2002 |
| Contract # MM 000001 | Thursday, 10/31/2002 | 8 | 0 | Day Const | 11/2/2002 |
| Contract # PM 333028 | Friday, 11/1/2002 | 8 | 1 | Day Const | 11/2/2002 |
| Contract # PM 333028 | Monday, 11/4/2002 | 8 | 1 | Day Const | 11/9/2002 |

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333028 | Wednesday, 11/6/2002 | 8 | 1 | Day Const | 11/9/2002 |
| Contract # PW 002074 | Friday, 11/8/2002 | 8 | 0 | Day Const | 11/9/2002 |
| Contract # PM 333028 | Wednesday, 11/13/2002 | 8 | 1 | Day Const | 11/16/2002 |
| Contract # PM 333040 | Friday, 11/15/2002 | 8 | 0 | Day Const | 11/16/2002 |
| Contract # PM 333037 | Saturday, 11/16/2002 | 8 | 2 | Night | 11/16/2002 |
| Contract # PM 333037 | Tuesday, 11/19/2002 | 8 | 2 | Day Const | 11/23/2002 |
| Contract # PM 333033 | Saturday, 12/14/2002 | 8 | 0 | Night | 12/14/2002 |
| Contract # PM 333033 | Sunday, 12/15/2002 | 8 | 0 | Night | 12/21/2002 |
| Contract # PM 333024 | Wednesday, 12/18/2002 | 8 | 2 | Day Const | 12/21/2002 |
| Contract # PM 333028 | Thursday, 12/19/2002 | 8 | 1 | Day Const | 12/21/2002 |
| Contract # PM 333041 | Friday, 12/20/2002 | 8 | 0 | Day Const | 12/21/2002 |
| Contract # PM 333039 | Sunday, 12/22/2002 | 8 | 0 | Night | 12/28/2002 |
| Contract # PM 333039 | Thursday, 12/26/2002 | 8 | 0 | Night | 12/28/2002 |
| Contract # PM 333033 | Saturday, 1/11/2003 | 8 | 0 | Night | 1/11/2003 |
| Contract # PM 333039 | Monday, 1/13/2003 | 8 | 0 | Night | 1/18/2003 |
| Contract # PM 333024 | Thursday, 1/16/2003 | 8 | 0 | Night | 1/18/2003 |
| Contract # PM 333028 | Friday, 1/24/2003 | 8 | 0 | Night | 1/25/2003 |
| Contract # MM 000004 | Thursday, 3/6/2003 | 8 | 0 | Night - RAMP A | 3/8/2003 |
| Contract # PM 333028 | Tuesday, 3/11/2003 | 8 | 0 | Night | 3/15/2003 |
| Contract # PM 333039 | Monday, 3/17/2003 | 8 | 0 | Night | 3/22/2003 |
| Contract # MM 000004 | Monday, 3/24/2003 | 8 | 0 | Day Const | 3/29/2003 |
| Contract # PM 333028 | Tuesday, 3/25/2003 | 8 | 2 | Day Const | 3/29/2003 |
| Contract # MM 000004 | Wednesday, 3/26/2003 | 8 | 0 | Day Const | 3/29/2003 |
| Contract # PM 333028 | Thursday, 3/27/2003 | 8 | 2 | Day Const | 3/29/2003 |
| Contract # PM 333016 | Friday, 3/28/2003 | 8 | 4 | Day Const - 190 | 3/29/2003 |
| Contract # PM 333039 | Sunday, 3/30/2003 | 8 | 4 | Day Const - 180 | 4/5/2003 |
| Contract # PM 333039 | Thursday, 4/3/2003 | 8 | 1 | Day Const | 4/5/2003 |
| Contract # PM 333016 | Sunday, 4/6/2003 | 8 | 0 | Night | 4/12/2003 |
| Contract # PM 333028 | Friday, 4/11/2003 | 8 | 2 | Day Const | 4/12/2003 |
| Contract # PM 333016 | Sunday, 4/13/2003 | 8 | 0 | Night | 4/19/2003 |
| Contract # PM 333039 | Wednesday, 4/16/2003 | 8 | 0 | Night | 4/19/2003 |
| Contract # PM 333028 | Tuesday, 4/22/2003 | 8 | 1 | Day Const | 4/26/2003 |
| Contract # PM 333028 | Wednesday, 4/23/2003 | 8 | 1 | Day Const | 4/26/2003 |
| Contract # PM 333028 | Monday, 4/28/2003 | 8 | 1 | Day Const | 5/3/2003 |
| Contract # PM 333028 | Wednesday, 4/30/2003 | 8 | 1 | Day Const - LAT | 5/3/2003 |
| Contract # PW 002074 | Monday, 5/5/2003 | 8 | 0 | Night | 5/10/2003 |
| Contract # PM 333042 | Saturday, 5/10/2003 | 8 | 0 | Night | 5/10/2003 |
| Contract # PM 333024 | Tuesday, 5/13/2003 | 8 | 0 | Day Const | 5/17/2003 |
| Contract # PM 806000 | Friday, 5/16/2003 | 8 | 0 | Night | 5/17/2003 |
| Contract # PM 333028 | Monday, 5/19/2003 | 8 | 1 | Day Const | 5/24/2003 |
| Contract # PM 333039 | Tuesday, 5/20/2003 | 8 | 0 | Night | 5/24/2003 |

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333038 | Wednesday, 5/21/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333039 | Thursday, 5/22/2003 | 8 | 0 | Night | 5/24/2003 |
| Contract # PM 333028 | Wednesday, 5/28/2003 | 8 | 1 | Day Const | 5/31/2003 |
| Contract # PM 333033 | Friday, 5/30/2003 | 8 | 0 | Day Const | 5/31/2003 |
| Contract # PM 333028 | Monday, 6/2/2003 | 8 | 1 | Day Const | 6/7/2003 |
| Contract # PM 333028 | Friday, 6/6/2003 | 8 | 1 | Day Const | 6/7/2003 |
| Contract # PM 333028 | Monday, 6/9/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract # PM 333028 | Wednesday, 6/11/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract # PM 333028 | Thursday, 6/12/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract # PM 333031 | Friday, 6/13/2003 | 8 | 0 | Day Const | 6/14/2003 |
| Contract # PM 333042 | Tuesday, 6/17/2003 | 4 | 0 | Day Const - 060 | 6/21/2003 |
| Contract # PM 333041 | Wednesday, 6/18/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract # PM 333024 | Thursday, 6/19/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract # PM 333015 | Friday, 6/20/2003 | 8 | 0 | Day Const | 6/21/2003 |
| Contract # PM 333028 | Monday, 6/23/2003 | 8 | 1 | Day Const | 6/28/2003 |
| Contract # PM 333031 | Thursday, 6/26/2003 | 8 | 0 | Day Const | 6/28/2003 |
| Contract # PM 333028 | Monday, 6/30/2003 | 8 | 1 | Day Const | 7/5/2003 |
| Contract # PM 333039 | Saturday, 7/5/2003 | 4 | 0 | Night | 7/5/2003 |
| Contract # PM 333028 | Monday, 7/7/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract # PM 333028 | Tuesday, 7/8/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract # PM 333028 | Friday, 7/11/2003 | 8 | 1 | Day Const | 7/12/2003 |
| Contract # PM 333039 | Monday, 7/14/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract # PM 333028 | Tuesday, 7/15/2003 | 8 | 1 | Day Const | 7/19/2003 |
| Contract # PM 333028 | Wednesday, 7/16/2003 | 8 | 1 | Day Const | 7/19/2003 |
| Contract # PM 333039 | Thursday, 7/17/2003 | 8 | 0 | Day Const | 7/19/2003 |
| Contract # PM 333042 | Tuesday, 7/29/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract # PM 333039 | Wednesday, 7/30/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract # PM 333039 | Thursday, 7/31/2003 | 8 | 0 | Night | 8/2/2003 |
| Contract # PM 333039 | Friday, 8/1/2003 | 8 | 2 | Night | 8/2/2003 |
| Contract # PM 333028 | Monday, 8/11/2003 | 8 | 0 | Day Const | 8/16/2003 |
| Contract # PM 333028 | Wednesday, 8/13/2003 | 8 | 1 | Day Const | 8/16/2003 |
| Contract # PM 333043 | Thursday, 8/14/2003 | 8 | 0 | Day Const | 8/16/2003 |
| Contract # PM 333043 | Friday, 8/15/2003 | 4 | 0 | Day Const | 8/16/2003 |
| Contract # PM 333033 | Friday, 8/15/2003 | 4 | 0 | Night | 8/16/2003 |
| Contract # PM 333028 | Monday, 8/18/2003 | 8 | 1 | Day Const | 8/23/2003 |
| Contract # PM 333033 | Tuesday, 8/19/2003 | 8 | 0 | Day Const | 8/23/2003 |
| Contract # PM 333028 | Thursday, 8/21/2003 | 8 | 1 | Day Const | 8/23/2003 |
| Contract # PM 200334 | Friday, 8/22/2003 | 8 | 0 | Day Const | 8/23/2003 |
| Contract # PM 333039 | Wednesday, 8/27/2003 | 8 | 0 | Day Const | 8/30/2003 |
| Contract # PM 333028 | Wednesday, 9/3/2003 | 8 | 0 | Day Const | 9/6/2003 |
| Contract # PM 333037 | Monday, 9/8/2003 | 8 | 0 | Day Const | 9/13/2003 |

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333031 | Tuesday, 9/9/2003 | 8 | 0 | Day Const | 9/13/2003 |
| Contract # PW 002074 | Friday, 9/12/2003 | 8 | 0 | Day Const | 9/13/2003 |
| Contract # PM 333042 | Tuesday, 9/16/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract # PM 333042 | Wednesday, 9/17/2003 | 4 | 0 | Night | 9/20/2003 |
| Contract # PM 333042 | Friday, 9/19/2003 | 8 | 0 | Night | 9/20/2003 |
| Contract # PM 333042 | Saturday, 9/27/2003 | 8 | 0 | Day Const | 9/27/2003 |
| Contract # PM 333042 | Monday, 9/29/2003 | 8 | 0 | Day Const - 160 | 10/4/2003 |
| Contract # PM 333024 | Monday, 9/29/2003 | 8 | 0 | Night | 10/4/2003 |
| Contract # PM 333042 | Wednesday, 10/1/2003 | 8 | 0 | Day Const - 160 | 10/4/2003 |
| Contract # PM 333042 | Thursday, 10/2/2003 | 8 | 0 | Night | 10/4/2003 |
| Contract # PM 333039 | Saturday, 10/4/2003 | 8 | 0 | Day Const - 220 | 10/4/2003 |
| Contract # PM 333028 | Wednesday, 10/8/2003 | 8 | 1 | Day Const | 10/11/2003 |
| Contract # PM 333042 | Tuesday, 10/14/2003 | 8 | 0 | Day Const | 10/18/2003 |
| Contract # PM 333041 | Friday, 10/17/2003 | 8 | 0 | Day Const | 10/18/2003 |
| Contract # PM 333028 | Tuesday, 10/21/2003 | 8 | 1 | Day Const | 10/25/2003 |
| Contract # PM 333044 | Friday, 10/24/2003 | 8 | 1 | Day Const | 10/25/2003 |
| Contract # PM 333041 | Monday, 10/27/2003 | 8 | 0 | Day Const | 11/1/2003 |
| Contract # PM 333040 | Thursday, 10/30/2003 | 8 | 0 | Day Const | 11/1/2003 |
| Contract # PM 333028 | Friday, 10/31/2003 | 8 | 0 | Night | 11/1/2003 |
| Contract # PM 333044 | Thursday, 11/13/2003 | 8 | 0 | Day Const | 11/15/2003 |
| Contract # PM 333033 | Friday, 11/14/2003 | 8 | 0 | Day Const | 11/15/2003 |
| Contract # PM 333039 | Monday, 11/17/2003 | 8 | 1 | Day Const | 11/22/2003 |
| Contract # PM 333044 | Tuesday, 11/18/2003 | 8 | 1 | Day Const | 11/22/2003 |
| Contract # PM 333039 | Wednesday, 11/19/2003 | 8 | 0 | Day Const | 11/22/2003 |
| Contract # PM 333039 | Friday, 11/21/2003 | 8 | 4 | Day Const | 11/22/2003 |
| Contract # PM 200331 | Monday, 11/24/2003 | 8 | 0 | Day Const | 11/29/2003 |
| Contract # MM 000004 | Tuesday, 12/2/2003 | 8 | 0 | Day Const | 12/6/2003 |
| Contract # PM 333043 | Friday, 12/5/2003 | 8 | 0 | Day Const | 12/6/2003 |
| Contract # PM 333033 | Thursday, 12/11/2003 | 8 | 0 | Day Const - LAT | 12/13/2003 |
| Contract # PM 333028 | Tuesday, 12/16/2003 | 8 | 0 | Day Const | 12/20/2003 |
| Contract # PM 333028 | Wednesday, 12/17/2003 | 8 | 1 | Day Const | 12/20/2003 |
| Contract # PM 333027 | Friday, 12/19/2003 | 8 | 4 | Day Const | 12/20/2003 |
| Contract # MM 000004 | Saturday, 12/20/2003 | 8 | 0 | Night | 12/20/2003 |
| Contract # MM 000004 | Sunday, 1/11/2004 | 8 | 2 | Night | 1/17/2004 |
| Contract # PM 333043 | Thursday, 1/15/2004 | 8 | 0 | Night | 1/17/2004 |
| Contract # PM 333042 | Monday, 1/19/2004 | 8 | 0 | Night | 1/24/2004 |
| Contract # PM 333042 | Saturday, 2/7/2004 | 8 | 0 | Day Const | 2/7/2004 |
| Contract # PM 333042 | Monday, 2/23/2004 | 8 | 0 | Night | 2/28/2004 |
| Contract # PM 333042 | Saturday, 3/6/2004 | 8 | 0 | Day Const | 3/6/2004 |
| Contract # PM 333042 | Monday, 3/8/2004 | 8 | 0 | Night | 3/13/2004 |
| Contract # PM 333042 | Friday, 3/26/2004 | 8 | 0 | Night | 3/27/2004 |

| | | | | | |
|---|---|---|---|---|---|
| Contract # PM 333028 | Monday, 3/29/2004 | 8 | 2 | Day Const | 4/3/2004 |
| Contract # PM 333039 | Friday, 4/2/2004 | 8 | 0 | Night | 4/3/2004 |
| Contract # PM 333039 | Monday, 4/5/2004 | 8 | 0 | Night | 4/10/2004 |
| Contract # PM 333044 | Wednesday, 4/14/2004 | 8 | 1 | Day Const | 4/17/2004 |
| Contract # PM 333042 | Friday, 4/16/2004 | 8 | 0 | Day Const | 4/17/2004 |
| Contract # PW 002074 | Tuesday, 4/20/2004 | 8 | 0 | Night | 4/24/2004 |
| Contract # PM 333044 | Thursday, 4/22/2004 | 8 | 1 | Day Const | 4/24/2004 |
| Contract # PM 333028 | Friday, 4/23/2004 | 8 | 2 | Day Const | 4/24/2004 |
| Contract # PM 333042 | Wednesday, 4/28/2004 | 8 | 0 | Day Const | 5/1/2004 |
| Contract # PM 333044 | Friday, 4/30/2004 | 8 | 0 | Night | 5/1/2004 |
| Contract # PM 333042 | Monday, 5/3/2004 | 8 | 0 | Night | 5/8/2004 |
| Contract # PM 333024 | Wednesday, 5/5/2004 | 8 | 0 | Day Const | 5/8/2004 |
| Contract # PM 333042 | Thursday, 5/6/2004 | 8 | 0 | Day Const | 5/8/2004 |
| Contract # PM 333027 | Wednesday, 5/12/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract # PM 333027 | Thursday, 5/13/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract # PM 333027 | Friday, 5/14/2004 | 8 | 0 | Night | 5/15/2004 |
| Contract # PM 333040 | Monday, 5/17/2004 | 4 | 0 | Night | 5/22/2004 |
| Contract # PM 333042 | Wednesday, 5/19/2004 | 8 | 0 | Day Const | 5/22/2004 |
| Contract # PM 333042 | Monday, 5/24/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract # PM 333042 | Wednesday, 5/26/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract # PM 333032 | Friday, 5/28/2004 | 8 | 0 | Night | 5/29/2004 |
| Contract # PM 333042 | Wednesday, 6/2/2004 | 8 | 0 | Day Const | 6/5/2004 |
| Contract # PM 333032 | Monday, 6/7/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract # PM 333044 | Tuesday, 6/8/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract # PM 333044 | Wednesday, 6/9/2004 | 4 | 0 | Night | 6/12/2004 |
| Contract # PM 333042 | Thursday, 6/10/2004 | 8 | 0 | Night | 6/12/2004 |
| Contract # PM 333024 | Wednesday, 6/16/2004 | 8 | 0 | Day Const | 6/19/2004 |
| Contract # PM 333039 | Thursday, 6/17/2004 | 8 | 0 | Day Const | 6/19/2004 |
| Contract # PM 333039 | Friday, 6/18/2004 | 8 | 0 | Day Const | 6/19/2004 |
| Contract # PM 333039 | Saturday, 6/19/2004 | 4 | 0 | Night | 6/19/2004 |
| Contract # PM 333024 | Monday, 6/21/2004 | 8 | 0 | Day Const | 6/26/2004 |
| Contract # PM 333024 | Wednesday, 6/30/2004 | 8 | 0 | Day Const | 7/3/2004 |
| Contract # PM 333039 | Thursday, 7/1/2004 | 8 | 0 | Day Const | 7/3/2004 |
| Contract # PM 333033 | Monday, 7/12/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract # PM 333043 | Tuesday, 7/13/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract # PM 333039 | Wednesday, 7/14/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract # PM 333027 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract # PM 333043 | Friday, 7/16/2004 | 8 | 0 | Night | 7/17/2004 |
| Contract # PM 333044 | Monday, 7/19/2004 | 8 | 1 | Day Const | 7/24/2004 |
| Contract # PM 333043 | Monday, 7/19/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract # PM 333043 | Tuesday, 7/20/2004 | 8 | 0 | Night | 7/24/2004 |

| | | | | | |
|---|---|---|---|---|---|
| Contract  # PM 333042 | Wednesday, 7/21/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract  # PM 333042 | Thursday, 7/22/2004 | 8 | 0 | Night | 7/24/2004 |
| Contract  # PM 333044 | Sunday, 8/1/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract  # PM 333044 | Monday, 8/2/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract  # PM 333043 | Tuesday, 8/3/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract  # PM 333043 | Wednesday, 8/4/2004 | 8 | 0 | Night | 8/7/2004 |
| Contract  # PM 333044 | Friday, 8/6/2004 | 8 | 1 | Day Const | 8/7/2004 |
| Contract  # PM 333039 | Monday, 8/16/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract  # PM 333039 | Tuesday, 8/17/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract  # PM 333044 | Wednesday, 8/18/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract  # PM 333044 | Thursday, 8/19/2004 | 8 | 0 | Night | 8/21/2004 |
| Contract  # PM 333039 | Friday, 8/20/2004 | 8 | 2 | Night | 8/21/2004 |
| Contract  # PM 333043 | Tuesday, 8/24/2004 | 8 | 0 | Night | 8/28/2004 |
| Contract  # PM 333042 | Thursday, 8/26/2004 | 8 | 0 | Day Const | 8/28/2004 |
| Contract  # PM 333044 | Friday, 8/27/2004 | 8 | 1 | Day Const | 8/28/2004 |
| Contract  # PM 333044 | Monday, 8/30/2004 | 8 | 2 | Day Const | 9/4/2004 |
| Contract  # PM 333044 | Tuesday, 8/31/2004 | 8 | 1 | Day Const | 9/4/2004 |
| Contract  # PM 333044 | Thursday, 9/2/2004 | 8 | 1 | Day Const | 9/4/2004 |
| Contract  # PM 333044 | Monday, 9/13/2004 | 8 | 2 | Day Const | 9/18/2004 |
| Contract  # PM 333024 | Tuesday, 9/14/2004 | 8 | 0 | Day Const | 9/18/2004 |
| Contract  # PM 333039 | Wednesday, 9/15/2004 | 8 | 0 | Day Const | 9/18/2004 |
| Contract  # PM 333039 | Thursday, 9/16/2004 | 8 | 0 | Night | 9/18/2004 |
| Contract  # PM 333042 | Friday, 9/17/2004 | 8 | 4 | Night | 9/18/2004 |
| Contract  # PM 333039 | Monday, 9/20/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract  # PM 333043 | Tuesday, 9/21/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract  # PM 333039 | Wednesday, 9/22/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract  # PM 333043 | Thursday, 9/23/2004 | 8 | 0 | Night | 9/25/2004 |
| Contract  # PM 333044 | Monday, 9/27/2004 | 8 | 2 | Day Const | 10/2/2004 |
| Contract  # PM 333039 | Tuesday, 9/28/2004 | 8 | 0 | Night | 10/2/2004 |
| Contract  # PM 333039 | Wednesday, 9/29/2004 | 8 | 0 | Night | 10/2/2004 |
| Contract  # PM 333042 | Friday, 10/1/2004 | 8 | 0 | Day Const | 10/2/2004 |
| Contract  # PM 333042 | Tuesday, 10/5/2004 | 8 | 0 | Night | 10/9/2004 |
| Contract  # PM 333042 | Friday, 10/8/2004 | 8 | 0 | Day Const | 10/9/2004 |
| Contract  # PM 333044 | Wednesday, 10/13/2004 | 8 | 0 | Night | 10/16/2004 |
| Contract  # PM 333044 | Thursday, 10/14/2004 | 8 | 0 | Night | 10/16/2004 |
| Contract  # PM 333042 | Tuesday, 10/19/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract  # PM 333043 | Wednesday, 10/20/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract  # PM 333044 | Friday, 10/22/2004 | 8 | 2 | Day Const | 10/23/2004 |
| Contract  # PM 333044 | Saturday, 10/23/2004 | 8 | 0 | Night | 10/23/2004 |
| Contract  # PM 333044 | Wednesday, 10/27/2004 | 8 | 1 | Day Const | 10/30/2004 |
| Contract  # PM 333044 | Thursday, 10/28/2004 | 8 | 1 | Day Const | 10/30/2004 |

| Contract # PM 333044 | Wednesday, 11/3/2004 | 8 | 1 | Day Const | 11/6/2004 |
| Contract # PM 333039 | Saturday, 11/6/2004 | 8 | 0 | Night | 11/6/2004 |
| Contract # PM 333044 | Monday, 11/8/2004 | 8 | 2 | Day Const | 11/13/2004 |
| Contract # PM 333044 | Tuesday, 11/9/2004 | 8 | 1 | Day Const | 11/13/2004 |
| Contract # PM 333044 | Friday, 11/12/2004 | 8 | 1 | Day Const | 11/13/2004 |
| Contract # PM 333044 | Tuesday, 11/16/2004 | 8 | 1 | Day Const | 11/20/2004 |
| Contract # PM 333033 | Friday, 11/19/2004 | 8 | 0 | Day Const | 11/20/2004 |
| Contract # PM 333040 | Wednesday, 12/1/2004 | 8 | 0 | Day Const | 12/4/2004 |
| Contract # PM 333043 | Thursday, 12/2/2004 | 8 | 0 | Night | 12/4/2004 |
| Contract # PM 333042 | Monday, 12/13/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333043 | Tuesday, 12/14/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333042 | Wednesday, 12/15/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333032 | Thursday, 12/16/2004 | 8 | 0 | Night | 12/18/2004 |
| Contract # PM 333042 | Saturday, 12/18/2004 | 8 | 1 | Night | 12/18/2004 |
| Contract # PM 333032 | Monday, 12/20/2004 | 8 | 0 | Night | 12/25/2004 |
| Contract # PM 333042 | Tuesday, 1/4/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | Thursday, 1/6/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 200331 | Friday, 1/7/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333039 | Saturday, 1/8/2005 | 8 | 0 | Night | 1/8/2005 |
| Contract # PM 333032 | Friday, 1/14/2005 | 8 | 0 | Night | 1/15/2005 |
| Contract # PM 333032 | Friday, 1/21/2005 | 8 | 0 | Night | 1/22/2005 |
| Contract # PM 333039 | Wednesday, 2/9/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333042 | Friday, 2/11/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333043 | Saturday, 2/12/2005 | 8 | 0 | Night | 2/12/2005 |
| Contract # PM 333032 | Friday, 2/25/2005 | 8 | 0 | Night | 2/26/2005 |
| Contract # PM 333039 | Saturday, 3/12/2005 | 8 | 0 | Day Const | 3/12/2005 |
| Contract # PM 333043 | Friday, 3/18/2005 | 8 | 0 | Night | 3/19/2005 |
| Contract # PM 333043 | Friday, 4/1/2005 | 8 | 0 | Night | 4/2/2005 |
| Contract # PM 333044 | Wednesday, 4/6/2005 | 8 | 0 | Night | 4/9/2005 |
| Contract # PM 333042 | Friday, 4/22/2005 | 8 | 0 | Night | 4/23/2005 |

**Total Hours:** 2460    134.5

$68,880.00     $5,649.00

<u>$74,529.00</u>

**Grand Total:**    2460   **Hrs Regular**     134.5   **Hrs Overtime**