DUNN & GOUDREAU COURT REPORTING SERVICE, INC.
ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS



EXHIBIT
1

------------------------------
                                    *
JOHN GRENNON, LOREN LYNCH,          *
JOHN BARNES, DAVID BERGERON,        *
JOHN ELLIS, TIMOTHY TURLEY,         *
AL MASCONE, WILLIAM PENEAU,         *
ERIC DILIBERO AND PAUL GIGLIO       *
     Plaintiffs                     *CA No. 05-11661-RGS
vs.                                 *
                                    *
ANDREA CABRAL, IND. AND AS          *
SHERIFF OF SUFFOLK COUNTY           *
     Defendant                      *
------------------------------


DEPOSITION OF:  SHERIFF ANDREA CABRAL

MERRICK LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

January 22, 2007

Commenced at 10:00 a.m.


LESLIE A. D'EMILIA
Court Reporter

ORIGINAL

Page 48

Q.  Let me ask the question again.  You were aware at
this meeting that somebody in your executive staff
had conveyed to the union the issue regarding
delayed pension fund payments; is that correct?

        MS. CAULO:  Objection.

A.  I was comfortable that they had gotten a response
from the administration that the delay in the
pension payments was necessary; that no one--that it
was temporary; and that no one was going to be
adversely affected by it.

Q.  But you don't know who from the administration
communicated that?

A.  I believe it would have been Mike Harris, but there
could have been others that communicated it on more
of a one-on-one basis as well.

Q.  Would those others be people on the executive staff
that you just mentioned?

A.  If they could--it could have been.

Q.  Somebody else in addition to a member of the
executive staff?

A.  There are no secrets, as you well know Mr. Pfaff, at
the house of correction and the jail.  Information
is transmitted from everybody from the janitorial
staff straight on up to the Sheriff to others.

Page 82

1    operational need and necessity, and that there was

2    very little scrutiny of the application, at least

3    not to the extent that we currently do it.

4    Q.  When did--when was the decision made to make the

5        position more meaningful?

6    A.  Oh, goodness.  Probably sometime in 2004 and going

7        into 2005, sort of reviewing the process and really

8        trying to figure out how we wanted it to look and

9        what we wanted it to represented.

10   Q.  And who was responsible for reviewing the process?

11   A.  I essentially said to Elizabeth Keeley, and I may

12       have actually said it to Mike Harris, everything

13       that we're doing is supposed to be performance based

14       and merit based.  Not all corrections officers are

15       deputy sheriffs.  That is a designation beyond that

16       of correction officer.  It should be--it should have

17       some meaning, and to the extent that we can make it

18       more performanced based, more reflective of the good

19       work or good character or whatever you want to call

20       it, good comportment of the officer, we should do

21       that, and they went off and I think began to try to

22       figure out ways to do it.

23   Q.  Who was they?

24   A.  At the time I didn't know who the group was.  I

DUNN & GOUDREAU

Page 81

1    A.    When we did large groups, to make it more time

2          efficient, I was commissioned to qualify.

3          Elizabeth Keeley was commissioned to qualify, and I

4          think Gerard Horgan was commissioned to qualify.  So

5          I would swear in everyone, but then you have to fill

6          out and sign the paperwork, and so we would separate

7          people into--each commissioner would be in charge of

8          getting some group of them.  So, you know, I may

9          have been standing in front of a large group, but in

10          terms of knowing who was in it, and I did the actual

11          swearing in, and on other occasions when I was

12          unavailable subsequent to that, Elizabeth could do

13          it and did do it, and so did Gerard.

14    Q.    The actual swearing in?

15    A.    Yes.

16    Q.    Were recommendations made to you as Sheriff that

17          these individuals who were being sworn in on mass

18          were qualified to be deputy sheriffs?

19    A.    I don't think that there was any real discussion

20          about qualification because at that point we'd not

21          gotten into what came later, which was trying to

22          make the position a little bit more meaningful.  I

23          think this was surely based on

24          Superintendent Bradley's representations around

1    answered.

2  A.  I don't know.  I don't remember.

3  Q.  And who did you learn was on this group that Keeley

4      was putting together?

5  A.  It was the superintendents and that includes

6      Mike Harris.

7  Q.  Anybody else?

8  A.  I don't--not to my knowledge.

9  Q.  Was Viktor Theiss part of this?

10 A.  Well, he was the superintendent.

11 Q.  Well you didn't mention him earlier.

12 A.  Well, I said the superintendents.  I mean all of

13     them, house, jail, TID, and human resources.

14 Q.  And did these individuals--strike that.  Did this

15     group meet with you on a regular basis to discuss

16     this?

17 A.  No.

18 Q.  Did you receive information from Keeley that the

19     group was meeting to review the process of deputy

20     sheriffs?

21 A.  I can recall on a couple of occasions because it

22     was--it seemed to me that it was taking a while,

23     asking her about it.  "How are we doing on that,"

24     and she would give me an update, and she may very

1    how I'm viewing this without saying that I'm having

2    a lengthy discussion with anybody about it, but this

3    is how I internalized it was you're looking at the

4    person's length of service.  You're looking at their

5    disciplinary history.  You're looking at how they

6    behaved in recent years or months, depending on how

7    long they've been here, and that my goal was to

8    achieve some balance.  So if you have

9    something--there is something positive that is going

10   to balance out what may be negative, that should be

11   considered as well, and I assumed that they

12   understood that that's--that was what I wanted.

13   Q.  So you conveyed this component of an improvement in

14       comportment to someone?

15   A.  My memory of it is that I--the person that I spoke

16       to it about it was Gerard Horgan.  That's my memory.

17       I could be wrong, but that's what I--I seem to

18       remember that that was an issue that Gerard was

19       struggling with, and it came up in a completely

20       separate meeting.  It wasn't--the purpose of the

21       meeting wasn't to discuss it.  It just came up.

22   Q.  Did Chief of Staff Keeley ever come to you and say

23       this criteria, this improvement in comportment in

24       judging a veteran officer who had never been

EXHIBIT 2

Volume 1
Pages 1-216
Exhibit as per

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661/RGS

. . . . . . . . . . . . . . . . . . . .

Bergeron, et al           :
              Plaintiff,  :
                          :
V.                        :
                          :
Andrea Cabral             :
              Defendant.  :

. . . . . . . . . . . . . . . . . . . .

DEPOSITION OF JOHN BARNES, a witness
called on behalf of the Defendant taken pursuant to the
Federal Rules of Civil Procedure, before Patricia D.
Haynes, a Certified Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts, CSR No.
146208, at the offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Tuesday, October 31, 2006, commencing at 10:15 a.m.

Copley Court Reporting
58 Batterymarch Street, Suite 317
Boston, Massachusetts  02110
(617) 423-5841

---

**Page 2**

1   APPEARANCES:

2

3   Suffolk County Sheriff's Department
      (By: Ellen M. Caulo, Esquire)
4   200 Nashua Street
      Boston, Massachusetts 02114
5   Counsel for the Defendant

6

    Merrick, Louison & Costello, LLP
7   (By: David Condon, Esquire
      67 Batterymarch Street
8   Boston, Massachusetts 02110
      Counsel for the Plaintiffs

9

10

11

12

13

14

15

16

18

21

22

23

24

---

**Page 3**

                I N D E X

Witness        Direct Cross Redirect Recross

JOHN BARNES
(By Ms. Caulo)   4

            E X H I B I T S

Exhibit No.                              Page

1  Deposition                             4

2  Policy S 516                          40

3  Policy S 520                          44

4  Revocation letter                     66

5  Mailing to unions                    152

6  Mailing to Suffolk County Residents  152

7  Press release                        152

8  Copy of article from West Roxbury    152
   Transcript

9  Copy of press release from Boston    152
   City Paper, 4/23/04

10 Memo from Sheriff Cabral, 12/12/03   179

11 Posting from JOEASC web site         203

---

**Page 4**

1              P R O C E E D I N G S

2          (Document marked for identification as

3   Exhibit No. 1.)

4              JOHN BARNES,

5   having been previously sworn, was examined and testified

6   as follows:

7          MS. CAULO:  For the record, my name is

8   Ellen Caulo, Deputy General Counsel for the Suffolk

9   County Sheriff's Department.  We are here in the matter

10  of Bergeron, et al versus Andrea Cabral.  Today is the

11  deposition of John Barnes, who has just been sworn.

12         Exhibit 1 has been marked, which is the notice

13  of taking deposition.

14         David, we've been operating under the usual

15  stipulations, all objections, except as to form, are

16  reserved until trial, all motions to strike reserved

17  until trial.  And Mr. Barnes will have 30 days within

18  which to review the transcript and sign, requirement of

19  the notary waived.

20         MR. CONDON:  That's agreed.

21  DIRECT EXAMINATION BY MS. CAULO:

22     Q.  Please state your name and rank.

23     A.  **My name is John Barnes, Jail Officer 1.**

24     Q.  And where are you employed, Officer Barnes?

45

1  (Witness confers with counsel.)

2  BY MS. CAULO:

3    Q.    A few moments ago before the break, Officer

Barnes, I placed before you a document which has been

identified as S 520, private paid details, now marked as

6  Exhibit 3. I represent to you it is the policy that was

7  in effect on May 1 of 2004. Is that fair?

8    A.    Correct.

9    Q.    I want to review with you what this policy

10  covers. Looking at Policy Statements I-D, "Must be an

11  employee in good standing whose current job performance

12  is commensurate with the duties and responsibilities of

13  public law enforcement officers." Did I read that

14  correctly?

15    A.    Yes, you did.

16    Q.    That was what was expected of an individual

17  who was going to perform private paid details in May of

18  2004?

19    A.    Correct.

20    Q.    Second page, IV, Rules and Regulations, A,

21  "Employees working a private paid security detail are an

22  emissary of the Suffolk County Sheriff's Department,"

23  correct?

24    A.    Correct.

46

1    Q.    B, "Professionalism is expected at all times

2  both in demeanor and appearance." Did I read that

3  correctly?

4    A.    Yes.

5    Q.    C, "All Suffolk County Sheriff's Department

6  employees are bound by department policies and

7  procedures." Did I read that correctly?

8    A.    Correct.

9    Q.    And that certainly was your understanding of

10  an individual who had the privilege of being a deputy

11  sheriff working private paid details, that they would in

12  fact be an emissary of the department, correct?

13    A.    Correct.

14    Q.    And it was your understanding that

15  professionalism would be expected at all times in both

16  appearance and demeanor, correct?

17    A.    Absolutely.

18    Q.    Just to go back for a moment. I want to make

19  sure I got the testimony accurately. You recall filling

20  out an application to become a deputy sheriff when

Sheriff Rouse was appointed, correct?

22    A.    To the best of my knowledge.

23    Q.    You don't have a recollection of filling out

24  such an application when Sheriff Ruffo was sheriff?

47

1    A.    To the best of my knowledge.

2    Q.    Is it your recollection you simply wanted to

3  be one and you were sworn in?

4    A.    I don't recall. I don't recall if I was

5  recommended by a shift commander or if I was recommended

6  by a deputy superintendent or superintendent, I don't

7  recall.

8    Q.    Is it fair to say that you filled out an

9  application to become a deputy sheriff when Sheriff

10  Cabral came in in 2002?

11    A.    I filled out an application sometime shortly

12  thereafter.

13    Q.    Either in the latter part of '02 or '03?

14    A.    I believe it may have been '03.

15    Q.    You indicated earlier that it's a privilege to

16  be a deputy sheriff, correct?

17    A.    Yes.

18    Q.    Was it within the authority of the sheriff to

19  evaluate the process for selecting deputy sheriffs?

20    A.    I believe they have recently done that for the

21  first time last year.

22    Q.    I'm asking you is it within the authority of

23  any sheriff to evaluate the process for selecting deputy

24  sheriffs?

48

1    A.    Yes.

2    Q.    Would that be within a sheriff's prerogative?

3    A.    Yes.

4    Q.    Is it within the authority of any sheriff to

5  determine criteria for a deputy sheriff?

6    A.    Yes.

7    Q.    Is it within a sheriff's authority to

8  determine what kind of qualifications would allow one to

9  be appointed as a deputy sheriff?

10    A.    Yes.

11    Q.    Once you were sworn in initially under Sheriff

12  Ruffo and then thereafter under Rouse and current

13  Sheriff Cabral, what was your understanding of your

14  status, were you permanent or at will?

15    A.    I would say at will.

16    Q.    What type of functions did you perform as

17  deputy sheriff from the moment you were first sworn in

18  in '94 or '95, whenever it was?

19    A.    Pretty much the functions I perform as a

20  deputy sheriff was handling court papers and signing of

21  court papers and the transportation of prisoners,

22  detainees.

23    Q.    Handling court papers and transportation of

24  detainees?

49

1    A.    Yes.

2    Q.    Did you ever --

3    A.    And signing of court papers at court.

4    Q.    Did you ever have a permanent assignment to
transportation?

6    A.    No.

7    Q.    Before you became the property officer, which
8    I believe you said was in 1999 or 2000, how frequently
9    do you recall being assigned to transportation?

10    A.    I can't recall.  More so before I became
11    property officer than after.

12    Q.    Did you ever have a three month quarterly
13    assignment to transportation?

14    A.    I can't recall.

15    Q.    You can't recall?

16    A.    I can't recall.

17    Q.    That's your best memory?

18    A.    That's my best memory.

19    Q.    When you were in property, what deputy sheriff
20    powers did you perform?

21    A.    The same.  I've been on transportation on
22    occasions, and it would be the same functions.

23    Q.    So while you were permanently assigned in the
24    support services position of property, you also worked

50

1    in transportation?

2    A.    I thought you said after I was removed.

3    Q.    No.

4    A.    While I was assigned there?

5    Q.    Yes.

6    A.    On occasion, to the best of my recollection it
7    wouldn't be often, but on occasion I was pulled to
8    provide assistance to transportation on transportation
9    assignments.

10    Q.    And since you were removed as you were
11    reassigned from property to a line officer, how
12    frequently have you performed the functions of a deputy
13    sheriff?

14    A.    On occasions.

15    Q.    And those occasions would be in conjunction
16    with what?

17    A.    Just a daily assignment.

18    Q.    What daily assignments would require you --

19    A.    Oh, transportation.

20    Q.    What are the police powers that you hold as
deputy sheriff?

22    A.    According to the ID when you're deputized,
23    you're vested with all police powers as applied by
24    Massachusetts law.

51

1    Q.    What are they?

2    A.    The power to arrest.

3    Q.    What else?

4    A.    I'm not quite familiar with all the powers
5    that the deputy sheriff status pertains to.  I know it's
6    the power of arrest.

7    Q.    So from about 1994, '95 to 2005, you were a
8    deputy sheriff, is that fair?

9    A.    Correct.

10    Q.    During that 12 or 13 year period, were you
11    familiar with what police powers are?

12    A.    Yes.  You uphold the laws of the Commonwealth
13    of Massachusetts.

14    Q.    What else as a police power, what specific
15    authority did you have?  What are the police powers?

16    A.    You have the power to arrest, make arrest,
17    effectuate arrest if the law is being broken.  Basically
18    the deputy sheriff status also provides you with an
19    ability to provide private paid details.  And to the
20    best of my knowledge, right now off the top of my head,
21    I don't recall.  That's all I recall.

22    Q.    I was asking to the best of your knowledge
23    what are police powers or what did they enable you to do
24    other than the power to arrest?

52

1    A.    Specifically off the top of my head right now,
2    that's all I recall.

3    Q.    When were you gun qualified?

4    A.    I was gun qualified under Sheriff Ruffo.  I
5    don't recall specifically what date it was.

6    Q.    Do you have to recertify your gun
7    qualification from the point that you were initially
8    qualified?

9    A.    You have to requalify every year, yes.

10    Q.    Have you continued to do that?

11    A.    Yes.

12    Q.    Are you still currently gun qualified?

13    A.    Yes.

14    Q.    During the period of time that you were a
15    deputy sheriff from about 1994, '95 to April of 2005,
16    did you have occasion to effectuate an arrest?

17    A.    Fortunately, no.

18    Q.    So you've never utilized the one police power
19    that you can identify, the power of arrest, in the
20    entire time --

21    A.    Fortunately, I've never been put in a
22    situation where I had to utilize that.

23    Q.    Are there any functions that are essential to
24    performing your current job as a line officer?  Let's

**85**

1  support your family and children if you do get
2  terminated. When you go home and you look at
3  your family, my family means the world to me.
4  Being told that I could possibly suffer adverse
5  action because of what I did really hit home on
6  me. That is why I really didn't want to get,
7  become involved with the union.
8  Q. Who told you that?
9  A. What's that?
10 Q. You were going to suffer adverse actions,
11    consequences?
12 A. Based on what was portrayed to me by Mike Walsh
13    of possibly being terminated, it really set in,
14    it sunk in. It sunk in. It made me put things
15    in perspective that when sometimes you think
16    what is doing right for the membership in turn
17    could be what is wrong for yourself or family.
18 Q. Describe specifically any emotional pain that
19    you have suffered?
20 A. Other than the constant fear of not knowing if
21    there is going to be retribution or not, it
22    weighs heavy on you. Emotionally, it weighs on
23    you. You go home to your wife, and you look at
24    your kids, and, I don't know, I can't describe

**86**

1  it. The last thing you want to do is put them
2  in a situation where you cannot provide for
3  them. Emotionally, it takes a toll on you
4  because you are thinking about that.
5  Q. What facts can you direct me to that form the
6  basis for this constant concern or fear that
7  you have of retribution?
8       MR. PFAFF: Objection. Asked and
9       answered.
10 A. Like I indicated, I believe that at one time it
11    was a considering factor by this
12    administration. I don't know to this date if
13    it still is not. I don't know.
14 Q. Have you received any mental health treatment
15    in the last five years?
16 A. No, I have not.
17 Q. Have you received any mental health treatment
18    as a result of the allegations in your
19    complaint?
20 A. No.
21 Q. Are you on any medication as a result of the
22    allegations in this complaint?
23 A. No, I am not.
24 Q. Previously, you indicated that you transferred

**87**

1  from your position in property in January of
2  '05?
3  A. Yes.
4  Q. And you were transferred to become a line
5  officer in the 161 unit; is that right?
6  A. I am assigned up there currently, yes.
7  Q. That was not your initial assignment subsequent
8  to your transfer?
9  A. I have worked different assignments since my
10    transfer to property.
11 Q. How did you learn that you were transferred out
12    of property?
13 A. When the shift selection started, my name
14    appeared. I was never officially informed that
15    I was being removed. I was just on the list.
16    No one, once your name is on that list, you are
17    picking your shift and days off, you are no
18    longer in that position, which is excluded from
19    the selection process.
20 Q. So when you are in a support services position,
21    you automatically get, it is automatically days
22    and it is automatically weekends off, so there
23    is no need for you to select?
24 A. Depending on what position it is, the position

**88**

1  that I was in, it was Monday through Friday,
2  weekends off, seven to three shift.
3  Q. Did you have a conversation with anybody,
4  specifically, the superintendent, Gene Sumpter
5  or the deputy superintendent Cliff Carney,
6  after you realized that you were on a list to
7  select a shift and your days off?
8  A. No. I don't recall any specific conversation
9  in regards to that.
10 Q. Did you have any conversation with anybody,
11    with Mr. Sumpter, Gene Sumpter or Cliff Carney
12    regarding your transfer out of property?
13 A. No. No, I don't recall that.
14 Q. At any time after you were transferred out of
15    property, did you have any conversations with
16    superintendent, deputy superintendent or anyone
17    concerning the reasons why?
18 A. To the best of my recollection, no.
19 Q. The conversation that you have spoken about at
20    length with Mickey Walsh that occurred some
21    time in the fall of 2004, did he mention to you
22    that you might be transferred out of property?
23 A. No, he did not.
24 Q. Prior to your transfer out of property, do you

**89**

1  have any incling whatsoever that you were going
2  to be transferred?
3       MR. PFAFF: Objection.
4  A. No. I believe that year, it was either that
5  year or it might have been the prior year that
6  I received the job I was doing there. I didn't
7  think I was going to be moved out of there for
8  job performance, I got a commendation based on
9  my performance from the department of
10    correction audit. I didn't, I had no idea why
11    I was being removed.
12 Q. Who replaced you as the property officer?
13 A. Edoardo Vargas.
14 Q. Where had he been, do you know what his
15    assignment was prior to him being moved into
16    property?
17 A. He was I believe working upstairs as a line
18    officer.
19 Q. Is he still employed by the department?
20 A. Yes, currently.
21 Q. What is his position right now?
22 A. Line officer.
23 Q. Who is currently in the property department?
24 A. Thomas Johnson. He was the property officer on

**90**

1  the three-to-eleven shift.
2  Q. Now he is on the seven-to three shift?
3  A. Yes.
4  Q. Did he succeed Edoardo Vargas?
5  A. Edoardo Vargas went out injured. I don't
6  recall exactly when. They ended up placing me
7  down there to cover for him for most of the
8  duration that he was out.
9  Q. How long a period of time was that?
10 A. I want to say that I was down there for a good
11    three or four month span.
12 Q. When you were down there covering for Mr.
13    Vargas during his injury period, were you
14    getting weekends off?
15 A. No.
16 Q. So the department, who asked you to fill in for
17    him?
18 A. It was assignment by shift commander.
19 Q. So you did that for three or four months and
20    you had your weekends off?
21 A. No. I did not have weekends off at that time.
22    I had my -- I picked on seniority, but I was
23    not provided the weekend off based on the
24    assignment.

**EXHIBIT 3**

---

**Page 1**

DAVID BERGERON, ET AL.,
Plaintiffs,

vs

ANDREA CABRAL,
Defendant.

DEPOSITION OF ALBERT J. MOSCONE

COPLEY COURT REPORTING, INC.
101 TREMONT STREET
BOSTON, MASSACHUSETTS   02108
(617) 423-5841
www.copleycourt.com

---

**Page 4**

P R O C E E D I N G S
   MS. CAULO:  Please, mark the
Deposition Notice as Exhibit Number 1.
   (Notice of Taking Deposition was
marked as Exhibit Number 1 for identification)
   MS. CAULO:  Please, swear in the
witness.

8       ALBERT J. MOSCONE
9  a witness called on behalf of the respective
10 parties, having been identified by license, and
11 being first duly sworn, was examined and
12 testified as follows:
13       DIRECT EXAMINATION
14 BY MS. CAULO:
15 Q.  Good morning.  We are here in the matter of
16    Bergeron, et al versus Andrea J. Cabral.  Today
17    we are taking the deposition of Albert Moscone.
18    My name is Ellen Caulo on behalf of Andrea J.
19    Cabral.  With me is Associate General Counsel,
20    Kathy Cawley.  Would you like to introduce
21    yourself?
22       MR. PFAFF:  I am Stephen Pfaff,
23    representing the Plaintiff, Captain Albert
24    Moscone.  Usual stipulations?

---

**Page 5**

1       MS. CAULO:  Yes.  All objections
2    except as to form are reserved until trial.
3    All motions to strike, unresponsive answers, to
4    trial.  Mr. Moscone will have thirty days to
5    sign and we waive the requirement of a notary.
6       MR. PFAFF:  Yes.  Sign under the
7    pains and penalties of perjury.  I will get a
8    copy of the transcript.  When I get it, I will
9    send it to you, you will read it, sign it, and
10   do that within thirty days.  Okay.
11      THE WITNESS. Okay.
12 Q.  State your name, please.
13 A.  Albert John Moscone.
14 Q.  Where do you reside?
15 A.  189 Crescent Avenue, Revere, Massachusetts.
16 Q.  Captain Moscone, I am Ellen Caulo.  You are
17    aware that I am here representing Sheriff
18    Cabral?
19 A.  Yes.
20 Q.  I understand that you have been present for
21    many of the depositions that have already been
22    taken in this matter; but I want to remind you
23    what the rules and procedures are.
24 A.  Okay.

---

**Page 6**

1 Q.  I am here certainly to ask questions concerning
2    the lawsuit that you and the other named
3    plaintiffs have filed against Sheriff Cabral.
4    If I ask you any question that you do not
5    understand, please, let me know, and I will do
6    my best to rephrase it.
7 A.  Okay.
8 Q.  You must give audible, verbal responses so the
9    court reporter can take down your answers.
10 A.  Okay.
11 Q.  If you need to take a break at any time, let me
12    know.  If there is a question before you,
13    answer the question, and then we can take a
14    break.
15 A.  Okay.
16 Q.  Do you understand these rules?
17 A.  Yes.
18 Q.  Have you taken any medication in the last
19    twenty-four hours?
20 A.  Yes.
21 Q.  What is that?
22 A.  I am a diabetic.  I have arrythmia.  So I take
23    Arytena for my arrythmia.  I take Metformin for
24    my diabetes.

---

**37**

```
1        speaks for itself.
2    Q.  You may answer.
3    A.  Yes.
4    Q.  Yes, it does.
5    A.  Yes.
6    Q.  Were you in agreement with these
7        recommendations and solutions that were
8        proposed?
9    A.  Yes.
10   Q.  Did you think these solutions or
11       recommendations were necessary?
12   A.  Yes.
13   Q.  Were you supportive of the changes?
14   A.  Yes.
15   Q.  What did you do to implement the changes?
16   A.  I followed the changes that they wanted to be
17       made.  I didn't agree with the reassigning of
18       six officers.  It didn't matter where you got
19       the officers from, if they came from the
20       morning or if I pulled them from the shift
21       commander.
22   Q.  Previously, you testified that you agreed with
23       the four recommendations.  Now, you are saying
24       that you didn't agree with Number 2,
```

**38**

```
1        re-assignment of six officers?
2               MR. PFAFF:  Objection.
3    A.  Yes.
4    Q.  Which of these recommendations that are on Page
5        3 of Exhibit Number 2 did you agree with?
6    A.  Which?
7    Q.  Which did you agree with?
8    A.  I agreed with 1, 3, and 4.  I also agreed with
9        2, but I just didn't think that it was -- it
10       didn't matter where you pulled the officers
11       from, whether they were assigned to me at the
12       beginning or whether they were left with the
13       shift commander.  We still needed the six
14       officers.
15   Q.  Did you voice your disagreement or criticism of
16       that particular recommendation?
17   A.  It was not a criticism.
18              MR. PFAFF:  Wait until she is
19       finished with the question before you answer.
20   A.  Yes, I did.
21              MS. CAULO:  Can we hear the question
22       again.
23           (Record read)
24   A.  I did.
```

**39**

```
1    Q.  Who did you tell that you did not agree with
2        that particular recommendation?
3    A.  It was not that I didn't agree with it.  It
4        didn't matter where you pulled the six people
5        from, whether they originated from
6        transportation or from the shift commander, it
7        was six people.
8    Q.  Who did you complain about that to?
9    A.  Deputy Walsh.
10   Q.  What was his response?
11   A.  He told me that is the way that it was going to
12       be.
13   Q.  Did you voice that disagreement, if you will,
14       before or after you signed off on the audit
15       report?
16   A.  Just before I signed it.
17   Q.  What did you do as being the supervisor in
18       charge of transportation to implement the
19       changes that were proposed in the audit?
20   A.  There was really nothing to be done.
21       Everything was always run the way it was ran,
22       assigned the officers to their trips, do their
23       trips, and then do a hospital run.
24   Q.  Is your testimony that none of these changes
```

**40**

```
1        were implemented after the audit report was
2        generated?
3               MR. PFAFF:  Objection.
4    A.  I didn't say that.
5    Q.  I want to make sure that I understand your
6        testimony.  I thought your testimony was that
7        the transportation department ran the same way
8        after the audit as it did before the audit?
9    A.  I was not there long enough to find out how
10       long it ran.
11   Q.  During the period of time that you were there,
12       what did you do to support the recommendations
13       that were proposed as part of this audit
14       committee?
15   A.  I recommended to roll call, do the best that
16       you can, double up on the trips.
17   Q.  In your estimation, did you do everything that
18       was required of you in order to implement these
19       proposals that were listed in the audit report?
20   A.  Yes, I did.
21   Q.  Did you have any difficulty or problems in
22       implementing the changes?
23   A.  No.
24   Q.  Who was responsible for implementing these
```

**41**

```
1        changes?
2    A.  Deputy Walsh and Deputy Carney.
3    Q.  As head of transportation, what
4        responsibilities did you have?
5    A.  I oversaw --
6               MR. PFAFF:  Wait for the question to
7        be finished.
8    Q.  I recognize that it is hard.  It is an awkward
9        way to have a conversation.
10              As supervisor of the transportation
11       department, what responsibility did you have,
12       Captain Moscone, to implement these changes and
13       to ensure that the changes and recommendations
14       were being implemented?
15   A.  Again, at roll call, I told people what needed
16       to be done, and that the staff that we normally
17       have, we were not going to be getting, and to
18       do the best that you can.
19   Q.  Did you ever express any displeasure or
20       disagreement to fellow employees about the
21       recommendations that were made?
22   A.  No.
23   Q.  Did you ever indicate to any fellow employees
24       or individuals assigned to transportation that
```

**42**

```
1        these recommendations are not helpful?
2    A.  I don't believe so.
3    Q.  At some point, did it come to your attention
4        that the department was concerned that the
5        recommendations or the solutions were not being
6        implemented?
7    A.  No one ever told me that.
8    Q.  Did anybody, Deputy Superintendent Carney,
9        Deputy Superintendent Walsh, Deputy
10       Superintendent Horgan, did anybody ever discuss
11       with you your abilities to implement the
12       changes that were recommended for the audit?
13   A.  I don't believe so.
14   Q.  How did you feel that you were doing with
15       respect to implementing the changes that were
16       suggested?
17   A.  Good.
18   Q.  Who is currently in charge of coordinating the
19       trip assignments?
20   A.  I am not sure if it is Lieutenant McCarthy or
21       Lieutenant Charles.
22              MS. CAULO:  May I have this marked,
23       please.
24
```

<table>
<tr><td>

1  discipline?
2       MR. PFAFF: Objection.
3  A. Normally -- how do I explain this? Normally,
4     if we had a captain get demoted to lieutenant,
5     he was disciplined, moved off the shift that he
6     was on, and he was moved back to the jail. He
7     was disciplined, and that is why they took him
8     out of the assignment. Your question is, I
9     believe that when somebody gets out of an
10    assignment, most of the time it is for
11    disciplinary reasons.
12 Q. How frequently are assignments made for the
13    support services positions?
14 A. Are you talking about the officers or are you
15    talking about the person in charge?
16 Q. I am talking any support services position
17    regardless of rank.
18 A. It depends.
19 Q. You were not demoted?
20 A. No. I was not demoted.
21 Q. You were not disciplined?
22 A. No. I was not disciplined.
23 Q. You were moved out of an assignment and given a
24    new assignment?

</td><td>

1  A. Yes.
2  Q. As a captain or lieutenant, can you pick your
3     shift?
4  A. No.
5  Q. Who makes those determinations about what
6     shifts a captain or a lieutenant works?
7  A. I believe it is the superintendent and the
8     deputy superintendent.
9  Q. So you are not the only captain or lieutenant
10    that was unable to pick their shift?
11 A. That's correct.
12 Q. No one can pick their shift?
13 A. That's correct.
14 Q. You heard the term balancing shifts, have you
15    heard that term before?
16 A. Balancing shifts?
17 Q. Yes.
18 A. Yes.
19 Q. What is your understanding of what that term
20    means?
21 A. My understanding, they need to balance the
22    shift by putting a third captain on a three to
23    eleven shift.
24 Q. I am speaking in general. Captain Moscone.

</td></tr>
</table>

62

<table>
<tr><td>

1  A. A less desirable assignment, a less desirable
2     shift, and less desirable workload.
3  Q. Why was it less desirable an assignment to you?
4  A. I am the only captain in charge of a floor.
5  Q. Why is that less desirable?
6  A. Why is it less desirable?
7  Q. Yes.
8  A. Well, if you want to put captains on the floor,
9     put all the captains on the floor. Don't just
10    single out one person because of strictly
11    retaliation.
12 Q. Why is the assignment less than desirable,
13    Captain, why is it less desirable?
14       MR. PFAFF: Objection. Asked and
15    answered.
16 A. In my personal opinion?
17 Q. Yes.
18 A. You are wasting a good guy on a floor.
19 Q. Is it fair to say that other employees of the
20    department may not agree with your assessment
21    that it is less than a desirable position?
22       MR. PFAFF: Objection. Speculation.
23 A. Can I hear that one more time?
24 Q. Sure. Is it fair to say that other employees

</td><td>

1     What is your understanding of the term
2     balancing the shift means?
3  A. Make sure every shift has the adequate staffing
4     levels.
5  Q. Whose responsibility is it to insure that each
6     shift has the adequate staffing levels?
7  A. Deputy superintendent and the superintendent.
8  Q. Why is it important to insure that each shift
9     has the adequate staffing levels?
10 A. Cost efficient. Make sure that the more staff
11    people that you have, the better the job will
12    be for everybody.
13 Q. Why is it important for their to be a certain
14    number of supervisory officers on a shift?
15 A. To quell some of the overtime.
16 Q. Would it be appropriate balancing of shifts if
17    the shift consisted of solely blue shirts?
18 A. No.
19 Q. Would that put forth the obligation of care and
20    custody for the detainee population here at the
21    Nashua Street Jail if the shift consisted
22    solely of blue shirts?
23 A. No.
24 Q. Is there a need for adequate balancing of the

</td></tr>
</table>

65

63

<table>
<tr><td>

1     of the department might not agree with your
2     assessment that a floor supervisor is a less
3     desirable position?
4        MR. PFAFF: Objection.
5  A. I don't mean that in a negative way. I have a
6     lot of respect for everybody that works here.
7     As a captain, 24 years experience, a senior
8     captain, it was wrong for them to move me to
9     that position.
10 Q. Were any other senior officers moved at that
11    time, captains, lieutenants, moved to different
12    shifts?
13 A. I believe so.
14 Q. You were not the only, I will use the
15    vernacular, white shirt, you were not the only
16    white shirt, if you will, moved to a different
17    shift or assignment in December of '03 or '04,
18    depending on what the actual date is?
19 A. I was the only captain that was moved to a less
20    desirable shift.
21 Q. In your opinion, it was less desirable?
22 A. Yes.
23 Q. Were there other lieutenants and captains who
24    were moved as well, also, correct?

</td><td>

1     shifts to make sure care and custody of the
2     detainees is met?
3  A. Yes.
4  Q. When you were first transferred to the
5     eleven-to-seven shift -- strike that.
6        Had you ever worked that shift before
7     in your career?
8  A. Make I correct you?
9  Q. Yes.
10 A. I was transferred to the three-to-eleven shift.
11 Q. Thank you. I appreciate that clarification.
12 A. Is there something that I don't know, am I
13    going to seven to eleven?
14 Q. When you were first transferred to the three to
15    eleven shift, Captain Moscone, who was your
16    shift commander?
17 A. On the three-to-eleven shift?
18 Q. Yes.
19 A. Two shift commanders. Overall shift commander,
20    Kevin Janelis.
21 Q. Who is the other one?
22 A. Captain Boyce.
23 Q. Would you report to them?
24 A. Yes.

</td></tr>
</table>

66

73

```
1    charge of central control there as well as
2    dispatch and the front lobby over at Charles
3    Street?
4  A. At this facility.
5  Q. Were you in charge of central control over at
6    Charles Street?
7  A. No.
8  Q. But those were all, corporal and sergeant were
9    support services positions?
10 A. They were all support services.
11 Q. Did you always have weekends off?
12 A. No.  When we first moved to this building, I
13   believe I started with a Friday, Saturday off.
14   If you want to call Friday a weekend.  Then I
15   guess it was changed to Sunday, Monday, and
16   then every other weekend.  Then when I moved
17   into the transportation department, it was
18   Monday through Friday.
19 Q. When we left off, we were discussing your
20   discipline for the ferret incident.  The
21   discipline was imposed because this individual
22   was allowed into the facility and he had a
23   ferret on his person?
24 A. He had a ferret concealed inside two jackets.
```

76

```
1    complaint; is that correct?
2  A. A while ago.
3  Q. Did you review it prior to it being filed?
4  A. Yes.
5  Q. Reading Paragraph Number 27.  Despite the
6    sheriff's contention in the April 21, 2005
7    letter, the plaintiffs were losing their deputy
8    sheriff's position because they were members
9    not in good standing.  Did I read that
10   correctly?
11 A. Yes.
12 Q. Is that an accurate statement?
13       MR. PFAFF:  Objection.
14 A. Yes.
15 Q. Well, in fact, you had received discipline in
16   December of 2004?
17 A. That was overturned.
18 Q. At the time that this complaint was filed, that
19   discipline was imposed, was it not?
20       MR. PFAFF:  Objection.
21 A. Yes.
22 Q. The discipline that was overturned by way of an
23   arbitration, that arbitration decision came
24   down in 2006?
```

74

```
1    I happened to be the overall supervisor in
2    central control, and got a day's suspension.
3  Q. Since that incident in 1992, have you received
4    any other discipline?
5  A. I believe I got an oral warning for forgetting
6    to lock up a weapon.  That was it.
7  Q. Have you received any other discipline?
8  A. Discipline that I told you earlier about, that
9    I came across a subordinate sleeping on a
10   detail, I wrote that individual up, and I got a
11   letter of discipline for failure to supervise,
12   which I won an arbitration hearing.
13       MS. CAULO: Mark this, please.
14       (Written reprimand, dated December
15       13, 2004, was marked as Exhibit Number 4 for
16       identification)
17 Q. I am placing before you what has been marked as
18   Exhibit Number 4.  I ask you if you recognize
19   this, Captain Moscone?
20 A. Yes.
21 Q. What do you recognize that to be?
22 A. A written reprimand.
23 Q. Do you know what discipline imposed?
24 A. November 13, 2004.
```

77

```
1  A. Yes.
2  Q. This complaint was filed in 2005?
3  A. Yes.
4  Q. So at the time that this complaint was filed,
5    that Paragraph 27 was incorrect, because you
6    had been subjected to discipline in December of
7    2004; is that correct?
8  A. Yes.
9  Q. And that is Exhibit Number 4; is it not?
10 A. Yes.
11 Q. Are you familiar with the term deputy sheriff,
12   Captain Moscone?
13 A. Yes.
14 Q. How are you familiar with that term?
15 A. Deputy sheriff, it is sort of an honor to be
16   selected as a deputy sheriff for the Suffolk
17   County Sheriff's Department or any other
18   department.
19 Q. Why is it an honor?
20 A. Because you get to earn extra income, you have
21   more police powers, and you get to work the
22   details on the street.
23 Q. Do you have to have any special expertise or
24   talents to be deputy sheriff?
```

75

```
1  Q. So this was issued in November of 2004?
2  A. Yes.
3  Q. You are familiar with the complaint that your
4    attorney filed on your behalf?
5  A. Yes.
6  Q. This was imposed in December?
7  A. Yes.
8  Q. Let me show you this document, Captain Moscone,
9    and ask you if you recognize that as a
10   complaint that was filed on your behalf by your
11   attorney?
12 A. You are talking about the letter of reprimand
13   complaint?
14 Q. I am talking about that document there.  The
15   complaint that is captioned David Bergeron, et
16   al versus Andrea Cabral.  Is that the complaint
17   that was filed in the lawsuit that you and your
18   counsel has filed on behalf of you and the
19   other plaintiffs?
20 A. Yes.
21 Q. Directing your attention to Paragraph Number
22   27.
23 A. What page was that?
24 Q. Page Number 6.  You have reviewed the
```

78

```
1  A. Training.  You have to report training.  They
2    teach you what to do while you are out there.
3    Just basic four hours detail class.  You have
4    to become gun qualified.
5  Q. Is that after you get the title of deputy
6    sheriff?
7  A. It is prior to becoming deputy sheriff.
8  Q. Is there a requirement that you be gun
9    qualified before you become deputy sheriff?
10 A. Yes.
11 Q. Are there any tests that you need to take?
12 A. No.
13 Q. Any references?
14 A. No.
15 Q. Is there an application process?
16 A. Yes.
17 Q. When during your employment with the Suffolk
18   County Sheriff's Department did you first hold
19   the title deputy sheriff?
20 A. I believe it was six months after I first
21   started.  Probably.  June of 1984.
22 Q. That was under Sheriff Kerney?
23 A. Yes.
24 Q. What was the process for your becoming selected
```

157

1  A. No. Not that I can recall.
2  Q. Was there anything that would refresh your
3     memory?
4  A. Maybe you can help me. I don't know.
5  Q. Did you speak to anyone else after your
6     conversations with Gene Sumpter?
7  A. I don't think so.
8  Q. Did you discuss your conversation with Gene
9     Sumpter with any of your fellow employees?
10 A. I don't believe so.
11 Q. Did you discuss your conversation with Michael
12    Harris with any of your fellow employees?
13 A. I may have because I was a little concerned
14    that his signature was on it and he had no
15    knowledge of this letter.
16 Q. Sure. So what did you do?
17 A. I just thought it was -- how do you sign
18    something and not know that you sent the letter
19    out? I was concerned about that.
20 Q. Did you find an answer?
21 A. No.
22 Q. Did anybody ever tell you the reasons why you
23    were decommissioned?
24 A. I think it was because I was not in good

158

1     standing.
2  Q. Who told you that?
3  A. Mike Harris.
4  Q. Is that something else that he said during this
5     conversation?
6  A. He read it from what I read, and I asked him
7     what not good standing meant.
8  Q. What did he say?
9  A. He didn't know.
10 Q. Did he say anything else?
11 A. To the best of my recollection, no.
12 Q. Have you told us everything that you can
13    remember about your conversation with Michael
14    Harris concerning this letter?
15 A. I believe so.
16 Q. Have you told us everything that you can
17    remember about your conversation with
18    Superintendent Sumpter about this letter?
19 A. I believe so.
20 Q. How about Deputy Superintendent Carney?
21 A. I believe so.
22 Q. Did you have any communication with Sheriff
23    Cabral concerning your decommissioning?
24 A. No.

159

1  Q. Did you have any conversation with Liz Keeley
2     concerning your decommission?
3  A. No.
4  Q. Looking again at the complaint, Captain
5     Moscone. What's the basis for the allegation
6     of Paragraph 30, that you have lost a
7     significant amount of income because of the
8     decommission?
9  A. Once again, the detail money.
10 Q. How much have you lost?
11 A. I believe I was averaging between twenty and
12    $25,000 a year on details.
13 Q. For how long?
14 A. Maybe four or five years.
15 Q. And before that, it was where he is?
16 A. Yes.
17 Q. Do you work overtime shifts?
18 A. Occasionally.
19 Q. How frequently do you work overtime shifts?
20 A. About a year ago, I got a part-time job. I
21    can't work details as much as I would like. I
22    don't work that many -- overtime.
23 Q. Before you got the part-time job, how
24    frequently did you work overtime?

160

1  A. This before they took the seven to one ratio
2     away?
3  Q. Give me a time frame. When did you stop
4     working?
5  A. When they took the seven to one ratio away, we
6     were working maybe two, three shifts a week.
7     When they took the seven to one ratio away from
8     us, once a month, twice a month.
9  Q. Have you done more or less overtime shifts
10    since you were decommissioned?
11 A. Less.
12 Q. Is that by your choice?
13 A. No.
14 Q. Who controls the overtime process?
15 A. The union does.
16 Q. Have you been denied the opportunity to do
17    overtime shifts?
18 A. Only when they took the seven to one ratio
19    away. We were denied the amount of overtime,
20    but as far as the overall denial of overtime,
21    no.
22 Q. When you say they took the seven to one ratio
23    away?
24 A. Administration. Mike Harris, Gene Sumpter,

161

1     Carney.
2  Q. Is that because there was an excessive amount
3     of overtime at a higher rate of pay, was it
4     explained to you why it was doing that?
5  A. Yes.
6  Q. What was the explanation?
7  A. They were trying to cut on costs.
8  Q. Do you think that was a reasonable thing for
9     the department to do?
10 A. At that time, it was just ironic after an
11    election, we supported the opponent and all
12    this stuff started happening. I think if they
13    want to say that, it's bad timing.
14 Q. You think the desire to cut costs was driven
15    because you supported the opponent in the
16    sheriff's election?
17 A. That's correct. Because I don't believe that
18    is the reason why they wanted to take the seven
19    to one ratio away.
20 Q. Was the issue of excessive overtime costs ever
21    discussed with you in your capacity as union
22    president prior to the election?
23 A. No.
24 Q. Never?

162

1  A. Not to my knowledge.
2  Q. Did you ever attend labor management meetings?
3  A. Yes.
4  Q. Were there ever any discussions about overtime
5     costs in those meetings?
6     MR. PFAFF: Objection. Time frame?
7  Q. Between 2002 and 2004.
8  A. I don't recall.
9  Q. If you didn't go, would other members go in
10    your stead?
11 A. Yes.
12 Q. Would they report back to you?
13 A. Yes.
14 Q. Would you get the minutes of those labor
15    management meetings?
16 A. No.
17 Q. You never got any minutes?
18 A. No.
19 Q. Were you ever advised that the issue of
20    overtime costs was something that the
21    department was concerned about?
22 A. What year?
23 Q. 2002, 2003, 2004.
24 A. Not at that time, I don't believe so.

109

```
   handle it.
 Q. Who handled it?
 A. My wife.
 Q. Was she the treasurer for the campaign?
 A. No.
 Q. Other than holding this fund-raiser, did you
    hold any position in the campaign?
 A. No.
 Q. Did your wife hold any position in the
    campaign?
 A. No.
 Q. Other than holding this fund-raiser about two
    weeks before the election, and making some
    phone calls from your home, did you do anything
    else in support of Mr. Murphy's candidacy for
    sheriff?
 A. No.
 Q. Did you work the poles on election day?
 A. No.
 Q. How did you make your support for Steve Murphy
    known?
 A. When people heard about that fund-raiser that I
    had. It went around like wildfire. I did not
    publicly come out and tell everybody who I was
```

110

```
    backing.
 Q. Did you ever publicly come out and inform
    anyone who you were backing?
 A. Outside of this facility?
 Q. Yes.
 A. Yes.
 Q. Where?
 A. My home.
 Q. Inside your home?
 A. Yes.
 Q. Other than to your family, did you make your
    support of Steve Murphy known publicly?
 A. No.
 Q. Was your name on a fund-raiser for Mr. Murphy?
 A. No.
 Q. The notification of this fund-raiser was done
    solely by telephone?
 A. That's correct.
 Q. So there was no invitation sent by you,
    addressed by you, and signed by you, inviting
    people to come to a fund-raiser for Stephen
    Murphy?
 A. There was an invitation. Not with my name on
    it.
```

111

```
 Q. There was an invitation. Whose name was on it?
 A. Steve Murphy's.
 Q. Did you work with his campaign to set up this
    fund-raiser?
 A. Yes.
 Q. What did you do, how many times did you meet
    with people from the campaign?
 A. Once.
 Q. When was that?
 A. About a month prior to the election.
 Q. So about two weeks before the actual event?
 A. Yes.
 Q. Who did you tell at work here at the Suffolk
    County Sheriff's Office that you were
    supporting Steve Murphy for the election for
    sheriff?
 A. I don't remember exactly who.
 Q. Well, did you tell the folks, department
    employees that attended the fund-raiser?
 A. Yes.
 Q. So we have identified some of them. In
    addition to those individuals that you
    identified came to the fund-raiser, who
    else did you tell at the fund-raiser that you
```

112

```
    were supporting Steve Murphy's candidacy for
    sheriff of Suffolk County?
 A. John Barnes, John Grennon. I don't remember
    everyone I told.
 Q. How many people did you tell?
 A. Fifty.
 Q. How often did you talk about your support for
    Steve Murphy's candidacy while you were at
    work?
 A. Not often.
 Q. When you had these conversations, where would
    you have them?
 A. On the telephone at my house.
 Q. Did you have them here in the building?
 A. Not inside the building, no.
 Q. Did you inform Deputy Superintendent Cliff
    Carney that you were supporting Steve Murphy
    for sheriff?
 A. No.
 Q. Sumpter?
 A. No.
 Q. Did you inform Michael Harris?
 A. I don't believe so.
 Q. Did you inform Victor Theiss?
```

113

```
 A. No.
 Q. Did you inform Sheriff Cabral that you were
    supporting her opponent for sheriff?
 A. No.
 Q. What is the basis for your allegation that
    Sheriff Cabral retaliated against you because
    you supported Steve Murphy?
    MR. PFAFF:  Objection.
 A. I got removed from my position less than a
    month after the election. I wrote up a
    subordinate for sleeping on the job, I got
    reprimanded on that discipline that was
    eventually overturned in an arbitration
    hearing.
 Q. Other than that, do you have any evidence that
    Sheriff Cabral knew that you supported Stephen
    Murphy?
 A. Yes.
 Q. What is your evidence?
 A. We had a mutual attorney friend.
 Q. Who was that?
 A. Mr. Randy Chapman. She had called him and told
    him that she heard that I was backing Murphy.
    Mr. Chapman phoned me and asked me if that was
```

114

```
    correct. At that time, I was not supporting
    Murphy, and I told him that it was not correct.
 Q. Is that the only evidence that you have that
    Sheriff Cabral was aware that you were backing
    Stephen Murphy?
 A. I believe so.
 Q. When was this conversation with Attorney Randy
    Chapman?
 A. February or March.
 Q. Of the year of the election?
 A. Yes.
 Q. Whatever year that was.
 A. Exactly.
 Q. In that conversation, you told Mr. Chapman that
    you were not supporting Mr. Murphy?
 A. At that time, that's correct.
 Q. Other than that conversation, what evidence do
    you have that Sheriff Cabral was aware that you
    supported Stephen Murphy in June of 2000 of
    whatever the year the election was?
 A. Other than that, none.
 Q. Are you familiar with Angelo Rossi?
 A. Yes.
 Q. He is an employee of the Sheriff's Department?
```

**115**

...a deputy sheriff?
...don't know.
...did he run for sheriff?
...don't know either.
You are not aware that Angelo Rossi ran for sheriff?
A. My understanding is that he did not get enough signatures. Are you considering that running?
Q. I am asking you.
A. No.
Q. Did he attempt to get signatures in order for him to run for the office of sheriff?
A. I believe so.
Q. Was he intent on opposing Sheriff Cabral, if you know?
          MR. PFAFF: Objection on the record. Objection as to speculation.
Q. Was Dave Bergeron involved in helping Mr. Rossi in his campaign?
A. I don't know.
Q. Pat O'Brien. Do you know Pat O'Brien?
A. Yes.
Q. Is he an employee of the Sheriff's Department?

**116**

A. Yes.
Q. Is he a deputy sheriff?
A. I think so.
Q. Did he support Steve Murphy?
A. Yes.
Q. Mark Turley, do you know him?
A. Yes.
Q. Is he the brother of your fellow plaintiff, Tim Turley?
A. Yes.
Q. Is he an employee of the department?
A. Yes.
Q. Is he a deputy sheriff?
A. I don't know that.
Q. Did he support Stephen Murphy?
A. My opinion or guess?
Q. What is your understanding.
A. I believe so.
Q. Lieutenant Dave McCarthy, you know him, right?
A. Yes.
Q. You work with him in transportation?
A. Yes.
Q. Did he attend the fund-raiser that you held, organized for Stephen Murphy?

**117**

A. Yes.
Q. He supported Stephen Murphy?
A. Yes.
Q. Lieutenant Mullin, do you know him?
A. Yes.
Q. Is he an employee of the department?
A. Yes.
Q. Did he support Stephen Murphy?
A. Yes.
Q. Is he a deputy sheriff?
A. Yes.
Q. Is Lieutenant McCarthy a deputy sheriff?
A. I don't know that.
Q. William Noonan, do you know him?
A. Yes.
Q. Is he a former union official for your union?
A. No.
Q. Never was involved in union affairs for a different union?
A. Possibly.
Q. Do you know or not know?
A. I don't know.
Q. Is he an employee of the department?
A. Yes.

**118**

1 Q. Did he support Stephen Murphy?
2 A. I don't know.
3 Q. Did you have any conversations with Deputy
4 Superintendent Carney regarding the Suffolk
5 County Sheriff's election before the election?
6 A. The only conversation I remember having with
7 Deputy Superintendent Cliff Carney was the day
8 I received that transfer letter, I was still in
9 the transportation office, it was around
10 quarter-of-three, he walked by, he stuck his
11 head in, and said high. I stood up, stood up,
12 and asked him what this letter was for. He
13 turned around to me, and he said you shouldn't
14 have backed Murphy. That is the only
15 conversation that I had with Deputy Cliff
16 Carney regarding any type of conversation on
17 the election.
18 Q. When was that?
19 A. When I received that letter of transfer, I
20 believe, it was either November or December,
21 November or December.
22 Q. What did you say?
23 A. So it is political then.
24 Q. What did he say?

**119**

1 A. He smiled and walked away.
2 Q. So when I asked you before what evidence did
3 you have that you were being transferred
4 because of your political affiliation, this is
5 something new?
6 A. You asked me about Sheriff Cabral.
7 Q. I asked you what evidence do you have, and we
8 will go back --
9          MR. PFAFF: Stop. Just ask the
10 question, you will get an answer.
11 Q. What evidence do you have that your transfer
12 out of transportation was a result of your
13 political affiliation, what's the basis for
14 that?
15 A. You can add that. I apologize.
16 Q. Is there anything else, Captain Moscone, other
17 than your writing up the subordinate officer,
18 your belief, because of the timing, and this
19 comment from Deputy Superintendent Carney, is
20 there anything else that's the basis for your
21 position that you were decommissioned and
22 transferred because of your support for Stephen
23 Murphy?
24 A. And my union beliefs.

**120**

1 Q. Go ahead.
2 A. I told you earlier, we had a heated discussion,
3 myself and Chief Keeley. She had no idea what
4 I did other than transportation. She didn't
5 believe what I told her, the many hats I wore.
6 She, again, called me a liar. She apologized
7 to me the next morning by telephone call, I
8 believe, after talking to Superintendent Gerard
9 Horgan. And solely blamed me for that contract
10 in '03 not getting ratified.
11 Q. When she called you a liar, was there anybody
12 else present?
13 A. I know Mike Harris was in and out of that
14 office. I don't know if he heard her or not.
15 Q. When you say that she blamed you, she never
16 told you directly that she blamed you directly
17 for the contract not being ratified?
18 A. That's correct.
19 Q. In your twenty-four years as an employee of the
20 department and your work with the union, have
21 you ever been involved in other contract
22 negotiations?
23 A. Yes.
24 Q. You don't always agree with management; is that



**EXHIBIT 4**

UNITED STATES DISTRIC[T]
FOR THE DISTRICT O[F]

Civil Action No[.]

* * * * * * * * * * * * * * * * * *

DAVID BERGERON, JOHN GRENNON, *
LORNE LYNCH, JOHN BARNES, JOHN ELLIS, *
TIMOTHY TURLEY, AL MOSCONE, *
WILLIAM PENEAU, ERIC DILIBERO and *
PAUL GIGLIO, *
                Plaintiffs, *
                                        *
        vs.                             *   VOLUME 1
                                        *
ANDREA CABRAL, INDIVIDUALLY and *
as SHERIFF OF SUFFOLK COUNTY, *
                Defendant. *

* * * * * * * * * * * * * * * * * *

DEPOSITION OF JOHN M. GRENNON, a witness
called on behalf of the Defendant, taken pursuant
to the provisions of the Federal Rules of Civil
Procedure, before Christine L. Warwick, a
Certified Shorthand Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of the Suffolk County Sheriff's
Department, 200 Nashua Street, Boston,
Massachusetts 02114, on Friday, January 19, 2007,
commencing at 1:05 p.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

COPLEY COURT REPORTING
(617) 423.5841

---

**Page 2**

APPEARANCES:

**SUFFOLK COUNTY SHERIFF'S DEPARTMENT**
(Ellen M. Caulo, Deputy General Counsel)
(Kathleen Cauley, Assistant General Counsel)
200 Nashua Street
Boston, Massachusetts 02114
Counsel on behalf of the Defendant

**MERRICK, LOUISON & COSTELLO, LLP**
(Stephen C. Pfaff, Esquire)
67 Batterymarch Street
Boston, Massachusetts 02110
Counsel on behalf of the Plaintiffs

ALSO PRESENT:

Lorne Lynch

COPLEY COURT REPORTING
(617) 423.5841

---

**Page 3**

I N D E X

Witness:   Direct  Cross  Redirect  Recross

JOHN M. GRENNON
(By Ms. Caulo) 5

E X H I B I T S

Exhibit No.                          Page

1   Notice of Deposition              4

COPLEY COURT REPORTING
(617) 423.5841

---

**Page 4**

1       PROCEEDINGS
2           (Document was marked as Exhibit No. 1
3   for identification.)
4       MS. CAULO:  Today is the 19th of January.
5   Scheduled is the deposition of John Grennon, one
6   of the plaintiffs in the matter of Bergeron, et
7   al. versus Cabral.  My name is Ellen Caulo.  I'm
8   here on behalf of the Defendant, Sheriff Andrea
9   Cabral.
10      Usual stipulations, all objections
11  except as to form reserved until trial.  All
12  motions to strike reserved until trial.  Okay
13  with you, Steve?
14      MR. PFAFF:  Yes.
15      MS. CAULO:  With respect to the 30 days,
16  can we dispense with that, a week, 10 days?
17      MR. PFAFF:  I'd like to have him read and
18  sign it.  I mean, I don't care if -- I'm not going
19  to raise an issue if it comes after January 31st
20  if you don't.
21      MS. CAULO:  My only concern is with the
22  deadline.  Can we go off the record for one
23  second?
24      (Discussion off the record.)

COPLEY COURT REPORTING
(617) 423.5841

**69**

1  ...Richard Tranfaglia, I completely
2  ...ty.
3  ...any conversations with Marty
4  ...n which he recounted what Sheriff
5  ...d said about you?
6  ...Marty saying that the Sheriff had
7  ...ted that she was very unhappy with me
8  ...use of my activity with the jail officers
9  ...nion.  I don't recall any specific quotes that
10 ...the Sheriff may have said that Marty gave me, but
11 ...he --
12 Q. Is that a quote right there, that specifically
13    that she was unhappy with you because of your work
14    with the jail officers union?
15 A. The quote was that "she's bullshit at your union
16    activity."
17 Q. That's the quote?
18 A. That's the quote.
19 Q. Did you inquire as to what he meant by that?
20 A. Yeah.  And he said, told me that I was putting him
21    in a bad spot because he had a wife and child at
22    home and that he was told if he didn't control me,
23    he was going to be out of a job.
24 Q. Give me everything that --

COPLEY COURT REPORTING
(617) 423.5841

**70**

1  A. I felt pretty bad about it.
2  Q. -- was said during this conversation, what you
3     said, what he said?
4  A. There were multiple conversations where Marty
5     would frequently come to me and tell me that he
6     had been told by Keeley, Theiss or Cabral that he
7     was in jeopardy of losing his job if I didn't
8     cease my activity with the union.
9  Q. Let's break it down.  How many conversations did
10    you have with Marty Michelman in which he told you
11    that Elizabeth Keeley was upset with him because
12    of your activities with the union?
13 A. Many.  I don't recall how many, but many.
14 Q. Well, give me your best estimate.
15 A. More than ten.  More than then.
16 Q. Give me your best recollection of these more than
17    ten conversations of exactly what was said.
18 A. What I've already said, the answer I've already
19    given you.
20 Q. Give it to me again, please.
21 A. Can you read it back to me, please?
22 Q. No, I want you to --
23    MR. PFAFF:  He just gave you the answer.
24 A. I gave you the answer.  Just numerous

COPLEY COURT REPORTING
(617) 423.5841

**71**

1  conversations have occurred where Marty some days
2  looking very happy, other days looking despondent
3  told me that I was going to cost him his job
4  because of activities within the union and that
5  Keeley, Theiss and Cabral were bullshit.
6  Q. I'd like to hear what he told you that Victor said
7     to him about you.
8  A. What Victor said.  Marty told me that Victor said
9     the Sheriff hates Grennon.  The Sheriff can't
10    stand being at the podium at graduations listening
11    to Grennon say what a great job she's doing and
12    what a great job the Department is doing and then
13    checking up on her in his union position or doing
14    what he does in his union position.  It's driving
15    the Sheriff crazy.  Get rid of him.
16       Marty came to me multiple times and told
17    me that Victor Theiss said, You're gone
18    January 1st.  You're gone March 1st.  You're gone
19    July 1st.  These are all 2004.  Marty came to me
20    and told me that Victor Theiss had said, Whack
21    him.  Get rid of him.  He must be doing something
22    over there he's not supposed to be doing.  Write
23    him up and get rid of him.
24       This was just a constant stream of Marty

COPLEY COURT REPORTING
(617) 423.5841

**72**

1  coming into my office and telling me how much the
2  Sheriff, Elizabeth Keeley and Victor Theiss
3  wanted me fired.
4  Q. And what did he tell you, he being Marty
5     Michelman, tell you that Sheriff Cabral told him
6     about you?  You've recounted what Victor said.
7     You've recounted -- have you given us everything
8     that you can recall about what Elizabeth said?
9  A. What Elizabeth said to Marty Michelman?
10 Q. Correct.
11 A. I believe so.
12 Q. And you've given us everything that you recall
13    Marty Michelman telling -- Victor Theiss telling
14    Marty Michelman?
15 A. Yes, I believe so.
16 Q. Give me your best memory of everything that Marty
17    Michelman told you that Sheriff Cabral said about
18    you.
19 A. I remember him telling me that Sheriff Cabral was
20    upset that I had spoke to a reporter, and he told
21    me that Sheriff Cabral told him to write me up for
22    it, that I wasn't authorized to speak to the
23    press.
24       I remember Marty telling me that Sheriff

COPLEY COURT REPORTING
(617) 423.5841

73

1    Cabral said that, something along the lines of,

2    Well, as long as John Grennon is over there,

3    you're not going to get anything. And I don't

4    recollect anything else specifically right now

5    that was said from the Sheriff.

6  **Q.** What do you recall about what your response was to

7    these, this information that you received from

8    Marty Michelman?

9  **A.** I explained to Marty Michelman each and every time

10   that -- I emphatically explained to him each and

11   every time that I did everything that was asked of

12   me in that training division, ran sections of it

13   to a large extent, did an excellent job; and that

14   what the Department didn't like was -- I was bound

15   to those activities by the bylaws of our union,

16   and I told Marty I was protected under the law.

17  **Q.** What activities are you referring to?

18  **A.** Activities that -- filing grievances against the

19   Department, filing unfair labor practice charges

20   against the Department, questioning to a large

21   extent some of the decisions that were made by the

22   Administration.

23  **Q.** What specifics were provided to you by Marty

24   Michelman when he referred, made reference to

COPLEY COURT REPORTING

(617) 423.5841

75

1    Department property. He said that came from

2    somebody at the Department.

3  **Q.** Did he identify who that was?

4  **A.** No, he didn't. But he said that we couldn't do it

5   over there. I know the same thing happened here

6   at the back gate, where Officer Dinardo at the

7   back gate refused to let cars in that had Steve

8   Murphy stickers. And he had said that had come

9   from somebody too. I don't know who it came from,

10   but it was at least at two facilities, if not

11   three that that was the rule.

12  **Q.** Did you ask who it came from?

13  **A.** No.

14  **Q.** Why not?

15  **A.** It wasn't my business. Marty was a deputy

16   superintendent, and I was an officer. He had told

17   me I couldn't do it, so I didn't do it.

18  **Q.** Why didn't you ask Larry Dinardo?

19  **A.** That happened to another officer over here that

20   was reported to me as the vice president of the

21   union, and John Barnes was handling that.

22  **Q.** Well, as vice president of the union, why didn't

23   you go ask Larry Dinardo who it was?

24  **A.** Because the president of the union was handling

COPLEY COURT REPORTING

(617) 423.5841

74

1    union activity? Did he mention grievances?

2  **A.** No.

3  **Q.** Did he mention unfair labor practices that had

4   been filed?

5  **A.** No.

6  **Q.** So what specifically did he communicate to you

7   that was causing displeasure?

8  **A.** Oh, my support of Stephen Murphy.

9  **Q.** Tell me specifically what Marty Michelman

10   recounted to you on that issue.

11  **A.** Marty said that the Sheriff knows I'm supporting

12   Steve Murphy. He asked me not to support Steve

13   Murphy.

14  **Q.** Who asked you?

15  **A.** Marty.

16  **Q.** Mm-hmm.

17  **A.** And I told him I couldn't do that. And he said,

18   She's going to get rid of you for it. And I had

19   said to Marty, you know, countless times that it

20   was the union activity part of it. It had nothing

21   to do with my job performance. And I frankly just

22   didn't understand why, you know.

23       Marty said that we couldn't have Steve

24   Murphy bumper stickers on our cars and park on

COPLEY COURT REPORTING

(617) 423.5841

76

1    it.

2  **Q.** Did he handle it?

3  **A.** I believe he did.

4  **Q.** Did he find out?

5  **A.** I believe he did.

6  **Q.** Who was it?

7  **A.** I don't know. You'd have to ask him.

8  **Q.** I'm asking you. Did he tell you?

9  **A.** I don't recall.

10       MR. PFAFF: He doesn't know.

11  **A.** I don't know.

12  **Q.** Did John Barnes tell who you it was?

13  **A.** He didn't.

14  **Q.** You weren't curious?

15  **A.** No.

16  **Q.** Did John Barnes tell anybody else who it was?

17  **A.** I don't know. Counsel, I had a lot of

18   responsibility as the vice president to the union.

19   And John Barnes being here, ground zero, handled a

20   lot of that. And I was in Chelsea. So I didn't

21   make it a habit to question John Barnes as the

22   president because he was handling most of the

23   stuff.

24  **Q.** Now, when did the union endorse Stephen Murphy?

COPLEY COURT REPORTING

(617) 423.5841

81

1  Q. Did you ever have any conversation with Elizabeth
2     Keeley concerning the reasons why you were removed
3     from training?
4  A. I don't recall. No, I don't believe so.
5  Q. Was it ever reported to you anything that
6     Elizabeth Keeley said to you about the reasons why
7     you were removed from training?
8  A. Elizabeth Keeley never said anything to me. I
9     don't recall if she answered that question in her
10    deposition or not or if it was even asked. I had
11    very little contact with Elizabeth Keeley after I
12    was thrown out of training.
13        So I don't -- no, I don't recall
14    Elizabeth Keeley ever saying anything to me or
15    hearing her speculate as to why I was removed,
16    no.
17 Q. I think my question was, Did you hear from anybody
18    else anything that Elizabeth Keeley had said about
19    the reasons why you were removed from training?
20 A. No, no. I heard from Michael Harris that
21    Elizabeth Keeley wanted myself and John Barnes
22    fired.
23 Q. When did you hear that?
24 A. Just after the letters went out.

COPLEY COURT REPORTING
(617) 423.5841

82

1  Q. Which letters are you referring to?
2  A. The letters that we sent prior to the election, I
3     believe prior to the election to voters about the
4     veterans issue that we were having and the pension
5     issue. And Michael Harris had said to John and I
6     that Keeley wants you two fired.
7        And he had told us that he had explained
8     to Elizabeth Keeley that, you know, you can't
9     fire them for protected activity. I don't
10    remember much more after that. But no, no,
11    that's all I remember about Elizabeth Keeley.
12 Q. Is that a quote from Michael Harris?
13 A. Yes.
14 Q. That he reported to you that you can't fire them
15    for protected activity?
16 A. Yes, that's a quote.
17 Q. Did you ever hear from anybody -- you indicated
18    that Sheriff Cabral wouldn't take your phone
19    calls. When had you attempted to phone Sheriff
20    Cabral directly?
21 A. Oh, we asked for meetings numerous times through
22    Steve Tompkin. We asked for meetings numerous
23    times through Mike Harris. I had left messages
24    with Liz Conroy. We weren't getting any responses

COPLEY COURT REPORTING
(617) 423.5841

83

1     back.
2  Q. When was this?
3  A. Oh, 2003 and 2004.
4  Q. How many times?
5  A. I don't recall.
6  Q. What were the issues that you wanted to meet with
7     Sheriff Cabral about?
8  A. I remember one issue about the honor guard. Guys
9     had come to me and said that the honor guard
10    officers were doing honor guard events and weren't
11    getting compensated for it. So I went to Mike
12    Harris and brought the issue up in labor
13    management.
14        It kind of stalled out. I went to Steve
15    Tompkin. I called him and didn't get a phone
16    call back from him. Then we had told the honor
17    guard guys that they shouldn't participate in
18    honor guard events until this was cleared up.
19        I remember Elizabeth Keeley calling me
20    to her office, I want to say it was in 2003, but
21    I'm not exactly sure, maybe the fall of 2003,
22    calling me to her office. Actually, I know
23    exactly when it was. It was when the posting for
24    the director of training was out.

COPLEY COURT REPORTING
(617) 423.5841

84

1        And she called me to her office --
2  Q. So when was that?
3  A. I don't recall. July 2003 maybe. Whenever --
4     I'll tell you why in a moment if you'll give me a
5     moment. She called me in her office, and I came
6     to her office. And I said, You were looking to
7     see me? And she said, Yeah, what's this honor
8     guard thing?
9        And I said, Oh, we're having a little
10    conflict here about whether the officers get time
11    and a half or they get straight time, credit
12    comp. We're not getting any answers back. I
13    said, We've tried to talk to Steve Tompkin about
14    it. We brought it out to labor management. It's
15    been stalled out month to month to month. And so
16    we told the officers just not to participate in
17    these events until this was rectified.
18        She said to me that she was not used to
19    this type of behavior. And I asked her what she
20    meant by that. And she said, Where I come from,
21    people do things when I tell them to do it. And
22    they want to do things for me.
23        And I said, Well, we want to do things
24    for you too and for the Department, but we need

COPLEY COURT REPORTING
(617) 423.5841

85

1  to have these things rectified. And may I grab
2  this for one second (indicating)? She then
3  grabbed from her folder on her desk, she grabbed
4  a piece of paper out, and it was my application
5  for the director of staff training.
6         And she said, highly inappropriate in my
7  opinion in the midst of this union conversation,
8  she said, I understand you've applied for John
9  O'Leary's position? And I said, Yes, I have.
10 And it has nothing to do with this issue.
11        And she took it, and she put it back
12 into the folder on her desk. And she said, I
13 think it has everything to do with this issue,
14 and I want this rectified now before the Sheriff
15 is embarrassed.
16        And I said, It doesn't work that way.
17 They're supposed to get time and a half. And
18 then Elizabeth Keeley had said, Well, there's an
19 event at Bunker Hill -- I believe it's Bunker
20 Hill Community College, and the Sheriff needs an
21 honor guard.
22        So I said, Well, can you get me a
23 meeting with Steve Tompkin? I can. And I said,
24 Well, then, I'll tell them to go do it, and then

COPLEY COURT REPORTING
(617) 423.5841

86

1  we can have our meeting. And I again told her
2  that I thought it was utterly unprofessional that
3  she would toss my application for promotion out
4  in the midst of this conversation.
5         And then she said, You're excused, and I
6  left the office.
7  Q. Is that the extent of this conversation you had
8  with Elizabeth Keeley?
9  A. Yes, it is, front to back.
10 Q. Did you file an unfair labor practice with respect
11 to your conversation?
12 A. No.
13 Q. Did you file a grievance?
14 A. It wasn't grievable.
15 Q. Did you make a formal complaint as to the way in
16 which you interacted with her?
17 A. No.
18 Q. Once you didn't get the -- once you weren't
19 promoted to the position of director of training,
20 did you make any formal complaint that your reason
21 why you weren't promoted was because Elizabeth
22 Keeley was retaliating against you?
23 A. No.
24 Q. Did you feel that you weren't promoted because it

COPLEY COURT REPORTING
(617) 423.5841

87

1  was retaliation?
2  A. Yes, but not for that specific incident.
3  Q. Tell me why it was that you felt the reason why
4  you didn't get selected as the director of
5  training in July or June of 2003 was retaliation?
6  A. Because I had received so many threats from Victor
7  Theiss and from Marty Michelman that he said came
8  from the Sheriff and Elizabeth Keeley and Victor
9  Theiss that I was going to lose my job because of
10 my union activity --
11 Q. In July of 2003?
12 A. Oh, it was -- yes, it was -- these union issues
13 came up almost instantaneously when the Sheriff
14 arrived here.
15 Q. Well, the Sheriff arrived here, correct me if I'm
16 wrong, in November of 2002, right?
17 A. I believe so.
18 Q. Okay. And at that time, what was the union that
19 you belonged to?
20 A. AFSCME Local 1134, Council 93.
21 Q. At what point in time did AFSCME Local 1143 (sic)
22 seek to decertify, rather, from AFSCME?
23 A. Local 1134 did not decertify from AFSCME.
24 Q. I mean 1134. How did it work?

COPLEY COURT REPORTING
(617) 423.5841

88

1  A. How did what work, the creation?
2         MR. PFAFF: The decertification?
3         MS. CAULO: The decertification.
4         MR. PFAFF: Objection. That's a legal
5  question. He may not be qualified to answer.
6  Q. Let me withdraw the question. At some point, did
7  the employees of the jail seek to self organize?
8  A. Yes.
9  Q. As a result of the self organization, what
10 happened to your affiliation with AFSCME?
11 A. Local 1134 dissolved, and our affiliation with
12 Council 93 ended.
13 Q. So 1134 ceased to exist?
14 A. Yes.
15 Q. And a new entity was created?
16 A. Yes.
17 Q. And that entity no longer had an affiliation with
18 AFSCME, Council 93, correct?
19 A. Correct.
20 Q. Okay. So were you involved in that effort to self
21 organize?
22 A. Yes.
23 Q. And when did that occur?
24 A. I believe around February -- did you say the

COPLEY COURT REPORTING
(617) 423.5841

125

1  A. Over the telephone. Nothing written.
2  Q. You never provided anything in writing?
3  A. I don't believe so. I didn't do much in writing.
4  Q. Who did most of the writing?
5  A. It was the secretary's responsibility, which was
6     John Ellis, to do most of the writing.
7  Q. How did he get the information within which to
8     write it?
9  A. From conversations, I would think.
10 Q. Well, you were there, sir.
11 A. Well, how did -- no, I wasn't there when he was
12    typing it. He was most likely at his home.
13 Q. How did you provide that information to him?
14 A. By telephone.
15 Q. I thought you said your telephone conversations
16    were with John Barnes?
17 A. And John Ellis. To a larger extent with John
18    Barnes, but with John Ellis also.
19 Q. Why don't we start from the beginning. How was it
20    the idea -- how was it that a decision was made to
21    create mailings?
22 A. The membership voted to take action at a union
23    meeting. Ideas were brought up of picketing.
24    Ideas were brought for direct mailings. Ideas

COPLEY COURT REPORTING
(617) 423.5841

127

1     financial records.
2  Q. Is that the only thing you looked for?
3  A. Yes, yes.
4  Q. Okay. So there was a union meeting, and a
5     suggestion was made to do what?
6  A. It was a motion made to take external action in
7     the form of picketing. And then we had -- it went
8     to the floor -- it was seconded and went to the
9     floor for discussion. And some people, including
10    myself, had voiced concern that picketing wasn't
11    the right thing to do, that it really wasn't good
12    for the Department. It wasn't good for us. It
13    doesn't accomplish too much.
14         And we had talked about mailings. We
15    had talked about -- during the same discussion,
16    we had talked about newspaper ads. This union
17    here had taken a newspaper ad out with I think
18    it's the Rouse Administration many, many years
19    ago about a contract.
20         And then the motion to the best of my
21    recollection was withdrawn. A new motion was
22    made stating that, authorizing the board of
23    directors to take external action in the form of
24    picketing, excuse me, picketing, newspaper

COPLEY COURT REPORTING
(617) 423.5841

126

1     were brought up for newspaper ads. And the
2     membership voted to take such action at the
3     discretion of the executive board -- excuse me,
4     the board of directors.
5  Q. Whose idea was it? Who floated the idea at a
6     union meeting?
7  A. Oh, I don't recall. But it would be in the
8     minutes.
9  Q. Okay. And where are those minutes?
10 A. You'd have to ask John Ellis. They were taken.
11 Q. Okay. And who's currently the secretary?
12 A. Stephen Dedilonis.
13 Q. And it's the practice that minutes are kept of
14    meetings and that those minutes of meetings that
15    occurred under prior administrations are kept even
16    if it's a different administration?
17 A. Yes, I believe that's -- that's the practice with
18    me. I don't know about the presidents before me,
19    and I don't know right now. But that was the
20    practice that we utilized. When I left office,
21    John Barnes transferred everything to Mike Walsh.
22    And when Mike Walsh finished, it's my
23    understanding that he transferred everything to
24    us. The only thing that I saw, however, was the

COPLEY COURT REPORTING
(617) 423.5841

128

1     advertisements, direct mailings and that members
2     would be required to participate.
3          I remember that was part of it too
4     because it had come up that if we picket, we have
5     to make members go because some members might not
6     want to go. That's the reason I didn't want to
7     do it.
8  Q. You indicated that picketing wasn't a good idea
9     because it wasn't good for the Department. What
10    do you mean by that?
11 A. The concern first and foremost is the well-being
12    of the Department, and picketing kind of puts the
13    Department in a bad light. It kind of takes your
14    dirty laundry outside and I think adversely
15    effects the community. There have been recent
16    examples of firefighters picketing, and somebody
17    actually died on the Mass. Turnpike because of
18    traffic. I just I think picketing is
19    counterproductive to be honest with you.
20         MR. PFAFF: Excuse me one second.
21         (Interruption.)
22 Q. Would those same concerns about airing dirty
23    laundry and not being good for the Department
24    pertain to mailings?

COPLEY COURT REPORTING
(617) 423.5841

1  A. They were if they were irresponsible mailings or
2     untruthful mailings, yes.
3  Q. So there's some limit on what would be in the
4     content of these mailings?
5  A. Yeah.  Yes, we scrutinized that mailing before it
6     went out.
7  Q. I'm just speaking generally that there's some
8     concern that you would have some parameters in
9     terms of truthfulness?
10 A. Oh, sure.  Yes.
11 Q. Accuracy?
12 A. Yes.
13 Q. Respectfulness?
14 A. Yes.
15 Q. Professionalism?
16 A. Yes.
17 Q. Ensuring that you weren't disparaging the Department?
18 A. Yes.
19 Q. Ensuring that the mailings wouldn't just be
20    disparaging of the Sheriff?
21 A. Disparaging of the sheriff, our intent was not to
22    disparage the Sheriff at all.
23 Q. I'm didn't ask you what your intent was.  I'm
24    asking generally, is that something that you would

COPLEY COURT REPORTING
(617) 423.5841

1  A. We did that.
2  Q. You indicated that there was a motion from the
3     floor, a motion to do picketing, and then who
4     suggested the mailings?
5  A. I don't recall.
6  Q. So you were authorized by the membership to take
7     some action, right?
8  A. Yes.
9  Q. And you were given the options.  The option was
10    picketing, advertisement or direct mailing?
11 A. I think that's the final motion, yes.
12 Q. What did you do then to take, to implement the
13    action that you were authorized to take by the
14    membership?
15 A. We sent the letter out.
16 Q. Okay.  How did you decide on the letter as opposed
17    to the two other options that were made available
18    to you by the membership?
19 A. I was totally against picketing, and I made that
20    known to everybody else.  I thought it was
21    counterproductive.
22 Q. Who was involved in making this decision on which
23    option you should select?
24 A. I think John Barnes made the final decision.

COPLEY COURT REPORTING
(617) 423.5841

130

1     consider in terms of what you would put in the
2     mailings?
3  A. I don't think we considered disparaging the
4     Sheriff.  We considered truthfulness and accuracy
5     and professionalism.  I think the only person who
6     can make a judgment on disparaging would be the
7     Sheriff, herself.
8  Q. You don't think somebody reading something could
9     draw an inference that it's disparaging?  You
10    think it's a subjective assessment that has to be
11    made by the person to whom it's made about?
12        MR. PFAFF:  Objection.
13 A. I do.
14 Q. There's no objective criteria?
15 A. What do you mean by that?
16 Q. I'm asking you.
17 A. I don't understand the question.
18 Q. You don't understand what objective is?
19 A. Objective criteria for the sheriff, disparaging
20    the letter, professionalism, I don't understand
21    what you mean by objective criteria for what?
22 Q. I'm asking you whether or not there's any
:3    objective way that one could look at the writings
24    that you submitted?

COPLEY COURT REPORTING
(617) 423.5841

132

1  Q. I asked you who was involved.  I asked you who was
2     involved in the decision-making process that
3     resulted in mass mailings?
4  A. The entire board of directors.
5  Q. Give me all of those people, and tell me their
6     participation.
7  A. John Barnes, John Grennon, John Ellis, Michael
8     Cinelli, Michael Walsh, Jack Tullos and Mark
9     Turley.  And their participation was -- the part
10    that I'm involved in, just conversations, get
11    their opinions, get their thoughts.
12 Q. What did they think?
13 A. Everybody concurred.
14 Q. When did it occur?
15 A. I don't recall where they -- mostly on the
16    telephone.
17 Q. You had a conference call with six or seven
18    people?
19 A. No.  I had conference calls with a few of them
20    through the law office, but the other ones were
21    contacted directly.
22 Q. Let's speak specifically.  What communication was
23    done by Mickey Walsh?  What did he contribute to
24    this decision-making process?

COPLEY COURT REPORTING
(617) 423.5841



**EXHIBIT 5** (tabbies)

Page 1:

```
DAVID BERGERON, ET AL.,
                    Plaintiffs,
vs.
ANDREA CABRAL,
                    Defendant.
```

DEPOSITION OF JOHN BARNES, a witness...

COPLEY COURT REPORTING, INC.
101 TREMONT STREET
BOSTON, MASSACHUSETTS  02108
(617) 423-5841
www.copleycourt.com

Page 4:

PROCEEDINGS

MS. CAULO: For the record this is the matter of Bergeron versus Andrea Cabral, et al. I am Ellen Caulo. Today is December 7, 2006 for the continuation of the deposition of John Barnes, which was suspended on October 31. Mr. Barnes, you are still under oath.

MR. BARNES: I understand.

JOHN BARNES

a witness called on behalf of the respective parties, having been previously duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CAULO:

Q. Are there any answers or testimony that you gave on the prior date of your deposition that you wish to change?

A. I did fill out an errata sheet in regards to corrections to spelling and missed words that I saw. I faxed that over to the law firm the other day.

Q. I have not seen the errata sheet; but other than typographical, there is no substance of anything that you wish to change?

Page 5:

A. No.

Q. I don't know if you recall, but at some point, the last time that you were here, I was asking you some questions concerning the issue of veterans benefits. Do you recall that testimony?

A. Yes.

Q. I believe, it is fair to say, that the union's position was that there was a certain statute, Chapter 37 of the acts of 2003 that not only applied to jail officers, but that provided for the accrual of vacation time while they were serving in military duty?

A. I don't know if that was the union's position, but I know the union's view on that statute.

Q. I want to quickly point your attention to Page 148 of your testimony. Just if you could read there and see. Having done that, read it, I will ask you what the union's position was.

A. We filed a grievance based on past practice. Yes. After reviewing the law, we, to the best of my recollection, we felt after consultation from our law firm that the law may apply to our individual members.

Page 6:

Q. I want to make sure that I am characterizing your testimony correctly. Regardless of your testimony, I am characterizing the union's position, you as president of the union, the statute applied to jail officers, and it specifically allowed for officers who were fulfilling their military obligation to accrue vacation time while they were on leave, is that fair?

A. It is fair to say that we had questions in regards to whether it applied or didn't apply. The answer that we received back from Richard Transfaglia, who was in charge of personnel at the time, it did apply to our officers, and it gave vacation accruals to one of our members when he returned, and in turn that ended up being taken from him.

Q. Who is Tom Kelly?

A. He is secretary of veterans affairs, I believe.

Q. Did you have communications with Mr. Kelly concerning whether or not this statute that we have been discussing applied to jail officers and whether or not it specifically allowed for officers to accrue vacation time while they

67

```
 1     time, had a contract been agreed to?
 2   A. We didn't have a ratified contract.
 3   Q. When did a ratified contract come to be?
 4   A. I can't recall the exact date. I want to say I
 5     can't recall the exact date, when it was. I
       want to say some time in 2005.
       Q. Who was in the leadership of JOEASC at that
 8     point in time?
 9   A  I want to say Mike Walsh was president, Robert
10     Tool was vice president, treasurer was Chris
11     Mills.  Secretary, I don't recall who that was.
12     The executive board, Steve Spinelli, Edwin
13     Paris, I believe, and William Grant.
14   Q. Did you continue as part of the contract
15     negotiating team after you were no longer
16     president?
17   A. No, I did not.
18   Q. Did contract negotiations continue with the
19     department up to the point in time when a
20     contract was ratified?
21       MR. PFAFF:  Objection.
22   A. I don't recall when they negotiated and I don't
23     recall the exact date we were not negotiating.
24     So it is fair to say that they did not
```

68

```
 1     negotiate a contract after my, after my term
 2     expired.
 3   Q. To your knowledge, did Mickey Walsh in his
 4     capacity as president and Robert Tool as vice
 5     president, act on behalf of JOEASC in dealing
 6     with the department after you left as
 7     president?
 8   A. Yes.
 9   Q. Is it fair to say as elected representative of
10     JOEASC, they engaged in union activity?
11   A. Yes.
12   Q. Ultimately, a contract was ratified after their
       negotiations with the department; is that
       correct?
.u   A. Yes.
16   Q. We touched briefly on the last time we were
17     together. It had to do with union records.
18     What types of documents or records were kept by
19     JOEASC, categories of things I am talking
20     about?
21       MR. PFAFF:  Objection.  When?
22   Q. During the period of time that you were
23     president, from 2003 to 2005, what kind of
24     document records before kept or maintained by
```

69

```
 1     JOEASC?
 2   A. Anything that was, I believe anything that was
 3     correspondence that would be directed to
 4     JOEASC.  Minutes of meetings, minutes of
 5     contract negotiations.  Minutes of general
 6     membership meetings.  I can't recall any
 7     others.  Documents that we may have.
 8   Q. Who maintained them during the period of time
 9     that you were president?
10   A. I want to say most of the documents were
11     maintained by John Ellis, the secretary.  I
12     know there has been numerous transitions.  I
13     know we utilized the law firm for storage, for
14     documents, grievance, that is another thing
15     that we maintain, grievances.  Arbitration
16     cases.  Stuff like that.  Legal actions that
17     may have been filed in our file, and I know the
18     law firm had a lot of stuff stored there, and I
19     believe we were utilizing a locker, an empty
.u     locker in the transfer room for storage at one
       time.  That stuff was transitioned over to the
       next union officials coming in who in turn
23     would be turned over to the next union
24     officials.
```

70

```
 1   Q. What happened with respect to union officials
 2     that came in that was maintained by the
 3     leadership that was leaving?
 4   A. This is where the stuff is stored, if you need
 5     access to anything, this is where the
 6     grievances are at, this is what, we have this
 7     locker for stuff stored in there, the law firm
 8     had stuff stored.  It would be word of mouth on
 9     a transition process, I believe.  At least what
10     I did with Mike Walsh, indicating where certain
11     things were at.
12   Q. To your knowledge, is that locker still being
13     utilized?
14   A. No.  I believe everything was moved out of that
15     locker and may have been turned over to, I am
16     only speculating, may have been turned over to
17     Attorney Condon and Attorney Pfaff's office.
18   Q. When was that?
19   A. I don't recall.
20   Q. Was it before or after, was it during your
21     tenure as president of JOEASC?
22   A. No.  During my tenure, everything was where it
23     was at.  It was in the locker or up at the law
24     firm.  Other than that, I don't recall
```

71

```
 1     specifically.  I don't have knowledge
 2     specifically of how Mike Walsh and John Grennon
 3     might have exchanged documents or how they
 4     transitioned.
 5   Q. But the locker no longer has any documents in
 6     it currently?
 7   A. The last I checked, the only thing that may
 8     have been in there is contract books and
 9     calendars.
10   Q. When was the last time that you checked?
11   A. Like a week ago.
12   Q. What caused you to go check that?
13   A. I needed to pass out some calendars and Chris
14     Mills informed me that it was inside that
15     locker.  So I went to that locker.
16   Q. Is that on the first floor, is that here in the
17     building?
18   A. Yes.  It is down in the officers locker room.
19   Q. Were there any records kept regarding the
20     mailing, Exhibits 5 through 9, that were put up
21     by JOEASC before the election?
22   A. I believe that would have all been in there.  I
23     know we did not throw it out.  I would assume
24     it would all be in that transition.
```

72

```
 1   Q. Were there drafts of these mailings?
 2   A. I don't recall.
 3   Q. Were there any records of your documents
 4     concerning JOEASC voted to endorse Steve
 5     Murphy?
 6   A. There could be.  I'm not sure.  There could be.
 7   Q. What evidence did you have that Sheriff Cabral
 8     decommissioned you because you were engaged in
 9     union activity?  That's in Paragraph 26 of your
10     complaint.
11   A. Based on her actions when she addressed us in
12     regards to our union issues, on the letter that
13     we sent out, basically, telling us that we
14     would be held accountable, and based on our
15     decommissioning of deputy sheriff status one
16     way or another, indicated that our deputy
17     sheriff status was revoked in order for us to
18     be deputized.  Again, we needed to be an
19     officer in good standing.
20   Q. When Sheriff Cabral said to you during this
21     meeting that you had with her and John Grennon,
22     again, the date of that meeting was around?
23   A. I can't recall a specific date.
24   Q. Well, the mailing went out in March or April of
```

EXHIBIT
6

**Page 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

*****************************

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES, JOHN ELLIS,
TIMOTHY TURLEY, AL HOSCONE,
WILLIAM PENEAU, ERIC DILZBERG and
PAUL GIGLIO,
                          Plaintiffs,

        vs.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
                          Defendant.

*****************************

        DEPOSITION OF LORNE LYNCH, a witness
called on behalf of the Defendant, taken pursuant
to the provisions of the Federal Rules of Civil
Procedure, before Christine L. Warwick, a
Certified Shorthand Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of the Suffolk County Sheriff's
Department, 200 Nashua Street, Boston,
Massachusetts 02114, on Friday, October 6, 2006,
commencing at 10:10 a.m.

        COPLEY COURT REPORTING
        58 Batterymarch Street, Suite 317
        Boston, Massachusetts 02110
        (617) 423-5841

COPLEY COURT REPORTING
(617) 423-5841

**Page 2**

APPEARANCES:

**SUFFOLK COUNTY SHERIFF'S DEPARTMENT**
(Ellen M. Caulo, Deputy General Counsel)
200 Nashua Street
Boston, Massachusetts 02114
Counsel on behalf of the Defendant

**MERRICK, LOUISON & COSTELLO, LLP**
(Stephen C. Pfaff, Esquire)
67 Batterymarch Street
Boston, Massachusetts 02110
Counsel on behalf of the Plaintiffs

COPLEY COURT REPORTING
(617) 423-5841

**Page 3**

I N D E X

Witness:         Direct  Cross  Redirect  Recross
LORNE LYNCH
(By Ms. Caulo)     4

E X H I B I T S

Exhibit No.                              Page

1  Notice of Taking Deposition      4

2  Notice of Written Warning Dated
   12/7/01                          57

3  Letter of Reprimand Dated 5/2/02    70

4  Deposition Excerpts of Lorne Lynch,
   Pages 1, 12, 13, 14, 15 and 24    85

5  Application for Deputy Sheriff    97

6  Policy S516, Deputy Sheriff
   Appointments                     104

7  SCSD Departmental Policy S516     105

8  Memo Dated 12/12/03              119

9  Six-Page Memo Dated 4/28/04     138

10 Article Dated 4/2/04 - "What A Mess!
   Promises Not Kept."              150

11 Policy S520, Date of Issue 1/1/00  158

COPLEY COURT REPORTING
(617) 423.5841

**Page 4**

      PROCEEDINGS

        (Document was marked as Exhibit No. 1
for identification.)

        MS. CAULO:  With respect to stipulations,
we're using the ones we're operating on recently
which are all objections except as to form are
reserved until trial.  All motions to strike are
reserved until trial, and Mr. Lynch will have 30
days to review the deposition and sign it.  We're
waiving the requirement of the notary.
Acceptable, Steve?

        MR. PFAFF:  Yes, sure.

        LORNE LYNCH, of lawful age, being first
properly identified and duly sworn, deposes and
says as follows in answer to direct
interrogatories

BY ATTORNEY CAULO:

        MR. PFAFF:  Also, I have to say on the
record that the deponent is, in fact, Lorne Lynch.
I, in fact, do know him.  Irrespective of the fact
that he does not have any identification, I can
state for the record with 100 percent accuracy
that it is Lorne Lynch sitting next to me.

Q.  State your name and rank.

COPLEY COURT REPORTING
(617) 423.5841

65

*to do.* You're not

*on the apple on this. You*

*that by way of a recorded*

*we're not going down this road.*

*ct him not to answer the*

CAULO: Any questions?

PFAFF: Well, let's see what else

You want to -- let's go off the

MS. CAULO: No, no, no.

MR. PFAFF: Give me the questions that

have, and I'll say whether he can answer.

MS. CAULO: You won't allow him to answer

any questions about what those terms meant when he

said them, what the word "hot" meant, what the

word -- no?

MR. PFAFF: Let me see your questions

that you're going to ask him --

MS. CAULO: These are all kind of --

they're notes. They're things to remind me. So

it's not a specific question.

MR. PFAFF: Okay.

**Q.** What did you mean by the term "hot"?

COPLEY COURT REPORTING
(617) 423.5841

---

66

MR. PFAFF: I'm instructing my client not

to answer the question. If you've got another

one, ask it.

**Q.** Was that a vulgar statement to make?

MR. PFAFF: Objection. Don't answer it,

Lorne, on advice of counsel.

**Q.** Was it offensive?

MR. PFAFF: Objection. That calls for a

legal conclusion for which the witness is not

qualified to answer. I'm instructing him not to

answer it.

MS. CAULO: Whether or not the comment

was offensive is a legal conclusion?

MR. PFAFF: Absolutely. Absolutely under

the law it is a legal conclusion on the issue of

defamation.

**Q.** It was poor judgment to make that statement?

MR. PFAFF: You can have it.

**A.** Yes.

**Q.** You were a lieutenant at the time?

**A.** Yes.

**Q.** Part of your obligations and responsibilities as

lieutenant was to ensure that your subordinates

complied with the Department's code of conduct?

COPLEY COURT REPORTING
(617) 423.5841

---

67

1  **A.** Yes.

2  **Q.** The comment you made was in violation of that

3  policy?

4  **A. Policy S-220, yes, conduct unbecoming.**

5  **Q.** You were disciplined for that?

6  **A. Yes.**

7  **Q.** Now, there's a written warning; but initially, you

8  received three days, is that correct?

9  **A. Yes.**

10 **Q.** And you appealed that?

11 **A. Yes.**

12 **Q.** Did you think you deserved the punishment?

13 **A. I believe that I deserved the letter of reprimand.**

14 **Q.** Why didn't you think three days was appropriate?

15 **A. I have very little discipline in my file. It**

16 **wasn't meant as a malicious act. I think if you**

17 **go with -- discipline is to be progressive, and I**

18 **didn't believe the discipline I received was**

19 **progressive with the fact that they just gave me a**

20 **three-day suspension along with the letter of**

21 **reprimand. I just felt that it was excessive, and**

22 **the arbitrator agreed with that.**

23 **Q.** Did you tell the Department that you would take a

24 letter of reprimand --

COPLEY COURT REPORTING
(617) 423.5841

---

68

1  **A. Yes.**

2  **Q.** -- before the arbitration?

3  **A. Yes, long -- the day that everything was filed and**

4  **they had handed -- we had discussed it, and they**

5  **had brought me in. I was interviewed by Jim**

6  **Davin, intense interview by him in this case who's**

7  **now the head of the general counsel. I just felt**

8  **it was excessive.**

9  **Q.** You said it wasn't malicious. What was it meant

10 as?

11 **A. As a joke.**

12 **Q.** What was funny about it?

13 **A. A poor joke. Obviously, nothing.**

14 **Q.** I'm just trying to understand how that's a joke.

15 What is it joking about?

16 MR. PFAFF: Objection. Asked and

17 answered.

18 MS. CAULO: No, that wasn't asked and

19 answered.

20 MR. PFAFF: Objection. Asked and

21 answered. He said it was not funny at all and

22 that it was a joke.

23 **Q.** You meant it as a joke?

24 **A. It was inappropriate.**

COPLEY COURT REPORTING
(617) 423.5841

77

here at Suffolk County.

...ction.

...rogatory, no.

...ny fun or poked fun at ...kground while at work?

Objection.

...ferred to a fellow employee with ...ments regarding their ethnic or

...round?

...to -- I don't understand what you mean ...stion. You have to explain that.

...ve to go into more depth as far as -- I'm ...peat the question.

...a different one. Have you ever made any ...ments directed to a fellow employee based upon

...ethnic background?

MR. PFAFF: Objection.

...No.

Have you ever made any comments to a fellow employee or about a fellow employee based upon their ethnic or racial background?

A. No.

Q. You would agree with me that to do so would be

---

78

1  offensive, right?

2  A. Absolutely.

3  Q. And it would be unprofessional?

4  A. Yes.

5  MR. PFAFF: Objection. You can answer.

6  Q. And it would be -- yes?

7  A. Yes.

8  Q. And it would be conduct unbecoming of a lieutenant

9  for the Suffolk County Sheriff's Department?

10 A. Yes.

11 Q. And it would be conduct that would be unbecoming

12 of a deputy sheriff, correct?

13 A. Yes.

14 Q. And indeed, your statement to Miss Sutherland was

15 unbecoming as a deputy sheriff, was it not?

16 MR. PFAFF: Objection. Asked and

17 answered.

18 MS. CAULO: He didn't answer that

19 question.

20 MR. PFAFF: Yes, he did. Asked and

21 answered. Unbecoming and unprofessional, okay.

22 Q. You may answer.

23 MR. PFAFF: For the last time, you may

24 answer that question.

---

79

1  A. It was inappropriate. I shouldn't have said it,

2  and I've testified to that numerous times.

3  Q. Do you know who Elizabeth Keeley is?

4  A. Yes.

5  Q. At some point, was she employed here at the

6  Suffolk County Sheriff's Department?

7  A. She was.

8  Q. What was her role? Strike that. Bad question.

9  What was her position?

10 A. I believe her title was chief of staff.

11 Q. Is it fair to say that she's the second, at that

12 time was the second most senior person to the

13 sheriff?

14 MR. PFAFF: Yeah, we'll stipulate to

15 that.

16 A. I don't know where she was on the chain of command

17 because in the past, the special sheriff was

18 always the number 2 person within the Department.

19 If you're telling me that she was number 2, that

20 would be somewhat new to me. Chief of staff, I

21 always thought the chain of command was three or

22 four.

23 Q. Okay.

24 A. Or perhaps in her case, you know, maybe she was

---

80

1  number 2. I'm not sure.

2  Q. If she was 3 or if she was 4, she's a, she was a

3  senior person in the Department?

4  A. Yes, yes. But historically, the special sheriff

5  was always the number 2 position.

6  Q. Do you recall having any interactions with

7  Miss Keeley while she was chief of staff here at

8  the Suffolk County Sheriff's Department?

9  A. I've never had a conversation with the woman.

10 I've greeted her in the elevator. I've greeted

11 her in the hallway. I attended two captain and

12 lieutenant's meetings where she addressed, where

13 she addressed us.

14 The last meeting I believe was last

15 summer, maybe the summer of 2005 when we had

16 taken over a new contract with the ARAMARK Food

17 Services, and she had addressed us on that. And

18 she had also gone ahead to say that she wasn't

19 going anywhere. She was here for good, contrary

20 to all the rumors that are going around.

21 I kind of felt that she was here just to

22 tell us that she wasn't going anywhere. And she

23 said that she had heard that there's rumors going

24 around that she was leaving, and there had been

189

1  well aware of who I represented, who I was with.
2  And I think everybody knew, had an idea of who was
3  with who just through general knowledge and where
4  people were coming and going. I believe they knew
5  that.
6  Q. What about your activities in support of Stephen
7  Murphy, how would they know based upon what you
8  did that you supported Stephen Murphy?
9  A. Because they may have received a donation list. I
10  mean, there's a million ways to find out who's
11  supporting who. There are donation lists that
12  they can get their hands on. They would know that
13  I donated money to Steve Murphy.
14  Q. On one occasion?
15  A. On one occasion.
16  Q. Other than that --
17  A. They would know that the executive board, which
18  was a lot of the guys who attended that, Rick
19  Coleman, an executive board member, Matty Mullen,
20  executive board member, Kevin Janielis, vice
21  president of the union, we were all union members.
22  Q. So how would that allow Sheriff Cabral to know
23  that you, Lorne Lynch, supported Stephen Murphy?
24  A. Once again, we need to go back to my meeting --

COPLEY COURT REPORTING
(617) 423.5841

190

1      MR. PFAFF: Objection. It's asked and
2  answered.
3  A. My meeting with Gene Sumpter on that day when I
4  walked out of that office, I knew that I was going
5  to have some issues with the way he addressed me
6  at that meeting, okay. He emulates me one day,
7  and the next day I'm nobody, that I'll never
8  respect. Those are the sort of comments he made.
9  I knew that I had an issue. Now in --
10  Q. Is that based solely on your support for Stephen
11  Murphy and for no other reasons?
12  A. I think it has to do with my union activities,
13  being the grievance officer, when Al Moscone was
14  written up with this Tommy Derosa (phonetics)
15  incident, my federal suit we have going on with
16  the overtime differential.
17      There were a lot of things that were
18  leading up to this. We have issues going on, and
19  I think -- I think that they came in, and they
20  said, look it, we're going to take out the power
21  brokers, these union guys. We're going to do
22  what we can with them; and we're going to
3  decommission, and we're going to show them who's
24  boss.

COPLEY COURT REPORTING
(617) 423.5841

191

1  Q. Is Captain Janielis involved in the union?
2  A. Yes.
3  Q. Mullen?
4  A. Mullen is not because he's a temporary lieutenant
5  at the time. With the temporary positions with
6  everything that's going on with the promotions and
7  everything, AFSCME, which is our union affiliate,
8  came out and said they were no longer members of
9  our local.
10  Q. Captain Coleman involved?
11  A. He was an executive board member, yes.
12  Q. Is Captain Coleman a deputy sheriff?
13  A. I think he is now. I know that they took him off
14  the road for about a year.
15  Q. Was he decommissioned?
16  A. I don't know. I would imagine he was
17  decommissioned. I don't know if he was or not.
18  Q. Lieutenant Mullen, is he a deputy sheriff?
19  A. He is.
20  Q. Was he decommissioned?
21  A. He was not.
22  Q. I'm focusing right now -- we'll get to your union
23  officer activities in awhile. Probably not today.
24  I'm focusing now on your political activity. I'm

COPLEY COURT REPORTING
(617) 423.5841

192

1  trying to understand from what you've testified to
2  what is it about the way that you verbalized your
3  support for Stephen Murphy or any actions you took
4  on behalf of Stephen Murphy that would lead
5  Sheriff Cabral to know that you supported him?
6      MR. PFAFF: Objection. Asked and
7  answered. You can have it for the last time.
8  A. My meeting with Gene Sumpter walking out of the
9  office and then a comment made to me by Cliff
10  Carney a couple of months after that leads me to
11  believe that a combination of my political and my
12  union affiliation is the only reason why this is
13  happening.
14      It's never been done, no one's ever been
15  decommissioned other than for disciplinary
16  reasons. I get a letter that I'm no longer in
17  good standing as if I've done something wrong. I
18  did nothing wrong.
19  Q. You mention this conversation with Superintendent
20  Sumpter. Is that the only conversation you had
21  with Superintendent Sumpter regarding the election
22  for sheriff?
23  A. Yes.
24  Q. You just mentioned a comment made to you by Deputy

COPLEY COURT REPORTING
(617) 423.5841

193

1  Superintendent Cliff Carney several months after
2  the election.  What year was that?
3  **A.  It was around May of 2005.**
4  **Q.**  Okay.
5  **A.  I came into work, and Cliff Carney was having a**
6  **conversation with Captain Janielis and Captain**
7  **Moscone.  And it had to do with Corporal**
8  **McGonnagle not supplying a report to an incident**
9  **that occurred.  Like I said, I had just come in on**
10  **duty.**
11          I was walked into the hallway.  They had
12  wrapped up their conversation.  Cliff Carney
13  turned to me, and he looked at Al Moscone, and he
14  said, "If Lieutenant Lynch was handling this
15  matter, I wouldn't have to ask for a report.  The
16  reports would have already been there."
17          As Cliff Carney -- everybody walks away.
18  Cliff Carney walks back into the administrative
19  offices in the hallway.  And I said, "Imagine
20  that?  And I'm not in good standing."  And he
21  turned around and looked at me and said, "There's
22  two types of good standing."
23          I took that as your political and union
24  activity and the way you do your job.  That's how

COPLEY COURT REPORTING
(617) 423.5841

194

1  I felt when he told me there's two types of good
2  standing.
3  **Q.**  Did he say there were two types of good standing,
4  the way you do your job and your political
5  affiliation?
6  **A.  No.**
7  **Q.**  Exactly what did he say?
8  **A.  He said, "There's two types of good standing."**
9  **Q.**  That's it?
10  **A.  That's it.**
11  **Q.**  And what did you say?
12  **A.  He walked into the office.  I didn't say anything.**
13  **Q.**  Did you go and ask him what he meant?
14  **A.  No.**
15  **Q.**  At any time, did you ever ask him what he meant?
16  **A.  No.**
17  **Q.**  You made an assumption?
18  **A.  Yes.**
19  **Q.**  Had you ever had any conversations with Deputy
20  Superintendent Carney regarding the Sheriff's
21  election before the primary?
22  **A.  Which deputy superintendent?**
3  **Q.**  Deputy Superintendent Carney, I think I said?
24  **A.  No.**

COPLEY COURT REPORTING
(617) 423.5841

195

1  **Q.**  Did you ever have any conversations with Deputy
2  Superintendent Carney regarding your support for
3  Stephen Murphy before the election?
4  **A.  No.**
5  **Q.**  Did you ever have any conversation with Deputy
6  Superintendent Carney regarding the election after
7  the election?
8  **A.  No.**
9  **Q.**  Did you have any conversation with Jerry Walsh
10  regarding the Sheriff's election?
11  **A.  No.**
12  **Q.**  Did you ever have any conversations with Jerry
13  Walsh regarding consequences for Stephen Murphy
14  supporters if Sheriff Cabral was elected?
15  **A.  I did not, no.**
16  **Q.**  Did you have any conversation with any, with
17  Deputy Superintendent Carney regarding
18  consequences for individuals who supported Steve
19  Murphy if Sheriff Cabral was elected?
20  **A.  Consequences, no.**
21  **Q.**  How about Superintendent Sumpter?
22  **A.  Other than that conversation I told you about, no.**
23          MR. PFAFF:  This might be a good place to
24  end.

COPLEY COURT REPORTING
(617) 423.5841

196

1          MS. CAULO:  That's fine.  What time is
2  it?
3          MR. PFAFF:  Five of two.
4          MS. CAULO:  We have a while longer, and
5  you have to go back.  And we had a bit of a taffy
6  pull earlier.
7          (Whereupon, the deposition suspended at
8  1:55 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

COPLEY COURT REPORTING
(617) 423.5841

EXHIBIT

7

---

**Page 1**

```
 1                          Volume 1
                            Pages 1-162
 2                          Exhibits per

 3          UNITED STATES DISTRICT COURT

 4          DISTRICT OF MASSACHUSETTS

 5          Civil Action No. 05-CV-11661-RGS

 6

 7      - - - - - - - - - - - - - - - - - - -

 8     Bergeron, et al
                      Plaintiff,        :
 9
                                        :
10     v.
                                        :
11     Andrea Cabral
                      Defendant.        :
12
                                        :
13      - - - - - - - - - - - - - - - - - - -

14
            DEPOSITION OF DAVID BERGERON, a witness
15   called on behalf of the Defendant taken pursuant to the
     Federal Rules of Civil Procedure, before Patricia M.
16   Haynes, a Certified Shorthand Reporter and Notary Public
     in and for the Commonwealth of Massachusetts, CSR No.
17   14620F, at the Offices of Suffolk County Sheriff's
     Department, 200 Nashua Street, Boston, Massachusetts, on
18   Wednesday, October 4, 200, commencing at 10:15 a.m.

19

20

21

22               Copley Court Reporting
                    101 Tremont Street
23                Boston, Massachusetts 02108
                      (617) 423-5841
24
```

---

**Page 2**

```
 1   APPEARANCES:

 2

 3   Suffolk County Sheriff's Department
        (By: Ellen M. Caulo, Esquire)
 4   200 Nashua Street
     Boston, Massachusetts 02114
 5   Counsel for the Defendant

 6

     Merrick, Louison & Costello, LLP
 7   (By: Stephen C. Pfaff, Esquire
     67 Batterymarch Street
 8   Boston, Massachusetts 02110
     Counsel for the Plaintiffs

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

---

**Page 3**

```
              I N D E X
Witness    Direct  Cross  Redirect  Recross
DAVID BERGERON
(By Ms. Caulo)   4
```

```
            E X H I B I T S

Exhibit No.                        Page

 1  Deposition Notice               30

 2  Copy of Policy S 516            30

 3  Copy of Policy S 520            32

 4  Copy of mailing                105

 5  Sheriff's response to Exhibit 4   111

 6  Notification of Decommissioning  135
```

---

**Page 4**

```
 1              P R O C E E D I N G S

 2          DAVID BERGERON,

 3   having been previously sworn, was examined and testified

 4   as follows:

 5          MS. CAULO:  This is the matter of

 6   Bergeron, et al versus Sheriff Andrea Cabral.  Today we

 7   are taking the deposition of David Bergeron.

 8          The usual stipulations, all objections, except

 9   as to form, reserved until trial, all motions to strike

10   are reserved until trial.  Mr. Bergeron will have 30

11   days to review and sign the deposition waiving the

12   requirement of the notary.

13          MR. PFAFF:  Sign under the pains and

14   penalties of perjury.

15   DIRECT EXAMINATION BY MS. CAULO:

16      Q.  Please state your name and your rank.

17      A.  David C. Bergeron, sergeant.

18      Q.  Where do you reside?

19      A.  141 Weld Street, West Roxbury.

20      Q.  As you know, my name is Ellen Caulo.  I'm the

21   Deputy General Counsel for the Suffolk County Sheriff's

22   Department.  I represent Sheriff Cabral in the Complaint

23   that you and fellow employees have brought against her.

24          For purposes of today's deposition, I'm going
```

85

1 She's my boss." I was trying to have a little fun with
2 it. So she is like, "Go on." We also discussed the
3 raises. I said, "You know, it just doesn't look good.
4 You're giving out raises to your people up top and there
5 are other people doing without." She said, "I didn't
6 give them raises." I said, "It appears you gave them
7 raises."
8         And she went on to describe the F 15 wage
9 acceleration forms. I told her I understood what that
10 was, I understand what it means. But she was adamant
11 that it was not a raise. I said, "Okay, let me put it
12 to you this way. You start on day one and you have X.
13 Day 366 you now have X plus $400 a week. That's a
14 raise."
15         She said, "It's not a raise." So we didn't
16 agree on that either. We talked about veteran benefits,
17 the vacations for the veterans. She told me, I believe
18 she said she had a legal opinion that she was correct on
19 that. And we went on to another topic. I'm trying to
20 remember what else we talked about.
21         I told her that I work quite a bit of overtime
22 and with all the problems that we had at the jail I had
23 only seen her twice. I don't know how many months she
24 was in by then. I said, "That's unacceptable from my

86

1 point of view. You should be spending more time at the
2 jail, some more hands-on stuff."
3         And she said she was busy cultivating
4 relationships up at the State House to get money for the
5 jail, at the court houses and the House of Correction.
6 I can't think of anything else. It was a 20 minute
7 conversation a couple of years ago.
8         I'm sure there's probably more issues. Mostly
9 they were the issues of the day that we talked about.
10 Like I said, at the end of it, we were smiling. She
11 shook my hand, I shook her hand. I went in to vote. I
12 actually wished her luck on the election.
13     Q.   What was your tone of voice?
14     A.   I would say pretty much like I'm talking to
15 you.
16     Q.   Were you loud?
17     A.   I don't think so.
18     Q.   Were you angry?
19     A.   No.
20     Q.   Were you upset?
21     A.   No.
22     Q.   Were you insistent in terms of making sure she
23 listened to you?
24     A.   No more than she was with me.

87

1     Q.   Well, talk to me about what you mean by that.
2     A.   I mean, you know, she was, she had her
3 opinions, and she wasn't going to step away from those
4 opinions. It just appeared to me that we just had
5 different opinions, that's all. I mean, I don't think I
6 was negative at all in my conversation.
7         You want me to define insistent or define how
8 she was speaking to me. I mean, I didn't take anything
9 negative away from that except I would have liked more
10 definitive answers than I got. Other than that, that's
11 it.
12     Q.   Did you attempt to get more definitive answers
13 from Sheriff Cabral other than what she was providing
14 you?
15     A.   If she didn't answer me, I said, "I don't
16 agree with that either."
17     Q.   Did you challenge her?
18     A.   No.
19     Q.   Were you loud?
20         MR. PFAFF: Objection. Asked and
21 answered.
22 BY MS. CAULO:
23     A.   I don't believe I was.
24     Q.   You wanted answers to your questions, correct?

88

1     A.   Yes.
2     Q.   You didn't like the answers that the sheriff
3 was giving you; is that correct?
4     A.   Some of them could have been more definitive.
5     Q.   And how did you tell her that?
6     A.   I didn't. I don't remember saying anything
7 about it. I remember moving on from one question to the
8 next saying, "We don't agree on that either."
9     Q.   What was your tone when you said that?
10     A.   Just what I said to you.
11     Q.   You why do you think Matt O'Malley came up two
12 times to see if she was all right?
13     A.   I would imagine -- do you want me to speculate
14 why he came over?
15     Q.   I want you to tell me why you think it is that
16 he came over.
17     A.   She was spending too much time with me.
18     Q.   Why did you feel it necessary to say we are
19 all right here?
20     A.   Because she said, "I'm okay."
21     Q.   Why did you feel the need to say that?
22     A.   Because she said, "I'm okay," that's why. Why
23 she said she's okay, I really don't know.
24     Q.   Why did you feel the need to say --

109

1 to terminate you and John Grennon, what exactly did you
2 do?
3      A.    I don't recall what I did right after that. I
know there was a time, I don't know exactly when, that I
conversed with our legal representatives.
6      Q.    Did you call John Grennon?
7      A.    I did speak to him. I don't know if it was
8 directly after, but I did talk to him about it.
9      Q.    What did you say to him?
10     A.    That there was a time when certain people in
11 the administration were considering terminating him and
12 me based on our union activity and out political support
13 of Murphy.
14     Q.    Are those the words Mickey Walsh used, union
15 activity and political support for Steve Murphy?
16     A.    I don't know exactly verbatim if those were
17 the words, but it was pretty much union activity and
18 political, failure to remain neutral. I forget exactly
19 what he utilized for words, but that's what I got out of
20 it.
21     Q.    Failure to remain neutral?
22     A.    I forget exactly what he said in regards to
23 verbatim, word for word, in the conversation.
24     Q.    Did you go speak to Michael Harris about this

110

1 information you had received from Mickey Walsh?
2      A.    Absolutely not.
3      Q.    Did you speak to Cliff Carney about this
4 information?
5      A.    Absolutely not.
6      Q.    Eugene Sumpter?
7      A.    No.
8      Q.    Victor Theiss?
9      A.    No.
10     Q.    Elizabeth Keeley?
11     A.    No.
12     Q.    Elizabeth Keeley was the chief of staff,
13 correct?
14     A.    Correct.
15     Q.    Did you seek to have a meeting with Sheriff
16 Cabral and let her know what you had just learned?
17     A.    Absolutely not.
18     Q.    Other than John Grennon and your legal
19 representative, did you speak to anyone else concerning
the information you received from Mickey Walsh in
October or November of 2004?
22     A.    Not that I recall.
23     Q.    What evidence do you have, Officer Barnes,
24 that Sheriff Cabral knew that you supported Steve

111

1 Murphy?
2      A.    Right after our endorsement, I got a call from
3 Steve Tompkins wanting to know what our endorsement vote
4 was and who we supported. Can I directly say that she
5 was aware of it? It wasn't directly told to her. I
6 believe she may have knowledge through Steve Tompkins or
7 other administration staff that we endorsed Steve
8 Murphy.
9      Q.    Tell me about the conversation you had with
10 Steve Tompkins after the union decided to endorse Steve
11 Murphy.
12     A.    He called up and inquired who we endorsed and
13 what the election results were and when we were planning
14 on pretty much making it public.
15     Q.    Is that the extent of the conversation?
16     A.    Yeah. It wasn't a long conversation.
17     Q.    Did he indicate to you there would be
18 consequences because JOEASC was coming out in favor of
19 Steve Murphy?
20     A.    He didn't indicate that, no.
21     Q.    Did he attempt to persuade you to not
22 publicize the endorsement?
23     A.    No.
24     Q.    Did he tell you not to do it?

112

1      A.    No, he did not.
2      Q.    Lieutenant Matt Mullen, did he support Steve
3 Murphy?
4      A.    I have no idea.
5      Q.    William Noonan?
6      A.    No idea.
7      Q.    You indicated Robert Tullos did, right?
8      A.    I believe he did.
9      Q.    Pat O'Brien did?
10     A.    I believe so.
11     Q.    Chuck Magner did?
12     A.    I have no idea.
13     Q.    You're aware that Angelo Rossi ran for
14 sheriff, right?
15     A.    Yes. Ultimately he never got on the ballot.
16 He made an attempt to run.
17     Q.    Fair to say he wasn't supporting Sheriff
18 Cabral?
19     A.    I hope he was supporting himself. After the
20 fact, I don't have knowledge of who he was supporting.
21     Q.    Mark Turley, is that Tim Turley's brother?
22     A.    Yes.
23     Q.    He supported Stephen Murphy?
24     A.    I don't recall.

121

1  refused to promote you.  What positions have you applied
2  for that you have not been promoted to?
3      A.    **None yet.**
    Q.    Has there been an examination prior to 2004
5  for lieutenants?
6      A.    **Yes.**
7      Q.    Have you taken it?
8      A.    **Yes, I have.**
9      Q.    What was the passing score?
10     A.    **80.**
11     Q.    Did you pass the examination?
12     A.    **Yes, I did.**
13     Q.    When was this?
14     A.    **When was the test?**
15     Q.    Yes.
16     A.    **I believe it was in February.**
17     Q.    Of?
18     A.    **This year.**
19     Q.    February of '06?
20     A.    **'06.**
21     Q.    But the question was, perhaps I wasn't clear.
22  Prior to 2005, was there an examination for lieutenant?
23     A.    **No.**
24     Q.    Since Sheriff Cabral came into office in

122

1  November of 2003, when was the first time that there was
2  an examination for lieutenant at the Nashua Street Jail?
3      A.    **I believe February of this year.**
4      Q.    February of '06?
5      A.    **Yes.**
6      Q.    Is that process on-going?
7      A.    **Yes.**
8      Q.    So although you say the sheriff has refused to
9  promote you, there hasn't been anything that you applied
10  for for which you have not been promoted, is that fair?
11     A.    **That's correct.**
12     Q.    What is the basis for your allegation that
13  Sheriff Cabral decommissioned you because you held a
14  sign for Stephen Murphy?
15     A.    **Because I can't think of any other reason why**
16  **she would.**
17     Q.    How many employees at the Suffolk County
18  Sheriff's Department in total?
19     A.    **1,100 maybe.**
20     Q.    You're one of 1,100 employees?
             MR. PFAFF:  We'll stipulate to that.
22  BY MS. CAULO:
23     Q.    Fair to say the majority of these 1,100
24  employees supported Stephen Murphy?

123

1      A.    **I couldn't answer that, I have no idea.**
2      Q.    It's your contention that Sheriff Cabral
3  singled you out for retaliation, is that fair?
4      A.    **Yes.**
5      Q.    You described during the course of this
6  deposition three specific interactions you had with
7  Sheriff Cabral.  March 2, when you had a conversation
8  with her?
9      A.    **Yes.**
10     Q.    Posing a question to her at roll call sometime
11  in April?
12     A.    **Yes.**
13     Q.    And she walked within a couple of feet of you
14  on primary day?
15     A.    **Yes.**
16     Q.    Other than those, have you had any
17  interactions with Sheriff Cabral at all subsequent to
18  September 14, 2004?
19     A.    **Other than those, no.**
20     Q.    Have you ever seen her here at the jail since
21  September of 2004.
22     A.    **Not that I recall, no.**
23     Q.    Have you ever ignored her or refused to
24  acknowledge her?

124

1      A.    **No.**
2      Q.    How about Elizabeth Keeley, you know who she
3  was, right?
4      A.    **I knew there was an Elizabeth Keeley, but I**
5  **used to confuse her with you actually because I didn't**
6  **know either one of you.**
7      Q.    You knew that Elizabeth Keeley, whoever that
8  person, you knew the chief of staff at one point was
9  Elizabeth Keeley, correct?
10     A.    **Yes.**
11     Q.    Prior to the day she was deposed by your
12  counsel, had you met with her?
13     A.    **She came into my booth once.  I was in**
14  **control.**
15     Q.    Do you know when that was?
16     A.    **No.  It was pretty early on in the**
17  **administration.  Maybe the first year, at the end of the**
18  **first year.**
19     Q.    So at the end of '03 perhaps?
20     A.    **I would think so, yeah.**
21     Q.    Do you recall anything about that interaction
22  with her when she came into your control booth?
23     A.    **Yeah.  She came in with Mr. Horgan and said,**
24  **"Mr. Horgan tells me you run a very good booth."  I**

# ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

      Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

      Defendant

**EXHIBIT**

**8**

DAY 1 - VOLUME I

DEPOSITION OF: MICHAEL HARRIS

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 4, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

```
1    A.    That they were specifically decommissioned because
2    of political affiliation?
3    Q.    Right.
4    A.    Not that I'm aware of.
5    Q.    Do you know any of those names on that list who were
6    decommissioned because they supported Sheriff Cabral's
7    opponent in the last election?
8    A.    Not that I'm aware of.
9    Q.    Well, was the support of Sheriff Cabral's opponent
10   in the last election a consideration by you or the ad hoc
11   committee in recommending those 37 names to be
12   decommissioned?
13   A.    I recall that there might have been some discussion
14   on that.
15   Q.    Where were you when you had this discussion?
16   A.    I believe in the conference room at the house of
17   correction.
18   Q.    With whom were you present?
19   A.    I was present.  And I recall, I believe,
20   Superintendent Horgan, Superintendent Sumpter,
21   Superintendent Theiss.
22   Q.    Was there anybody else present?
23   A.    I'm not sure.  Elizabeth Keeley could possibly have
24   been there, but I don't recall.
```

# ORIGINAL

Volume: I
Pages: 1-120

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

C.A. No. 05-11661 RGS

DAVID BERGERON, JOHN GRENNON, LORNE
LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY
TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC
DILIBERO and PAUL GIGLIO,

       Plaintiffs

vs.

ANDREA CABRAL, Individually and as
Sheriff of Suffolk County,

       Defendant

**EXHIBIT**

9

DEPOSITION OF: EUGENE SUMPTER, JR.

MERRICK, LOUISON & COSTELLO

67 Batterymarch Street

Boston, MA 02110

April 5, 2006

Virginia Dodge
Registered Professional Reporter

DUNN & GOUDREAU

ONE STATE STREET, SUITE 1150
BOSTON, MA 02109
(617) 742-6900

1   A.    I didn't know that he was, if he was.

2   Q.    Were the activities of those -- of Grennon, Lynch,

3   Barnes and Moscone as union officials; were their

4   activities discussed as reasons for decommissioning them

5   as deputy sheriff?

6   A.    If their activities included poor attitudes,

7   inappropriate behavior, then yes, it was.  I think it was.

8   It would have been discussed in that context, in that

9   there was an attitude issue, not necessarily with whatever

10  it was they were doing, but how they went about doing it.

11  How they interacted with people in the department was the

12  discussion.  Not any type of union activity.

13  Q.    So the interaction of -- or how they reacted or

14  interacted with other members of the department was

15  reviewed; not just how they interacted or reacted in their

16  official job function, but also how they interacted in

17  their official union function?

18          MS. CAULO:  Objection.

19          You may answer.

20  A.    Yes.

21          MR. PFAFF:  I'd like to take five minutes,

22          and I don't think I have much more.

23

24              (A recess was taken.)


                    DUNN & GOUDREAU



UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Volume: I

*************************************
DAVID BERGERON, ET AL,                 :
                    Plaintiffs,        :
                                       :
vs                                     :
ANDREA CABRAL,                         :
                    Defendant.         :
*************************************

DEPOSITION OF TIMOTHY TURLEY, a

witness called on behalf of the Defendant,

taken pursuant to the applicable provisions of

the Massachusetts Rules of Civil Procedure,

before William M. Jackson, Professional Court

Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Nashua

Street Jail, 200 Nashua Street, Boston,

Massachusetts 02114, on January 9, 2007,

commencing at 10:20 a.m.

COPLEY COURT REPORTING, INC.
59 Batterymarch Street
Boston, Massachusetts 02110
(617) 423-5841
www.copleycourt.com



Q.    You are familiar with the complaint that your

      attorneys have filed on your behalf?

A.    I am.

Q.    I ask you to look at that and see if that is in

      fact the document that I am placing in front of

      you, the complaint that has been filed on your

      behalf by your attorneys?

A.    Yes.

Q.    The complaint was based upon information that

      you and your fellow plaintiffs communicated to

      your attorneys; is that correct?

A.    That's correct.

Q.    Directing your attention, Corporal, to

      Paragraph 27.  If you would please turn to Page

      6, and it is on Page 6, Paragraph 27.

A.    Yes.

Q.    Which reads, despite the sheriff's contention

      in the April 21, 2005 letter that the

      plaintiffs were losing their deputy sheriff's

      position because they were members not in good

      standing, none of the members have been

      subjected to any disciplinary since 2003 when

      last appointed deputy sheriffs to April 21,

      2005.  Did I read that correctly?

1    A.    Yes.

2    Q.    That is not accurate, if --

3                MR. STEWART:    Objection.

4    Q.    I will ask the question differently.

5                Is that paragraph contained, the

6          content I just read, contained in the paragraph

7          by your attorneys on your behalf, is that

8          accurate as it pertains to you?

9    A.    Despite the sheriff's contention -- that is not

10         accurate as it pertains to me.

11   Q.    April 21, 2005, when you were decommissioned,

12         you had a twenty-day suspension on your record;

13         is that correct?

14   A.    At that point, it was in my record.  Yes.

15   Q.    Directing your attention, if you will,

16         Corporal, to Paragraph Number 45 of this

17         complaint, which is on Page 9.  Did you appeal

18         the discipline that you received in January

19         2004 to the Civil Service Commission?

20   A.    I believe there was an arbitration in place.  I

21         did not appeal to the Civil Service Commission.

22         I don't recall.  Maybe the attorneys did.

23   Q.    You are the client, right?

24   A.    Yes.  To my recollection, there was no appeal

to the Civil Service Commission.

Q.   So --

A.   But that is not to say that there might have
     been.

Q.   Your attorneys would have done something on
     your behalf without your knowledge?

                MR. STEWART:  Objection.

A.   I wanted the attorneys to pursue any avenue in
     this matter.  If they did file an appeal, I
     just don't remember right now.

                MS. CAULO:  If there is any paperwork
     associated with the civil service appeal, I
     will be requesting that as well.

                MR. STEWART:   Of course.

Q.   The third sentence of Paragraph 45, Turley was
     successful at department of training subsequent
     to the twenty-day suspension, which his loss of
     pay was reinstated.  Explain that to me, what
     do you mean by that?

A.   The Department of Employment and Training, that
     is unemployment, basically.  Unemployment
     benefits were denied to me initially by the
     department.  I requested a hearing with the
     department of unemployment, I'm sorry, the

28

state changed the name of it at some point,
Department of Employment and Training, and I
received one, and three of the twenty days is
four weeks.  Three of the four weeks was
restored at that point.  Within five business
days.  I collected unemployment.  They approved
my unemployment and I received unemployment
benefits during my suspension.

Q.    So it says the loss of pay was reinstated.  How
much?

A.    Three of the four weeks.  It is not entirely
correct.

Q.    So that sentence is not entirely correct,
because your complete loss of pay for the
twenty-day suspension was not in fact
reinstated by the department of unemployment or
Department of Employment and Training?

A.    Right.  I guess you have to be out of work at
least one week before you can collect
unemployment.  So that is what it is.  I had to
lose one week.

Q.    When you receive unemployment, is it your
entire salary, is it a percentage of your
salary?

| | | |
|---|---|---|
| 1 | A. | I believe it is a percentage.  They base it on |
| 2 | | what your earnings were.  I am not exactly sure |
| 3 | | how they stretch it. |
| 4 | Q. | So we know that you did not receive the entire |
| 5 | | twenty days, you lost one week, and the amount |
| 6 | | of money that was reimbursed to you, did that |
| 7 | | represent your entire salary or a percentage of |
| 8 | | that salary? |
| 9 | A. | A percentage. |
| 10 | Q. | That determination by the Department of |
| 11 | | Employment and Training with respect to your |
| 12 | | salary, what effect did that have on your |
| 13 | | discipline? |
| 14 | A. | I am sorry.  The money that I received, is that |
| 15 | | what you are asking me? |
| 16 | Q. | The decision of Department of Employment and |
| 17 | | Training to award you unemployment compensation |
| 18 | | for a portion of the suspension period, what |
| 19 | | effect did that have on the discipline that was |
| 20 | | in your file? |
| 21 | A. | It had none. |
| 22 | Q. | So it did not rescind? |
| 23 | A. | Well, it took the sting, the loss of pay, it |
| 24 | | took the financial sting away. |

Q.   It did not rescind the twenty-day suspension?

A.   No.   That was going forward with arbitration.
     I believe the department waived Step 2 in the
     grievance process.   Step 3 would be
     arbitration.

Q.   Did you testify at the hearing conducted by the
     department of unemployment and training?

A.   I did.

Q.   Who else testified on your behalf?

A.   On my behalf?

Q.   Anybody?

A.   Attorney Dave Condon was present.   Just me and
     Dave Condon.

Q.   Who testified from the department, was there
     anybody there?

A.   It would, I might pronounce the name wrong.
     Richard Transfaglia.   He was I believe the
     director of personnel at the time.   He
     presented it for the department.

Q.   Were you present during his testimony?

A.   I was.

Q.   Was it your position that -- strike that.

                 What was your assessment of Mr.
     Transfaglia's testimony?

concerning the reasons why you were

decommissioned?

A. Not that I recall.

Q. Were you curious?

A. I was curious.

Q. What was your reaction when you received the

letter?

A. Well, I was pretty angry.

Q. What did you do about it?

A. Well, this went out en masse to a bunch of

fellow officers. We discussed it and we had

decided that, you know, it was retaliatory in

nature.

Q. Who is the we?

A. Some fellow officers.

Q. What fellow officers are those, sir?

A. I believe John Barnes, John Grennon, I believe

John Ellis. Basically, the then union

officials of JOEASC.

Q. Why did you decide that it was retaliatory in

nature?

A. Well, you may find this hard to believe, but I

had a somewhat contentious relationship with

Mr. Theiss in my duties as chief steward. He

made statements to my counsel, to Dave Condon,
JOEASC counsel, about my credibility. It had
to do with an investigation that was conducted.
I had a problem with something that went on in
the investigation, how an officer was being
interviewed. I think, I believe it was based
on that incident that I was decommissioned or
subject to this retaliatory action.

Q. Well, what incidents are you referring to that
prompted this contentious relationship with
Victor Theiss?

A. It would be a series of them.

Q. I thought it was one investigation?

A. It had built up. No. In my role as chief
steward, as an advocate for the members of the
JOEASC, I am required to sit in on
investigations that the members request and
just --

Q. When you say investigations, are you talking
about investigative interviews?

A. And disciplinary hearings. During the
investigation, a couple of different
investigations. There was one involving a
lieutenant at the jail, who has since passed

1    Q.    Who made the suggestion?

2    A.    The sheriff.

3    Q.    What did she say?

4    A.    She didn't say anything specifically.  She

5          nodded.

6    Q.    Tell me, how it was, Corporal, that you came to

7          the conclusion that job sanctions were in the

8          open?

9    A.    I specifically told her, would he face job

10         sanctions by either answering, failing to

11         answer any of your questions?  She nodded.

12   Q.    What was her nod?

13   A.    It was a silent response.  She didn't give a

14         verbal response.

15   Q.    Well, describe for me her nod, what was it?

16   A.    Head in a vertical motion.  Up and down.

17   Q.    May an officer refuse to answer a question

18         posed by a sheriff?

19   A.    An officer may not; but he was not called in on

20         that capacity.

21   Q.    How do you know what capacity he was called in

22         on?

23   A.    Because these documents were there.  They are

24         specifically John Grennon, vice president.  It

about, April of 2003 to the fall of 2004, when

you were chief steward?

A.   William Pino would have been able to file

grievances.  He was grievance administrator.

John Barnes and John Grennon or John Ellis.

Any one of them could file a grievance.

Q.   Did you have any specific interaction as chief

steward, April of '03 to the fall of '04 with

Elizabeth Keeley?

A.   Yes.

Q.   What was that, sir?

A.   She would have presided over a couple of

disciplinary hearings.  I remember Paul Davis

was a termination she presided over.

Q.   Was that Paul Davis who was charged in the

federal indictment with assaulting detainees of

the jail?

A.   I don't think he was ever changed.  He was

never on trial.  I think he testified before

the grand jury, I am trying to think.  No.  He

was terminated, and there was a couple of other

disciplinary issues.  I think there was at

least two others.

Q.   Can you describe your relationship with

Elizabeth Keeley?

A.    Professional.

Q.    Can you describe your relationship with Michael

Harris?

A.    More friendly and professional.  I got along

good with Mike.

Q.    Victor Theiss you previously characterized as?

A.    Initially, I got along well with him.  Then it

soured.  It was more, we were in adversary

roles as an advocate for the members.  I don't

know.  It was just more of an adversary role.

I don't know if he took things personal or not.

I don't know.  We didn't seem to hit it off.

Q.    Describe your relationship with Eugene Sumpter?

A.    Well, I have known him the longest.  Pretty

much professional all through his, it got

contentious after one specific hearing.

Q.    Which was?

A.    George McCallum's termination.

Q.    Why did it become contentious?

A.    He presented for the department.  As it was

communicated to me, through Superintendent

Horgan, I think he felt that the union ambushed

him in the hearing and somehow made him look

Q. Again, Corporal, I mean no disrupt, but you
have brought this complaint, meaning you have
suffering emotional pain and distress.

A. I believe I just explained some.

Q. That is what you have just described?

A. Yes.

Q. Being ribbed by your colleagues?

        MR. STEWART:  Objection.

A. I explained to you, well, you are leaving out
the part where I was left in limbo by this
department.  I believe I have given good
service.  I was just suspended and never given
an explanation.  Yes.  It was eventually
expunged and I was restored the finances, but
what does that tell me, what is my future
consideration if that happens tomorrow.  Why
not?  It happened then.  I did nothing to bring
that on.  That's a distressing thing.  I don't
know how else to explain it.

Q. Have you received any form of mental health
treatment?

A. No.

Q. As a result of the allegations in the
complaint?