UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
DAVID BERGERON ET AL.,                )
        Plaintiffs                                   )
                                                    )
        v.                                          )
                                                    )        C. A. No. 05-11661-RGS
ANDREA CABRAL, INDIVIDUALLY    )
And SHERIFF OF SUFFOLK COUNTY,  )
        Defendant                                )
_____)

## MEMORANDUM IN SUPPORT OF DEFENDANT SHERIFF ANDREA CABRAL'S MOTION TO STRIKE PLAINTIFF JOHN GRENNON'S AFFIDAVIT.

        This is an action brought pursuant to 42 U.S.C. § 1983 alleging retaliation based

upon political affiliation and union activity.  The Plaintiffs[1] are ten (10) of the thirty-six

(36) custody and non-custody staff at both the Nashua Street Jail ("NSJ") and the Suffolk

County House of Correction ("HOC") who were decommissioned as Deputy Sheriffs on

April 21, 2005 by Defendant Sheriff Cabral pursuant to M.G. L. c. 37, § 3.  Sheriff

Cabral filed her Motion for Summary Judgment on August 13, 2007.  Plaintiffs filed their

Opposition to Defendant's Motion for Summary Judgment on September 21, 2007.

        Sheriff Andrea Cabral hereby moves this Honorable Court to strike from the

summary judgment record the Affidavit of Plaintiff John Grennon included in Plaintiffs'

Opposition to Defendant's Motion for Summary Judgment.  Plaintiff Grennon's Affidavit

---

[1] During the relevant time period of the Complaint, Plaintiffs John Barnes, John Ellis, Paul Giglio, John Grennon, and William Peneau held the rank of JO-1 and were members of the Jail Officers & Employees Association of Suffolk County ("JOASC").  Plaintiff Tim Turley was a Corporal (JO-2) and Plaintiff David Bergeron was a Sergeant (JO-3); both were members of JOEASC.  Plaintiff Erik Dilibero was a permanent Sergeant (JO-3), serving as a temporary Lieutenant pursuant to the terms of the Collective Bargaining Agreement ("CBA").  At various points he was a member of JOEASC and Local 3643, the superior officers union.  Plaintiff Lorne Lynch was a Lieutenant (JO-4) and Plaintiff Al Moscone was a Captain (JO-5). Both Lynch and Moscone belonged to Local 3643.

contradicts his sworn deposition testimony, contains conclusory statements and statements based upon information and belief.  Accordingly it must be stricken from the summary judgment record.  Sheriff Cabral also requests that ¶¶ 3-5 be stricken from Attorney Stephen Pfaff's Affidavit as the information contained therein is inconsistent with Plaintiff Grennon's sworn deposition testimony.

### John Grennon

Plaintiff John Grennon was deposed in this case for two full days on January 19, 2007 and February 26, 2007.  Grennon testified under oath and was represented by counsel who had full opportunity to correct or clarify any of his answers.  Grennon was also provided with an opportunity to review his deposition testimony and make any corrections using an errata sheet.  He made no changes to his deposition testimony.

Notwithstanding, Grennon has submitted an affidavit in support of the Plaintiffs' Opposition to Defendant's Motion for Summary Judgment that directly contradicts his prior sworn testimony without acknowledging the contradictions much less providing any explanation for them. " 'When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory' without providing 'a satisfactory explanation of why the testimony is changed.'" Colburn v. Parker Hannifin/Nichols Portland Division, 429 F.3d 325,  (1st Cir. 2005), quoting Colantuoni v. Calcagni, 44 F. 3d 1, 4-5 (1st Cir. 1994).  Furthermore, the affidavit contains conclusory statements and inadmissible hearsay. See Sheinkopf v. Stone, 927 F.2d 1259, 1271 (1st.Cir. 1991)("It is apodictic that an affidavit…made upon information and belief…does not comply with Rule

56(e)."(citations and internal quotation marks omitted) Accordingly, it must be stricken in its entirety from the record.

Plaintiff Grennon's Affidavit is replete with contradictory and misleading statements. See ¶¶ 4-6, 7, and 9 of the Affidavit of John Grennon, attached as Exhibit 1 to his Opposition to Defendant's Motion for Summary Judgment. Specifically, ¶ 4 of his Affidavit is directly contradicted by his deposition testimony in which he discusses the meeting that he and John Barnes had with Sheriff Cabral concerning dental and vision benefits. Grennon testified that other than Mike Harris and Sheriff Cabral, no one else from the Department was present. Grennon never testified that Steve Tompkins was present and he certainly never testified that Steve Tompkins made the statement that he now attributes to him in the Affidavit. (See Deposition of John Grennon, pgs. 119-125 attached as Exhibit A, hereinafter Grennon Dep.).

Additionally, ¶¶ 4 & 6 contain statements attributed to Steve Tompkins that were never provided in response to clear and unambiguous questions during two days of deposition. Grennon was specifically asked to recount any interactions with senior Department management staff, including Steve Tompkins, in which Grennon felt he had been treated unprofessionally. The **only** such interaction described by Grennon that involved Tompkins occurred in April 2004, when Grennon and Plaintiff Barnes met with Sheriff Cabral concerning the mailings authored and issued by Grennon, Barnes and Plaintiff Ellis in March and April 2004. According to Grennon, at the close of the meeting Tompkins said "something to the effect, we can take your houses for this. I recall him at that point turning and walking away and that was the end of it." (Grennon Dep. pgs. 49-50, 201-202). Grennon never testified to the statements contained in ¶¶ 4

& 6 that he now attributes to Tompkins.  Indeed, the only other conversations that

Grennon testified that he had with Tompkins, were "[t]here cordial conversations"

concerning JOEASC's intention to endorse a candidate in the 2004 election for Sheriff.

(Grennon  Dep., pgs. 154-156).

    The second sentence of ¶ 7 should be stricken because it is contradicted by his

deposition testimony.  When Grennon described his reassignment from training, he

stated, "A lot of people have been reassigned from training, and I **don't think** their

offices have been opened by the investigation division and had their hard drives taken

and other things." (Grennon Dep., pg. 44).  Further, despite being questioned extensively

about his reassignment from the Training Division and the removal of the computer from

the office he was using, he never he provided the information contained in the second

sentence of ¶ 7 of his Affidavit.   (Grennon Dep., pgs. 4-5, 9-13, 44).  Finally, Grennon

does not articulate any facts demonstrating that this statement is based upon personal

knowledge. See <u>Sheinkopf</u>, supra at 1271.  Accordingly it must be stricken.

    The information contained in ¶¶ 2-3, & 5 of Grennon's Affidavit was not testified

to in response to clear and unambiguous questions during his deposition and it is directly

contradicted by his deposition testimony.  Specifically, despite being questioned

extensively concerning contract negotiations and the Department's payment of COBRA

benefits to JOEASC members, he never provided the information contained in ¶¶ 2-3, &

5.  (Grennon Dep., pgs. 40-42, 115-125, 152, 172-173, 194, 196).  Indeed, the

information contained in ¶¶ 2-3 is directly contradicted by his deposition testimony in

which he admitted that the Department voluntarily paid COBRA benefits for JOEASC

members commencing in approximately April 2003 and continuing until October 2004.

(Grennon Dep., pgs. 40-42).   Additionally, Grennon's contention in ¶ 5 that Superintendent Harris was "speaking with Defendant Cabral's knowledge and input" is objectionable because it is a conclusion without articulating any facts to support such conclusion or to demonstrate that it is based upon personal knowledge.

The Plaintiffs' Opposition to Summary Judgment is replete with citations to Grennon's Affidavit regarding the issue of dental and vision coverage.  (See Plaintiffs' Opposition to Defendants' Motion for Summary Judgment pgs. 8-9).  Significantly, in their Opposition, the Plaintiffs contend that the statements that Grennon attributes to Superintendent Harris (¶¶ 2-3, & 5) and Steven Tompkins (¶ 6) were actually made to Grennon **and** Plaintiff John Barnes.  However, Grennon's Affidavit only indicates that the statements were allegedly made to him.  Further, the sworn deposition testimony of John Barnes as the 30(b)(6) representative of JOEASC flatly contradicts Grennon's Affidavit and the Plaintiffs' Opposition on these points.  Specifically, Barnes testified that Sheriff Cabral **agreed** to continue COBRA coverage for JOEASC members **beyond** September 30, 2003.  (See Deposition of John Barnes, dated March 28, 2007, pgs. 127-130, attached as Exhibit B, hereinafter Barnes Dep.).  Indeed, in his deposition testimony as the 30(b)(6) representative for JOEASC and over the two days that he was deposed as an individual, Plaintiff John Barnes testified extensively about the Department's payment of COBRA benefits and the negotiations that took place concerning that issue.  Mr. Barnes testified that the issue of dental and vision coverage was discussed "weekly".  (Barnes Dep., pgs. 116-118; Deposition of John Barnes, dated October 31, 2006, pgs. 143-145, 161-162, hereinafter Barnes II Dep., attached as Exhibit C; Deposition of John Barnes dated December 7, 2006, pgs. 28-29, 33, 37-38, 56, 61-66, hereinafter Barnes III

Dep., attached as Exhibit D). During the three days that he was deposed, John Barnes never testified that Mike Harris or Steve Tompkins made the statements that Grennon attributes to them in his Affidavit and that the Plaintiffs allege were made to both Grennon **and** Barnes in their Opposition.

As demonstrated above, Grennon's Affidavit is in direct conflict with his prior sworn testimony. It is not based upon personal knowledge, contains conclusory statements and conflicts with the sworn testimony of John Barnes. Accordingly, Grennon's Affidavit should be stricken from the summary judgment record in its entirety. Colburn v. Parker Hannifin/Nichols Portland Division, 429 F.3d 325, (1st Cir. 2005); Colantuoni, 44 F. 3d at 4-5; Sheinkopf v. Stone, 927 F.2d 1259, 1271 (1st.Cir. 1991).

Stephen Pfaff

Additionally, ¶¶ 3-5 of Attorney Stephen Pfaff's Affidavit should be stricken, as the information contained therein is inconsistent with the sworn deposition testimony of Plaintiff Grennon. In his affidavit, Attorney Pfaff contends that the reason why Grennon's counseling records were not produced is because Grennon's ex-wife would not authorize the release of records pertaining to treatment that they received together from Dr. Robert Nutt. However, when Grennon was deposed he testified that the **only** mental health counseling that he received pertaining to the allegations in the complaint was from a female psychologist named McNulty. Grennon denied that the allegations in his complaint contributed to the dissolution of his marriage. (Grennon Dep., pgs. 222-224). To the extent that Attorney Pfaff's Affidavit provides factual support for the Plaintiff's Opposition to Sheriff Cabral's Motion to Dismiss for Failure to Comply with the Court's Order of Discovery, it should be stricken. Sheriff Cabral further requests that

Dr. Nutt's records pertaining to the treatment of Plaintiff Grennon and his ex-wife be

subpoenaed to Court for this Court's *in camera* review.

> Respectfully submitted
> For Sheriff Andrea Cabral
> By her attorney
>
> /s/ Ellen M. Caulo
> Ellen M. Caulo, BBO #545250
> Deputy General Counsel
> Suffolk County Sheriff's Department
> 200 Nashua Street
> Boston, MA 02114
> (617) 961-6681

Date:   October 16, 2007


### Local Rule 7.1 Certification

I hereby certify that I conferred with counsel for the Plaintiff in an attempt to narrow the issues raised by Defendant's Motion to Strike.

> /s/ Ellen M. Caulo
> Ellen M. Caulo


### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF).

> /s/ Ellen M. Caulo
> Ellen M. Caulo

1

1        Volume 2
          Pages
2        Exhibits per index

3

    UNITED STATES DISTRICT COURT
4
    DISTRICT OF MASSACHUSETTS
5

6    Civil Action No. 05-CV-11661-RGS

7

8  ------------------------------:
            :
9  Bergeron, et al    :
      Plaintiff,  :
            :
10 V.          :
            :
11 Andrea Cabral     :
      Defendant.  :
12            :
  ------------------------------:
13

ORIGINAL

14

15      CONTINUED DEPOSITION OF JOHN GRENNON, a
  witness called on behalf of the Defendant taken pursuant
16 to the Federal Rules of Civil Procedure, before Patricia
  M. Haynes, a Certified Shorthand Reporter and Notary
17 Public in and for the Commonwealth of Massachusetts, CSR
  No.: 14620F, at the Offices of Suffolk County Sheriff's
18 Department, 200 Nashua Street, Boston, Massachusetts, on
  Monday, February 26, 2007, commencing at 10:00 a.m.
19

20

21

22

23     Copley Court Reporting
    58 Batterymarch Street, Suite 317
24    Boston, Massachusetts  02110
      (617) 423-5841

4

```
 1              P R O C E E D I N G S

 2                 JOHN GRENNON,

 3   having been previously sworn, was examined and testified

 4   as follows:

 5                 MS. CAULO:  Today is Monday, February 26,

 6   2007.  This is the continuation of the deposition of

 7   John Grennon.  Mr. Grennon, you've just been sworn.  We

 8   are going to continue with your testimony.

 9   DIRECT EXAMINATION BY MS. CAULO:

10       Q.   Have you had an opportunity, sir, to review

11   the transcript of your first day of testimony in this

12   matter?

13       A.   Yes.

14       Q.   Do you want to change any of your answers?

15       A.   I don't believe so.

16       Q.   I want to follow up on a couple of things we

17   covered on that earlier date.  In reference to your

18   testimony concerning the office that you utilized at the

19   training division in Chelsea, you indicated on some date

20   you came in and things had been removed from that

21   office.  Do you recall that testimony?

22       A.   I do.

23       Q.   Was any personal property removed from the

24   office that you used at Chelsea?
```

5

1     A.    What do you mean by personal property, things

2  that I owned?

3     Q.    Yes.

4     A.    No, I don't believe so.

5     Q.    Did you keep any union material in the office

6  at Chelsea?

7     A.    I don't believe so.

8     Q.    Last time when we were all together, I asked

9  you about what kinds of things were removed, and you

10 indicated there were files with papers in them and the

11 papers referred to what?

12    A.    There were files with weekly activity reports.

13 There were files with payroll exception reports.  There

14 were files with lesson plans.  There were files,

15 projects that I was working on, that type of stuff.

16 Hanging file folders primarily.

17    Q.    Did any of the files or materials removed

18 relate to anything other than the work that you did for

19 the training division?

20    A.    I don't believe so.

21    Q.    The last time that we were here, you indicated

22 that on one occasion when Marty Michelman was talking to

23 you, he said something to the effect, and this is a

24 quote that was from Victor Theiss I believe, "As long as

9

1    2004 until the time I was disciplined and removed from

2    training, which was October 2004, all the way through

3    that period.  I don't recall late in 2003, to be honest

4    with you.  It's been a long time ago.

5         Q.    When were you disciplined?

6         A.    Well, I was transferred from the training

7    division.

8         Q.    How is that discipline?

9         A.    I felt as though I was disciplined.

10        Q.    Did you grieve it?

11        A.    No.

12        Q.    So was it discipline?

13        A.    Oh, it can be discipline without a grievance,

14   sure.

15        Q.    You said you felt it was discipline?

16        A.    Yes.

17        Q.    Were you disciplined when you were removed

18   from that training as that term is commonly understood

19   in your Collective Bargaining Agreement?

20             MR. STEWART:  Objection.  It's a legal

21   question.

22             MS. CAULO:  He can answer it.

23   BY MS. CAULO:

24        A.    I felt I was disciplined when I was

10

```
 1    transferred from the training division.  I felt I was

 2    disciplined when my computer and files from my office

 3    were confiscated.  I felt as though I was disciplined

 4    when I was decommissioned as a deputy sheriff.

 5            I felt I was disciplined when they sent me a

 6    letter that said I was in bad standing in this

 7    department.

 8        Q.   Did you lose anything having to do with your

 9    rank when you were removed from training?

10        A.   No.

11        Q.   Did you lose any of your salary?

12        A.   A ton, a ton of money.

13        Q.   Was your salary reduced?

14        A.   My salary, my base salary was not reduced.  My

15    overtime was.

16        Q.   Were you suspended?

17        A.   I was not suspended.

18        Q.   We'll get to the issue of the overtime in a

19    little bit.  When your computer -- was it your computer,

20    lieutenant?

21        A.   No.

22        Q.   Was it your office at training, lieutenant?

23        A.   No.

24        Q.   It was an office that you utilized as part of
```

11

```
 1    working for the sheriff's department, correct?

 2         A.    Yes.

 3         Q.    And the items that were taken did not contain

 4    any of your personal property?

 5         A.    I don't believe so.

 6         Q.    Well, search your memory.  Did it?

 7         A.    I don't recall.  I never got that stuff back.

 8    I asked for it on numerous occasions, but I just never

 9    got it back.  Did I have booklets or pamphlets in there

10    that may have been mine?  There may have.  I don't know.

11              I didn't get it back.  I just kind of lost,

12    kind of ran out of steam asking for it, to be honest

13    with you.

14         Q.    What efforts did you make to seek recovery of

15    the property that you felt was yours?

16         A.    I asked Lieutenant Medeiros.

17         Q.    How many times?

18         A.    Numerous.  I don't recall.

19         Q.    What did he do for you?

20         A.    Nothing.

21         Q.    Did you have any conversations with him about

22    whether or not he sought to recover properties that you

23    said was yours?

24         A.    He said he was looking at one point.  He
```

12

1    believed the computer went to MIS.  I asked for some of

2    the presentations that were on the computer that I was

3    working on, and he said he was unable to get it.

4        Q.    Were those your presentations or were they the

5    property of the department?

6        A.    I would say they were my presentations.  I

7    developed them.

8        Q.    Which presentations are you talking about?

9        A.    I don't recall.

10        Q.    What presentations did you develop?

11        A.    Classes that I was working on at the time.

12    It's been a couple of years, so I don't recall which

13    ones they were.

14        Q.    You developed completely things that you came

15    up with on your own?

16        A.    Some of them were revisions to presentations

17    we were using with some new statistics or new facts or

18    new ideologies that had come about in the past few

19    years.  And some were, like the cultural diversity

20    presentation, were from scratch.

21        Q.    If you were working on creating presentations

22    to deliver as part of your job at the training academy,

23    it's your position that was personal property?

24        A.    No, that's not my position.

13

1     Q.    Is it your personal property or do they belong
2     to the --
3     A.    It's a legal question.  I don't know the
4     answer to that one.
5     Q.    I'm asking your opinion?
6     A.    I don't have an opinion on it, to be honest
7     with you.
8     Q.    You indicated these were your things that you
9     felt should have been returned to you.  I'm trying to
10    get a sense --
11    A.    Well, I'm not asking for exclusive license to
12    them, I would just like the copies of what I was working
13    on so I would have them.  I teach other places, I do
14    lectures in other places.  Not that I would use sheriff
15    department material for lectures outside of the
16    sheriff's department, certainly not without permission,
17    but some of the research efforts that went into those
18    presentations, the raw data, I would have liked to have
19    had.
20    Q.    When was this conversation that you had with
21    Marty Michelman where you had dinner with him after he
22    was terminated, do you recall?
23    A.    I don't.  Pardon me, dinner was in Somerville
24    at a restaurant called Red Bones, but I don't recall

40

1     employee relations had told him about these grievances

2     and he was going to speak to --

3          A.   I don't recall.

4          Q.   Did anyone ever say to you, Marty Michelman or

5     anybody over at training, that the union had better stop

6     filing grievances?

7          A.   I don't recall.

8          Q.   Unfair labor practices, did Mr. Michelman ever

9     mention that?

10         A.   I don't recall.

11         Q.   When did the department begin paying COBRA

12    benefits for dental and vision?

13         A.   I don't recall when they started paying but

14    shortly thereafter.

15         Q.   Shortly after your separation from AFSCME?

16         A.   No, shortly thereafter of our termination of

17    benefits from the Mass. Public Employees Fund.

18         Q.   Which coincided with your self-organization as

19    JOEASC?

20         A.   I recall in about two months after that.

21         Q.   So are we talking about April of '03?

22         A.   That sounds good.

23         Q.   And the department was paying COBRA benefits,

24    and for how long a period of time were those benefits

41

1    being paid?

2         A.    I don't recall.

3         Q.    Was it about 18 months?

4         A.    I don't recall.

5         Q.    Were the COBRA benefits being paid by the

6    department for dental and vision in the spring of 2004?

7         A.    I believe they were.

8         Q.    In fact, they continued to about October of

9    2004; isn't that right?

10        A.    I don't recall.

11        Q.    I'm placing a document in front of you.  Does

12   that refresh your recollection as to when the COBRA

13   benefits extension coverage was going to go?

14        A.    Okay.

15        Q.    Does that refresh your recollection as to the

16   COBRA benefits being extended into October?

17        A.    Yes.

18        Q.    And when I say "this," I'm referring to a

19   letter sent to John Barnes, president of JOEASC,

20   delivered in hand by Michael Harris, superintendent of

21   human resources, dated July 16, 2004?

22        A.    Yes.

23              MS. CAULO:  We'll mark it as Exhibit 2.

24              (Document marked for identification as

42

Exhibit No. 2.)

BY MS. CAULO:

    Q.   At the time, spring, summer through the early fall of 2004, the department was making the COBRA benefits, correct?

    A.   Sounds right.

    Q.   At the time that you applied for the director of training lieutenant, were you certified to train the trainers or the instructors?

    A.   I was.

    Q.   Is there a distinction between someone who is certified to train the trainers or the teachers or someone who is certified to train the students?

    A.   Yes.

    Q.   And at that time you applied, which would be the spring of 2003, you had the certification to train the trainers?

    A.   Yes.

    Q.   When did you first get that?

    A.   I don't recall.  Probably years before.

    Q.   What management experience did you have from the time you submitted your application to be director of training?

    A.   Within the training division, I was

44

1    for how long a period of time?

2        A.    I would bet from around 2000 until I was

3    thrown out in 2004.

4        Q.    You were thrown out or reassigned, lieutenant?

5        A.    Do you object to my using the words thrown

6    out?

7        Q.    I'm asking.  Were you thrown out of training

8    or were you reassigned?

9        A.    The department would say reassigned, but I was

10    reassigned in a special way.  A lot of people have been

11    reassigned from training, and I don't think their

12    offices have been opened by the investigation division

13    and had their hard drives taken and other things.

14        Q.    What other things were taken?  I've been

15    trying to articulate from you exactly what was taken

16    from you, things that belonged to you.

17        A.    Hanging file folders with documents in them

18    that were in my possession.

19        Q.    Can you describe how your qualifications for

20    the director of training position compared with those of

21    Mr. Michelman?

22        A.    Can I describe them?

23        Q.    Yes.

24        A.    I don't know how they compare.

49

```
 1    the sheriff's administration that you felt was acting on
 2    behalf of the sheriff in a way you did not think was
 3    professional.
 4         A.   Yes.
 5         Q.   Who?
 6         A.   Elizabeth Keeley.
 7         Q.   Describe those interactions which you felt
 8    were not professional.
 9         A.   I described it from my day one testimony when
10    she called me into her office.
11         Q.   Other than that incident?
12         A.   Nothing I can recall right now.
13         Q.   Anybody else other than that one incident with
14    Elizabeth Keeley and the conversations or interactions
15    you've described with Victor Theiss, anybody else on
16    behalf of the department that you felt interacted with
17    you in an unprofessional manner?
18         A.   Steve Tompkins.
19         Q.   When?
20         A.   We had a meeting in this conference room, I
21    don't recall the date, where we were called here.  It
22    was a Friday afternoon I believe, and we were called to
23    report here at 2:30 in the afternoon, myself and John
24    Barnes.  And we were here for about three hours.
```

50

1     Q.   We'll get there in a minute.  This was the

2  issue about the mailings?

3     A.   Yes.

4     Q.   We'll talk about that in greater detail, but

5  what exactly about Mr. Tompkins on that particular date?

6     A.   As we were leaving the room, Mr. Tompkins at

7  the door behind you turned around and asked us if we

8  owned homes.  Myself and John Barnes I remember said

9  yes.  And he had said something to the effect, How would

10  you like to lose those homes?

11     We just very stunned looked at him.  He said

12  something to the effect, We can take your houses for

13  this.  And I recall him at that point turning and

14  walking away and that was the end of it.

15     Q.   What did you say?

16     A.   I didn't say anything to him.  I called

17  Merrick, Louison & Costello.

18     Q.   When?

19     A.   The minute I walked out the front door.

20     Q.   What did you tell them?

21     MR. STEWART:  Objection.  Don't tell her

22  anything you talked about with your lawyers.

23  BY MS. CAULO:

24     Q.   What was it about that situation, what was it

115

1    were going to make a decision?

2        A.   I suppose I was.

3        Q.   Were you required to get approval?

4        A.   Depending on what the decision was, yeah,

5    absolutely.  Absolutely.  If we were having a meeting

6    that had anything to do with the Collective Bargaining

7    Agreement, I would have felt it necessary to get

8    approval from him.

9        If I was looking to schedule a meeting, I

10   would have had to get his approval because he would have

11   had to attend.  I can't think of any specifics where I

12   had to actually call him up and get approval for doing

13   something.

14       Q.   How would you characterize the way that you

15   worked together in your respective roles?  Was it kind

16   of have a shared responsibility in terms of the decision

17   making process?

18       A.   I would agree with that.  It was a shared

19   responsibility to run the organization.  Some shared

20   decisions were made, but there was also some blind

21   support also that if John made a decision and if he knew

22   I would be behind it 100 percent.

23       Q.   What work did do you as vice president on

24   behalf of the union membership between April of '03 and

116

1    say October of '04 when the new administration came in,

2    thereabouts?

3         A.    I think I was already out in October '04.  I

4    think.  What kind of work?  Contract negotiations, a lot

5    of that.  Some labor management stuff.  What else?

6         Q.    Describe to me the contract negotiations.

7         A.    I sat on the contract negotiation team.

8         Q.    Who else did?

9         A.    John Barnes was there.  I believe Mike Walsh

10   was there.  John Ellis was definitely there taking

11   notes.

12        Q.    What was your role?

13        A.    John was the primarily the negotiator, and we

14   had some rules that if you wanted to say something that

15   you would need to call for a caucus and then step out.

16   The role was basically listening, the role was to have a

17   discussion before contract negotiations about what the

18   points were going to be that day, go into the room and

19   kind of keep your mouth shut and see how it went, have a

20   few caucuses during the contract negotiations to offer

21   suggestions or counterpoints to the administration or

22   whatever came up, you know.

23              And then to meet after contract negotiations

24   to see where we were with our goals and where the

117

1   department was with theirs.

2        Q.    This is the period of 2003 through 2004?

3        A.    Yeah.

4        Q.    You mentioned Mr. Ellis, Mr. Barnes, Mr. Walsh

5   and yourself.  Anybody else from the union at the table

6   for contract negotiations?

7        A.    Jack Tullos was at the table for contract

8   negotiations, and I recall Cinelli occasionally but not

9   all the time.  I don't think his job allowed him to be

10  pulled out for negotiations.

11       Q.    Who was at the table for the department?

12       A.    Michael Harris was always there.

13       Q.    Anybody else?

14       A.    I remember Gene Sumpter a few times.  And I

15  remember Michelle Gibbons was kind of like Mike's

16  administrative assistant shall we say next to him.

17       Q.    Did Sheriff Cabral ever sit at the table

18  during the contract negotiations?

19       A.    I don't believe so.

20       Q.    Prior to this particular contract negotiation,

21  which you indicated earlier was not successful in

22  gaining a contract --

23       A.    Correct.

24       Q.    -- had you ever been involved in contract

118

1    negotiations on behalf of the union before then?

2        A.    No.

3        Q.    Could you describe the contract negotiations,

4    what the climate was?

5        A.    Well, some days were good, some days were bad.

6    We were working towards a common goal.  Both sides

7    wanted the contract.  We would make our proposals.  Some

8    were well received, some weren't.  The department would

9    make their proposals.

10            I remember a collegial atmosphere.  I don't

11   remember any shouting matches.  It was very professional

12   I thought.  I enjoyed contract negotiations.

13       Q.    Michael Walsh and Mr. Tullos, fair to say they

14   were both active union members in your experience?

15       A.    They were active when I was the vice president

16   of the union, yes.

17       Q.    They have been promoted to lieutenants?

18       A.    Just recently, yes, the same day I did, the

19   first Wednesday of January 20007.

20       Q.    You mentioned contract negotiations and labor

21   management meetings.  Other than Michael Harris, did you

22   engage in any direct contact with Elizabeth Keeley in

23   your role as vice president of the union?

24       A.    When she called me in at South Bay to discuss

119

1    an issue with me.  Other than that, no, I don't believe

2    I dealt with her one on one.

3         Q.    To be clear, the issue you're referring to is

4    the time you were at the house and you wanted to speak

5    with her concerning the honor guard, and she had some

6    conversation with you concerning your application for

7    director of training?

8         A.    Yes.  I didn't want to speak to her, she

9    wanted to speak to me.

10         Q.    I want to make sure we are clear.  There was

11    no other incident you had or interaction you had with

12    Elizabeth Keeley?

13         A.    Not that I recall.

14         Q.    How about Sheriff Cabral, did you have any

15    specific interactions with her?

16         A.    We met with Sheriff Cabral in her office here

17    at Nashua Street just after the interim elections were

18    held.  I want to say it was myself, Michael Harris, John

19    Barnes and the sheriff.  I don't believe anybody else

20    was there.

21         Q.    When was this?

22         A.    When?  Right after the interim election, so

23    I'm going to say -- do you have the creation date of

24    JOEASC in front of you?

120

1      Q.    February or thereabouts, February of '03?

2      A.    So this meeting was probably March of '03.

3      Q.    Before you were elected a vice president or

4  after?

5      A.    I believe it's probably right afterwards.  I

6  don't think she would have met with us prior to that.

7      Q.    I believe that was April, but that year, March

8  or April?

9      A.    Ballpark, yeah.

10     Q.    Other than that occasion, did you have any

11 specific interactions with Sheriff Cabral in your

12 capacity as vice president with respect to contract

13 negotiations?

14     A.    No.  I don't recall.

15     Q.    Labor management issues?

16     A.    I'm thinking back.  The dental and vision

17 benefits, yeah, may have risen to Sheriff Cabral's

18 level, and we had a conversation about that.

19     Q.    When was that?

20     A.    Whenever our benefits were discontinued, we

21 met with the sheriff and gained her support that day

22 trying to establish some interim benefits.  So I don't

23 know the date right offhand, but I would say immediately

24 during that crisis when we realized that people were

121

1    going to the dentist and the eye doctor and it wasn't

2    being paid for.

3        Q.   When you say gained her support, is that when

4    the department agreed to pay the COBRA benefits?

5        A.   I believe so, yes.

6        Q.   Is that what you're talking about?  I want the

7    record to be clear about what your testimony is.

8        A.   My recollection of that meeting was that, and

9    this is through Michael Harris, too, because he was

10    speaking to her, that the sheriff was not happy that

11    this had happened and the department wasn't notified

12    about it, No. 1, and that the Mass. Public Employees

13    Fund didn't call them and tell them they were cutting

14    almost 300 people from their program and that -- yeah,

15    the sheriff would be paying the COBRA benefits to

16    continue our dental and vision coverage, yeah.

17        Q.   So the department wasn't responsible for the

18    Massachusetts Public Employees benefits cutting you

19    folks off?

20        A.   Absolutely not.

21        Q.   Did the sheriff ever say to you that she

22    wanted to use dental and vision as a bargaining chip?

23        A.   Yes.

24        Q.   When in relation to this conversation in which

122

1    she supported you?

2       A.   I forget.  We were in a meeting and it was in

3    this room.  And I'm not sure which meeting it was, but

4    we were in a meeting with her in this room.  And John

5    Barnes had brought it up, the dental and vision thing,

6    and she had said something along the lines, and I'm not

7    quoting here exactly, I'm not giving you dental and

8    vision benefits outside of a new contract.  It's too big

9    of a bargaining chip or I'd lose a bargaining chip.

10        It was just a statement.  We weren't arguing

11    or anything like that.  She just made the statement.

12       Q.   You mentioned before that you had a meeting

13    with the sheriff shortly after you got selected, you had

14    a meeting in which she expressed support and surprise

15    for providing the COBRA benefits and surprised you were

16    cut off.  Is there a third meeting?

17       A.   There is a third and fourth meeting, yes.

18       Q.   When did it occur in relation to the

19    department voluntarily picking up the COBRA benefits?

20       A.   At some point during that crisis, I'm not

21    sure.  I'm thinking probably months down the road

22    though.  Because things were quiet.  When the department

23    continued that obligation, things were quite quiet for

24    several months while we were working with Richard

123

1    Tranfaglia and a representative of the dental and were

2    trying to get a new plan hammered out.  I'm going to say

3    when that kind of fell apart.

4        Q.    I'm trying to make sure I understand you

5    correctly.  At the time that you allege that the sheriff

6    said that she wanted to, what were your words, what did

7    the sheriff say?

8        A.    That dental and vision were -- actually, what

9    did I say?  Can you go back and look?

10        Q.    You said you weren't quoting the sheriff.

11    Give me your best memory as to what the sheriff said as

12    pertaining to dental and vision?

13        A.    That the issue wouldn't be settled, and this

14    isn't a direct quote, outside of contract negotiations

15    because it was a bargaining chip or it was leverage.

16    That was the gist of the conversation.

17        Q.    At the time that that comment was allegedly

18    made, was the department paying the COBRA benefits?

19        A.    I believe they were.

20        Q.    And at that time, were you and the department,

21    you meaning JOEASC, engaged in contract negotiations

22    which we just spoke about a few moments ago?

23        A.    I believe at that point they were stalled

24    contract negotiations, but yes, I believe we were.

1

1           Volume 2
2           Pages
            Exhibits per index

3
            UNITED STATES DISTRICT COURT
4
            DISTRICT OF MASSACHUSETTS
5

6       Civil Action No. 05-CV-11661-RGS

7

8   --------------------------------:
                                    :
9   Bergeron, et al                 :
                    Plaintiff,      :
                                    :
10  V.                              :
                                    :
11  Andrea Cabral                   :
                    Defendant.      :
                                    :
12                                  :
13  --------------------------------:

14

15          CONTINUED DEPOSITION OF JOHN GRENNON, a
    witness called on behalf of the Defendant taken pursuant
16  to the Federal Rules of Civil Procedure, before Patricia
    M. Haynes, a Certified Shorthand Reporter and Notary
17  Public in and for the Commonwealth of Massachusetts, CSR
    No.: 14620F, at the Offices of Suffolk County Sheriff's
18  Department, 200 Nashua Street, Boston, Massachusetts, on
    Monday, February 26, 2007, commencing at 10:00 a.m.
19

20

21

22
            Copley Court Reporting
23      58 Batterymarch Street, Suite 317
          Boston, Massachusetts  02110
24              (617) 423-5841

*ORIGINAL*

124

```
1        Q.    If you're already engaged in contract

2   negotiations, is that the forum where issues pertaining

3   to the contract are supposed to be raised?

4        A.    In contract negotiations?

5        Q.    Yes.

6        A.    Yes, formally.  But I would say no informally.

7   We would meet with Mike Harris a lot and we would

8   discuss ideas and we would discuss points of negotiation

9   in an informal setting in his office where the rules of

10  contract negotiations weren't bound.

11       Q.    I'm just trying to get a sense that this

12  meeting that you talked about with Sheriff Cabral.  This

13  was not a contract negotiation meeting, was it?

14       A.    No, it was not.

15       Q.    And you weren't there to negotiate the

16  contract in any way, shape or form even as it pertained

17  to dental and vision?

18       A.    No.  This may have been the meeting where we

19  were called in and Steve Tompkins made that statement

20  going out the door.  It may have been that meeting.

21       Q.    Wasn't the meeting that you had with Sheriff

22  Cabral, wasn't that in April of 2004?

23       A.    The meeting where?

24       Q.    Where Sheriff Cabral wanted to speak to you
```

125

1    about the mailings that you and Mr. Ellis and Mr. Barnes

2    put out?

3        A.    I'll take your word for it, sure.   The dates

4    are very difficult here.   I don't have a calendar in

5    front of me, and we didn't write these things down as

6    they happened.

7        Q.    You said it was a Friday afternoon at 2:30 and

8    you lasted there for about three hours.

9        A.    I know that.

10       Q.    And the meeting that you're talking about in

11   which Sheriff Cabral mentioned something about dental

12   and vision, Michael Harris was there, Barnes was there

13   and who else, Ellis?

14       A.    Possibly, but I don't recall.   I remember John

15   Barnes being there.

16       Q.    Who else from the department?

17       A.    I don't recall anybody else.   It all gets kind

18   of fuzzy.

19       Q.    Did you testify in any arbitrations on behalf

20   of the union members in 2003?

21       A.    I don't believe so.

22       Q.    2004?

23       A.    I don't believe so.

24       Q.    In 2005?

152

1      A.     Absolutely.  As vice president of the union,
2  absolutely, yeah.
3      Q.     You wouldn't go through employee relations?
4      A.     No.
5      Q.     Or chief of staff?
6      A.     Not when I thought they rose to that level.
7      Q.     What issues did you feel rose to the level of
8  requiring a direct meeting with the sheriff in which you
9  initiated it directly?
10      A.     The dental and vision benefits being
11  terminated for our members.
12      Q.     When were they terminated?  I thought the
13  department was paying COBRA payments?
14      A.     Sporadically.  There were quite a few months
15  where the payments weren't made or they were made late,
16  and members were almost on a monthly basis tell us they
17  weren't receiving benefits.  And that was a problem.
18      Q.     What other times did you seek to speak with
19  the sheriff directly and she didn't speak to you?
20      A.     I don't recall.
21      Q.     You don't recall or there wasn't any other
22  occasions?
23      A.     There were other occasions, I just don't
24  recall when they were.  It was a long time ago.

154

```
1     computer.  I can get it for you.
2          Q.   Once JOEASC endorsed Sheriff Cabral --
3          A.   JOEASC never endorsed Sheriff Cabral.
4          Q.   Once JOEASC voted to endorse Stephen Murphy,
5     did the sheriff have any comment or response to that?
6          A.   I don't recall.
7          Q.   You don't recall or it didn't happen?
8          A.   I don't recall.  I know Michael Harris was
9     very upset.  I know that there were a lot of people,
10    there was a lot of rumblings around here.  I don't
11    recall if the sheriff had a response to that whether
12    direct or indirectly.
13         Q.   Did you have any response delivered to you to
14    Michael Harris concerning the endorsement of Stephen
15    Murphy?
16         A.   No.
17         Q.   Did you have any response delivered to you
18    through Steven Tompkins concerning the endorsement of
19    Stephen Murphy?
20         A.   No
21         Q.   Did you ever discuss the election for sheriff
22    with Steve Tompkins?
23         A.   Yes.
24         Q.   Before or after the election?
```

155

1      A.    Before and after.

2      Q.    Tell me those conversations.

3      A.    Steve had asked me before we had endorsed

4  anybody if we were going to support the sheriff.  And I

5  had told Steve that we hadn't made our mind up yet.  In

6  a subsequent conversation, I remember telling Steve that

7  we were going to interview candidates for sheriff, and

8  we were going to ask them their opinion or what they

9  would do with the three points of contention we were

10  having here, which I described earlier.

11      And I remember Steve Tompkins telling us after

12  we endorsed that we had made a very, very big mistake.

13  I think that's probably all the conversations I had with

14  him about that.  Three cordial conversations.

15      Q.    What further did he say about you're making a

16  big mistake?

17      A.    He wasn't a big fan of Steve Murphy, and he

18  kind of indicated that.

19      Q.    Tell me everything you can recall about what

20  he said to you about you're making a big mistake for

21  endorsing Stephen Murphy.

22      A.    Initially in the conversation, he had said

23  that Stephen Murphy, that Stephen Murphy represented

24  what the sheriff was trying to change, the old political

156

```
 1    establishment in Boston and the good old boy network and
 2    what this department was trying to get away from.  And
 3    that was his, the gist of that.
 4            And then he had said it would not be good for
 5    our carriers as union leadership.  And he reminded us
 6    that the sheriff embraced us and the sheriff allowed us
 7    to do our, to be disclaimed by AFSCME.  And that was
 8    kind of the end of it.
 9        Q.   What specifically did he say whether or not
10    this would be good for your careers?
11        A.   That's all he said.
12        Q.   Did you ask him what he meant by that?
13        A.   I did not.
14        Q.   What did you think it meant?
15        A.   That there could be potential trouble for us,
16    that the administration could make potential trouble for
17    us.
18        Q.   Did you agree with his assessment of Stephen
19    Murphy that he represented the good old boy?
20        A.   I did not.
21        Q.   Did you believe he embraced the same kind of
22    reforms that Sheriff Cabral did?
23        A.   I believe that he embraced different reforms.
24    I believed he probably shared some with Sheriff Cabral
```

172

```
1    accused of mismanaging its fiscal resources and creating

2    its own budget shortfall of over $3 million."  Accused

3    by whom?

4         A.    I don't know.

5         Q.    The press release also refers to a lack of

6    dental and vision health coverage, does it not?

7         A.    It does.

8         Q.    And the date of that is March 25 of 2004?

9         A.    Yes.

10        Q.    The department was paying COBRA benefits at

11   that time?

12        A.    I'm not sure.

13        Q.    Well, we do know that they were paying COBRA

14   benefits by your own testimony shortly after your

15   separation from AFSCME, which is in or about April of

16   2003, right?

17        A.    Yes.

18        Q.    Continuing until October of 2004 as that

19   letter from Michael Harris to John Barnes indicated,

20   Exhibit 2?

21        A.    The letter does indicate that.  But there were

22   significant disruptions in payments, including some that

23   were over a month long.

24        Q.    Were union leaders and local Suffolk County
```

173

```
1    opinion leaders and citizens informed that the
2    department was paying COBRA benefits?
3         A.   I have no idea.
4         Q.   These are three documents.  Is there anything
5    in those three documents that indicates the department
6    was paying COBRA benefits?
7         A.   I don't believe so.
8         Q.   To your knowledge, is there a reason why that
9    information wasn't included?
10        A.   They may not have been paying them at this
11   time.
12        Q.   Do you think it would have been important for
13   opinion leaders in Suffolk County to know the department
14   was paying the COBRA benefits?
15                  MR. STEWART:  Objection.
16   BY MS. CAULO:
17        A.   Do I think it would be important?  The
18   department was intermittently paying COBRA benefits and
19   also letting us know or holding it over our head that
20   this was not going to be a permanent solution.  So for
21   all I know, March 25, 2004, we may not have had benefits
22   at that time.
23        Q.   On that particular day?
24        A.   That month maybe.  I don't know.  I know we
```

194

1    said.  She was not pleased about the letters.  She

2    demanded a retraction.  She was not pleased about us

3    talking to the press.  She was not pleased about a

4    lawsuit being filed.  She wasn't pleased -- it was three

5    hours of not being pleased with us.

6        Q.    Did you discuss anything other than the

7    content of those mailings?

8        A.    I don't recall.

9        Q.    Did you discuss the contract negotiations?

10       A.    Yes.

11       Q.    What contract negotiations did you discuss?

12       A.    Ones that were pending I believe.

13       Q.    What specifically?

14       A.    The dental and vision benefits.  When we

15   brought the dental -- when we talked about the

16   department not following through with their contractual

17   obligations to provide dental and vision benefits at

18   this meeting when we were defending ourselves, that's

19   when the statement was made that she wasn't going to

20   give us dental and vision benefits because it was a

21   bargaining chip.

22       Q.    That was right here?

23       A.    In this room.

24       Q.    Wait.  The comment that you attribute to

196

1    like to know what I already said because I'll reiterate

2    those points.

3         Q.    What did she say that she was displeased about

4    your behavior?  That's a different question.  What about

5    your behavior displeased her?

6         A.    She was upset or she was mad at the activities

7    that we were engaging in as a union.

8         Q.    What activities did she tell you that she was

9    upset about?

10        A.    She thought was the letter was sabotage.  She

11   asked who wrote this letter.  She brought up the dental,

12   she brought up Richard Tranfaglia in the meetings that

13   we had had.  And I remember the sheriff saying they had

14   brought a rep in from dental and it was almost resolved.

15             And I remember we came back and said it was

16   resolved.  Richard Tranfaglia said it was resolved.  He

17   said we with are all set.  Then Mike Harris came in and

18   said it's not resolved outside the bargaining table.

19             It was like all done, and I remember us trying

20   to explain that to her.  We were at a very great

21   disadvantage in this room.

22        Q.    When she asked who wrote this letter, what did

23   you say?

24        A.    I believe I said I didn't write the letter,

201

1    we had committed a crime.

2        Q.    What was that?

3        A.    It was either libel or slander.  I'm not sure

4    which one it was.  And I remember telling her that the

5    pension lawsuit and any of these letters or all of these

6    letters or anything that we do goes through Merrick,

7    Louison & Costello.

8            And I remember her telling me that we had

9    gotten bad advice from our lawyers, and they wouldn't be

10   the ones at the end of the day being punished for it.

11       Q.    Anything else that you can recall that Sheriff

12   Cabral said?

13       A.    I don't.

14       Q.    Did anyone else speak other than Sheriff

15   Cabral?

16       A.    Michael Harris spoke.

17       Q.    What did he say?

18       A.    I don't recall, but I know he spoke.

19       Q.    Do you recall what he spoke about if not the

20   exact words?

21       A.    I don't.

22       Q.    Did Mr. Tompkins say anything?

23       A.    Other than at the door, I don't believe so.

24       Q.    What did he say at the door?

202

| | | |
|---|---|---|
| 1 | A. | That he could take our houses. |
| 2 | Q. | Was that on your way out? |
| 3 | A. | Oh, yes. |
| 4 | Q. | Did Mr. Sumpter say anything? |
| 5 | A. | I don't recall. |
| 6 | Q. | Did you take any notes during it? |
| 7 | A. | I don't believe so. |
| 8 | Q. | Did you take any notes afterwards? |
| 9 | A. | I did. |
| 10 | Q. | Where are those notes? |

11  A.  Dave Condon might have them.  We had called,
12  when we left here, as soon as we hit the front door, we
13  called Merrick, Louison & Costello on the cell phone,
14  Dave Condon specifically, and told him what had just
15  happened.

16         My specific concern was being fired, and my
17  second concern I told him was going to jail.  And my
18  third concern was losing any assets that I had.  Dave
19  was very upset.  He got Doug Louison and Steve Pfaff on
20  the phone.

21         MR. STEWART:  Stop right there.  Don't
22  reveal things that took place between you and your
23  attorneys.

24  BY MS. CAULO:

222

```
1        Q.    When did become union president?

2        A.    In 2006, April.  But that's the emotional

3    distress.  I just wanted to come to work and do my job.

4        Q.    Did you seek any counseling?

5        A.    My job has never been in question.

6        Q.    Have you received any counseling?

7        A.    Yes.

8        Q.    Mental health counseling?

9        A.    Yes.

10       Q.    Related to this?

11       A.    Yes.

12       Q.    With whom?

13       A.    McNulty I believe her name was.  She's in

14   Hingham or Norwell.

15       Q.    What is her specialty?

16       A.    I don't know.

17       Q.    Is she a psychiatrist, a psychologist?

18       A.    I believe she's a psychologist.

19       Q.    Clinical social worker?

20       A.    She's a psychologist but I don't know.

21       Q.    When did see her?

22       A.    Early 2005.  February or March, April, 2005.

23       Q.    For how long a period of time did you see her?

24       A.    Not many.  A couple of visits, maybe three or
```

223

1    four, and then I stopped going.

2        Q.    Were you prescribed any medication?

3        A.    Absolutely not.

4        Q.    Have you received any other form of mental

5    health treatment pertaining to any allegation you raise

6    in this Complaint?

7        A.    None.

8            MS. CAULO:  Rob, that clearly falls within

9    the document production request, any records pertaining

10   to his treatment with this psychologist.

11           THE WITNESS:  Whatever she was.

12   BY MS. CAULO:

13       Q.    How were you referred to her?

14       A.    Lieutenant Ryan, EAP.

15       Q.    What effect did the allegations in this

16   Complaint have on your marriage?

17       A.    Just caused stress at the house.

18       Q.    What effect did removal from training have on

19   your marriage?

20       A.    None.

21       Q.    What effect did the decommissioning have on

22   your marriage?

23       A.    None.

24       Q.    Do you have any contention that any of the

224

1  allegations in your Complaint contributed to the

2  dissolution of your marriage?

3       A.   No.

4       Q.   You were involved with the Mass. Sheriff's

5  Association?

6       A.   I was.

7       Q.   What was your involvement with that

8  organization?

9       A.   I was on the education and training

10  subcommittee.

11       Q.   What training issues were you involved in on

12  the education and training subcommittee?

13       A.   We approved recruit and in-service training

14  state wide for the 14 counties or the 12 counties that

15  are active.  We ran a seminar out at I think it's

16  Holyoke Community College once a year.  We held monthly

17  board meetings at the Worcester County Sheriff's

18  Department.

19            It's kind of a fun place to be.  It was one of

20  the cutting edge things coming off training.  We would

21  talk about it there and then try to promulgate a

22  program.

23       Q.   Who is Brian Gary?

24       A.   He's a member of the Plymouth County Sheriff's

1

VOLUME:  I
PAGES:  1 through 141
EXHIBITS:  See Index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.
05-CV-11661-RGS

*********************************
DAVID BERGERON, JOHN GRENNON,    )
LORNE LYNCH, JOHN BARNES,        )
JOHN ELLIS, TIMOTHY TURLEY,      )
AL MOSCONE, WILLIAM PENEAU,      )
ERIC DILIBERO and PAUL GIGLIO,   )
                Plaintiffs,      )
                                 )
     vs.                         )
                                 )
ANDREA CABRAL, Individually and  )
as SHERIFF OF SUFFOLK COUNTY,    )
                Defendant.       )
*********************************

**ORIGINAL**

     **DEPOSITION OF JOHN BARNES**, a witness called
on behalf of the Defendant, taken pursuant to the
Provisions of the Federal Rules of Civil
Procedure, before Julie A. Healey, a Certified
Shorthand Reporter, Registered Professional
Reporter, and Notary Public in and for the
Commonwealth of Massachusetts, at the offices of
the Suffolk County Sheriff's Department, 200
Nashua Street, Boston, Massachusetts, on March 28,
2007, commencing at 10:03 a.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110

COPLEY COURT REPORTING, INC.
(617) 423-5841

127

1     meeting, then it's correspondences are read, and

2     then it's reports of officers.

3         Q.   Okay.

4         A.   And special committees.

5         Q.   And the way reports of officers are done

6     is someone stands up, the president, vice

7     president, or secretary and verbally gives a

8     report?

9         A.   Correct.

10        Q.   And these notes reflect a summary of that

11    presentation, is that fair?

12        A.   Correct.

13        Q.   Okay.  I want to direct your attention

14    under paragraph No. 3, president's report, to the

15    bullet point, the second bullet point, dental and

16    vision plan update, "Mr. Barnes stated that the

17    Department was attempting to use the acquisition

18    of a new plan as a, quote, "bargaining chip" end

19    quote, towards a new collective bargaining

20    agreement."

21             Did I read that correctly?

22        A.   Correct.

23        Q.   You informed the assembled members the

24    Department was attempting to use that, you didn't

128

1    tell them Sheriff Cabral told you dental and

2    vision was a bargaining chip, correct?

3         A.   Not at this time, correct.

4         Q.   And certainly this doesn't reflect that?

5         A.   Correct.

6         Q.   Later on in the same second bullet point,

7    you specifically state, "Mr. Barnes stated that

8    Sheriff Cabral indicated to him that Cobra

9    insurance coverage would be extended beyond

10   September 30th"?

11        A.   Correct, because that was another one of

12   those dates that the Department kept putting dates

13   they were going to cut it off in, they kept

14   placing the date saying effective this date,

15   you'll lose your Cobra coverage unless you have a

16   contract.

17        Q.   So, they kept extending the Cobra

18   coverage?

19        A.   Yes.

20        Q.   And so, it was extended until

21   September 30th, 2003, and we know from your

22   earlier testimony it was extended to July 30th,

23   2004?

24        A.   Correct.

129

1        Q.   And you make a specific reference to

2    Sheriff Cabral as communicating that information

3    to you, right?

4        A.   Um --

5        Q.   "Mr. Barnes stated that Sheriff Cabral

6    indicated to him," you, "that Cobra insurance

7    coverage would be extended beyond September 30th"?

8        A.   That's what's written in the minutes.

9    Like I said, it's not an exact transcript.

10       Q.   Sure.

11       A.   I believe I had a conversation with the

12   Sheriff in regards to the extension of the Cobra

13   coverage at that time, and she agreed to do it.

14       Q.   Sure, and this is no indication that the

15   use of the word bargaining chip several sentences

16   earlier was attributed to Sheriff Cabral in a

17   conversation you had with her, right?

18       A.   There is no indication of it, right.

19       Q.   And the last sentence of that bullet

20   point, "Mr. Barnes hoped for a meeting to vote on

21   the plan in October with new application forms

22   available by December 15th for a 2004 enactment of

23   new coverage."

24            We know that coverage didn't happen at

130

1    that time, right?

2        A.    Um, we did have a plan in place, but Mike

3    Harris would not, would not voluntarily transfer

4    us to the plan indicating that it had to be

5    bargained for in a successive collective

6    bargaining agreement.

7        Q.    But my point is when you said you had a

8    plan in place, you had a proposal for a plan,

9    right?

10        A.    We had proposals, numerous proposals,

11    yes.

12        Q.    Cobra continued for the membership,

13    right?

14        A.    The Department continued Cobra, correct.

15        Q.    When was the next time after

16    September 20th of 2003 that there was a general

17    membership meeting?

18        A.    I don't recall.

19        Q.    Was it in October?

20        A.    I don't recall.

21        Q.    Any memory as to whether or not you had

22    another meeting between September 20th of 2003 and

23    December 31st of 2003?

24        A.    I have no recollection, I'm not sure.

1

Volume 1
Pages 1-216
Exhibits per index

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

-------------------------------:
                                :
Bergeron, et al                 :
            Plaintiff,           :
                                :
V.                              :
                                :
Andrea Cabral                   :
            Defendant.          :
                                :
-------------------------------:

            DEPOSITION OF JOHN BARNES, a witness
called on behalf of the Defendant taken pursuant to the
Federal Rules of Civil Procedure, before Patricia M.
Haynes, a Certified Shorthand Reporter and Notary Public
in and for the Commonwealth of Massachusetts, CSR No.:
14620F, at the Offices of Suffolk County Sheriff's
Department, 200 Nashua Street, Boston, Massachusetts, on
Tuesday, October 31, 2006, commencing at 10:15 a.m.

            Copley Court Reporting
      58 Batterymarch Street, Suite 317
        Boston, Massachusetts  02110
            (617) 423-5841

143

1     And when the subject of dental and vision came up, she

2     indicated it was being utilized as a bargaining chip.

3          Q.    Who did?

4          A.    Sheriff Cabral.

5          Q.    What exactly did she say?

6          A.    We asked to have the transfer of rights on

7     dental and vision transferred over to another dental

8     plan because the contract allows for the transfer of

9     rights.

10          And we asked them to transfer it over because

11     we had a lot of members every day going there being

12     denied coverage because payments weren't being made

13     timely to the COBRA coverage we were under.

14          And when we requested this, we said,

15     "Regardless of who is right or wrong on this issue, we

16     are asking for all employees and their family to be

17     covered to be transferred to this dental plan."

18          We had numerous dental plans that Attorney

19     Condon was working on and John Grennon and myself were

20     working on with Rich Tranfaglia.  And Sheriff Cabral

21     said she couldn't do that because it would take away her

22     leverage in bargaining.

23          Q.    When did she say this?

24          A.    At this meeting.

144

```
1        Q.    Who was present at the meeting?

2        A.    Superintendent Sumpter and Superintendent

3   Harris, Sheriff Cabral, John Grennon, myself and Mike

4   Walsh, Jack Tullos.

5        Q.    Jack Tullos meaning Robert Tullos?

6        A.    Yes, sorry.  Mark Turley, John Ellis.  I want

7   to say everybody but Mike Cinelli.  I think he was the

8   only one not present from the Board of Directors.

9        Q.    When did this meeting take place?

10       A.    I want to say around March 2004.

11       Q.    Give me your best memory as to exactly what

12  Sheriff Cabral said.

13       A.    We brought up the subject matter of dental.

14  We discussed a lot of the issues, which we had different

15  stances on.  The sheriff was adamant on her position and

16  we were adamant on our position.  And when dental came

17  up, we said regardless of whose position is right, we

18  were hoping based on the transfer of rights, transfer of

19  contract, labor law, whatever the case may be, that we

20  could transfer to another dental plan to allow all

21  members to be covered without repeated interruptions

22  where we were being denied coverage at dental offices.

23            And Sheriff Cabral said she couldn't do that

24  because it would take away her leverage.
```

145

```
 1        Q.    What did you say?

 2        A.    We said, "We were hoping you could do this."

 3   And basically Mike Harris' stance was we could try to

 4   streamline contract negotiations to get it done.  And

 5   basically when we left there, we debriefed.

 6              And we weren't too happy with the position

 7   that the sheriff took, and we as a group decided we were

 8   going to utilize one of the options approved by our

 9   membership.

10        Q.    Which was?

11        A.    The external mailing.

12        Q.    What were the other issues that were discussed

13   at this meeting sometime in March of 2004?

14        A.    We talked about the pension fund.

15        Q.    What did you say and what did Sheriff Cabral

16   say?

17        A.    She pretty much commented on our attorneys

18   filing an action and questioned that action saying that,

19   she kind of laughed about it saying it wasn't

20   appropriate action.  And she, pretty much, you know, she

21   had her position on issues and we had our position.

22              Our whole thing on the pension fund was, and

23   it was from day one, from the start, it was how is it

24   going to be paid back and when is it going to be paid
```

1

1     UNITED STATES DISTRICT COURT

2     DISTRICT OF MASSACHUSETTS

3

   Volume: II

4

   **********************************

5   DAVID BERGERON, ET AL,     :

6        Plaintiffs,   :

   vs            :

7   ANDREA CABRAL,       :

        Defendant.    :

8   **********************************

9      **DEPOSITION OF JOHN BARNES**, a witness

10  called on behalf of the Defendant, taken

11  pursuant to the applicable provisions of the

12  Massachusetts Rules of Civil Procedure, before

13  William M. Jackson, Professional Court Reporter

14  and Notary Public in and for the Commonwealth

15  of Massachusetts, at the Nashua Street Jail,

16  200 Nashua Street, Boston, Massachusetts

17  02114, on December 7, 2006, commencing at 2:00

18  p.m.

19

20

      COPLEY COURT REPORTING, INC.

21       101 TREMONT STREET

      BOSTON, MASSACHUSETTS  02108

22       (617) 423-5841

       www.copleycourt.com

23

24

      **ORIGINAL**

         *DISK ENCLOSED*

28

```
 1          the plan.
 2     Q.   You never had any conversations with the folks
 3          at the public employees, this plan as to why
 4          you were no longer getting benefits through it?
 5     A.   No.  Shortly after the vote took place,
 6          Attorney Condon and myself and other JOEASC
 7          reps were negotiating with Mike Harris, and we
 8          were able to negotiate corporate coverage until
 9          the department -- this is based on my
10          recollection.  We were able to negotiate COBRA
11          coverage for our members with the department
12          and ourselves looking for replacement coverage
13          that we would be allowed over into.
14     Q.   The department agreed to pay the COBRA payments
15          for your members?
16     A.   That's correct.
17     Q.   And there was no contribution from the members;
18          is that correct?
19     A.   That's correct.
20     Q.   So the department completely paid the premium
21          for you and your members to get dental and
22          vision coverage through COBRA?
23     A.   Right.
24               MR. PFAFF:  Objection.  Asked and
```

29

```
 1          answered.
 2     Q.   You may answer.
 3     A.   That's correct.
 4     Q.   For how long a period of time did the
 5          department pay those COBRA payments?
 6     A.   COBRA coverage could last up to 18 months.  To
 7          the best of my memory, it was provided for 15
 8          months.  As I testified earlier, there was
 9          interruptions in coverage from the onset, from
10          the first time that we were placed in it until
11          the conclusion of coverage.
12     Q.   Is it your position that the department stopped
13          making payments to a dental and vision plan,
14          which is why initially you lost benefits?
15     A.   Can you repeat that question?
16     Q.   I am trying to understand.  When you were first
17          notified they no longer were a part of this
18          plan, why did that happen?
19               MR. PFAFF:  Why did what happen?
20          Objection.  I don't understand the question.
21     A.   I don't understand the question.
22               MS. CAULO:  Steve, if you want to
23          coach him, that is fine.
24               MR. PFAFF:  I don't understand it.
```

33

1       correct?

2    A.    The department was sporadically paying payments

3          on time which resulted in numerous

4          interruptions of benefits for our members and

5          denial of coverage for our members, and we were

6          also informed by the sheriff that she was using

7          dental vision as bargaining leverage. That's

8          correct.

9    Q.    That was a yes or no question. Let me ask it

10         again. At the time that you sent the mailing

11         out in March and April of 2004, those mailing

12         being exhibits previously marked as 5 through

13         9, the department was in fact making COBRA

14         payments for dental and vision benefits for

15         JOEASC members?

16   A.    They were making payments, but untimely.

17               MR. PFAFF: Objection.

18   Q.    At any time, did you issue a retraction or a

19         clarification of the information that was

20         provided in those mailings in March and April

21         of 2004?

22   A.    No. We felt our stance, we stuck by our

23         stance.

24   Q.    Did you think it was important, now, these

37

```
 1            the entire member but written by a few folks,

 2            yourself included; is that correct?

 3      A.    That's correct.

 4      Q.    Did you think, do you think this information,

 5            do you think it was relevant for the public to

 6            know that the department was in fact making

 7            COBRA payments for dental and vision care?

 8                  MR. PFAFF:  Objection.  Speculation.

 9            Asked and answered.

10      A.    We had an issue with how dental and vision was

11            being distributed.  We had an issue with the

12            sheriff using it as bargaining leverage.  We

13            had an issue with members going to dental and

14            vision monthly and being denied coverage.

15            Absolutely, we had an issue with that.

16      Q.    Do you think it would have been, it would have

17            provided a more comprehensive view of the issue

18            if the public at large and the media outlets

19            had been informed that the department was not

20            making COBRA payments?

21                  MR. PFAFF:  Objection.

22      A.    I have no idea.  I could have gotten into

23            specifics and wrote that the department was

24            providing COBRA payments and they were not
```

38

```
1              timely, and we were being denied coverage.

2              What we wrote was correct and accurate.

3        Q.    You chose not to include the fact that the

4              department was in fact making these COBRA

5              payments?

6        A.    We never put that in the letter.

7        Q.    You didn't include anything in those letters

8              that you are not eligible for the public

9              employees fund, the ineligibility for the Mass.

10             Public Employees Fund had nothing to do with

11             the department?

12       A.    We did not put that in.

13       Q.    At some point, did you have a meeting with

14             Sheriff Cabral concerning these mailings?

15       A.    We were ordered in to see her.  I would not say

16             that it was a meeting.

17       Q.    The sheriff directed you to come and speak with

18             her concerning these mailing?

19       A.    The sheriff ordered us.  We were ordered to

20             report to the sheriff's office.  That's

21             correct.

22       Q.    Who besides yourself attended?

23       A.    Myself and John Grennon on one occasion and

24             John Ellis on another occasion.
```

56

```
 1           employee before they began their employment; is

 2           that right?

 3      A.   If that is what you are indicating.  Like I

 4           stated, there was others other than employees

 5           that were recently hired, there was others that

 6           were on the job for years that had their

 7           salaries increased via the 15F letter.

 8      Q.   What specific interactions did you have with

 9           Sheriff Cabral in your official capacity as

10           president of JOEASC between 2003 and 2005?

11      A.   Specific interactions?

12      Q.   Yes.

13      A.   Most of our interactions were through her

14           bargaining agent, Mike Harris.  We had specific

15           times where we spoke, but I can't recall when

16           or what the nature of the conversation was.

17           There were not many conversations or many

18           meetings with the sheriff.

19      Q.   So as president of JOEASC, the bulk of your

20           interactions with department management was

21           with Michael Harris; is that correct?

22      A.   Yes.

23      Q.   Not Sheriff Cabral?

24      A.   That's correct.
```

61

1        contract negotiations on behalf of your union

2        members?

3    A.  Yes.

4    Q.  Which contracts?

5    A.  The Collective Bargaining Agreement for the

6        Suffolk County Sheriff's Department and the

7        jail officers.

8    Q.  That was a bad question.  I'm sorry.  What

9        year?

10   A.  I can't recall exactly when contract

11       negotiations commenced.  I know they are

12       ongoing throughout my duration as president.

13       We never came to a ratified contract.

14   Q.  The duration we are talking about is 2003

15       through, you left as president of JOEASC in?

16   A.  October or November of 2004, I believe.

17   Q.  So we are talking about a period of time, about

18       a year-and-a-half, January, February of '03 or

19       even March of '03?

20   A.  It could have been July of '03 when the

21       contract expired until, July of '03 when the

22       contract expired until possibly October of

23       2004.

24   Q.  Okay.  When you were no longer present?

62

```
 1      A.    That's correct.

 2      Q.    What was your role, could you describe your

 3            role briefly?

 4      A.    It was part of the negotiating team.  I was

 5            part of the negotiating team.  You have to be

 6            specific.  Role in when we directly met with

 7            the department?

 8      Q.    Yes.  What was your role when you sat at the

 9            table with the department?

10      A.    I was one of, I can't recall exactly, there

11            might have been five or six JOEASC

12            representatives that were part of the

13            bargaining unit, bargaining negotiating team.

14            That bargained proposals, actually, we allowed

15            our attorneys, Attorney Condon, Attorney Pfaff,

16            Attorney Lewis to conduct most of the proposals

17            and exchanges.  We were, gave them proposals

18            that we felt would, you know, proposals that we

19            felt, that we tried to negotiate, you know, for

20            quality of life, and cost of living increases,

21            so on and so forth, that would be beneficial to

22            JOEASC's membership.

23      Q.    Who else was part of the contract negotiating

24            team for the union?
```

63

| | | |
|---|---|---|
| 1 | A. | The board of directors, the seven board of |
| 2 | | directors were all eligible to go in for |
| 3 | | contract negotiations at any time and at any |
| 4 | | given meeting.  There could have been seven or |
| 5 | | could have been five.  It fluctuated.  There |
| 6 | | was an occasion where I was not present for a |
| 7 | | few meetings.  We had scheduled meetings, I |
| 8 | | can't recall how many, but not all seven were |
| 9 | | there for every meeting.  It fluctuated. |
| 10 | Q. | And these seven people are John Grennon, |
| 11 | | yourself, Tim Turley, Mark Turley? |
| 12 | A. | For contract negotiations, it was the board of |
| 13 | | directors. |
| 14 | Q. | So give them to me again? |
| 15 | A. | Myself, John Grennon, John Ellis, Mark Turley, |
| 16 | | Mike Sinelli, Mike Walsh, Robert Tools. |
| 17 | Q. | And you folks represented the interest of the |
| 18 | | union in your efforts to secure a contract that |
| 19 | | would be favorable to your members? |
| 20 | A. | Yes. |
| 21 | Q. | Who sat at the table for the department? |
| 22 | A. | Mostly, it was Mike Harris.  On occasion, Cliff |
| 23 | | Carney, Deputy Superintendent Carney.  I |
| 24 | | believe even on occasion Superintendent |

64

```
 1          Sumpter.  Maybe on occasion Chief of Staff
 2          Keeley may have entered at certain points
 3          based on where we are at the negotiations.
 4     Q.   It is fair to say that Chief of Staff Keeley
 5          was not a frequent or consistent presence
 6          during the contract negotiations?
 7     A.   Consistently, no.  On occasion, yes.
 8     Q.   Was Sheriff Cabral ever at the table during
 9          these discussions?
10     A.   I can't recall her presence during the
11          negotiations.  That's correct.
12     Q.   Can you describe the climate, if you will, the
13          demeanor, how these exchanges, how the
14          negotiations went?
15     A.   Contract negotiations were, it depends what the
16          nature of the topic.  Obviously, when
17          dental/vision got brought up, there was a
18          different stance and a different argument from
19          both sides, and they showed that disagreement
20          at the table.  When other issues were being
21          discussed, it was fluent and as in any
22          collective bargaining negotiations, it was a
23          lot of proposals exchanged back and forth, and
24          breaks to discuss certain things and coming
```

65

```
 1          back in with agreements or non-agreements,

 2          table and items that were opened.

 3   Q.   In your experience -- strike that.

 4              Did the discussion sometimes become

 5          heated?

 6   A.   There was an occasion, like I indicated on

 7          occasion, there was disagreements, and there

 8          was, I would not call it argumentative, but

 9          disagreements in different substances where

10          there was no one that person did not agree with

11          based on expressions.

12   Q.   Certainly, it is not uncommon for contract

13          negotiations to become heated at times?

14   A.   Yes.

15   Q.   In fact, that happens fairly routinely?

16   A.   It can.

17   Q.   Were you ever informed that the sheriff had

18          instructed Michael Harris or anyone acting at

19          her direction not to meet with her and not to

20          negotiate with you?

21   A.   To the best of my knowledge, no.  To the best

22          of my knowledge, no.

23   Q.   Do you know how many different unions there are

24          at the Suffolk County Sheriff's Department?
```

66

```
1    A.    To the best of my knowledge, we have JOEASC, we

2          have the white shirt union.  I don't recall

3          what local that is from ASCME.  We have Local

4          419.  ASCME local.  And we have the local

5          representing the case workers.  I don't recall

6          what union reps mean, whether it is name.  I am

7          not quite sure.

8    Q.    So there are about four or five different

9          union's operating in the department?

10   A.    Possibly.

11   Q.    All of them have different collective

12         bargaining agreements?

13   A.    Each one negotiates separate collective

14         bargaining agreements, yes.

15   Q.    Each of those use those unions, to your

16         knowledge, do they have elected officials, E

17         board members, directors?

18   A.    I believe to the best of my knowledge, they do.

19   Q.    And union stewards and grievance coordinators?

20   A.    Yes.

21   Q.    And probably contract negotiating teams?

22   A.    More than likely, yes.

23   Q.    You left as president of JOEASC in about

24         October/November of 2004.  At that point in
```