UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO, and PAUL GIGLIO

v.

ANDREA CABRAL

MEMORANDUM AND ORDER ON
MOTION FOR SUMMARY JUDGMENT

February 14, 2008

STEARNS, D.J.

Plaintiffs are ten Suffolk County corrections officers whose commissions as deputy sheriffs were revoked by defendant Andrea Cabral, the Sheriff of Suffolk County, shortly after her election to office in 2004.[1] Plaintiffs, who are members of a union that supported Cabral's opponent, allege retaliation and political discrimination in violation of their First Amendment rights. The suit is brought under the Federal Civil Rights Act, 42 U.S.C. § 1983. After the close of discovery, Sheriff Cabral filed a motion for summary judgment that plaintiffs opposed in due course. A hearing on the motion was held on December 18, 2007.

BACKGROUND

---

[1] Cabral is sued in both her individual and official capacities.

The facts, viewed in the light most flattering to plaintiffs as the non-moving parties, are as follows. Cabral was appointed Sheriff of Suffolk County by the Governor on November 29, 2002. On March 28, 2003, she formally recognized the newly-formed Jail Officers and Employees Association of Suffolk County (JOEASC or "the Union") as the designated collective bargaining agent for Suffolk County corrections employees.[2] The interim officers of JOEASC were four of the plaintiffs: John Barnes (President); John Grennon (Vice President); Timothy Turley (Treasurer); and David Bergeron (Executive Secretary).[3]

JOEASC and Cabral quickly became embroiled in disputes over contract provisions governing health care benefits, pension fund contributions, military benefits, and pay raises. The health care issue arose when the Massachusetts Public Employees Fund decided that it would no longer offer a dental plan. Although Cabral assured the Union that she would immediately arrange for a substitute dental plan, it became clear to plaintiffs by June of 2003 that Cabral intended to use dental insurance as a bargaining chip in the negotiations over a new contract.[4] In December of 2003, JOEASC filed suit against Cabral for failing to remit payments of $2.66 million on behalf of Union members to the City of Boston Retirement Fund. Finally, in January of 2004, JOEASC members who were called

---

[2] JOEASC succeeded AFSCME Local 1134 as the corrections officers' designated bargaining agent.

[3] These plaintiffs, with the exception of Bergeron, were eventually confirmed by the membership as permanent officers of JOEASC. Bergeron was replaced by plaintiff John Ellis.

[4] The collective bargaining agreement then in effect was set to expire on June 30, 2003.

to duty during the Iraq War were informed that they would not receive credit for vacation time and sick leave accrued during their military service. JOEASC responded by organizing informational pickets directed at Cabral.

In March of 2004, the officers of JOEASC, plaintiffs among them, met with Cabral in an attempt to resolve the impasse. They again asked Cabral to enroll JOEASC members in a new dental plan, but she refused, stating that to do so would weaken her negotiating position. The meeting ended acrimoniously, and on March 17, 2004, JOEASC filed four charges of prohibited practices against Cabral with the State Labor Relations Commission. JOEASC then mailed letters to members of the State Legislature and to the Governor protesting Cabral's alleged unwillingness to fund employee pensions. On March 27, 2004, JOEASC authorized direct mailings to 10,000 Suffolk County voters and elected officials requesting support and assistance in the contract negotiations. One letter, with the heading "What a Mess! Promises Not Kept," accused Cabral of "taking" employee pension money, while awarding undeserved pay increases to her friends and campaign supporters. In a press release dated March 25, 2004, JOEASC called upon "[political] leaders to join them in their struggle with [Cabral]."

When Chief of External Affairs Steven Tompkins learned of the press release, he confronted Barnes and Grennon and asked how they would feel about losing their homes. On April 1, 2004, Barnes and Grennon were summoned to Cabral's office, where they were met by an angry Cabral, Tompkins, Deputy Superintendent Gene Sumpter, and Superintendent of Human Resources Michael Harris. For three hours, Cabral berated the

two men, accusing them of libel and slander. She also told them that she had grounds to fire them and have their personal assets seized.

Cabral won election to a six-year term as Suffolk County Sheriff in November of 2004. Five months later, by letter dated April 5, 2005, Cabral informed the plaintiffs that she was rescinding their commissions as deputy sheriffs.

## DISCUSSION

### 1. Decommissioning

The court must first resolve whether the loss of a discretionary commission as a deputy sheriff can qualify as an adverse action. By operation of Mass. Gen. Laws ch. 37, § 3, a Sheriff may, in her discretion, "appoint deputies, who shall be sworn before performing any official act." Id. Deputies have some limited law enforcement powers. They may make warrantless arrests for misdemeanors, but only if the misdemeanor constitutes a breach of the peace, occurs in their presence, and is continuing at the time of the arrest. See Harvard Crimson, Inc. v. President and Fellows of Harvard College, 445 Mass. 745, 753 (2006). Of greater importance, deputies are authorized to serve process in civil cases. Mass. Gen. Laws. ch. 37, §§ 11,12. Perhaps of greatest significance, deputies are eligible to work lucrative private details during their off-hours.

Cabral argues that the decommissioning had no impact whatsoever on the terms and conditions of plaintiffs' employment as jail officers. She notes that a deputy's commission is unremunerated and is not a requirement for service as a corrections officer. Nor does the commission have any bearing on a jail officer's work hours, vacation days, or job assignments. That may be true, but being stripped of their commissions subjected

4

plaintiffs to a diminution of status by being relegated to the minority of officers in the Department who were not entrusted with commissions. They were also deprived of the opportunity to supplement their income by working private details.[5]

That acknowledged, the question remains whether the revocation of a benefit that is within the discretion of the Sheriff to grant or deny can constitute an adverse action as a matter of law. If construed strictly through the prism of due process, the answer is almost certainly no. The procedural protections of the Due Process Clause apply to liberty and property interests that existing rules and understandings define as entitlements. See Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972). There is no protected due process interest in a benefit that government officials may grant or deny in their discretion. Town of Castle Rock v. Gonzales, 545 U.S. 748, 764 (2005). Employment law, however, defines an adverse employment action in more expansive terms. An adverse action must be "material" in the sense of amounting to something of consequence. See Larou v. Ridlon, 98 F.3d 659, 663 n.6 (1st Cir. 1996). However,

> the standard for showing an adverse employment action is lower in the First Amendment retaliation context than it is in other contexts (such as Title VII), see Power v. Summers, 226 F.3d 815, 820-821 (7th Cir. 2000), and the Supreme Court has indicated that even relatively minor events might give rise to liability. See Rutan v. Republican Party of Ill., 497 U.S. 62, 75-76 & n.8; see also Coszalter v. City of Salem, 320, F.3d 968, 974-977 (9th Cir. 2003) ("To constitute an adverse employment action, a government act of retaliation need not be severe and it need not be of a certain kind."); Power, 226 F.3d at 820 ("Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable.").

---

[5]Cabral's argument that many of the plaintiffs never took advantage of the opportunity to work private details misses the mark. What is of concern for present purposes is not what plaintiffs gained, but what they lost.

5

Rivera-Jimenez v. Pierluisi, 362 F.3d, 87, 94 (1st Cir. 2004).[6] Given this "generous definition of 'adverse employment action,'" Larou, 98 F.3d at 663, the court readily concludes that the divestiture of a jail officer's deputy sheriff's commission by his Sheriff employer is of sufficient consequence to constitute an adverse employment action.[7]

    2.    Assignment Transfers

Barnes, Moscone, Lynch and Grennon also argue that they suffered an adverse action when the Sheriff transferred them to new job assignments, allegedly in retaliation for their Union activity. In 2004, Barnes was transferred from a "plum" position in the Suffolk County House of Corrections property department to a line officer's job in an inmate housing unit. Despite the transfer, Barnes retained his rank and salary. At deposition, Barnes agreed that the assignment as a line officer was not punitive; it was merely less desirable to him personally because he no longer had every weekend off. Although Moscone was reassigned to the night shift, his rank remained unchanged and his salary actually increased because of shift differential payments. Moscone argues that his new assignment was less desirable because as the only captain assigned to supervise a floor, the Department was "wasting a good guy." After Lynch was told by a superior

---

[6]In a hostile environment context, an adverse employment action may consist simply of an employer's failure to take remedial action to protect an employee from a co-worker's taunts and ridicule. See Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st Cir. 1999).

[7]The court notes a Tenth Circuit Court of Appeals opinion reaching the identical conclusion. See Bass v. Richards, 308 F.3d 1081, 1088 (10th Cir. 2002) (A deputy sheriff's "[c]ommission [is] a valuable government benefit. . . . Depriving and threatening to deprive [plaintiffs] of such a benefit [is] punishment that could inhibit speech and thus could infringe on [plaintiffs'] First Amendment rights.").

6

officer that Cabral was angry with him for attending a Murphy fundraiser, his days off were switched from Friday and Monday to Tuesday and Thursday. Lynch was also the only lieutenant who was not trained in the use of the jail's new fire extinguishers.

These minor alterations in Barnes's, Moscone's, and Lynch's working conditions are insufficient as a matter of law to amount to an adverse action. "Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting [him], reducing [his] salary, or divesting [him] of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering [him] for promotion after a particular period of service." Blackie v. State of Maine, 75 F.3d 716, 725-726 (1st Cir. 1996) (internal citations omitted). Where what is complained of is an alteration in a plaintiff's work assignment or schedule without any diminution of pay or responsibility, the reduction in the quality of working conditions must be "drastic" if it is to qualify as an adverse action. Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1218-1219 (1st Cir. 1989). Although Barnes, Moscone, and Lynch may have suffered a "limited blow to [their] pride," their pay remained unchanged (and in Moscone's case it increased), and their job duties remained appropriate to their rank. Id. at 1218.[8]

The analysis in Grennon's case is somewhat different. In October of 2005, Grennon was transferred out of a senior position in the jail's Training Division where he had worked

---

[8]Although plaintiffs Peneau, Dilibero, Turley, and Giglio also claim that they were retaliated against by disadvantageous transfers and the like, their claims will be dismissed in toto, as they have produced no evidence that they engaged in protected speech or were discriminated against because of political affiliation.

for five years. Politically motivated adverse actions are not prohibited when an employee occupies a position of trust. See Elrod v. Burns, 427 U.S. 347, 367 (1976). To be vulnerable to political recrimination, a confidential employee need not be a head of department or a sole policy maker. Rather, "[i]t is enough that the official [is] involved [in policy], if only as an adviser, implementer or spokesperson." Hadfield v. McDonough, 407 F.3d 11, 16 (1st Cir. 2005) (citation omitted). See also Flynn v. City of Boston, 140 F.3d 42, 46 (1st Cir. 1998) ("[A]n employee is not immune from political firing merely because the employee stands apart from 'partisan' politics, or is not the ultimate decisionmaker in the agency, or is guided in some of his or her functions by professional or technical standards. Rather, it is enough that the official be *involved* in policy . . . .") (emphasis in original).

Although Grennon was not the highest ranking official in the Training Division, he was responsible for the training of new recruits and veteran officers. He researched and drafted Department policies, designed course curricula, and taught classes. He additionally represented the Sheriff at monthly meetings of the Massachusetts Sheriffs Association Education and Training Committee.

> The Sheriff is involved in several areas which can be affected by partisan divisions. The Sheriff runs a prison and therefore must make numerous politically-influenced decisions about prison operations and the treatment of inmates-some or many of which decisions could be the subject of partisan political contention. These decisions are embodied in Department policies and directives which are put into effect by Department employees working directly within the prison. These employees, in turn, learn about the new policies and directives primarily through training. The Sheriff's efforts to implement [her] agenda could therefore be frustrated by a training program which does not accurately reflect [her] views.

Hadfield, 407 F.3d at 16-17.  Because Grennon occupied a position of trust in the Training Division, he does not have a viable cause of action based on his transfer.  See Branti v. Finkel, 445 U.S. 507, 518 (1980).

    3.    Retaliation Based On Union Activity

The First Amendment protects a public employee's right, in certain circumstances, to speak freely on matters of public concern.  Connick v. Myers, 461 U.S. 138, 147 (1983).  A three-part test must be utilized to determine whether plaintiffs have an actionable First Amendment claim.  Plaintiffs must show:  (1) that their speech involved matters of public concern; (2) that their interest [and that of the public] in commenting upon those matters outweighed Sheriff Cabral's interest in maintaining a smoothly functioning workplace; and (3) that "protected speech" was a substantial or motivating factor in the Sheriff's decision to retaliate against them.  Lewis v. City of Boston, 321 F.3d 207, 218 (1st Cir. 2003).  The first two factors raise questions of law that are for the court to decide.  Connick, 461 U.S. at 148 n.7 (1983).  If these questions are resolved in plaintiffs' favor, the Sheriff can avoid liability only if she is able to demonstrate by a preponderance of the evidence that she would have taken the same action even had the protected conduct never occurred.  Mt. Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977).  Whether protected speech was a motivating or substantial factor in the decision to take an adverse employment action raises issues of fact the resolution of which is ordinarily a jury issue.  Nethersole v. Bulger, 287 F.3d 15, 18-19 (1st Cir. 2002).

    A.  Public Concern

Where speech does not touch on matters of public concern, or does so only peripherally, its First Amendment value "is low, and a federal court is not the appropriate forum in which to review the wisdom of internal decisions arising therefrom." Jordan v. Carter, 428 F.3d 67, 72-73 (1st Cir. 2005) (internal quotation marks and citation omitted). Whether an employee's speech in fact addresses a matter of public concern is determined by the "content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-148. Matters of inherent concern to the public include official malfeasance, abuse of office, and neglect of duties. Curran v. Cousins, 509 F.3d 36, 46 (1st Cir. 2007).

The depth of the court's inquiry depends on how clearly the content of the speech in question relates to a matter of public concern. See O'Connor v. Steeves, 994 F.2d 905, 914 (1st Cir. 1993) ("[P]ublic-employee speech on a topic which would not necessarily qualify, *on the basis of its content alone,* as a matter of inherent public concern (e.g., internal working conditions, affecting only the speaker and co-workers), may require a more complete Connick analysis.") (emphasis in original). Here, the bulk of the speech at issue was inspired by private, not public, concerns. By disparaging the Sheriff's management style, the plaintiffs sought to advance the Union's bargaining position for their benefit and the benefit of other Union members. Although the public would likely be concerned with revelations of discord and dysfunction in the Sheriff's office, the import of plaintiffs' message was "diminished by [their] preoccupation with personal disagreements and internal disputes over the workings of the [Department]." Mullin v. Town of Fairhaven, 284 F.3d 31, 39 (1st Cir. 2002). Plaintiffs' speech did not purport to alert the public to a

10

significant safety threat; they complained instead of pay raises given by the Sheriff to "her friends" and her creation of a "fiscal mess in the Department." The letters and press release issued by plaintiffs were less concerned with exposing malfeasance on the Sheriff's part than they were with garnering public support for the Union's bargaining posture. For example, the April 2, 2004 letter stated:

> [i]magine an elected official who took a $5 million deficit and turned it into a several million dollar larger problem. In the process, imagine that same official taking employee pension money and money set aside for employee dental and vision care and using the money attempting to balance her budget. Imagine things getting so bad that the Water and Sewer Commission sends out a notice threatening to shut off the water because you owe thousands of dollars in unpaid bills. . . . Ms. Cabral said she was going to "clean up the mess" in the Suffolk County Sheriff's Department. Unfortunately, what she did was take a bad situation and make it worse. Instead of handing out pay increases to her friends, the Sheriff needs to get control of the Department's fiscal mess. A mess of her own making!

### B. Pickering Balancing Test

Assuming that plaintiffs' speech touched upon some matters of public concern, at least insofar as it aired issues of possible mismanagement by the Sheriff, it must still pass the balancing test of Pickering v. Bd. of Educ., 391 U.S. 563 (1968). Under Pickering, the court is required to "arrive at a balance between the interests of [the employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 568. There are a number of considerations that figure in a Pickering analysis, including "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the

speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378, 388 (1987).

"[T]he government as an employer indeed has far broader powers than does the government as sovereign." Waters v. Churchill, 511 U.S. 661, 671 (1994) (plurality opinion). "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom. . . . Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. . . . Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." Garcetti v. Ceballos, 126 S.Ct. 1951, 1958 (2006). The need for discipline is even more acute in the ranks of a law enforcement agency. See Guilloty Perez v. Pierluisi, 339 F.3d 43, 53 (1st Cir. 2003). This is so because "[i]n quasi-military organizations such as law enforcement agencies, comments concerning co-workers' performance of their duties and superior officers' integrity can directly interfere with the confidentiality, esprit de corps, and efficient operation of the police department." Busby v. City of Orlando, 931 F.2d 764, 774 (11th Cir.1991) (internal quotation marks and citation omitted). Here, the scabrous content of the Union's letters and press release had the undoubted tendency to "impair[] discipline by superiors or harmony among co-workers . . . [and] impede the performance of the speaker's duties or interfere [with the regular operation of the [Sheriff's Department]." Rankin, 482 U.S. at 388.      The First Amendment does not "require a public office to be run as a

12

roundtable for employee complaints over internal office affairs," Connick, 461 U.S. at 149, nor was it necessary for the Sheriff to "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships [was] manifest before taking action." Id. at 152. The Sheriff's interest in maintaining order and discipline among her officers outweighed any legitimate interest of the plaintiffs in promoting the Union's bargaining position. Accordingly, the Sheriff's motion will be ALLOWED insofar as Count II alleges retaliation based on Union-related speech.[9]

   4. Retaliation Based On Political Affiliation

The Supreme Court has identified a distinct category of First Amendment protection that precludes government officials from taking adverse actions against employees based on their political affiliation. See Elrod v. Burns, 427 U.S. at 373 (patronage dismissals); Rutan v. Republican Party of Ill., 497 U.S. 62, 74-76 (1990) (promotion, transfer, recall, and hiring decisions). To make out a prima facie case of political discrimination, a plaintiff must produce competent evidence that "(1) the plaintiff and the defendant belong to opposing political affiliations; (2) the defendant has knowledge of the plaintiff's . . . affiliation; (3) . . . a challenged employment action [occurred]; and (4) . . . political affiliation was a substantial or motivating factor" behind it. Peguero-Moronta v. Santiago, 464 F.3d 29, 48 (1st Cir. 2006) (internal citation and quotation marks omitted). A defendant may challenge a plaintiff's prima facie showing of political discrimination, or may offer a Mt.

---

[9]With regard to union activity, only Barnes, Grennon, and Ellis have been identified as plaintiffs who were active in JOEASC's affairs. As the Sheriff points out, none of the other seven defendants were involved in the dissemination of the letters and press release. Nor do they identify with specificity any other union activity in which they engaged.

Healthy defense (or both).  Martinez-Velez v. Reyes Canada, 506 F.3d 32, 39 (1st Cir. 2007).

Unlike a Title VII case, where a plaintiff retains the burden of proof throughout the case and only the burden of production shifts, in a political discrimination case, a plaintiff who establishes a successful prima facie case "foist[s] the burden of *proof* onto [the defendant] simply by meeting her own threshold burden of persuasion. . . . Summary judgment [is] warranted . . . only if [defendant's] evidentiary proffer *compel[s]* the finding that political discrimination did not constitute a 'but for' cause of the [adverse action]." Jirau-Bernal v. Agrait, 37 F.3d 1, 3-4 (1st Cir. 1994) (emphases in original).  See also Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 431 (1st Cir. 2005); Padilla-Garcia v. Rodriguez, 212 F.3d 69, 77 (1st Cir. 2000).

With this framework in mind, the court turns to an analysis of the claims of the individual plaintiffs.

### A. Grennon, Barnes, Ellis, Moscone, Lynch, and Bergeron

Grennon, Barnes, and Ellis were instrumental in the dissemination of the anti-Cabral letters and press release.  When Tompkins learned of the press release, he confronted Barnes and Grennon and asked how they would feel about losing their homes.  It is reasonable to infer that Tompkins was upset at the impact that these plaintiffs' vocal and public criticisms of Cabral might have on her campaign.[10]

---

[10]Harris conceded at his deposition that the plaintiffs' support for Murphy was discussed in relation to their decommissioning.

> Q: Well, was the support of Sheriff Cabral's opponent in the last election a consideration by you or the ad hoc committee in recommending those 37

Moscone raised $5,000 for Murphy's campaign, contributed $200 of his own, and made telephone calls on Murphy's behalf. Moscone additionally told Cabral's Chief of Staff, Elizabeth Keeley, of his lack of support for Cabral. Keeley called him a liar and warned him that his job could be in danger. Lynch attended a fundraiser for Murphy in East Boston, and was later informed by his immediate superior that Cabral was "pissed off" at him for doing so. In May of 2005, Superintendent Carney told Lynch that Cabral considered "two types of good standing," those who do their job well, and those who support her. In March of 2004, Bergeron encountered Cabral at the Holy Name Church and complained about the loss of dental benefits and the pay raises she had given to her immediate staff. In September of 2004, Cabral observed Bergeron holding a sign in support of Murphy.

Cabral contends that the decomissioning was undertaken as part of a comprehensive process that began in 2004 to make the position of deputy sheriff more meaningful and to reflect the merit and performance-based reforms that she was implementing in the Department. An "ad hoc" committee reviewed the list of 472 current deputy sheriffs, and in early 2005, recommended to her that thirty-five employees be decomissioned. Cabral added plaintiff Dilibero to the list, and ultimately jettisoned thirty-

---

names to be decommissioned?

A:   I recall that there might have been some discussion on that.

Deposition of Michael Harris, at 120.

six employees including the plaintiffs.[11]  While the Sheriff's justification for the group decommissioning is plausible, it does not *compel* the conclusion that political discrimination played no "determinative" role in her decision to rescind the commissions of plaintiffs Grennon, Barnes, Ellis, Moscone, Lynch and Bergeron.  Consequently, summary judgment will be DENIED as to their political discrimination claims.

        B.  Peneau, Dilibero, Turley, and Giglio

These four plaintiffs have failed to establish a prima facie case of political discrimination.  Peneau and Turley simply state that they supported Murphy without offering any evidence that Cabral knew of their support.  See Carrasquillo v. Pereira-Castillo, 441 F. Supp. 2d 363, 368 (D.P.R. 2006) (an essential element of a prima facie case of political discrimination is evidence that defendant knew of a plaintiff's political affiliation).  Dilibero states that he attended an occasional fundraiser in support of Murphy, and Giglio argues that his support for Murphy was "well known" in the Department.  These conclusory statements do not constitute "competent evidence" that Cabral was aware of these plaintiffs' support for Murphy, and as a result, was motivated to retaliate against them.  Cabral states that they were decommissioned because of a combination of poor attitude, comportment, discipline, job performance, and lack of respect.  Peneau was disciplined for conduct unbecoming an officer in January of 2005 after making inappropriate comments that were overheard by Superintendent Sumpter.  Turley had been suspended for twenty-one days in January of 2004 after an investigation revealed

---

[11]In addition, Cabral lists thirteen jail officers who were known to her or her personal staff as supporters of Murphy who were not decommissioned.  She also cites five known supporters of Murphy who received promotions.

that he had falsely accused a detainee of kicking another detainee in the head. Dilibero and Giglio were considered to have poor attitudes and to have been disrespectful to Cabral. Accordingly, summary judgment will be <u>ALLOWED</u> as to the political discrimination claims brought by Peneau, Turley, Dilibero, and Giglio.

### 5. Qualified Immunity

Finally, Cabral asserts a defense of qualified immunity. Qualified immunity attaches to discretionary conduct of government officials that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). In assessing the defense, a prescribed sequence is to be followed. The court "must first determine whether the plaintiff has alleged a deprivation of an actual constitutional right at all," before considering whether that right was clearly established when the alleged violation occurred. <u>Conn v. Gabbert</u>, 526 U.S. 286, 290 (1999). Stated differently, the "threshold" question that must be answered is this: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? . . . If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). Only if the violation of a right is found does the court proceed to the remaining questions in the sequence: whether the right was clearly established; and if so, whether a similarly situated reasonable officer would have understood that her conduct violated the law. <u>Savard v. Rhode Island</u>, 338 F.3d 23, 27 (1st Cir. 2003).

Plaintiffs' loss of their commissions as a result of their refusal to support the Sheriff's election campaign adequately states a deprivation of a constitutional right: the right to be free from political discrimination. The question of whether the right was "clearly established" at the time the deprivation occurred is a matter of law for the court. Siegert v. Gilley, 500 U.S. 226, 232 (1991). A right is "clearly established" when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts "that a reasonable officer could not have believed that [her] actions were lawful." Wilson v. Layne, 526 U.S. 603, 617 (1999). The right of a non-policymaking public employee to be free from retaliation based on his or her political affiliation was emphatically stated by the Supreme Court in Elrod as long ago as 1976, and has been reaffirmed in an unbroken chain of Supreme Court and First Circuit cases since. It is simply not credible for Cabral to argue that a reasonable official in her position would not have understood that punishment of a rank-and-file employee for the refusal to lend political support to her campaign would give rise to liability. See Savard, 338 F.3d at 28.

## ORDER

For the foregoing reasons, Cabral's motion for summary judgment is DENIED as to the political discrimination claims of plaintiffs Grennon, Barnes, Ellis, Moscone, Bergeron, and Lynch. In all other respects, the motion is ALLOWED. The Clerk will set the case for trial.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE