UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DAVID BERGERON ET AL., <br> Plaintiffs <br><br> v. <br><br> ANDREA CABRAL, INDIVIDUALLY <br> And SHERIFF OF SUFFOLK COUNTY, <br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> )     C. A. No. 05-11661-RGS <br> ) <br> ) <br> ) <br> ) |

## DEFENDANT SHERIFF ANDREA CABRAL'S MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FED.R.CIV.P. 60

Now comes the Defendant Andrea Cabral, Individually and as Sheriff of Suffolk County, and pursuant to Rule 60 of the Federal Rules of Civil Procedure respectfully requests that this Honorable Court reconsider that portion of its Memorandum and Order On Motion for Summary Judgment (Document No. 35) denying the Defendant's Motion for Summary Judgment as to Plaintiffs Lynch, Moscone, Bergeron, Ellis, Barnes, and Grennon on Count 1 of their Complaint alleging political discrimination[1]. The remaining Plaintiffs are six (6) of the thirty-seven (37) custody and non-custody staff at both the Nashua Street Jail ("NSJ") and the House of Correction ("HOC") who were decommissioned as Deputy Sheriffs on April 21, 2005 by Sheriff Cabral pursuant to M.G.L. ch. 37, § 3. The Plaintiffs are all officers at the NSJ. The Complaint filed by the Plaintiffs pursuant to the Federal Civil Rights Act, 42 U.S.C. § 1983 alleged retaliation based upon union activity (Count 1) and political affiliation (Count 2). Sheriff Cabral

---

[1] The Court granted summary judgment to Sheriff Cabral and dismissed the political retaliation claims of the other four Plaintiffs: Peneau, Giglio, Turley, and Dilibero. Additionally, the Court granted summary judgment to Sheriff Cabral and dismissed Count 2 of the Complaint alleging retaliation based upon union activity as to all ten (10) Plaintiffs.

1

moved for summary judgment as to both counts. On December 18, 2007 the Court heard argument from the parties on Sheriff Cabral's Motion for Summary Judgment.

On February 14, 2008, the Court issued its decision dismissing Count 2 (retaliation based on union activity) as to all ten Plaintiffs. The Court further granted summary judgment to Sheriff Cabral as to the political retaliation claims of Plaintiffs Peneau, Giglio, Turley, and Dilibero (Count 1). Accordingly, all that remains are the political retaliation claims of six Plaintiffs: Lynch, Moscone, Bergeron, Ellis, Barnes, and Grennon, alleging their decommissioning as Deputy Sheriffs as the **only** constitutional injury.

By this motion and the argument set forth below, Sheriff Cabral respectfully requests that this Court reconsider its ruling as to the political retaliation claims of the six remaining Plaintiffs. As reasons therefore, Sheriff Cabral respectfully contends that the Court's decision is flawed in that it relies on allegations in the Plaintiffs' Memorandum of Law for which there is no factual support in the summary judgment record and/or misconstrues the evidence that is in the record. Furthermore, in light of the standard for political discrimination claims in the First Circuit, Sheriff Cabral asserts that the Plaintiffs have failed to make out a prima facie case of political discrimination and that she is entitled to qualified immunity.

> **A.    The Summary Judgment Record Does Not Support the Court's Assessment of the Political Discrimination Claims of Plaintiffs Lynch, Moscone, Bergeron, Ellis, Barnes, and Grennon.**

The Court's Memorandum and Order denying summary judgment as to the political retaliation claims of Plaintiffs Lynch, Moscone, Bergeron, Ellis, Barnes, and Grennon contains numerous material factual assertions that are not supported by the

2

summary judgment record. (Document No. 35, pgs. 14-15). There is **no** evidence in the summary judgment record that Plaintiff Lynch was informed by his immediate superior that "Cabral was 'pissed off' at him" for attending a fundraiser for Stephen Murphy in East Boston. (Document No. 35, pg. 15). The **only** source for this allegation in the entire summary judgment record is the Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment. Indeed, the Plaintiffs do not cite to anything in the summary judgment record to support their allegation. (Plaintiffs' Memorandum at pg. 17). Significantly, the excerpts of Plaintiff Lynch's deposition submitted by both the Plaintiff and the Defendant contain **no** reference that Sheriff Cabral was aware that Lynch had attended the fundraiser for Murphy, much less that she was "pissed off" that he had attended the fundraiser. [2] (Plaintiffs' Exhibit 6 to Response to Defendant's Statement of Undisputed Facts, Document No. 30; Defendant's Exhibits 18 and 35 to Motion for Summary Judgment, Document No.17). Further, Plaintiff Lynch cannot rely on inadmissible hearsay from Captain Janielis to establish his prima facie case. Significantly, even if this Court were to consider this evidence it actually lends support to the Defendant's position that political affiliation was not a consideration because Captain Janielis was not decommissioned.

Similarly, there is no evidence in the summary judgment record that Deputy Superintendent Cliff Carney told Plaintiff Lynch in May 2005 that "Cabral considers 'two types of good standing,' those who do their job well and those who support her". (Document No. 35, pg. 15). The **only** source for this allegation in the entire summary judgment record is the Plaintiff's Memorandum of Law in Opposition to the Defendant's

---

[2] Indeed, a review of both volumes of Plaintiff Lynch's deposition (he was deposed over two days) does not reveal that Lynch learned that the Sheriff was "pissed off" because he attended the fundraiser.

3

Motion for Summary Judgment. (Plaintiffs' Memorandum at pg. 17). As Plaintiff Lynch's deposition transcript makes perfectly clear, the exchange between him and Superintendent Carney was as follows:

Lynch: Imagine that? And I'm not in good standing.

Carney: There's two types of good standing. (Lynch Deposition, pg. 193-194, Plaintiffs' Exhibit 6 to Response to Defendant's Statement of Undisputed Facts). Carney never defines what he means by "two types of good standing" nor does he reference Sheriff Cabral or attribute the "two types of good standing" to her in any way. Lynch does not ask Carney to explain his comment; rather, as he admitted in his deposition, he **assumed** Carney meant: "political and union activity and the way you do your job". (Lynch Deposition, pg. 193, lines 23-24, Id.)[3] Furthermore, the summary judgment record is clear that Superintendent Carney had no involvement in the process that resulted in the recommendation of employees for decommissioning. (Defendant's Exhibit 7).

Furthermore, it is undisputed that Lynch did not do any work for the Murphy campaign such as volunteer on committees, participate in phone banks, hold signs, or attend any meetings to support Murphy's campaign for Suffolk County Sheriff.

---

[3] Q:   Did he say there were two types of good standing, the way you do your job and political affiliation?
A:   No.
Q:   Exactly what did he say?
A:   He said, "There's two types of good standing."
Q:   That's it.
A:   That's it.
Q:   And what did you say?
A:   He walked into his office. I didn't say anything.
Q:   Did you go and ask him what he meant?
A:   No.
Q:   At any time, did you ever ask him what he meant?
A:   No.
Q:   You made an assumption?
A:   Yes.
(Lynch Deposition, pg. 194, Lines 3-18, Id.)

(Defendant's Statement of Undisputed Facts, No. 206). Indeed, when pressed during the deposition to articulate how Sheriff Cabral would know that he supported Stephen Murphy, Lynch offered nothing more than "they may have received a donation list" to find out that he had made a single contribution and referenced a nebulous interaction with Superintendent Sumpter, in which Sheriff Cabral's name was **never** mentioned and the conversation with Superintendent Carney referenced above. (Lynch Deposition, pgs. 189-194, Id.). Contrast this with the evidence in the summary judgment record that Lynch did not volunteer information about his support for Stephen Murphy within the Department and never told Sheriff Cabral that he supported Stephen Murphy. (Lynch Deposition, pg. 179-180, Defendant's Exhibit 18).

With respect to Plaintiff Moscone, there is no evidence in the summary judgment record that Sheriff Cabral was aware that Moscone contributed $200 of his own money to Murphy's campaign, made phone calls on Murphy's behalf or that his fundraiser raised under $5,000. Significantly, Sheriff Cabral only became aware that Moscone hosted the fundraiser **after** depositions were taken in this case[4]. (Defendant's Exhibit 2, ¶25). In his deposition testimony, Moscone acknowledged that he did not make his support of Murphy known publicly and the invitation to the fundraiser did not have his name on it. (Moscone Deposition, pg. 110, Defendant's Exhibit 19). The one thing that the summary judgment record does establish is that Moscone attended a fundraiser for Murphy with other employees of the Department who were not decommissioned. Additionally, the summary judgment record **only** supports the assertion that the fundraiser Plaintiff Moscone held for Stephen Murphy raised an amount of money **under** $5,000 dollars, not,

---

[4] Indeed, given the fact that M.G.L. ch.55, §§ 13-17 makes it illegal for a public employee to solicit money for a political campaign, Sheriff Cabral would have had no reason to know that Moscone had hosted a political fundraiser for Murphy.

5

as the Court's Memorandum and Order states, $5,000. (Moscone Deposition, pg. 108, Plaintiffs' Exhibit 4 to Opposition to Defendant's Motion for Summary Judgment).

Further, the summary judgment record establishes that the interaction between Plaintiff Moscone and Chief of Staff Keeley, referenced by the Court in its Memorandum at pg. 15, occurred in the context of the failure of Local 3643 to ratify a tentative contract in 2003, not the political campaign for Suffolk County Sheriff in 2004. (Id. at pg. 119-120; Moscone Deposition, pg. 120, 125, Defendant's Exhibit 19).  Moreover, as Plaintiff Moscone's deposition makes clear, Keeley allegedly called him a liar because she did not believe Moscone when he informed her of all the different responsibilities he had, not because he supported Stephen Murphy.[5] (Id.)  There is no support in the summary judgment record that this interaction had anything to do with Moscone's support for Stephen Murphy[6].  Indeed, Moscone acknowledged that the only "evidence" that he had that Sheriff Cabral was aware of his support for Stephen Murphy was a conversation that he had with a mutual acquaintance, Attorney Randy Chapman, in which Chapman allegedly told Moscone that Sheriff Cabral told him that "she had heard that [Moscone] was backing Murphy". (Moscone Deposition, pg. 113-114, Plaintiffs' Exhibit 3 to Response to Defendant's Undisputed Facts).  The Court at summary judgment should not consider this inadmissible double hearsay.

---

[5]According to Moscone's deposition, Keeley called him the next day to apologize. (Moscone Deposition, pg. 119-120).

[6] Q:    With Elizabeth Keeley, other than the conversation that you mentioned concerning the contract negotiations, did you ever have any other conversations with Elizabeth Keeley in which your support for Sheriff Cabral was raised?
A:    No.
Q:    Your support for Stephen Murphy?
A:    No.
(Moscone Deposition, pg. 125, Defendant's Exhibit 19).

6

Contrast this with the evidence in the summary judgment record that the **only** **direct** conversation that Moscone and Sheriff Cabral had concerning the 2004 campaign for Suffolk County Sheriff was when Moscone telephoned Sheriff Cabral and told her that he was not supporting Stephen Murphy. (Moscone Deposition, pg. 126, Defendant's Exhibit 19; Defendant's Undisputed Facts Nos. 207 & 208). Furthermore, Fact No. 208 is undisputed that Moscone never had a conversation with Chief of Staff Keeley, Superintendent Sumpter, Superintendent Harris, or Deputy Superintendent Theiss about his support for Murphy.

The summary judgment record establishes that the **only** time that Plaintiff Bergeron publicly demonstrated his support for Stephen Murphy was on September 14, 2004; the day the Democratic primary was held for the election for Suffolk County Sheriff, when he held a sign for Murphy at the Holy Name School. According to Bergeron's testimony, until he picked up the Murphy sign at the Holy Name School on September 14, 2004, no one knew that he supported Stephen Murphy. Further, the summary judgment record establishes that Bergeron did not speak with Sheriff Cabral on that date and that, at most, she walked by him when he held the sign. (Bergeron Deposition, pg. 65-68, Plaintiffs' Exhibit 5 to Opposition to Defendant's Motion for Summary Judgment). Bergeron admitted that he never had any conversations with Sheriff Cabral about his political affiliation and never verbally informed her that he was supporting Stephen Murphy. (Bergeron Deposition, pgs. 63-64, 70-74, Defendant's Exhibit 28). The summary judgment record does not support the Court's suggestion that Bergeron's conversation with Sheriff Cabral on March 2, 2004, almost one year before Bergeron was decommissioned, about issues concerning him as a union member

constituted political activity. (Plaintiffs' Exhibit 6 at pgs. 81-86, 98; Defendant's Exhibit 28 at pgs. 131-132).

In its decision, the Court mischaracterizes the interaction between Steve Tompkins and Plaintiffs Barnes and Grennon concerning the press release and Michael Harris' testimony regarding the extent to which support for Stephen Murphy was a consideration in recommending the names of 37 employees for decommissioning. (Docket No. 35 at pg. 14-15). The summary judgment record is clear that the statement attributed to Tompkins concerning Barnes and Grennon facing the prospect of losing their homes occurred at the end of the April 1, 2004 meeting with Sheriff Cabral (one year before the decommissioning) regarding the mailings issued by Plaintiffs Barnes, Grennon and Ellis to gain public support for the Union's bargaining position.[7] (Grennon Deposition, pgs. 192-202, Plaintiffs' Exhibit 2 to Opposition to Defendant's Motion for Summary Judgment; Barnes Deposition, pgs. 43-46, Plaintiffs' Exhibit 1 to Opposition to Defendant's Motion for Summary Judgment). Further, the summary judgment record makes clear that neither the 2004 election for Suffolk County Sheriff nor Stephen Murphy were discussed during the April 1, 2004 meeting with Sheriff Cabral. (Barnes Deposition, Exhibit 1 at pgs 46-48.) Moreover, this Court has construed the mailings issued by Barnes, Ellis, and Grennon as Union activity designed to "garner[] public support for the Union's bargaining position". (Document No. 35, pg. 11). Significantly this Court determined that this union activity was not entitled to First Amendment protection. Other than Grennon's Affidavit (Document 28), which was stricken by the

---

[7] Notably the summary judgment record is clear that Steve Tompkins, like Deputy Superintendent Carney, was not involved in the process that resulted in the recommendation of 37 names for decommissioning.

Court, there is nothing in the summary judgment record to support a separate meeting in which Tompkins confronted Barnes and Grennon.

Finally, Superintendent Harris did **not** concede at his deposition that the "plaintiffs' support for Murphy was discussed in relation to their decommissioning". (Docket No. 35, pg. 14, fn. 10). Harris' response was an equivocation about a general discussion that **might** have occurred and was not in relation to any specific plaintiff. Indeed, there was no follow-up concerning what that discussion consisted of, to the extent that it occurred at all. Further Superintendents Horgan, Sumpter, and Harris all stated definitively that political affiliation was not the reason that the plaintiffs or any of the other 37 employees were recommended for decommissioning. Indeed, the summary judgment record is replete with evidence of employees who were vocal and active supporters of Sheriff Cabral's opponent who were not decommissioned. (Defendant's Exhibits 4, 5 & 7).

>   **B.    The Plaintiffs Failed To Establish A Prima Facie Case Of Political Discrimination Under The Standard In The First Circuit.**

In it's Memorandum and Order of Decision, the Court cites to a 1994 First Circuit case, Jirau-Bernal v. Agrit, 37 F.3d 1, for the proposition that once a plaintiff establishes a prima facie case, the burden shifts to the defendant who can only prevail at summary judgment if her evidence "compel[s] the finding that political discrimination did not constitute a 'but for' cause of the [adverse action]." Jirau-Bernal v. Agrit, 37 F.3d 1, 3-4 (1st Cir. 1994) (Document No. 35 at pg. 14). However, in that case, there was **direct** evidence of discriminatory animus in the form of an affidavit of one of the defendants. Here, at most what the summary judgment record shows is that Sheriff Cabral knew that Moscone and perhaps Lynch attended a fundraiser with other Department employees who

9

were not decommissioned; Sheriff Cabral may have seen Plaintiff Bergeron holding a sign for Murphy on the date of the Democratic primary in September 2004; and Ellis, Barnes and Grennon issued mailings to Suffolk County voters that disparaged her and the Sheriff's Department and mischaracterized her positions on issues of concern to the Union.

Another case cited by the Court, Gonzalez-Pina v. Rodriquez, 407 F. 3d 425 (1st Cir. 2005), confirms what the Defendant argued in her summary judgment motion that in the First Circuit (1) a plaintiff must establish by clear and convincing evidence that the alleged adverse employment action resulted in unreasonably inferior working conditions; and (2) that mere knowledge of a plaintiff's political affiliation is insufficient to establish discriminatory animus. Gonzalez-Pina, supra at 431-432. In Gonzalez-Pina, the First Circuit determined that it did not need to decide whether the plaintiff had established "unreasonably inferior" working conditions because the plaintiff failed to link the defendant Mayor to any of the alleged discriminatory practices. Id. at 432. "[The Plaintiff's] support for a rival mayoral candidate in the primary, even if the Mayor was aware of such support, [was] by itself insufficient to establish discriminatory animus." Id. citing Padilla-Garcia v. Guillermo Rodriguez, 212 F.3d 69, 74 (1st Cir. 2000) (a showing of political animus "requires more than merely 'juxtaposing a protected characteristic-someone else's politics-with the fact that the plaintiff was treated unfairly'") (citations omitted). Here too, this Court does not need to reach the issue of whether the Plaintiffs have established by clear and convincing evidence that the decommissioning resulted in unreasonably inferior working conditions because, as set forth herein, the evidence

10

proffered by the Plaintiffs does not establish any discriminatory animus on behalf of Sheriff Cabral.

Although the United States Supreme Court suggested in <u>Rutan v. Republican Party of Illinois</u>, 497, U.S. 62, 75-76 (1990), that trivial acts of political discrimination may give rise to a constitutional claim, the standard in the First Circuit is that **only** those employment actions that result in employment conditions that are "unreasonably inferior" to the norm for that position are redressable. <u>Rosario-Urdaz v. Velazco</u>, 433 F.3d 174, 178 (2006) (emphasis added). In political discrimination claims involving employment actions short of outright dismissal, the First Circuit requires plaintiffs to prove by **clear and convincing** evidence that their "job had been rendered **'unreasonably inferior'** to the norm for that position and that the change was of a magnitude that would cause 'reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.'" <u>Bisbal-Ramos v. City of Mayaguez</u>, 467 F.3d 16, 22 (1st Cir. 2006) quoting <u>Agosto-de-Feliciano v. Aponte-Roque</u>, 889 F.2d 1209, 1217-1220 (1st Cir. 1989) (en banc) (emphasis added); <u>Torres-Martinez v. Puerto Rico Department of Corrections</u>, 485 F.3d 19, (1st Cir. 2007); <u>Gonzalez-Pina v. Rodriguez</u>, 407 F.3d 425, 431 (1st Cir. 2005).

The severity of harm that a plaintiff must establish to make out a cognizable claim of political retaliation is tantamount to that required for a constructive discharge. <u>Agusto-de-Feliciano</u>, 889 at 1218; <u>Mercado-Alicea</u>, supra at 52 (proof of constructive discharge requires working conditions imposed by the employer so onerous, abusive or unpleasant that a reasonable person in the employee's position would have felt compelled to resign); <u>Wilson v. Moreau</u>, 2007 WL 1866758 * 7. Requiring that proof of changed working

conditions be established by **clear and convincing** evidence is "consistent with the First Amendment interest of the governmental employer." Agosto-de-Feliciano, supra at 1220, (emphasis added), citing Addington v. Texas, 441 U.S. 418, 424 (1979) ("clear and convincing" standard has been used to protect notably important interests in civil cases).

The summary judgment record is clear that a deputy sheriff designation is not required to perform the essential functions of a jail officer. (Defendant's Exhibits 12: pg. 80; 15: pg.57 & 159; 29: pgs. 104 & 111; 37; and 47). Private paid details are not a part of the job responsibilities of a jail officer employed at the Suffolk County Sheriff's Department. (Defendant's Exhibit 49: Grennon Admission No. 6). Being denied an opportunity to take advantage of a privilege is insufficient to make out a constitutional injury. See Agosto-de-Felicano, supra at 1219. (An employee who has lost merely the "perks" of his position e.g. the best office or secretary, unlimited telephone access or minimal oversight, would not meet the "unreasonably inferior" standard).

Further, as the summary judgment record indicates, there are approximately 1100 employees in the Suffolk County Sheriff's Department, 800 of which are custody staff. The 37 employees (out of a total of 476 who held the designation of Deputy Sheriff) who were decommissioned included custody and non-custody staff. Clearly the loss of their commission did not relegate the Plaintiffs to the "minority of officers in the Department who were not entrusted with commissions". (Document No. 35, pgs. 4-5). Accordingly, the summary judgment record does not support a finding that the Plaintiffs established that their decommissioning constituted an adverse employment action under the standard for political discrimination cases in the First Circuit. Agusto-de-Feliciano, 889 at 1218; Mercado-Alicea, supra at 52 (proof of constructive discharge requires working conditions

imposed by the employer so onerous, abusive or unpleasant that a reasonable person in the employee's position would have felt compelled to resign); Wilson v. Moreau, 2007 WL 1866758 * 7.

The First Circuit also requires that in order to prevail on a political discrimination claim, a Plaintiff must point to evidence in the record that would "permit a rational fact finder to conclude that the challenged personnel action occurred and stemmed from a politically based discriminatory animus. Carrasquillo v. Pereira-Castillo, 441 F.Supp. 2d 363, 369 (D. P.R. 2006) quoting Rivera-Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994). Here, to the extent that Sheriff Cabral was even aware of their political affiliation, Plaintiffs Lynch, Moscone and Bergeron have failed to introduce sufficient evidence of their political activity **and** that Sheriff Cabral was aware of that activity. Further, the manifestation of their political activity (attendance at a fundraiser, making a financial contribution and holding a sign) is insufficient to establish that Sheriff Cabral knew of this support and decommissioned them **because** of it. Roman v. Delgado Altierei, 390 F.Supp.2d 94, 102-103 (D.P.R. 2005). (Knowledge of political affiliation cannot be merely established through testimony of having been seen or met during participation in routine campaign activity, having political propaganda attached to one's car or house or through the knowledge of third parties); Carrasquillo, 441 F.Supp.2d at 369 (Evidence of plaintiff's membership in political party, service as an electoral officer, attendance at political rallies, fundraising and other activity in support of political campaigns, not sufficient to survive summary judgment). Nor do the mailings issued by Ellis, Barnes and Grennon, clearly intended to provide them with some leverage in contract negotiations, constitute sufficient political activity. Accordingly, the Plaintiffs have

failed to make out a prima facie case of political discrimination under the standard articulated by the First Circuit.[8]

### C. Sheriff Cabral Is Entitled To Qualified Immunity

For purposes of qualified immunity, a "right is 'clearly established' when it is enunciated by a court of controlling authority in the defendant's jurisdiction in a case sufficiently similar in its facts 'that a reasonable officer could not have believed that [her] actions were lawful'". (Document No. 35, pg. 13, internal citations omitted). The First Circuit however, does not require that "the facts of prior cases [providing notice]…be materially similar…" Demayo v. Nugent, et al., __ F.3d __, 2008 WL 467081 (1st Cir. 2008) quoting Riverdale Mills Corp. v. Pimpare, 392 F. 3d 55, 65-66 (1st Cir. 2004) (internal citations omitted). As set forth above and in greater detail in the Defendant's Memorandum in Support of Her Motion for Summary Judgment, given the standard for political discrimination in the First Circuit, it is unreasonable to conclude that Sheriff Cabral would have known that divestiture of a jail officer's deputy sheriff commission in the context of this factual record would give rise to liability. Specifically, since the decommissioning did not result in unreasonably inferior working conditions for the Plaintiffs and the record is void of any evidence of discriminatory political animus it would be unfair to deny Sheriff Cabral qualified immunity.

### D. Conclusion

For all the reasons stated above the Defendant respectfully requests that this

---

[8] The Court cites a Tenth Circuit Court of Appeals opinion that concluded that depriving a deputy sheriff of a commission was of sufficient consequence to constitute a constitutional injury. Bass v. Richards, 308 F.3d 1081, 1088 (10th Cir. 2002). However, Bass involved a police officer for which the deputy sheriff designation was essential to the performance of his duties as a police officer. As discussed above that is not the case here.

Honorable Court reconsider its decision and grant Summary Judgment as to the remaining political discrimination claims of Plaintiffs Lynch, Moscone, Bergeron, Ellis, Barnes, and Grennon.

The Defendant respectfully requests to be heard on her motion.

>Respectfully submitted
>For Sheriff Andrea Cabral
>By her attorney,
>
>/s/ Ellen M. Caulo
>Ellen M. Caulo, BBO #545250
>Deputy General Counsel
>Suffolk County Sheriff's Department
>200 Nashua Street
>Boston, MA 02114
>(617) 961-6681

Date:   February 27, 2008

### Local Rule 7.1 Certification

I hereby certify that I conferred with counsel for the Plaintiff in an attempt to narrow the issues raised by Defendant's Motion for Summary Judgment.

>/s/ Ellen M. Caulo
>Ellen M. Caulo

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF).

>/s/ Ellen M. Caulo
>Ellen M. Caulo