UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
Defendant.

**PLAINTIFFS' OPPOSITION
TO DEFENDANT'S MOTION FOR RELIEF
FROM JUDGMENT PURSUANT TO
FED.R.CIV.P. 60**

## I. STATEMENT OF THE CASE

The plaintiffs' Motion for Relief is actually a Motion for Reconsideration asking this Court to reconsider its Memorandum and Order on Motion for Summary Judgment denying the defendant's Motion for Summary Judgment at to plaintiffs Lynch, Moscone, Bergeron, Ellis, Barnes and Grennon on Count I of their Complaint alleging political discrimination.

The plaintiffs file their opposition and request this Court to deny defendant's motion, and in addition, addresses the Court's concern as expressed on March 3, 2008 after defendant had filed her motion (Docket No. 37):

> The Court is disturbed by defendant's allegations that plaintiffs' counsel misrepresented the underlying record in his opposition to the motion for summary judgment . . .

## II. STANDARD OF REVIEW

Normally, interlocutory orders such as the partial denial of a summary judgment motion are not grounds for relief pursuant to Rule 60 of the Federal Rules of Civil Procedure. See Aguiar-Carrasquill v. Agosto-Alicea, 445 F.3d 19 (lst Cir. P.R. 2006). Indeed, an order granting summary judgment which adjudicates rights of fewer than all the parties is merely interlocutory and not a final judgment. Gagne v. Carl Bauer Schrauben Fabrick, Gambh, 595 F.Sup. 1081 (D.C. Me. 1984); however, while a motion to reconsider an interlocutory order is not governed by Fed.R.Civ.P. 60(b), it is within the discretion of the trial court to review. United Mine Workers of America 1974 Pension Trust v. Pittston Co., 793 F.Sup. 339 (D.D.C. 1992).

## III. ARGUMENT

### DEFENDANT'S MOTION SHOULD BE DENIED BECAUSE THE SUMMARY JUDGMENT RECORD SUPPORTS CLAIMS OF POLITICAL DISCRIMINATION WITH RESPECT TO PLAINTIFFS LYNCH, MOSCONE, BERGERON, ELLIS, BARNES AND GRENNON

The plaintiffs address defendant's concern which "contains numerous material factual assertions that are not supported by the summary judgment record" (Defendant's memorandum pages 2-3).

The plaintiffs address each specific contention made by the defendant.

### A. PLAINTIFF LORNE LYNCH

The defendant alleges that the reference to her being "pissed off" at Lynch for attending a fundraiser for her opponent Steven Murphy in East Boston has no immediate source in the record. Furthermore, the defendant argues that there is no reference anywhere in the record that defendant Cabral knew that Lynch had attended the fundraiser for Murphy.

On the contrary, Lynch's deposition indicates a conversation that he had with Captain Janelis indicating that Superintendent Eugene Sumpter made a comment that alluded to Cabral's knowledge of both Janelis' and Lynch's attendance at a fundraiser for Murphy in East Boston. To the extent that there is no reference to the use of the phrase "pissed off" by the sheriff in the plaintiffs' summary judgment motion, Exhibit A of the instant memorandum indicates the conversation that Lynch had with Cabral's subordinate Superintendent Eugene Sumpter. Lynch's conversation is directly with Superintendent Murphy who indicated that he was aware of people supporting Murphy and that those people who supported Murphy "were looking to gain something out of it through Murphy being there." (Exhibit A, p. 184).

Lynch then commented that he knew that Captain Janelis had been brought into an office the day after the election to discuss Janelis' own attendance at the Murphy fundraiser in East Boston (Id. at p. 186). Lynch indicated that Janelis had told him that Janelis had been called into Sumpter's office along with a Captain Casey and a Jerry Walsh, and that part of the discussion with Sumpter and Janelis had been the political event that both Janelis and Lynch attended (Id. at p. 188). Based on this conversation with Janelis, based on this conversation with Sumpter and Janelis, Lynch rightfully believed that the administration – including defendant Cabral – was aware of Lynch's support of her opponent Murphy (Id. at p. 188-189).

There is no intention by the plaintiff, Lynch, or his counsel to deceive the Court with respect to the use of the phrase "pissed off." As Lynch has stated, he believed that the defendant had received a donation list of supporters who had donated money to her opponent, Murphy (Id. at p. 189). Moreover, the clarification of the use of the phrase "pissed off" is expressed in the attached Affidavit of Lorne Lynch (see Affidavit of Lorne Lynch).

With respect to there being no evidence in the summary judgment record that Cliff

Carney told the plaintiff that “Cabral considers two types of good standing  those who do their job well and those support her,” the defendant is correct in saying that there is no support for this entire quote. However, the defendant has misinterpreted the quote as attributed to Carney.

The plaintiffs do not allege that Carney uttered that “there are two types of good standing, those who do the job well and those who support her,” but rather allege that Carney indicated “there’s two types of good standing.” The defendant’s reference to the remaining part of the phrase “those who do their job well and those who support her” is simply argument by the plaintiffs as to what Carney’s intent was by the use of the phrase “two types of good standing.” At no point does Lynch try to have this Court believe that, in fact, Carney said “two types of good standing, those who do their jobs well and those who support her.” What Carney said was, in fact, that there was “two types of good standing” (Exhibit A, p. 193). The remaining part of the phrase is simply argument used by the plaintiffs to emphasize exactly what Carney meant by the use of that phrase. As Lynch indicated later, what he assumed that Carney meant by the use of the phrase “two types of good standing” that there was “political and union activity and the way you do your job.” (Id. at p. 193).

**B. PLAINTIFF ALBERT MOSCONE**

The defendant indicates that “there is no evidence in the summary judgment record that Sheriff Cabral was aware that Moscone contributed $200.00 of his own money to Murphy’s campaign . . .” To the contrary, as alluded to with respect to the deposition testimony of Lynch, there was a “donation list” in which Lynch alluded Sheriff Cabral had received (Exhibit A, p. 189). Moreover, it is undisputed that Moscone had a fundraiser for Sheriff Cabral’s opponent Steven Murphy in the 2000 race for the Suffolk County Sheriff’s position and made phone calls on behalf of Murphy soliciting the support of others for Murphy’s candidacy. (Moscone

deposition, p. 104). Defendant's statement that plaintiff Moscone testified that he believed that he had sent a $200.00 check to the Murphy campaign (Exhibit B, Moscone deposition, pp. 107-108) and Lynch's assertion that there was a donation list held by defendant Cabral of all of the donations made to the Murphy campaign which support his retaliation claim.

Moreover, to the extent that the defendant claims that here is only "inadmissible hearsay" evidence of any knowledge of Cabral that Moscone was supporting Murphy, defendants own memorandum indicates that there was a direct conversation between Moscone and Cabral concerning the 2004 campaign for Suffolk County Sheriff in which Moscone telephoned Cabral and told her that he was not supporting Murphy (Moscone deposition, p. 126, defendants' Exhibit 19, defendants' undisputed facts nos. 207 and 208).

**C. PLAINTIFF DAVID BERGERON**

Bergeron supported Murphy, and it is obvious that at the September 14, 2004 Democratic primary, he held a sign for Murphy at the Holy Name School and had an interaction with the defendant (Defendant's Memorandum p. 7; see Memorandum in Support of Plaintiffs' Opposition to Defendant Cabral's Motion for Summary Judgment, p. 18; see also Plaintiffs' Exhibit 6 at pp. 81-86).

Finally, the defendant's statement that the "Court mischaracterizes the interaction between Steve Thompkins and plaintiffs Barnes and Grennons" and "Michael Harris' testimony regarding the extent to which support for Steven Murphy was a consideration in recommending the names of 37 employees for decommissioning" is simply misplaced. The fact that Thompkins indicated to Barnes and Grennon that they faced the prospect of losing their homes is knowledge of the sheriff's retaliation simply because of Thompkins position to the sheriff. The fact that it may have occurred one year prior to both plaintiffs being decommissioned misses the point. It is

not the length of time between what Thompkins said and the actions taken by defendant Cabral, but the fact that Thompkins said that Barnes and Grennon could face the prospect of losing their homes, that is important and relevant to the plaintiffs' claim against Cabral of retaliation.

The decommissioning of the plaintiffs is, in fact, an employment condition resulting in the plaintiffs being reduced to "an unreasonably inferior position." Stripping the plaintiffs of their deputy sheriff's commissioned status has resulted in a monetary loss to the plaintiffs because they are now forbidden to work details, for which the status of being a deputy sheriff is required. This situation has resulted in being rendered an "unreasonably inferior" position. Agosto DeFeliciao v. Aopnte-Roque, 889 F.2d 1209, 1217-20 (lst. Cir. 1989 *en banc*). See also Bisbal-Ramos v. City of Mayaguec, 467 F.3d 16, lst. Cir. 2006; Tores-Martinez v. Puerto Rico Department of Corrections, 485 F.3d (19 lst Cir. 207). The plaintiffs were, in fact, deprived of the benefit of deputy sheriff and the assignment of details which would logically lead a reasonable person to conclude that they have established a "unreasonably inferior" work environment.

Courts have held that depriving an employee of all or most of his work for an indefinite period can be sufficient to establish an "unreasonably inferior work environment." See Rosario-Urdaz, 433 F.3d at 179 ("utterly depriving an employee of work indefinitely . . . might make out a claim"); Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 432 (lst Cir. 2005) (holding that such facts were more than a scintilla of evidence, but reserving the question of whether they established unreasonably inferior conditions); Rivera-Jimeenez v. Pierluisi, 362 F.3d 87, 94095 (lst Cir. 2004) (denial of benefits and assignments sufficient to show adverse action); Rodriguez-Pinto v. Tirado-Delgado, 982 F.2d 34, 40 (lst Cir. 1993) (finding that plaintiff had made out a prima facie case of political discrimination where "since his reassignment, plaintiff only has been assigned

clerical tasks which take ten minutes a day to perform.)

## IV. CONCLUSION

For the reasons expressed above, the plaintiffs' Motion for Relief from Judgment Pursuant to Fed.R.Civ.P. 60 must be denied.

Plaintiffs, Bergeron, Grennon, Lynch,
Barnes, Ellis, Turley and Moscone,
By their attorney,

/s/ *Stephen C. Pfaff*
______________________________

Douglas I. Louison BBO# 545191
Stephen C. Pfaff BBO# 553057
Merrick, Lousion & Costello, LLP
67 Batterymarch Street
Boston, MA 02110
(617) 439-0305

CERTIFICATE OF SERVICE

I, Stephen C. Pfaff, hereby certify that on the 24th day of March, 2008, I served the foregoing by causing a copy to be directed electronically to Ellen Caulo, Esquire, Deputy General Counsel, Suffolk County Sheriff's Department, 200 Nashua Street, Boston, MA 02114.

/s/ *Stephen C. Pfaff*
________________________
Stephen C. Pfaff

EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 05-CV-11661-RGS

DAVID BERGERON, JOHN GRENNON, LORNE LYNCH, JOHN BARNES, JOHN ELLIS, TIMOTHY TURLEY, AL MOSCONE, WILLIAM PENEAU, ERIC DILIBERO and PAUL GIGLIO,
Plaintiffs,

vs.

ANDREA CABRAL, INDIVIDUALLY and as SHERIFF OF SUFFOLK COUNTY,
Defendant.

DEPOSITION OF LORNE LYNCH, a witness called on behalf of the Defendant, taken pursuant to the provisions of the Federal Rules of Civil Procedure, before Christine L. Warwick, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of the Suffolk County Sheriff's Department, 200 Nashua Street, Boston, Massachusetts 02114, on Friday, October 6, 2006, commencing at 10:00 a.m.

COPLEY COURT REPORTING
58 Batterymarch Street, Suite 317
Boston, Massachusetts 02110
(617) 423-5841

APPEARANCES:

SUFFOLK COUNTY SHERIFF'S DEPARTMENT
(Ellen M. Caulo, Deputy General Counsel)
200 Nashua Street
Boston, Massachusetts 02114
Counsel on behalf of the Defendant

MERRICK, LOUISON & COSTELLO, LLP
(Stephen C. Pfaff, Esquire)
67 Batterymarch Street
Boston, Massachusetts 02110
Counsel on behalf of the Plaintiffs

I N D E X

| Witness: | Direct |
|---|---|
| LORNE LYNCH (By Ms. Caulo) | 4 |

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 1 | Notice of Taking Deposition | 4 |
| 2 | Notice of Written Warning Dated 12/7/01 | 57 |
| 3 | Letter of Reprimand Dated 5/2/02 | 70 |
| 4 | Deposition Excerpts of Lorne Lynch, Pages 1, 12, 13, 14, 15 and 24 | 85 |
| 5 | Application for Deputy Sheriff | 97 |
| 6 | Policy S516, Deputy Sheriff Appointments | 104 |
| 7 | SCSD Departmental Policy S516 | 105 |
| 8 | Memo Dated 12/12/03 | 119 |
| 9 | Six-Page Memo Dated 4/28/04 | 138 |
| 10 | Article Dated 4/2/04 - "What A Mess! Promises Not Kept." | 150 |
| 11 | Policy S520, Date of Issue 1/1/00 | 158 |

PROCEEDINGS

(Document was marked as Exhibit No. 1 for identification.)

MS. CAULO: With respect to stipulations, we're using the ones we're operating on recently which are all objections except as to form are reserved until trial. All motions to strike are reserved until trial, and Mr. Lynch will have 30 days to review the deposition and sign it. We're waiving the requirement of the notary. Acceptable, Steve?

MR. PFAFF: Yes, sure.

LORNE LYNCH, of lawful age, being first properly identified and duly sworn, deposes and says as follows in answer to direct interrogatories

BY ATTORNEY CAULO:

MR. PFAFF: Also, I have to say on the record that the deponent is, in fact, Lorne Lynch. I, in fact, do know him. Irrespective of the fact that he does not have any identification, I can state for the record with 100 percent accuracy that it is Lorne Lynch sitting next to me.

Q. State your name and rank.

**that whole event. I just -- I had received a call from him. And we actually went over -- I just listened to what Murphy had to say.**
Q. Was his wife involved in organizing that event?
A. **She was there. She was there.**
Q. Who else organized it besides --
A. **I don't know who else, but there were numerous people I never saw there before. I would have to say the majority of the people that I saw I'd never seen there.**
Q. Where was that?
A. **In Boston, Orient Heights at a Chinese restaurant.**
Q. Did you participate in any phone banks for Stephen Murphy?
A. **No.**
Q. Attend any political meetings for him?
A. **No.**
Q. Volunteer on any committees?
A. **No.**
Q. Hold any signs?
A. **No.**
Q. March in any parades on his behalf?
A. **No.**
Q. A sign at your house?

A. **No.**
Q. Did you have a bumper sticker on your car?
A. **No.**
Q. Did your wife have a bumper sticker on her car?
A. **No.**
Q. Did you work the polls on election day?
A. **I did not, no.**
Q. When you attended this fund-raiser with Captain Moscone in late August and early September before the 2004 primary, did you see any other employees there from the Department?
A. **Yes.**
Q. Who did you see?
A. **I saw Captain Coleman, Matty Mullen, Kevin Janielis. I saw some former employees there, guys who retired, Peter Cipriano. Like I say, the majority of the people there I wasn't familiar with. They were from that side of the tracks. Meaning I'm from the other side of Boston. I really don't know East Boston and that area very well.**
Q. Okay. I didn't know what side of the tracks you were referring to.
A. **It's south and north of Boston. I meant nothing**

**else by that.**
Q. Other than Captain Coleman, Captain Moscone, Captain Janielis, and is it Lieutenant Mullen?
A. **Matthew Mullen.**
Q. I'm wondering what his status was?
A. **He was a lieutenant, temporary lieutenant.**
Q. Other than those individuals and yourself, did you see anybody else from the Department?
A. **Not off the top of my head.**
Q. Did you contribute any money to the Murphy campaign?
A. **Yes.**
Q. By check or by cash?
A. **Check.**
Q. How much?
A. **I don't recall. I don't recall if it was 100 or 200. I forget. Definitely at least a 100.**
Q. How many times did you contribute money?
A. **Just once.**
Q. How did you make your support of Stephen Murphy known within the Department?
A. **I didn't.**
Q. Were you vocal at all about your support for Stephen Murphy within the Department?

A. **If someone asked me, I would say who I was supporting, yes.**
Q. How many times did people ask you?
A. **Who knows. I don't recall -- I mean people asked, but I don't recall who asked.**
Q. Do you recall having discussions with fellow employees about your support for Stephen Murphy?
A. **No, not necessarily.**
Q. What do you mean not necessarily? What do you mean? Yes?
A. **I mean I just don't recall anything that stands out with having, with discussions with fellow employees in regard to that. I mean, I don't recall that.**
Q. Did you tell Sheriff Cabral that you were supporting Stephen Murphy for the Suffolk County sheriff's race?
A. **No.**
Q. Did you tell Victor Theiss?
A. **No.**
Q. Did you tell Elizabeth Kelly, the chief of staff?
A. **No.**
Q. Did you tell Superintendent Sumpter that you were supporting Stephen Murphy in the Suffolk County

Sheriff's Department race?

A. **No.**

Q. Did you tell Michael Harris that you were supporting Stephen Murphy in the Suffolk County sheriff's election?

A. **I don't recall. I don't think so.**

Q. What recollection do you have of having any conversation with Stephen, with Michael Harris before the 2004 Suffolk County sheriff's election?

A. **It's just that in the course of -- I've had numerous conversations with Michael Harris where I had, I know for a fact I didn't have these conversations with him because the other people I've never really spoke to or had any conversation with them. But my recollection is, no, I don't believe I discussed anything with Mike Harris.**

Q. And Gene Sumpter was no?

A. **No.**

Q. Cliff Carney, Deputy Superintendent Carney?

A. **Prior to, no.**

Q. Prior to, no. Okay. What evidence do you have that Sheriff Cabral knew that you supported Stephen Murphy?

A. **I think it was well-known throughout the entire**

**administration who supported who in this matter, things that were said to me in meetings, the way the events went down, the way things happened. I had a conversation with Gene Sumpter in regards to after the Department took away our overtime ratio. And I think we can actually go back to when our days off changed in December of 2004.**

After picking vacations, we were told -- there were a few of us told they were changing our days off. It's the first time in the history of the Department that I know of that they've ever changed your days off after you've picked your vacations.

You have to pick your vacations a year in advance. So you sit down with your family at the kitchen table, and you go over what we're doing for vacation in the next year. And those are based on your days off.

So I would have to say that was Step 1 until the events that came up after the election. The worst part is a year later, they promote two temporary lieutenants, and they give them my days off. I've been a lieutenant for sixteen years.

They took them away from one of the

lieutenants, but they let the other one keep it saying that he had more seniority. Next up is they take away our 7 to 1 ratio. They say it's cost-effective, about $22 for every $2,500 spent.

I speak to Gene Sumpter, which is Step 1 in the, Step 1 in the arbitration process to see if we can clear this up. In the course of this meeting, he gives me a dissertation on how people were looking to advance themselves under Murphy, and that's why they went for -- that's why they supported Murphy. Personal gain, that's the word, personal gain.

He went on to say that he used to emulate me, that I was one of the best lieutenants around but that I had too much to say. I walked out of that meeting knowing that that was, I had some serious issues here.

Q. When was that meeting?

A. **I'm going to say February of 2005.**

Q. How long did it take, the meeting?

A. **We were probably in there 20 minutes.**

Q. Anybody else there?

A. **No.**

Q. Why did you have the meeting?

A. **Because the Department had taken away our 7 to 1 ratio, and we were filing an arbitration on it, a grievance. And the Step 1 in the grievance process is to try to clear it up with the superintendent which is what we used to be able to do years ago.**

I went in to see him and asked him not to take away the 7 to 1. And in the course of that meeting, he got into people supporting Murphy and that people were looking to -- they were looking -- they were looking to gain something out of it through Murphy being there.

Q. Tell me everything you remember about what you said and what he said during the course of this 20-minute exchange that occurred sometime in February of 2005?

A. **The first thing we discussed was the 7 to 1 ratio, why they took it away from us, why it was going this route; that he could stop it from happening. He agreed that he could stop it from happening.**

We got into the impact bargaining aspect of it. They had two or three quick meetings with us. They knew what they were going to do. More or less I went in there to ask him to swear this

away or to increase the ratio number to 10 to 1 or 12 to 1.

After about 10 or 15 minutes of that, I know I didn't initiate it, but it came up that people were looking to advance themselves or for personal gain that supported Murphy. This is what he said.

Q. Tell me everything you recall how that came up.

**A. In the course of the conversation.**

Q. What did you say?

**A. In the course of the conversation. I said there's no personal gain for me because I'm quite happy where I am right now as a lieutenant. And I commented on my own. I said, Look it, I supported the man because I thought he was going to be a better sheriff. That's my right. But I'm not looking for any personal gain as far as Murphy was concerned or anybody else. I'm looking for a fair shake. That's it.**

Q. Prior to that moment in time when you said I supported the man because I thought he would be a better sheriff and that's my right, had you informed Gene Sumpter that you were supporting Stephen Murphy?

**A. I believe he knew it.**

Q. How did he know it?

**A. Because he opened up the conversation.**

Q. I'm asking you what evidence do have you that he knew it?

**A. He opened up the conversation as to people who were looking for personal gain.**

Q. We started down this road when I asked you specifically what evidence do you have that Sheriff Cabral knew specifically that you supported Stephen Murphy?

**A. I would believe that she would have known that through her superintendent, however he knew. I knew that Captain Janielis was brought into an office a day after the election, a couple of days after the election, and I know that there was some discussion as to if he attended this time or not.**

Q. When did this conversation take place?

**A. Which conversation are you referring to?**

Q. The one you're just talking about with Captain Janielis?

**A. February of 2005, right after we were informed that we were losing the 7 to 1, after the impact bargaining. So it was sometime in February.**

Q. When you say we, what do you --

**A. Meaning me. As the grievance coordinator, I went in to see him.**

Q. So it was just you and Superintendent Sumpter?

**A. And Gene, yes.**

Q. Now, you just referenced a meeting that Captain Janielis had with other unidentified people. Who did Captain Janielis meet?

**A. Captain Janielis I know was brought into the shift commander's office after the election.**

Q. In September or November?

**A. September.**

Q. After the primary --

**A. I believe it was after the primary election. I know he had told him that he had attended a Murphy, he was a Murphy supporter and that he had attended Murphy's time in Orient Heights.**

Q. He told who?

**A. I believe it was Gene Sumpter and whoever was at the meeting with him. I know Captain Casey was at the meeting with him. I think Jerry Walsh was at the meeting with him. But this is what was relayed to me.**

Q. Who related this to you?

**A. Kevin did.**

Q. Kevin Janielis?

**A. Yes.**

Q. Captain Janielis?

**A. Yes.**

Q. Who called him into this office, do you know?

**A. I don't know.**

Q. Tell me everything you recall about what he said to you about this meeting.

**A. He just said that he was called in, and they discussed, that part of the discussion was the political event that we attended.**

Q. Is Captain Janielis a deputy sheriff?

**A. Yes.**

Q. Has he been decommissioned?

**A. No.**

Q. So again --

**A. He's our shift commander.**

Q. So again, Lieutenant Lynch, do you have any evidence, do you have any direct evidence that Sheriff Cabral knew that you supported Steve Murphy?

**A. Once again, I believe my conversation with Gene Sumpter and the way he opened it up, they were**

**well aware of who I represented, who I was with. And I think everybody knew, had an idea of who was with who just through general knowledge and where people were coming and going. I believe they knew that.**

Q. What about your activities in support of Stephen Murphy, how would they know based upon what you did that you supported Stephen Murphy?

A. **Because they may have received a donation list. I mean, there's a million ways to find out who's supporting who. There are donation lists that they can get their hands on. They would know that I donated money to Steve Murphy.**

Q. On one occasion?

A. **On one occasion.**

Q. Other than that --

A. **They would know that the executive board, which was a lot of the guys who attended that, Rick Coleman, an executive board member, Matty Mullen, executive board member, Kevin Janielis, vice president of the union, we were all union members.**

Q. So how would that allow Sheriff Cabral to know that you, Lorne Lynch, supported Stephen Murphy?

A. **Once again, we need to go back to my meeting --**

MR. PFAFF: Objection. It's asked and answered.

A. **My meeting with Gene Sumpter on that day when I walked out of that office, I knew that I was going to have some issues with the way he addressed me at that meeting, okay. He emulates me one day, and the next day I'm nobody, that I'll never respect. Those are the sort of comments he made. I knew that I had an issue. Now in --**

Q. Is that based solely on your support for Stephen Murphy and for no other reasons?

A. **I think it has to do with my union activities, being the grievance officer, when Al Moscone was written up with this Tommy Derosa (phonetics) incident, my federal suit we have going on with the overtime differential.**

There were a lot of things that were leading up to this. We have issues going on, and I think -- I think that they came in, and they said, look it, we're going to take out the power brokers, these union guys. We're going to do what we can with them; and we're going to decommission, and we're going to show them who's boss.

Q. Is Captain Janiells involved in the union?

A. **Yes.**

Q. Mullen?

A. **Mullen is not because he's a temporary lieutenant at the time. With the temporary positions with everything that's going on with the promotions and everything, AFSCME, which is our union affiliate, came out and said they were no longer members of our local.**

Q. Captain Coleman involved?

A. **He was an executive board member, yes.**

Q. Is Captain Coleman a deputy sheriff?

A. **I think he is now. I know that they took him off the road for about a year.**

Q. Was he decommissioned?

A. **I don't know. I would imagine he was decommissioned. I don't know if he was or not.**

Q. Lieutenant Mullen, is he a deputy sheriff?

A. **He is.**

Q. Was he decommissioned?

A. **He was not.**

Q. I'm focusing right now -- we'll get to your union officer activities in awhile. Probably not today. I'm focusing now on your political activity. I'm

trying to understand from what you've testified to what is it about the way that you verbalized your support for Stephen Murphy or any actions you took on behalf of Stephen Murphy that would lead Sheriff Cabral to know that you supported him?

MR. PFAFF: Objection. Asked and answered. You can have it for the last time.

A. **My meeting with Gene Sumpter walking out of the office and then a comment made to me by Cliff Carney a couple of months after that leads me to believe that a combination of my political and my union affiliation is the only reason why this is happening.**

It's never been done, no one's ever been decommissioned other than for disciplinary reasons. I get a letter that I'm no longer in good standing as if I've done something wrong. I did nothing wrong.

Q. You mention this conversation with Superintendent Sumpter. Is that the only conversation you had with Superintendent Sumpter regarding the election for sheriff?

A. **Yes.**

Q. You just mentioned a comment made to you by Deputy

EXHIBIT
tabbies
B

DAVID BERGERON, ET AL,
Plaintiffs,
vs
ANDREA CABRAL,
Defendant.

DEPOSITION OF ALBERT J. MOSCONE,

COPLEY COURT REPORTING, INC.
101 TREMONT STREET
BOSTON, MASSACHUSETTS 02108
(617) 423-5841
www.copleycourt.com

PROCEE[illegible]

MS. CAULO: [illegible]
Deposition Notice as [illegible]

(Notice of Takin[illegible] marked as Exhibit Nu[illegible] for identification)

MS. CAULO: Please, swear in the witness.

ALBERT J. MOSCONE

a witness called on behalf of the respective parties, having been identified by license, and being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. CAULO:

Q. Good morning. We are here in the matter of Bergeron, et al versus Andrea J. Cabral. Today we are taking the deposition of Albert Moscone. My name is Ellen Caulo on behalf of Andrea J. Cabral. With me is Associate General Counsel, Kathy Cawley. Would you like to introduce yourself?

MR. PFAFF: I am Stephen Pfaff, representing the Plaintiff, Captain Albert Moscone. Usual stipulations?

MS. CAULO: Yes. All objections except as to form are reserved until trial. All motions to strike, unresponsive answers, to trial. Mr. Moscone will have thirty days to sign and we waive the requirement of a notary.

MR. PFAFF: Yes. Sign under the pains and penalties of perjury. I will get a copy of the transcript. When I get it, I will send it to you, you will read it, sign it, and do that within thirty days. Okay.

THE WITNESS: Okay.

Q. State your name, please.
A. Albert John Moscone.
Q. Where do you reside?
A. 189 Crescent Avenue, Revere, Massachusetts.
Q. Captain Moscone, I am Ellen Caulo. You are aware that I am here representing Sheriff Cabral?
A. Yes.
Q. I understand that you have been present for many of the depositions that have already been taken in this matter; but I want to remind you what the rules and procedures are.
A. Okay.

Q. I am here certainly to ask questions concerning the lawsuit that you and the other named plaintiffs have filed against Sheriff Cabral. If I ask you any question that you do not understand, please, let me know, and I will do my best to rephrase it.
A. Okay.
Q. You must give audible, verbal responses so the court reporter can take down your answers.
A. Okay.
Q. If you need to take a break at any time, let me know. If there is a question before you, answer the question, and then we can take a break.
A. Okay.
Q. Do you understand these rules?
A. Yes.
Q. Have you taken any medication in the last twenty-four hours?
A. Yes.
Q. What is that?
A. I am a diabetic. I have arrythmia. So I take Arytena for my arrythmia. I take Metformin for my diabetes.

A. I believe so.
Q. Why did you go to a pager system?
A. To make it a little more effective. It was getting huge.
Q. What do you mean?
A. We were having thirty a shift as opposed to five when the Big Dig started rolling.
Q. That started to taper off?
A. Yes.
Q. There is far fewer Big Dig associated details currently than there were in 2002, 2003, 2004; is that correct?
A. Yes.
Q. Who did you support in your 2004 Suffolk County Sheriff's election?
A. Stephen Murphy.
Q. Did you do any work on behalf of Mr. Murphy?
A. Some.
Q. What did you do?
A. Made telephone calls.
Q. What else?
A. Had a fund-raiser.
Q. You held a fund-raiser?
A. Yes.

Q. When did you hold the fund-raiser?
A. Two weeks prior to the election.
Q. When did you first start working for him, with respect to his political campaign for sheriff?
A. It was late June.
Q. Of?
A. When was the election, in '03? I am not sure when the election was. I helped him from June on.
Q. So the June before the election going forward?
A. That's correct.
Q. So prior to the June of the election year, you were not involved in any activities supporting Mr. Murphy's candidacy; is that fair?
A. Somewhat.
Q. It is either fair or not fair.
A. I am not sure if it was May or June. Yes. That's correct.
Q. You indicated that you made some phone calls. Where did you go to make these phone calls?
A. In my house.
Q. In addition to making phone calls, what kind of phone calls were they?
A. Just friendly, friend phone calls.

Q. Did you work off a list, did you call your own friends, how did this work?
A. There was a list generated for me by the Murphy campaign.
Q. Who was your contact in the Murphy campaign, did you meet with somebody regularly?
A. I just had one contact. Anthony Albano.
Q. Did you ever go to any campaign meetings?
A. I might have gone to one.
Q. Did you ever volunteer for any committees?
A. No.
Q. Did you hold any signs?
A. No.
Q. Did you March in any parades?
A. During the election?
Q. Yes.
A. No.
Q. Did you have a sign at your house, a political campaign sign, Murphy for sheriff?
A. I am not sure if I had a sign there or not. I may have.
Q. When did you put it up?
A. About a month before the election.
Q. Did you have a bumper sticker on your car?

A. No.
Q. You indicated that you held a fund-raiser. What did you do in order to hold this fund-raiser?
A. I called friends up, and had a small fund-raiser at my friend's restaurant.
Q. Where was it?
A. East Boston.
Q. What's the restaurant?
A. Kailua Hawaiian.
Q. When was it?
A. It was two weeks before the election.
Q. How did you publicize it?
A. Word of mouth. Phone calls.
Q. How many people were there?
A. Approximately, fifty.
Q. Were any employees from the department there?
A. Yes.
Q. How many?
A. Approximately, twenty.
Q. Who?
A. Rickey Colman, Kevin Janelis, Mike Donovan, myself, Michael Sinelli, Dave McCarthy. I would have to look at my list. I can't

remember the rest of the people down there.
Q. How did you contact these people and tell them that there was a fund-raiser for Mr. Murphy?
A. Telephone.
Q. Was John Grennon?
A. No.
Q. Tim Turley?
A. No.
Q. Mark Turley?
A. No.
Q. David Bergeron?
A. No.
Q. John Ellis?
A. I don't believe so.
Q. William Pino?
A. No.
Q. Eric Deleibro?
A. Yes.
Q. Paul Giglio?
A. Yes.
Q. Did you contribute any money to the Murphy campaign?
A. Yes.
Q. By cash or by check?

A. Check.
Q. How many times?
A. Once.
Q. How much?
A. I believe it was $200.
Q. Did you solicit money on that occasion for this fund-raiser for Mr. Murphy?
A. Yes.
Q. Were the individuals asked to come and contribute money to support his candidacy for sheriff?
A. I don't believe so.
Q. Did you take any checks from them, these individuals that arrived at this fund-raiser?
A. Yes.
Q. How much money did you raise for Mr. Murphy?
A. I believe it was under $5,000.
Q. In cash or check?
A. Check, I believe.
Q. All the money was provided to you by check or by cash?
MR. PFAFF: Objection. Asked and answered. He said check.
A. I believe most of it was check. I didn't

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11661-RGS

DAVID BERGERON, JOHN GRENNON,
LORNE LYNCH, JOHN BARNES,
JOHN ELLIS, TIMOTHY TURLEY,
AL MOSCONE, WILLIAM PENEAU,
ERIC DILIBERO and PAUL GIGLIO,
Plaintiffs,

V.

ANDREA CABRAL, INDIVIDUALLY and
as SHERIFF OF SUFFOLK COUNTY,
Defendant.

**AFFIDAVIT OF LORNE LYNCH**

I, Lorne Lynch, do hereby swear and depose the following:

1. After the September 2004 election, and sometime before February of 2005, I had a conversation with Superintendent Sumpter in which he inferred that the administration was aware of my support for Sheriff Cabral's opponent Steven Murphy;

2. I indicated to Superintendent Sumpter during the course of this conversation that I had no personal gain with respect to my support for defendant Cabral's opponent Murphy and I indicated that I supported him because I thought he was going to be a better sheriff;

3. Sometime in September of 2005, after the primary election, I had a conversation with Captain Janelis and he indicated that he had been called into Superintendent Sumpter's office and questioned about his attendance and my attendance at a fundraiser for Murphy in East Boston.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 24th DAY OF

MARCH, 2008.

                                                      /s/ *Lorne Lynch*
                                                      Lorne Lynch